**No. 26-1065**

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

FREE PRESS, NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES AND TECHNICIANS—COMMUNICATIONS WORKERS OF AMERICA, THE NEWSGUILD—COMMUNICATIONS WORKERS OF AMERICA, UNITED CHURCH OF CHRIST MEDIA JUSTICE MINISTRY, INC., AND PUBLIC KNOWLEDGE,

*Appellants-Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION,

*Appellee-Respondent*.

———————————

On Appeal from
an Order of the Federal Communications Commission,
MB Docket No. 25-331

———————————

## NOTICE OF APPEAL OR, IN THE ALTERNATIVE,
## EMERGENCY PETITION FOR WRIT OF MANDAMUS

———————————

Gigi B. Sohn
G Squared Strategies
3503 Alton Place, NW
Washington, DC 20008

Paul R.Q. Wolfson
Kali Schellenberg
Bradley Girard
Andrew Bookbinder
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

*Counsel for Appellants-Petitioners*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and D.C. Circuit Rule 26.1:

- Free Press certifies that it has no parent companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest.

- National Association of Broadcast Employees and Technicians—Communications Workers of America certifies that it has no parent companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest. National Association of Broadcast Employees and Technicians—Communications Workers of America is a sector of Communications Workers of America, which certifies that it has no parent companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest.

- The NewsGuild—Communications Workers of America certifies that it has no parent companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest. The NewsGuild—Communications Workers of America is a sector of Communications Workers of America, which certifies that it has no parent

i

companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest.

- The United Church of Christ Media Justice Ministry, Inc. certifies that it has no parent companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest.

- Public Knowledge certifies that it has no parent companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest.

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A. Parties and Amici.

Appellants/Petitioners (hereinafter "Public Interest Appellants") are Free Press, National Association of Broadcast Employees and Technicians—Communications Workers of America, The NewsGuild—Communications Workers of America, the United Church of Christ Media Justice Ministry, Inc. and Public Knowledge. Appellee/Respondent is the Federal Communications Commission (FCC). The following persons or entities also participated in proceedings before the Commission:

- American Federation of Teachers

- American Economic Liberties Project

- American Television Alliance

- Asian Americans Advancing Justice

- Asian and Pacific Islander American Vote

- Broadband Communications Association of Pennsylvania

- Broadband Communications Association of Washington

- Business Forward

- CCB License, LLC

- Center for American Rights

- Center for Journalism & Liberty at Open Markets Institute

- Christopher Rollins

- Cincinnati Bell Extended Territories LLC d/b/a AltaFiber

- Committee for the First Amendment

- Common Cause

- Consumer Action

- Digital First Project

- DIRECTV, LLC

- EchoStar Corporation

- Empowering Pacific Islander Communities

- Eric Williams

- Fourth Branch Action

- Get Free

- Hispanic Federation

- Hispanic Tech and Telecommunications Partnerships

- Indiana Cable and Broadband Association

- Indivisible

- Japanese American Citizens League

- Jim Petzel

- LGBT Tech

- Local Independent Online News Publishers

- Mafia Monthly

- Maher Akremi

- MANA, A National Latina Organization

- Media and Democracy Project

- Mississippi Internet and Television

- Multicultural Media & Correspondents Association

- Multicultural Media, Telecom and Internet Council

- NAACP

- National Action Network

- National Association of Black Owned Broadcasters

- National Black Justice Collective

- National Coalition on Black Civic Participation

- National Content & Technology Cooperative

- National Council of Asian Pacific Americans

- National Council of Negro Women

- National Hispanic Media Coalition

- National LGBTQ Taskforce Action Fund

- National Newspaper Publishers Association

- National Urban League

- Newsmax Media Inc.

v

- Nexstar Media Inc.

- NTCA-The Rural Broadband Association

- OCA-Asian Pacific American Advocates

- One Ministries, Inc.

- Public Citizen

- SAG-AFTRA

- Sean Patrick Patterson

- Sikh American Legal Defense and Education Fund

- Sinclair Inc.

- TEGNA Inc.

- Tennessee Cable and Broadband Association

- Terry B.

- The Leadership Conference on Civil and Human Rights

- TIG Advisors LLC

- VCTA—Broadband Association of Virginia

- Writers Guild of America East

- Writers Guild of America West

## B.    Ruling Under Review.

The ruling under review is the March 19, 2026 Media Bureau order granting the applications to transfer control of broadcast licenses held by TEGNA Inc. to

vi

Nexstar Media, Inc. The order is reproduced at App.1-40. One day after the Media Bureau issued its order, Public Interest Appellants, along with other parties, filed an application for review with the full Commission. As of this filing, the Commission has not acted on that application. Public Interest Appellants and those other parties simultaneously filed a motion asking the Commission to stay the Media Bureau's order and, due to the merger's supposed closure, requested a ruling by March 21 at 3 PM. Public Interest Appellants noted that, absent a ruling by that time, they would deem the stay motion to be denied. Nexstar has publicly stated that the merger has closed. App.673.

## C.    Related Cases.

Another group of appellants has filed a notice of appeal from the same Bureau order. *See Broadcast Communications Ass'n of Pa. v. Federal Communications Comm'n*, No. 26-1062 (filed March 21, 2026).

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................................... i

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. iii

TABLE OF AUTHORITIES ................................................................................. ix

GLOSSARY OF ABBREVIATIONS..................................................................... xi

INTRODUCTION..................................................................................................1

CONCISE STATEMENT OF THE NATURE OF THE PROCEEDINGS ...............2

CONCISE STATEMENT OF REASONS FOR APPEAL .......................................7

ARGUMENT ......................................................................................................10

I.    This Court has jurisdiction to review the Media Bureau's order as a "decision or order of the Commission." .........................................................10

II.   Alternatively, this Court should use its mandamus authority to direct the FCC to act on Public Interest Appellants' application for review and to stay the Media Bureau's order in the interim. ...................................14

CONCLUSION ...................................................................................................17

CERTIFICATE OF COMPLIANCE ....................................................................

CERTIFICATE OF SERVICE..............................................................................

# TABLE OF AUTHORITIES

## CASES

*Astroline Comm'cns Co. v. FCC*,
   857 F.2d 1556 (D.C. Cir. 1988)..................................................................10

*Bennett v. Spear*,
   520 U.S. 154 (1997)....................................................................................14

*Envtl. Def. Fund, Inc. v. Ruckelshaus*,
   439 F.2d 584 (D.C. Cir. 1971)....................................................................13

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021)......................................................................................3

*Friedman v. FAA*,
   841 F.3d 537 (D.C. Cir. 2016)..............................................................13, 14

*In re Nat'l Nurses United*,
   47 F.4th 746 (D.C. Cir. 2022).....................................................................14

*In re NTE Connecticut, LLC*,
   26 F.4th 980 (D.C. Cir. 2022)......................................................................15

*Sierra Club v. Thomas*,
   828 F.2d 783 (D.C. Cir. 1987)....................................................................14

## STATUTES

28 U.S.C. § 1651 .....................................................................................14, 15

47 U.S.C. § 151 .............................................................................................12

47 U.S.C. § 155 ..........................................................................................6, 12

47 U.S.C. § 307(a).........................................................................................3

47 U.S.C. § 309(d)(2)...................................................................................10

47 U.S.C. § 402(b)........................................................................1, 3, 10, 12, 14, 15

47 U.S.C. § 402(c).......................................................................................1, 10

Pub. L. No. 108-199, § 629, 118 Stat. 99 ..............................................................4

## REGULATIONS

47 C.F.R. § 0.283(c) .........................................................................................9

47 C.F.R. § 0.5(c) ............................................................................................9

47 C.F.R. § 0.61..............................................................................................12

Radio Broadcasting Services; Milano, TX, Final Rule; Dismissal of
  Petition for Reconsideration,
  72 Fed. Reg. 16283 (April 4, 2007) .................................................................4

## FEDERAL RULES

Fed. R. App. P. 15 ............................................................................................1

# GLOSSARY OF ABBREVIATIONS

| Abbreviation | Definition |
|---|---|
| App. | Appendix |
| FCC | Federal Communications Commission |

## NOTICE OF APPEAL

Pursuant to 47 U.S.C. § 402(b)-(c) and Federal Rule of Appellate Procedure 15, Free Press, the National Association of Broadcast Employees and Technicians—Communications Workers of America (NABET-CWA), The NewsGuild—Communications Workers of America (TNG-CWA), the United Church of Christ Media Justice Ministry, Inc. (UCC Media Justice), and Public Knowledge (collectively, Public Interest Appellants) hereby appeal the March 19, 2026 order of the Media Bureau approving the applications to transfer control of broadcast licenses held by TEGNA Inc. to Nexstar Media Inc, as well as the decision by the Commission constructively denying, through inaction in the face of emergency, the Public Interest Appellants' application for full Commission review of that order.

## INTRODUCTION

As described in the Notice of Appeal for the Broadband Communications Association of Pennsylvania, et al. ("Industry Appellants' Notice of Appeal"), No. 26-1062, this case involves the largest broadcast merger in history. In a decision that was pre-ordained by political direction from above, the Federal Communications Commission, nominally acting through the Media Bureau, rushed to approve the merger without regard for (a) statutory restrictions that make the approval impermissible, (b) procedural requirements that require a hearing at minimum before such a far-reaching decision with vast consequences for the media landscape can be

finalized, (c) the dramatically adverse consequences for the public interest—and in particular localism, viewpoint diversity, and competition in broadcasting—that will result from the merger, and (d) the harm the merger will have on broadcasting employees who are essential to the journalism required to fulfill licensees' public interest obligations under the Communications Act. As a result, Nexstar and TEGNA purported to consummate a merger that is illegal and that, if not stayed, could become nigh on irreversible. Under these unprecedented circumstances, an immediate stay is essential to preserve the status quo and to prevent irreparable harm to appellants and the public interest.

In the interest of judicial economy, Public Interest Appellants join in, and incorporate by reference, the arguments set forth in the Industry Appellants' Notice of Appeal and address in this Notice matters particular to the Public Interest Appellants.

**CONCISE STATEMENT OF THE NATURE OF THE PROCEEDINGS**

**1.** This appeal and petition for mandamus arise out of the August 19, 2025, announcement by Nexstar Media Group, Inc., stating it had reached a deal to acquire TEGNA. This deal would result in the largest merger in broadcast history. It would allow Nexstar to own or operate 265 full-power TV stations (259 with illusory "divestitures" two years hence that may never materialize) under one company reaching over 80% of U.S. television households, more than twice the 39% limit set

2

by Congress. In many markets, Nexstar would control half or more of all commercial stations airing English-language news, further consolidating already highly concentrated markets. Such market domination would undeniably "adversely affect" Appellants, their members, and the public, 47 U.S.C. § 402(b): The merger would entrench and extend Nexstar's dominant position in the market, reduce or eliminate substantial existing competition between firms, reduce or eliminate distinctive sources of and voices in local news, reduce or eliminate competition among firms for labor in the broadcast industry, further depress wages, kill local investigative journalism, close vital avenues and platforms for public interest nonprofit work, and impact ongoing and future union contract bargaining for cycles to come. It is also contrary to the Commission's statutory obligation to regulate broadcasting in the public interest, 47 U.S.C § 307(a), and to the Commission's longstanding adherence to promoting the values of competition, localism, and viewpoint diversity in broadcasting, *see FCC v. Prometheus Radio Project,* 592 U.S. 414, 418 (2021).

**2.** Nexstar and TEGNA jointly filed applications to transfer TEGNA's broadcast licenses to Nexstar, which the FCC accepted for filing on December 1, 2025. In accordance with the pleading cycle announced by the FCC's Media Bureau, Public Interest Appellants—a labor union with members that work for both Nexstar and TEGNA and in markets where each owns stations, along with three nonprofit groups dedicated to promoting diverse and public interest oriented broadcast and

news coverage—filed a petition asking the FCC to deny the application or (at minimum) to designate the applications for hearing. Public Interest Appellants explained the merger would violate the Consolidated Appropriations Act of 2004 (the 2004 Appropriations Act), which directed the FCC to impose a "39 percent national audience reach limitation." Pub. L. No. 108-199, § 629, 118 Stat. 99-100; *see also* 72 Fed. Reg. 16283, 16284 & n.7 (Apr. 4, 2007). Public Interest Appellants also explained that Nexstar's acquisition of TEGNA is presumptively unlawful under U.S. antitrust law, that the merger would not serve the public interest, and that the deal would further concentrate the broadcast market and violate the FCC Local Multiple Ownership rule.

**3.** On March 19, 2026, the Media Bureau granted the applications and denied Public Interest Appellants' petitions to deny. Eschewing "strict application" of legal limits, *see* App.14 ¶ 30, the Bureau allowed Nexstar to acquire TEGNA's licenses. The Bureau concluded that the FCC was free to waive Congress's 39% national cap, codified in the 2004 Appropriations Act. *See* App.17-18 ¶¶ 36-38, n. 120, 123. Likewise, the Bureau waived the local-ownership cap. App.21-24 ¶ 49-54.

The Bureau next addressed—and quickly dismissed—the reams of public-interest harms raised by opponents of the merger without addressing the specific facts and arguments they raised. *See, e.g.*, App.28-30 ¶¶ 65-76. Instead, the Bureau

relied on "commitments" made by Nexstar to conclude that "the Transaction will not raise any material public interest harms." *See* App.28 ¶ 65.

As support for these so-called commitments, and for many of its factual conclusions, the Bureau did not cite any declarations or affidavits. Instead, it cited a letter that Nexstar sent to Chairman Carr on March 19—*the day of the decision. See, e.g.*, App.29 ¶ 69 n. 223-25. The March 19 Letter is not sworn, and it does not contain any citations to support its factual assertions. *See* App.667-670. Yet the Bureau cited the letter 26 times to support its conclusions.

The Bureau devoted one paragraph to the public interest in localism and viewpoint diversity—concluding that "access to national and state news bureaus" will provide "public interest benefits to viewers" without explaining what those benefits are or why they serve localism or viewpoint diversity. App.32 ¶ 81. The Bureau simply quoted a party *supporting* the merger to conclude (once again, without support) that the merger will "enhance the ability of local stations to invest in journalism," and that "[t]he record contains no evidence" that the merger "will reduce local news output, eliminate independent editorial judgment, or diminish viewpoint diversity." App.32 ¶ 81 (quoting Digital First Project's Reply at 1).

Finally, turning to potential public-interest benefits of the merger, the Bureau recognized that benefits are cognizable only if they are verifiable and flow to consumers. App.33 ¶ 83. Nevertheless, the Bureau again described the benefits of

the merger in vague terms—quoting Nexstar's statements to conclude that Nexstar will have "the ability" to invest in local news, that Nexstar believes the merger is "the best course for the future," and that its March 19 Letter committed (for two years) to "increase the amount and availability of local programming in the aggregate." App.33-34 ¶¶ 83-84.

**4.** The Media Bureau's order obviously represents the Commission's decision; indeed, the Commission simultaneously issued a press release commending the Bureau's order, noting the "agency decision" approving the order and stating that "the FCC acts" and "the agency ensures" through that order to promote broadcasting. App. 671.

One day after the Media Bureau issued its order, Public Interest Appellants, along with other parties, filed an application under 47 U.S.C. § 155 for full Commission review, as well as a motion to stay the Media Bureau's order. App.676-708, 709-732. Given that Nexstar has stated that the merger has already closed, App.673, Public Interest Appellants requested a stay ruling by March 21 at 3:00 PM. Public Interest Appellants further noted that, absent a ruling by that time, they would seek emergency relief from this Court. App.713, 730.

This appeal and petition followed. Public Interest Appellants are simultaneously filing an application asking this Court to stay the Media Bureau's order pending disposition of this appeal and petition.

**CONCISE STATEMENT OF REASONS FOR APPEAL**

1.      The decision to waive the 39% national audience reach limitation was contrary to law and in excess of statutory authority. The 2004 Appropriations Act makes abundantly clear that the FCC does not have the authority to decide when to apply the cap, an understanding that is reinforced by the statutory history, the regulatory history, and the major-questions doctrine.

2.      The decision to waive the 39% national audience reach limitation was also arbitrary and capricious, as it departs from the FCC's prior precedent, and the Commission provided insufficient reasoning for the decision. The waiver was also arbitrary and capricious because it failed adequately to consider important aspects of the problem before the Commission as well as factors that Congress intended the Commission to consider, and the Commission has long considered, including the principles of competition in broadcasting, localism, and viewpoint diversity that have long been fundamental to the Commission's regulation of broadcasting in the public interest.

3.      The decision to waive the Local Television Ownership Rule in 21 Designated Market Areas was arbitrary and capricious. Granting these waivers will give Nexstar market power far exceeding levels that the federal antitrust agencies deem presumptively unlawful and will cause substantial and predictable harm to television viewers, news consumers, subscribers to cable and satellite television

systems, broadcast workers, and advertisers. The Media Bureau failed to offer any reasoned explanation for how this waiver promotes competition, localism, and diversity in local broadcast markets, crediting Applicants' implausible argument that stations described as strong to investors cannot survive absent this merger, and failed to consider multiple relevant aspects of the problem. Its approval of these waivers, in the face of these core statutory and policy mandates, renders the decision arbitrary and capricious.

4.     The Bureau's finding that Nexstar did not need to make a detailed showing that its duopolies served the public interest because there were no "cognizable public interest harms identified in the record," App.21 ¶ 48, is arbitrary and capricious. On the contrary: there was a substantial record identifying public interest harms, and the Bureau engaged in unreasoned decision making in finding otherwise.

5.     The determination that this merger serves the public interest, App.28-35 ¶¶ 65-88, is arbitrary and capricious. The Bureau's errors here are manifest, including that it failed to engage with the substantial record identifying public interest harms and contradicting the merger's purported public interest benefits, failed to consider multiple relevant aspects of the problem, departed from its' previous precedent, and erred in in its reliance on Nexstar's March 19 letter.

6.      The Bureau's order was arbitrary and capricious and in excess of statutory authority because it was procedurally infirm and violated FCC regulations limiting the Media Bureau's authority. Under 47 C.F.R. § 0.283(c), the Media Bureau lacks authority over "novel questions of law, fact or policy that cannot be resolved under existing precedents and guidelines," and must "refer" license-transfer applications that present such questions to "the Commission en banc for disposition." *See also id.* § 0.5(c) ("[T]he Commission has delegated authority to its staff to act on matters which are *minor or routine or settled* in nature." (emphasis added)). Among other novel questions, the Commission has never before purported to waive the 39% national audience reach limitation in the context of an application to transfer broadcast licenses. The Media Bureau thus violated FCC regulations by declining to refer these applications to the full Commission.

7.      The Media Bureau's order was also procedurally irregular, and arbitrary and capricious in granting the license-transfer applications, because, acting under political directions to approve the merger, it rushed to a decision in record time without designating applications for a hearing, and it uncritically credited all of Nexstar's assurances in the face of conflicting evidence and without testing them in an adversarial setting. The Commission must designate applications for a hearing if, assuming the facts set forth in a petition to deny are true, there is at least a substantial and material question of fact presented in the record, or if the Commission for any

9

reason is unable to find that granting the applications furthers the public interest. *See* 47 U.S.C. § 309(d)(2); *Astroline Comm'cns Co. v. FCC*, 857 F.2d 1556 (D.C. Cir. 1988). Here, Appellants' petitions to deny presented several substantial and material questions of fact, and identified several reasons why granting the applications would not further the public interest—including increased consumer prices, harms to local news and relevant workforces, and recent prior statements by both the Department of Justice and the FCC itself that violations of the 39% national audience reach limitation by Nexstar could only be remedied through divestiture. App.337, 373-374.

## ARGUMENT

### I.    This Court has jurisdiction to review the Media Bureau's order as a "decision or order of the Commission."

Under 47 U.S.C. § 402(b), "decisions [or] orders of the Commission" granting or denying "an application for authority to transfer" broadcast licenses may be appealed to this Court by "any … person who is aggrieved or whose interests are adversely affected." Congress further prescribed that this Court "shall have jurisdiction of the proceedings and of the questions determined therein" and "shall have power … to grant such temporary relief as it may deem just and proper" "by order[] directed to the Commission or any other party to the appeal." *Id.* § 402(c).

There is no doubt that Public Interest Appellants' "interests are adversely affected" by the Media Bureau's order—and, in fact, the Bureau concluded that four

of the Public Interest Appellants had standing before the agency to challenge Nexstar's application, at least in significant part. *See* App.26-27 ¶ 60. Public Interest Appellants are a labor union and three nonprofit media organizations dedicated to a just and equitable media landscape. The union represents thousands of members who work in media markets, including where Nexstar and TEGNA currently operate separate stations. The union would be adversely affected by dramatic changes in the labor market that will result from the merger, including a serious contraction in the market for broadcast station employee labor, as Nexstar and TEGNA move to combine their operations and eliminate overlapping positions. Those members, and their union, will be adversely affected in their negotiations over labor contracts with the resulting combined entity.

The other Public Interest Appellants will likewise be adversely affected by the merger. Free Press, UCC Media Justice, and Public Knowledge are organizations dedicated to the protection of diverse, local, and public-interest-oriented broadcasting reflecting diverse sources. Those missions are frustrated by corporate mergers, including the Nexstar-TEGNA merger, that predictably result in a decline in the quality and quantity of local news coverage, as local community-oriented news is supplanted by formulaic broadcasting directed by the corporate parent and repeated over commonly owned stations. In addition, Free Press and UCC Media Justice have individual members who depend on local broadcasting for access to

11

diverse and election and public-interest-oriented news, and that news coverage is certain to wither if the merger is consummated. In addition, access to local broadcasting will become more expensive for those members; now that the Media Bureau has blessed transferring TEGNA's licenses to Nexstar, Nexstar will have new-found power to demand higher and higher retransmission consent fees in those markets from cable and satellite operators, and those operators will inevitably pass on those costs to individual consumers.

Although the order issued nominally from the Media Bureau, it is clearly attributable to the full Commission and represents a "decision [or] order of the Commission," 47 U.S.C § 402(b). In the first place, the Commission itself claimed credit for the Bureau's decision in a press release and touted it as an "agency decision." App.671. Further, Congress gave the FCC authority to administer a system of broadcast licenses, *see* 47 U.S.C. § 151, and the Commission delegated the authority to process applications to transfer those licenses to the Media Bureau in certain circumstances, *see* 47 C.F.R. § 0.61. The Media Bureau purported to act pursuant to that delegation here. *See* App.36 ¶ 94. By statute, "[a]ny order … made or taken pursuant to any such delegation … shall have the same force and effect, and shall be made, evidenced, and enforced in the same manner, as orders … of the Commission," provided that the Commission had an adequate opportunity to review the order. 47 U.S.C. § 155(c)(3).

As noted above, the day after the Media Bureau issued its order, Public Interest Appellants filed an application for review of the order and a motion to stay with the full Commission. *See supra* p. 6. That application advised the Commission that, given the already-announced closure of the transaction and the imminent integration of the two companies, if the Commission did not act within twenty-four hours, Public Interest Appellants would seek emergency relief from this Court. Under these circumstances, the Commission's failure to act on the application for review in the face of such urgency is fairly characterized as a decision of the Commission upholding the order of the Media Bureau.

That approach fully accords with this Court's "pragmatic and flexible" approach "to ensure justice" in cases of agency inaction. *Friedman v. FAA*, 841 F.3d 537, 543 (D.C. Cir. 2016). When an agency's "actions suggest the [agency] has made up its mind," it cannot "seek[] to avoid judicial review by holding out a vague prospect of reconsideration." *Id.* In other words, "the applicable test is not whether there are further administrative proceedings available, but rather 'whether the impact of the order is sufficiently "final" to warrant review in the context of the particular case.'" *Id.* at 542 (quoting *Envtl. Def. Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 591 (D.C. Cir. 1971)).

Here, the Media Bureau's order represents the decision of the Commission. In the first place, the Commission has said that it is. *See* App.671. And nothing about

the Media Bureau's order is "tentative or interlocutory," *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The Media Bureau through its order unquestionably "determined" "rights [and] obligations" and set "legal consequences" into motion, *Bennett*, 520 U.S. at 177-78; Nexstar, relying on the Bureau's order, has already announced the closure of the merger. App.673. In these circumstances, the Commission's silence amounts to "a constructive denial" of Public Interest Appellants' application. *Friedman*, 841 F.3d at 541.

Because the Court has jurisdiction over this appeal under 47 U.S.C. § 402(b), it should proceed to take up Public Interest Appellants' emergency motion for stay, which is being filed with this notice.

**II.    Alternatively, this Court should use its mandamus authority to direct the FCC to act on Public Interest Appellants' application for review and to stay the Media Bureau's order in the interim.**

Even if this Court has questions regarding its jurisdiction to review the Media Bureau's order, this Court has jurisdiction "to issue a writ of mandamus to compel the agency to take final action." *Sierra Club v. Thomas*, 828 F.2d 783, 795-96 (D.C. Cir. 1987) (citing 28 U.S.C. § 1651); *see also In re Nat'l Nurses United*, 47 F.4th 746, 753 (D.C. Cir. 2022). Here, to preserve the status quo and prevent irreparable harm to Public Interest Appellants, the Court should order the Commission to act expeditiously on the application, and to stay the Media Bureau's order while the Commission does so. Such action is essential to preserve Public Interest Appellants'

14

right to seek judicial review of the Commission's actions, which Congress has guaranteed in 47 U.S.C § 402(b). If Nexstar and TEGNA proceed to fully consummate a merger that could be impossible to unwind after lengthy court proceedings—which they are endeavoring to do given that the Commission is not acting expeditiously to take up Public Interest Appellants' application for review and motion for stay—the Public Interest Applicants' right to judicial review will be rendered illusory.

As this Court has explained, relief in the form of mandamus under 28 U.S.C. § 1651 is available and appropriate when (a) the Court acts to preserve its own jurisdiction, or (b) a party seeking judicial review faces irreparable harm caused by a non-final agency action and presently has no other avenue of review. *See, e.g., In re NTE Connecticut, LLC*, 26 F.4th 980, 987 (D.C. Cir. 2022). This case readily fits into both categories.

First, given the speed at which Nexstar and TEGNA proceeded to close their merger, there is a serious concern that, if the Commission does not act expeditiously to take up the application for review and motion for stay, the Commission and Nexstar will argue the merger is effectively impossible to unwind, and that this case is moot. Whether or not that mootness argument would eventually prevail, the possibility is sufficiently concerning that the Court should act now to preserve the statutory right of the opponents of the merger to obtain judicial review.

Second, Public Interest Appellants face irreparable harm and—if the Court concludes that the Media Bureau's order is not properly characterized as Commission action—have no other avenue to seek review of the harmful effects of that order. For the reasons set forth in the Public Interest Appellants' motion to stay, also filed today, the Media Bureau's order will gravely impair their, and their members', interests in vibrant and diverse local news coverage—particularly in the months leading up to an election year when voters are evaluating many state and local candidates—as Nexstar increasingly concentrates news programming to fit a centralized template. This order will also lastingly distort labor markets to the serious disadvantage of the union appellant's members, and will cause economic harm in the form of increased costs passed on to consumers by cable and satellite operators who will pay higher retransmission consent fees to Nexstar. All of those harms are contrary to the public interest as well. And the Commission would face no harm from a pause of its order while the full Commission, and later this Court, have the opportunity to review the serious concerns raised by this merger. Nor will Nexstar and TEGNA suffer from any irreparable harm from a modest delay in the full consummation of their merger.

**CONCLUSION**

The Court should lodge the appeal and grant Public Interest Appellants' accompanying motion to stay the Media Bureau's order forthwith. Alternatively, the Court should issue a writ of mandamus directing the full Commission to act on Appellants' application for review and to stay the Media Bureau's order pending this Court's review. Following briefing and argument, the Court should reverse the Media Bureau's order and remand with instructions to grant Appellants' petitions to deny.

Respectfully submitted,

Gigi B. Sohn
G Squared Strategies
3503 Alton Place, NW
Washington, DC 20008

s/ *Paul R.Q. Wolfson*
Paul R.Q. Wolfson
Kali Schellenberg
Bradley Girard
Andrew Bookbinder
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

*Counsel for Appellants-Petitioners*

March 23, 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and D.C. Circuit Rule 32(e) because it contains 3,781 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(a)(1).

2. This brief complies with Federal Rule of Appellate Procedure 32(a)(5)'s typeface requirements and Federal Rule of Appellate Procedure 32(a)(6)'s typestyle requirements because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

March 23, 2026

s/ *Paul R.Q. Wolfson*
Paul R.Q. Wolfson

## CERTIFICATE OF SERVICE

I certify that, on March 23, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. Consistent with 47 C.F.R. § 1.13(b), I also served a true copy of the foregoing upon the Commission's general counsel by email to LitigationNotice@fcc.gov. Consistent with 47 U.S.C. § 402(d), I will provide a courtesy copy of the foregoing to all other parties listed in section A of the certificate as to parties, rulings, and related cases appended to the front of this filing.

s/ *Paul R.Q. Wolfson*
Paul R.Q. Wolfson

# APPENDIX

# TABLE OF CONTENTS

Memorandum Opinion (Mar. 19, 2026) ..........................................................App.1

Nexstar Merger Application (Dec. 1, 2025) ..................................................App.41

Industry Petition to Deny (Dec. 31, 2025) ..................................................App.328

Public Interest Petition to Deny (Dec. 31, 2025).........................................App.406

Public Interest Parties Reply ISO Petition to Deny (Jan. 27, 2026) .............App.642

Localism Letter (Mar. 19, 2026) ................................................................App.667

Chair Carr's Press Release (Mar. 19, 2026).................................................App.671

Nexstar Press Release (Mar. 19, 2026) ........................................................App.673

Emergency Application for Review (Mar. 20, 2026)....................................App.676

Emergency Petition for Stay and Injunction Pending Appeal
(Mar. 20, 2026) .........................................................................................App.709

Declaration of Ronald J. Gabalski (Mar. 22, 2026) .....................................App.733

Declaration of John Bergmayer (Mar. 22, 2026) .........................................App.743

Federal Communications Commission                                              DA 26-267

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | **)** |
| | **)** |
| Applications for Consent to the Transfer of Control | **)**    MB Docket No. 25-331 |
| of TEGNA Inc. to Nexstar Media Inc. | **)** |
| | **)**    LMS File Nos. 0000280940 et al. |

**MEMORANDUM OPINION AND ORDER**

Adopted:  March 19, 2026                                          Released:  March 19, 2026

By the Chief, Media Bureau:

**TABLE OF CONTENTS**

Heading                                                                                      Paragraph #

I.   INTRODUCTION ........................................................................................................1
II.  BACKGROUND .........................................................................................................8
     A.  Description of Transaction....................................................................................8
     B.  Transaction Review Process ...............................................................................10
III. STANDARD OF REVIEW AND PUBLIC INTEREST FRAMEWORK ...........................17
IV.  QUALIFICATIONS OF APPLICANTS AND COMPLIANCE WITH
     COMMUNICATIONS ACT AND FCC RULES AND POLICIES ......................................21
     A.  Applicants' Qualifications .................................................................................22
     B.  Compliance with the Communications Act and FCC Rules and Policies .....................24
         1.  National Television Ownership Rule ................................................................25
         2.  Local Television Ownership Rule .....................................................................46
         3.  Divestitures...................................................................................................55
V.   STANDING.................................................................................................................56
VI.  POTENTIAL PUBLIC INTEREST HARMS AND BENEFITS ........................................65
     A.  Potential Public Interest Harms .........................................................................77
     B.  Potential Public Interest Benefits.......................................................................83
VII. CONCLUSION ..........................................................................................................89
VIII. ORDERING CLAUSES .............................................................................................90
APPENDIX – TEGNA Transfer of Control Applications

**I.    INTRODUCTION**

        1.      The American people benefit from access to trusted sources of local news and information.  As newspapers have closed by the dozen in communities across the country, local broadcast TV stations and the talented reporters that work there have become even more important.  Often, they are the ones in a market doing the gumshoe reporting that citizens value and need.  Today, the FCC takes an action that empowers these local broadcast TV stations to serve the public interest, and it does so by enabling them to expand the production of local news and information.  This is especially so given the concrete commitments that Nexstar has made in the record, including on affordability, localism, and their commitment to divest a number of TV stations.

        2.      Put simply, our action today promotes the FCC's longstanding media policy goals of competition, localism, and diversity.  It does so by allowing the relevant local broadcast TV stations to continue and in fact expand their investments in local news.  It does so by allowing them to compete more

**App.1**

effectively in the modern media marketplace. And it does so by allowing them to counteract the growing imbalance of power between those local broadcast TV stations on the one hand and the powerful Big Four national programmers on the other—namely, Comcast, Disney, Paramount, and Fox. While the FCC adopted its TV ownership rules at least in part to strike an appropriate balance of power between the Big Four national programmers and local broadcast TV stations, strict application of our rules in this case would run counter to the very reason for those agency regulations. Approving this transaction—which will allow Nexstar to own less than 15% of television stations—will promote a more balanced relationship between the Big Four and the relevant local broadcast TV stations.[1]

3.      Therefore, by this *Memorandum Opinion and Order*, the Media Bureau (Bureau) grants the applications (Applications) seeking consent to the transfer of control of TEGNA Inc. (TEGNA) to Nexstar Media Inc. (Nexstar, and, together with TEGNA, the Applicants), a wholly owned subsidiary of Nexstar Media Group, Inc.[2] In doing so, we grant the Applicants' request for a waiver of the Commission's National Television Ownership Rule.[3] As discussed below, the full Commission has previously determined that the agency has the authority to change or modify the current 39% National Television Ownership Rule. As with other FCC rules, the agency also has authority to waive the rule, and we take that step here today in the context of this specific transaction.

4.      As indicated above, we grant this waiver in recognition of the dramatic changes that have taken place in the media marketplace since the National Television Ownership Rule was last updated by the FCC twenty years ago. Since then, there has been an explosion of distribution technologies and programming, which has given viewers more choice and has further strengthened the bargaining position of large Big Four national programming networks relative to their broadcast affiliate stations, like many of those owned by Nexstar and TEGNA. Grant of the relevant waiver, based on the record in this transaction, will most effectively further FCC media policy goals, help promote better service in local markets, and benefit consumers.

5.      Turning from the FCC's National Television Ownership Rule to our local one, in the seventeen Nielsen Designated Market Areas (DMAs) where Nexstar proposes to form or acquire a combination of two full power television stations, we find that these combinations comply with the Commission's Local Television Ownership Rule and grant them herein. Regarding Nexstar's proposed ownership of more than two full power television stations in twenty-three DMAs,[4] we grant the Applicants' requests for waiver of the Commission's Local Television Ownership Rule, subject to the

---

[1] As originally proposed, the transaction would result in Nexstar owning 265 full power television stations. Nexstar has committed to divesting 6 stations, bringing the total to 259 after divestiture. This equates to less than 15% of the 1,777 full power television stations. Additionally, there are 397 Class A television stations and 1,760 low power television stations. *See Broadcast Station Totals as of December 31, 2025*, Public Notice, DA 26-49 (Jan. 13, 2026), https://docs.fcc.gov/public/attachments/DA-26-49A1.pdf.

[2] The Appendix provides a complete list of the Applications and the subject broadcast television station licenses. The Applications are on file with the Federal Communications Commission (FCC or Commission), which can be found in the Commission's Licensing and Management System (LMS). In addition, the Applicants separately have filed applications for consent to the transfer of control of the TEGNA subsidiaries' earth station, microwave, and land mobile facilities.

[3] 47 CFR § 73.3555(e) (National Television Ownership Rule).

[4] 47 CFR § 73.3555(b) (vacated in part by *Zimmer Radio of Mid-Missouri, Inc. v. FCC et al.*, 145 F.4th 828 (8th Cir. 2025) (*Zimmer Radio*)) (Local Television Ownership Rule). These DMAs are: Dallas-Fort Worth; Houston; Washington, DC (Hagerstown); Tampa-St. Petersburg (Sarasota); Phoenix (Prescott); Denver; Cleveland-Akron (Canton); Charlotte; Portland, OR; St. Louis; Indianapolis; San Diego; Hartford-New Haven; Grand Rapids-Kalamazoo-Battle Creek; Norfolk-Portsmouth-Newport News; New Orleans; Memphis; Buffalo; Little Rock-Pine Bluff; Des Moines-Ames; Huntsville-Decatur (Florence); Ft. Smith-Fayetteville-Springdale-Rogers; and Davenport-Rock Island-Moline. The divestitures Nexstar has committed to make in Indianapolis and Norfolk-Portsmouth-Newport News would result in it owning two full power television stations in those DMAs.

2

**App.2**

Federal Communications Commission                                    DA 26-267

divestitures Nexstar has committed to make.[5]  The FCC has previously waived the Local Television Ownership Rule and we do so again here.[6]

6.          We note that Nexstar has made significant commitments in the agency's record as well, further ensuring that this transaction promotes the public interest.  To further serve its local communities, Nexstar commits to expanding its investment in local news and programming, including increasing the amount of local news it provides in acquired markets.  Regarding concerns about pricing and affordability, Nexstar commits to offering those multichannel video programming distributors (MVPDs) with which it has an existing retransmission agreement an extension of its agreement at the existing rates for a certain period of time.  Finally, Nexstar commits to equal opportunity employment and nondiscrimination.

7.          After carefully and thoroughly reviewing the record, we therefore find that, in light of Nexstar's commitments, there will be no material public interest harms arising from the transaction. Accordingly, we decline to adopt the conditions or remedies proposed in the record.[7]  We further find that certain transaction-related public interest benefits are likely to be realized, especially given Nexstar's reaffirmed commitment to operating its "broadcast television stations in a manner that serves the public interest through locally focused programming responsive to the needs and interests of the communities [Nexstar] serve[s]."[8]  We note that the upshot of the divestitures and other relief provided here will not result in a single entity owning more than two top four stations plus one additional one based on our review of current station ratings.[9]

## II.    BACKGROUND

### A.    Description of Transaction

8.          TEGNA is the ultimate parent of the licensees of 64 full power television stations, one AM radio station, one FM radio station, and other related FCC licenses.[10]  Pursuant to an Agreement and

---

[5] *See* Letter from Perry Sook, Chairman and Chief Executive Officer, Nexstar Media Group, Inc., to Hon. Brendan Carr, Chairman, FCC, MB Docket No. 25-331 at 2 (filed Mar. 19, 2026) (*Nexstar Localism Commitment Letter*). We note that the commitments are being made collectively by Nexstar Media Inc. and Nexstar Media Group, Inc. For the sake of clarity, we reference both entities when referring to the commitments made by Nexstar.

[6] *See Application for Consent to the Assignment of the Licensee of WRTV(TV), Indianapolis, Indiana, from Scripps Broadcasting Holdings LLC to CCB License, LLC*, Order, DA 26-207 (MB Feb. 27, 2026) (*CCB Order*).

[7] *See, e.g.*, *Ex Parte* Letter of Optimum Communications at 1 (filed Mar. 2, 2026) (Optimum *Ex Parte* Letter) (suggesting mitigating "measures" in mergers such as the Transaction, including:  (1) requiring merging parties to forgo enforcement of any "automatic retransmission consent rate increases resulting from after-acquired station clauses, until existing contracts expire;" (2) enforcing Commission rules on sidecar agreements; (3) requiring divestiture of Big-4 triopolies in a local market; and (4) reviewing Commission rules governing blackouts); *Ex Parte* Letter of DIRECTV at 1 (filed Mar. 2, 2026) (DIRECTV Mar. 2 *Ex Parte*) (suggesting conditions that should: (1) address Nexstar's "increased incentive and ability to raise retransmission consent fees;" (2) address Nexstar's ability to black out signals; and (3) prevent Nexstar from evading any such conditions (e.g., through affiliate swaps); *Ex Parte* Letter of State Cable Petitioners at 3 (filed Mar. 9, 2026) (State Cable Petitioners Mar. 9 *Ex Parte* Letter) (suggesting "structural and behavioral conditions," including:  (1) station divestitures; (2) anti-circumvention measures; and (3) barring the triggering of after-acquired station clauses); Reply Comments of Cincinnati Bell Extended Territories LLC (d/b/a altafiber) at 7 (filed Jan. 26, 2026) (altafiber Jan. 26 Reply) (proposing use of a "social contract" to provide actionable remedies if Nexstar fails to act in accordance with the promises it made to secure Commission approval).

[8] *See Nexstar Localism Commitment Letter* at 1.

[9] We note that the ratings and rankings of stations can vary, including by varying across different points in time. Our decision today does not depend on any particular ranking.  Rather, we are observing that, after conducting our review and accepting Nexstar's divestment, the upshot appears to be that there will be no markets where Nexstar owns more than two top four stations, plus one additional station outside the top four.

3

**App.3**

Plan of Merger dated August 18, 2025,[11] Nexstar seeks to acquire the outstanding equity interests in TEGNA in a cash merger transaction (Transaction).[12] Upon consummation of the Transaction, each share of TEGNA common stock issued and outstanding immediately prior to closing will be converted into the right to receive $22.00, and TEGNA will become a wholly-owned subsidiary of Nexstar Media Group, Inc., which will immediately contribute its shares in TEGNA to Nexstar.[13]

9.    The Applicants state that post-Transaction, Nexstar would reach 54.5% of the national audience, after taking into account the 50% discount applied to UHF stations (UHF Discount),[14] and, therefore, seek a waiver of the National Television Ownership Rule.[15] Furthermore, the Applicants propose in their Applications that Nexstar would form or acquire combinations of two full power television stations (Duopolies) in seventeen DMAs, which they assert complies with the Local Television Ownership Rule and serves the public interest.[16] In addition, the Applicants propose that Nexstar would own more than two full power television stations in twenty-three DMAs and, therefore, seek a waiver of the Local Television Ownership Rule with respect to those DMAs.[17]

### B.    Transaction Review Process

10.    The Bureau accepted the Applications for filing on December 1, 2025, released a public notice establishing a pleading cycle, and designated the proceeding as "permit-but-disclose" in accordance with the Commission's *ex parte* rules.[18] We received fourteen pleadings timely filed as petitions to deny, comments, and other requests.[19] While most of the pleadings filed as petitions to deny[20] and comments oppose the Transaction,[21] other commenters support it.[22]

(Continued from previous page) ───────────────

[10] *See, e.g.*, *Application for Consent to Transfer Control of Belo TV, Inc.*, LMS File No. 0000280940, Comprehensive Exhibit at 1 (Comp. Exh.). A copy of the Comp. Exh. is attached to each of the Applications.

[11] Comp. Exh. at Schedule 4.

[12] *Id*. at 1.

[13] *Id*.

[14] 47 CFR § 73.3555(e)(2).

[15] 47 CFR § 73.3555(e). For purposes of paragraph (e), national audience reach means the total number of television households in the DMAs in which the relevant stations are located divided by the total national television households as measured by DMA data at the time of a grant, transfer, or assignment of a license. 47 CFR § 73.3555(e)(2)(i). Further, no market shall be counted more than once. 47 CFR § 73.3555(e)(2)(ii).

[16] These DMAs are: Atlanta; Seattle-Tacoma; Jacksonville; Tucson (Sierra Vista); Spokane; Waco-Temple-Bryan; San Angelo; Sacramento-Stockton-Modesto; Austin; Columbus; Harrisburg-Lancaster-Lebanon-York; Greensboro-High Point-Winston Salem; Wilkes Barre-Scranton-Hazelton; Knoxville; Tyler-Longview (Lufkin & Nacogdoches); Odessa-Midland; and Abilene-Sweetwater. *See* Comp. Exh. at 18, nn. 74-75. *See also Zimmer Radio; Letter from Chief, Video Division to Sinclair, Inc., et al*., Letter Order, DA 26-108 (MB Feb. 3, 2026) (*Sinclair-Cunningham-Roberts Letter Order*) (*application for review pending*). For further discussion, see *infra* Section IV.B.

[17] These DMAs are: Dallas-Fort Worth; Houston; Washington, DC (Hagerstown); Tampa-St. Petersburg (Sarasota); Phoenix (Prescott); Cleveland-Akron (Canton); Charlotte; Portland, OR; St. Louis; Indianapolis; San Diego; Grand Rapids-Kalamazoo-Battle Creek; Norfolk-Portsmouth-Newport News; Memphis; Buffalo; Little Rock-Pine Bluff; Des Moines-Ames; Huntsville-Decatur (Florence); Davenport-Rock Island-Moline; Fort Smith-Fayetteville-Springdale-Rogers; Denver; Hartford & New Haven; and New Orleans.

[18] *Media Bureau Establishes Pleading Cycle for Applications to Transfer Control of TEGNA Inc. to Nexstar Media Inc. and Permit-But-Disclose Ex Parte Status for the Proceeding*, MB Docket No. 25-331, Public Notice, DA 25-1000 (MB Dec. 1, 2025) (*Pleading Cycle Public Notice*); *see also* 47 CFR § 1.1206.

[19] In addition to the Applicants, only individuals or entities that file petitions to deny and meet the filing requirements become parties to a licensing or transaction proceeding. *See Entercom Sacramento Licenses, LLC*, Letter Order, 32 FCC Rcd 6880, 6883 (MB 2017); *Cloud Nine Broadcasting, Inc.*, Letter Order, 10 FCC Rcd 11555, 11556 (MB 1995) (*Cloud Nine*). Informal objectors can only become parties to the proceeding if there is no

**Federal Communications Commission**                    **DA 26-267**

11.    Regarding the Applicants' requests for waiver of the Commission's National Television Ownership Rule and Local Television Ownership Rule, as discussed below, the Petitioners and Opposing Commenters raise several arguments.  For example, some assert that the FCC lacks authority either to modify or eliminate the National Television Ownership Rule generally or to grant a waiver to Nexstar,[23] and others advance pragmatic arguments why waiving the rule would be harmful.[24]  On the other hand, CAR asserts that the FCC should repeal the National Television Ownership Rule or, alternatively, grant a waiver to Nexstar.[25]  Further, some Petitioners assert that the FCC should deny the Applicants' requests for waiver of the Local Television Ownership Rule, arguing that the Applicants do not sufficiently justify waiver of the rule.[26]

12.    In addition, some Petitioners and Opposing Commenters express concerns regarding a number of anticompetitive effects that they claim would result from the Transaction.  Petitioners and Opposing Commenters allege that the consolidation resulting from the Transaction will harm the public

(Continued from previous page) ───────────

statutory opportunity to file a petition to deny.  *Cloud Nine*, 10 FCC Rcd at 11556.  For a discussion of standing, see *infra* Section V.

[20] Petition to Deny of DIRECTV, LLC (filed Dec. 31, 2025) (DIRECTV Petition); Petition to Deny of CCB License, LLC (filed Dec. 31, 2025) (CCB Petition); Petition to Deny of Broadband Communications Association of Pennsylvania et al. (filed Dec. 31, 2025) (State Cable Petition); Petition to Deny of United Church of Christ Media Justice Ministry et al. (filed Dec. 31, 2025) (Public Interest Petition); Petition to Deny of EchoStar Corporation (filed Dec. 31, 2025) (EchoStar Petition) (together, the Petitioners).  As discussed in greater detail *infra* in Section V, we note that only certain organizations or associations within the State Cable Petitioners and the Public Interest Petitioners have standing as parties-in-interest.  For ease of reference, we refer to the groups collectively, as "State Cable Petitioners" and "Public Interest Petitioners."

[21] *See* Petition to Deny of Newsmax Media, Inc. (filed Dec. 31, 2025) (Newsmax Objection).  While filed as a petition to deny, as discussed *infra* in Section V, we treat Newsmax's filing as an informal objection.  *See also* Letter from Keith J. Leitch, President, One Ministries, Inc. to Marlene H. Dortch, Secretary, FCC, MB Docket No. 25-331 (filed Dec. 1, 2025) (OMI Objection); Comments of Asian Americans Advancing Justice – AAJC et al. (filed Dec. 10, 2025) (AANHPI Coalition Objection); Comments of Asian Americans Advancing Justice – AAJC et al. (filed Dec. 10, 2025) (National Civil Rights Organizations Objection); Brief of Mafia Monthly (filed Dec. 13, 2025); Comments of Business Forward (filed Dec. 15, 2025) (Business Forward Objection); Comments of Sean Patrick Patterson (filed Dec. 13, 2025); Comments of the American Television Alliance (ATVA) and the National Content & Technology Cooperative (NCTC) (filed Dec. 31, 2025) (ATVA and NCTC Objection), (together, the Opposing Commenters).   With respect to the OMI Objection, which asks the Commission to "update the cable TV must carry rules to apply" to newer virtual MVPDs (vMVPDs), we note that this matter is best addressed through a rulemaking proceeding rather than the transaction-review process.  *See* OMI Objection at 1.  We therefore decline to consider that request here.  We direct OMI to the open Commission proceeding proposing to modernize the definition of an MVPD.  *See Promoting Innovation and Competition in the Provision of Multichannel Video Programming Distribution Services*, MB Docket No. 14-261, Notice of Proposed Rulemaking, 29 FCC Rcd 15995 (2014).

[22] *See* Comments of the Center for American Rights (filed Dec. 30, 2025) (CAR Comments).  Others filed comments supporting the Transaction at a later stage of the pleading cycle.  See *infra* note 50.
[23] *See, e.g.*, Newsmax Objection at 5-6; State Cable Petition at 10-16; EchoStar Petition at 7-10; ATVA and NCTC Objection at 15-18.

[24] *See, e.g.*, State Cable Petition at 36-44; EchoStar Petition at 9-11.  See *infra* Section IV.B. for discussion of the alleged harms attendant to waiver of the National Television Ownership Rule in this Transaction.

[25] *See* CAR Comments at 9-11.  CAR responds to arguments raised by State Cable Petitioners regarding the Commission's authority to modify the National Television Ownership Rule in a later *ex parte*.  *See* Letter from Daniel R. Suhr, Center for American Rights to Marlene H. Dortch, Secretary, FCC, MB Docket No. 25-331 (filed Feb. 11, 2026) (CAR Feb. 11 *Ex Parte* Letter).  *See infra* note 52, and, for a discussion of the Commission's authority to waive the National Television Ownership Rule, see *infra* Section IV.B.

[26] *See, e.g.*, State Cable Petition at 27-32; Public Interest Petition at 68-132 (providing a market-by-market analysis).

5

**App.5**

**Federal Communications Commission** DA 26-267

interest because it will enhance Nexstar's leverage to extract higher retransmission consent fees, which they assert will negatively impact MVPDs and consumers.[27]  Some Petitioners further assert that Nexstar has a history of using blackouts to extract higher retransmission consent fees and that the Transaction will give the combined company bargaining leverage.[28]  A number of Petitioners also claim that the Transaction is presumptively unlawful under Department of Justice (DOJ) and Federal Trade Commission (FTC) guidelines concerning the definition of the relevant product market and traditional Herfindahl-Hirschman Index measures of concentration.[29]  Petitioners also express concern about the impact of "after-acquired station clauses," which allow a broadcaster to bring newly acquired stations under its existing retransmission consent agreement, substituting the acquiring broadcaster's retransmission consent fee for the rate previously negotiated by the MVPDs for the broadcast stations in question.[30]  Moreover, some Petitioners and Opposing Commenters assert that the Transaction will increase prices for local advertisers that rely on local broadcast television spot advertisements.[31]  With respect to the Indianapolis DMA, CCB License, LLC (CCB) argues that "Nexstar's ability to exert anticompetitive control over the retransmission consent revenue market would inflict economic harm on CCB, which would in turn severely impinge on its ability to survive as a source of local news and programming in the market."[32]

13.    Several Petitioners and Opposing Commenters raise concerns regarding localism, viewpoint diversity, and the labor market, arguing that increased access to Nexstar's various news bureaus will not enhance localism and that consolidated news functions will result in duplication of content.[33]  For example, EchoStar Corporation (EchoStar), the parent company of DISH Network Corporation (DISH), claims that allowing Nexstar to reach 54.5% of the national audience will "effectively create a single broadcast behemoth with the power to homogenize news coverage, mandate editorial policy, and 'drive diverse political viewpoints' from the local airwaves across the entire country . . . ."[34]  Moreover, the State Cable Petitioners claim that the Transaction will reduce locally produced news

---

[27] *See, e.g.*, Newsmax Objection at 11-12; DIRECTV Petition at 16-37; State Cable Petition at 36-48; ATVA and NCTC Objection at 4-9; EchoStar Petition at 2; AANHPI Coalition Objection at 3; National Civil Rights Organizations Objection at 3-4; Public Interest Petition at 42; Business Forward Objection at 1.

[28] *See, e.g.*, State Cable Petition at 47-48; EchoStar Petition at 15-16.

[29] *See, e.g.*, Public Interest Petition at 29-40; DIRECTV Petition at 12-16.  We note that our review is independent of DOJ and FTC merger guidelines.  Moreover, regarding the State Cable Petitioners' claim that Nexstar's proposed reacquisition of eleven stations from TEGNA that DOJ required it to divest as part of the Tribune transaction would violate the terms of DOJ's settlement, we note that this claim is outside the scope of our proceeding.  *See* State Cable Petition at 32-33, citing Final Judgment at 17-18, *United States v. Nexstar Media Grp., Inc.*, No. 1-19-cv-02295-DLF (D.D.C. Feb. 10, 2020).

[30] State Cable Petition at 41.  State Cable Petitioners are comprised of the Broadband Communications Association of Pennsylvania (BCAP), Broadband Communications Association of Washington (BCAW), Indiana Cable and Broadband Association (ICBA), Mississippi Cable Telecommunications Association (MCTA), Tennessee Cable & Broadband Association (TCBA), and VCTA – Broadband Association of Virginia (VCTA).

[31] *See, e.g.*, DIRECTV Petition at 37-41; ATVA and NCTC Objection at 9-10; State Cable Petition at 54-55.  We note that the Commission has never defined a market for spot advertising, and, to the extent that the Commission is to consider such an argument, we believe it is better addressed in the context of a rulemaking of industry-wide nature.

[32] CCB Petition at 7.

[33] *See, e.g.*, ATVA and NCTC Objection at 11-12; CCB Petition at 9-10; DIRECTV Petition at 46-53; Newsmax Objection at 13-16; State Cable Petition at 51-54; Public Interest Petition at 46-47.

[34] EchoStar Petition at 24 (internal citations omitted); *but see* CAR Comments at 1 ("More specifically, the applications evidence Nexstar's core commitment to the public interest in viewpoint diverse programming and unbiased, fact-based news.").

6

content and further "enable Nexstar to replace independent local news with corporate 'must run' segments to further its own political agenda."[35]  Likewise, Newsmax Media, Inc. (Newsmax) asserts that "[r]etransmitting the same news—which will likely be weaker, less local, and more national—on an additional weak station does nothing to provide public interest benefits."[36]

14.       Other Petitioners and Opposing Commenters raise concerns related to the labor market. For example, Newsmax asserts that it is not possible to achieve the kind of savings that the Applicants claim (i.e., "annual net synergies of approximately $300 million from a combination of revenue synergies and net operating expense reductions[]"),[37] without "ending the employment of journalists and news producers necessary to provide essential news programming."[38]  In addition, the Public Interest Petitioners assert that the Transaction would extend Nexstar's "dominant position in local labor markets," resulting in fewer potential employers for broadcast technicians, reduced wages, and layoffs.[39]  Similarly, with respect to the Indianapolis DMA, CCB asserts that the proposed combination would "distort the broadcast television employment market," leaving Nexstar, as the dominant competitor, "able to attract the best talent in the market, further harming any other broadcaster's ability to compete."[40]

15.       As discussed more fully below, in their Opposition, the Applicants initially assert that each of the pleadings filed as petitions fail to establish standing.[41]  The Applicants reiterate the arguments made in their Applications that the Transaction will produce significant public interest benefits, including ushering in a combined company that will provide more "flexibility and better resources to build upon the Applicants' established commitment to locally-focused programming, independent news coverage, and critical emergency information while navigating a rapidly changing video landscape that features intense competition from the largest technology and media companies in the world."[42]  Further, the Applicants note that significant advantages will accrue to the TEGNA stations once they have access to Nexstar's Washington, DC, news bureau and state capital news bureaus, as well as its Aggregated Content Team (ACT), which serves to "collect and distribute stories of interest from Nexstar's local stations around the country."[43]  In addition, the Applicants state that the "Transaction also will allow Nexstar to accelerate the

---

[35] State Cable Petition at 53.

[36] Newsmax Objection at 16.

[37] *See* Press Release, Nexstar Media Group, Inc. Enters into Definitive Agreement to Acquire TEGNA Inc. for $6.2 Billion in Accretive Transaction, (Aug. 19, 2025), https://www.nexstar.tv/nexstar-media-group-inc-enters-into-definitive-agreement-to-acquire-tegna-inc-for-6-2-billion-in-accretive-transaction/.

[38] *See* Newsmax Objection at 8; *see also* State Cable Petition at 48 ("Similarly, Applicants emphasize the 'operational efficiencies,' 'economies of scale,' and the ability to 'reduce costs' following the Transaction, but provide no explanation of how these benefits will materialize in practice and at what cost to local journalism.  In reality, Nexstar has used its station acquisitions to make significant job cuts and centralize its production of 'local' news content.") (internal citations omitted).

[39] *See* Public Interest Petition at 51-59.  Public Interest Petitioners are comprised of Free Press, the National Association of Broadcast Employees and Technicians - Communications Workers of America (NABET-CWA), The NewsGuild - Communications Workers of America (TNG-CWA), and the United Church of Christ Media Justice Ministry (UCC Media Justice), along with Public Knowledge.

[40] CCB Petition at 8.

[41] Consolidated Opposition of Applicants to Petitions to Deny and Comments at 5-15 (filed Jan. 15, 2026) (Applicants Opposition).  For the discussion on standing, see *infra* Section V.

[42] Applicants Opposition at i.

[43] *Id*. at 21-23.  In particular, according to the Applicants, the ACT "provides Nexstar's stations with the resources to cover major news events that impact their communities, such as natural disasters, breaking news, and sporting events, through the lens of a local news station."  *Id*. at 23.  As an example, the Applicants provide that "when a shooter opened fire in a Brown University classroom in December 2025, it affected not only students and faculty in Providence, Rhode Island, but also parents and alumni across the country.  The ACT was able to coordinate

(continued….)

7

**App.7**

shift to ATSC 3.0 for those TEGNA stations that are not already equipped for the next generation broadcast television standard."[44]  Finally, the Applicants state that "local advertisers in the DMAs where Nexstar's stations operate will benefit from Nexstar's integration of TEGNA's digital ad sales platform (Premion) for providing premium connected TV ('CCTV') and over-the-top ('OTT') impressions for local and regional advertisers."[45]  They also contest arguments regarding retransmission consent and spot advertising.[46]  Regarding compliance with the Commission's rules, the Applicants maintain that the Commission has authority to waive the National Television Ownership Rule and that the Applicants have demonstrated that it is in the public interest to do so.[47]  The Applicants also reassert that the public interest would be served by granting Applicants' proposal to form or acquire Duopolies in seventeen DMAs and by granting their requests for waiver of the Local Television Ownership Rule to own more than two television stations in twenty-three DMAs.[48]

16.      We received fourteen timely filed reply pleadings,[49] with some filings supporting the Transaction,[50] and others reiterating their opposition.[51]  After the pleading cycle ended, we received multiple *ex parte* and other submissions.[52]

(Continued from previous page) ────────────────────────

coverage from Nexstar's WPRI in Providence to help Nexstar's stations serving other affected communities tell this story through a local lens." *Id*. at 23-24.

[44] *Id*. at 24-25 (internal citations omitted).

[45] *Id*. at 26 (internal citations omitted).

[46] *Id*. at 38-53.

[47] *Id*. at 54-72.

[48] *Id*. at 29-37.

[49] Due to severe weather, the Commission's Headquarters was closed from Monday, January 26 to Tuesday, January 27, 2026.  We therefore accept as timely the replies from Public Interest Petitioners and Digital First Project filed after the reply date established by the *Pleading Cycle Public Notice*. *See* 47 CFR § 1.4.

[50] Comments of Sinclair Inc. (filed Jan. 15, 2026) (Sinclair Reply); Reply Comments of Digital First Project (filed Jan. 27, 2026) (DFP Reply); Reply Comments of the Center for American Rights (filed Jan. 26, 2026) (CAR Reply), (together, with CAR Comments, the Supporting Commenters).

[51] Letter from Keith J. Leitch, President, One Ministries, Inc. to Marlene H. Dortch, Secretary, FCC, MB Docket No. 25-331 (filed Jan. 2, 2026) (Jan. 2, 2026 OMI Reply); Letter from Keith J. Leitch, President, One Ministries, Inc. to Marlene H. Dortch, Secretary, FCC, MB Docket No. 25-331 (filed Jan. 15, 2026) (Jan. 15, 2026 OMI Reply); Reply to Opposition of United Church of Christ Media Justice Ministry et al. (filed Jan. 27, 2026) (Public Interest Petitioners Reply); Reply to Opposition of CCB License, LLC (filed Jan. 26, 2026) (CCB Reply); Reply of Broadband Communications Association of Pennsylvania et al. (filed Jan. 26, 2026) (State Cable Petitioners Reply); Reply to Opposition of DIRECTV, LLC (filed Jan. 26, 2026) (DIRECTV Reply); Reply Comments of NTCA—The Rural Broadband Association (filed Jan. 26, 2026) (NTCA Reply); Reply of EchoStar Corporation (filed Jan. 26, 2026) (EchoStar Reply); Reply of Newsmax Media, Inc. (filed Jan. 26, 2026) (Newsmax Reply); altafiber Jan. 26 Reply; Reply Comments in Support of CCB Petition to Deny of the National Association of Black Owned Broadcasters (NABOB) and the Multicultural Media, Telecom and Internet Council (MMTC) (filed Jan. 23, 2026).

[52] *See, e.g.*, Letter from AFT et al. to Chairman Brendan Carr, FCC, MB Docket No. 25-331 (filed Jan. 27, 2026); *Ex Parte* Letter of the Center for American Rights, MB Docket Nos. 25-331 and 17-318 (filed Feb. 6, 2026) (CAR Feb. 6 *Ex Parte* Letter); *Ex Parte* Letter of TIG Advisors LLC, MB Docket Nos. 25-331 and 17-318 (filed Feb. 9, 2026); *Ex Parte* Letter of State Cable Petitioners (filed Feb. 9, 2026) (State Cable Petitioners Feb. 9 *Ex Parte* Letter); CAR Feb. 11 *Ex Parte* Letter; Letter from Reps. Wesley Bell, Troy A. Carter, Sr., Steven Horsford, and Robin L. Kelly, U.S. House of Representatives, to Hons. Brendan Carr, Anna Gomez, and Olivia Trusty, FCC, MB Docket Nos. 25-331, 22-459, and 17-318 (filed Feb. 20, 2026); *Ex Parte* Letter of Cincinnati Bell Extended Territories LLC dba altafiber and Hawaiian Telecom Services Company, Inc., MB Docket Nos. 17-318, 25-322, and 25-331 (filed Feb. 20, 2026) (regarding meeting with Commissioner Trusty's office); *Ex Parte* Letter of Cincinnati Bell Extended Territories LLC dba altafiber and Hawaiian Telecom Services Company, Inc., MB Docket Nos. 17-

(continued….)

Federal Communications Commission    DA 26-267

### III.    STANDARD OF REVIEW AND PUBLIC INTEREST FRAMEWORK

17.    Pursuant to section 310(d) of the Communications Act of 1934, as amended (the Act),[53] we must determine whether the proposed transfer of control to Nexstar of licenses and authorizations held and controlled by TEGNA will serve the public interest, convenience, and necessity.  In making this determination, we first assess whether the proposed transaction complies with the specific provisions of the Act, other applicable statutes, and the Commission's rules.[54]

18.    If the proposed transaction does not violate a statute or rule, we then consider whether the transaction could result in public interest harms by substantially frustrating or impairing the objectives or implementation of the Act or related statutes.[55]  Our competitive analysis, which forms an important part of the public interest evaluation, is informed by, but not limited to, traditional antitrust principles.[56]  The United States Department of Justice has independent authority to examine the competitive impacts of proposed mergers and transactions involving transfers of Commission licenses, but the Commission's competitive analysis under the public interest standard is somewhat broader, and often takes a more extensive view of potential and future competition and its impact on the relevant markets. [57]  Notably, the

(Continued from previous page) ————————————

318, 25-322, and 25-331 (filed Feb. 20, 2026) (regarding meeting with Commissioner Gomez's office); *Ex Parte* Letter of DIRECTV (filed Feb. 24, 2026) (DIRECTV Feb. 24 *Ex Parte*); Optimum *Ex Parte* Letter; DIRECTV Mar. 2 *Ex Parte*; *Ex Parte* Letter of Nexstar Media Group, Inc. (filed Mar. 3, 2026); *Ex Parte* Letter of DIRECTV (filed Mar. 6, 2026) (DIRECTV Mar. 6 *Ex Parte*); *Ex Parte* Letter of DIRECTV (filed Mar. 9, 2026) (DIRECTV Mar. 9 *Ex Parte*); State Cable Petitioners Mar. 9 *Ex Parte* Letter; *Ex Parte* Letter of National Hispanic Media Coalition (filed Mar. 16, 2026); *Ex Parte* Letter of DIRECTV (filed Mar. 16, 2026) (DIRECTV Mar. 16, 2026 *Ex Parte*).  *See also* Reply to Opposition to Application for Review of Cincinnati Bell Extended Territories (dba altafiber), MB Docket No. 25-331 (filed Feb. 9, 2026) (altafiber Feb. 9 Reply).  We note that the altafiber Feb. 9 Reply is a reply in a pending good-faith retransmission consent proceeding and therefore we decline to address it herein.

[53] 47 U.S.C. § 310(d).  Section 310(d) of the Act requires that we consider applications for transfer of Title III licenses under the same standard as if the proposed transferee were applying for licenses directly under section 308 of the Act, 47 U.S.C. § 308.  *See, e.g.*, *Applications of Level 3 Communications, Inc. and CenturyLink, Inc. for Consent to Transfer Control of Licenses and Authorizations*, Memorandum Opinion and Order, 32 FCC Rcd 9581, 9585, para. 8 (2017) (*CenturyLink-Level 3 Order*); *Application of Verizon Communications Inc. and Straight Path Communications, Inc. for Consent to Transfer Control of Local Multipoint Distribution Service, 39 GHz, Common Carrier Point-to-Point Microwave, and 3650-3700 MHz Service Licenses*, Memorandum Opinion and Order, 33 FCC Rcd 188, 189, para. 5 & n.11 (WTB 2018) (*Verizon-Straight Path Order*); *Applications of GCI Communication Corp., ACS Wireless License Sub, Inc., ACS of Anchorage License Sub, Inc., and Unicom, Inc. for Consent to Assign Licenses to the Alaska Wireless Network, LLC*, Memorandum Opinion and Order and Declaratory Ruling, 28 FCC Rcd 10433, 10442, para. 23 & n.71 (2013) (*Alaska Wireless-GCI Order*).

[54] 47 U.S.C. § 310(d); *Applications for Consent to the Transfer of Control of Paramount Global,* Memorandum Opinion and Order, 40 FCC Rcd 5689, 5701, para. 25 (2025); *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9585, para. 8; *Verizon-Straight Path Order*, 33 FCC Rcd at 190, para. 5; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10442, para. 23.

[55] *See, e.g.*, *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9585, para. 9; *Verizon-Straight Path Order*, 33 FCC Rcd at 190, para. 5; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10442, para. 23.

[56] *See, e.g.*, *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9585, para. 9; *Verizon-Straight Path Order*, 33 FCC Rcd at 190, para. 6; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10443, para. 25; *see also Northeast Utils. Serv. Co. v. FERC*, 993 F.2d 937, 947 (1st Cir. 1993) (public interest standard does not require agencies "to analyze proposed mergers under the same standards that the Department of Justice . . . must apply").

[57] *See, e.g.*, *Applications for Consent to the Transfer of Control of Licenses, XM Satellite Radio Holdings Inc., Transferor to Sirius Satellite Radio Inc., Transferee*, MB Docket No. 07-57, Memorandum Opinion and Order and Report and Order, 23 FCC Rcd 12348, 12365-66, para. 32 (2008); *AT&T Inc. and BellSouth Corporation Application for Transfer of Control*, WC Docket No. 06-74, Memorandum Opinion and Order, 22 FCC Rcd 5662, 5674, para. 21 (2007) (*AT&T-BellSouth Order*); *Applications of Nextel Communications, Inc. and Sprint Corporation for Consent to Transfer Control of Licenses and Authorizations, File Nos. 0002031766, et al.*, WT Docket No. 05-63, Memorandum Opinion and Order, 20 FCC Rcd 13967, 13978, para. 22 (2005) (*Sprint-Nextel*

(continued….)

9

**App.9**

**Federal Communications Commission**      **DA 26-267**

Commission has determined it may impose and enforce transaction-related conditions to ensure that the public interest is served by the transaction.[58]

19.       If we determine that a transaction raises no public interest harms or that any such harms have been ameliorated by the Commission-imposed conditions or by voluntary commitments, we next consider a transaction's public interest benefits. Applicants bear the burden of proving those benefits by a preponderance of the evidence.[59] As part of our public interest authority, we may impose conditions to ensure for the public the transaction-related benefits claimed by the Applicants.[60]

20.       Finally, if we are able to find that transaction-related conditions are able to ameliorate any public interest harms and the transaction is in the public interest, we may approve the transaction as so conditioned or agreed.[61] In contrast, if we are unable to find that a proposed transaction even with such conditions serves the public interest or if the record presents a substantial and material question of fact, then we must designate the application for hearing.[62]

## IV. QUALIFICATIONS OF APPLICANTS AND COMPLIANCE WITH COMMUNICATIONS ACT AND FCC RULES AND POLICIES

21.       Section 310(d) of the Act requires that the Commission make a determination as to

---

(Continued from previous page) ─────────────

*Order*); *Applications of AT&T Wireless Services, Inc. and Cingular Wireless Corporation for Consent to Transfer Control of Licenses and Authorizations, File Nos. 0001656065, et al.; Applications of Subsidiaries of T-Mobile USA, Inc. and Subsidiaries of Cingular Wireless Corporation for Consent to Assignment and Long-Term De Facto Lease of Licenses, File Nos. 0001771442, 0001757186, and 0001757204; Applications of Triton PCS License Company, LLC, AT&T Wireless PCS, LLC, and Lafayette Communications Company, LLC for Consent to Assignment of Licenses, File Nos. 0001808915, 0001810164, 0001810683, and 50013CWAA04*, WT Docket Nos. 04-70, 04-254, and 04-323, Memorandum Opinion and Order, 19 FCC Rcd 21522, 21545, para. 42 (2004) (*Cingular-AT&T Wireless Order*).

[58] *See, e.g.*, *Applications of AT&T Inc. and DIRECTV for Consent to Assign or Transfer Control of Licenses and Authorizations*, Memorandum Opinion and Order, 30 FCC Rcd 9131, 9141, para. 22 (2015) (*AT&T-DIRECTV Order*); *Comcast-NBC Universal Order*, 26 FCC Rcd at 4249, para. 25; *Application of EchoStar Communications Corp., (A Nevada Corp.), General Motors Corp., and Hughes Electronics Corp (Delaware Corps.) (Transferors) and EchoStar Communications Corp. (A Delaware Corp.) (Transferee)*, Hearing Designation Order, 17 FCC Rcd 20559, 20575, para. 27 (2002) (*EchoStar-DIRECTV HDO*); *see also Application of WorldCom, Inc. and MCI Commc'ns Corp. for Transfer of Control of MCI Communications Corporation to WorldCom, Inc.*, Memorandum Opinion and Order, 13 FCC Rcd 18025, 18032, para. 10 (1998) (stating that the Commission may attach conditions to the transfers); *Applications of T-Mobile US, Inc., and Sprint Corp., for Consent to Transfer Control of Licenses and Authorizations, Applications of American H Block Wireless L.L.C., DBSD Corp., Gamma Acquisition L.L.C., and Manifest Wireless L.L.C. for Extension of Time*, Memorandum Opinion and Order, Declaratory Ruling, and Order of Proposed Modification, 34 FCC Rcd 10578, 10596, para. 42 (2019) (*T-Mobile-Sprint Order*).

[59] 47 U.S.C. § 309(e); *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9586, para. 10; *Verizon-Straight Path Order*, 33 FCC Rcd at 190-91, para. 7; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10442, para. 23.

[60] *See, e.g.*, *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10443, para. 26; *Applications of AT&T Inc. and Centennial Communications Corp. for Consent to Transfer Control of Licenses, Authorizations, and Spectrum Leasing Arrangements*, Memorandum Opinion and Order, 24 FCC Rcd 13915, 13929, para. 30 (2009).

[61] *See, e.g.*, *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9586, para. 11; *Verizon-Straight Path Order*, 33 FCC Rcd at 191, para. 8.

[62] 47 U.S.C. § 309(e); *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9586-87, para. 11; *Verizon-Straight Path Order*, 33 FCC Rcd at 191, para. 8; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10444, para. 27. Section 309(e)'s requirement applies only to those applications to which Title III of the Act applies. *ITT World Communications, Inc. v. FCC*, 595 F.2d 897, 901 (2d Cir. 1979); *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9586-87, para. 11 & n.37.

**App.10**

whether the Applicants have the requisite qualifications to hold Commission licenses.[63]  Among the factors the Commission considers in its public interest review is whether the applicant for a license has the requisite "citizenship, character, financial, technical, and other qualifications."[64]  Therefore, as a threshold matter, the Commission must determine whether the applicants to a proposed transaction meet the requisite qualification requirements to hold and transfer licenses under section 310(d) of the Act and the Commission's rules.[65]

### A.    Applicants' Qualifications

22.    No party has raised an issue with respect to the basic qualifications of the Applicants. Accordingly, pursuant to Commission precedent,[66] we find that there is no reason to reevaluate the requisite citizenship, character, financial, technical, or other basic qualifications of Nexstar or TEGNA under the Act or our rules, regulations, and policies.[67]

23.    *Current Renewals.*  It is Commission policy, in multi-station, multi-market transactions, to grant transfer of control applications while renewal applications are pending as long as there are no basic qualification issues pending against the transferor or transferee that could not be resolved in the context of the transfer proceeding, and the transferee explicitly assents to standing in the stead of the transferor in the pending renewal proceeding.[68]  To the extent any TEGNA licensees have pending license renewals, none of these renewals present a basic character qualification issue.  Nexstar has submitted a statement explicitly agreeing to stand in the stead of the transferor in any renewal application that is pending at the time of the consummation of the transfer.[69]  Therefore, we will apply the policy set out in *Shareholders of CBS* to those applications.

### B.    Compliance with the Communications Act and FCC Rules and Policies

24.    As discussed below, we grant the Applicants' request for a waiver of the Commission's National Television Ownership Rule.[70]  In the seventeen DMAs where Nexstar proposes to form or acquire a combination of two full power television stations, we find that these combinations will permit

---

[63] 47 U.S.C. § 310(d).

[64] 47 U.S.C. §§ 308, 310(d); *see also T-Mobile-Sprint Order*, 34 FCC Rcd at 10596, para. 43; *AT&T-DIRECTV Order*, 30 FCC Rcd at 9142, para. 24; *Applications Filed by Qwest Communications International, Inc. and CenturyTel, Inc. d/b/a CenturyLink for Consent to Transfer Control*, WC Docket No. 10-110, Memorandum Opinion and Order, 26 FCC Rcd 4194, 4201, para. 11 (2011) (*CenturyLink-Qwest Order*); *AT&T-BellSouth Order,* 22 FCC Rcd at 5756, paras. 190-91.

[65] *See T-Mobile-Sprint Order*, 34 FCC Rcd at 10596, para. 43; *AT&T-DIRECTV Order*, 30 FCC Rcd at 9142, para. 24; *CenturyLink-Qwest Order,* 26 FCC Rcd at 4201, para. 11; *AT&T-BellSouth Order,* 22 FCC Rcd at 5756, para. 191.  The Commission generally does not reevaluate the qualifications of transferors unless issues related to basic qualifications have been sufficiently raised in petitions to warrant designation for hearing.  *See T-Mobile-Sprint Order*, 34 FCC Rcd at 10597, para. 45; *AT&T-DIRECTV Order*, 30 FCC Rcd at 9142, para. 25.

[66] *See supra* note 65.  With respect to the *WPIX NAL* proceeding discussed *infra* note 100, State Cable Petitioners assert that "Nexstar failed to disclose to the Commission in the WPIX matter that it exercised total retransmission consent negotiation authority over the station" and that the Applicants "make no mention of this prior lack of candor" in the instant Transaction.  State Cable Petition at n.131.  We dismiss this allegation as the *WPIX NAL*, as discussed *infra* note 100, raised no character issues.  Therefore, the Applicants had no duty of candor to raise this issue in the instant Transaction.

[67] *See T-Mobile-Sprint Order*, 34 FCC Rcd at 10597, para. 44; *AT&T-DIRECTV Order*, 30 FCC Rcd at 9142, para. 25.

[68] *Shareholders of CBS Corporation*, Memorandum Opinion and Order, l6 FCC Rcd 16072, 16072-73 (2001).

[69] *Nexstar Localism Commitment Letter* at 3.

[70] 47 CFR § 73.3555(e) (National Television Ownership Rule).

11

Federal Communications Commission                                    DA 26-267

Nexstar to better serve its local viewers while at the same time complying with the Commission's Local Television Ownership Rule and grant them herein.  Regarding Nexstar's proposed ownership of more than two full power television stations in twenty-three DMAs,[71] we grant the Applicants' requests for waiver of the Commission's Local Television Ownership Rule, subject to the divestitures Nexstar has committed to make.[72]

### 1.     National Television Ownership Rule

25.     While the Communications Act itself does not set any limit on broadcast ownership, the FCC has long had rules in place restricting the ownership of broadcast stations to promote its core public interest goals of competition, localism, and diversity.  The Commission created the National Television Ownership Rule in 1941 as a rule under the statute's public interest standard.  Since it was promulgated originally, the limit on national television ownership has become less restrictive as television licensees have required greater flexibility to respond to the marketplace changes confronting the broadcast industry.  During the earliest days of television, the Commission's first, and most restrictive, ownership limits prohibited an entity from owning, operating, or controlling more than three television stations nationwide.[73]

26.     As technology and the media landscape changed, the restriction on national ownership was relaxed accordingly.  The Commission's current National Television Ownership Rule—adopted twenty years ago[74]—prohibits a commercial television licensee from having a cognizable interest in television stations that have an aggregate national audience reach above 39%, or up to a maximum of 78% using the UHF discount, which attributes to a UHF television station only 50% of the households in the station's Nielsen Designated Market Area (DMA).[75]  While the Commission long ago rejected competition and diversity concerns as a justification for the rule, the rule was last retained in order to promote localism.[76]

27.     Over the last two decades, the media landscape has shifted dramatically, as a plethora of video distribution technologies have come to market at a pace that eclipsed all changes that came before.

---

[71] 47 CFR § 73.3555(b) (vacated in part by *Zimmer Radio of Mid-Missouri, Inc. v. FCC et al.*, 145 F.4th 828 (8th Cir. 2025) (*Zimmer Radio*)) (Local Television Ownership Rule).  These DMAs are:  Dallas-Fort Worth; Houston; Washington, DC (Hagerstown); Tampa-St. Petersburg (Sarasota); Phoenix (Prescott); Denver; Cleveland-Akron (Canton); Charlotte; Portland, OR; St. Louis; Indianapolis; San Diego; Hartford-New Haven; Grand Rapids-Kalamazoo-Battle Creek; Norfolk-Portsmouth-Newport News; New Orleans; Memphis; Buffalo; Little Rock-Pine Bluff; Des Moines-Ames; Huntsville-Decatur (Florence); Ft. Smith-Fayetteville-Springdale-Rogers; and Davenport-Rock Island-Moline.  The divestitures Nexstar has committed to making in Indianapolis and Norfolk-Portsmouth-Newport News would result in it owning two full power television stations in those DMAs.

[72] *Nexstar Localism Commitment Letter* at 2.

[73] *Broadcast Services Other Than Standard Broadcast*, 6 Fed. Reg. 2282, 2284-85 (May 6, 1941).

[74] *Implementation of Section 629 of the Consolidated Appropriations Act, 2004 (National Broadcast Television Ownership)*, Order, 22 FCC Rcd 4245, 4245-46, paras. 1-3 (2006) (*Order Implementing the CAA*).

[75] 47 CFR § 73.3555(e).  Section 73.3555(e)(1) states that "[n]o license for a commercial television broadcast station shall be granted, transferred or assigned to any party (including all parties under common control) if the grant, transfer or assignment of such license would result in such party or any of its stockholders, partners, members, officers or directors having a cognizable interest in television stations which have an aggregate national audience reach exceeding thirty-nine (39) percent."  Section 73.3555(e)(2) defines national audience reach as "the total number of television households in the Nielsen Designated Market Areas (DMAs) in which the relevant stations are located divided by the total national television households as measured by DMA data at the time of a grant, transfer, or assignment of a license" and provides that "[f]or purposes of making this calculation, UHF television stations shall be attributed with 50 percent of the television households in their DMA."

[76] *2002 Biennial Review Order*, 18 FCC Rcd at 13828-45, para. 538-84 (retaining a national cap but raising it from 35% to 45%).

**App.12**

**Federal Communications Commission**                DA 26-267

Viewers can now access video content online through streaming platforms, podcasts, video sharing sites, and virtual MVPDs.  Indeed the current media marketplace is thriving.  Recent data show that there are 15,686 radio stations; 1,777 television stations;[77] 35.3 million cable subscribers; 13.7 million DBS subscribers; 5.1 million telephone company video subscribers;[78] at least 193 nationally-distributed non-broadcast networks;[79] and roughly 2.3 million U.S. podcast shows.[80]  Approximately 121 million U.S. households subscribe to an Internet access provider,[81] and the Internet offers approximately 200 million active websites, with 252,000 new websites created daily.[82]  Although traditional MVPD subscribership has been in decline since 2012, when it reached 101.6 million subscribers,[83] 83% of U.S. adults now access video programming through streaming services.[84]  Subscribership is robust for online video distributors (OVDs), which distribute video programming to consumers over the Internet and include services such as Netflix, Amazon Prime Video, Disney+, and Paramount+, among many others.[85]  In addition, one recent report found that there are 1,189 free, ad-supported streaming television (FAST) channels are available over the Internet.[86]

28.    In that same timeframe, we have seen significant changes in the relative market position between national networks (particularly the Big Four networks (i.e., ABC, CBS, FOX, and NBC)) and their local affiliates.  To maximize their national audience, these Big Four networks traditionally have acquired their own local broadcast stations (typically in the largest television markets) and entered into affiliation agreements with station owners throughout the rest of the country.[87]  Through this affiliation model, the Big Four networks benefit by obtaining wide-scale delivery of their programming, and affiliates benefit by obtaining access to network programming.[88]  By contrast, many local affiliates historically have aired local programming, including local news, in time slots not occupied by national network programming.  Television viewers benefit from localism to the extent that their affiliated stations have the latitude and resources to produce and air local programming, as well as the incentive and ability to preempt national network programming in favor of local news or other programming that is potentially

---

[77] *Broadcast Station Totals as of December 31, 2025*, Public Notice, DA 26-49 (Jan. 13, 2026), https://docs.fcc.gov/public/attachments/DA-26-49A1.pdf.

[78] *2024 Communications Marketplace Report*, GN Docket No. 24-119, Report, 39 FCC Rcd 14116, 14256, para. 204, Fig. II.E.1 (2024) (*2024 CMR*).

[79] *See* S&P Global, *Economics of Basic Cable Networks, Ownership, 2025* (Dec. 9, 2025) (listing 193 cable networks).

[80] Beamly, *Podcast Statistics & Trends in 2026* (Jan. 1, 2026), https://beamly.com/podcast-statistics/.

[81] *See 2024 CMR*, 39 FCC Rcd at 14132-33, para. 25, Fig. II.A.11.

[82] As of October 2025, the total number of websites, including inactive sites, was over 1.2 billion.  Katherine Haan, *Top Website Statistics for 2025*, Forbes (Feb. 2, 2026), https://www.forbes.com/advisor/business/software/website-statistics/.

[83] *2024 CMR*, 39 FCC Rcd at 14256, para. 204.

[84] Eugenie Park and Colleen McClain, *83% of U.S. Adults Use Streaming Services, Far Fewer Subscribe to Cable or Satellite TV*, Pew Research Center (July 1, 2025), https://www.pewresearch.org/short-reads/2025/07/01/83-of-us-adults-use-streaming-services-far-fewer-subscribe-to-cable-or-satellite-tv/.

[85] *2024 CMR*, 39 FCC Rcd at 14266-68, paras. 225-28.

[86] Gracenote, *Beyond nostalgia: Tracking FAST channel evolution and the opportunities for platforms and advertisers*, at 2 (Mar. 2025).

[87] *See, e.g.*, *2022 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 22-459, Notice of Proposed Rulemaking, FCC 25-64, para. 41 (Sept. 30, 2025).

[88] *Id.*

13

**App.13**

of greater value or importance to their local audiences and better serves local needs and interests.[89]  This network/affiliate model has long sought to balance two competing interests: that of broadcast networks, which are economically motivated to ensure that their programming appeals to a nationwide audience and is carried broadly by affiliates; and that of local affiliates, which are economically motivated to attract viewers and advertising dollars by tailoring their programming to the tastes of their local audiences and by inducing networks to air programming that is responsive to their communities' needs and interests.[90]

29.    But times have changed.  Networks do not depend on affiliates for programming distribution to the same extent as they did in the past.  Now networks can reach viewers directly by placing their programming on their associated streaming platforms, such as Peacock, Disney+, Paramount+, and FOX One.  The streaming services owned by the parent companies of the Big Four networks reach tens of millions of viewers.[91]  As a result, the networks no longer rely solely on broadcast television stations to distribute their programming, which has resulted in reduced influence and bargaining power for local affiliates.  The station licensee is ultimately responsible for all programming aired on its station, including the absolute right to preempt network programming under section 73.658(g) of the Commission's rules.[92]  Any imbalance between the networks and affiliates that could jeopardize licensee control over programming is a matter of significant concern.

30.    Accordingly, in light of these broader trends and based on the specific factors presented in this transaction, we find that strict application of the rule is not warranted.  Instead, as discussed in greater detail below, we find both that we have the authority to waiver the National Television Ownership Rule and that a transaction-specific waiver is the best way to effectuate the FCC's traditional policy goals.  Indeed, as opposed to restricting the national audience reach of station owners through an *ex ante* 39% cap, we believe that a case-by-case waiver review of such transaction in this case gives us the opportunity to analyze whether a particular transaction would benefit the public, such as through increased investment in local news coverage and other programming of local interest.

31.    We now consider the record in this transaction.  Several Petitioners and Opposing Commenters[93] assert that the 39% limit (National Cap) set forth in the National Television Ownership Rule became fixed by statute when Congress instructed the Commission to "modify its rules" in the Telecommunications Act of 1996[94] and, again, in the Consolidated Appropriations Act of 2004.[95]  Moreover, several Petitioners argue that that the CAA's removal of the National Television Ownership Rule from the Commission's periodic review process under Section 202(h) of the 1996 Act foreclosed further changes by the Commission, because that process had "displaced the Commission's general rulemaking authority" over the broadcast ownership rules.[96]  In addition, some Petitioners assert that the

---

[89] *Id.*

[90] *Id.*

[91] *See 2024 CMR*, 39 FCC Rcd at 14277-78, para. 249, Fig. II.E.11.  For instance, by the third quarter of 2023, Peacock Premium had 28.4 million U.S. subscribers; Disney+ had 41.7 million; and Paramount+ had 30.7 million. *Id.*  FOX One launched in August 2025 and currently has more than two million subscribers.  Antenna, *State of Subscriptions Preview: Sports Officially Enters Its Streaming Era*, https://www.antenna.live/insights/state-of-subscriptions-preview-sports-officially-enters-its-streaming-era (last visited Feb. 11, 2026).

[92] 47 CFR § 73.658(g).

[93] *See, e.g.*, DIRECTV Petition at 55-59; EchoStar Petition at 7-9; ATVA and NCTC Objection at 15-16; NTCA Reply at 5-6.

[94] Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(c)(1), 110 Stat. 56, 111 (1996) (1996 Act).

[95] Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004) (CAA).

[96] *See, e.g.*, State Cable Petition at 12-14; DIRECTV Petition at 58-59.

14

forbearance provision in section 629 of the CAA[97] prohibits the Commission from waiving the National Television Ownership Rule.[98]  Moreover, some Petitioners assert that the divestiture provision in Section 629 of the CAA establishes "divestiture" as the "exclusive remedy for violations of the Cap."[99]  Finally, some Petitioners and Opposing Commenters maintain that waiver of the National Television Ownership Rule will fail to deliver concrete benefits to viewers that are specific to the Transaction and ask the Commission to deny the request for waiver of the National Television Ownership Rule.[100]  For the reasons discussed below, we disagree with Petitioners and Opposing Commenters in all respects and find both that the Commission has the authority to waive the National Television Ownership Rule and that waiver is warranted in this Transaction.[101]

32.     *Legal Authority*.  As a preliminary matter, we find that the Commission has the authority to waive the National Television Ownership Rule.  The Commission first established a 25% National Cap on television audience reach in 1985,[102] exercising its "broad statutory authority to regulate broadcast media 'as the public convenience, interest, or necessity requires.'"[103]  In section 202(c)(1)(B) of the 1996 Act, Congress instructed the Commission to "modify its rules . . . by increasing the national audience reach limitation for television stations to 35 percent."[104]  In section 202(h), Congress also directed the Commission to review its media ownership rules every two years to determine whether they remain "necessary in the public interest as the result of competition."[105]

---

[97] *See* CAA § 629(2), 118 Stat. at 100 (amending the 1996 Act to add Section 202(c)(4) to state that "Section 10 of the Communications Act of 1934 (47 U.S.C. § 160) shall not apply to any person or entity that exceeds the 39 percent national audience reach limitation for television stations").

[98] *See, e.g*., DIRECTV Petition at 55-56; State Cable Petition at 14.

[99] *See* State Cable Petition at 24-25.

[100] *See, e.g*., State Cable Petition at 22-23; ATVA and NCTC Objection at 17-18.  We acknowledge State Cable Petitioners' claim that there is a pending proceeding in which the Commission found that Nexstar apparently violated the Commission's rules, including the National Television Ownership Rule, when Nexstar assumed *de facto* control over WPIX, one of the stations it was required to divest to come into compliance with the rule in the *Nexstar/Tribune* transaction.  *See Mission Broadcasting, Inc., Licensee of Station WPIX, New York, NY*, Notice of Apparent Liability for Forfeiture, 39 FCC Rcd 3676 (2024) (*WPIX NAL*); *see Applications of Tribune Media Co. (Transferor) & Nexstar Media Group, Inc. (Transferee), et al*., Memorandum Opinion and Order, 34 FCC Rcd 8436, 8441-42, para. 8 (2019) (*Nexstar/Tribune Order*).  State Cable Petitioners assert that the finding in the *WPIX NAL* proceeding has direct implications on Nexstar's compliance with the National Television Ownership Rule in the instant Transaction and raises substantial and material questions of fact as to whether Nexstar has been violating other ownership rules via its relationships with side car entities.  State Cable Petition at 33-35.  In light of the decision we reach here today, we determine that this argument is moot.  The *WPIX NAL* proceeding remains open, and our action today does not pre-judge or in any way prejudice any actions we may take in that proceeding.

[101] *See* CAR Reply at 1 ("The Center continues to argue the best reading of the law is that the Commission retains the power to modify its own rules, which include the national ownership cap . . . . Objectors are again looking to stitch together 'signals' of 'Congress's intent' from various bits of text and scraps of legislative history, like Roman priests judging the auguries of bird entrails."); Sinclair Reply at 3 ("There is no statutory bar to the Commission raising or eliminating the national cap through rulemaking or waiving the cap to permit specific transactions based on its conclusion that such a waiver would serve the public interest.").

[102] *Amend. of Section 73.3555(e),* MB Docket No. 13-236, Order on Reconsideration, 32 FCC Rcd 3390, 3391, paras. 3-4 (2017).

[103] *FCC v. Prometheus Radio Project*, 592 U.S. 414, 418 (2021) (quoting 47 U.S.C. § 303(r)).

[104] Pub. L. No. 104-104, § 202(c)(1)(B), 110 Stat. 111 (1996).

[105] 110 Stat. 111-12.

33.      After the Commission subsequently voted to raise the National Cap to 45%,[106] Congress in 2004 "amended" section 202(c)(1)(B) "by striking '35 percent' and inserting '39 percent.'"[107] Congress also modified the Commission's obligation to periodically review its media ownership rules to every four years, and removed the National Cap from that obligation.[108]

*34.*     We determine that as amended, section 202(c)(1)(B) "did not directly establish [a specific percentage] limitation by statute," but "directed the Commission to revise its rules."[109]  By directing the Commission to "modify its rules" to set the National Cap at 35 and then 39%, Congress left the National Cap embedded in the Commission's rules and accordingly left undisturbed the Commission's general authority to waive any of its rules for "good cause" shown.[110]

*35.*     This straightforward reading of section 202(c)(1)(B) is reinforced by additional indications of statutory meaning.  First, two years before the CAA was enacted, the United States Court of Appeals for the D.C. Circuit had ruled that Congress's choice of 35% in the 1996 Act did not insulate the National Cap from further changes under the biennial review process.[111]  And, well before the 1996 Act, it had been settled generally that "changes in factual and legal circumstances may impose upon the [FCC] an obligation to reconsider a settled policy or explain its failure to do so."[112]  Courts "normally assume that Congress is aware of relevant judicial precedent when it enacts a new statute."[113]  Congress's choice to direct the Commission to "modify its rules" again in 2004 shows that it "intended the phras[ing]" to preserve the FCC's authority.[114]  Second, Congress "knew exactly" how to remove the Commission's authority to waive or modify the National Cap if it so intended,[115] but chose not to do so.[116]

---

[106] *See 2002 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket Nos. 02-277 et al., Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 13620, 13842-45, paras. 578-84 (2003) (*2002 Biennial Review Order*).

[107] CAA, § 629(1), 118 Stat. at 99.

[108] *Id.* § 629(3).

[109] *Amend. of Section 73.3555(e)*, MB Docket No. 13-236, Notice of Proposed Rulemaking, 28 FCC Rcd 14324, 14329, para. 13 (2013); *Amend. of Section 73.3555(e),* MB Docket No. 13-236, Report and Order, 31 FCC Rcd 10213, 10220-10224, paras. 16-24 (2016) (same).

[110] 47 CFR § 1.3 ("The FCC may waive its rules 'where particular facts would make strict compliance with a rule inconsistent with the public interest.'"); *Levine/Schwab Partnership v. FCC*, 61 F.4th 183, 186 (D.C. Cir. 2023) (cleaned up).

[111] *Fox Tel. St. v. FCC*, 280 F.3d 1027, 1043 (D.C. Cir. 2002) ("First, the choice of 35% rather than any other number determined only the starting point from which the Commission was to assess the need for further change").

[112] *Bechtel v. FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992).  *See FCC v. WNCN Listeners Guild*, 450 U.S. 582, 603 (1981) ("[T]he Commission should be alert to the consequences of its policies and should stand ready to alter its rule if necessary to serve the public interest more fully.").

[113] *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 233-34 (2020).

[114] *Id*.

[115] *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018).

[116] *See, e.g., Ex Parte* Letter of Thomas M. Johnson, Jr., MB Docket No. 17-318, at 5 (Dec. 15, 2025) (Johnson Letter) (discussing the Radio Broadcasting Preservation Act of 2000, Pub. L. No. 106-553, § 632(a)(1), 114 Stat. 2762, 2762A-111 (2000)).  There, the Johnson Letter states, "Congress showed that it knows how to remove the FCC's discretion expressly," because Congress similarly directed the Commission to "modify [its] rules" about low-power FM radio stations, but, "in tandem with that direction," Congress told the Commission that it "may not . . . eliminate or reduce" its "minimum distance separations," except "as expressly authorized by an Act of Congress enacted after the date of the enactment of this Act." *Id.* (internal citations omitted).  By comparison, as the Johnson Letter asserts, "the 1996 Act contained no such recission of the agency's discretion over the national cap,

(continued….)

16

Third, Congress considered and rejected language that would have codified the National Cap into statutory law, thereby eliminating the Commission's authority to waive or modify it.[117]  Finally, given the dynamic nature of the broadcast market, it would have been odd for Congress to have permanently embedded an ownership limit into statute and thereby immunized a media ownership limitation from regulatory reconsideration regardless of subsequent market conditions.

36.      As discussed above, Petitioners' and Opposing Commenters' arguments to the contrary are unpersuasive.  The National Cap's removal from the quadrennial review process did not serve to codify the 39% limitation.  Section 202(h), as amended, "merely provides that the Commission is not *required* to review the national audience reach cap quadrennially, it says nothing about whether the Commission is *allowed* to review that rule at any point in time."[118]  Nor does the divestiture provision of the 2004 CAA limit the Commission's authority to waive the National Cap.  That provision requires a broadcaster "that exceeds the 39 percent" cap to divest in certain circumstances "to come into compliance with such limitation."[119]  In doing so, the provision simply sets a specific time period for compliance with the rule; it does not purport to limit the FCC's authority to waive the rule.  The rule being waived, "the divestiture provision simply does not apply," because, as to the waiver recipient, the cap itself does not apply.[120]

37.      The forbearance provision,[121] likewise, does not limit Commission authority to waive the National Cap.  That provision cross-references section 10 of the Act, which authorizes the Commission to "forbear from applying any regulation or any provision of this chapter to a telecommunications carrier or telecommunications service" when the agency finds that certain criteria are met.[122]  By its terms, however, section 10 applies to "telecommunications carriers," and "telecommunications services," not broadcasters.  In any event, the Commission's forbearance and waiver authority are distinct.[123]

38.      Finally, the fact that section 629 of the 2004 CAA refers to "the 39 percent national audience reach limitation" several times is of no moment.  The language in question references the National Cap "in paragraph (1)(B)," which amends "section 202(c)(1)(B)" of the 1996 Act.  Section 202(c)(1)(B) directs the FCC to set the National Cap through its rulemaking authority, which necessarily leaves the agency with the discretion to modify or waive its rules.  The statutory references to "the 39

(Continued from previous page) ─────────────────────

demonstrating that Congress intended the FCC to continue to modify these rules as circumstances changed." *Id*. *See also* Comments of Nexstar Media Inc. in MB Docket No. 17-318 at n.88 & accompanying text (Aug. 4, 2025) (discussing examples of prohibitory language in the Communications Act).

[117] Johnson Letter at n.34 & accompanying text (discussing drafting history).  "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987).

[118] Joint Broadcasters' Reply Comments in MB Docket No. 17-318 at 12 (Aug. 22, 2025) (emphasis in original). *See Prometheus Radio Project v. FCC*, 373 F.3d 372, 397 (3rd Cir. 2004) (recognizing that section 202(h) did not speak to the FCC's authority over the National Cap "outside the context of" that mandatory review) (subsequent history omitted).

[119] 2004 CAA § 629(2).

[120] Applicants Opposition at 64.

[121] 2004 CAA § 629(2).

[122] 47 U.S.C. § 160.

[123] *See* Applicants Opposition at 61 ("the Commission is statutorily required to make certain specific findings to support exercise of its forbearance authority that differ from the general good cause standard that applies to waiver requests."), and "where Congress has intended to address the FCC's waiver authority, it has used the term waiver, not the term forbearance." *Id.* (citing 47 U.S.C. §§ 621(b)(3)).  *See* 1996 Act, § 202(d) (specifically addressing Commission's "waiver policy" for "one-to-a-market" ownership rules).

17

**App.17**

percent national audience reach limitation in paragraph (1)(B)" simply reflect that, at the time Congress enacted the 2004 CAA, it had directed the Commission to revise its rules to reset the National Cap to that level.

39.     The Commission's conclusion that the 39% rule is in fact a rule—rather than a statutory limit—is reinforced by a Court of Appeals decision.  The U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) remanded that decision in 2002, finding that the Commission had failed to demonstrate that the 35% cap advanced localism, diversity, or competition.[124]  The court stated that Congress' decision to set the cap at 35% did not require deference because "the choice of 35% rather than any other number determined only the starting point from which the Commission was to assess the need for further change."[125]

40.     *Waiver Request*.  In support of their request for waiver of the National Television Ownership Rule, the Applicants assert that depriving Nexstar of the ability to "maintain and grow its local news and other programming" undermines "localism by increasing the likelihood that local broadcast stations will be replaced by automated and filtered non-local content provided by Big Tech."[126]  They argue that the Transaction will enhance localism by allowing Nexstar to build on the current model of Nexstar and TEGNA of developing "strong local stations that are responsive to the needs of their communities and supporting them with the regional and national programming and journalistic resources that can only come with enhanced scale."[127]

41.     Further, the Applicants provide that "Nexstar has a proven history of improving service to the public when adding stations to its portfolio."[128]  In addition, the Transaction will "deliver specific benefits in each of the new DMAs where Nexstar will operate by shoring up the long term viability of those stations, fueling Nexstar's ability to continue investing in fact-based, independent journalism."[129]  The Applicants also note that the acquired TEGNA stations will gain access to Nexstar's Washington, DC bureau, and state capitol bureaus, both the Nexstar and TEGNA stations will benefit from their ability to share coverage across stations and markets, and Nexstar will gain access to TEGNA's Premion platform.[130]

---

[124] *See Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1040-49 (*Fox I*), *modified on reh'g*, 293 F.3d 537 (*Fox II*) (D.C. Cir. 2002).

[125] *Fox I*, 280 F.3d at 1042-43.

[126] Comp. Exh. at 116.

[127] *Id*.

[128] *Id*. at 115.  For example, the Applicants provide that in connection with Nexstar's acquisition of Tribune in 2019, Nexstar "identified several specific ways in which its ownership of the Tribune stations would benefit the public," such as providing localized coverage of national affairs; improving coverage of state government affairs; and enhancing news, public affairs, and emergency programming from reinvestment in local stations.  *Id.* at 10-11.  The Applicants assert that Nexstar delivered on each of the benefits, meeting or exceeding those described in Nexstar's applications filed in connection with the *Nexstar/Tribune* transaction.  *Id.* at 11.  In contrast to claims in the record that "[c]onsiderable evidence shows that Applicants' past mergers have led to a reduction in output and quality in local news," *see* DIRECTV Reply at 21, Nexstar states that in the "five years following Nexstar's 2019 acquisition of Tribune, Nexstar's stations (including many of its newly acquired stations) increased local news coverage by more than 28,000 hours per year (more than 12.5%) and garnered hundreds of awards annually recognizing their journalistic excellence.  During the same period, local lifestyle programming on Nexstar's stations rose by more than 9,000 hours per year (more than 75%) and local political programming increased by almost 800 hours per year (more than 40%)." *Nexstar Localism Commitment Letter* at 1-2.

[129] *Id*. at 115.

[130] *Id*.; Applicants Opposition at 69.

Federal Communications Commission    DA 26-267

42.    The Commission's rules may be waived for good cause shown.[131]  When an applicant seeks waiver of a rule, it must plead with particularity the facts and circumstances which warrant such action.[132]  Waiver is appropriate "if special circumstances warrant a deviation from the general rule and such deviation will serve the public interest."[133]  In making this determination, the Commission may take into account considerations of hardship, equity, or more effective implementation of overall policy on an individual basis.[134]

43.    We find that the waiver standard is met and special circumstances warrant grant of the waiver of the National Television Ownership Rule in this Transaction.[135]  First, we find that by enabling Nexstar to achieve the scale needed to sustain its operations, the Transaction will deliver concrete public interest benefits with respect to localism.[136]  For example, we find that Nexstar will be better positioned to "acquire and retain the rights to popular content, such as live sports and entertainment programming," which "it will make available to viewers over-the-air for free."[137]  We also agree with the Applicants that the Transaction will produce specific benefits to viewers, including increased access by the acquired TEGNA stations to Nexstar's Washington, DC, news bureau and state capital news bureaus, access by TEGNA's stations to Nexstar's ACT, and Nexstar's access to TEGNA's Premion platform.[138]  Importantly, the Applicants provide that these shared resources will allow local reporters and crews to provide "wider and/or more in-depth coverage of stories occurring within the stations' local communities."[139]

44.    Second, the Applicants provide that combining Nexstar with TEGNA "provides the only hope to achieve the scale needed to sustain operations."[140]  In further support, before the Transaction was negotiated, the Applicants point to TEGNA's plans to reduce costs and consolidate certain operations, as "part of its extensive cost-containment efforts."[141]  The Applicants state that when the "possibility of a

---

[131] 47 CFR § 1.3.

[132] *WAIT Radio v. FCC*, 418 F.2d 1153, 1157, para. 2 (D.C. Cir. 1969).

[133] *See Northeast Cellular*, 897 F.2d at 1166 (citing *WAIT Radio*, 418 F.2d at 1159)); *NetworkIP, LLC v. FCC*, 548 F.3d 116, 127 (D.C. Cir. 2008).

[134] *Northeast Cellular*, 897 F.2d at 1166.

[135] *CCB Order* at  n.27 ("The Commission previously has granted a permanent waiver of its multiple ownership rules," citing *Fox Television Stations Inc*., Declaratory Ruling, 8 FCC Rcd 5341 (1993) (permanent waiver of the newspaper/broadcast cross-ownership rule)).  *See also* CAR Feb. 11 *Ex Parte* Letter at 1 (disputing the assertion of the State Cable Petitioners that it was a novel legal question whether the Commission has authority to modify the National Cap and pointing out that the Commission has taken the position in the past that it does have that authority.).

[136] In the Commission's 2003 decision to retain the National Cap, the Commission reasoned that it was "necessary to promote localism on broadcast television" and found that a "cap is necessary to protect localism by preserving a balance of power between networks and affiliates . . . ."  *See 2002 Biennial Regulatory Review*, 18 FCC Rcd at 13828, para. 539.  *See also* Sinclair Reply at 7 ("Broadcasters' ability to preserve and expand local news turns *entirely* on the economics of the broadcast industry and individual broadcasters within the industry.") (emphasis in the original).

[137] *See* Applicants Opposition at 68-69.  *See also FCC's Media Bureau Seeks Comment on Sports Broadcasting Practices and Marketplace Developments*, MB Docket No. 26-45, Public Notice, DA 26-188 (MB Feb. 25, 2026) (acknowledging that "sports remain inherently local" as well as the "frustration among many consumers and sports fans" over the shift in availability of sporting events from free broadcast and traditional pay-TV packages to stand-alone subscription streaming services).

[138] Applicants Opposition at 69.

[139] *Id*.

[140] *Id*. at 68.

19

**App.19**

**Federal Communications Commission**                    **DA 26-267**

transformative merger or acquisition such as the Transaction came about, TEGNA paused its implementation of these plans."[142]  By providing TEGNA stations with the full panoply of resources available to Nexstar's stations, we find that the combined company will better serve its local communities.  In addition, to further serve its local communities, Nexstar commits to "expand its investment in local news and programming after its acquisition of TEGNA is complete" and "increase[e] the amount and availability of local programming in the aggregate in the acquisition markets, and to maintain that increase in local programming hours for a minimum of two years" from consummation.[143]  Nexstar also plans to expand the local news it provides in nine markets.[144]

45.      Finally, we find that the combination provided by the Transaction will help preserve Nexstar's ability to influence network programming through collective negotiation and to preempt network programming in favor of programming that better serves the local community.  Therefore, we find that strict compliance with the National Television Ownership Rule would be inconsistent with the purpose of the National Television Ownership Rule—enhancing localism—and, therefore, inconsistent with the public interest.[145]  The FCC is taking many actions to empower local broadcast television stations to serve the public interest, and this grant of the Applicants' request for waiver of the National Television Ownership Rule will help do just that.

### 2.      Local Television Ownership Rule

46.      The Local Television Ownership Rule provides that an entity may own two television stations licensed in the same DMA if:  "(i) the digital noise limited service contours of the stations . . . do not overlap; or (ii) at the time the application to acquire . . . the station(s) is filed, at least one of the stations is not ranked among the top-four stations in the DMA, based on the Sunday to Saturday, 7 a.m. to 1 a.m. daypart audience share ratings averaged over a 12-month period immediately preceding the date of the application, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service."[146]  Following *Zimmer Radio*'s vacatur of the latter provision—the Top-Four Prohibition—we have determined that ownership of any two stations in a single DMA is rule compliant.[147]  Ownership of more than two stations, however, is impermissible, unless the Commission finds good cause to waive application of the Local Television Ownership Rule.[148]

47.      In this section, we consider whether the Applicants' proposals to form or acquire Duopolies in seventeen DMAs, as well as their requests for waiver of the Local Television Ownership Rule to permit Nexstar to own more than two full power television stations in twenty-three DMAs, serve the public interest.[149]  Regarding the proposed Duopolies, several Petitioners and Opposing Commenters

(Continued from previous page) ————————————————

[141] *Id*. at 20, 70.

[142] *Id*. at 20.

[143] Nexstar Localism Commitment Letter at 2.

[144] *Id*.  These include Dallas-Fort Worth, Houston, Washington-Hagerstown, Phoenix-Prescott, Grand Rapids-Kalamazoo-Battle Creek, Huntsville-Decatur-Florence, Waco-Temple-Bryan, Abilene-Sweetwater, and San Angelo. *Id*. at n.1.

[145] *See 2002 Biennial Review Order*, 18 FCC Rcd at 13815, 13842, paras. 501, 578 (finding that while a National Cap was no longer needed to protect diversity or competition, a cap remained necessary to promote localism).

[146] 47 CFR § 73.3555(b) (vacated in part by *Zimmer Radio*).  We will refer to the numerical ownership limit of the Local Television Ownership Rule as the "Two-Station Limit."

[147] *Sinclair-Cunningham-Roberts Letter Order; Letter from Chief, Video Division to Sinclair, Inc., et al.*, Letter Order, DA 26-177 (MB Feb. 20, 2026) (*application for review pending*).

[148] *See CCB Order* at paras. 9-11.

[149] *See supra* note 4.

**App.20**

assert that nothing in *Zimmer Radio* alters the Applicants' affirmative obligation to demonstrate that ownership of two top-four stations in a DMA serves the public interest.[150]  Moreover, with respect to the twenty-three DMAs where the Applicants seek waivers for Nexstar to own more than two full power television stations, several Petitioners and Opposing Commenters assert that Applicants have failed to provide actual evidence of the public interest benefits in each of the twenty-three DMAs,[151] and others assert that the Transaction will harm local news in those DMAs.[152]

48.    *Duopolies*.  We find that the proposed Duopolies[153] fully comply with the Commission's rules, including the post-*Zimmer Radio* Local Television Ownership Rule.[154]  Further, as discussed below, we find that there are no cognizable public interest harms identified in the record that would require further consideration of these station combinations.[155]  Accordingly, we conclude that grant of the Duopolies will serve the public interest, convenience, and necessity.

49.    *More than Two Full Power Television Stations*.  In addition, the Applicants propose that Nexstar would own more than two full power television stations in twenty-three DMAs and, therefore, seek waivers of the Local Television Ownership Rule.[156]  In their waiver requests, the Applicants argue that, as a general matter, application of the Local Television Ownership Rule would "contravene the purpose of the rule and hinder the competition" that the rule was "intended to promote."[157]  They assert that, post-Transaction, competition in these DMAs will continue to be "fierce," with at least four,[158] and as many as fifteen,[159] full power television stations competing "for viewer attention and the advertising

---

[150] *See* DIRECTV Petition at 4; ATVA and NCTC Objection at 4.

[151] *See, e.g.*, Public Interest Petition at 68-132; State Cable Petitioners Reply at 17; DIRECTV Reply at 36-37. Moreover, regarding Public Interest Petitioners' claim that Applicants should have submitted requests for waiver of the Local Television Ownership Rule to allow for ownership of more than two stations in the Austin and Waco-Temple-Bryan DMAs, we dismiss this claim.  *See* Public Interest Petition at 132-34.  The Commission's rules exempt from the Local Television Ownership Rule full power television stations that have Commission authorization to operate as a satellite.  *See* 47 CFR § 73.3555, Note 5.

[152] *See, e.g.*, Public Interest Petition at 68-132; Newsmax Objection at 15-16.

[153] Comp. Exh. at 18, nn. 74-75. These DMAs are:  Atlanta; Seattle-Tacoma; Jacksonville; Tucson (Sierra Vista); Spokane; Waco-Temple-Bryan; San Angelo; Sacramento-Stockton-Modesto; Austin; Columbus; Harrisburg-Lancaster-Lebanon-York; Greensboro-High Point-Winston Salem; Wilkes-Barre-Scranton-Hazelton; Knoxville; Tyler-Longview (Lufkin & Nacogdoches); Odessa-Midland; and Abilene-Sweetwater.  *Id*. at nn. 74-75.

[154] *See Sinclair-Cunningham-Roberts Letter Order* at 8 ("Where the Commission has adopted a specific, numerical ownership limit, as it has with the Two-Station Limit, an applicant satisfies its initial burden of showing that the transaction is in compliance with the Act and the Commission's rules and policies related to competition and diversity by correctly certifying compliance with that limit.").

[155] *Id*. at 8-9 ("A more detailed showing is necessary only if the applicant is seeking a waiver, if a petitioner raises cognizable potential public interest harms, or if the Commission, on its own review, determines that additional information is required to process the application.") (internal citations omitted).  We note that some Opposing Commenters raise concerns with Nexstar's ownership of the proposed top-four duopolies, which we dismiss herein.  *See, e.g.*, Newsmax Objection at 12 ("Nexstar should not be permitted to further capture the local advertising market even where its proposed transaction would not violate the Commission's rules, such as markets where Nexstar proposes to hold two of the top-4 stations in a local market.").  For a discussion of the potential harms associated with the Transaction, see *infra* Section VI.A.

[156] These DMAs are:  Dallas-Fort Worth; Houston; Washington, DC (Hagerstown); Tampa-St. Petersburg (Sarasota); Phoenix (Prescott); Cleveland-Akron (Canton); Charlotte; Portland, OR; St. Louis; Indianapolis; San Diego; Grand Rapids-Kalamazoo-Battle Creek; Norfolk-Portsmouth-Newport News; Memphis; Buffalo; Little Rock-Pine Bluff; Des Moines-Ames; Huntsville-Decatur (Florence); Davenport-Rock Island-Moline; Fort Smith-Fayetteville-Springdale-Rogers; Denver; Hartford & New Haven; and New Orleans.

[157] Comp. Exh. at 19.

[158] *Id.* at 102 (Huntsville-Decatur (Florence) DMA)).

21

**App.21**

Federal Communications Commission                            DA 26-267

dollars that fuel local news and information programs"[160] and that grant of their waiver requests will "strengthen the competitive position of the stations currently owned and operated by Nexstar and TEGNA, particularly against the companies that are working feverishly to disrupt the way local media is consumed."[161]  The Applicants state that in "each DMA where [they] are seeking a waiver of the [Local Television Ownership Rule], core revenue is stagnant or falling" and contend that "[s]eparately, neither Nexstar nor TEGNA will be able to sustain their commitment to the localized, independent, fact-based journalism that these markets currently enjoy."[162]  The Applicants further maintain that "[i]nsisting on continued separate ownership eventually will be the death of at least one news organization in these markets."[163]  Finally, they state that "at least two independent local broadcast news operations will remain" in each of the DMAs post-Transaction.[164]

50.    Absent grant of the waiver request, the Applicants assert that Nexstar would be required to divest a weak station, one that shows "signs that a station is failing."[165]  While acknowledging that the "failing" station waiver standard "does not extend to markets where the applicant will own more than two stations," the Applicants nevertheless assert that the Commission's underlying policy—allowing a "failing" station to join with a stronger station in the market to improve its ability to provide local programming—supports grant of their waiver request.[166]  For example, in the Dallas DMA, Nexstar states that it would be forced to divest either KDAF(TV), Dallas, Texas (CW/Antenna TV), the tenth-ranked station in the DMA, or KFAA-TV, Decatur, Texas (Independent/EstrellaTV), the twelfth-ranked station in the DMA, and that it is only through common ownership that the stations are able to offer the quality programming that they provide today.[167]  If, however, it is permitted to leverage the strength of the newsroom of TEGNA's WFAA(TV), Dallas, Texas (ABC), the second-ranked station in the DMA, Nexstar states that it will be able to "begin broadcasting local news on KDAF."[168]  The Applicants assert that similar public interest benefits from common ownership will be realized across other DMAs, including, for example, Houston;[169] Phoenix (Prescott);[170] Grand Rapids-Kalamazoo-Battle Creek;[171] Washington, DC (Hagerstown);[172] San Diego;[173] and Huntsville-Decatur (Florence).[174]

(Continued from previous page) ───────────────────────

[159] *See, e.g.*, *id*. at 39 (Phoenix (Prescott) DMA)); *id*. at 31 (Washington, DC (Hagerstown) DMA).

[160] *Id*. at 20.

[161] *Id*. at 21.

[162] *Id*. at 20.

[163] *Id*. at 21.

[164] *Id*.

[165] *See, e.g., id.* at 25 (citing 47 CFR § 73.3555, note 7; *Review of the Commission's Regulations Governing Television Broadcasting*, Report and Order, 14 FCC Rcd 12903, 12939, para. 81 (1999) (*Local Ownership Order*)) (establishing the presumptive "failing" station waiver standard).  We note that in granting the requests for waiver herein, we are not explicitly applying the "failing" station waiver standard.

[166] Comp. Exh. at 26 (citing *Local Ownership Order*, 14 FCC Rcd at 12939, para. 79).

[167] *Id*.

[168] *Id*. at 21.

[169] *Id*. at 28 ("Nexstar plans to expand the local news operations at KIAH, which broadcasts a locally produced four-hour morning news show and a late local news program, utilizing TEGNA's award-winning KHOU newsroom.").

[170] *Id*. at 40 ("Nexstar plans to expand the amount of news on KAZT-TV, leveraging KPNX's strong local newsroom which has served its communities for more than 70 years.").

[171] *Id*. at 76 ("Nexstar plans to expand the amount of news on WZZM by leveraging WOOD-TV's award-winning newsroom.").

22

51.     The Commission's rules may be waived for good cause shown.[175]  When an applicant seeks waiver of a rule, it must plead with particularity the facts and circumstances which warrant such action.[176]  Waiver is appropriate "if special circumstances warrant a deviation from the general rule and such deviation will serve the public interest."[177]  In making this determination, the Commission may take into account considerations of hardship, equity, or more effective implementation of overall policy on an individual basis.[178]

52.     We find that special circumstances warrant grant of the waiver requests to permit Nexstar to own three full power television stations in twenty-one of the twenty-three requested DMAs.[179]  In particular, we find that such degree of common ownership better serves the public interest than strict application of the Local Television Ownership Rule in those DMAs where at least one of the stations in the proposed combination is weak relative to the stronger stations in the market.  Even in those DMAs here where the weak, third station is the fifth-ranked station in the market, it is a distant fifth in terms of revenue and audience share, or other special circumstances exist to offset any competition concerns.[180]  Requiring divestiture of these weak stations to an independent buyer is not likely to enhance competition or preserve and promote increased local programming.  Any prospective buyer would have to invest significant capital to build the facilities and hire the staff necessary to operate the stations independently, without any guarantee that the stations would generate enough revenue to survive.  Moreover, as the Applicants state, the "production or acquisition of video content is an expensive endeavor," with local news operations being "particularly costly," amounting to "one third or more of a station's annual budget."[181]  Indeed, even TEGNA observes that it has already considered significant cost reduction initiatives and strategies for consolidating certain operations for its television stations that it was able to

(Continued from previous page) ────────────────

[172] *Id.* at 32-33 (stating that Nexstar plans to "expand both the amount of news" on WDCW(TV), Washington, DC (Hagerstown) (CW/AntennaTV), the ninth-ranked station in the DMA, and "the station's newsgathering resources").

[173] *Id.* at 67 (observing that, if Nexstar were required to divest Nexstar station KUSI-TV, San Diego, California (Independent), the fifth-ranked station in the DMA, the 62.5 hours of local news that it broadcasts each week, as well as its extensive local high school sports coverage, could be lost).

[174] *Id.* at 103 (detailing that Nexstar plans to "expand the amount of news on WZDX, leveraging WHNT's strong news operation, which produces more than 37 hours of local news weekly and earned six ABBY Awards from the Alabama Broadcasters Association in 2025.") (internal citations omitted).

[175] 47 CFR § 1.3.

[176] *WAIT Radio v. FCC*, 418 F.2d 1153, 1157, para. 2 (D.C. Cir. 1969).

[177] *See Northeast Cellular Telephone Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir. 1990 (citing *WAIT Radio*, 418 F.2d at 1159)); *NetworkIP, LLC v. FCC*, 548 F.3d 116, 127 (D.C. Cir. 2008).

[178] *Northeast Cellular*, 897 F.2d at 1166.

[179] These DMAs are: Dallas-Fort Worth; Houston; Washington, DC (Hagerstown); Tampa-St. Petersburg (Sarasota); Phoenix (Prescott); Denver; Cleveland-Akron (Canton); Charlotte; Portland, OR; St. Louis; San Diego; Hartford-New Haven; Grand Rapids-Kalamazoo-Battle Creek; New Orleans; Memphis; Buffalo; Little Rock-Pine Bluff; Des Moines-Ames; Huntsville-Decatur (Florence); Ft. Smith-Fayetteville-Springdale-Rogers; and Davenport-Rock Island-Moline.  *See supra* note 6.

[180] For example, in the Grand Rapids-Kalamazoo-Battle Creek DMA, while Nexstar's WOTV(TV), Battle Creek, Michigan, is an ABC affiliate, it is a "distant fifth" in terms of both revenue and audience share.  *Id.* at 75.  Applicants note that this is largely because "WOTV primarily serves Battle Creek and the southeast corner of the DMA, while the DMA's top four stations cover the larger population center of Grand Rapids (which has its own ABC affiliate in WZZM[(TV), Grand Rapids, Michigan])."  *Id.* at 74-75.  Similarly, in the Huntsville-Decatur (Florence) DMA, Nexstar's WHDF(TV), Florence, Alabama, which is a CW affiliate, is a "very distant . . . fifth" and the "lowest-ranked reported station in the DMA in terms of revenue."  *Id.* at 102.

[181] Comp. Exh. at 9.

23

**Federal Communications Commission** **DA 26-267**

pause in light of the Transaction.[182]  The public interest would not be served by further diminishing these already weak stations or, in the event a buyer could not be found, letting them go dark; rather, we agree with the Applicants that Nexstar, through its acquisition of a third television in these markets, will "shor[e] up the long term viability" of the stations it will operate.[183]

53.    We further find that common ownership of the stations would not harm competition in these particular DMAs.  We agree with the Applicants that one station in each of these markets is weak and would otherwise fail, which does not serve competition.  In addition, Nexstar commits to "expand its investment in local news and programming after its acquisition of TEGNA is complete" and "increase[e] the amount and availability of local programming in the aggregate in the acquisition markets, and to maintain that increase in local programming hours for a minimum of two years" from consummation.[184]  Nexstar also plans to expand the local news it provides in nine markets.[185]  Thus, strict compliance with the Local Television Ownership Rule would be inconsistent with the purpose of that rule—promoting competition among broadcast television stations—and, therefore, inconsistent with the public interest.[186]  Moreover, we find that grant of the Application will result in more effective implementation of Commission policy by preserving and promoting increased local programming in these particular DMAs.

54.    Finally, based on our own review of the Application and the record in this matter, we conclude that the potential public interest benefits of Nexstar owning the stations in these DMAs outweigh the potential harms.  Indeed, any potential competitive harm would be minimal in light of the weakness of one or more stations in the markets, the breadth of the number of full-power broadcast stations in the DMAs, and the degree of independent ownership of those stations.  We have not identified any other issues or potential public interest harms that would require further consideration, and we conclude that Nexstar's acquisitions in these particular markets would serve the public interest.

### 3.    Divestitures

55.    Nexstar commits to divest the following stations:  KTVD(TV), Denver, Colorado; WTHR(TV), Indianapolis, Indiana;[187] WCTX(TV), New Haven, Connecticut; WAVY-TV, Portsmouth, Virginia; WUPL(TV), Slidell, Louisiana; and KNWA-TV, Rogers, Arkansas.[188]  Moreover, Nexstar commits to divesting these stations "no later than two years following the TEGNA Closing Date, provided that a waiver of the Local TVO Rule remains necessary under the Commission's rules at such time."[189]  We find that competition will not be unduly harmed during the period of common ownership.

---

[182] Applicants Opposition at 20.  As the Applicants themselves admit, they are both "susceptible to intense market forces conspiring against their ability to sustain operations at their current level, and these challenges are amplified by the specific circumstances in the markets in which waiver of the Commission's rules may be necessary to allow the proposed combinations."  *See* Comp. Exh. at 1.

[183] *See* Comp. Exh. at 115.

[184] Nexstar Localism Commitment Letter at 2.

[185] *Id*.  These include Dallas-Fort Worth, Houston, Washington-Hagerstown, Phoenix-Prescott, Grand Rapids-Kalamazoo-Battle Creek, Huntsville-Decatur-Florence, Waco-Temple-Bryan, Abilene-Sweetwater, and San Angelo.  *Id*. at n.1.

[186] *See 2014 Quadrennial Regulatory Review*, MB Docket Nos. 14-50 et al., Order on Reconsideration and Notice of Proposed Rulemaking, 32 FCC Rcd 9802, 9833, para. 71 (2017); *2018 Quadrennial Review*, MB Docket No. 18-349, Report and Order, 38 FCC Rcd 12782, 12827, para. 81 (Local Television Ownership Rule "remains first and foremost competition-focused").

[187] Given that Nexstar has committed to divest WTHR, we find that we need not address the arguments raised in the CCB Petition.

[188] *Nexstar Localism Commitment Letter* at 2.

[189] *Id.* at 2.

24

**App.24**

Federal Communications Commission                                    DA 26-267

## V.     STANDING

56.     Under the Act, only a "party in interest" has standing to file a petition to deny.[190]  In addition to containing the necessary factual allegations to support a *prima facie* case that grant of the application would be inconsistent with the public interest, convenience, and necessity, a petition to deny must contain specific allegations of fact demonstrating that the petitioner is a party in interest.[191]  The allegations of fact, except for those of which official notice may be taken, must be supported by an affidavit or declaration under penalty of perjury of someone with personal knowledge of the facts alleged.[192]  In the broadcast regulatory context, standing is generally shown in one of three ways: (1) as a competitor in the market subject to signal interference; (2) as a competitor in the market subject to economic harm; or (3) as a resident of the station's service area or regular listener or viewer of the station.[193]  An organization can establish standing on behalf of its members if it provides an affidavit or declaration "of one or more individuals entitled to standing indicating that the group represents local residents and that the petition is filed on their behalf."[194]  In general, a petitioner in a transfer proceeding also must allege and prove that: (1) it has suffered or will suffer an injury in fact; (2) there is a causal link between the proposed transfer and the injury in fact; and (3) not granting the transfer would remedy or prevent the injury in fact.[195]  Consistent with Commission practice, to the extent that we find standing has not been established, we will treat such pleading as an informal objection and address the arguments raised.[196]

57.     *CCB*.  We find that CCB has standing in the Indianapolis DMA.  Consistent with

---

[190] 47 U.S.C. § 309(d); 47 CFR § 73.3584.

[191] 47 U.S.C. § 309(d).

[192] *Id*.

[193] *See, e.g.*, *Nexstar/Tribune Order*; *Entercom License, LLC*, MB Docket No. 16-357, Hearing Designation Order, 31 FCC Rcd 12196, 12205, para. 22 (2016); *Connoisseur Media Licenses, LLC*, Letter Order, 30 FCC Rcd 6045, 6048, 6049 (MB 2015).

[194] *Liberman Television of Dallas License LLC, Debtor-in-Possession et al.*, Order, 34 FCC Rcd 8543, 8547, para. 7 (MB 2019); *Cox Radio, Inc. & Summit Media, LLC*, Letter Order, 28 FCC Rcd 5674, 5676, para. 2, n.12 (MB 2013).

[195] *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992); *MCI Communications Corp.*, Memorandum Opinion and Order, 12 FCC Rcd 7790 (1997); *Saga Communications of North Carolina, LLC and Library Productions, a Limited Partnership, re: WOXL-FM*, Letter Order, 20 FCC Rcd 11987 (MB 2005).  The Public Interest Petitioners request that the Commission expand its concept of "organizational standing," which limits an organization's standing to those markets in which a member submits an affidavit certifying residency or regular viewership of a station, and, instead, find standing based on harm that "could be derived from the impact on an organization, regardless of where it is located, or on the local or national impact on members who may not necessarily reside in the geographic market where stations are changing hands but still experience harm." Applicants Opposition at 10; *see Nexstar/Tribune Order*, 34 FCC Rcd at 8448, para. 23.  The Public Interest Petitioners and the State Cable Petitioners also assert organizational standing on the basis of the standard set forth by the United States Supreme Court in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) (*Hunt v. Washington*), despite the fact that the Commission has squarely rejected this theory.  Public Interest Petition at 19-25; State Cable Petitioners Reply at 6-7; see *Friends of the Earth, Inc. and Forest Conservation Council, Inc.*, Memorandum Opinion and Order, 18 FCC Rcd 23622, 23622, para. 4 (2003) (stating that, for purposes of standing under section 309(d), *Hunt v. Washington* does not eliminate the requirement that "associations submit affidavits from *local* residents or competitors to meet the party in interest threshold to establish standing" (emphasis added). Finally, the Applicants request that the Commission require organizational members to submit an affidavit certifying to both residency *and* regular viewership of a station in order to demonstrate standing.  Applicants Opposition at 6, n.12.  The Bureau is bound by Commission precedent, and, accordingly, we deny the requested changes to the Commission's analysis.

[196] *See* 73 CFR § 73.3587.

25

**App.25**

Federal Communications Commission                    DA 26-267

Commission precedent, any broadcast licensee has standing to challenge a competitor seeking to transfer a license in the same market.[197]

58.    *DIRECTV and EchoStar*.  DIRECTV claims standing, arguing that the consolidation created by the Transaction will increase retransmission consent rates to MVPDs, thus making consumer price increases inevitable and causing direct economic injury in the form of higher churn, lower subscribership, and lower revenue.[198]  EchoStar also asserts that it is a party in interest because, as the parent company of DISH, an MVPD that retransmits local broadcast stations in all 210 DMAs and currently has retransmission consent agreements with both Applicants, it expects to negotiate with them in the future for continued retransmission of all of their stations.[199]  The Applicants respond that the alleged harms are too remote and speculative to support standing and that concerns about prospective increases in retransmission consent fees should instead be addressed under the Commission's good-faith negotiation framework.[200]  In reply, DIRECTV states that the Applicants literally repeat arguments previously rejected by the Commission,[201] while EchoStar maintains that the threatened harm flows directly from the Transaction.[202]

59.    Consistent with Commission precedent, we determine that the claims of DIRECTV and EchoStar—that the Transaction will have specific, negative effects on them, specifically related to retransmission consent fee negotiations, and that those harms can be cured by dismissal or denial of the Applications—are sufficient to establish standing.[203]  Accordingly, we find that DIRECTV and EchoStar qualify as parties-in-interest with respect to the Transaction.

60.    *Public Interest Petitioners*.[204]  The Public Interest Petitioners claim representational standing and submit affidavits from members of NABET-CWA, TNG-CWA, Free Press, and UCC Media Justice certifying residency or regular viewership in several Transaction DMAs.[205]  We reject the Applicants' argument that the affidavits suffer from fatal "factual and other defects"[206] and, consistent with Commission precedent, find that all four organizations have standing as a party in interest only in certain DMAs.[207]  In all other markets, we will treat them as informal objectors.  NABET-CWA has standing in Cleveland; Denver; Hartford & New Haven; Portland, OR; and Washington, DC (Hagerstown).  TNG-CWA has standing in St. Louis; Phoenix (Prescott); and Washington, DC (Hagerstown).  Free Press has standing in Denver; Grand Rapids-Kalamazoo-Battle Creek; Indianapolis;

---

[197] *See*, *e.g.*, *Existing Shareholders of Clear Channel Communications Inc. (Assignors) and Aloha Station Trust, LLC, as Trustee (Assignee)*, Memorandum Opinion and Order, 23 FCC Rcd 1421, 1431, para. 22 (finding standing based on petitioner's claim that its licensed stations compete with the transferors' in the same market).

[198] DIRECTV Petition at 61-63.

[199] EchoStar Petition at 1, n.1.

[200] Applicants Opposition at 12.

[201] DIRECTV Reply at 41.

[202] EchoStar Reply at 11-13.

[203] *See Nexstar/Tribune*, 34 FCC Rcd at 8448, para. 24.

[204] Although Public Knowledge is a signatory to the Public Interest Petition, it failed to submit the required affidavits.  We will, therefore, treat Public Knowledge as an informal objector with respect to the Transaction.

[205] *See, e.g.*, Public Interest Petition at Declaration of Kenneth Koscick.

[206] Applicants Opposition at 11 & nn. 34-35.

[207] Since the requirement for viewer standing is either residency *or* regular viewership, *see supra* note 195, we reject the Applicants' arguments that certain affidavits certifying to regularly watching news produced by local television stations, without further specifying which stations, necessarily disqualifies party-in-interest status.  *See* Applicants Opposition at 11, nn.34 & 35.

New Orleans; Sacramento; and San Diego.  UCC Media Justice has standing in Cleveland-Akron (Canton); Dallas; Des Moines-Ames; Hartford & New Haven; St. Louis; San Diego; and Washington, DC (Hagerstown).

61.    *State Cable Petitioners*.[208]  The State Cable Petitioners claim standing as representatives of more than 20 MVPD "market competitors" operating across more than 100 DMAs served by Nexstar and TEGNA[209] and submit declarations from executives of member companies of BCAP and VCTA[210] asserting harms with a direct causal link to the Applicants' retransmission consent practices, including the use of "after-acquired station" clauses.[211]  The Applicants contend that, to the extent we find that MVPDs establish standing on the basis of potential changes in retransmission consent fees, standing for BCAP and VCTA should be limited to those DMAs in which the supporting declarations indicate their members carry Nexstar or TEGNA stations.[212]  In reply, the State Cable Petitioners assert that their representational standing should not be limited in geographic scope, because Nexstar negotiates retransmission consent on a nationwide basis, across its station footprint, and most State Cable Petitioners' members will be adversely impacted across numerous markets in multiple states."[213]

62.    Consistent with Commission precedent, we find that, based on the declarations submitted, BCAP and VCTA have standing in certain DMAs.  In all other markets we will treat them as informal objectors.  Both associations have standing in Portland-Auburn; Washington, DC (Hagerstown); Cleveland-Akron (Canton); Hartford & New Haven; Norfolk-Portsmouth-Newport News; Buffalo; Columbus; Harrisburg-Lancaster-Lebanon-York; and Wilkes Barre-Scranton-Hazleton.[214]  We also find that BCAP has standing in the Buffalo DMA.[215]

63.    *Newsmax*.  Newsmax argues that, as the independent video programmer of a linear television channel carried by major MVPDs, it will be harmed by the Transaction, because the resulting concentrated distribution will "further opportunities for other content creators like Nexstar . . . to use their market dominance to anti-competitively freeze out strong competitors from the marketplace."[216]  Specifically, Newsmax alleges that Nexstar has its own nonbroadcast station, NewsNation, and that "Nexstar appears to have used its broadcast stations as leverage to coerce pay-TV distributors to pay a

---

[208] Although BCAW, ICBA, MCTA, and TCBA are signatories to the State Cable Petition, they failed to submit the required affidavits.  We will, therefore, treat them as informal objectors with respect to the Transaction.

[209] State Cable Petition at 2-3.

[210] *See, e.g., id.* at Declaration of Joe Lorah.

[211] State Cable Reply at 4-5.

[212] Applicants Opposition at 13.

[213] State Cable Reply at 7.  To the extent that the State Cable Petitioners suggest that they, rather than their members, have "standing . . . as competitors alleging economic harm," *id.*, we reject the argument.  *See supra* note 195; *see also Standards for Determining the Standing of a Party*, 82 F.C.C.2d at 96 ("Even in the absence of injury to itself . . . an association may establish standing as the representative of its members, as long as it alleges that one or more of its members has standing, and the nature of the claim and the relief sought does not make the individual participation of each injured party indispensable to the resolution of the lawsuit.").

[214] *See* State Cable Petition, Declaration of Paul Beaudry, Cogeco US Finance LLC d/b/a Breezeline, para. 4 (Beaudry Decl.) (identifying service to all nine markets as a member of both BCAP and VCTA); Declaration of Joe Lorah, Blue Ridge Communications, para. 4 (Lorah Decl.) (identifying service to Harrisburg-Lancaster-Lebanon-York, PA; and Wilkes Barre-Scranton-Hazleton, PA as a member of BCAP); Declaration of Jack Capparell, Service Electric Cable TV & Communications, para. 4 (Capparell Decl.) (identifying service to Harrisburg-Lancaster-Lebanon-York, PA; and Wilkes Barre-Scranton-Hazleton, PA as a member of BCAP).

[215] *See* Lorah Decl. at para. 4 (identifying service to Buffalo, NY).

[216] Newsmax Objection at 3.

higher license fee for NewsNation than they do for Newsmax and other networks with higher ratings."[217] The Applicants respond that Newsmax fails to identify a single direct, non-speculative injury, observing that Newsmax does not own any television broadcast licenses; does not appear to have any commercial agreements with Nexstar or TEGNA; and that Newsmax's offices are not located in any of the DMAs at issue in the Transaction.[218]  The Applicants further argue that Newsmax's claim of harm from possible anti-competitive behavior is based on conjecture and rests on a speculative chain of possibilities that courts have rejected.[219]  In reply, Newsmax denies that its claim of harm is speculative, maintaining that Nexstar's increased market power will better enable it to strong-arm MVPDs to favor Nexstar's news service over Newsmax.[220]

64.    We find that Newsmax does not qualify as a party in interest.  The courts have made clear that "standing is accorded to persons not for the protection of their private interests but only to vindicate the public interest,"[221] and the Commission has repeatedly applied this ruling.[222]

## VI.    POTENTIAL PUBLIC INTEREST HARMS AND BENEFITS

65.    In this section, we consider the potential harms and benefits arising from the Transaction. As discussed below, in light of Nexstar's commitments, we find that the Transaction will not raise any material public interest harms.  We further find that the Transaction is likely to result in some tangible benefits by allowing Nexstar to achieve the scale necessary to provide expanded news coverage, enhanced service, and continued innovation to the local communities it serves.  We conclude that, on balance, the benefits outweigh any potential public interest harms.

66.    Petitioners and Opposing Commenters of the Transaction argue that there are several distinct markets where this Transaction will result in consumer or other harms.  As discussed below, the FCC's analysis and the record shows that they have failed to establish any relevant harms in the markets they define—or at least no harms that are not more than offset by the consumer benefits that will flow from this Transaction.  Indeed, in many cases, they focus on claiming harm to competitors, rather than articulating harms to competition or to consumers.  Throughout their advocacy, the Petitioners and Opposing Commenters also take a backwards-looking approach to competition.  In at least some cases, they appear to assume that the market for news and information and other programming is a narrow one that looks nearly indistinguishable to decades past when broadcast TV dominated rather than the decade we live in today when broadcast TV competes in a broader market against streaming services, cable operators, virtual cable operators, and many other digital and traditional distributors of news, content, and information.

67.    First, Petitioners and Opposing Commenters argue that this Transaction will produce harms in what they define as a market for local news.  They appear to claim that this Transaction will result in a reduction in local news and therefore harm to consumers.  The record does not support their position.

---

[217] *Id*. at 9;  Newsmax Reply at 3.  Newsmax included an affidavit from Christopher Ruddy, its chief executive officer, attesting to the truth of its submission.  Newsmax Objection at 17.

[218] Applicants Opposition at 6.

[219] *Id*. at n.15 (citations omitted).

[220] *Id*. at 4.

[221] *Office of Communication of the United Church of Christ v. FCC,* 123 U.S. App. D.C. 328, 335, 359 F. 2d 994, 1001 (1966).

[222] *See, e.g.*, *CBS Radio Stations Assignor, Memorandum Opinion and Order*, 22 FCC Rcd 20058, 20061, para. 4 (MB 2007); *Arizona Mobile Telephone Company*, Memorandum Opinion and Order, 80 FCC 2d 87 (1980) (creditors are not generally permitted to participate in an application proceeding solely on the ground that they have a financial stake in the matter).

68.        The record shows that Nexstar has a track record of maintaining and expanding local news following its acquisition of other stations.  For instance, in the five years following Nexstar's 2019 acquisition of Tribune, Nexstar's stations (including many of its newly acquired stations) increased local news coverage by more than 28,000 hours per year (more than 12.5%) and garnered hundreds of awards annually recognizing their journalistic excellence, as Nexstar states in the record here.[223]  During the same period, local lifestyle programming on Nexstar's stations rose by more than 9,000 hours per year (more than 75%) and local political programming increased by almost 800 hours per year (more than 40%).[224]  More concretely, Nexstar has committed in this Transaction to increasing the amount and availability of local programming in the aggregate in the acquisition markets, and to maintain that increase in local programming hours for a minimum of two years from the date the TEGNA Acquisition is consummated.[225]  We accept these commitments as enforceable commitments.

69.        We therefore conclude that the Petitioners and Opposing Commenters have failed to establish that there will be any relevant harm in a market they define as the local news market.  Indeed, we find that both Nexstar's commitments and our analysis of the record show that consumers will realize benefits in the local news market.  The new combined station group will continue to invest in local news and reporting, which is a significant public interest benefit.

70.        Second, Petitioners and Opposing Commenters of the Transaction argue that there will be harms in what they define as a local spot advertising market.  Here, too, they fail to show relevant harms in any such market.  More fundamentally, they ground their arguments in an outdated and unduly narrow view of the competitive environment.  For one, advertising dollars have been shifting in large numbers from local TV broadcasters to digital platforms, including Facebook.  This supports the argument both advertisers and consumers view digital advertising as a substitute for traditional local TV ads.  We agree and find that this substitutability rebuts the claimed harms articulated by many Petitioners and Opposing Commenters.  Moreover, their arguments ignore relevant and revolutionary technology and other changes.  Today, both streamers and cable providers offer targeted and DMA-wide advertising options.[226]  These offerings are real and competitive substitutes in any market for local spot advertising.  Advertisers can use those other competitors and distribution channels to reach the same demographic as the tradition local TV spot ad market.

71.        Third, Petitioners and Opposing Commenters argue that there will be harms that relate to retransmission consent.  In other words, they argue that this Transaction will allow Nexstar to charge MVPDs more for carrying their program and in turn this will result in harms—either harms in the form of higher prices or increased blackouts of programming based on their argument that MVPDs and Nexstar TV stations will fail to reach carriage agreements in a higher percentage of cases.  As above, they have failed to establish this case.  In many cases, certain Petitioners and Opposing Commenters do not even appear to be making an argument about harm to competition or to consumers.  Rather, they appear to be making an argument about harms to MVPDs themselves in the main while indicating additional pass through harms.  But even so, they have not established a cognizable case.

72.        As an initial matter, the Petitioners and Opposing Commenters effectively ignore a basic and fundamentally important fact.  The Nexstar programming that consumers get through an MVPD has a readily available and free substitute.  The Nexstar programming is broadcast free over the air.  Assuming

---

[223] *Nexstar Localism Commitment Letter* at 1-2.

[224] *Id.* at 2.

[225] *Id.*

[226] *See, e.g.*, *Streaming TV Advertising is Taking Over – Here's How to Get Ahead of the Curve* (Nov. 5, 2025), https://nationalmediaspots.com/streaming-tv-advertising-is-taking-over-heres-how-to-get-ahead-of-the-curve/; *Addressable TV: How Advertising is Evolving With Television* (Mar. 14, 2019), https://www.paramount.com/news/addressable-tv-how-advertising-is-evolving-with-television.

29

arguendo that Nexstar attempted to raise prices on MVPDs in a way that could produce cognizable harms or reach a point of program blackouts on MVPDs, consumers could switch to viewing Nexstar for free over the air. This dynamic disciplines both Nexstar and MVPDs. We find that this ameliorates any concerns raised in our record.

73.    Likewise, we conclude that the Petitioners and Opposing Commenters appear to base all or at least a substantial portion of their argument on a theory that consumers are locked into a traditional MVPD with no real competitive options if prices rises or blackouts increase. The record here does not support that view. We have entered a new streaming age where consumers have many more options today for the type of programming that, in many cases, they could previously get only through a single MVPD or cable company. Consumers now view those and use those as competitive substitutes to traditional MVPDs. This substitutability provides consumers with protection against the theoretical harms put forth by this deal's opponents. Indeed, the record here shows that the pricing charged for the equivalent type of network programming that consumers view on these streaming or virtual MVPDs is not set by Nexstar or any traditional MVPD. Rather, the evidence indicates that the relevant pricing for that programming is set, in the vMVPD context, by the national programmers negotiating directly with the vMVPD.

74.    Moreover, the Petitioners and Opposing Commenters have failed to establish that, assuming arguendo Nexstar increases the fees it charges to MVPDs, that any such increases would reach consumers. Nexstar does not set the rates that MVPDs charge to their customers. Nor have MVPDs provided transparency in our record regarding the current and potential future inputs that go into their consumer pricing for us to conclude that the relevant MVPDs would have to raise prices in response to this Transaction.

75.    We also note that Nexstar has made specific commitments that are relevant to this point. Specifically, Nexstar states that it "joins the Commission in its efforts to promote consumer affordability," and notes that MVPD bills are "wholly in the control of the MVPDS and include costs well beyond Nexstar's control, including for hundreds of other programming channels – particularly regional sports networks, equipment fees, DVR fees, regulatory fees, administrative fees, and HD fees, among the numerous charges before taxes."[227] While Nexstar notes its stations are always available free, over-the-air, to help consumers with MVPD affordability, "Nexstar commits to offer those MVPDs with which Nexstar has an existing retransmission consent agreement ('RTCA') that expires after the TEGNA Closing Date and before November 30, 2026, an extension of such RTCA at the existing rates through November 30, 2026."[228] We accept these commitments as enforceable commitments.

76.    As indicated above, we also conclude that Petitioners and Opposing Commenters have largely ignored the features relevant to today's media environment. Their arguments would be more relevant and meaningful if the media environment looked more like the one that existed decades ago. But today, broadcasters are competing in a much larger, broader, and competitive environment. They are competing against digital advertisers and they are competing for viewers and listeners against various technology platforms—from streamers to podcasts. Broadcasters are no longer competing against other broadcasters, but against competitors that deliver their offerings over the Internet, from satellites in orbit, over 5G networks, over fiber, and over cable plus other technologies or modes of distribution. When placed in its proper market context, the harms and arguments pressed by this Transaction's opponents melt away and are otherwise offset by the substantial, competitive benefits as well as the benefits for the FCC's core media policy goals of competition, localism, and diversity.

## A.    Potential Public Interest Harms

77.    *Anticompetitive Effects.*  Several of the Petitioners and Opposing Commenters allege that

---

[227] *Nexstar Localism Commitment Letter* at 2-3.

[228] *Id.*

Federal Communications Commission    DA 26-267

the Transaction would have anticompetitive effects, such as enhancing Nexstar's leverage to extract higher retransmission consent fees, which will negatively impact MVPDs and consumers,[229] and to use blackouts to extract higher retransmission consent fees.[230]  We find, however, that the Petitioners' and Opposing Commenters' allegations regarding retransmission consent do not raise a substantial and material question of fact as to whether grant of the Applications would serve the public interest.[231]

78.    With respect to alleged non-local effects, as the Commission stated in *Nexstar/Tribune*, the Commission has not previously identified a national market for the negotiation of retransmission consent.[232]  Neither has the Commission found previously that increasing a station's national reach leads to a public interest harm in retransmission consent negotiations.[233]  Moreover, consistent with the Commission's precedent, we do not believe that an increase in retransmission consent rates, by itself, is necessarily a public interest harm.[234]  Rather, as the Commission has found, such harm exists only where an increase is not the product of "competitive marketplace considerations."[235]  Over the years, the Commission has consistently affirmed Congress's intent, in creating the retransmission consent regime, to "establish a marketplace for the disposition of the rights to retransmit broadcast signals" but not to "dictate the outcome of the ensuing marketplace negotiations."[236]

79.    Nexstar states that it "joins the Commission in its efforts to promote consumer affordability," and notes that MVPD bills are "wholly in the control of the MVPDS and include costs well beyond Nexstar's control, including for hundreds of other programming channels – particularly regional sports networks, equipment fees, DVR fees, regulatory fees, administrative fees, and HD fees, among the numerous charges before taxes."[237]  While Nexstar notes its stations are always available free, over-the-air, to help with consumers with MVPD affordability, "Nexstar commits to offer those MVPDs with which Nexstar has an existing retransmission consent agreement ('RTCA') that expires after the TEGNA

---

[229] *See, e.g.*, Newsmax Objection at 11-12; DIRECTV Petition at 16-37; State Cable Petition at 36-48; ATVA and NCTC Objection at 4-9; EchoStar Petition at 2; AANHPI Coalition Objection at 3; National Civil Rights Organizations Objection at 3-4; Public Interest Petition at 42; Business Forward Objection at 1.

[230] *See, e.g.*, State Cable Petition at 47-48; EchoStar Petition at 15-16.

[231] *See supra* para. 12.

[232] *See Nexstar/Tribune Order*, 34 FCC Rcd at 8450, para. 28; *Transfer of Control of Raycom Media, Inc. to Gray Television, Inc.,* MB Docket 18-230, Memorandum Opinion and Order, 33 FCC Rcd 12349, 12357, para. 16 (*Gray-Raycom Order*); *Applications to Transfer Control of License Subsidiaries of Media General, Inc., to Nexstar Media Group, Inc.*, Memorandum Opinion and Order, 32 FCC Rcd 183, 196, para. 35 (MB/WTB 2017) (*Nexstar/Media General Order*).

[233] *See Nexstar/Tribune Order*, 34 FCC Rcd at 8451, para. 28; *Gray-Raycom Order*, 33 FCC Rcd at 12357, para. 16; *Nexstar-Media General Order*, 32 FCC Rcd at 196, para. 35.

[234] *Nexstar/Tribune Order*, 34 FCC Rcd at 8451, para. 29.

[235] *Implementation of the Satellite Home Viewer Improvement Act of 1999 Retransmission Consent Issues: Good Faith Negotiation and Exclusivity*, MB Docket No. 99-363, First Report and Order, 15 FCC Rcd 5445, 5469-70, paras. 56-58 (2000) (*2000 Good Faith Negotiation Order*) (finding that "[c]onsiderations that are designed to frustrate the functioning of a competitive market" and "[c]onduct that is violative of national policies favoring competition" are not "competitive marketplace considerations").

[236] *See, e.g., Implementation of Section 103 of the STELA Reauthorization Act of 2014 Totality of the Circumstances Test*, MB Docket No. 15-216, Notice of Proposed Rulemaking, 30 FCC Rcd 10327, 10328, para. 2 (2015) (*Totality of the Circumstances Test NPRM*), citing S. Rep. No. 92, 102nd Cong., 1st Sess. (1991), *reprinted in* 1992 U.S.C.C.A.N. 1133, 1169.  Under this regime, broadcast television stations and MVPDs are required to "negotiate in good faith," and it is not a violation of the duty to negotiate in good faith where a party enters into agreements "containing different terms and conditions, including price terms" with different entities, provided "such different terms and conditions are based on competitive marketplace considerations."  *See* 47 U.S.C. § 325(b)(3)(C).

[237] *Nexstar Localism Commitment Letter* at 2-3.

31

**App.31**

Closing Date and before November 30, 2026, an extension of such RTCA at the existing rates through November 30, 2026."[238]

80.     We also find that Petitioners' and Opposing Commenters' allegations regarding Nexstar's incentive and ability, post Transaction, to black out (or threaten to black out) its stations go to the functioning of the retransmission consent marketplace, and the Commission has not previously entertained general concerns about the retransmission consent marketplace in the context of individual transactions.[239]  Instead, the Commission has, in the past, considered issues related to retransmission consent—including leverage in retransmission consent negotiations—in rulemaking proceedings,[240] and we believe that it is appropriate to continue that practice here.

81.     *Localism, Viewpoint Diversity, and Jobs*.  Several Petitioners and Opposing Commenters raise concerns regarding localism, viewpoint diversity, and the labor market, arguing that increased access to Nexstar's various news bureaus will not enhance localism and that consolidated news functions will result in duplication of content.[241]  We find that Petitioners' and Opposing Commenters' arguments regarding the Transaction's impact on localism do not raise a substantial and material question of fact as to whether grant of the Applications would serve the public interest.[242]  In particular, we find that the arguments that increased access to national and state news bureaus will not enhance localism to be without merit.  As discussed *infra*, the Commission has previously found that expanded access to Washington, DC, and state news bureaus can produce transaction-specific public interest benefits to viewers and give stations access to new resources, even when it is a shared resource.[243]  To the contrary, we agree with the Digital First Project that the Transaction "enhances the ability of local stations to invest in journalism, weather coverage, and public-interest programming by enabling scale and operational efficiency.  The record contains no evidence that the [T]ransaction will reduce local news output, eliminate independent editorial judgment, or diminish viewpoint diversity."[244]

82.     Regarding the arguments that Nexstar may cut news staff and consolidate news functions, which they contend will result in duplication of content across stations and harm to localism,[245] we conclude that Nexstar's commitments, as discussed below, will offset any potential harms.  Specifically, as discussed above, Nexstar commits to "expand[ing] its investment in local news and programming"

---

[238] *Id*.

[239] *See, e.g., Nexstar/Tribune Order*, 34 FCC Rcd at 8452, para. 31; *Gray-Raycom Order*, 33 FCC Rcd at 12356-58, paras. 15-17; *Nexstar-Media General Order*, 32 FCC Rcd at 196-97, paras. 34-36.

[240] *See, e.g., Reporting Requirements for Commercial Television Broadcast Station Blackouts,* MB Docket No. 23-427, 40 FCC Rcd 659 (2024)*; Totality of the Circumstances Test NPRM*, 30 FCC Rcd at 10336-38, para. 13 (seeking comment on certain practices employed by broadcasters to "gain leverage in retransmission consent discussions"); *Implementation of Section 207 of the Satellite Home Viewer Extension and Reauthorization Act of 2004 Reciprocal Bargaining Obligation*, MB Docket No. 05-89, Report and Order, 20 FCC Rcd 10339, 10345-46, para. 15 (2005) (concluding that the Commission would "take into account the relative bargaining positions of the parties when examining the totality of the circumstances for a failure to negotiate in good faith"); *2000 Good Faith Negotiation Order*, 15 FCC Rcd at 5469-70, paras. 56-58 (providing examples of retransmission consent negotiation proposals that would be presumptively consistent or inconsistent with "competitive marketplace considerations" under the good faith standard).

[241] *See, e.g*., ATVA and NCTC Objection at 11-12; CCB Petition at 9-10; DIRECTV Petition at 46-53; Newsmax Objection at 13-16; State Cable Petition at 51-54; Public Interest Petition at 46-47.

[242] *See supra* para. 13.

[243] *See infra* notes 261-62.

[244] DFP Reply at 1.

[245] *See supra* paras. 13-14.

32

following consummation of the Transaction.[246]  Nexstar "commits to increasing the amount and availability of local programming in the aggregate in the acquisition markets, and to maintain that increase in local programming hours for a minimum of two years" from consummation.[247]  In addition, Nexstar plans to "expand the local news it provides" in nine DMAs.[248]  Nexstar also notes that it has launched local station apps on a variety of platforms in 108 of its markets, which provide a "wide array of truly local programming to serve viewers."[249]  Nexstar also submits that to preserve the independence of its local newsrooms, Nexstar has "already ended our news cooperation relationship with one of the national broadcast networks," and it intends to allow its "remaining agreements with the national broadcast networks to terminate as they expire."[250]  We accept these commitments as firm and definite, and expect that they will help ensure that the post-Transaction company will continue to serve its communities by maintaining, and even increasing, locally focused programming.

### B.    Potential Public Interest Benefits

83.    We next review the potential public interest benefits.  The Commission finds a claimed benefit to be cognizable only if it is:  (1)  transaction-related; (2) verifiable; and (3) likely to flow through to consumers and not inure solely to the benefit of the company.[251]  Here, we find that the record indicates that the Transaction will produce some public interest benefits to viewers of Nexstar's and TEGNA's stations, including by "creat[ing] a broadcaster positioned to navigate the 'headwinds and competition' facing the broadcast industry," which, in turn, will provide Nexstar with the ability to invest in local news production and increase local coverage in the communities the combined company will serve.[252]  We also recognize Nexstar's commitments to increase the amount and availability of local programming in the aggregate in the acquisition markets, as discussed above, as well as Nexstar's commitments with respect to its hiring practices.[253]

84.    The Applicants observe "existential changes to the market in which they compete," in which "national and global technology and media behemoths" increasingly "siphon revenue away from broadcast stations for the benefit of their national and global digital platforms and affiliated streaming services, rendering Nexstar and TEGNA unable to compete and maintain the same level of investment in the essential local content upon which their communities rely."[254]  They assert that consumers viewing habits have also changed, stating that in the last year, "video streaming reached 100 percent market penetration, streaming emerged as the primary way that viewers consume video content, and broadcast

---

[246] *Nexstar Localism Commitment Letter* at 2.

[247] *Id.*

[248] *Id.* & n. 1 ("These include Dallas-Fort Worth, Houston, Washington-Hagerstown, Phoenix-Prescott, Grand Rapids-Kalamazoo-Battle Creek, Huntsville-Decatur-Florence, Waco-Temple-Bryan, Abilene-Sweetwater, and San Angelo.")

[249] *Id.* at 2.

[250] *Id.*

[251] *See Applications Filed for the Transfer of Control of Authorizations Held by Frontier Communications Corporation, Debtor-in-Possession and Its Wholly Owned Subsidiaries et al.,* WC Docket No. 20-197 et al., Memorandum Opinion and Order and Declaratory Ruling, 36 FCC Rcd 291, 301, para. 25 (WCB/IB/WTB/OEA 2021) (*Frontier 2021 Order*); *T-Mobile-Sprint Order*, 34 FCC Rcd at 10671, para. 214; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9604, para. 50 (citing *AT&T-BellSouth Order*, 22 FCC Rcd at 5761, para. 202); *AT&T-DIRECTV Order*, 30 FCC Rcd at 9237, paras. 273-74.

[252] *See* Applicants Opposition at 16 & 21 (internal citations omitted).

[253] *Nexstar Localism Commitment Letter; see* Letter from Perry Sook, Chairman and Chief Executive Officer, Nexstar Media Group, Inc., to Hon. Brendan Carr, Chairman, FCC, MB Docket No. 25-331 (filed Mar. 19, 2026) (*Nexstar Workforce Commitment Letter*).

[254] Comp. Exh. at 2.

33

television viewing plummeted to a new low of just 18.5 percent of total monthly television viewing."[255] The Applicants note that forecasts predicting decreases in local television advertising revenue are further compounded by rising operating costs for producing or acquiring video content.[256]  The Applicants thus provide that "[w]ith this handwriting on the wall," the proposed Transaction represents the best course for the future and will "enable the combined company to reduce costs and innovate, thus continuing to serve local communities with freely available and critical news, sports, weather and emergency information."[257]

85.    Further, they assert that "[e]fficiencies created by the Transaction likewise will fuel enhancements to the quantity and quality of broadcast service that neither company alone can continue to provide."[258]  For example, the Applicants state that, once the Transaction is consummated, the TEGNA stations will gain access to Nexstar's Washington, DC, news bureau, a resource TEGNA stations will not otherwise have, "which provides in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the individual DMAs where Nexstar's stations operate."[259]  Moreover, viewers of stations, including in a number of states that TEGNA stations serve, will also benefit from Nexstar's operation of "24 state capital news bureaus that provide local viewers with increased access to state lawmakers and their opinions on critical issues, state agency activities, and state supreme court proceedings, as well as special programming on state issues."[260]  We have previously found that expanded access to Washington, DC, and state news bureaus that results from a transaction "provide[s] transaction-specific, public interest benefits" to viewers[261] and that even shared news sources provide public interest benefits when stations did not have prior access to those sources.[262]

86.    To better serve their local audiences, the Applicants point out that the Transaction will also allow "Nexstar to accelerate the shift to ATSC 3.0 for those TEGNA stations that are not already equipped for the next generation broadcast television standard."[263]  They also provide that the "Transaction will go beyond merely upgrading broadcast infrastructure and provide all TEGNA stations with access to EdgeBeam Wireless, a joint venture among four leading broadcast station groups (including Nexstar) that provides a national footprint for ATSC 3.0 Broadcast Internet services. Participation in EdgeBeam will provide the TEGNA stations with new revenue opportunities, allowing them to monetize their spectrum to support their continued investment in reliable and trustworthy local journalism."[264]  As we have previously found, investments in ATSC 3.0 for the acquired stations constitutes a public interest benefit and we therefore disagree with Petitioners[265] and find that accelerating

---

[255] Applicants Opposition at 17, citing Comp. Exh. at 7.

[256] *See* Comp. Exh. at 8-9.

[257] *Id*. at 9.  *See also* CAR Comments at 9 ("And Nexstar's applications demonstrate a consistent commitment to increasing local sports where possible, such as pre-season games or secondary sports and leagues. Approving the transaction will give Nexstar necessary leverage to negotiate broadcast rights that keep marquee sports free for everyone.").

[258] Applicants Opposition at 26.

[259] *Id*. at 21-22.

[260] *Id*. at 22-23 (internal citations omitted).

[261] *See Nexstar/Tribune Order*, 34 FCC Rcd at 8449-8450, para. 26; *see also Gray-Raycom Order*, 33 FCC Rcd at 12356, 12361-62, paras. 14, 31; *Nexstar/Media General Order*, 32 FCC Rcd at 194-196, paras. 26-29.

[262] *Nexstar/Tribune Order*, 34 FCC Rcd at 8450, para. 26; *Gray-Raycom Order*, 33 FCC Rcd at 12361-62, para. 31.

[263] Applicants Opposition at 24-25.

[264] *Id*. (internal citations omitted).

[265] *See* Public Interest Petition at 48; State Cable Petition at 55-57.

34

Federal Communications Commission                                          DA 26-267

the transition to ATSC 3.0 is in the public interest.[266]

87.    We recognize Nexstar's commitment to equal opportunity employment and nondiscrimination as strengthening its service in the public interest.[267]  Nexstar states that it does not have DEI programs in place today and will not establish such initiatives.  Nexstar further summarizes the changes Nexstar has made to its practices to promote equal employment and nondiscrimination and additional commitments it will make upon closing the Transaction, including to its hiring and promoting practices, training, compensation, supplier and vendor selection, leadership structure and job functions, employee groups, and public and internal messaging.[268]  We accept Nexstar's commitment as firm and definite, and expect that these changes will prevent DEI discrimination in the post-transaction company, as consistent with the law and public interest.[269]

88.    The Commission has acknowledged that a transaction enabling a combined company to emerge as a stronger competitor in the marketplace is a transaction-specific benefit to consumers.[270]  Overall, based on the record before us, we find that the Transaction is likely to result in public interest benefits and therefore we find the Transaction serves the public interest, convenience, and necessity.

## VII.    CONCLUSION

89.    We have conducted a detailed review of the Applications and related filings in this proceeding, as well as a thorough analysis of the potential harms and benefits of the Transaction, including the firm and definite commitments of the Applicants to take certain actions, as set forth above.  Based on our extensive consideration of the record, and subject to the commitments contained herein, we find that the Applicants are fully qualified and conclude that grant of the Applications will result in public interest benefits and serve the public interest, convenience, and necessity.

## VIII.    ORDERING CLAUSES

90.    Accordingly, having reviewed the Applications and the record in this matter, **IT IS ORDERED**, pursuant to sections 4(i) and (j), and 310(d) of the Communications Act of 1934, as amended, 47 U.S.C. § 154(i), 154(j), 310(d), that, subject to Nexstar's commitments, the Applications proposing to transfer control of TEGNA Inc. to Nexstar Media Inc. **ARE GRANTED**.

91.    Accordingly, **IT IS ORDERED** that, pursuant to section 1.3 of the Commission's rules, 47 CFR § 1.3, the requests of Nexstar Media Inc. and TEGNA Inc., for waiver of sections 73.3555(b) and (e) of the Commission's rules, 47 CFR § 73.3555(b) (vacated in part by *Zimmer Radio*) and (e), **ARE GRANTED**.

92.    **IT IS FURTHER ORDERED**, pursuant to Sections 4(i) and (j), 309, and 310(d) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 309, 310(d), that the petitions to deny and other requests for Commission action, addressed herein, filed by Newsmax Media, Inc.; DIRECTV, LLC; CCB License, LLC; Broadband Communications Association of Pennsylvania et al.; United Church of Christ Media Justice Ministry et al.; EchoStar Corporation; One Ministries, Inc.;

---

[266] *See Nexstar/Tribune Order*, 34 FCC Rcd at 8450, para. 26.

[267] *Nexstar Workforce Commitment Letter*.

[268] *Id.* at 1-3.

[269] *Id*.

[270] *See, e.g., CenturyLink-Qwest Order*, 26 FCC Rcd at 4202, para. 15, 4212, para. 39; *Applications of GCI Communication Corp., ACS Wireless License Sub, Inc., ACS of Anchorage License Sub, Inc., and Unicom, Inc. for Consent to Assign Licenses to the Alaska Wireless Network, LLC*, Memorandum Opinion and Order and Declaratory Ruling, 28 FCC Rcd 10433, 10472-73, paras. 100-101 (2013) (*Alaska Wireless-GCI Order*); *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9605, paras. 52-53; *Applications of XO Holdings and Verizon Communications Inc. For Consent to Transfer Control of Licenses and Authorizations,* Memorandum Opinion and Order, 31 FCC Rcd 12501, 12534, para. 61 (WCB, IB, WTB 2016).

35

**App.35**

AANHPI Coalition Objection; National Civil Rights Organizations Objection; Sean Patrick Patterson; Mafia Monthly; Business Forward; American Television Alliance and National Content & Technology Cooperative; NTCA—The Rural Broadband Association; Cincinnati Bell Extended Territories LLC (dba altafiber); National Association of Black Owned Broadcasters and the Multicultural Media, Telecom and Internet Council, **ARE DENIED**.

93.    **IT IS FURTHER ORDERED** that this Memorandum Opinion and Order **SHALL BE EFFECTIVE** upon adoption, in accordance with section 1.102 of the Commission's rules, 47 CFR § 1.102.  Petitions for reconsideration under section 1.106 of the Commission's Rules, 47 CFR § 1.106, may be filed within thirty days of the release date of this Memorandum Opinion and Order.

94.    These actions are taken pursuant to Sections 0.61 and 0.283 of the Commission's rules, 47 CFR §§ 0.61, 0.283, and Sections 4(i) and (j), and 310(d) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 310(d).

95.    **IT IS FURTHER ORDERED**, that, should no petitions for reconsideration, applications for review, or petitions for judicial review be timely filed, MB Docket No. 25-331 **SHALL BE TERMINATED** and the docket closed.

FEDERAL COMMUNICATIONS COMMISSION

Erin Boone
Chief, Media Bureau

36

**App.36**

Federal Communications Commission                               DA 26-267

**APPENDIX**
**TEGNA Transfer of Control Applications**

| Call Sign | Facility ID No. | Licensee | LMS File No. | Community of License |
|---|---|---|---|---|
| WUPL(TV) | 13938 | Belo TV, Inc. | 0000280940 | Slidell, LA |
| WBXN-CD | 70419 | Belo TV, Inc. | 0000280941 | New Orleans, LA |
| KFSM-TV | 66469 | Cape Publications, Inc. | 0000280719 | Fort Smith, AR |
| KTHV(TV) | 2787 | Cape Publications, Inc. | 0000280720 | Little Rock, AR |
| WZZM(TV) | 49713 | Combined Communications of Oklahoma, LLC | 0000280972 | Grand Rapids, MI |
| KENS(TV) | 26304 | KENS-TV, Inc. | 0000280703 | San Antonio, TX |
| KFMB-TV | 42122 | KFMB-TV, LLC | 0000280712 | San Diego, CA |
| KHOU(TV) | 34529 | KHOU-TV, Inc. | 0000280755 | Houston, TX |
| KTBU(TV) | 28324 | KHOU-TV, Inc. | 0000280756 | Conroe, TX |
| KING-TV | 34847 | KING Broadcasting Company | 0000280789 | Seattle, WA |
| KREM(TV) | 34868 | KING Broadcasting Company | 0000280799 | Spokane, WA |
| KTVB(TV) | 34858 | KING Broadcasting Company | 0000280798 | Boise, ID |
| K15IO-D | 34869 | KING Broadcasting Company | 0000280792 | McCall & New Meadows, ID |
| K16JE-D | 188132 | KING Broadcasting Company | 0000280790 | Glenns Ferry, ID |
| K17KF-D | 188131 | KING Broadcasting Company | 0000280797 | Cambridge, ID |
| K21CC-D | 50532 | KING Broadcasting Company | 0000280796 | Lewiston, ID |
| K23KY-D | 11446 | KING Broadcasting Company | 0000280791 | Council, ID |
| K29NB-D | 34884 | KING Broadcasting Company | 0000280793 | Cascade, ID |
| K30QA-D | 34861 | KING Broadcasting Company | 0000280794 | Coeur d'Alene, ID |
| KTFT-LD | 167056 | KING Broadcasting Company | 0000280795 | Twin Falls, ID |
| KONG(TV) | 35396 | KONG-TV, Inc. | 0000280832 | Everett, WA |
| KSKN(TV) | 35606 | KSKN Television, Inc. | 0000280842 | Spokane, WA |
| KTTU-TV | 11908 | KTTU-TV, Inc. | 0000280848 | Tucson, AZ |
| KVUE(TV) | 35867 | KVUE Television, Inc. | 0000280853 | Austin, TX |
| KWES-TV | 42007 | KWES Television, LLC | 0000280858 | Odessa, TX |
| KXTV(TV) | 25048 | KXTV, LLC | 0000280868 | Sacramento, CA |
| KBMT(TV) | 10150 | LSB Broadcasting, Inc. | 0000280646 | Beaumont, TX |
| KCEN-TV | 10245 | LSB Broadcasting, Inc. | 0000280649 | Temple, TX |
| KIDY(TV) | 58560 | LSB Broadcasting, Inc. | 0000280656 | San Angelo, TX |
| KIII(TV) | 10188 | LSB Broadcasting, Inc. | 0000280647 | Corpus Christi, TX |
| KXVA(TV) | 62293 | LSB Broadcasting, Inc. | 0000280652 | Abilene, TX |
| KYTX(TV) | 55644 | LSB Broadcasting, Inc. | 0000280651 | Nacogdoches, TX |
| KUIL-LD | 168234 | LSB Broadcasting, Inc. | 0000280655 | Beaumont, TX |
| KAGS-LD | 10246 | LSB Broadcasting, Inc. | 0000280648 | Bryan, TX |

37

**App.37**

Federal Communications Commission                    DA 26-267

| Call Sign | Facility ID No. | Licensee | LMS File No. | Community of License |
|---|---|---|---|---|
| KIDU-LD | 58559 | LSB Broadcasting, Inc. | 0000280650 | Brownwood, TX |
| KIDV-LD | 58571 | LSB Broadcasting, Inc. | 0000280654 | Albany, TX |
| KVHP-LD | 168235 | LSB Broadcasting, Inc. | 0000280653 | Jasper, TX |
| WGRZ(TV) | 64547 | Multimedia Entertainment, LLC | 0000280922 | Buffalo, NY |
| KARE(TV) | 23079 | Multimedia Holdings Corporation | 0000280666 | Minneapolis, MN |
| KNAZ-TV | 24749 | Multimedia Holdings Corporation | 0000280670 | Flagstaff, AZ |
| KPNX(TV) | 35486 | Multimedia Holdings Corporation | 0000280667 | Mesa, AZ |
| K06AE-D | 35274 | Multimedia Holdings Corporation | 0000280668 | Prescott, AZ |
| K26OD-D | 35487 | Multimedia Holdings Corporation | 0000280669 | Globe, AZ |
| KPSN-LD | 63396 | Multimedia Holdings Corporation | 0000280672 | Payson, AZ |
| KTVD(TV) | 68581 | Multimedia Holdings Corporation | 0000280671 | Denver, CO |
| KUSA(TV) | 23074 | Multimedia Holdings Corporation | 0000280674 | Denver, CO |
| WJXX(TV) | 11893 | Multimedia Holdings Corporation | 0000280675 | Orange Park, FL |
| WTLV(TV) | 65046 | Multimedia Holdings Corporation | 0000280673 | Jacksonville, FL |
| KSDK(TV) | 46981 | Multimedia KSDK, LLC | 0000280839 | St. Louis, MO |
| WATL(TV) | 22819 | Pacific and Southern, LLC | 0000280898 | Atlanta, GA |
| WLTX(TV) | 37176 | Pacific and Southern, LLC | 0000280901 | Columbia, SC |
| WMAZ-TV | 46991 | Pacific and Southern, LLC | 0000280900 | Macon, GA |
| WXIA-TV | 51163 | Pacific and Southern, LLC | 0000280899 | Atlanta, GA |
| WBNS(AM) | 54901 | RadiOhio, Incorporated | 0000280910 | Columbus, OH |
| WBNS-FM | 54701 | RadiOhio, Incorporated | 0000280909 | Columbus, OH |
| WHAS-TV | 32327 | Sander Operating Co. I LLC D/B/A WHAS Television | 0000280924 | Louisville, KY |
| KGW(TV) | 34874 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280730 | Portland, OR |
| K16ML-D | 34851 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280736 | Corvallis, OR |
| K17HA-D | 130923 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280738 | Astoria, OR |
| K19LT-D | 34864 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280732 | Prineville, etc., OR |
| K25KS-D | 34844 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280735 | The Dalles, OR |
| K28MJ-D | 189303 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280737 | Tillamook, OR |
| K29AZ-D | 34865 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280734 | Newport, OR |
| K35HU-D | 34870 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280733 | Grays River, OR |
| KGWZ-LD | 30810 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280731 | Portland, OR |

38

**App.38**

Federal Communications Commission                    DA 26-267

| Call Sign | Facility ID No. | Licensee | LMS File No. | Community of License |
|---|---|---|---|---|
| KMSB(TV) | 44052 | Sander Operating Co. V LLC D/B/A KMSB Television | 0000280816 | Tucson, AZ |
| KCWI-TV | 51502 | TEGNA Broadcast Holdings, LLC | 0000280681 | Ames, IA |
| WCCT-TV | 14050 | TEGNA Broadcast Holdings, LLC | 0000280688 | Waterbury, CT |
| WNEP-TV | 73318 | TEGNA Broadcast Holdings, LLC | 0000280689 | Scranton, PA |
| WOI-DT | 8661 | TEGNA Broadcast Holdings, LLC | 0000280692 | Ames, IA |
| WPMT | 10213 | TEGNA Broadcast Holdings, LLC | 0000280687 | York, PA |
| WQAD-TV | 73319 | TEGNA Broadcast Holdings, LLC | 0000280693 | Moline, IL |
| WTIC-TV | 147 | TEGNA Broadcast Holdings, LLC | 0000280683 | Hartford, CT |
| WZDX(TV) | 28119 | TEGNA Broadcast Holdings, LLC | 0000280684 | Huntsville, AL |
| W07DC-D | 73325 | TEGNA Broadcast Holdings, LLC | 0000280686 | Allentown/ Bethlehem, PA |
| W10CP-D | 73320 | TEGNA Broadcast Holdings, LLC | 0000280682 | Towanda, PA |
| W14CO-D | 73326 | TEGNA Broadcast Holdings, LLC | 0000280685 | Clarks Summit, etc., PA |
| W15CO-D | 73324 | TEGNA Broadcast Holdings, LLC | 0000280691 | Towanda, PA |
| W20AD-D | 73321 | TEGNA Broadcast Holdings, LLC | 0000280694 | Williamsport, PA |
| W26CV-D | 129499 | TEGNA Broadcast Holdings, LLC | 0000280695 | Mansfield, PA |
| W29FQ-D | 73327 | TEGNA Broadcast Holdings, LLC | 0000280690 | Pottsville, PA |
| WTSP(TV) | 11290 | Tegna East Coast Broadcasting, LLC | 0000280915 | St. Petersburg, FL |
| WLBZ(TV) | 39644 | Tegna East Coast Broadcasting, LLC | 0000280918 | Bangor, ME |
| WCSH(TV) | 39664 | Tegna East Coast Broadcasting, LLC | 0000280916 | Portland, ME |
| WATN-TV | 11907 | TEGNA Memphis Broadcasting, Inc. | 0000280904 | Memphis, TN |
| WLMT(TV) | 68518 | TEGNA Memphis Broadcasting, Inc. | 0000280905 | Memphis, TN |
| WTHR(TV) | 70162 | VideoIndiana, Inc. | 0000280937 | Indianapolis, IN |
| WALV-CD | 70161 | VideOhio, Inc. | 0000280876 | Indianapolis, IN |
| WBIR-TV | 46984 | WBIR-TV, LLC | 0000280906 | Knoxville, TN |
| WBNS-TV | 71217 | WBNS-TV, Inc. | 0000280907 | Columbus, OH |
| WCNC-TV | 32326 | WCNC-TV, Inc. | 0000280911 | Charlotte, NC |
| W17EE-D | 32316 | WCNC-TV, Inc. | 0000280913 | Lilesville/ Wadesboro, NC |
| W36FB-D | 32317 | WCNC-TV, Inc. | 0000280912 | Briscoe, NC |
| KFAA-TV | 73701 | WFAA-TV, Inc. | 0000280990 | Decatur, TX |
| WFAA(TV) | 72054 | WFAA-TV, Inc. | 0000280989 | Dallas, TX |
| WFMY-TV | 72064 | WFMY Television, LLC | 0000280921 | Greensboro, NC |
| WKYC(TV) | 73195 | WKYC-TV, LLC | 0000280936 | Cleveland, OH |
| WTOL(TV) | 13992 | WTOL Television, LLC | 0000280938 | Toledo, OH |

**App.39**

**Federal Communications Commission** **DA 26-267**

| Call Sign | Facility ID No. | Licensee | LMS File No. | Community of License |
|---|---|---|---|---|
| WUSA(TV) | 65593 | WUSA-TV, Inc. | 0000280943 | Washington, DC |
| WVEC(TV) | 74167 | WVEC Television, LLC | 0000280949 | Hampton, VA |
| WJHJ-LD | 35137 | WVEC Television, LLC | 0000280950 | Newport News, etc., VA |
| WWL-TV | 74192 | WWL-TV, Inc. | 0000280967 | New Orleans, LA |

40

**App.40**

**REDACTED - FOR PUBLIC INSPECTION**
Form 2100, Schedule 315
Comprehensive Exhibit

**COMPREHENSIVE EXHIBIT**

**Table of Contents**

I.      DESCRIPTION OF THE TRANSACTION AND ASSOCIATED APPLICATIONS ......1

II.     CURRENT CIRCUMSTANCES COMPEL URGENT NEED FOR APPROVAL OF THE TRANSACTION.................................................................................................1

III.    SUMMARY OF IMPLICATIONS UNDER EXISTING MEDIA OWNERSHIP RULE… .................................................................................................................3

IV.     THE TRANSACTION WILL ENABLE COMBINED NEXSTAR'S STATIONS TO MAINTAIN AND ADVANCE THEIR CRITICAL ROLE IN THE INFORMATION ECOSYSTEM.........................................................................................................4

    A.    The Marketplace in Which Nexstar and TEGNA Compete Has Undergone Wholesale Change that Jeopardizes the Companies' Ability to Invest in Trusted Local Journalism...........................................................................................5

    B.    With Greater Scale and Efficiencies Derived from the Transaction, Nexstar Will Improve Service to the Public.................................................................10

V.      THE FCC SHOULD ACT TO ALLOW THE LOCAL TELEVISION COMBINATIONS COMTEMPLATED BY THE TRANSACTION ............................................................17

    A.    Nexstar's Ownership of Two Stations in Certain DMAs Complies With the Local TVO Rule and Serves the Public Interest .............................................................18

    B.    Nexstar's Ownership of More than Two Stations in Certain DMAs Will Serve the Public Interest, and the Applicants Seek a Waiver of the Local TVO Rule to the Extent Required ...............................................................................................19

VI.     THE NATIONAL AUDIENCE REACH OF COMBINED NEXSTAR WILL EXCEED THE NATIONAL CAP AND THE COMMISSION SHOULD WAIVE THE RULE, AS NECESSARY ...............................................................................................114

VII.    PENDING APPLICATIONS AND CUT OFF RULES................................................116

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

**TABLE OF ATTACHMENTS, SCHEDULES, AND EXHIBITS**

ATTACHMENTS A-1 AND A-2 – PRE- AND POST-MERGER STRUCTURES
ATTACHMENT B – TOP FOUR PUBLIC INTEREST SHOWINGS

SCHEDULE 1 – FCC LICENSES TO BE TRANSFERRED OR ASSIGNED
SCHEDULE 2 – OTHER AUTHORIZATIONS HELD BY NEXSTAR
SCHEDULE 3 – PARTIES TO THE APPLICATIONS
SCHEDULE 4 – TRANSACTION DOCUMENTS

EXHIBIT A – NIELSEN RATINGS DATA
EXHIBIT B – COMSCORE RATINGS DATA
EXHIBIT C – BIA OTA DATA
EXHIBIT D – BIA AD MARKET DATA
EXHIBIT E – AD FONTES MEDIA BIAS AND RELIABILITY RATINGS
EXHIBIT F – COMSCORE RATINGS - FT. SMITH DMA

**App.42**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

## I.      DESCRIPTION OF THE TRANSACTION AND ASSOCIATED APPLICATIONS

This application is one of 37 concurrently filed applications on Form 2100, Schedule 315 (the "Applications") that seeks the Commission's consent to the acquisition of the outstanding equity interests of TEGNA Inc. (together with its subsidiaries, "TEGNA"), the ultimate parent of the licensees of 64 full power television stations, one AM radio station, one FM radio station, and related other Federal Communications Commission ("FCC" or "Commission") licenses, by Nexstar Media Inc. (together with its subsidiaries, "Nexstar"), a wholly owned subsidiary of Nexstar Media Group, Inc., in a cash merger transaction (the "Transaction").[1]

Upon the consummation of the Transaction (the "Merger"), each share of TEGNA common stock issued and outstanding immediately prior to the effective time of the Merger will be converted into the right to receive $22.00 and TEGNA will become a wholly-owned subsidiary of Nexstar Media Group, Inc., which will immediately contribute its shares in TEGNA to Nexstar Media Inc. Corporate structure charts illustrating the pre- and post-closing structures of the merging companies are provided as Attachments A-1 and A-2.[2]

## II.     CURRENT CIRCUMSTANCES COMPEL URGENT NEED FOR APPROVAL OF THE TRANSACTION

The Applications demonstrate that the Transaction unequivocally will serve the public interest and its approval is urgently needed. Despite Nexstar's and TEGNA's positions as industry leaders, both are susceptible to intense market forces conspiring against their ability to sustain operations at their current level, and these challenges are amplified by the specific circumstances in the markets in which waiver of the Commission's rules may be necessary to allow the proposed combinations. Nexstar and TEGNA each have longstanding histories of providing unparalleled service to their local communities. Their stations cover breaking news, alert their viewers about threats to public safety, provide up-to-the-minute information and emergency alerting about severe weather, and invest in the kind of local journalism upon which citizens depend to make informed decisions about their lives. Each company has been duly recognized for its hard work, exemplary journalism, and commitment to its licensed communities over many years.[3] Each has demonstrated

---

[1] Schedule 1 attached hereto lists each TEGNA licensee entity for which the Commission's consent to a transfer of control to Nexstar is being sought, along with its associated full power television stations, low power and Class A television stations, television translator stations, and radio stations. The applicants will file separate applications with the appropriate bureaus requesting Commission consent for the transfer of control of the TEGNA subsidiaries' earth station, microwave, and land mobile facilities.

[2] A list of broadcast stations owned by Nexstar through its direct and indirect subsidiaries is included as Schedule 2. Tables detailing the Parties to the Application are included as Schedule 3.

[3] In 2025, Nexstar's stations won 2 National Edward R. Murrow Awards, 52 Regional Edward R. Murrow Awards, 56 Regional Emmy Awards, and an Alfred I. duPont-Columbia University Award, among others. TEGNA's stations won 6 National Edward R. Murrow Awards, 59 Regional Edward R. Murrow Awards, and an Alfred I. duPont-Columbia University Award, among others. Stations owned by both companies are consistently honored by their state broadcast associations for excellence in local journalism.

1

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

leadership in moving the broadcast industry forward toward technologies that better serve consumers. Yet, against the backdrop of existential changes to the market in which they compete, maintaining the *status quo* simply is not an option for either company.

In short, this Transaction is absolutely critical to preserve the ability of the local television stations owned by Nexstar and TEGNA to continue as viable, reliable sources of trusted, locally-focused news and information. Local television stations are among the few remaining such sources—particularly given the gutting of local newspapers—in a media landscape that is more and more dominated by national and global technology and media behemoths.

Steep competition from tech platforms has engendered a crisis even for broadcasters considered to be well-positioned. The Transaction will provide the combined Nexstar with economies of scale and the reach needed to successfully compete with giants like Alphabet (Google, YouTube, YouTubeTV), Amazon (Amazon Ads, Prime Video, Twitch), Apple (AppleTV), Comcast (Peacock), Disney (Disney+, Hulu, ESPN, Fubo), Meta (Facebook, Instagram, WhatsApp), Netflix, Paramount (Paramount+, Pluto TV), TikTok, and Warner Bros. Discovery (HBO Max), all of which are unshackled in their ability to reach a national audience. These conglomerates increasingly siphon revenue away from broadcast stations for the benefit of their national and global digital platforms and affiliated streaming services, rendering Nexstar and TEGNA unable to compete and maintain the same level of investment in the essential local content upon which their communities rely.

Evaluation of the Transaction should not be skewed by false narratives whose foundation relies on wishful thinking about yesteryear, or the misconception that local broadcast television today is a business in which it is commonplace for individually-owned stations to successfully compete and derive the wherewithal to invest in diverse, local programming and innovation. A determination as to whether or not the public interest is served by grant of the Applications should be based in reality—Nexstar and TEGNA must combine if their local stations' critical role in our nation's information ecosystem is to be preserved. Time is of the essence.

Against this backdrop, it is clear that FCC approval of the instant Transaction will serve the public interest and should be approved for the reasons set forth herein. It is imperative that the Commission move quickly to shore up the position of the Nexstar and TEGNA stations because competition is increasing at a dizzying pace. As Chairman Carr has recognized, local television broadcasting stands at a crossroads and, absent swift regulatory relief, faces an irreversible demise akin to that of local newspapers. Here, Nexstar's decision to acquire TEGNA—and TEGNA's decision to be acquired—were based upon each company's determination that increased scale and additional resources are the only means to preserve the local television service each company historically has provided to its communities. The Transaction also will provide oxygen to a number of local television stations that, under the Commission's own criteria, currently would be considered as failing and are unlikely to survive as standalones. Approval of the Transaction will allow combined Nexstar to invest in local newsrooms and local programming, to innovate, including with respect to ATSC 3.0, and to deliver the freely available content Americans expect.

2

**App.44**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

### III. SUMMARY OF IMPLICATIONS UNDER EXISTING MEDIA OWNERSHIP RULES

The Transaction implicates the FCC's outdated broadcast ownership rules, which were adopted decades ago when over-the-air ("OTA") broadcasting was the primary source for video consumption and advertisers were dependent on OTA broadcasting to reach customers in a local market. Those rules are in a state of flux and, to the extent not finally resolved during the pendency of the Applications, the applicants seek waiver of those rules that are pertinent.

As relevant to the Transaction:

- The local television ownership rule (the "Local TVO Rule") generally permits common ownership of two television stations in a single Nielsen Designated Market Area ("DMA").[4]

  - Nexstar's proposed ownership of two television stations in 17 DMAs complies with the Local TVO Rule and serves the public interest.

  - At its September 30, 2025 Open Meeting, the Commission adopted a Notice of Proposed Rulemaking for the *2022 Quadrennial Regulatory Review* that asks, among other things, whether the Local TVO Rule "is necessary in the public interest as a result of competition, notwithstanding substantial changes that have occurred in the video marketplace with changes in technology (including online video, and digital television broadcasting) and the challenges now facing the broadcast television industry" and whether it should be modified or repealed.[5]

  - If the Local TVO Rule is modified or repealed, Nexstar's proposed ownership of more than two full power television stations in 23 DMAs may (or will) comply with the FCC's rules.

  - To the extent the Local TVO Rule remains effective when the FCC evaluates the Transaction, the applicants are seeking a waiver of the Local TVO Rule to allow Nexstar to own more than two full power stations in each of those DMAs and demonstrate herein why such waiver is in the public interest.

---

[4] 47 C.F.R. § 73.3555(b). On October 23, 2025, the United States Court of Appeals for the Eighth Circuit issued its mandate in *Zimmer Radio of Mid-Missouri, Inc. v. FCC* that, among other things, vacated and remanded the portion of the Local TVO Rule prohibiting common ownership of two of the top four rated stations (each a "Top Four Station") in a DMA, except where the applicants make a case-by-case showing that the prohibition should not apply to a specific transaction or with respect to a specific market (the "Top Four Prohibition"). *See* 145 F.4th 828 (8th Cir. 2025).

[5] *See 2022 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Notice of Proposed Rulemaking, MB Dkt. No. 22-459, FCC 25-64, ¶ 24 (Sept. 30, 2025).

3

**App.45**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

- The national television multiple ownership rule (the "National Cap")[6] generally prohibits the grant, transfer, or assignment of a license that would result in a party having a cognizable interest in stations with a national audience reach exceeding 39% (after applying the UHF discount).

  - The Commission recently refreshed the record on whether to modify, retain, or eliminate the National Cap.[7]

  - If the National Cap is modified or eliminated, Nexstar's proposed interest in stations with a national audience reach of 54.5% may (or will) comply with the FCC's rules.

  - To the extent the National Cap remains effective when the FCC evaluates the Transaction, the applicants are seeking a waiver of the National Cap to allow Nexstar to have an interest in stations with a national audience reach of 54.5% and demonstrate herein why such waiver is in the public interest.

The Transaction serves the Commission's goal of fostering localism in each of the affected markets by allowing for expanded news coverage and enhanced service to these local communities, as well as continued innovation, providing Nexstar with the scale and reach necessary to survive the growing and existential challenges it faces as a local broadcast station owner. The applicants urge the Commission to process and grant the Applications promptly including, to the extent necessary, through grant of the waiver requests made herein.

## IV.  THE TRANSACTION WILL ENABLE COMBINED NEXSTAR'S STATIONS TO MAINTAIN AND ADVANCE THEIR CRITICAL ROLE IN THE INFORMATION ECOSYSTEM

The Transaction serves the public interest by enabling Nexstar to: (i) achieve the scale necessary to demonstrate a significant audience to advertisers in the face of declining broadcast ratings and shares; (ii) future-proof against market forces that threaten to eviscerate local television; (iii) invest in the resources necessary to provide extensive and reliable local news coverage; (iv) remain steadfast to Nexstar's longstanding commitment to providing high quality local programming and service to its communities; and (v) preserve TEGNA's legacy of providing similar high quality local programming and service. The industry data and trends detailed below have impacted each of Nexstar's and TEGNA's operations profoundly. Specific examples of those effects, and how grant of the Applications will stave off erosion of the public service provided by these local stations and instead improve it, are included in the market-specific discussions contained in Section V(B) and Attachment B below. To be clear, Big Tech is a competitive giant that is present and siphoning off dollars from local broadcasters *in each and every market* in which the applicants operate, regardless of size or place. The Transaction will equip the combined Nexstar with the enhanced operational efficiencies and critical scale necessary to fill the local information void given

---

[6] 47 C.F.R. § 73.3555(e).

[7] *Media Bureau Seeks to Refresh the Record in the National Television Multiple Ownership Rule Proceeding*, Public Notice, 30 FCC Rcd 4159 (2025) ("*National Cap Record Refresh*").

4

**App.46**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

unrelenting competition from the mega-conglomerates that have wholly altered and are continuing to transform the media landscape.

> A.    **The Marketplace in Which Nexstar and TEGNA Compete Has Undergone Wholesale Change that Jeopardizes the Companies' Ability to Invest in Trusted Local Journalism**

The ability of Nexstar's and TEGNA's local television stations to sustain the revenue necessary to provide reliable emergency information and trusted news to their local communities is imperiled by the explosive growth in competition for viewers and advertisers. Local television broadcasting has been under increasing siege since 2002, when cable surpassed broadcasters in primetime viewership.[8] The situation became an existential crisis in 2017, when viewership of over-the-top ("OTT") streaming surpassed cable.[9] Circumstances are now even more dire—in 2025, *streaming viewership has surpassed all of cable and broadcasting combined.*[10]

Today, "online audio and video streaming services too numerous to quantify or recount" have "fundamentally altered the competitive landscape."[11] The media marketplace facing Nexstar and TEGNA—overrun by global technology companies, on-demand streaming services, and ubiquitous social media—is hypercompetitive. American television viewers live in a world where literally hundreds if not thousands of programming choices are available at any given moment. Unprecedented growth in online video distributors and streaming services in addition to traditional cable and satellite multichannel video programming distributors ("MVPDs"), combined with Americans' increased use of smartphones, tablets, and the Internet, have radically altered how viewers interact with their local television stations.

---

[8] Mike Reynolds, *2002: Cable's Breakout Nielsen Year,* Multichannel News (Jan. 5, 2003), https://tinyurl.com/t52j9nkr.

[9] Ian Morris, *Netflix Is Now Bigger Than Cable TV*, Forbes (Jun. 13, 2017), https://tinyurl.com/4had7by5; *see Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Notice of Proposed Rulemaking, 32 FCC Rcd 10785, 10810 (2017) (Statement of Commissioner Brendan Carr) (recognizing that broadcasters "compete for eyeballs with YouTube stars, social media platforms, and streaming services like Hulu and Netflix—not to mention traditional cable and satellite offerings").

[10] Nielsen, *Netflix Leads Streaming Growth in June on the Strength of Multiple Big Titles in Nielsen's 50th Report of the Gauge*, (July 15, 2025), https://tinyurl.com/y8s3sh4p ("*The Gauge June 2025*"). Note that Nielsen's "The Gauge" counts only streaming that occurs on "television" and does not assess the consumption of content on mobile devices, thus substantially undercounting the viewing associated with primarily digital platforms such as YouTube, Netflix, Instagram, and TikTok.

[11] *2018 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Report and Order, 38 FCC Rcd 12782, 12873 (2023) ("*2018 Quadrennial Review Order*") (Dissenting Statement of Commissioner Brendan Carr).

5

**App.47**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

At the same time, the unbiased, fact-based reporting provided by Nexstar's and TEGNA's local television newsrooms has never been more necessary for American citizens. Since 2005, more than 3,200 newspapers have shuttered, and the remaining newspapers are closing at a rate of more than two per week.[12] Americans increasingly receive their news from digital platforms, where consumers are fed stories based on algorithms rather than through journalism that ascertains local needs and interests, investigates, and fact checks. A recent study by the Reuters Institute for the Study of Journalism captures the state of journalism in America: local television news is the most trusted source of news, with 59% of respondents saying they trust it.[13] Only 50% of respondents, however, described getting news from television in the prior week.[14] This marked the first time more Americans got their news from social media—predominately Facebook, YouTube, X, Instagram, TikTok, and WhatsApp—than from television.[15] Most of these social media sites do not produce news of their own. They do not employ journalists who cultivate sources and verify information, or photojournalists who chronicle the events that affect local communities for viewers to experience for themselves, or trained meteorologists who provide life-saving information about looming weather threats. Instead, these platforms rely on links to third party websites with varying degrees of reliability. The algorithmic bias on these platforms is well-documented and skews the kinds of information consumers are fed.[16] These biases are exacerbated by content moderation policies that result in echo chambers rather than the dissemination of fact-based news.[17]

While Americans' trust of local television news remains high, the same cannot be said of national news organizations. Indeed, not a single national news organization in the Reuters Institute study was trusted by more than half of the respondents.[18]

---

[12] *See* Zachary Metzger, *The State of Local News 2024: Expanding Deserts, Shifts in Ownership, and Expanded Digital Coverage*, Northwestern Medill, at 7 (2024), https://tinyurl.com/5fakpcpp.

[13] *See* Reuters Institute for the Study of Journalism, *Digital News Report 2025*, at 119 (June 2025), https://tinyurl.com/3ze58yct ("*Digital News Report 2025*").

[14] *See id.*

[15] *See id.*; *see also* Elisa Shearer, *et al.*, *Americans' Changing Relationship with Local News*, Pew Research Center, at 8–9 (May 7, 2024), https://tinyurl.com/47mp8k97 (finding that 52% of respondents say they at least sometimes get their news from online forums such as Facebook or the Nextdoor app).

[16] *See generally* David Klepper, *Deep Dive Into Meta's Algorithms Shows that America's Political Polarization Has No Easy Fix*, AP (July 27, 2023), https://tinyurl.com/mppebk5n; Timothy Graham & Mark Andrejevic, *A Computational Analysis of Potential Algorithmic Bias on Platform X During the 2024 US Election* (Queensland Univ. of Tech., Working Paper No. 253211, 2024), https://tinyurl.com/2byr8npa.

[17] *See* Justin T. Huang, Jangwon Choi & Yuqin Wan, *Politically Biased Moderation Drives Echo Chamber Formation: An Analysis of User-Driven Content Removals on Reddit* (Oct. 17, 2024), available at https://tinyurl.com/4sbjybd5.

[18] *See Digital News Report 2025*. BBC was the only non-local news organization exceeding 50%.

6

**App.48**

**REDACTED - FOR PUBLIC INSPECTION**
Form 2100, Schedule 315
Comprehensive Exhibit

At a time when the role of local television stations in the information ecosystem has never been more critical, transformative changes in the video marketplace threaten the ability of Nexstar's and TEGNA's local television stations to continue investing in trusted news. For example:

- As of February 2025, video streaming obtained almost 100% market penetration,[19] up from 2024, when 80% of U.S. adults watched streaming video over a typical 30-day period.[20]

- In April 2025, streaming surpassed traditional television to become the primary way that viewers consume video content, with 70% of adults using streaming as their default viewing choice.[21]

- In June 2025, broadcast television viewing plummeted to just 18.5% of total television viewing.[22] This marked the first time broadcast television has fallen below a 20.0% share.

- Amazon Prime Video now reaches 130 million customers in the U.S. with its ad-supported offering; total subscribership for the streaming service is even higher.[23]

- Netflix reports 84.8 million subscribers in the U.S. and Canada.[24] In the first half of 2025 alone, Netflix subscribers spent 95 *billion* hours viewing[25] and the company achieved a 16% revenue increase year-over-year, exceeding its own projections.[26]

---

[19] Press Release, Kantar, *Sports Fuel Q4 Streaming Surge in the US, Boosting Prime Video, ESPN+, Netflix, and Peacock Sign-ups* (Feb. 12, 2025), https://tinyurl.com/3xv9hsb6.

[20] *Communications Marketplace Report*, 2024 Communications Marketplace Report, 39 FCC Rcd 14116, 14272 ¶ 238 (2024).

[21] Jennifer Flanagan, *Streaming in the Lead: Majority of U.S. TV Consumers Choose Digital Video First*, Adtaxi (Apr. 16, 2025), https://tinyurl.com/2wbjfwek; *see also* Communications Daily, *Nielsen: Streaming Share of TV Eclipsing Broadcast and Cable* (June 18, 2025), https://tinyurl.com/bdfh3xj9.

[22] *The Gauge June 2025*; *see* David Bauder, *Rough Times For Broadcast Networks Illustrate Changing Media Landscape*, TVNewsCheck (July 16, 2025), https://tinyurl.com/3rh24v29.

[23] *See* Alex Werpin, *Prime Video Now Reaches 130 Million U.S. Ad-Supported Customers, Amazon Says*, The Hollywood Reporter (May 12, 2025), https://tinyurl.com/bddsz3fu (also noting that Amazon last reported total Prime subscribers worldwide of 200 million in 2021).

[24] David Satin, *Prime Video has More Subscribers than Netflix, Any Other Service in the US*, MSN (Nov. 12, 2024), https://tinyurl.com/44v5msem.

[25] Netflix, *What We Watched the First Half of 2025* (July 17, 2025), https://tinyurl.com/578wbvje.

[26] Netflix, *2025 Quarterly Earnings, Letter to Shareholders*, at 2 (July 17, 2025), https://tinyurl.com/bdhr947d.

**App.49**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

- YouTube recently was crowned by a prominent media and technology research firm as the "new king of all media."[27]

- The popularity of connected television ("CTV") advertising continues to grow,[28] with two-thirds of media buyers indicating that CTV is essential to their media plans[29] and spending on CTV projected to exceed spending on broadcast and cable *combined* by 2028.[30]

- Social media platforms such as Instagram and TikTok, which are available at users' fingertips, facilitate the consumption of massive amounts of video content. Social video is a close second to CTV in media buyers' eyes.[31]

The explosive growth of competitors not only creates relentless competition for limited eyeballs, but also has transformed advertising markets, diminishing ad revenues that both Nexstar and TEGNA use to support local journalism.

Local digital advertising "cleared a historic threshold . . . topping $100 billion and accounting for roughly 70% of all local ad spending—an inversion of the 1990s-era hierarchy that once favored print."[32] In 2024, local ad spending on television, radio, and cable *combined* was a mere $19.3 billion.[33] New data shows that local television advertising accounted for only six percent of total local media spending through June of this year, which is less than half of the share that local television enjoyed in 2017, while digital video has increased its share of local ad spending from 15% in 2017 to 50% in the first six months of 2025.[34] Moreover, BIA Advisory Services recently cut $3.5 billion from its forecast of local advertising dollars to be spent on traditional media in 2025, while raising its forecast for local ad spending on digital by almost $1 billion in part based

---

[27] Todd Spangler, *YouTube Now Worth as Much as $550 Billion, Analysts Say: 'New King of All Media,'* Variety (Mar. 31, 2025), https://tinyurl.com/bd92t2uu.

[28] Tom Butts, *Nearly 90% of Advertisers Will Use Gen AI to Build Video Ads, According to IAB*, TV Tech (July 15, 2025), https://tinyurl.com/ywa9dvz6; *see* Interactive Advertising Bureau, *2025 Digital Video Ad Spend & Strategy Report*, at 9 (July 2025), https://tinyurl.com/7y3ccwjz ("*2025 Digital Ad Report*").

[29] *2025 Digital Ad Report* at 9.

[30] Tom Butts, *Roku, Amazon Team Up to Dominate CTV Ad Market*, TV Tech (June 16, 2025), https://tinyurl.com/bdcnujyv.

[31] *2025 Digital Ad Report* at 9.

[32] Borrell Associates, 2025 *Annual Report Benchmarking Local Digital Media: Executive Summary*, at 5 (May 15, 2025), available at https://tinyurl.com/m37u9eyd ("*Borrell 2025 Annual Report Executive Summary*").

[33] *Id.* at 6.

[34] George Winslow, *Local TV Has Lost More than Half of its Media Spending Market Share Since 2017*, TV Tech (Sept. 15, 2025), https://tinyurl.com/yskk9wm9.

8

**App.50**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

on "the ongoing fragmentation of the media landscape."[35] As 73 members of Congress recently recognized, viewer shift away from local media has resulted in a situation where "any one of the largest Big Tech platforms *dwarfs the entire broadcast industry*."[36]

The migration of advertising revenue from broadcast to digital is poised to accelerate as Big Tech and Big Media companies collaborate to provide one stop shopping for advertisers. Amazon has entered into deals with Netflix, Disney, NBCUniversal, Warner Bros. Discovery, Fox, and Paramount, to deliver inventory from Amazon's demand side platform to nearly all of the leading video streaming services.[37] As one observer noted, "[t]he deal [with Netflix] . . . underscores the rapid scale that Amazon has had in the advertising business, not just as a programmer, but as a backend service provider."[38] Meanwhile, broadcast television stations continue to struggle under regulations that restrict their national reach and their ability to provide ad buyers with similar efficiencies. Rapidly evolving technologies are harming local broadcasters in other ways as well. For example, marketers' increasing use of Artificial Intelligence ("AI") tools to allocate advertising budgets among platforms discounts broadcast television because the most popular AI programs frequently do not have access to information that establishes the viability of traditional media platforms.[39] These trends have television broadcasters' advertising revenues "locked in a slow, downward spiral" that is only expected to get worse as digital is projected to reach a 75% share by 2028.[40]

This loss of revenue is compounded by rising operating costs. The production or acquisition of video content is an expensive endeavor, requiring substantial investment. Local news operations are particularly costly—expenses attendant to newsgathering and news production often make up one third or more of a station's annual budget.

With this handwriting on the wall, Nexstar and TEGNA carefully considered the best course for the future and entered into the Transaction. As detailed below, the specifics of this strategic Transaction will enable the combined company to reduce costs and innovate, thus continuing to serve local communities with freely available and critical news, sports, weather and emergency information.

---

[35] Press Release, BIA Advisory Services, *BIA 2025 Forecast Update: $169 Billion in U.S. Local Advertising and 2.4% Year-Over-Year Decline* (Aug. 13, 2025), https://tinyurl.com/3xz7w2wp.

[36] Letter from Rep. Richard Hudson, *et al.*, to Brendan Carr, Chairman, FCC, at 1 (Mar. 28, 2025), https://tinyurl.com/4awdnstf (emphasis added); *see Borrell 2025 Annual Report Executive Summary* at 5.

[37] *See* Alex Werpin, *Amazon and Netflix Ink Major Advertising Deal*, The Hollywood Reporter (Sept. 10, 2025), https://tinyurl.com/4fm67b3h.

[38] *Id.*

[39] Matthew Keys, *Broadcasters Losing ad Revenue due to AI Recommendations*, TheDesk.net (July 15, 2025), https://tinyurl.com/5n6febwf.

[40] *Borrell 2025 Annual Report Executive Summary* at 6 (citation modified).

9

**App.51**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

**B.     With Greater Scale and Efficiencies Derived from the Transaction, Nexstar Will Improve Service to the Public**

Nexstar has grown from its humble roots as the owner of a single television station in Scranton, Pennsylvania, to one of the largest local broadcast television companies in the United States. It has done so through a commitment to innovation and to upholding the public interest principles of localism and unbiased broadcast journalism. Nexstar's dedication to these core principles has resulted in significant benefits for viewers in markets where Nexstar previously acquired television stations, and it is this dedication that is driving Nexstar's desire to capitalize on TEGNA's expertise in delivering local journalism to viewers when and how they want it, all for the benefit of the communities the combined company's stations serve. For example, as part of TEGNA's digital transformation, TEGNA recently launched new local newscasts in 50 markets from 7 to 9 AM daily—a time when most local stations are broadcasting network programming.[41] These newscasts are available live and on-demand through streaming, connected TV apps, and station websites, where they have proven popular with viewers, especially during severe weather or breaking news.

Moreover, consistent with Nexstar's commitment to new technologies, the Transaction will provide Nexstar and its local advertisers with access to Premion, TEGNA's platform for providing premium connected TV and OTT impressions for local and regional advertisers. Premion offers advertisers the targeting abilities and analytics of digital advertisements together with the premium inventory traditionally reserved for broadcast or cable. Premion's offering is particularly beneficial for small-to-medium market businesses that historically have lacked the budgets and wherewithal for connected TV advertising. By adding Premion to their portfolio, Nexstar's local sales teams will be able to add greater value for their advertisers while generating additional revenue to invest in local journalism.

The addition of the TEGNA stations to Nexstar's portfolio will come at a time when scale and reach have become absolutely imperative, but the principles that have guided Nexstar's post-acquisition strategies remain.

For example, in connection with its 2019 acquisition of Tribune Media Company ("Tribune"), Nexstar identified several specific ways in which its ownership of the Tribune stations would benefit the public, including:

1.  Localized coverage of national affairs through Nexstar's Washington, D.C. news bureau;[42]

2.  Improved coverage of state government affairs through new and expanded state news bureaus;[43]

---

[41] *See* Press Release, TEGNA Inc., *TEGNA Announces Major Local News Expansion: Adding More than 100 Hours of New Daily Programming Across 50+ Markets* (June 16, 2025), https://tinyurl.com/mrycbw33.

[42] *See* Application for Consent to Transfer Control of WGN Continental Broadcasting, LLC, File No. BTC-20190107ADI, Exh. 15, Amended Comp. Exh. at 4.

[43] *Id.* at 4–5.

10

**App.52**

REDACTED - FOR PUBLIC INSPECTION

Form 2100, Schedule 315
Comprehensive Exhibit

3. Enhanced news, public affairs, and emergency programming from reinvestment in local stations;[44]

4. Increased investment in the next generation broadcast standard, ATSC 3.0;[45] and

5. New community service efforts.[46]

Nexstar has delivered on each of these benefits, meeting or exceeding those described in the applications filed in connection with the Tribune transaction:

*Localized Coverage of National Affairs.* Nexstar has continued to invest in and expand its Washington, D.C. Capital Bureau to deliver news and information from the Nation's Capital to viewers of Nexstar's local television stations. Nexstar acquired the Washington Bureau in 2017, as part of its acquisition of Media General. At the time, the Bureau had 5 journalists. Shortly after acquiring the Bureau, Nexstar doubled its size, allowing it to provide more customized news coverage for its local stations.

When Nexstar acquired Tribune in 2019, the former Tribune stations gained access to a D.C. news bureau for the first time since Tribune shuttered its news bureau a decade earlier.[47] Nexstar also added three additional journalists dedicated to providing local journalism from the Nation's Capital.

Today, Nexstar's D.C. Capital Bureau has 17 journalists working on behalf of Nexstar's stations to connect local communities to their representatives in Washington, D.C. The Bureau's daily news coverage includes stories relevant to viewers and interviews with lawmakers about news of the day and issues of interest to their constituents. In recent months, Nexstar's D.C. Capital Bureau has leveraged its relationships to break stories about the U.S. Department of Agriculture using water resources as leverage with Mexico[48] and bipartisan legislation to make childbirth free.[49] Nexstar was the only local television group invited to provide coverage from the Oval Office regarding the relocation of the U.S. Space Command from Colorado Springs, Colorado to Huntsville, Alabama. The Bureau also regularly facilitates interviews with members of Congress in connection with important events; for example, on the first day of the Congressional session in January 2025, the Bureau facilitated interviews with 83 lawmakers from 28 states, while 162

---

[44] *Id.* at 5–6, 9, 13–14.

[45] *Id.* at 9–10.

[46] Application for Consent to Transfer Control of Tribune Broadcasting Indianapolis, LLC, File No. BTCCDT-20190107ACF, Exh. 20, Top-Four Showing at 14–15.

[47] *See* Phil Rosenthal, *Tribune Co. Washington Bureau Shuts Down TV Operations; Kerry Luft Named D.C. Chief*, Chicago Tribune (Feb. 27, 2009), https://tinyurl.com/4zkcztnf.

[48] *See* Sandra Sanchez, *Border Report Live: US, Mexico at Odds Over Water Payments*, WIAT (Apr. 12, 2025), https://tinyurl.com/ckvus7n6.

[49] *See* Maddie Biertempfel, *Bipartisan Group Seeks to Make Childbirth Free*, WATE (July 25, 2025), https://tinyurl.com/3bt6a627.

11

**App.53**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

lawmakers were interviewed before and after President Trump's Joint Session of Congress in March of 2025. Nexstar D.C. Capital Bureau correspondent Reshad Hudson recently interviewed Vice President J.D. Vance, the latest in a series of exclusive interviews with senior officials from both parties that Nexstar makes available to its local television stations to include in their newscasts at their discretion.

***Improved Coverage of State Government Affairs.*** Nexstar has used its acquisitions as an opportunity to expand its coverage of state capital news by creating new state capital bureaus, investing to grow existing state capital bureaus, and providing acquired stations with access to these bureaus.

Today, Nexstar operates 24 state capital news bureaus (16 launched since 2017). These bureaus invest in dedicated reporters providing coverage of Governor's offices, legislative matters, state agencies, and statewide education issues. These journalists are able to explain to local viewers how state government matters affect them.

Notably, four of these bureaus operate in cities where Nexstar does not have a local station, but where Nexstar's presence in the state provides it with the scale needed to support a standalone bureau. For example, in January 2020, following its acquisition of television stations in St. Louis and Kansas City, Nexstar launched the only broadcast and digital news bureau in Jefferson City, Missouri.[50] Nexstar's Missouri State Capital News Bureau delivers live television broadcasts and exclusive news coverage and digital reports to viewers of the three Missouri stations that Nexstar acquired in the Tribune transaction (KPLR-TV, St. Louis; KTVI, St. Louis; and WDAF-TV, Kansas City) and to viewers of Nexstar's legacy stations in Springfield and Joplin, none of which had access to regular coverage from the state capital prior to the transaction. Nexstar also has established bureaus in Tallahassee, Florida, Montgomery, Alabama, and Atlanta, Georgia, to provide coverage of state government in states where Nexstar does not have a station in the capital city.

Nexstar leveraged its presence in several Texas markets in February 2025 to broadcast both Texas Governor Greg Abbott's State of the State Address and the response of Texas Democratic Party Chair Gilberto Hinojosa on 15 Nexstar television stations serving 14 Texas markets.[51] As a public service, Nexstar made its live feed available to every other broadcast company serving Texas.

At the outset of the COVID-19 pandemic, Nexstar was able to provide one stop access for state officials to communicate directly with their constituents across the state. For example, in Colorado, Nexstar hosted a town hall featuring Colorado's Governor, members of the state's Congressional

---

[50] *See* Press Release, Nexstar Media Group, Inc., *Nexstar Media Group Launches Missouri's Only Broadcast and Digital News Bureau in State Capital* (Jan. 8, 2020), https://tinyurl.com/reaahdht.

[51] Press Release, Nexstar Media Group, Inc., *Nexstar To Host Statewide Live Telecast of Texas Governor's 2025 "State of the State" Address and Democratic Party Response on February 2nd at 5 PM* (Jan. 27, 2025), https://tinyurl.com/2s4cusfd.

12

**App.54**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

delegation, and other state and local officials and policy experts.[52] The town hall originated from Nexstar's studios in Denver and aired on Nexstar's Colorado stations, which serve viewers in Denver, Durango, Colorado Springs, and Grand Junction. Nexstar held similar town halls in Arkansas, California, Connecticut, Florida, Hawaii, Illinois, Indiana, Kansas, Massachusetts, Michigan, Mississippi, Missouri, New Mexico, New York, North Carolina, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, West Virginia, and Wisconsin.

Nexstar also has used the resources it acquired through prior acquisitions to produce and broadcast unbiased election-related programming with a particular focus on issues of interest to viewers. Nexstar frequently hosts debates for statewide offices including Governor, U.S. Senate, and Congressional races. In the lead-up to the 2022 mid-term elections, Nexstar stations hosted nearly 50 local and statewide candidate debates and forums.[53] In several states with competitive races, Nexstar was the only local broadcaster with the resources capable of bringing opposing candidates together for a live broadcast carried in virtually every county across the state. Indeed, many of these Nexstar-hosted debates—including debates for the U.S. Senate races in Georgia and Pennsylvania and the Governor's race in Texas—represented the only face-to-face meetings between the candidates ahead of the mid-term elections. Leading up to the 2024 election, Nexstar stations hosted 74 political debates or forums, including exclusive live debates between candidates across the primary and general elections.

***Expanded News, Public Affairs, Sports and Emergency Programming.*** Nexstar has invested heavily to expand its news, public affairs, and emergency programming in markets where it has acquired new stations. In the five years following Nexstar's 2019 acquisition of Tribune, Nexstar's stations (including many of its newly acquired stations) increased local news coverage by more than 28,000 hours per year (more than 12.5%) and garnered hundreds of awards annually recognizing their journalistic excellence. During the same period, local lifestyle programming on Nexstar's stations rose by more than 9,000 hours per year (more than 75%) and local political programming increased by almost 800 hours per year (more than 40%).

In the Washington, D.C. market, for example, Nexstar moved the news operations of CW affiliate WDCW and independent station WDVM-TV into a new state-of-the-art facility supported by new satellite news bureaus in Hagerstown and Frederick, Maryland and Chantilly, Virginia.[54] Nexstar hired additional journalists and support personnel to expand to 67 hours of local news programming each week, covering more communities than any other local broadcaster serving the Washington DMA. To expand the reach of this programming, Nexstar invested in a new

---

[52] Press Release, Nexstar Media Group, Inc., *Nexstar Broadcasting To Host Exclusive Multi-Market Live Telecast of Virtual Town Hall with Colorado Governor and Members of the State's Congressional Delegation on Thursday, June 4* (June 3, 2020), https://tinyurl.com/3xc48ca9.

[53] Press Release, Nexstar Media Group, Inc., *Nexstar Media Hosts Nearly 50 Candidate Debates and Forums, Delivering Critical Information to Voters Ahead of the 2022 Midterm Elections* (Oct. 13. 2022), https://tinyurl.com/3vfzb66p.

[54] Press Release, Nexstar Media Group, Inc., *Nexstar To Expand Local News Operations Serving Washington, D.C., Northern Virginia and Maryland* (May 25, 2022), https://tinyurl.com/mr7bj99m.

13

**App.55**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

transmission tower for WDVM-TV, making the station's local news, weather and emergency alerts and other programming available to almost 700,000 additional households.[55]

In September 2020, Nexstar expanded its weekly political affairs program, "Inside California Politics," to all six of its California DMAs.[56] The 30-minute program examines the political, economic and social issues important to Californians across the state and especially to those living in communities served by Nexstar's television stations. That same month, Nexstar launched "LA Unscripted," a high energy public affairs show broadcast on KTLA and distributed on digital platforms focusing on the people, places, and personalities that make Southern California one of the most unique, diverse, and vibrant places in the world.[57]

Nexstar has also used its expanded reach to provide free, OTA access to local sporting events once relegated to paid subscription services. The failure of the regional sports network model in recent years has threatened to place local sporting events behind paywalls, forcing casual fans to either pay for new subscription services or forgo watching their local teams and sharing in the communal experience local sports teams provide. For the 2025 Major League Baseball season, Nexstar broadcast four Texas Rangers spring training games and 15 regular season games across 17 stations in Texas, Oklahoma, Arkansas, and Louisiana.[58] In California, Nexstar provided viewers in Los Angeles, San Diego, Bakersfield, Fresno, Palm Springs, and Santa Barbara with the opportunity to watch the Los Angeles Clippers for free on broadcast television.[59]

Adding TEGNA's stations to its portfolio will allow Nexstar to build upon the efforts of both companies to keep sports local and accessible. TEGNA has reached agreements to broadcast NHL, NBA, and WNBA games on several of TEGNA's stations. Nexstar will be able to better serve these teams and their fans with more outlets to broadcast live games and analysis.

Nexstar's dedication to the communities it serves is particularly evident in the commitment and ability of each of its stations to serve as a critical source of news and information when an emergency strikes. During the 2025 Los Angeles wildfires, for example, Nexstar station KTLA was on the air non-stop for *94 hours—almost 4 days*—providing uninterrupted, commercial-free,

---

[55] Press Release, Nexstar Media Group, Inc., *Nexstar Media Erects New Transmitter Tower for WDVM-TV in Washington, D.C., Enhancing Delivery of Local News, Important Weather Alerts, and Local Programming to Nearly 700,000 Additional Television Households and 1.8 Million People* (Oct. 6, 2025), https://tinyurl.com/46ywm57s.

[56] Press Release, Nexstar Media Group, Inc., *Nexstar Broadcasting To Expand Weekly Political Affairs Program "Inside California Politics" Statewide On September 13* (Sept. 9, 2020), https://tinyurl.com/zewp22yp.

[57] Press Release, Nexstar Media Group, Inc., *KTLA to Launch LA Unscripted, Fall 2020* (Sept. 9, 2020), https://tinyurl.com/5xp24x9y.

[58] Press Release, Nexstar Media Group, Inc., *Nexstar Partners with Texas Rangers To Broadcast 15 Baseball Games on Free Over-the-Air Television* (Jan. 29, 2025), https://tinyurl.com/5x9xskty ("Nexstar-Rangers Press Release").

[59] Press Release, Nexstar Media Group, Inc., *LA Clippers and KTLA-TV Extend Partnership* (Sept. 7, 2023), https://tinyurl.com/2vr65stm.

14

**App.56**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

live local coverage that was an essential lifeline for its viewers. Following an earthquake off the coast of northern Russia in July of this year that caused a tsunami watch for the Hawaiian Islands, Nexstar's KHON provided immediate coverage and summoned news personnel and meteorologists back to its studios to prepare for a potential emergency. Nexstar does not believe that any non-broadcast platform issued any warnings or even mentioned the Russian earthquake, let alone that the earthquake had triggered a tsunami watch for Hawaii.[60]

Nexstar's broad reach is essential to maintaining its local focus particularly when a natural disaster is so severe that it threatens to cause a catastrophic failure at a Nexstar station. In those situations, stations in the affected area are able to leverage resources from other Nexstar stations and, in the most extreme conditions, access remotely produced emergency weather information, ensuring those local communities continue receiving uninterrupted access to critical news and safety information. This resource sharing delivered benefits to viewers during and after major weather events such as Hurricanes Beryl, Debby, Francine, Helene, and Milton.

*Investment in ATSC 3.0.* Nexstar has been a leader in the transition to ATSC 3.0, the world's most advanced broadcast technology. ATSC 3.0 delivers stunning video with brilliant color, sharper images, and deeper contrast to create a more life-like viewing experience.[61] ATSC 3.0 can be enhanced with Internet content to enable viewers to get the most out of live sports, live news, and live events in real-time, without looking away from TV screens.[62] ATSC 3.0 also provides public benefits beyond the screen by harnessing the power of one-to-many distribution for high demand and time sensitive data applications including automotive connectivity, content delivery networks, and enhanced GPS services.[63] Notably, ATSC 3.0 has the capability for wake-up signaling, a technology that awakens compatible receivers when in standby or sleep mode.[64] This has obvious utility in emergency threats that develop in overnight hours, for example.

Since acquiring Tribune, Nexstar has invested almost $23 million to transition 90 stations to the ATSC 3.0 standard, including 21 legacy Tribune stations. Twenty-two of these stations act as "lighthouse stations" for the ATSC 3.0 transition, becoming the first in their respective DMAs to adopt ATSC 3.0 and hosting other stations that continue transmitting using the ATSC 1.0 standard.

Not only are Nexstar's stations leading the way to ATSC 3.0 video programming, but they are also pioneers in the offering of Broadcast Internet services as founding members of EdgeBeam

---

[60] Because it appears that no Emergency Alert System alerts were issued, those who saw the local television watch announcements had an additional hour of warning should a tsunami have been headed for the state.

[61] Press Release, Mission Broadcasting Inc. & Nexstar Media Group, Inc., *Mission Broadcasting and Nexstar Media Group Launch NextGen TV on WPIX-TV In New York City* (Dec. 14, 2023), https://tinyurl.com/3tyzcd3e.

[62] *Id.*

[63] *See* Nexstar, *ATSC 3.0 Progress: Understanding the Value of ATSC 3.0 and NEXTGEN TV*, https://tinyurl.com/3cd8ce69 (last visited Nov. 11, 2025).

[64] *See* ATSC – The Broadcast Standards Association, *Special Report: 'Re-Imagining' Emergency Alerting with ATSC 3.0* (July 10, 2018), https://tinyurl.com/ydjes5zn.

15

**App.57**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Wireless, LLC ("EdgeBeam").[65] EdgeBeam is a joint venture among four leading broadcast station groups to leverage the ATSC 3.0 transmission standard to provide expansive, reliable, and secure data delivery services. The partnership provides EdgeBeam with a spectrum footprint that no individual broadcaster is able to achieve on its own, making ATSC 3.0 Broadcast Internet services a more attractive form of data delivery and a true alternative to other wireless networks.

*New Community Service Efforts.* Nexstar's deep commitment to public service extends beyond the important local programming its stations provide daily. Since Nexstar's acquisition of Tribune, Nexstar has engaged in over 2,000 service initiatives every year in the communities it serves, donating funds and raising awareness for important causes. Whether helping community members navigate through emergencies, recover from local tragedies, or obtaining food and shelter during difficult times, Nexstar serves its communities with boots on the ground in a way that a computer program or an algorithm will never be able to match.

Nexstar's dedicated local journalism provides Nexstar with a unique perspective on how natural disasters can turn someone's life upside down in an instant. Often before the tragedy is fully abated, Nexstar's local stations spring into action to help community members in need. This summer, Nexstar's stations helped raise nearly $1.4 million to assist the victims of the disastrous Central Texas flooding.[66] Nexstar stations in Chicago, Buffalo, Las Vegas, Denver, and Bakersfield were among those joining Nexstar's Texas stations to support the relief effort.[67] Nexstar's KXAN-TV in Austin, Texas, launched a custom-made microsite where viewers could find more information about a variety of resources and relief organizations aimed at helping those in need.[68] Following Hurricanes Helene and Milton, Nexstar's 200 owned or serviced stations raised nearly $1.5 million to support storm victims through the American Red Cross, United Way, the Salvation Army, and other relief organizations.[69] Following the 2023 wildfires that devastated Maui, Nexstar's KHON in Honolulu, Hawaii raised almost $1.2 million to assist local victims through the Hawaii Red

---

[65] *See* Press Release, The E.W. Scripps Company, Gray Media, Nexstar Media Group, Inc.& Sinclair, Inc., *Local Broadcasters Form Joint Venture to Provide High-Speed Data Transmission Services to Clients Across the United States* (Jan. 7, 2025), https://tinyurl.com/34wja9d6 ("Local Broadcasters ATSC 3.0 Joint January 2025 Press Release").

[66] *See* Press Release, Nexstar Media Group, Inc., *Nexstar Television Stations Help Raise Nearly $1.4 Million to Assist Victims of Flooding in Central Texas* (July 30, 2025), https://tinyurl.com/47e3at7h.

[67] *See id.*

[68] *See id.*

[69] *See* Press Release, Nexstar Media Group, Inc., *Nexstar Media Raises Nearly $1.5 Million to Date for Hurricane Relief Efforts* (Oct. 8, 2024), https://tinyurl.com/mvs6zvhv.

16

**App.58**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Cross[70] while across the ocean, Nexstar's KLAS-TV in Las Vegas, Nevada, hosted a telethon that raised an additional $134,253.[71]

The combination of Nexstar and TEGNA will build on both companies' historic commitments to their local communities, generating more impact and more reach. It will create efficiencies and fuel enhancements to the quantity and quality of coverage that neither company alone can continue to provide. Approval of the Transaction is essential as the very existence of these local television companies is threatened by accelerating predation from their unhandicapped competitors.

## V.    THE FCC SHOULD ACT TO ALLOW THE LOCAL TELEVISION COMBINATIONS COMTEMPLATED BY THE TRANSACTION

The applicants own stations in 17 DMAs where Nexstar's ownership of the combined stations complies with the Local TVO Rule. In 7 of these DMAs, at least one of the two stations is not a Top Four Station, and the combination would have complied with the Local TVO Rule even before *Zimmer*.[72] In 10 of these DMAs, both stations are Top Four Stations. Nevertheless, following *Zimmer* and the elimination of the Top Four Prohibition, Nexstar's ownership of two stations in these DMAs also complies with the Local TVO Rule.

The applicants own stations in 23 DMAs where, absent a waiver, common ownership of the combined stations would exceed the limits imposed by the current version of the Local TVO Rule. Accordingly, the applicants seek waivers of the Local TVO Rule to the extent necessary to approve the Applications.

The Commission has recognized that ownership of multiple stations in a DMA "can create operating efficiencies, which allow the commonly owned stations to invest in news and other local programming."[73] In addition to providing Nexstar with the scale to compete against the technology and media conglomerates that continue to transform the video distribution and advertising marketplaces, the Transaction will deliver specific public interest benefits in each DMA in which Nexstar will own multiple stations. The Commission should find that the proposed station combinations serve the public interest and grant waivers of the Local TVO Rule, as necessary, to

---

[70] *See* Press Release, Nexstar Media Group, Inc., *Nexstar Television Station KHON2 in Honolulu Raises More Than $1.1 Million To Assist Hawaii Wildfire Relief Efforts* (Aug. 24, 2023), https://tinyurl.com/2s3us3rh.

[71] *See id.*

[72] In two other DMAs (Sacramento-Stockton-Modesto, CA and Odessa-Midland, TX), the Top Four Stations vary depending on whether ratings are based on total households or the P25–54 demographic. If the P25–54 demographic is used, Nexstar would not own two Top Four Stations in these DMAs.

[73] *See 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, et al.*, Second Report and Order, 31 FCC Rcd 9864, 9881 ¶ 44 (2016) (the "*2014 Quadrennial Regulatory Review*").

17

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

enable Nexstar to continue investing in fact-based, independent journalism in the face of unrelenting competition from national programmers and Big Tech.

### A.    Nexstar's Proposed Ownership of Two Stations in Certain DMAs Complies With the Local TVO Rule and Serves the Public Interest

The Transaction will result in Nexstar forming or acquiring duopolies in 17 DMAs that comply with the Local TVO Rule. In 7 of these DMAs, at least one of the stations Nexstar will own is not a Top Four Station.[74] In 10 of these DMAs, Nexstar will own two Top Four Stations. Given the recent issuance of the mandate in *Zimmer*, these duopolies are, as a practical matter, rule-compliant.[75]

In evaluating broadcast transactions, the FCC has traditionally accepted a transaction's compliance with the bright line media ownership rules as prima facie evidence that a proposed station combination serves the public interest.[76] This precedent alone supports approval of the Transaction

---

[74] These DMAs are Atlanta, GA, Seattle, WA, Jacksonville, FL, Tucson, AZ, Spokane, WA, Waco-Temple-Bryan, TX, and San Angelo, TX. Unless otherwise specified, ratings data provided in this Comprehensive Exhibit are based on the Sunday to Saturday, 7 AM to 1 AM daypart audience share from ratings averaged over October 2024 through September 2025 (the most recently available period immediately preceding the date of application), as measured by The Nielsen Company (US), LLC, attached hereto as Exhibit A (the "Nielsen Ratings Data"). *See* 47 C.F.R. § 73.3555(b)(1)(ii). TEGNA does not subscribe to Nielsen ratings but subscribes to Comscore, Inc. ("Comscore") instead. Accordingly, in DMAs where Nexstar does not have a station (Atlanta, Seattle, Jacksonville, Tucson, and Spokane), the applicants provide ratings data from Comscore for September 30, 2024, through September 28, 2025, attached hereto as Exhibit B (the "Comscore Ratings Data"). *See* 47 C.F.R. § 73.3555(b)(1)(ii) (accepting ratings from "any comparable professional, accepted audience ratings service").

[75] These DMAs are Sacramento-Stockton-Modesto, CA, Austin, TX, Columbus, OH, Harrisburg-Lancaster-Lebanon-York, PA, Greensboro-High Point-Winson Salem, NC, Wilkes-Barre-Scranton-Hazelton, PA, Knoxville, TN, Tyler-Longview (Lufkin & Nacogdoches), TX, Odessa-Midland, TX, and Abilene-Sweetwater, TX. On October 23, 2025, the Eighth Circuit issued its mandate in *Zimmer*, vacating the Top Four Prohibition. *See Zimmer*, 145 F.4th at 857 n.11. If the FCC's ministerial action of deleting the Top Four Prohibition from its rules is not yet complete when the Commission considers the instant applications, the applicants request a waiver of the Top Four Prohibition to the extent deemed necessary. While no longer legally required, the public interest showing in Attachment B amply supports such a waiver.

[76] *E.g.*, *Applications of Tribune Media Company and Nexstar Media Group, Inc., et al.*, Memorandum Opinion and Order, 34 FCC Rcd 8436, 8446 ¶ 19 (2019) ("*Tribune MO&O*") (in determining whether assignment or transfer of control of a station license will serve the public interest, "the Commission must first determine whether the proposed transaction would comply with the specific provisions of the [Communications] Act, other applicable statutes, and the Commission's rules."); *Consent to Transfer Control of License Subsidiaries of Media General, Inc. from Shareholders of Media General, Inc. to Nexstar Media Group, Inc., et al.*, Memorandum Opinion and Order, 32 FCC Rcd 183, 189 ¶ 15 (2017) ("*Media General 2017 MO&O*") (same);

18

**App.60**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

in those markets where Nexstar will own only two stations as a result of the Transaction. Nevertheless, without conceding the necessity of such a showing, the applicants demonstrate in Attachment B that permitting Nexstar to own two Top Four Stations in these DMAs outweighs any potential harms, and that allowing each combination will serve the public interest.

**B.    Nexstar's Proposed Ownership of More than Two Stations in Certain DMAs Will Serve the Public Interest, and the Applicants Seek a Waiver of the Local TVO Rule to the Extent Required**

In the following DMAs, the Transaction will result in Nexstar owning more than two stations. The Commission should waive the Local TVO Rule to allow Nexstar to achieve the efficiencies and economies of scale necessary to adapt to the rapidly evolving video distribution and advertising marketplace and to preserve and expand one of the last remaining sources of trusted news and information.

The FCC may waive any of its rules, including the Local TVO Rule, based on a showing of good cause.[77] Waiver is appropriate if: (1) special circumstances warrant a deviation from the general rule; and (2) such deviation would better serve the public interest than would strict adherence to the rule.[78] The Commission will grant a waiver of its rules in a particular case upon a showing that the relief requested will not undermine the policy objective of the rule in question and will otherwise serve the public interest.[79] In determining whether waiver is appropriate, it is well-established that the Commission should "take into account considerations of hardship, equity, or more effective implementation of overall policy."[80]

Waiver is appropriate here because application of the Local TVO Rule to the Transaction would contravene the purpose of the rule and hinder the competition that the Local TVO Rule was intended to promote. In its most recent quadrennial broadcast ownership review, the FCC recognized that the Local TVO Rule "remains first and foremost competition-focused."[81] Indeed, competition has been the Commission's primary rationale for the Local TVO Rule since 2008,

---

*Consent to Transfer Control from Shareholders of Belo Corp.*, Memorandum Opinion and Order, 28 FCC Rcd 16867, 16876 ¶ 22 (2013) (same).

[77] *See* 47 C.F.R. § 1.3 ("Any provision of the rules may be waived by the Commission on its own motion . . . if good cause therefor is shown."); *Levine/Schwab P'ship v. FCC*, 61 F.4th 183, 186 (D.C. Cir. 2023); *Ne. Cellular Tel. Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir. 1990); *WAIT Radio v. FCC*, 418 F.2d 1153, 1157 (D.C. Cir. 1969); *see also 2014 Quadrennial Regulatory Review* at 9940 ¶ 188 (explaining that specific waiver standard in multiple ownership rules "does not replace or limit a waiver applicant's available options under Section 1.3" pursuant to "a broader public interest showing, under which parties can assert any variety of considerations they believe warrant waiver of the rule consistent with established precedent").

[78] *See Ne. Cellular*, 897 F.2d at 1166.

[79] *See WAIT Radio*, 418 F.2d at 1157.

[80] *Id.* at 1159.

[81] *2018 Quadrennial Review Order* at 12827 ¶ 81.

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

when the agency recognized that the rule was "no longer necessary to foster diversity because"— even in the infancy of the modern streaming and social media era—"there [we]re other outlets for diversity of viewpoint[s] in local markets."[82]

Applying a competition-focused framework in the *2018 Quadrennial Review Order*, the FCC acknowledged that "there are far more sources of video programming available today than there were when the Local [TVO] Rule was first adopted."[83] The agency, nevertheless, sought to distinguish local broadcasting on the basis that it remains available for free with no subscription fee or other service required to access broadcast programming.[84] The FCC also observed that "the provision of local programming remains a hallmark of broadcast television and an area where viewers directly benefit from competition among local broadcast television stations."[85]

Yet, it is axiomatic that the broadcast "industry's ability to function in the 'public interest, convenience and necessity' is fundamentally premised on its economic viability."[86] As the agency recognized in its *2017 Reconsideration Order*, "television broadcasters' important role makes it critical for the Commission to ensure that its rules do not unnecessarily restrict their ability to serve their local markets in the face of ever-growing video programming options."[87] This warning is not merely theoretical. Chairman Carr rightly has compared the circumstances local broadcasters face today to that of the newspaper industry around the turn of the century.[88] "Communities across the country lost access to local news and information at least in part because the FCC failed to react quickly enough to changes in the marketplace."[89]

At a time when political bias is rampant and opinion too frequently masquerades as news, the need for the trustworthy news and information provided by the broadcast stations owned and operated by Nexstar and TEGNA has never been greater. However, these stations face unprecedented competition for viewer attention and the advertising dollars that fuel local news and information programs. In each DMA where the applicants are seeking a waiver of the Local TVO Rule, core revenue is stagnant or falling. Separately, neither Nexstar nor TEGNA will be able to sustain their commitment to the localized, independent, fact-based journalism that these markets currently enjoy. As FCC Office of Economics and Analytics ("OEA") economists Kim Makuch and

---

[82] *2006 Quadrennial Regulatory Review*, Report and Order and Order on Reconsideration, 23 FCC Rcd 2010, 2066 ¶ 100 (2008).

[83] *2018 Quadrennial Review Order* at 12823 ¶ 74.

[84] *Id.*

[85] *Id.* at 12824 ¶ 75.

[86] *Revision of Radio Rules and Policies*, Report and Order, 7 FCC Rcd 2755, 2760 ¶ 10 (1992).

[87] *Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, et al.*, Order on Reconsideration and NPRM, 32 FCC Rcd 9802, 9834 ¶ 72 (2017).

[88] *2018 Quadrennial Review Order* at 12873 (Dissenting Statement of Commissioner Brendan Carr).

[89] *Id.*

20

**App.62**

REDACTED - FOR PUBLIC INSPECTION

Jonathan Levy explained in their 2021 report on *Market Size and Local Television News*, "[l]ocal news production is characterized by high fixed costs."[90] Ultimately, to achieve equilibrium, "a market will not have more local news operations than it can sustain."[91] Insisting on continued separate ownership eventually will be the death of at least one news organization in these markets.

Under the unique circumstances in each of these DMAs, waiver of the Local TVO Rule will strengthen the competitive position of the stations currently owned and operated by Nexstar and TEGNA, particularly against the companies that are working feverishly to disrupt the way local media is consumed. In each of the DMAs, at least two independent local broadcast news operations will remain.[92] The truth is, many of these DMAs simply are not large enough to sustain three or four independent broadcast news operations today.[93] Even those best positioned continue to face significant headwinds as media consumption habits continue to evolve and the local advertising operations of the biggest technology companies become even more sophisticated. The Commission should waive the Local TVO Rule to deliver to consumers the benefits of the Transaction, which will serve the public interest, convenience, and necessity.

1. **Dallas-Ft. Worth, TX**

In this DMA, TEGNA is the licensee of WFAA, Dallas, Texas (ABC), the second-ranked station in the DMA, and KFAA-TV, Decatur, Texas (Independent/EstrellaTV), the twelfth-ranked station in the DMA. Nexstar is the licensee of KDAF, Dallas, Texas (CW/Antenna TV), the tenth-ranked station in the DMA. Allowing Nexstar to own WFAA, KFAA-TV, and KDAF (collectively, the "Dallas DMA Stations") will enhance competition in the Dallas-Ft. Worth DMA and, thereby, better serve the public interest than strict adherence to the rule.

Following the Transaction, competition will remain fierce in this DMA, with 15 other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. Several of these stations broadcast local news, and the Transaction will allow Nexstar to begin broadcasting local news on KDAF, leveraging the strength of WFAA's newsroom, which

---

[90] Kim Makuch & Jonathan Levy, *Market Size and Television News*, at 3 (OEA, Working Paper No. 52, Jan. 15, 2021), https://tinyurl.com/ycxe9us7 ("OEA Working Paper 52").

[91] *Id.*

[92] Further, as noted below, in each of these DMAs, there will continue to be several television stations broadcasting local news. Even where some news is commonly produced, viewers will continue to benefit from the availability of news on multiple stations.

[93] *Id.* at 4 (explaining that, based on data from 2019, under a 75% acceptance criterion, only the largest 38 markets could support four or more local news operations—a number that certainly has decreased over the past six years of Big Tech disruption).

REDACTED - FOR PUBLIC INSPECTION

Form 2100, Schedule 315
Comprehensive Exhibit

was awarded a National Edward R. Murrow Award for Excellence in Writing in 2025 and a National Edward R. Murrow Award for Overall Excellence in 2023.[94]

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[95] Those benefits have become necessities as competition has accelerated for television stations in the Dallas-Ft. Worth DMA.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is Fox-owned KDFW (FOX) followed by WFAA. Comcast/NBC-owned KXAS-TV (NBC/Cozi) ranks third, with KTVT (CBS) fourth. The fifth-ranked station, KUVN (Univision), has ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and all remaining stations in the market have an audience share of ▮▮▮▮▮▮▮. KDAF has a low all day audience share of only ▮ and KFAA-TV has a similarly low audience share of ▮. When considering the P25–54 advertising demographic,[96] WFAA falls to fourth, trailing KDFW, KUVN, and KXAS-TV.

In terms of advertising revenue, according to data from BIA available as Exhibit C (the "BIA OTA Data"),[97] KXAS-TV brought in the highest estimated FY 2024 advertising revenue at ▮▮▮▮▮ (a ▮▮▮▮ share), with KDFW close behind with an estimated FY 2024 advertising revenue of ▮▮ (▮▮▮▮). KTVT had ▮▮▮▮▮ (▮▮▮) in estimated FY 2024 advertising revenue, and WFAA came in fourth at ▮▮▮▮▮ (▮▮▮). From there, the advertising revenues dip substantially to fifth-ranked KUVN, which had an estimated ▮▮▮▮▮ (▮▮▮) in FY 2024 advertising revenue, and the eleventh-ranked station, KDFI, which had an estimated ▮▮▮▮ (▮▮▮) in FY 2024 advertising revenue. All other stations in the market had revenues significantly below that level, including Nexstar's KDAF (▮▮▮▮▮▮▮▮▮▮▮▮▮) and TEGNA's KFAA-TV (▮▮▮▮▮▮▮▮▮▮▮). Moreover, advertising revenue share for KDAF declined by ▮▮▮▮▮▮ between 2020 and 2024, falling from ▮▮ to ▮▮.

---

[94] RTDNA, *2023 Edward R. Murrow Awards: National Winners*, https://tinyurl.com/34kymh2w (last visited Nov. 11, 2025); WFAA Staff, *WFAA's Jobin Panicker Wins Prestigious National Murrow Award for Excellence in Writing* (Aug. 15, 2025), https://tinyurl.com/52he7u68.

[95] *See 2002 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 13620, 13674–75 ¶¶ 147–150 (2003) ("*2002 Biennial Review Order*"). Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. *See Prometheus Radio Project v. FCC*, 373 F.3d 372 (3d Cir. 2004).

[96] The FCC's rules do not specify which demographic to use.

[97] BIA OTA Data provides information on OTA advertising revenue by DMA and by station and does not include information on all advertising revenue in a DMA. As such, the shares presented throughout this application represent the station share of OTA advertising revenue in the relevant DMA and is exclusive of non-OTA advertising. These shares do not take the parties' other advertising competitors' revenues into account, which include but are not limited to cable and digital video advertising platforms.

22

**App.64**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Television stations in the Dallas-Ft. Worth DMA compete for advertising revenue not only with each other, but with cable providers including Altice, Cable One, Charter, and Frontier, along with several smaller cable operators, national Direct Broadcast Satellite ("DBS") providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from BIA data available in Exhibit D (the "BIA Ad Market Data"), which indicates that OTA television advertising revenue for the Dallas-Ft. Worth DMA declined by ███████ (██) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ███████ (██), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ██ to ██.

Top line revenue figures mask the underlying trends facing stations like the Dallas DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. This is particularly true for KDAF and KFAA-TV, which, as stations not affiliated with any of the Big Four networks, are uniquely vulnerable to erosion of both viewers and advertising dollars.

The Dallas DMA Stations stand out for their commitment to delivering independent news and information to residents in the Dallas-Ft. Worth DMA. The Ad Fontes Media Bias and Reliability Ratings, available as Exhibit E (the "Ad Fontes Media Bias and Reliability Ratings"), confirm that WFAA serves as a politically balanced, reliable source of fact-based reporting.

To sustain their investment in quality journalism, the Dallas DMA Stations must find a way to combat declining viewership and revenues. Combining the Dallas DMA Stations under a common owner will provide these stations with the scale needed in the Dallas-Ft. Worth DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the Dallas DMA Stations will position these stations to better compete for advertising revenue in the Dallas-Ft. Worth DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the Dallas DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Dallas-Ft. Worth DMA, including other highly ranked television stations offering a broad reach, the Transaction will place the Dallas DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's WFAA by supplementing the station's already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, WFAA and KFAA-TV will gain access to Nexstar's

23

**App.65**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Dallas-Ft. Worth DMA. By assigning one of Nexstar's Washington Bureau reporters specifically to the Dallas-Ft. Worth DMA, Nexstar's reporting will reflect the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else. This model has allowed Nexstar's stations to break stories and broadcast exclusive interviews relevant to specific markets, including a recent interview with Senator Ted Cruz and the Texas teenager behind the *Take It Down Act*.

As a result of the Transaction, TEGNA's WFAA will also gain access to Nexstar's Texas state capital bureau, which covers matters of interest from the Governor's office, the state legislature, and state agencies for Nexstar stations across Texas. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will allow WFAA to expand its coverage of meaningful proceedings in Texas that directly affect the lives of its viewers.

Additionally, the Transaction will make the Dallas DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the Dallas DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Dallas-Ft. Worth DMA.

The Transaction will enhance the efforts of Nexstar and TEGNA to keep local sports free for viewers in the Dallas DMA. Nexstar has partnered with the Texas Rangers to broadcast at least 15 regular season games and four spring training games on KDAF-TV and 16 other stations in Texas, Oklahoma, Arkansas, and Louisiana.[98] TEGNA, meanwhile, has an agreement with the Dallas Mavericks to broadcast all Mavericks games that are not exclusively on national television on several of TEGNA's Texas stations, including KFAA-TV, with 15 games each year simulcast on WFAA.[99] TEGNA also has an agreement with the Dallas Wings to broadcast all Wings games not designated for national television.[100] These arrangements make Rangers, Mavericks, and Wings games available for free, over the air, and without the need for fans to subscribe to cable or a paid streaming service to support their local team. While live sporting events are popular with viewers and provide a significant public benefit, sports rights are expensive, and the Transaction will provide Nexstar with the scale in the Dallas DMA to continue, if not expand, the broadcast of live sporting events.

---

[98] *See* Nexstar-Rangers Press Release.

[99] *See* Press Release, TEGNA Inc., *Dallas Mavericks and TEGNA Announce New Multi-Year Broadcast Rights Agreement*, TEGNA Inc. (Sept. 6, 2024), https://tinyurl.com/3kyybkr5 ("TEGNA-Mavericks Press Release").

[100] *See* Press Release, TEGNA Inc., *Dallas Wings Partners with TEGNA's KFAA for Broadcast Rights Agreement* (Feb. 13, 2025), https://tinyurl.com/2eyb7x5e.

24

**App.66**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

The Transaction will allow Nexstar to expedite WFAA's and KFAA-TV's transition to ATSC 3.0 and provide WFAA and KFAA-TV access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[101] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[102] WFAA's and KFAA-TV's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Dallas-Ft. Worth DMA, where KDAF already broadcasts an ATSC 3.0 signal, and provide new revenue opportunities for WFAA and KFAA-TV.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Dallas DMA, Nexstar in 2024 partnered with numerous local organizations to raise funds for cancer research, hold toy drives for underprivileged children, and participate in other community events. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Dallas DMA Stations to create even more meaningful engagement with residents and issues unique to Dallas, in furtherance of the public interest.

Waiver of the Local TVO Rule is particularly appropriate here because the alternative is to allow one of the Dallas DMA Stations to fail. Absent a waiver, Nexstar will be forced to divest either KFAA-TV or KDAF. Even though KFAA-TV currently benefits from its common ownership with WFAA, it still has a low all day audience share of only ▮. Similarly, Nexstar's KDAF has a low all day audience share of ▮. Two out of the three stations that would be commonly owned as a result of the Transaction have shares below the 4% benchmark that the FCC has recognized as one of the signs that a station is failing.[103]

---

[101] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[102] *Id.*

[103] *See* 47 C.F.R. § 73.3555, note 7; *Review of the Commission's Regulations Governing Television Broadcasting*, Report and Order, 14 FCC Rcd 12903, 12939 ¶ 81 (1999) ("*Local Ownership Order*") (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower); (2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

25

**App.67**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[104] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and in [their] financial performance."[105] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity or competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[106] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming, and often struggle to provide significant local programming at all."[107] Therefore, "allowing a 'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[108]

KFAA-TV has only been able to provide the quality programming that it provides today because of its common ownership with WFAA. Granting a waiver of the Local TVO Rule under these circumstances to allow KFAA-TV to continue under common ownership, and to add KDAF to the existing station group, will create a stronger competitor in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the Dallas DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the Dallas-Ft. Worth DMA, the Transaction is critical to the ability of the Dallas DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit common ownership of the Dallas DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the Dallas-Ft. Worth DMA.

### 2.    Houston, TX

In this DMA, TEGNA is the licensee of KHOU, Houston, Texas (CBS), the second-ranked station in the DMA, and KTBU, Conroe, Texas (Independent), the fifteenth-ranked station in the DMA. Nexstar is the licensee of KIAH, Houston, Texas (CW/Antenna TV), the tenth-ranked station in the DMA. Allowing Nexstar to own KHOU, KIAH, and KTBU (collectively, the "Houston DMA Stations") will enhance competition in the Houston DMA and, thereby, better serve the public interest than strict adherence to the rule.

---

[104] *See* 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); *Local Ownership Order* at 12938 ¶ 79.

[105] *See Local Ownership Order* at 12938 ¶ 79.

[106] *Id.* at 12939 ¶ 79.

[107] *Id.*

[108] *Id.*

26

**App.68**

**REDACTED - FOR PUBLIC INSPECTION**
Form 2100, Schedule 315
Comprehensive Exhibit

Following the Transaction, competition will remain fierce in this DMA, with 14 other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. Several of these stations broadcast local news.

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[109] Those benefits have become necessities as competition has accelerated for television stations in the Houston DMA.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is Disney/ABC-owned KTRK-TV (ABC), followed by KHOU (CBS) in second, Graham-owned KPRC-TV (NBC) in third, and KXLN-DT (Univision) in fourth. Station KTMD (Telemundo) follows closely behind KXLN in fifth, and KRIV (FOX) is rated sixth. All other stations' audience shares drop off significantly from there, with KIAH only having a ▮ audience share and KTBU having a mere ▮ audience share. When considering the P25–54 advertising demographic, Univision affiliate KXLN-DT jumps to first place and Telemundo affiliate KTMD is second, followed by KTRK-TV, KRIV, and KPRC-TV, and KHOU slides to sixth place.

In terms of advertising revenue, according to the BIA OTA Data, despite being the second-ranked station by Nielsen, KPRC-TV brought in the highest estimated FY 2024 advertising revenue at ▮▮▮▮ (a ▮▮ share) with KTRK-TV close behind with an estimated FY 2024 advertising revenue of ▮▮▮▮ (▮▮▮). KHOU comes in third, bringing in an estimated ▮▮▮ advertising revenue for FY 2024 (▮▮). KRIV's estimated FY 2024 advertising revenue is next at ▮▮▮ (▮▮) with KXLN following with ▮▮▮ (▮▮). The remaining stations all earned ▮▮▮ of the share for FY 2024, including Nexstar's KIAH (▮▮▮▮▮ ▮▮▮) and TEGNA's KTBU (▮▮▮▮). Moreover, advertising revenue for KIAH declined by ▮▮▮▮ between 2020 and 2024, falling from ▮▮ to ▮▮.

Television stations in the Houston DMA compete for advertising revenue not only with each other, but with cable providers including Altice, Cable One, Charter, Comcast, and several smaller cable operators, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Houston DMA declined by ▮▮▮ (▮▮) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ▮▮▮ (▮▮), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ▮▮ to ▮▮.

Top line revenue figures mask the underlying trends facing stations like the Houston DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue

---

[109] *See 2002 Biennial Review Order* at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. *See Prometheus Radio Project*, 373 F.3d 372.

27

**App.69**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. This is particularly true for KTBU and KIAH, which, as stations not affiliated with any of the Big Four networks, are uniquely vulnerable to erosion of both viewers and advertising dollars.

The Houston DMA Stations stand out for their commitment to delivering independent news and information to residents in the Houston DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, the Houston DMA Stations must find a way to combat declining viewership and revenues. Combining the Houston DMA Stations under a common owner will provide these stations with the scale needed in the Houston DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the Houston DMA Stations will position these stations to better compete for advertising revenue in the Houston DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the Houston DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Houston DMA, including other highly ranked television stations offering a broad reach, the Transaction will place the Houston DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers in the Houston DMA by supplementing the KHOU's already strong local journalism with additional newsgathering resources. As a result of the Transaction, Nexstar plans to expand the local news operations at KIAH, which broadcasts a locally produced four-hour morning news show and a late local news program, utilizing TEGNA's award-winning KHOU newsroom, which recently received a regional Lone Star EMMY award for News Excellence.[110] Additionally, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, KHOU will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Houston DMA. With a Washington Bureau reporter assigned specifically to the Houston DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else. This model has allowed Nexstar's stations to break stories and broadcast exclusive interviews relevant to specific markets, including a recent interview with Senator Ted Cruz and the Texas teenager behind the *Take It Down Act*.

---

[110] KHOU, *KHOU 11 Honored for News Excellence with Regional Lone Star EMMY® Award* (Nov. 25, 2024), https://tinyurl.com/3xe2454h.

28

**App.70**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

As a result of the Transaction, TEGNA's KHOU will also gain access to Nexstar's Texas state capital bureau, which covers matters of interest from the Governor's office, the state legislature, and state agencies for Nexstar stations across Texas. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will allow KHOU and KTBU to expand their coverage of meaningful proceedings in Texas that directly affect the lives of its viewers.

Additionally, the Transaction will make the Houston DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the Houston DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Houston DMA.

The Transaction will enhance the efforts of Nexstar and TEGNA to keep local sports free for viewers in the Houston DMA. Nexstar has partnered with the Texas Rangers to broadcast at least 15 regular season games and four spring training games on KIAH and 16 other stations in Texas, Oklahoma, Arkansas, and Louisiana.[111] This arrangement makes Rangers games available for free, over the air, and without the need for fans to subscribe to cable or a paid streaming service to support an in-state team with a significant following in the Houston DMA. While live sporting events are popular with viewers and provide a significant public benefit, sports rights are expensive, and the Transaction will provide Nexstar with the scale in the Houston DMA to continue, if not expand, the broadcast of live sporting events.

The Transaction will allow Nexstar to expedite KTBU's transition to ATSC 3.0 and provide KHOU and KTBU access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[112] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[113] KHOU's and KTBU's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Houston DMA, where KIAH and KHOU already broadcast an ATSC 3.0 signal, and provide new revenue opportunities for KHOU and KTBU.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve

---

[111] *See* Nexstar-Rangers Press Release.

[112] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[113] *Id.*

29

**App.71**

local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Houston DMA, Nexstar in 2024 partnered with local organizations to hold toy and food drives collecting more than 80,000 toys and feeding 25,000 Houstonians a Thanksgiving meal, in addition to other community events. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Houston DMA Stations to create even more meaningful engagement with residents and issues unique to Houston, in furtherance of the public interest.

Waiver of the Local TVO Rule is particularly appropriate here because the alternative is to allow one of the Houston DMA Stations to fail. Absent a waiver, Nexstar will be forced to divest either KTBU or KIAH. KTBU has a low all day audience share of only █. Similarly, Nexstar's KIAH has a low all day audience share of only █. Two out of the three stations that would be commonly owned as a result of the Transaction thus have shares well below the 4% benchmark that the FCC has recognized as one of the signs that a station is failing.[114]

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[115] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and in [their] financial performance."[116] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity or competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[117] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming, and often struggle to provide significant local programming at all."[118] Therefore, "allowing a 'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[119]

KTBU has only been able to provide the quality programming that it provides today because of its common ownership with KHOU. Granting a waiver of the Local TVO Rule under these

---

[114] *See* 47 C.F.R. § 73.3555, note 7; *Local Ownership Order* at 12939 ¶ 81 (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower); (2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

[115] *See* 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); *Local Ownership Order* at 12938 ¶ 79.

[116] *See Local Ownership Order* at 12938 ¶ 79.

[117] *Id.* at 12939 ¶ 79.

[118] *Id.*

[119] *Id.*

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

circumstances to allow KTBU to continue under common ownership, and to add KIAH to the existing station group, will create a stronger competitor in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the Houston DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the Houston DMA, the Transaction is critical to the ability of the Houston DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit common ownership of the Houston DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the Houston DMA.

3.    **Washington, D.C.**

In this DMA, TEGNA is the licensee of WUSA, Washington, D.C. (CBS), the second-ranked station in the DMA. Nexstar is the licensee of WDCW, Washington, D.C. (CW/Antenna TV), the ninth-ranked station in the DMA, and WDVM-TV, Hagerstown, Maryland (Independent), the eleventh-ranked station in the DMA. Allowing Nexstar to own WUSA, WDCW, and WDVM-TV (collectively, the "Washington DMA Stations") will enhance competition in the Washington DMA and, thereby, better serve the public interest than strict adherence to the rule.

Following the Transaction, competition will remain fierce in this DMA, with 15 other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. Several of these stations broadcast local news, as does WZDC-CD, the Telemundo affiliate in the Washington DMA.

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[120] Those benefits have become necessities as competition has accelerated for television stations in the Washington DMA.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is Comcast/NBC-owned WRC-TV (NBC), followed by WUSA. FOX-affiliated WTTG ranks third, and ABC affiliate WJLA-TV ranks fourth. The next-rated station in the market, ION affiliate WPXW, is a distant fifth. WDCW and WDVM-TV rank ninth and eleventh with audience shares of ████████, respectively. In terms of advertising revenue, according to the BIA OTA Data, WRC-TV brought in the highest estimated FY 2024 advertising revenue at ████████ (a ██ share of OTA ad revenue), and WTTG ranks second with an estimated ████████ (████). WUSA ranks third with an estimated FY 2024 advertising revenue of ████████ (████), and

---

[120] See *2002 Biennial Review Order* at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. See *Prometheus Radio Project*, 373 F.3d 372.

31

**App.73**

REDACTED - FOR PUBLIC INSPECTION

Form 2100, Schedule 315
Comprehensive Exhibit

WJLA-TV comes in fourth with an estimated ███████ (████). WDCW and WDVM-TV are ninth and tenth, respectively, with combined revenue of █████████ that accounted for just a ███ share of OTA ad revenue in the DMA.

Television stations in the Washington DMA compete for advertising revenue not only with each other, but with cable providers including Comcast, Cox and Verizon, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Washington DMA declined by █████████ (███) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ██████████ (███), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ███ to ██.

Top line revenue figures mask the underlying trends facing stations like the Washington DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. This is particularly true for WDCW and WDVM-TV, which, as stations that are not affiliated with a Big Four network, are uniquely vulnerable to erosion of both viewers and advertising dollars.

The Washington DMA Stations stand out for their commitment to delivering independent news and information to residents in the Washington DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, the Washington DMA Stations must find a way to combat declining viewership and revenues. Combining the Washington DMA Stations under a common owner will provide these stations with the scale needed in the Washington DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the Washington DMA Stations will position these stations to better compete for advertising revenue in the Washington DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the Washington DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Washington DMA, including other highly ranked television stations offering a broad reach, the Transaction will place the Washington DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers in the Washington DMA by supplementing the Washington DMA Stations' already strong local journalism with additional newsgathering resources. As a result of the Transaction, Nexstar plans to expand both the amount

32

**App.74**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

of news on WDCW and the station's newsgathering resources, leveraging WUSA's award-winning newsroom—which earned three Regional Edward R. Murrow awards in 2025.[121] Additionally, following consummation of the Transaction, WUSA will gain access to Nexstar's Washington Bureau, strengthening WUSA's coverage and analysis of federal policies tailored to the particular needs and interests of viewers who live and work in the Nation's Capital. Nexstar's and TEGNA's local stations across the country, meanwhile, will benefit from the added journalistic resources WUSA will contribute to Nexstar's Washington coverage.

Additionally, the Transaction will make the Washington DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the Washington DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Washington DMA.

The Transaction will allow Nexstar to include WUSA in the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[122] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[123] WUSA's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Washington DMA and provide new revenue opportunities for WUSA.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need. As a result of the Transaction, Nexstar will leverage WUSA's culture of community service to expand its meaningful engagement with residents and issues unique to Washington, D.C., in furtherance of the public interest.

Waiver of the Local TVO Rule is particularly appropriate here because the alternative is to allow one of the Washington DMA Stations to fail. Absent a waiver, Nexstar will be forced to divest either WDCW or WDVM-TV. WDCW has a low all day audience share of only ▮, and WDVM-

---

[121] RTDNA, *RTDNA Announces 2025 Region 12 Edward R. Murrow Award Winners*, (May 28, 2025), https://tinyurl.com/yacuaj72.

[122] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[123] *Id.*

33

**App.75**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

TV has a low all day audience share of only ███. Both of these shares are below the 4% benchmark that the FCC has recognized as one of the signs that a station is failing.[124]

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[125] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and in [their] financial performance."[126] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity or competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[127] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming, and often struggle to provide significant local programming at all."[128] Therefore, "allowing a 'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[129] Granting a waiver of the Local TVO Rule under these circumstances to allow WDCW and WDVM-TV to join with WUSA under common ownership will preserve a stronger competitor in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the Washington DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the Washington DMA, the Transaction is critical to the ability of the Washington DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit common ownership of the Washington DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the Washington DMA.

### 4.    Tampa-St. Petersburg (Sarasota), FL

In this DMA (the "Tampa DMA"), TEGNA is the licensee of WTSP, Tampa, Florida (CBS), the second-ranked station in the DMA. Nexstar is the licensee of WFLA-TV, Tampa, Florida (NBC),

---

[124] *See* 47 C.F.R. § 73.3555, note 7; *Local Ownership Order* at 12939 ¶ 81 (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower); (2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

[125] *See* 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); *Local Ownership Order* at 12938 ¶ 79.

[126] *See Local Ownership Order* at 12938 ¶ 79.

[127] *Id.* at 12939 ¶ 79.

[128] *Id.*

[129] *Id.*

34

**App.76**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

the third-ranked station in the DMA, and WTTA, St. Petersburg, Florida (CW), the tenth-ranked station in the DMA. Allowing Nexstar to own WTSP, WFLA-TV, and WTTA (collectively, the "Tampa DMA Stations") will enhance competition in the Tampa DMA and, thereby, better serve the public interest than strict adherence to the rule.

Following the Transaction, competition will remain fierce in this DMA, with 11 other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. Several of these stations broadcast local news, as does WRMD-CD, the Telemundo affiliate in the Tampa DMA.

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[130] Those benefits have become necessities as competition has accelerated for television stations in the Tampa DMA.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is FOX-owned WTVT (FOX), followed by WTSP, WFLA-TV, WFTS-TV (ABC), WMOR-TV (Independent/MeTV/Estrella TV), WVEA-TV (Univision/UniMás), WWSB (ABC/Independent), WXPX-TV (Independent/CourtTV), WRMD-CD (Telemundo), WTTA, WEDU (PBS), and others. In terms of advertising revenue, according to the BIA OTA Data, the top four stations in the market each command between ▇▇ and ▇▇ of the advertising revenue. From there, the fallout is steep, with WTTA receiving just ▇▇ of the advertising revenue in the market. Television stations in the Tampa DMA compete for advertising revenue not only with each other, but with cable providers including Blue Stream, Charter, Comcast, Frontier, Summit Broadband, and WideOpenWest, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates OTA television advertising revenue for the Tampa DMA declined by ▇▇▇▇ (▇) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ▇▇▇▇ (▇), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ▇▇ to ▇▇.

Top line revenue figures mask the underlying trends facing stations like the Tampa DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. This is particularly true for WTTA, which, as a station not affiliated with any of the Big Four networks, is uniquely vulnerable to erosion of both viewers and advertising dollars.

---

[130] See 2002 Biennial Review Order at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. See Prometheus Radio Project, 373 F.3d 372.

35

**App.77**

**REDACTED - FOR PUBLIC INSPECTION**
Form 2100, Schedule 315
Comprehensive Exhibit

The Tampa DMA Stations stand out for their commitment to delivering independent news and information to residents in the Tampa DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, the Tampa DMA Stations must find a way to combat declining viewership and revenues. Combining the Tampa DMA Stations under a common owner will provide these stations with the scale needed in the Tampa DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the Tampa DMA Stations will position these stations to better compete for advertising revenue in the Tampa DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the Tampa DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Tampa DMA, including other highly ranked television stations offering a broad reach, the Transaction will place the Tampa DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's WTSP by supplementing the station's already strong local journalism with additional newsgathering resources from the award-winning WFLA newsroom, which earned the Suncoast Regional Emmy Award for Overall Excellence in 2024.[131] WTSP will also benefit from additional newsgathering resources at the state and national levels. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, WTSP will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Tampa DMA. With a Washington Bureau reporter assigned specifically to the Tampa DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

As a result of the Transaction, TEGNA's WTSP will also gain access to Nexstar's Florida state capital bureau, which covers matters of interest from the Governor's office, the state legislature, and state agencies for Nexstar stations across Florida. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will allow WTSP to expand its coverage of meaningful proceedings in Tallahassee that directly affect the lives of its viewers.

---

[131] *See* National Academy of Television Arts & Sciences Suncoast Chapter, *The 48th Annual Suncoast Regional Emmy Awards 2024 Program Winners* (last updated Oct. 29, 2024), https://tinyurl.com/ykvyd3mh.

36

**App.78**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Additionally, the Transaction will make the Tampa DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the Tampa DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Tampa DMA.

The Transaction will allow Nexstar to include WTSP in the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[132] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[133] WTSP's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Tampa DMA and provide new revenue opportunities for WTSP.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Tampa DMA, Nexstar in 2024 partnered with dozens of local organizations to raise funds for various community initiatives, including the Bloom Health and Fitness Expo with Advent Health and the Tampa Bay Buccaneers, "Clear the Shelters" with 35 local pet shelters, and the Tampa Bay Heart Walk with the American Heart Association. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Tampa DMA Stations to create even more meaningful engagement with residents and issues unique to Tampa Bay, in furtherance of the public interest.

Waiver of the Local TVO Rule is particularly appropriate here because the alternative is to allow one of the Tampa DMA Stations to fail. Absent a waiver, Nexstar will be forced to divest WTTA. Even though WTTA currently benefits from its common ownership with WFLA-TV, it still has a low all day audience share of only ██. This is well below the 4% share benchmark that the FCC has recognized as one of the signs that a station is failing.[134]

---

[132] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[133] *Id.*

[134] *See* 47 C.F.R. § 73.3555, note 7; *Local Ownership Order* at 12939 ¶ 81 (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower); (2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and

37

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[135] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and in [their] financial performance."[136] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity or competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[137] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming, and often struggle to provide significant local programming at all."[138] Therefore, "allowing a 'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[139]

WTTA has only been able to provide the quality programming that it provides today because of its common ownership with WFLA-TV. Granting a waiver of the Local TVO Rule under these circumstances to allow WTTA to continue under common ownership will preserve a stronger competitor in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the Tampa DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the Tampa DMA, the Transaction is critical to the ability of the Tampa DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit common ownership of the Tampa DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the Tampa DMA.

5.    **Phoenix (Prescott), AZ**

In this DMA, TEGNA is the licensee of KPNX, Mesa, Arizona (NBC), the fifth-ranked station in the DMA, and KNAZ-TV, Flagstaff, Arizona (NBC), the seventeenth-ranked station in the DMA. The FCC has previously recognized that KNAZ-TV operates as a satellite of KPNX.[140] Nexstar

---

diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

[135] *See* 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); *Local Ownership Order* at 12938 ¶ 79.

[136] *See Local Ownership Order* at 12938 ¶ 79.

[137] *Id.* at 12939 ¶ 79.

[138] *Id.*

[139] *Id.*

[140] *Applications for Consent to Transfer Control from Shareholders of Belo Corp. to Gannett Co, Inc.*, Memorandum Opinion and Order, 28 FCC Rcd 16867, 16870 ¶ 7 n.22 (2013) ("KNAZ-TV

38

**App.80**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

does not own any full power stations in the DMA, but programs KAZT-TV, Prescott, Arizona (CW), the eighth-ranked station in the DMA pursuant to a Local Marketing Agreement ("LMA"). Accordingly, upon Nexstar's acquisition of KPNX and KNAZ-TV, by virtue of the LMA relationship, Nexstar will have an attributable interest in KAZT-TV. Allowing Nexstar to hold an attributable interest in KPNX, KNAZ-TV, and KAZT-TV (collectively, the "Phoenix DMA Stations") will enhance competition in the Phoenix DMA and, thereby, better serve the public interest than strict adherence to the rule.

Following the Transaction, competition will remain fierce in this DMA, with 15 other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. Several of these stations broadcast local news.

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[141] Those benefits have become necessities as competition has accelerated for television stations in the Phoenix DMA.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is Gray-owned KPHO-TV (CBS), followed by Fox-owned KSAZ-TV (FOX), Scripps-owned KNXV-TV (ABC), Gray-owned KTVK (Independent), and KPNX in fifth. The sixth and seventh ranked stations, KTAZ (Telemundo) and KTVW (Univision), have ▮▮▮▮▮ the audience share of KPNX, and all other stations in the market, including KNAZ-TV and KAZT-TV, each have less than ▮ of the audience share. In terms of advertising revenue, according to the BIA OTA Data, KSAZ-TV brought in the highest estimated FY 2024 advertising revenue at ▮▮▮▮ (a ▮ share of OTA ad revenue), and KNXV-TV is a ▮ second with an estimated (▮▮▮). KPNX ranks third with an estimated FY 2024 advertising revenue of (▮▮▮), and KTVK comes in fourth with an estimated ▮▮▮ (▮▮). KPHO-TV follows in a close fifth with an estimated ▮▮▮ (▮▮). KAZT-TV is eleventh with an estimated revenue of ▮▮▮ (▮▮), and BIA does not report on KNAZ-TV.

Television stations in the Phoenix DMA compete for advertising revenue not only with each other, but with cable providers including Allo Communications, Altice, Cable One, Cox Communications, Mediacom, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Phoenix DMA declined by ▮▮▮ (▮) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ▮▮▮ (▮), led by growth in mobile, computers, and connected TV. Over this time

---

operates as a satellite of KPNX-TV, even though common ownership is permitted under our local television multiple ownership rule. Station KNAZ-TV's signal does not encompass Phoenix.").

[141] *See 2002 Biennial Review Order* at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. *See Prometheus Radio Project*, 373 F.3d 372.

39

**App.81**

frame, OTA television's share of the total local advertising spend in the market declined from  to ▇.

Top line revenue figures mask the underlying trends facing stations like the Phoenix DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. This is particularly true for KAZT-TV which, as a station not affiliated with any of the Big Four networks is uniquely vulnerable to erosion of both viewers and advertising dollars.

KPNX and its satellite KNAZ-TV stand out for their commitment to delivering independent news and information to residents in the Phoenix DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, the Phoenix DMA Stations must find a way to combat declining viewership and revenues. Combining the Phoenix DMA Stations under a common owner will provide these stations with the scale needed in the Phoenix DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the Phoenix DMA Stations will position these stations to better compete for advertising revenue in the Phoenix DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the Phoenix DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Phoenix DMA, including other highly ranked television stations offering a broad reach, the Transaction will place the Phoenix DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers in the Phoenix DMA by supplementing KPNX's already strong local journalism with additional newsgathering resources. Indeed, as a result of the Transaction, Nexstar plans to expand the amount of news on KAZT-TV, leveraging KPNX's strong local newsroom which has served its communities for more than 70 years. Additionally, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, KPNX and KNAZ-TV will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Phoenix DMA. By assigning one of Nexstar's Washington Bureau reporters specifically to the Phoenix DMA, Nexstar's reporting will reflect the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

40

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

The Transaction will also make the Phoenix DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the Phoenix DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Phoenix DMA.

The Transaction will allow Nexstar to expedite KNAZ-TV's transition to ATSC 3.0 and provide KPNX and KNAZ-TV access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[142] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[143] KPNX's and KNAZ-TV's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Phoenix DMA, where KPNX already broadcasts an ATSC 3.0 signal, and provide new revenue opportunities for KPNX and KNAZ-TV.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Phoenix DMA, Nexstar in 2024 partnered with more than 15 local organizations to put on events that benefited veterans, children, and firefighters, among others. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Phoenix DMA Stations to create even more meaningful engagement with residents and issues unique to Phoenix, in furtherance of the public interest.

Waiver of the Local TVO Rule is particularly appropriate here because the alternative is to allow one of the Phoenix DMA Stations to fail. Absent a waiver, Nexstar could be forced to either divest KNAZ-TV or terminate its LMA with KAZT-TV. KAZT-TV has a low all day audience share of only ▮, and KNAZ-TV has a low all day audience share of only ▮. Two out of the three stations that would be commonly owned as a result of the Transaction thus have shares well below the 4% benchmark that the FCC has recognized as one of the signs that a station is failing.[144] Alternatively,

---

[142] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[143] *Id.*

[144] *See* 47 C.F.R. § 73.3555, note 7; *Local Ownership Order* at 12939 ¶ 81 (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower);

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

to avoid this situation, the FCC could formally authorize KNAZ-TV as a satellite of KPNX based on its previous recognition of this long standing satellite relationship.[145]

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[146] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and in [their] financial performance."[147] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity of competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[148] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming, and often struggle to provide significant local programming at all."[149] Therefore, "allowing a 'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[150]

KNAZ-TV has only been able to provide the quality programming that it provides today because of its common ownership with KPNX. Granting a waiver of the Local TVO Rule under these circumstances to allow Nexstar to have attributable interests in the Phoenix DMA Stations will preserve a stronger competitor in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the Phoenix DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the Phoenix DMA, the Transaction is critical to the ability of the Phoenix DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit Nexstar to hold attributable interests in the Phoenix DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the Phoenix DMA.

---

(2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

[145] In lieu of a Local TVO Rule waiver, the Commission could, on an *ad hoc* basis, approve formal satellite status for KNAZ-TV based on the facts set forth herein. *See Television Satellite Stations Review of Policy and Rules*, Report and Order, 6 FCC Rcd 4212, 4212 ¶ 2 (1991).

[146] *See* 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); *Local Ownership Order* at 12938 ¶ 79.

[147] *See Local Ownership Order* at 12938 ¶ 79.

[148] *Id.* at 12939 ¶ 79.

[149] *Id.*

[150] *Id.*

42

**App.84**

6.     **Denver, CO**

In this DMA, TEGNA is the licensee of KUSA, Denver, Colorado (NBC), the top-ranked station in the DMA, and KTVD, Denver, Colorado (MyNetworkTV), the sixth-ranked station in the DMA. Nexstar is the licensee of KDVR, Denver, Colorado (FOX), the third-ranked station in the DMA,[151] and KWGN-TV, Denver, Colorado (CW), the fifth-ranked station in the DMA. Allowing Nexstar to own KUSA, KDVR, KWGN-TV, and KTVD (collectively, the "Denver DMA Stations") will enhance competition in the Denver DMA and, thereby, better serve the public interest than strict adherence to the rule.

Following the Transaction, competition will remain fierce in this DMA, with 16 other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. These stations and various low power stations serving the market include affiliates not only of the four major networks, but of Univision, PBS, ION, MeTV, UniMás, Telemundo, Estrella, Trinity Broadcasting Network, and Daystar. Several of these stations broadcast local news.

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[152] Those benefits have become necessities as competition has accelerated for television stations in the Denver DMA.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is KUSA, followed closely by CBS-owned KCNC-TV (CBS), KDVR, and ABC affiliate KMGH-TV. KWGN-TV is fifth with a ▮ share, followed by sixth-place KTVD with ▮. In terms of advertising revenue, according to the BIA OTA Data, KUSA earned the highest estimated FY 2024 advertising revenue at ▮ (a ▮ share of OTA advertising), and KCNC-TV is second with an estimated FY 2024 advertising revenue of ▮ (▮). Scripps' KMGH-TV is third with an estimated FY 2024 advertising revenue of ▮ (▮), outearning fourth-place KDVR (▮) even though KDVR's ratings are higher. KTVD and KWGN-TV are fifth and sixth respectively with combined revenue of ▮ (▮), and six other stations (including affiliates of Univision, ION, UniMás, Telemundo and Estrella) garnered reportable revenue in 2024.

Television stations in the Denver DMA compete for advertising revenue not only with each other, but with cable providers including Comcast and Charter, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from BIA's

---

[151] Nexstar is also the licensee of KFCT, Fort Collins, Colorado, which operates as a satellite station of KDVR. *See Tribune MO&O* at 8461–62 ¶¶ 53–58 (reauthorizing satellite exception for KFCT).

[152] *See 2002 Biennial Review Order* at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. *See Prometheus Radio Project*, 373 F.3d 372.

43

REDACTED - FOR PUBLIC INSPECTION

Form 2100, Schedule 315
Comprehensive Exhibit

yearly gross OTA revenue estimates for the market (available in the BIA OTA Data), which indicate that total television ad revenues for the Denver DMA have declined by ▮▮▮▮ between 2019 and 2025. During that same period, the BIA Ad Market Data indicates that OTA broadcasting fell from ▮▮▮ of the total media revenue in the DMA ▮▮▮▮ while mobile increased from ▮▮ to ▮▮, computers increased from ▮▮ to ▮▮, and connected TVs and OTT devices increased from ▮▮ to ▮▮.

Top line revenue figures mask the underlying trends facing stations like the Denver DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. This is particularly true for KWGN-TV and KTVD, which, as stations that are not affiliated with any of the Big Four networks, are uniquely vulnerable to erosion of both viewers and advertising dollars.

The Denver DMA Stations stand out for their commitment to delivering independent news and information to residents in the Denver DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, the Denver DMA Stations must find a way to combat declining viewership and revenues. Combining the Denver DMA Stations under a common owner will provide these stations with the scale needed in the Denver DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the Denver DMA Stations will position these stations to better compete for advertising revenue in the Denver DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the Denver DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Denver DMA, including a host of other television stations offering a broad range of programming, the Transaction will place the Denver DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's KUSA and KTVD by supplementing the stations' already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, KUSA and KTVD will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Denver DMA. With a Washington Bureau reporter assigned specifically to the Denver DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not

44

**App.86**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

available anywhere else. This model has allowed Nexstar's stations to break stories and broadcast exclusive interviews relevant to specific markets, including exclusive coverage from the Oval Office regarding the relocation of the U.S. Space Command from Colorado Springs, Colorado to Huntsville, Alabama.

As a result of the Transaction, TEGNA and Nexstar stations throughout Colorado will receive expanded coverage of news from the Governor's office, the state legislature, and state agencies through the resources of Nexstar's Colorado state capital bureau. With the added resources of KUSA, this bureau will be able to provide even stronger coverage of state government matters that directly affect the lives of viewers in the Denver DMA and throughout the state.

Additionally, the Transaction will make the Denver DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the Denver DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Denver DMA.

The Transaction will enhance the efforts of Nexstar and TEGNA to keep local sports free for viewers in the Denver DMA. TEGNA has an agreement to broadcast 20 Denver Nuggets games and 20 Colorado Avalanche games per year on KUSA and KTVD.[153] This arrangement makes Nuggets and Avalanche games available for free, over the air, and without the need for fans to subscribe to cable or a paid streaming service to support their local team. While live sporting events are popular with viewers and provide a significant public benefit, sports rights are expensive, and the Transaction will provide Nexstar with the scale in the Denver DMA to continue, if not expand, the broadcast of live sporting events.

The Transaction will allow Nexstar to expedite KTVD's transition to ATSC 3.0 and provide KUSA and KTVD access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[154] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[155] KUSA's and KTVD's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Denver DMA, where KUSA, KDVR, and KWGN-TV already broadcast an ATSC 3.0 signal, and provide new revenue opportunities for KUSA and KTVD.

---

[153] *See* Press Release, Kroenke Sports & Entertainment & TEGNA Inc., *Altitude Sports Extends Partnership with TEGNA Stations 9NEWS, My20 for Second Consecutive Year, Bringing 20 Nuggets Games, 20 Avalanche Games Free to Denver Fans* (Sept. 22, 2025), https://tinyurl.com/3492mayj.

[154] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[155] *Id.*

45

**App.87**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Denver DMA, Nexstar in 2024 hosted more than 15 community events, partnering with numerous local organizations to raise funds for cancer research and local hospitals, collect school supplies, shoes, and toys for children in need, and support veterans in the community. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Denver DMA Stations to create even more meaningful engagement with residents and issues unique to Denver, in furtherance of the public interest.

Waiver of the Local TVO Rule is particularly appropriate here because the alternative is to allow two stations in the Denver DMA to fail. Absent a waiver, Nexstar will be forced to divest KWGN-TV and KTVD. Even though KWGN-TV currently benefits from its common ownership with KDVR, it still has a low all day audience share of only ██. Similarly, KTVD has a low all day audience share of only ██, despite the current benefits it receives from its common ownership with KUSA. The audience shares for both of these stations are below the 4% benchmark that the FCC has recognized as one of the signs that a station is failing.[156]

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[157] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and in [their] financial performance."[158] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity or competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[159] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming,

---

[156] *See* 47 C.F.R. § 73.3555, note 7; *Local Ownership Order* at 12939 ¶ 81 (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower); (2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

[157] *See* 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); *Local Ownership Order* at 12938 ¶ 79.

[158] *See Local Ownership Order* at 12938 ¶ 79.

[159] *Id.* at 12939 ¶ 79.

**App.88**

and often struggle to provide significant local programming at all."[160] Therefore, "allowing a 'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[161]

KWGN-TV and KTVD have only been able to provide the quality programming (including local news) that they provide today because of their common ownership with KDVR and KUSA, respectively. Granting a waiver of the Local TVO Rule under these circumstances to allow KWGN-TV and KTVD to continue under common ownership will preserve a stronger competitor in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the Denver DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the Denver DMA, the Transaction is critical to the ability of the Denver DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit common ownership of the Denver DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the Denver DMA.

### 7.     Cleveland-Akron (Canton), OH

In this DMA (the "Cleveland DMA"), Nexstar is the licensee of WJW, Cleveland, Ohio (FOX/Antenna TV), the third-ranked station in the DMA, and WBNX-TV, Akron, Ohio (CW), the seventh-ranked station in the DMA. TEGNA is the licensee of WKYC, Cleveland, Ohio (NBC), the fourth-ranked station in the DMA. Allowing Nexstar to own WKYC, WJW, and WBNX-TV (collectively, the "Cleveland DMA Stations") will enhance competition in the Cleveland DMA and, thereby, better serve the public interest than strict adherence to the rule.

Following the Transaction, competition will remain fierce in this DMA, with 12 other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. Several of these stations broadcast local news, as does WTCL-LD, the Telemundo station in the Cleveland DMA.

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[162] Those benefits have become necessities as competition has accelerated for television stations in the Cleveland DMA.

---

[160] *Id.*

[161] *Id.*

[162] *See 2002 Biennial Review Order* at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. *See Prometheus Radio Project*, 373 F.3d 372.

**REDACTED - FOR PUBLIC INSPECTION**
Form 2100, Schedule 315
Comprehensive Exhibit

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is Gray-owned WOIO (CBS/MeTV), followed by Scripps-owned WEWS-TV (ABC), WJW, and WKYC. The remaining stations each have audience shares below ▮, including WVPX-TV (ION), WUAB (Independent), WBNX-TV (with a ▮ share), and others. Television stations in the Cleveland DMA compete for advertising revenue not only with each other, but with cable providers including Charter and Cox, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Cleveland DMA declined by ▮▮▮▮ (▮) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ▮▮ ▮▮ (▮), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ▮ to ▮.

Top line revenue figures mask the underlying trends facing stations like the Cleveland DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. This is particularly true for WBNX-TV, which, as a station not affiliated with any of the Big Four networks, is uniquely vulnerable to erosion of both viewers and advertising dollars.

The Cleveland DMA Stations stand out for their commitment to delivering independent news and information to residents in the Cleveland DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, the Cleveland DMA Stations must find a way to combat declining viewership and revenues. Combining the Cleveland DMA Stations under a common owner will provide these stations with the scale needed in the Cleveland DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the Cleveland DMA Stations will position these stations to better compete for advertising revenue in the Cleveland DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the Cleveland DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Cleveland DMA, including other highly ranked television stations offering a broad reach, the Transaction will place the Cleveland DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's WKYC by supplementing the station's already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following

48

**App.90**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

consummation of the Transaction, WKYC will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Cleveland DMA. With a Washington Bureau reporter assigned specifically to the Cleveland DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

As a result of the Transaction, TEGNA's WKYC will also gain access to Nexstar's Ohio state capital bureau, which covers matters of interest from the Governor's office, the state legislature, and state agencies for Nexstar stations across Ohio. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will allow WKYC to expand its coverage of meaningful proceedings in Columbus that directly affect the lives of its viewers.

Additionally, the Transaction will make the Cleveland DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the Cleveland DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Cleveland DMA.

The Transaction will allow Nexstar to expedite the transition of WJW, WBNX-TV, and WKYC to ATSC 3.0. WKYC will also gain access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[163] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[164] WKYC's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Cleveland DMA and provide new revenue opportunities for WKYC.

Waiver of the Local TVO Rule is particularly appropriate here because the alternative is to allow one of the Cleveland DMA Stations to fail. Absent a waiver, Nexstar will be forced to divest WBNX-TV. Even though WBNX-TV currently benefits from its common ownership with WJW, it still has a low all day audience share of only ▮▮▮. This is well below the 4% share benchmark that the FCC has recognized as one of the signs that a station is failing.[165]

---

[163] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[164] *Id.*

[165] *See* 47 C.F.R. § 73.3555, note 7; *Local Ownership Order* at 12939 ¶ 81 (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower); (2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and

49

**App.91**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[166] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and in [their] financial performance."[167] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity or competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[168] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming, and often struggle to provide significant local programming at all."[169] Therefore, "allowing a 'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[170]

WBNX-TV has only been able to provide the quality programming (including local news) that it provides today because of its common ownership with WJW. Granting a waiver of the Local TVO Rule under these circumstances to allow WBNX-TV to continue under common ownership will preserve a stronger competitor in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the Cleveland DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the Cleveland DMA, the Transaction is critical to the ability of the Cleveland DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waving the Local TVO Rule to permit common ownership of the Cleveland DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the Cleveland DMA.

### 8.  Charlotte, NC

In this DMA, TEGNA is the licensee of WCNC-TV, Charlotte, North Carolina (NBC), the third-ranked station in the DMA. Nexstar is the licensee of WJZY, Belmont, North Carolina (FOX/ION), the fourth-ranked station in the DMA, and WMYT-TV, Rock Hill, South Carolina (CW), the seventh-ranked station in the DMA. Allowing Nexstar to own WCNC-TV, WJZY, and WMYT-TV (collectively, the "Charlotte DMA Stations") will enhance competition in the Charlotte DMA and, thereby, better serve the public interest than strict adherence to the rule.

---

diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

[166] *See* 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); *Local Ownership Order* at 12938 ¶ 79.

[167] *See Local Ownership Order* at 12938 ¶ 79.

[168] *Id.* at 12939 ¶ 79.

[169] *Id.*

[170] *Id.*

50

**App.92**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Following the Transaction, competition will remain fierce in this DMA, with nine other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. Several of these stations broadcast local news.

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[171] Those benefits have become necessities as competition has accelerated for television stations in the Charlotte DMA.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is Cox-owned WSOC-TV (ABC/Telemundo), followed by Gray-owned WBTV (CBS/Bounce), WCNC-TV, WJZY, Bahakel-owned WCCB (Independent/MeTV), Cox-owned WAXN-TV, WMYT-TV, WTVI (PBS), WWJS-TV (Independent), and WCEE-LD (Estrella TV). WSOC-TV and WBTV lead the market, obtaining OTA ad revenue shares of ███████, respectively. WCNC-TV— the only other station to obtain more than a share of ██—lags far behind with only a ██ share, and WJZY's share is only ██. The remaining stations in the market earn an audience share of less than ██, including WMYT-TV which earns a share of only ██.

In terms of advertising revenue, according to the BIA OTA Data, WSOC-TV and WBTV were the clear leaders in the market, earning ███████ and ███████ in FY2024 estimated ad revenues respectively. WCNC-TV was a distant third at ███████, with the remainder of the stations in the market lagging far behind with most less than ███████ and WMYT-TV earning just ███████ (a mere ██ of OTA advertising revenue in the DMA). Television stations in the Charlotte DMA compete for advertising revenue not only with each other, but with cable providers including Altice and Charter as well as several smaller providers (such as Chester Telephone Company, CoMPAS Cable, Comporium, Hotwire, Sandhill Telephone Cooperative, SkyLine TMC/SkyBest Communications, and TDS Telecommunications), national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Charlotte DMA declined by ███████ (███) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ███████ (███), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ███ to ███.

Top line revenue figures mask the underlying trends facing stations like the Charlotte DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. This is particularly true for WMYT-TV which, as a station not

---

[171] *See 2002 Biennial Review Order* at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. *See Prometheus Radio Project*, 373 F.3d 372.

51

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

affiliated with any of the Big Four networks, is uniquely vulnerable to erosion of both viewers and advertising dollars.

The Charlotte DMA Stations stand out for their commitment to delivering independent news and information to residents in the Charlotte DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that WCNC-TV and WJZY serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, the Charlotte DMA Stations must find a way to combat declining viewership and revenues. Combining the Charlotte DMA Stations under a common owner will provide these stations with the scale needed in the Charlotte DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the Charlotte DMA Stations will position these stations to better compete for advertising revenue in the Charlotte DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the Charlotte DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Charlotte DMA, including other highly ranked television stations offering a broad reach, the Transaction will place the Charlotte DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's WCNC-TV by supplementing the station's already strong local journalism with additional newsgathering resources. This includes new opportunities to leverage WJZY's award-winning newsroom, which earned six Regional Edward R. Murrow awards in 2025.[172] WCNC-TV will also benefit from new journalism resources at the state and national levels. Although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, WCNC-TV will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Charlotte DMA. For example, the Washington Bureau shared tailored content from a recent press conference by House Minority Leader Hakeem Jeffries with WJZY. The tailored content exemplifies the Washington Bureau's dedicated team that monitors events, hearings, and press conferences for content relevant to specific local markets. With a Washington Bureau reporter assigned specifically to the Charlotte DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

---

[172] *See* RTDNA, *2025 Edward R. Murrow Awards: Regional Winners*, https://tinyurl.com/wwcu6vzx (last visited Nov. 11, 2025) ("2025 Murrow Awards Regional Winners").

52

**App.94**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

As a result of the Transaction, TEGNA's WCNC-TV will also gain access to Nexstar's North Carolina state capital bureau, which covers matters of interest from the Governor's office, the state legislature, and state agencies for Nexstar stations across North Carolina. Nexstar added this bureau in 2017, following Nexstar's acquisition of Media General. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will allow WCNC-TV to expand its coverage of meaningful proceedings in Raleigh that directly affect the lives of its viewers.

Additionally, the Transaction will make the Charlotte DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. WJZY produces and airs "Black and Blue Kickoff Live," a weekly show focusing on the Carolina Panthers, and "Around the Track," a 30-minute show focusing on NASCAR. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the Charlotte DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Charlotte DMA.

The Transaction will allow Nexstar to include WCNC-TV in the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[173] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[174] WCNC-TV's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Charlotte DMA and provide new revenue opportunities for WCNC-TV.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Charlotte DMA, Nexstar's initiatives include raising funds to support Alzheimer's and cancer research, helping replenish blood supplies for local medical facilities, and participating in toy drives for kids. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Charlotte DMA Stations to create even more meaningful engagement with residents and issues unique to Charlotte, in furtherance of the public interest.

---

[173] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[174] *Id.*

53

**App.95**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Waiver of the Local TVO Rule is particularly appropriate here because the alternative is to allow one of the Charlotte DMA Stations to fail. Absent a waiver, Nexstar will be forced to divest either WMYT-TV or WJZY. Even though WMYT-TV currently benefits from its common ownership with WJZY, it still has a low all day audience share of only ███. Similarly, Nexstar's WJZY has a low all day audience share of ███. Two out of the three stations that would be commonly owned as a result of the Transaction thus have shares below the 4% share benchmark that the FCC has recognized as one of the signs that a station is failing.[175]

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[176] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and in [their] financial performance."[177] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity or competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[178] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming, and often struggle to provide significant local programming at all."[179] Therefore, "allowing a 'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[180]

WMYT-TV has only been able to provide the quality programming that it provides today because of its common ownership with WJZY. Granting a waiver of the Local TVO Rule under these circumstances to allow WMYT-TV to continue under common ownership, and to add WCNC-TV to the station group, will preserve a stronger competitor in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the Charlotte Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the Charlotte DMA, the Transaction is critical to the ability of the Charlotte DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waving the Local TVO Rule to

---

[175] *See* 47 C.F.R. § 73.3555, note 7; *Local Ownership Order* at 12939 ¶ 81 (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower); (2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

[176] *See* 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); *Local Ownership Order* at 12938 ¶ 79.

[177] *See Local Ownership Order* at 12938 ¶ 79.

[178] *Id.* at 12939 ¶ 79.

[179] *Id.*

[180] *Id.*

54

**App.96**

**REDACTED - FOR PUBLIC INSPECTION**
Form 2100, Schedule 315
Comprehensive Exhibit

permit common ownership of the Charlotte DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the Charlotte DMA.

9.    **Portland, OR**

In this DMA, Nexstar is the licensee of KOIN, Portland, Oregon (CBS), the second-ranked station in the DMA, and KRCW-TV, Salem, Oregon (CW/Antenna TV), the eighth-ranked station in the DMA. TEGNA is the licensee of KGW, Portland, Oregon (NBC), the fourth-ranked station in the DMA. Allowing Nexstar to own KOIN, KRCW-TV, and KGW (collectively, the "Portland DMA Stations") will enhance competition in the Portland DMA and, thereby, better serve the public interest than strict adherence to the rule.

Following the Transaction, competition will remain fierce in this DMA, with eight other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. Several of these stations broadcast local news.

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[181] Those benefits have become necessities as competition has accelerated for television stations in the Portland DMA.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is Sinclair-owned KATU (ABC), followed by KOIN, Gray-owned KPTV (FOX), and KGW. All other stations have ▮▮▮▮▮▮ of the audience shares of the top four stations, including Nexstar's KRCW-TV with only a ▮ audience share. Moreover, the third-ranked Fox-affiliated station, KPTV, outperforms both KOIN and KGW in the key P25–54 market demographic, earning a share of ▮, more than ▮▮▮▮ higher than KGW (▮) and KOIN (▮). In terms of advertising revenue, according to the BIA OTA Data, KPTV brought in the highest estimated FY 2024 advertising revenue at ▮▮▮▮ (▮▮ share), with KGW second with an estimated FY 2024 advertising revenue of ▮▮▮▮ (▮▮). KATU had the next highest estimated FY 2024 advertising revenue at ▮▮▮▮ (▮▮), and KOIN had an estimated FY 2024 advertising revenue of ▮▮▮▮ (▮▮). The other stations in the market brought in less than ▮▮▮▮ in FY 2024 advertising revenue, including KRCW-TV (▮▮▮▮▮▮).

Additionally, each of the stations that would be commonly owned as a result of the Transaction experienced declining revenue shares between 2020 and 2024, with a decrease from ▮▮ to ▮▮ for KGW, from ▮▮ to ▮▮ for KOIN, and from ▮▮ to ▮▮ for KRCW-TV.

---

[181] *See 2002 Biennial Review Order* at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. *See Prometheus Radio Project*, 373 F.3d 372.

55

**App.97**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Television stations in the Portland DMA compete for advertising revenue not only with each other, but with cable providers including Charter, Comcast, and several smaller cable operators, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Portland DMA declined by ████████ (████) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ████████ (████), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ██ to ██.

Top line revenue figures mask the underlying trends facing stations like the Portland DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. This is particularly true for KRCW-TV, which, as a station that is not affiliated with any of the Big Four networks, is uniquely vulnerable to erosion of both viewers and advertising dollars.

The Portland DMA Stations stand out for their commitment to delivering independent news and information to residents in the Portland DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, the Portland DMA Stations must find a way to combat declining viewership and revenues. Combining the Portland DMA Stations under a common owner will provide these stations with the scale needed in the Portland DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the Portland DMA Stations will position these stations to better compete for advertising revenue in the Portland DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the Portland DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Portland DMA, including other highly ranked television stations offering a broad reach, the Transaction will place the Portland DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's KGW by supplementing the station's already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, KGW will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Portland DMA.

**REDACTED - FOR PUBLIC INSPECTION**
Form 2100, Schedule 315
Comprehensive Exhibit

Additionally, the Transaction will make the Portland DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the Portland DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Portland DMA.

The Transaction will allow Nexstar to include KGW in the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[182] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[183] KGW's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Portland DMA and provide new revenue opportunities for KGW.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Portland DMA, Nexstar's initiatives include raising funds to purchase Christmas gifts for foster kids, raising awareness on adoption needs, and holding food drives. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Portland DMA Stations to create even more meaningful engagement with residents and issues unique to Portland, in furtherance of the public interest.

Waiver of the Local TVO Rule is particularly appropriate here because the alternative is to allow one of the Portland DMA Stations to fail. Absent a waiver, Nexstar will be forced to divest KRCW-TV. Even though KRCW-TV currently benefits from its common ownership with KOIN, it still has a low all day audience share of only ■. This is below the 4% share benchmark that the FCC has recognized as one of the signs that a station is failing.[184]

---

[182] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[183] *Id.*

[184] *See* 47 C.F.R. § 73.3555, note 7; *Local Ownership Order* at 12939 ¶ 81 (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower); (2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[185] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and in [their] financial performance."[186] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity or competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[187] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming, and often struggle to provide significant local programming at all."[188] Therefore, "allowing a 'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[189]

KRCW-TV has only been able to provide the quality programming (including local news) that it provides today because of its common ownership with KOIN. Granting a waiver of the Local TVO Rule under these circumstances to allow KRCW-TV to continue under common ownership will preserve a stronger competitor in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the Portland DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the Portland DMA, the Transaction is critical to the ability of the Portland DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit common ownership of the Portland DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the Portland DMA.

### 10.    St. Louis, MO

In this DMA, TEGNA is the licensee of KSDK, St. Louis, Missouri (NBC), the second-ranked station in the DMA. Nexstar is the licensee of KTVI, St. Louis, Missouri (FOX/Antenna TV), the third-ranked station in the DMA, and KPLR-TV, St. Louis, Missouri (CW), the sixth-ranked station in the DMA. Allowing Nexstar to own KSDK, KTVI, and KPLR-TV (collectively, the "St. Louis DMA Stations") will enhance competition in the St. Louis DMA and, thereby, better serve the public interest than strict adherence to the rule.

---

diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

[185] *See* 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); *Local Ownership Order* at 12938 ¶ 79.

[186] *See Local Ownership Order* at 12938 ¶ 79.

[187] *Id.* at 12939 ¶ 79.

[188] *Id.*

[189] *Id.*

58

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Following the Transaction, competition will remain fierce in this DMA, with six other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. Several stations in the St. Louis DMA broadcast local news.

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[190] Those benefits have become necessities as competition has accelerated for television stations in the St. Louis DMA.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is Gray-owned KMOV (CBS), followed by KSDK, KTVI, KDNL-TV(ABC), KNLC (MeTV), KPLR-TV, WRBU (ION), KETC (PBS), and others. In terms of advertising revenue, according to the BIA OTA Data, KSDK is the leader, followed by KMOV. KTVI is third, although its share of OTA advertising revenue dropped from ▮▮ to ▮▮ between 2020 and 2024. KPLR-TV is fifth in revenue with only a ▮▮ share. Television stations in the St. Louis DMA compete for advertising revenue not only with each other, but with cable providers including Cable One, Charter, and Mediacom, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the St. Louis DMA declined by ▮▮▮▮ (▮▮) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ▮▮▮ ▮▮▮ (▮▮), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ▮▮ to ▮▮.

Top line revenue figures mask the underlying trends facing stations like the St. Louis DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. This is particularly true for KPLR-TV, which, as a station that is not affiliated with any of the Big Four networks, is uniquely vulnerable to erosion of both viewers and advertising dollars.

The St. Louis DMA Stations stand out for their commitment to delivering independent news and information to residents in the St. Louis DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, the St. Louis DMA Stations must find a way to combat declining viewership and revenues. Combining the St. Louis DMA Stations under a common owner will provide these stations with the scale needed in the St. Louis DMA to take on the technology and media companies that are siphoning revenue away from local stations.

---

[190] See 2002 Biennial Review Order at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. See Prometheus Radio Project, 373 F.3d 372.

59

**App.101**

REDACTED - FOR PUBLIC INSPECTION

Form 2100, Schedule 315
Comprehensive Exhibit

Common ownership of the St. Louis DMA Stations will position these stations to better compete for advertising revenue in the St. Louis DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the St. Louis DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the St. Louis DMA, including other highly ranked television stations offering a broad reach, the Transaction will place the St. Louis DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's KSDK by supplementing the station's already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, KSDK will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the St. Louis DMA. With a Washington Bureau reporter assigned specifically to the St. Louis DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

As a result of the Transaction, TEGNA's KSDK will also gain access to Nexstar's Missouri state capital bureau, which covers matters of interest from the Governor's office, the state legislature, and state agencies for Nexstar stations across Missouri. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will allow KSDK to expand its coverage of meaningful proceedings in Jefferson City that directly affect the lives of its viewers.

Additionally, the Transaction will make the St. Louis DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the St. Louis DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the St. Louis DMA.

The Transaction will allow Nexstar to include KSDK in the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[191] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to

---

[191] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

60

**App.102**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

billions of potential devices on market-disrupting terms."[192] KSDK's access to the network will increase the amount of spectrum available for Broadcast Internet services in the St. Louis DMA and provide new revenue opportunities for KSDK.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the St. Louis DMA, Nexstar's initiatives include raising funds to support cancer and ALS research, holding events with the American Heart Association to raise awareness about heart disease, and organizing job fairs. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the St. Louis DMA Stations to create even more meaningful engagement with residents and issues unique to St. Louis, in furtherance of the public interest.

Moreover, the Transaction will enhance Nexstar's ability to expand its community outreach initiatives in the St. Louis DMA. For example, in 2024, Nexstar partnered with more than 30 local organizations, such as the American Heart Association and Special Olympics, to support the community, raising more than $1.5 million for St. Louis area charities.

Waiver of the Local TVO Rule is particularly appropriate here because the alternative is to allow one of the St. Louis DMA Stations to fail. Absent a waiver, Nexstar will be forced to divest KPLR-TV. Even though KPLR-TV currently benefits from its common ownership with KTVI, it still has a low all day audience share of only ██. This is well below the 4% share benchmark that the FCC has recognized as one of the signs that a station is failing.[193]

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[194] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and

---

[192] *Id.*

[193] *See* 47 C.F.R. § 73.3555, note 7; *Local Ownership Order* at 12939 ¶ 81 (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower); (2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

[194] *See* 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); *Local Ownership Order* at 12938 ¶ 79.

61

**App.103**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

in [their] financial performance."[195] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity or competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[196] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming, and often struggle to provide significant local programming at all."[197] Therefore, "allowing a 'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[198]

KPLR-TV has only been able to provide the quality programming (including local news) that it provides today because of its common ownership with KTVI. Granting a waiver of the Local TVO Rule under these circumstances to allow KPLR-TV to continue under common ownership will preserve a stronger competitor in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the St. Louis DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the St. Louis DMA, the Transaction is critical to the ability of the St. Louis DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit common ownership of the St. Louis DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the St. Louis DMA.

11.    **Indianapolis, IN**

In this DMA, TEGNA is the licensee of WTHR, Indianapolis, Indiana (NBC), the top-ranked station in the DMA. Nexstar is the licensee of WXIN, Indianapolis, Indiana (FOX), the second-ranked station in the DMA, and WTTV, Bloomington, Indiana (CBS), the third-ranked station in the market.[199] Allowing Nexstar to own WTHR, WXIN, and WTTV (collectively, the "Indianapolis DMA Stations") will enhance competition in the Indianapolis DMA and, thereby, better serve the public interest than strict adherence to the rule.

Following the Transaction, competition will remain fierce in this DMA, with 10 other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. These stations and various low power stations serving the market include affiliates not only of the four major networks, but of CW, MyNetworkTV, Bounce TV, Univision, Daystar,

---

[195] *See Local Ownership Order* at 12938 ¶ 79.

[196] *Id.* at 12939 ¶ 79.

[197] *Id.*

[198] *Id.*

[199] Nexstar is also the licensee of WTTK, Kokomo, Indiana, which operates as a satellite station of WTTV. *See Tribune MO&O* at 8461–62 ¶¶ 53–58 (reauthorizing satellite exception for WTTK).

**App.104**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

PBS, and Telemundo. Several stations in the Indianapolis DMA broadcast local news. Viewers also have access to almost 20 Significantly Viewed signals from neighboring DMAs, such as Ft. Wayne, IN; Cincinnati, OH; and Louisville, KY.[200]

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[201] Those benefits have become necessities as competition has accelerated for television stations in the Indianapolis DMA.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is WTHR, followed by WXIN, WTTV,[202] and Scripps-owned ABC affiliate WRTV, and more distantly followed by WISH-TV (CW), WIPX-TV (ION), WFYI (PBS), WNDY-TV (MyNetworkTV), WCLJ (Bounce), WKOI (ION), WDNI-CD (Telemundo), WBXI-CD (Start TV), WIPB (PBS), WHMB-TV (Univision), WTIU (PBS), WDTI (Daystar), and WSOT-LD (Independent).

In terms of advertising revenue, according to the BIA OTA Data, WTHR leads the market, followed by second-place WXIN, which has seen its share of OTA advertising revenue fall from ▇▇▇ in 2020 to ▇▇▇ in 2024. Over that same period, WTTV's share of OTA advertising revenue decreased from ▇▇▇▇▇▇, placing WTTV behind Scripps' WRTV even though WTTV's ratings are higher. Six stations in the DMA other than the Indianapolis DMA Stations garnered revenue of at least ▇▇▇▇ in 2024.

Television stations in the Indianapolis DMA compete for advertising revenue not only with each other, but with cable providers including Cable One, Charter and Comcast, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. From 2019 to 2025, the BIA Ad Market Data indicates that OTA broadcasting fell from ▇▇▇ of the total media revenue in the DMA to ▇▇▇ while mobile increased from ▇▇▇ to ▇▇▇, computers increased from ▇▇▇ to ▇▇▇, and connected TVs and OTT devices increased from ▇▇▇ to ▇▇▇.

Top line revenue figures mask the underlying trends facing stations like the Indianapolis DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels.

The Indianapolis DMA Stations stand out for their commitment to delivering independent news and information to residents in the Indianapolis DMA. The Ad Fontes Media Bias and Reliability

---

[200] *See* FCC, *Significantly Viewed List*, https://tinyurl.com/5n8t53wm (last updated May 27, 2021).

[201] *See 2002 Biennial Review Order* at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. *See Prometheus Radio Project*, 373 F.3d 372.

[202] Ratings for WTTV and its multicast streams are reported by Nielsen as WTTV+ and ETTV+.

63

**App.105**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

In 2019, the Commission determined that application of the now-vacated Top Four Prohibition would not serve the public interest, and thus permitted Nexstar's Indianapolis DMA Stations (WXIN and WTTV) to be commonly owned after Nexstar's acquisition of Tribune Media.[203] The Commission did so because "the benefits of continuing to allow common ownership outweigh any public interest harms that . . . may yet result from the combination."[204] Given the explosive changes that have occurred in the ensuing years, the same holds true for Nexstar's proposal to now combine WXIN and WTTV with TEGNA's WTHR. To sustain their investment in quality journalism, the Indianapolis DMA Stations must find a way to combat declining viewership and revenues. Combining the Indianapolis DMA Stations under a common owner will provide these stations with the scale needed in the Indianapolis DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the Indianapolis DMA Stations will position these stations to better compete for advertising revenue in the Indianapolis DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the Indianapolis DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Indianapolis DMA, including a host of other television stations offering a broad range of programming, the Transaction will place the Indianapolis DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's WTHR by supplementing the station's already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, WTHR will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Indianapolis DMA. With a Washington Bureau reporter assigned specifically to the Indianapolis DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

As a result of the Transaction, TEGNA and Nexstar stations throughout Indiana will receive expanded coverage of news from the Governor's office, the state legislature, and state agencies through the resources of Nexstar's Indiana state capital bureau. With the added resources of WTHR, this bureau will be able to provide even stronger coverage of state government matters that directly affect the lives of viewers in the Indianapolis DMA and throughout the state.

---

[203] *See Tribune MO&O* at 8456 ¶ 38.

[204] *Id.*

64

**App.106**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Additionally, the Transaction will make the Indianapolis DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, Indy 500, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the Indianapolis DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Indianapolis DMA.

The Transaction will enhance the efforts of Nexstar and TEGNA to keep local sports free for viewers in the Indianapolis DMA. TEGNA has partnered with the Indiana Fever to broadcast 18 games per year on WTHR and TEGNA's WALV-CD.[205] This arrangement makes Fever games available for free, over the air, and without the need for fans to subscribe to cable or a paid streaming service to support their local team. While live sporting events are popular with viewers and provide a significant public benefit, sports rights are expensive, and the Transaction will provide Nexstar with the scale in the Indianapolis DMA to continue, if not expand, the broadcast of live sporting events.

The Transaction will allow Nexstar to include WTHR in the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[206] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[207] WTHR's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Indianapolis DMA and provide new revenue opportunities for WTHR.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Indianapolis DMA, Nexstar's initiatives include raising funds to support cancer research, organizing food drives with local food banks, and providing school supplies to students in need across central Indiana. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the

---

[205] *See* Press Release, TEGNA Inc., *Indiana Fever and WTHR Announce Extension of Their Multi-Year Broadcast Agreement to Deliver Record Number of Games to Fans* (Apr. 17, 2025), https://tinyurl.com/bdvv493p.

[206] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[207] *Id.*

65

**App.107**

Indianapolis DMA Stations to create even more meaningful engagement with residents and issues unique to Indianapolis, in furtherance of the public interest.

As described above, the Transaction will provide the Indianapolis DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the Indianapolis DMA, the Transaction is critical to the ability of the Indianapolis DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit common ownership of the Indianapolis DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the Indianapolis DMA.

### 12.    San Diego, CA

In this DMA, TEGNA is the licensee of KFMB-TV, San Diego, California (CBS/CW), the top-ranked station in the DMA. Nexstar is the licensee of KSWB-TV, San Diego, California (Fox/ION/Antenna TV), the third-ranked station in the DMA, and KUSI-TV, San Diego, California (Independent), the fifth-ranked full power station and sixth-ranked station overall in the DMA. Allowing Nexstar to own KFMB-TV, KSWB-TV, and KUSI-TV (collectively, the "San Diego DMA Stations") will enhance competition in the San Diego DMA and, thereby, better serve the public interest than strict adherence to the rule.

Following the Transaction, competition will remain fierce in this DMA, with at least seven other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. Several of these stations broadcast local news, as do KUAN-LD, the Telemundo affiliate in the San Diego DMA, and KBNT-CD, the Univision affiliate in the San Diego DMA.

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[208] Those benefits have become necessities as competition has accelerated for television stations in the San Diego DMA.



In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is KFMB-TV, although among the key P25–54 advertising demographic, second-ranked KNSD (NBC) outranks the first-ranked station by ▮▮▮▮▮▮▮▮▮▮ (▮▮▮▮). Looking at U.S.-licensed, full power stations alone, these two stations are followed by KSWB-TV (which ranks a distant third with ▮), KGTV (ABC) (with ▮), KUSI-TV (with only ▮), and KPBS (PBS) (with only ▮). In addition, the competitiveness of this DMA is marked not only by these other U.S.-licensed, full power stations, but also by a number of U.S.-licensed low power and Class A stations that are ranked by Nielsen—KUAN-LD (Telemundo, ranked #5), KBNT-CD (Univision, ranked #9), and

---

[208] *See 2002 Biennial Review Order* at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. *See Prometheus Radio Project*, 373 F.3d 372.

KDTF-LD (UniMás, ranked #14)—as well as a number of stations that broadcast programming into the United States from Mexico—XHUAA-TD, XEWT-TD, XHAS-TD, XHMEE-TD, XETV-TD, XDTV-TD, XHBC-TD, XHBM-TD, XHJK-TD, and XHTIT-TD.



In terms of advertising revenue, according to the BIA OTA Data, KFMB-TV's FY 2024 estimated advertising revenue was ▮▮▮ (a ▮▮ share), ranking second in the market behind KNSD, with an estimated ▮▮▮ (▮▮). KGTV is a distant third with ▮▮▮ (▮▮), while KSWB-TV earned ▮▮▮ (▮▮, down precipitously from ▮▮ in 2020). From there, the revenue figures dip substantially to Nexstar's KUSI-TV, with only ▮▮▮ (▮▮) in 2024 (a substantial drop from the station's ▮▮ share in 2020). Television stations in the San Diego DMA compete for advertising revenue not only with each other, but with cable providers including Charter, Cox, Mediacom, and Zito Media, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the San Diego DMA declined by ▮▮ ▮▮ (▮▮) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ▮▮▮ (▮▮), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ▮▮ to ▮▮.

Top line revenue figures mask the underlying trends facing stations like the San Diego DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. This is particularly true for KUSI-TV, which, as an independent station, is uniquely vulnerable to erosion of both viewers and advertising dollars.

The San Diego DMA Stations stand out for their commitment to delivering independent news and information to residents in the San Diego DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that the San Diego DMA Stations serve as reliable sources of fact-based reporting. Moreover, Nexstar's independent station KUSI-TV—which as discussed below is at risk of failing if not permitted to be commonly owned—broadcasts 62.5 hours of local news each week and airs extensive local high school sports coverage, exemplifying Nexstar's commitment to serving the local market.

To sustain their investment in quality journalism, the San Diego DMA Stations must find a way to combat declining viewership and revenues. Combining the San Diego DMA Stations under a common owner will provide these stations with the scale needed in the San Diego DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the San Diego DMA Stations will position these stations to better compete for advertising revenue in the San Diego DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the San Diego DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

options to advertise on broadcast in the San Diego DMA, including other highly ranked television stations offering a broad reach, the Transaction will place the San Diego DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's KFMB-TV by supplementing the station's already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, KFMB-TV will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the San Diego DMA. With a Washington Bureau reporter assigned specifically to the San Diego DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

As a result of the Transaction, TEGNA's KFMB-TV will also gain access to Nexstar's California state capital bureau, which covers matters of interest from the Governor's office, the state legislature, and state agencies for Nexstar stations across California. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will allow KFMB-TV to expand its coverage of meaningful proceedings in Sacramento that directly affect the lives of its viewers.

Additionally, the Transaction will make the San Diego DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the San Diego DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the San Diego DMA.

The Transaction will allow Nexstar to expedite KFMB-TV's transition to ATSC 3.0 and provide KFMB-TV access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[209] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[210] KFMB-TV's access to the network will increase the amount of spectrum available for Broadcast Internet services in the San Diego DMA, where KSWB-TV and KUSI-TV already broadcasts an ATSC 3.0 signal, and provide new revenue opportunities for KFMB-TV.

---

[209] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[210] *Id.*

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the San Diego DMA, Nexstar's initiatives include raising funds to support cancer and autism research, organizing a food drive with the San Diego Food Bank, and raising funds to support local military families. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the San Diego DMA Stations to create even more meaningful engagement with residents and issues unique to San Diego, in furtherance of the public interest.

Waiver of the Local TVO Rule is particularly appropriate here because the alternative is to allow one of the San Diego DMA Stations to fail. Absent a waiver, Nexstar will be forced to divest KUSI-TV. Even though KUSI-TV currently benefits from its common ownership with KSWB-TV, it still has a low all day audience share of only ██. This is below the 4% share benchmark that the FCC has recognized as one of the signs that a station is failing.[211]

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[212] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and in [their] financial performance."[213] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity or competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[214] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming, and often struggle to provide significant local programming at all."[215] Therefore, "allowing a

---

[211] See 47 C.F.R. § 73.3555, note 7; Local Ownership Order at 12939 ¶ 81 (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower); (2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

[212] See 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); Local Ownership Order at 12938 ¶ 79.

[213] See Local Ownership Order at 12938 ¶ 79.

[214] Id. at 12939 ¶ 79.

[215] Id.

69

**App.111**

'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[216]

KUSI-TV has only been able to provide the quality programming (including local news) that it provides today because of its common ownership with KSWB-TV. Granting a waiver of the Local TVO Rule under these circumstances to allow KUSI-TV to continue under common ownership will preserve a stronger competitor in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the San Diego DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the San Diego DMA, the Transaction is critical to the ability of the San Diego DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit common ownership of the San Diego DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the San Diego DMA.

### 13.    Hartford-New Haven, CT

In this DMA, TEGNA is the licensee of WTIC-TV, Hartford, Connecticut (FOX), the fourth-ranked station in the DMA, and WCCT-TV, Waterbury, Connecticut (CW), the ninth-ranked station in the DMA. Nexstar is the licensee of WTNH, New Haven, Connecticut (ABC), the second-ranked station in the DMA, and WCTX, New Haven, Connecticut (MyNetworkTV), the seventh-ranked station in the DMA. Allowing Nexstar to own WTIC-TV, WTNH, WCCT-TV, and WCTX (collectively, the "Hartford DMA Stations") will enhance competition in the Hartford-New Haven DMA and, thereby, better serve the public interest than strict adherence to the rule.

Following the Transaction, competition will remain fierce in this DMA, with seven other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. Several of these stations broadcast local news, as does WRDM-CD, the Telemundo affiliate in the Hartford DMA.

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[217] Those benefits have become necessities as competition has accelerated for television stations in the Hartford-New Haven DMA.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is Gray's CBS affiliate WFSB, followed by WTNH, WVIT (NBC), and WTIC-TV. Nexstar's WCTX is

---

[216] *Id.*

[217] *See 2002 Biennial Review Order* at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. *See Prometheus Radio Project*, 373 F.3d 372.

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

seventh, trailing both ION affiliate WHPX-TV and Telemundo-affiliated low power station WRDM-CD. WCCT-TV is ninth, trailing the market's public television broadcaster. In terms of advertising revenue, according to the BIA OTA Data, the top two revenue earners ▮▮▮▮ are NBC's third-ranked WVIT and Gray's top-ranked WFSB, which collectively ▮▮▮▮▮▮▮▮ of the market's advertising revenue. WTIC-TV is the third-ranked station in the DMA in terms of revenue, with estimated advertising revenue in FY 2024 of ▮▮▮▮, and—despite its second place standing in terms of audience share—WTNH is fourth, with estimated FY 2024 advertising revenue of ▮▮▮▮. WCTX and WCCT-TV account together for less than 7% of the market's advertising revenue.

Television stations in the Hartford-New Haven DMA compete for advertising revenue not only with each other, but with cable providers including Charter, Comcast and Cox, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Hartford-New Haven DMA declined by ▮▮▮▮ (▮▮) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ▮▮▮▮ (▮▮), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ▮▮ to ▮▮.

Top line revenue figures mask the underlying trends facing stations like the Hartford DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. This is particularly true for lower ranked stations such as WCTX and WCCT-TV, which, as stations not affiliated with any of the Big Four networks, are uniquely vulnerable to erosion of both viewers and advertising dollars.

The Hartford DMA Stations stand out for their commitment to delivering independent news and information to residents in the Hartford-New Haven DMA. Indeed, WTNH received a 2025 Regional Edward R. Murrow Award for its news coverage of a Connecticut woman pursuing a $30 million dollar lawsuit against the Connecticut Department of Children and Families after suffering a decade of sexual abuse at the hands of her legal guardian.[218] The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, the Hartford DMA Stations must find a way to combat declining viewership and revenues. Combining the Hartford DMA Stations under a common owner will provide these stations with the scale needed in the Hartford-New Haven DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the Hartford DMA Stations will position these stations to better compete for advertising revenue in the Hartford-New Haven DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a

---

[218] See 2025 Murrow Awards Regional Winners.

71

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the Hartford DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Hartford-New Haven DMA, including other highly ranked television stations offering a broad reach, the Transaction will place the Hartford DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's WTIC-TV and WCCT-TV by supplementing the stations' already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, WTIC-TV and WCCT-TV will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Hartford-New Haven DMA. With a Washington Bureau reporter assigned specifically to the Hartford-New Haven DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

Additionally, the Transaction will make the Hartford DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the Hartford DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Hartford-New Haven DMA.

The Transaction will enhance the efforts of Nexstar and TEGNA to keep local sports free for viewers in the Hartford DMA. Nexstar has partnered with SNY, the home of the New York Mets, to broadcast 25 regular season games and five spring training games on WCCT-TV and five other stations in Northeast region.[219] This arrangement makes Mets games available for free, over the air, and without the need for fans to subscribe to cable or a paid streaming service to support a regional team with a significant following in the Hartford DMA. While live sporting events are popular with viewers and provide a significant public benefit, sports rights are expensive, and the Transaction will provide Nexstar with the scale in the Hartford DMA to continue, if not expand, the broadcast of live sporting events.

The Transaction will allow Nexstar to include WTIC-TV and WCCT-TV in the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[220]

---

[219] *See* Press Release, Nexstar Media Group, Inc., *WPIX-TV to Carry New York Mets Games Through 2028* (Sep. 8, 2025), https://tinyurl.com/2was2nvw.

[220] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

72

**App.114**

REDACTED - FOR PUBLIC INSPECTION

Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[221] WTIC-TV's and WCCT-TV's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Hartford DMA and provide new revenue opportunities for WTIC-TV and WCCT-TV.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Hartford DMA, Nexstar's initiatives include raising funds to support cancer research and local military families, organizing events for domestic violence awareness. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Hartford DMA Stations to create even more meaningful engagement with residents and issues unique to Hartford, in furtherance of the public interest.

Waiver of the Local TVO Rule is particularly appropriate here because the alternative is to allow two of the Hartford DMA Stations to fail. Absent a waiver, Nexstar will be forced to divest WCTX and WCCT-TV. Even though WCTX currently benefits from its common ownership with WTNH, and WCCT-TV likewise benefits from its common ownership with WTIC-TV,[222] these stations still have low all day audience shares of just over ▮ each. This is well below the 4% share benchmark that the FCC has recognized as one of the signs that a station is failing.[223]

---

[221] *Id.*

[222] Notably, both WCTX and WCCT-TV were granted failing station waivers which allowed them to be commonly owned with their sister stations. *See Consent to Transfer Control of Licenses by Shareholders of Media General, Inc. and Shareholders of LIN Media, LLC to Post-Merger Shareholders of Media General Inc., et al.*, Memorandum Opinion and Order, 29 FCC Rcd 14798 (2014) (WCTX and WTNH); *Applications of Tribune Company and Its Licensee Subsidiaries, Debtors in Possession, et al.*, Memorandum Opinion and Order, 27 FCC Rcd 14239 (MB 2012) (WCCT-TV and WTIC-TV); *see also Media General 2017 MO&O.*

[223] *See* 47 C.F.R. § 73.3555, note 7; *Local Ownership Order* at 12939 ¶ 81 (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower); (2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

REDACTED - FOR PUBLIC INSPECTION

Form 2100, Schedule 315
Comprehensive Exhibit

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[224] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and in [their] financial performance."[225] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity or competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[226] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming, and often struggle to provide significant local programming at all."[227] Therefore, "allowing a 'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[228]

WCTX and WCCT-TV have only been able to provide the quality programming (including local news) that they provide today because of support from sister stations in the Hartford-New Haven DMA. Granting a waiver of the Local TVO Rule under these circumstances to allow WCTX and WCCT-TV to continue under common ownership with WTNH and WTIC-TV will preserve a stronger competitor in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the Hartford DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the Hartford-New Haven DMA, the Transaction is critical to the ability of the Hartford DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit common ownership of the Hartford DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the Hartford-New Haven DMA.

### 14.    Grand Rapids-Kalamazoo-Battle Creek, MI

In this DMA (the "Grand Rapids DMA"), Nexstar is the licensee of WOOD-TV, Grand Rapids, Michigan (NBC), the second-ranked station in the DMA, and WOTV, Battle Creek, Michigan (ABC), the fifth-ranked station in the DMA. TEGNA is the licensee of WZZM, Grand Rapids, Michigan (ABC), the fourth-ranked station in the DMA. Allowing Nexstar to own WOOD-TV, WOTV, and WZZM (collectively, the "Grand Rapids DMA Stations") will enhance competition in the Grand Rapids DMA and, thereby, better serve the public interest than strict adherence to the rule.

---

[224] *See* 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); *Local Ownership Order* at 12938 ¶ 79.

[225] *See Local Ownership Order* at 12938 ¶ 79.

[226] *Id.* at 12939 ¶ 79.

[227] *Id.*

[228] *Id.*

74

**App.116**

Following the Transaction, competition will remain fierce in this DMA, with seven other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. Several stations in the Grand Rapids DMA broadcast local news.

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[229] Those benefits have become necessities as competition has accelerated for television stations in the Grand Rapids DMA.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is Sinclair's CBS affiliate WWMT, followed by WOOD-TV, Fox affiliate WXMI, and WZZM. In terms of advertising revenue, according to the BIA OTA Data, WOOD-TV leads the DMA with estimated FY 2024 advertising revenue of ████████ (a ████ share of OTA advertising revenue in the DMA), followed ████ by WWMT, with estimated FY 2024 advertising revenue of ████████ (████). WZZM is ranked fourth in the DMA, with estimated FY 2024 advertising revenue of ████████ (████, a drop from ████████). WOTV is a distant fifth in terms of both audience and revenue, with a ████ audience share and estimated FY 2024 advertising revenue of ████████ (████ OTA ad revenue share). This is largely because WOTV primarily serves Battle Creek and the southeast corner of the DMA, while the DMA's top four stations cover the larger population center of Grand Rapids (which has its own ABC affiliate in WZZM).

Television stations in the Grand Rapids DMA compete for advertising revenue not only with each other, but with cable providers including Charter, Comcast, and Mediacom, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Grand Rapids DMA declined by ████████ (████) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ████████ (████), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ████ to ████.

Top line revenue figures mask the underlying trends facing stations like the Grand Rapids DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. This is particularly true for WOTV, which, as a station serving less-populated areas on the edges of the DMA, is uniquely vulnerable to erosion of both viewers and advertising dollars.

The Grand Rapids DMA Stations stand out for their commitment to delivering independent news and information to residents in the Grand Rapids DMA. The Ad Fontes Media Bias and Reliability

---

[229] *See 2002 Biennial Review Order* at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. *See Prometheus Radio Project*, 373 F.3d 372.

75

REDACTED - FOR PUBLIC INSPECTION

Form 2100, Schedule 315
Comprehensive Exhibit

Ratings confirm that WOOD-TV and WZZM serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, the Grand Rapids DMA Stations must find a way to combat declining viewership and revenues. Combining the Grand Rapids DMA Stations under a common owner will provide these stations with the scale needed in the Grand Rapids DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the Grand Rapids DMA Stations will position these stations to better compete for advertising revenue in the Grand Rapids DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the Grand Rapids DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Grand Rapids DMA, including other highly ranked television stations offering a broad reach, the Transaction will place the Grand Rapids DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers in the Grand Rapids DMA by supplementing WOOD-TV's already strong local journalism with additional newsgathering resources. Nexstar plans to expand the amount of news on WZZM by leveraging WOOD-TV's award-winning newsroom—which has earned multiple regional Edward R. Murrow and Emmy awards and was named the Market 2 "Station of the Year" award from the Michigan Association of Broadcasters 21 times in the past 24 years. [230] Additionally, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, WZZM will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Grand Rapids DMA. With a Washington Bureau reporter assigned specifically to the Grand Rapids DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else. In recent months, this model has allowed Nexstar's stations to break stories relevant to specific markets and broadcast exclusive interviews, including a recent interview with a group from Michigan visiting the Capitol to advocate for Special Olympics funding.

As a result of the Transaction, TEGNA's WZZM will also gain access to Nexstar's Michigan state capital bureau, which covers matters of interest from the Governor's office, the state legislature, and state agencies for Nexstar stations across Michigan. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will

---

[230] *See* Charlsie Dewey, *WOOD TV8 Wins Station of the Year MAB Award*, WOOD-TV (Apr. 7, 2025) https://tinyurl.com/45amb32d; Charlsie Dewey, *WOOD TV8 Wins MAB Station of the Year for 2023*, WOOD-TV (Apr. 8, 2024), https://tinyurl.com/4e6yy3wz.

76

**App.118**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

allow WZZM to expand its coverage of meaningful proceedings in Lansing that directly affect the lives of its viewers.

Additionally, the Transaction will make the Grand Rapids DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the Grand Rapids DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Grand Rapids DMA.

The Transaction will allow Nexstar to expedite WZZM's transition to ATSC 3.0 and provide WZZM access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[231] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[232] WZZM's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Grand Rapids DMA, where WOOD-TV and WOTV already broadcast an ATSC 3.0 signal, and provide new revenue opportunities for WZZM.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Grand Rapids DMA, Nexstar's initiatives include organizing local food drives and animal shelter adoption events, raising funds to support heart disease awareness, and partnering with local organizations to raise awareness about mental health issues impacting the Grand Rapids community. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Grand Rapids DMA Stations to create even more meaningful engagement with residents and issues unique to Grand Rapids, in furtherance of the public interest.

Waiver of the Local TVO Rule is particularly appropriate here because the alternative is to allow one of the Grand Rapids DMA Stations to fail. Absent a waiver, Nexstar will be forced to divest WOTV. Even though WOTV currently benefits from its common ownership with WOOD-TV, it

---

[231] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[232] *Id.*

**App.119**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

still has a low all day audience share of only ██. This is well below the 4% share benchmark that the FCC has recognized as one of the signs that a station is failing.[233]

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[234] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and in [their] financial performance."[235] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity or competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[236] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming, and often struggle to provide significant local programming at all."[237] Therefore, "allowing a 'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[238]

WOTV has only been able to provide the quality programming (including local news) that it provides today because of its common ownership with WOOD-TV. Granting a waiver of the Local TVO Rule under these circumstances to allow WOTV to continue under common ownership will preserve a stronger competitor in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the Grand Rapids DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the Grand Rapids DMA, the Transaction is critical to the ability of the Grand Rapids DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit common ownership of the Grand Rapids DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the Grand Rapids DMA.

---

[233] *See* 47 C.F.R. § 73.3555, note 7; *Local Ownership Order* at 12939 ¶ 81 (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower); (2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

[234] *See* 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); *Local Ownership Order* at 12938 ¶ 79.

[235] *See Local Ownership Order* at 12938 ¶ 79.

[236] *Id.* at 12939 ¶ 79.

[237] *Id.*

[238] *Id.*

78

**App.120**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

15.    **Norfolk-Portsmouth-Newport News, VA**

In this DMA (the "Norfolk DMA"), Nexstar is the licensee of WAVY-TV, Portsmouth, Virginia (NBC/Independent), the top-ranked station in the DMA and WVBT, Virginia Beach, Virginia (Fox/CW), the fourth-ranked station in the DMA. TEGNA is the licensee of WVEC, Hampton, Virginia (ABC), the third-ranked station in the DMA. Allowing Nexstar to own WAVY-TV, WVBT, and WVEC (collectively, the "Norfolk DMA Stations") will enhance competition in the Norfolk DMA and, thereby, better serve the public interest than strict adherence to the rule.

Following the Transaction, competition will remain fierce in this DMA, with eight other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. In addition to the Norfolk DMA Stations, Scripps-owned WTKR, which won a 2025 Edward R. Murrow Award for Excellence in Video, also broadcasts local news.[239]

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[240] Those benefits have become necessities as competition has accelerated for television stations in the Norfolk DMA.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is WAVY-TV, followed by Scripps-owned WTKR (CBS), WVEC, WVBT,[241] WTVZ-TV (MyNetworkTV), WPXV-TV (ION), WGNT (CW), WHRO-TV (PBS), and WSKY-TV (Independent). Television stations in the Norfolk DMA compete for advertising revenue not only with each other, but with cable providers including Charter, Cox, Mediacom, Verizon, Breezeline, and Shenandoah Cable, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Norfolk DMA declined by ███████ (███) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ███████ (███), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ███ to ███.

Top line revenue figures mask the underlying trends facing stations like the Norfolk DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue

---

[239] *See* 2025 Murrow Awards Regional Winners.

[240] *See 2002 Biennial Review Order* at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. *See Prometheus Radio Project*, 373 F.3d 372.

[241] WVBT's audience is divided between its primary stream (FOX), which has a low all day audience share of ███, and a secondary stream (CW), with an even lower share of ███. Each of these would be considered "failing" if they stood alone.

79

**App.121**

threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels.

The Norfolk DMA Stations stand out for their commitment to delivering independent news and information to residents in the Norfolk DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, the Norfolk DMA Stations must find a way to combat declining viewership and revenues. Combining the Norfolk DMA Stations under a common owner will provide these stations with the scale needed in the Norfolk DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the Norfolk DMA Stations will position these stations to better compete for advertising revenue in the Norfolk DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the Norfolk DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Norfolk DMA, including other highly ranked television stations offering a broad reach, the Transaction will place the Norfolk DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's WVEC by supplementing the station's already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, WVEC will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Norfolk DMA. With a Washington Bureau reporter assigned specifically to the Norfolk DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

As a result of the Transaction, TEGNA's WVEC will also gain access to Nexstar's Virginia state capital bureau, which covers matters of interest from the Governor's office, the state legislature, and state agencies for Nexstar stations across Virginia. Nexstar added this bureau in 2017, following Nexstar's acquisition of Media General. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will allow WVEC to expand its coverage of meaningful proceedings in Richmond that directly affect the lives of its viewers.

Additionally, the Transaction will make the Norfolk DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR

80

**App.122**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the Norfolk DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Norfolk DMA.

The Transaction will allow Nexstar to expedite WVEC's transition to ATSC 3.0 and provide WVEC access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[242] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[243] WVEC's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Norfolk DMA, where WAVY-TV and WVBT already broadcast an ATSC 3.0 signal, and provide new revenue opportunities for WVEC.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Norfolk DMA, Nexstar's initiatives include partnering with local organizations to raise funds for ALS, Alzheimer's, and diabetes research and organizing an event with a local group to raise awareness about domestic violence and sexual assault. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Norfolk DMA Stations to create even more meaningful engagement with residents and issues unique to the Norfolk community, in furtherance of the public interest.

As described above, the Transaction will provide the Norfolk DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the Norfolk DMA, the Transaction is critical to the ability of the Norfolk DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit common ownership of the Norfolk DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the Norfolk DMA.

16.    **New Orleans, LA**

In this DMA, TEGNA is the licensee of WWL-TV, New Orleans, Louisiana (CBS), the second-ranked station in the DMA, and WUPL, Slidell, Louisiana (MyNetworkTV), the seventh-ranked

---

[242] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[243] *Id.*

81

**App.123**

station in the DMA. Nexstar is the licensee of WGNO, New Orleans, Louisiana (ABC), the fourth-ranked station in the DMA, and WNOL-TV, New Orleans, Louisiana (CW), the sixth-ranked station in the DMA. Allowing Nexstar to own WWL-TV, WUPL, WGNO, and WNOL-TV (collectively, the "New Orleans DMA Stations") will enhance competition in the New Orleans DMA and, thereby, better serve the public interest than strict adherence to the rule.

Following the Transaction, competition will remain fierce in this DMA, with seven other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. Several stations in the New Orleans DMA broadcast local news.

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[244] Those benefits have become necessities as competition has accelerated for television stations in the New Orleans DMA.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is Gray-owned WVUE-DT (FOX) with a ██ share, followed by WWL-TV at ██ and Hearst-owned WDSU (NBC) at ██. The drop thereafter ████; all other stations in the market have audience shares of █████, starting with WGNO at █, followed by WPXL-TV (ION), WNOL-TV, WUPL, WYES-TV (PBS), KGLA-DT (Telemundo), WHNO (CTN), and WLAE-TV (Independent). WNOL-TV and WUPL have a combined share of ██████. In terms of advertising revenue, according to the BIA OTA Data, WWL-TV's FY 2024 estimated advertising revenue was ███████ (a ████ share of OTA ad revenue), ranking second in the DMA behind WVUE-DT, which had an estimated FY 2024 advertising revenue of ████████ (████). WNOL-TV and WUPL lagged far behind as fifth and sixth in terms of FY 2024 estimated advertising revenue, with only █████████ (████) and █████████ (████) in ad revenue, respectively. Television stations in the New Orleans DMA compete for advertising revenue not only with each other, but with cable providers including Cable One, Charter, Comcast Cox, EATEL Video, and Mediacom, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the New Orleans DMA declined by ██████ (███) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ████████ (████), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ███ to ███.

Top line revenue figures mask the underlying trends facing stations like the New Orleans DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically,

---

[244] *See 2002 Biennial Review Order* at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. *See Prometheus Radio Project*, 373 F.3d 372.

82

Form 2100, Schedule 315
Comprehensive Exhibit

local journalism at current levels. This is particularly true for WNOL-TV and WUPL, which, as stations not affiliated with any of the Big Four networks, are uniquely vulnerable to erosion of both viewers and advertising dollars.

The New Orleans DMA Stations stand out for their commitment to delivering independent news and information to residents in the New Orleans DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, the New Orleans DMA Stations must find a way to combat declining viewership and revenues. A 2021 Working Paper by economists in the FCC's OEA found that even in the more favorable economic environment for broadcasters in 2019 (before COVID shutdowns and the exponential growth of streaming services and social media as alternatives for video consumption), a DMA the size of New Orleans may only be able to support three local television news operations.[245] Combining the New Orleans DMA Stations under a common owner will provide these stations with the scale needed in the New Orleans DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the New Orleans DMA Stations will position these stations to better compete for advertising revenue in the New Orleans DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the New Orleans DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the New Orleans DMA, including other highly ranked television stations offering a broad reach, the Transaction will place the New Orleans DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's WWL-TV and WUPL by supplementing the stations' already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, WWL-TV and WUPL will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the New Orleans DMA. With a Washington Bureau reporter assigned specifically to the New Orleans DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

As a result of the Transaction, TEGNA's WWL-TV and WUPL will also gain access to Nexstar's Louisiana state capital bureau, which covers matters of interest from the Governor's office, the

---

[245] *See* OEA Working Paper 52 at 4–5.

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

state legislature, and state agencies for Nexstar stations across Louisiana. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will allow WWL-TV and WUPL to expand their coverage of meaningful proceedings in Baton Rouge that directly affect the lives of its viewers.

Additionally, the Transaction will make the New Orleans DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the New Orleans DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Louisiana DMA.

The Transaction will allow Nexstar to include WWL-TV and WUPL in the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[246] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[247] WWL-TV's and WUPL's access to the network will increase the amount of spectrum available for Broadcast Internet services in the New Orleans DMA and provide new revenue opportunities for WWL-TV and WUPL.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the New Orleans DMA, Nexstar's initiatives include partnering with local organizations to volunteer for and provide coverage to the Westbank Food Pantry, organizing a drive for donations for Hurricane Francine relief, and providing coverage for a local event with the American Cancer Society that raised funds for cancer research. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the New Orleans DMA Stations to create even more meaningful engagement with residents and issues unique to the New Orleans community, in furtherance of the public interest.

Waiver of the Local TVO Rule is particularly appropriate here because the alternative is to allow two of the New Orleans DMA Stations to fail. Absent a waiver, Nexstar will be forced to divest WNOL-TV and WUPL. Although WNOL-TV currently benefits from its common ownership with WGNO, and WUPL similarly benefits from its common ownership with WWL-TV, both stations

---

[246] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[247] *Id.*

84

**App.126**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

have low all day audience shares. WNOL-TV's share is only ▮ while WUPL has an even lower share of ▮. Even WGNO—the fourth-ranked station in the market that is currently owned by Nexstar—has a share of only ▮. Thus, three out of the four stations that would be commonly owned as a result of the Transaction have shares below the 4% share benchmark that the FCC has recognized as one of the signs that a station is failing.[248]

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[249] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and in [their] financial performance."[250] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity or competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[251] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming, and often struggle to provide significant local programming at all."[252] Therefore, "allowing a 'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[253]

WNOL-TV and WUPL have only been able to provide the quality programming (including local news) that they provide today because they have been under common ownership with other stations in the market. Granting a waiver of the Local TVO Rule under these circumstances to allow WNOL-TV and WUPL to be commonly owned with WGNO and WWL-TV will create a stronger competitor in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the New Orleans DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the New Orleans DMA, the Transaction is critical to the ability of the New Orleans DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit common ownership of the New Orleans DMA Stations will better serve

---

[248] *See* 47 C.F.R. § 73.3555, note 7; *Local Ownership Order* at 12939 ¶ 81 (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower); (2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

[249] *See* 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); *Local Ownership Order* at 12938, ¶ 79.

[250] *See Local Ownership Order* at 12938 ¶ 79.

[251] *Id.* at 12939 ¶ 79.

[252] *Id.*

[253] *Id.*

85

**App.127**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the New Orleans DMA.

### 17. Memphis, TN

In this DMA, TEGNA is the licensee of WATN-TV, Memphis, Tennessee (ABC), the fourth-ranked station in the DMA, and WLMT, Memphis, Tennessee (CW), the fifth-ranked station in the DMA. Nexstar is the licensee of WREG-TV, Memphis, Tennessee (CBS), the top-ranked station in the DMA. Allowing Nexstar to own WATN-TV, WLMT, and WREG-TV (collectively, the "Memphis DMA Stations") will enhance competition in the Memphis DMA and, thereby, better serve the public interest than strict adherence to the rule.

Following the Transaction, competition will remain fierce in this DMA, with eight other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. Several stations in the Memphis DMA broadcast local news.

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[254] Those benefits have become necessities as competition has accelerated for television stations in the Memphis DMA.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is WREG-TV, followed by Rincon Broadcasting Group's WHBQ-TV (FOX) and Gray's WMC-TV (WMC-TV). WATN-TV ranks a somewhat distant fourth, with a share just above ▉, and WLMT, the fifth-ranked station, earns an audience share below ▉, just above the sixth-ranked INYO Broadcast Holding's WPXX-TV (ION). In terms of advertising revenue, according to the BIA OTA Data, second-ranked WHBQ-TV leads the DMA with an estimated FY 2024 advertising revenue of ▉▉▉ (a ▉▉ revenue share), outperforming top-ranked WREG-TV at ▉▉ ▉▉▉ (▉▉▉). WATN-TV ranks fourth in revenue with ▉▉▉ (▉▉▉), well behind third-ranked WMC-TV's ▉▉▉ (▉▉▉). From there, revenue figures dip substantially to fifth-ranked WLMT, with an estimated FY 2024 advertising revenue of ▉▉▉ (▉▉▉). WLMT's share of OTA advertising revenue in the DMA has dropped by ▉▉▉ since 2020.

Television stations in the Memphis DMA compete for advertising revenue not only with each other, but with large cable providers including Charter, Comcast, Altice and Cable One and numerous smaller providers, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Memphis DMA declined by ▉▉▉ (▉) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ▉▉▉ (▉), led by growth in mobile, computers, and connected TV. Over this time

---

[254] *See 2002 Biennial Review Order* at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. *See Prometheus Radio Project*, 373 F.3d 372.

86

**App.128**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

frame, OTA television's share of the total local advertising spend in the market declined from ██ to ██.

Top line revenue figures mask the underlying trends facing stations like the Memphis DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. This is particularly true for lower-ranked stations such as WLMT, which, as an affiliate of a non-Big Four network, is uniquely vulnerable to erosion of both viewers and advertising dollars.

The Memphis DMA Stations stand out for their commitment to delivering independent news and information to residents in the Memphis DMA. Indeed, WREG-TV's continuing coverage of the Memphis Area Transit Authority's service issues won a 2025 Regional Edward R. Murrow Award.[255] The Ad Fontes Media Bias and Reliability Ratings confirm that the Memphis DMS Stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, the Memphis DMA Stations must find a way to combat declining viewership and revenues. A 2021 Working Paper by economists in the FCC's OEA found that even in the more favorable economic environment for broadcasters in 2019 (before COVID shutdowns and the exponential growth of streaming services and social media as alternatives for video consumption), a DMA the size of the Memphis DMA may only be able to support three local news operations.[256] Combining the Memphis DMA Stations under a common owner will provide these stations with the scale needed in the Memphis DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the Memphis DMA Stations will position these stations to better compete for advertising revenue in the Memphis DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the Memphis DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Memphis DMA, including other highly ranked television stations offering abroad reach, the Transaction will place the Memphis DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's WATN-TV and WLMT by supplementing the stations' already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, WATN-TV and WLMT will gain access to

---

[255] See 2025 Murrow Awards Regional Winners.

[256] See OEA Working Paper 52 at 4–5.

87

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Memphis DMA. With a Washington Bureau reporter assigned specifically to the Memphis DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

As a result of the Transaction, TEGNA's WATN-TV and WLMT will also gain access to Nexstar's Tennessee state capital bureau, which covers matters of interest from the Governor's office, the state legislature, and state agencies for Nexstar stations across Tennessee. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will allow WATN-TV and WLMT to expand their coverage of meaningful proceedings in Nashville that directly affect the lives of their viewers.

Additionally, the Transaction will make the Memphis DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the Memphis DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Memphis DMA.

The Transaction will allow Nexstar to expedite the transition of WREG-TV, WATN-TV, and WLMT to ATSC 3.0. WATN-TV and WLMT will also gain access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[257] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[258] WATN-TV's and WLMT access to the network will increase the amount of spectrum available for Broadcast Internet services in the Memphis DMA and provide new revenue opportunities for WATN-TV and WLMT.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Memphis DMA, Nexstar's initiatives include holding events and raising money for the Salvation Army, holding events to provide coats for students at Shelby County Schools, and raising money for Le Bonheur Children's Hospital. As a result of the Transaction,

---

[257] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[258] *Id.*

88

**App.130**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Memphis DMA Stations to create even more meaningful engagement with residents and issues unique to the Memphis community, in furtherance of the public interest.

Waiver of the Local TVO Rule is particularly appropriate here because the alternative is to allow one of the Memphis DMA Stations to fail. Absent a waiver, Nexstar will be forced to divest WLMT. Even though WLMT currently benefits from its common ownership with WATN-TV, it still has a low all day audience share of only ▮. This is below the 4% share benchmark that the FCC has recognized as one of the signs that a station is failing.[259]

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[260] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and in [their] financial performance."[261] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity or competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[262] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming, and often struggle to provide significant local programming at all."[263] Therefore, "allowing a 'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[264]

WLMT has only been able to provide the quality programming (including local news) that it provides today because of its common ownership with WATN-TV. Granting a waiver of the Local TVO Rule under these circumstances to allow WLMT to continue under common ownership will preserve a stronger competitor in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the Memphis DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the Memphis DMA, the Transaction is critical to the ability of the Memphis DMA Stations to remain viable

---

[259] See 47 C.F.R. § 73.3555, note 7; Local Ownership Order at 12939 ¶ 81 (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower); (2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

[260] See 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); Local Ownership Order at 12938 ¶ 79.

[261] See Local Ownership Order at 12938 ¶ 79.

[262] Id. at 12939 ¶ 79.

[263] Id.

[264] Id.

89

**App.131**

competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit common ownership of the Memphis DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the Memphis DMA.

18.    **Buffalo, NY**

In this DMA, Nexstar is the licensee of WIVB-TV, Buffalo, New York (CBS), the top-ranked station in the DMA, and WNLO, Buffalo, New York (CW), the sixth-ranked station in the DMA. TEGNA is the licensee of WGRZ, Buffalo, New York (NBC), the second-ranked station in the DMA. Allowing Nexstar to own WIVB-TV, WNLO, and WGRZ (collectively, the "Buffalo DMA Stations") will enhance competition in the Buffalo DMA and, thereby, better serve the public interest than strict adherence to the rule.

Following the Transaction, competition will remain fierce in this DMA, with seven other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. In addition to the Buffalo DMA Stations, Scripps-owned WKBW-TV also broadcasts local news. Sinclair-owned WUTV discontinued its local news in 2023.[265]

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[266] Those benefits have become necessities as competition has accelerated for television stations in the Buffalo DMA.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is WIVB-TV, followed by WGRZ, WKBW-TV (ABC), WUTV (FOX), WPXJ-TV (ION), WNLO, WBBZ-TV (MeTV), WNYO-TV (MyNetworkTV), and WNED-TV (PBS). In terms of advertising revenue, according to the BIA OTA Data, the circumstances are particularly challenging for stations like WNLO which are not affiliated with one of the "Big Four" networks. None of these stations had advertising revenue exceeding ███, and WNLO has seen its share of OTA advertising revenue fall from a five year high of ███ in 2021 to ██ in 2024. Television stations in the Buffalo DMA compete for advertising revenue not only with each other, but with cable providers including Charter, Comcast, and Verizon as well as several smaller cable companies, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Buffalo DMA declined by ██████ (██) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ██████ (██),

---

[265] *See* Alan Pergament, *WUTV's 10 p.m. Newscast Ending Jan. 27, Eliminating Four Jobs In Buffalo*, The Buffalo News (Jan. 11, 2023), https://tinyurl.com/mpc7ubpx.

[266] *See 2002 Biennial Review Order* at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. *See Prometheus Radio Project*, 373 F.3d 372.

90

**App.132**

led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ▮ to ▮.

Top line revenue figures mask the underlying trends facing stations like the Buffalo DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. This is particularly true for WNLO, which, as a station not affiliated with any of the "Big Four" networks, is uniquely vulnerable to erosion of both viewers and advertising dollars.

The Buffalo DMA Stations stand out for their commitment to delivering independent news and information to residents in the Buffalo DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, the Buffalo DMA Stations must find a way to combat declining viewership and revenues. Sinclair's decision in 2023 to replace its local news at WUTV with a national news program demonstrates how difficult it is to sustain local journalism in this DMA. Combining the Buffalo DMA Stations under a common owner will provide these stations with the scale needed in the Buffalo DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the Buffalo DMA Stations will position these stations to better compete for advertising revenue in the Buffalo DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the Buffalo DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Buffalo DMA, including other highly ranked television stations offering a broad reach, the Transaction will place the Buffalo DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's WGRZ by supplementing the station's already strong local journalism with additional newsgathering resources. Indeed, Nexstar's WIVB-TV and TEGNA's WGRZ each won a 2025 Edward R. Murrow Award for their reporting.[267] Although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, WGRZ will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Buffalo DMA. With a Washington Bureau reporter assigned specifically to the Buffalo DMA, Nexstar's reporting reflects the unique needs of the community

---

[267] *See* 2025 Murrow Awards Regional Winners.

91

Form 2100, Schedule 315
Comprehensive Exhibit

while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

As a result of the Transaction, TEGNA's WGRZ will also gain access to Nexstar's New York state capital bureau, which covers matters of interest from the Governor's office, the state legislature, and state agencies for Nexstar stations across New York. Nexstar added this bureau in 2017, following Nexstar's acquisition of Media General. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will allow WGRZ to expand its coverage of meaningful proceedings in Albany that directly affect the lives of its viewers.

Additionally, the Transaction will make the Buffalo DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the Buffalo DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Buffalo DMA.

The Transaction will allow Nexstar to include WGRZ in the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[268] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[269] WGRZ's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Buffalo DMA and provide new revenue opportunities for WGRZ.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Buffalo DMA, Nexstar's initiatives include holding food drives with the Food Bank of Western New York, partnering with local organizations to raise funds for cancer research, and partnering with the Special Olympics to cover the Polar Plunge, which raised funds for Special Olympics. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Buffalo DMA Stations to create even more meaningful engagement with residents and issues unique to the Buffalo community, in furtherance of the public interest.

---

[268] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[269] *Id.*

92

**App.134**

**REDACTED - FOR PUBLIC INSPECTION**
Form 2100, Schedule 315
Comprehensive Exhibit

Waiver of the Local TVO Rule is particularly appropriate here because the alternative is to allow one of the Buffalo DMA Stations to fail. Absent a waiver, Nexstar will be forced to divest WNLO. Even though WNLO currently benefits from its common ownership with WIVB-TV, it still has a low all day audience share of only ▮. This is well below the 4% share benchmark that the FCC has recognized as one of the signs that a station is failing.[270]

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[271] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and in [their] financial performance."[272] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity or competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[273] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming, and often struggle to provide significant local programming at all."[274] Therefore, "allowing a 'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[275]

WNLO has only been able to provide the quality programming (including local news) that it provides today because of its common ownership with WIVB-TV. Granting a waiver of the Local TVO Rule under these circumstances to allow WNLO to continue under common ownership will preserve a stronger competitor in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the Buffalo DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the Buffalo DMA, the Transaction is critical to the ability of the Buffalo DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit common ownership of the Buffalo DMA Stations will better serve the public interest and

---

[270] *See* 47 C.F.R. § 73.3555, note 7; *Local Ownership Order* at 12939 ¶ 81 (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower); (2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

[271] *See* 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); *Local Ownership Order* at 12938 ¶ 79.

[272] *See Local Ownership Order* at 12938 ¶ 79.

[273] *Id.* at 12939 ¶ 79.

[274] *Id.*

[275] *Id.*

93

**App.135**

the policy objective of the rule than would strict enforcement of the rule for television stations in the Buffalo DMA.

### 19. Little Rock-Pine Bluff, AR

In this DMA (the "Little Rock DMA"), Nexstar is the licensee of KARK-TV, Little Rock, Arkansas (NBC), the second-ranked station in the DMA, and KARZ-TV, Little Rock, Arkansas (Independent), the seventh-ranked station in the DMA. TEGNA is the licensee of KTHV, Little Rock, Arkansas (CBS), the third-ranked station in the DMA. Allowing Nexstar to own KARK-TV, KTHV, and KARZ-TV (collectively, the "Little Rock DMA Stations") will enhance competition in the Little Rock DMA and, thereby, better serve the public interest than strict adherence to the rule.

Following the Transaction, competition will remain fierce in this DMA, with nine other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. Several stations in the Little Rock DMA broadcast local news.

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[276] Those benefits have become necessities as competition has accelerated for television stations in the Little Rock DMA.

In terms of ratings, according to the Nielsen Ratings Data, Sinclair-owned KATV (ABC) is the dominant leader with an ███ audience share. KARK-TV and KTHV are second and third with shares of ███ and ███, respectively. FOX affiliate KLRT-TV is fourth at ███, followed by LR Telecasting LLC-owned KMYA-DT (MeTV) at ███. KARZ-TV is seventh with a ███ share. In terms of advertising revenue, according to the BIA OTA Data, KATV is similarly the leader with an estimated advertising revenue of ███ (███ of DMA advertising revenue) in FY 2024, with KTHV and KARK-TV second and third at ███ (███) and ███ (███) respectively, and KLRT-TV fourth at ███ (███). Second-place KTHV's share of OTA ad revenue, however, has dropped significantly since 2020 (from ███ to ███). Seventh-ranked KARZ-TV's revenue was a mere ███, representing ███ of the DMA total (down by ███ since a ███ share in 2020).

Television stations in the Little Rock DMA compete for advertising revenue not only with each other, but with national cable providers including Comcast, Altice, and Cable One, various smaller cable providers serving portions of the DMA, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Little Rock DMA declined by ███ ███ (███) from 2019 to 2025. At the same time, the total media advertising spend in the market

---

[276] *See 2002 Biennial Review Order* at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. *See Prometheus Radio Project*, 373 F.3d 372.

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

increased by ███████ (███), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ███ to ██.

Top line revenue figures mask the underlying trends facing stations like the Little Rock DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. This is particularly true for KARZ-TV, which, as an independent station, is uniquely vulnerable to erosion of both viewers and advertising dollars.

The Little Rock DMA Stations stand out for their commitment to delivering independent news and information to residents in the Little Rock DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that KARK-TV serves as a politically balanced, reliable source of fact-based reporting.[277]

To sustain their investment in quality journalism, the Little Rock DMA Stations must find a way to combat declining viewership and revenues. Combining the Little Rock DMA Stations under a common owner will provide these stations with the scale needed in the Little Rock DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the Little Rock DMA Stations will position these stations to better compete for advertising revenue in the Little Rock DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the Little Rock DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Little Rock DMA, including other highly ranked television stations offering a broad reach, the Transaction will place the Little Rock DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's KTHV by supplementing the station's already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, KTHV will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Little Rock DMA. With a Washington Bureau reporter assigned specifically to the Little Rock DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

---

[277] Ad Fontes has not rated KTHV.

**App.137**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

As a result of the Transaction, TEGNA and Nexstar stations throughout Arkansas will receive expanded coverage of news from the Governor's office, the state legislature, and state agencies through the resources of Nexstar's Arkansas state capital bureau. With the added resources of KTHV, this bureau will be able to provide even stronger coverage of state government matters that directly affect the lives of viewers in the Little Rock DMA and throughout the state.

Additionally, the Transaction will make the Little Rock DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the Little Rock DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Little Rock DMA.

The Transaction will allow Nexstar to include KTHV in the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[278] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[279] KTHV's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Little Rock DMA and provide new revenue opportunities for KTHV.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Little Rock DMA, Nexstar's initiatives include holding events with and raising funds for the American Heart Association, anti-bullying organizations, and opioid addiction awareness groups. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Little Rock DMA Stations to create even more meaningful engagement with residents and issues unique to the Little Rock community, in furtherance of the public interest.

Waiver of the Local TVO Rule is particularly appropriate here because the alternative is to allow one of the Little Rock DMA Stations to fail. Absent a waiver, Nexstar will be forced to divest KARZ-TV. Even though KARZ-TV currently benefits from its common ownership with KARK-

---

[278] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[279] *Id.*

96

**App.138**

REDACTED - FOR PUBLIC INSPECTION

Form 2100, Schedule 315
Comprehensive Exhibit

TV, it still has a low all day audience share of only ███. This is below the 4% share benchmark that the FCC has recognized as one of the signs that a station is failing.[280]

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[281] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and in [their] financial performance."[282] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity or competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[283] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming, and often struggle to provide significant local programming at all."[284] Therefore, "allowing a 'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[285]

KARZ-TV has only been able to provide the quality programming that it provides today because of its common ownership with KARK-TV. Granting a waiver of the Local TVO Rule under these circumstances to allow KARZ-TV to continue under common ownership will preserve a stronger competitor in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the Little Rock DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the Little Rock DMA, the Transaction is critical to the ability of the Little Rock DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit common ownership of the Little Rock DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the Little Rock DMA.

---

[280] *See* 47 C.F.R. § 73.3555, note 7; *Local Ownership Order* at 12939 ¶ 81 (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower); (2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

[281] *See* 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); *Local Ownership Order* at 12938 ¶ 79.

[282] *See Local Ownership Order* at 12938 ¶ 79.

[283] *Id.* at 12939 ¶ 79.

[284] *Id.*

[285] *Id.*

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

20.    **Des Moines-Ames, IA**

In this DMA, Nexstar is the licensee of WHO-DT, Des Moines, Iowa (NBC), the second-ranked station in the DMA. TEGNA is the licensee of WOI-DT, Ames, Iowa (ABC), the third-ranked station in the DMA, and KCWI-TV, Ames, Iowa (CW), the seventh-ranked station in the DMA. Allowing Nexstar to own WHO-DT, WOI-DT, and KCWI-TV (collectively, the "Des Moines DMA Stations") will enhance competition in the Des Moines-Ames DMA (the "Des Moines DMA") and, thereby, better serve the public interest than strict adherence to the rule.

Following the Transaction, competition will remain fierce in this DMA, with six other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. Several stations in the Des Moines DMA broadcast local news.

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[286] Those benefits have become necessities as competition has accelerated for television stations in the Des Moines DMA.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is Hearst's CBS affiliate KCCI, followed by WHO-DT, with both KCCI and WHO-DT registering audience shares above ▮▮. WOI-DT is a distant third with a ▮▮ share. KCWI-TV languishes in seventh, with a share below ▮▮ (▮▮), trailing the FOX affiliate, the ION affiliate, and the PBS station. In terms of advertising revenue, according to the BIA OTA Data, WHO-DT is the second-ranked station in the DMA with estimated FY 2024 advertising revenue of ▮▮▮▮. Despite its third place standing in terms of audience share, WOI-DT is fourth in revenue, with an estimated FY 2024 advertising revenue of ▮▮▮▮—just ▮▮ of the FY 2024 broadcast advertising revenue in the DMA. KCWI-TV's estimated FY 2024 advertising revenue of ▮▮▮▮ comprises just ▮▮ of the DMA's FY 2024 broadcast advertising revenue.

Television stations in the Des Moines DMA compete for advertising revenue not only with each other, but with cable providers including Mediacom and numerous smaller operators, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Des Moines DMA declined by ▮▮▮▮ (▮▮) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ▮▮▮▮ (▮▮), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ▮▮ to ▮▮.

Top line revenue figures mask the underlying trends facing stations like the Des Moines DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over

---

[286] *See 2002 Biennial Review Order* at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. *See Prometheus Radio Project*, 373 F.3d 372.

98

**App.140**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. This is particularly true for KCWI-TV, which, as a non-Big Four affiliate, is uniquely vulnerable to erosion of both viewers and advertising dollars.

The Des Moines DMA Stations stand out for their commitment to delivering independent news and information to residents in the Des Moines DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, the Des Moines DMA Stations must find a way to combat declining viewership and revenues. A 2021 Working Paper by economists in the FCC's OEA found that even in the more favorable economic environment for broadcasters in 2019 (before COVID shutdowns and the exponential growth of streaming services and social media as alternatives for video consumption), a DMA the size of the Des Moines DMA may only be able to support three local news operations.[287] Combining the Des Moines DMA Stations under a common owner will provide these stations with the scale needed in the Des Moines DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the Des Moines DMA Stations will position these stations to better compete for advertising revenue in the Des Moines DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the Des Moines DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Des Moines DMA, including other highly ranked television stations offering a broad reach, the Transaction will place the Des Moines DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's WOI-DT and KCWI-TV by supplementing the stations' already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, WOI-DT and KCWI-TV will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Des Moines DMA. With a Washington Bureau reporter assigned specifically to the Des Moines DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

---

[287] *See* OEA Working Paper 52 at 4–5.

99

**App.141**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

As a result of the Transaction, TEGNA and Nexstar stations throughout Iowa will receive expanded coverage of news from the Governor's office, the state legislature, and state agencies through the resources of Nexstar's Iowa state capital bureau. With the added resources of WOI-DT and KCWI-TV, this bureau will be able to provide even stronger coverage of state government matters that directly affect the lives of viewers in the Des Moines DMA and throughout the state.

Additionally, the Transaction will make the Des Moines DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the Des Moines DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Des Moines DMA.

The Transaction will allow Nexstar to expedite WOI-DT's and KCWI-TV's transition to ATSC 3.0 and provide WOI-DT and KCWI-TV access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[288] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[289] WOI-DT's and KCWI-TV's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Des Moines DMA, where WHO-DT already broadcasts an ATSC 3.0 signal, and provide new revenue opportunities for WOI-DT and KCWI-TV.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Des Moines DMA, Nexstar's initiatives include raising funds to support cancer research, helping replenish blood supplies for local medical facilities, and packing meal kits to feed hungry families. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Des Moines DMA Stations to create even more meaningful engagement with residents and issues unique to Des Moines, in furtherance of the public interest.

Waiver of the Local TVO Rule is particularly appropriate here because the alternative is to allow one of the Des Moines DMA Stations to fail. Absent a waiver, Nexstar will be forced to divest KCWI-TV. Even though KCWI-TV currently benefits from its common ownership with WOI-DT,

---

[288] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[289] *Id.*

100

**App.142**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

it still has a low all day audience share of only ███. This is well below the 4% share benchmark that the FCC has recognized as one of the signs that a station is failing.[290]

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[291] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and in [their] financial performance."[292] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity or competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[293] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming, and often struggle to provide significant local programming at all."[294] Therefore, "allowing a 'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[295]

KCWI-TV has only been able to provide the quality programming that it provides today (including local news) because of its common ownership with WOI-DT. Granting a waiver of the Local TVO Rule under these circumstances to allow KCWI-TV to continue under common ownership will preserve a stronger competitor in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the Des Moines DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the Des Moines DMA, the Transaction is critical to the ability of the Des Moines DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit common ownership of the Des Moines DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the Des Moines DMA.

---

[290] *See* 47 C.F.R. § 73.3555, note 7; *Local Ownership Order* at 12939 ¶ 81 (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower); (2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

[291] *See* 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); *Local Ownership Order* at 12938 ¶ 79.

[292] *See Local Ownership Order* at 12938 ¶ 79.

[293] *Id.* at 12939 ¶ 79.

[294] *Id.*

[295] *Id.*

101

**App.143**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

### 21.    Huntsville-Decatur (Florence), AL

In this DMA, Nexstar is the licensee of WHNT-TV, Huntsville, Alabama (CBS/Antenna TV), the top-ranked station in the DMA, and WHDF, Florence, Alabama (CW), the fifth-ranked station in the DMA. TEGNA is the licensee of WZDX, Huntsville, Alabama (FOX), the fourth-ranked station in the DMA. Allowing Nexstar to own WHNT-TV, WHDF, and WZDX (collectively, the "Huntsville DMA Stations") will enhance competition in the Huntsville-Decatur-Florence DMA (the "Huntsville DMA") and, thereby, better serve the public interest than strict adherence to the rule.

Following the Transaction, competition will remain fierce in this DMA, with four other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. Several stations in the Huntsville DMA broadcast local news.

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[296] Those benefits have become necessities as competition has accelerated for television stations in the Huntsville DMA.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is WHNT-TV, followed by Gray-owned WAFF (NBC/Bounce) and WAAY-TV (ABC/ION). WZDX and WHDF are a very distant fourth and fifth, with audience shares of only ███ and ███, respectively. Two PBS stations—WFIQ and WHIQ—round out the full power stations in the market and are ranked seventh and eighth, and low power station WTHV-LD (Telemundo) ranks sixth. In terms of advertising revenue, according to the BIA OTA Data, WAFF leads the market with an estimated ███████ in advertising revenue for FY 2024, with WHNT-TV as the second-ranked station earning an estimated ████████—although WHNT-TV's share of OTA ad revenue in the DMA has dropped significantly, from ████ in 2020 to ████ in 2024. WAAY-TV is third in revenue with an estimated ███████, WZDX is fourth with an estimated ██ ████, and WHDF, the lowest-ranked reported station in the DMA in terms of revenue, with only an estimated ███████. Television stations in the Huntsville DMA compete for advertising revenue not only with each other, but with cable providers including Charter, Comcast, and several smaller operators (Mediacom, Otelco, and WOW! to name but a few), national DBS providers, multiple so-called "virtual MVPDs," and large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Huntsville DMA declined by ███████ (███) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ███████ (███), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ███████.

---

[296] *See 2002 Biennial Review Order* at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. *See Prometheus Radio Project*, 373 F.3d 372.

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Top line revenue figures mask the underlying trends facing stations like the Huntsville DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. This is particularly true for WHDF, which, as a station not affiliated with any of the Big Four networks, is uniquely vulnerable to erosion of both viewers and advertising dollars.

The Huntsville DMA Stations stand out for their commitment to delivering independent news and information to residents in the Huntsville DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that WHNT-TV and WHDF serve as politically balanced, reliable sources of fact-based reporting.[297]

To sustain their investment in quality journalism, the Huntsville DMA Stations must find a way to combat declining viewership and revenues. A 2021 Working Paper by economists in the FCC's OEA found that even in the more favorable economic environment for broadcasters in 2019 (before COVID shutdowns and the exponential growth of streaming services and social media as alternatives for video consumption), a DMA the size of the Huntsville DMA may only be able to support three local news operations.[298] Combining the Huntsville DMA Stations under a common owner will provide these stations with the scale needed in the Huntsville DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the Huntsville DMA Stations will position these stations to better compete for advertising revenue in the Huntsville DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the Huntsville DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Huntsville DMA, including other highly ranked television stations offering a broad reach, the Transaction will place the Huntsville DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers in the Huntsville DMA by supplementing WHNT's already strong local journalism with additional newsgathering resources. Nexstar plans to expand the amount of news on WZDX, leveraging WHNT's strong news operation, which produces more than 37 hours of local news weekly and earned six ABBY Awards from the Alabama Broadcasters Association in 2025.[299] Although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated

---

[297] Ad Fontes has not rated WZDX.

[298] *See* OEA Working Paper 52 at 4–5.

[299] *See* Rebecca Teutsch, *News 19's Lauren Layton Wins Two ABBY Awards for TV News Feature and TV Hard News!*, WHNT (Apr. 6, 2025), https://tinyurl.com/5hd6hazb.

103

**App.145**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

to serving TEGNA's other stations. Following consummation of the Transaction, WZDX will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Huntsville DMA. With a Washington Bureau reporter assigned specifically to the Huntsville DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else. This model has allowed Nexstar's stations to break stories and broadcast exclusive interviews relevant to specific markets, including exclusive coverage from the Oval Office regarding the relocation of the U.S. Space Command from Colorado Springs, Colorado to Huntsville, Alabama.

As a result of the Transaction, TEGNA's WZDX will also gain access to Nexstar's Alabama state capital bureau, which covers matters of interest from the Governor's office, the state legislature, and state agencies for Nexstar stations across Alabama. Nexstar added this bureau in 2017, following Nexstar's acquisition of Media General. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will allow WZDX to expand its coverage of meaningful proceedings in Montgomery that directly affect the lives of its viewers.

Additionally, the Transaction will make the Huntsville DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the Huntsville DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Huntsville DMA.

The Transaction will allow Nexstar to expedite the transition of WHNT-TV, WHDF, and WZDX to ATSC 3.0. WZDX will also gain access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[300] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[301] WZDX's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Huntsville DMA and provide new revenue opportunities for WZDX.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve

---

[300] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[301] *Id.*

104

**App.146**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Huntsville DMA, Nexstar's initiatives include participating in drives for the Food Bank of North Alabama, sponsoring an event for the Huntsville Hospital Foundation, and raising 300 pints of blood for a local blood drive. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Huntsville DMA Stations to create even more meaningful engagement with residents and issues unique to Huntsville, in furtherance of the public interest.

Waiver of the Local TVO Rule is particularly appropriate here because the alternative is to allow one of the Huntsville DMA Stations to fail. Absent a waiver, Nexstar will be forced to divest WHDF. WHDF has a low all day audience share of only ▮▮▮, while WZDX has only a slightly higher share of ▮▮▮. Thus, two out of the three stations that would be commonly owned as a result of the Transaction have shares below the 4% share benchmark that the FCC has recognized as one of the signs that a station is failing.[302]

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[303] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and in [their] financial performance."[304] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity or competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[305] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming, and often struggle to provide significant local programming at all."[306] Therefore, "allowing a 'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[307]

WHDF has only been able to provide the quality programming (including local news) that it provides today because of its common ownership with WHNT. Granting a waiver of the Local

---

[302] *See* 47 C.F.R. § 73.3555, note 7; *Local Ownership Order* at 12939 ¶ 81 (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower); (2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

[303] *See* 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); *Local Ownership Order* at 12938 ¶ 79.

[304] *See Local Ownership Order* at 12938 ¶ 79.

[305] *Id.* at 12939 ¶ 79.

[306] *Id.*

[307] *Id.*

105

**App.147**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

TVO Rule under these circumstances to allow WHDF to continue under common ownership will preserve a stronger competitor in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the Huntsville DMA Stations with the scale and resources to not only sustain the high quality, local journalism they deliver today, but to better serve local viewers in the future. At a time of transformational change for television stations in the Huntsville DMA, the Transaction is critical to the ability of the Huntsville DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit common ownership of the Huntsville DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the Huntsville DMA.

## 22.    Ft. Smith-Fayetteville-Springdale-Rogers, AR

In this DMA (the "Fort Smith DMA"), TEGNA is the licensee of KFSM-TV, Fort Smith, Arkansas (CBS), the second-ranked station in the DMA. Nexstar is the licensee of KXNW, Eureka Springs, Arkansas (MyNetworkTV), the third-ranked station in the DMA and KFTA-TV, Fort Smith, Arkansas (FOX), the fifth-ranked station in the DMA. Nexstar is also the licensee of KNWA-TV, Rogers, Arkansas (NBC), which operates as an authorized satellite of KFTA-TV.[308] Allowing Nexstar to own KFSM-TV, KXNW, KFTA-TV, and KNWA-TV (collectively, the "Fort Smith DMA Stations") will enhance competition in the Fort Smith DMA and, thereby, better serve the public interest than strict adherence to the rule.

Following the Transaction, competition will remain fierce in this DMA, with three other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. These stations and various low power stations serving the market include affiliates not only of the four major networks, but of CW, Telemundo, MeTV, Univision, Estrella, Daystar, and PBS. Several stations in the Fort Smith DMA broadcast local news.

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[309] Those benefits have become necessities as competition has accelerated for television stations in the Fort Smith DMA.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the DMA is Hearst-owned ABC affiliate KHBS,[310] followed by KFSM-TV, KXNW, KNWA-TV, and KFTA-TV. Both KNWA-TV and KFTA-TV have Nielsen household audience shares of less than ██. As a

---

[308] *See Tribune MO&O* at 8439–40 ¶ 5 & n.20.

[309] *See 2002 Biennial Review Order* at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. *See Prometheus Radio Project*, 373 F.3d 372.

[310] Ratings for KHBS and its multicast streams are reported by Nielsen as KHBS+ and NHBS+.

106

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

result, the Fort Smith DMA Stations will include the second-ranked station together with the third-, fourth-, and fifth-ranked stations (which include a parent/satellite combination), two of which have audience shares less than ▆. Based on Nexstar's understanding of the Fort Smith DMA, Nexstar believes that Nielsen's designation of KXNW as the third-ranked station may be a statistical anomaly. Thus, Nexstar is also providing data from Comscore for the Ft. Smith DMA, attached hereto as Exhibit F.[311]

In terms of advertising revenue, according to the BIA OTA Data, KFSM-TV is the top-ranked station in the DMA, with estimated FY 2024 advertising revenue of ▆▆▆▆▆. KFSM-TV is followed by Hearst's KHBS, with estimated FY 2024 advertising revenue of ▆▆▆▆. Nexstar's KNWA-TV and KFTA-TV had FY 2024 estimated advertising revenues of ▆▆▆▆ and ▆▆▆▆, respectively. KFTA-TV's advertising revenue share percentage in the market has steadily declined since 2020, falling from ▆▆ to ▆▆. BIA does not report revenue data for KXNW.

Television stations in the Fort Smith DMA compete for advertising revenue not only with each other, but with cable providers including Altice and Cox, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Fort Smith DMA declined by ▆▆▆▆ (▆▆) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ▆▆▆▆ (▆▆), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ▆▆ to ▆▆.

Top line revenue figures mask the underlying trends facing stations like the Fort Smith DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. This is particularly true for KXNW, which, as a station not affiliated with any of the Big Four networks, is uniquely vulnerable to erosion of both viewers and advertising dollars.

The Fort Smith DMA Stations stand out for their commitment to delivering independent news and information to residents in the Fort Smith DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, the Fort Smith DMA Stations must find a way to combat declining viewership and revenues. Combining the Fort Smith DMA Stations under a common owner will provide these stations with the scale needed in the Fort Smith DMA to take on the technology and media companies that are siphoning revenue away from local stations.

---

[311] Because Nexstar is the licensee of a station in the Ft. Smith DMA, the Comscore data for this market is in a different format from the Comscore Ratings Data.

107

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Common ownership of the Fort Smith DMA Stations will position these stations to better compete for advertising revenue in the Fort Smith DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the Fort Smith DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Fort Smith DMA, including other television stations offering a broad range of programming, the Transaction will place the Fort Smith DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's KFSM-TV by supplementing the station's already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, KFSM-TV will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Fort Smith DMA. With a Washington Bureau reporter assigned specifically to the Fort Smith DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

As a result of the Transaction, TEGNA's KFSM-TV will also gain access to Nexstar's Arkansas state capital bureau, which covers matters of interest from the Governor's office, the state legislature, and state agencies for Nexstar stations across Arkansas. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will allow KFSM-TV to expand its coverage of meaningful proceedings in Little Rock that directly affect the lives of its viewers.

Additionally, the Transaction will make the Fort Smith DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the Fort Smith DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Fort Smith DMA.

The Transaction will allow Nexstar to expedite the transition of KXNW, KFTA-TV, and KFSM-TV to ATSC 3.0. KFSM-TV will also gain access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[312] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on

---

[312] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

108

**App.150**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[313] KFSM-TV's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Fort Smith DMA and provide new revenue opportunities for KFSM-TV.

Waiver of the Local TVO Rule is particularly appropriate here because the Fort Smith DMA Stations include stations that have long been reliant on common ownership with sister stations. KFTA-TV and KNWA-TV have operated as a parent/satellite combination for over two decades.[314] And until its sale to Nexstar in 2019, KXNW operated under common ownership with KFSM-TV under a failing station waiver.[315] Even though KFTA-TV, KNWA-TV and KNXW currently benefit from their common ownership in the Fort Smith DMA, two of those stations (KNWA-TV and KFTA-TV under Nielsen data; KFTA-TV and KXNW under Comscore data) still have low all day audience shares below the 4% share benchmark that the FCC has recognized as one of the signs that a station is failing.[316]

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[317] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and in [their] financial performance."[318] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity or competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[319] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming, and often struggle to provide significant local programming at all."[320] Therefore, "allowing a

---

[313] *Id.*

[314] *See* Letter from Barbara A. Kreisman, Chief, Video Division, Media Bureau, FCC to Nexstar Broadcasting, Inc., 19 FCC Rcd 24524, 24530 (Dec. 21, 2004), https://tinyurl.com/yth8m4cm.

[315] *See Applications of Local TV Holdings, LLC, Transferor and Tribune Broadcasting Company II, LLC, Transferee, et al.*, Memorandum Opinion and Order, 28 FCC Rcd 16850 (2013).

[316] *See* 47 C.F.R. § 73.3555, note 7; *Local Ownership Order* at 12939 ¶ 81 (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower); (2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

[317] *See* 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); *Local Ownership Order* at 12938 ¶ 79.

[318] *See Local Ownership Order* at 12938 ¶ 79.

[319] *Id.* at 12939 ¶ 79.

[320] *Id.*

109

**App.151**

'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[321]

KFTA-TV, KNWA-TV and KXNW have only been able to provide the quality programming (including local news) that they provide today because of their common ownership. Granting a waiver of the Local TVO Rule under these circumstances to allow KFTA-TV, KNWA-TV and KXNW to continue under common ownership will preserve stronger competitors in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the Fort Smith DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the Fort Smith DMA, the Transaction is critical to the ability of the Fort Smith DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit common ownership of the Fort Smith DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the Fort Smith DMA.

### 23.    Davenport, IA-Rock Island-Moline, IL

In this DMA (the "Davenport DMA"), TEGNA is the licensee of WQAD-TV, Moline, Illinois (ABC), the second-ranked station in the DMA. Nexstar is the licensee of WHBF-TV, Rock Island, Illinois (CBS), the third-ranked station in the DMA and KGCW, Burlington, Iowa (CW), the fifth-ranked station in the DMA. Allowing Nexstar to own WQAD-TV, WHBF-TV, and KGCW (collectively, the "Davenport DMA Stations") will enhance competition in the Davenport DMA and, thereby, better serve the public interest than strict adherence to the rule.

Following the Transaction, competition will remain fierce in this DMA, with five other full power television stations competing against each other and against the media and technology conglomerates that increasingly challenge local television stations for viewers and advertising dollars. Several stations in the Davenport DMA broadcast local news.

The Commission recognized more than 20 years ago that common ownership can produce consumer welfare enhancing benefits including efficiencies and cost savings, investment in new broadcast technologies, and stronger broadcast competitors offering better programming.[322] Those benefits have become necessities as competition has accelerated for television stations in the Davenport DMA.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is Gray's KWQC-TV (NBC) which earns a share of ██, with WQAD-TV a distant second at ██, followed by WHBF-TV (██) and KLJB (FOX) (██). The gap increases from there, with KGCW earning a



---

[321] *Id.*

[322] *See 2002 Biennial Review Order* at 13674–75 ¶¶ 147–150. Although the Third Circuit Court of Appeals later questioned the Commission's numerical limits, it did not undermine the underlying rationale. *See Prometheus Radio Project*, 373 F.3d 372.

110

share of ███, and two PBS affiliates, WQPT-TV and WMWC-TV, earning ███ shares. In terms of advertising revenue, according to the BIA OTA Data, KWQC-TV had estimated FY 2024 advertising revenue of ███ (a ███ share), nearly ███ more than WQAD-TV at ███ (███) and, indeed, more than ███. Revenues drop again significantly from WQAD-TV, with WHBF-TV's 2024 revenue estimated at ███ (███), KLJB's at ███ (███), and KGCW's at just ███ (███). Television stations in the Davenport DMA compete for advertising revenue not only with each other, but with cable providers including Comcast, Mediacom, Cable One, and a host of local cable companies, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Davenport DMA declined by ███ (███) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ███ (███), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ███ to ███.

Top line revenue figures mask the underlying trends facing stations like the Davenport DMA Stations. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. This is particularly true for KGCW, which, as a station not affiliated with any of the Big Four networks, is uniquely vulnerable to erosion of both viewers and advertising dollars.

The Davenport DMA Stations stand out for their commitment to delivering independent news and information to residents in the Davenport DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, the Davenport DMA Stations must find a way to combat declining viewership and revenues. A 2021 Working Paper by economists in the FCC's OEA found that even in the more favorable economic environment for broadcasters in 2019 (before COVID shutdowns and the exponential growth of streaming services and social media as alternatives for video consumption), a DMA the size of the Davenport DMA may only be able to support two local news operations.[323] Combining WQAD-TV, WHBF-TV, and KGCW under a common owner will provide these stations with the scale needed in the Davenport DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of the Davenport DMA Stations will position these stations to better compete for advertising revenue in the Davenport DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on the Davenport DMA Stations with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many

---

[323] *See* OEA Working Paper 52 at 4–5.

111

REDACTED - FOR PUBLIC INSPECTION

Form 2100, Schedule 315
Comprehensive Exhibit

options to advertise on broadcast in the Davenport DMA, including other highly ranked television stations offering a broad reach, the Transaction will place the Davenport DMA Stations in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's WQAD-TV by supplementing the station's already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, WQAD-TV will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Davenport DMA. With a Washington Bureau reporter assigned specifically to the Davenport DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

As a result of the Transaction, TEGNA's WQAD-TV will also gain access to Nexstar's Iowa and Illinois state capital bureaus, which cover matters of interest from the Governors' offices, the state legislature, and state agencies for Nexstar stations across Iowa and Illinois. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will allow WQAD-TV to expand its coverage of meaningful proceedings in the Iowa and Illinois state capitals that directly affect the lives of its viewers.

Additionally, the Transaction will make the Davenport DMA Stations stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, the Davenport DMA Stations will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Davenport DMA.

The Transaction will allow Nexstar to expedite WQAD-TV's and WHBF-TV's transition to ATSC 3.0 and provide WQAD-TV access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[324] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[325] WQAD-TV's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Davenport DMA, where KGCW already broadcasts an ATSC 3.0 signal, and provide new revenue opportunities for WQAD-TV.

---

[324] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[325] *Id.*

112

**App.154**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Waiver of the Local TVO Rule is particularly appropriate here because the alternative is to allow one of the Davenport DMA Stations to fail. Absent a waiver, Nexstar will be forced to divest KGCW. Even though KGCW currently benefits from its common ownership with WHBF-TV, it still has a low all day audience share of only ▮. This is well below the 4% share benchmark that the FCC has recognized as one of the signs that a station is failing.[326]

While the Commission's formal "failing station" waiver policy does not extend to markets where the applicant will own more than two stations,[327] the criteria are designed to identify stations that have "been struggling for an extended period of time both in terms of [their] audience share and in [their] financial performance."[328] The Commission has recognized that permitting common ownership of failing stations does not harm its diversity or competition goals because "their financial situation typically hampers their ability to be a viable 'voice' in the market."[329] As the FCC explained, "[t]hese stations rarely have the resources to provide local news programming, and often struggle to provide significant local programming at all."[330] Therefore, "allowing a 'failing' station to join with a stronger station in the market can greatly improve its ability to improve its facilities and programming operations, thus benefitting the public interest."[331]

KGCW has only been able to provide the quality programming (including local news) that it provides today because of its common ownership with WHBF-TV. Granting a waiver of the Local TVO Rule under these circumstances to allow KGCW to continue under common ownership will preserve a stronger competitor in the market and better serve the purpose of the rule.

As described above, the Transaction will provide the Davenport DMA Stations with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. At a time of transformational change for television stations in the Davenport DMA, the Transaction is critical to the ability of the Davenport DMA Stations to remain viable competitors. Under these circumstances, the Commission should recognize that waiving the Local TVO Rule to permit common ownership of the Davenport DMA Stations will better serve the public interest and the policy objective of the rule than would strict enforcement of the rule for television stations in the Davenport DMA.

---

[326] *See* 47 C.F.R. § 73.3555, note 7; *Local Ownership Order* at 12939 ¶ 81 (identifying failing station criteria as whether: (1) the station has had a low all day audience share (i.e. 4% or lower); (2) the station has had a negative cash flow for the previous three years; (3) the merger will produce tangible and verifiable public interest benefits that outweigh any harm to competition and diversity; and (4) there is no other willing buyer and that the station would only sell to an out-of-market buyer at an artificially depressed price).

[327] *See* 47 C.F.R. § 73.3555, note 7 (applying presumption where the "applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA"); *Local Ownership Order* at 12938 ¶ 79.

[328] *See Local Ownership Order* at 12938 ¶ 79.

[329] *Id.* at 12939 ¶ 79.

[330] *Id.*

[331] *Id.*

113

**App.155**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

## VI. THE NATIONAL AUDIENCE REACH OF COMBINED NEXSTAR WILL EXCEED THE NATIONAL CAP AND THE COMMISSION SHOULD WAIVE THE RULE, AS NECESSARY

The National Cap generally prohibits the transfer of a license for a commercial television broadcast station if the transfer will result in the transferee having an attributable interest in television stations that reach greater than 39% of the national audience.[332] In calculating an interest holder's total ownership, the Commission's rules reduce the population allotted to a UHF television station by 50%.[333] Further, no market shall be counted more than once (even if the transferee owns or would own multiple stations in that market).[334] Post-Transaction, Nexstar will serve 54.5% of the national audience, as calculated in accordance with the FCC's rules based on TV household data from The Nielsen Company (US), LLC, and seeks a waiver, to the extent the National Cap remains in effect at the time of grant, to permit closing of the Transaction.[335]

As explained in Section IV.C. above, the Commission may waive its rules where there is "good cause" taking into account "considerations of hardship, equity, or more effective implementation of overall policy."[336] Good cause supporting a waiver exists where the relief requested will not

---

[332] *See* 47 C.F.R. § 73.3555(e)(1).

[333] *See id.* § 73.3555(e)(2)(i).

[334] *See id.* § 73.3555(e)(2)(ii).

[335] Nexstar has addressed the Commission's statutory authority to eliminate the National Cap and provided a fulsome showing of why the National Cap no longer serves the public interest in comments and joint reply comments filed in the Commission's pending proceeding. *See* Comments of Nexstar Media Inc., MB Docket No. 17-318 (filed Aug. 4, 2025); Reply Comments of the Joint Broadcasters, MB Docket No. 17-318 (filed Aug. 22, 2025). Regardless of the outcome of that proceeding, waiver of the National Cap is warranted here because the FCC's approval of the Transaction would serve the public interest while application of the National Cap would result in tangible public interest harms.

[336] 47 C.F.R. § 1.3; *see, e.g.*, *WAIT Radio*, 418 F.2d at 1157, 1159; *1998 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Memorandum Opinion and Order, 17 FCC Rcd 6280 (2002) (granting waiver of National Cap); *Applications of Shareholders of CBS Corporation*, *(Transferor) and Viacom, Inc., (Transferee), et al.*, Memorandum Opinion and Order, 15 FCC Rcd 8230, 8236 ¶ 22 (2000) (same); *Applications of Stockholders of CBS Inc. (Transferor) and Westinghouse Electric Corporation (Transferee), et al.*, Memorandum Opinion and Order, 11 FCC Rcd 3733, 3775 ¶ 94 (1995) (same); *see also, e.g.*, *Applications of Capital Cities/ABC, Inc. (Transferor) and The Walt Disney Company (Transferee), et al.*, Memorandum Opinion and Order, 11 FCC Rcd 5841, 5851 ¶ 6 (1996) (granting waivers of newspaper/broadcast cross-ownership rule); *Applications of Midwest Communications, Inc. (Assignor) and CBS Inc. (Assignee), et al.*, Memorandum Opinion and Order, 7 FCC Rcd 159, 160 ¶ 6 (1991) (granting waiver of national radio ownership rule).

undermine the policy objective of the rule in question and will otherwise serve the public interest.[337] Those factors are present here.

The Commission determined more than forty years ago that diversity is "irrelevant" to the National Cap and that, even if a nationwide geographic area were appropriate, there were by that time an "enormous" number of media outlets providing viewpoint diversity.[338] The FCC similarly found in 1984 that, even considering television stations standing alone, elimination of the rule could result in no competitive harm at the national level.[339] Further, the D.C. Circuit found more than twenty years ago that the FCC had "adduced not a single valid reason to believe" the National Cap is necessary to serve any of the agency's public interest goals.[340] As to localism, the Commission has long recognized that there is no evidence indicating that stations which are not group-owned better respond to community needs or expend proportionately more of their revenues on local programming.[341] The National Cap in fact diminishes localism by constraining the ability of group station owners to put their resources into providing local content in additional markets.[342]

Nexstar has a proven history of improving service to the public when adding stations to its portfolio. Moreover, as demonstrated in Section IV, the Transaction will deliver specific benefits in each of the new DMAs where Nexstar will operate by shoring up the long term viability of those stations, fueling Nexstar's ability to continue investing in fact-based, independent journalism in the face of the substantial challenges posed by national and global competitors.

The acquired TEGNA stations will gain access to Nexstar's Washington, D.C. Bureau and state capitol bureaus, providing viewers with access to important political and other news provided through a local lens that they lack today. Both Nexstar and TEGNA stations will benefit from their ability to share coverage across stations and markets. For example, Nexstar's annual College Football Preview pools coverage from Nexstar's markets across the country to provide some of the most comprehensive coverage of the college football landscape available on any medium. Nexstar's acquisition of TEGNA will improve this coverage by adding additional reporting from TEGNA stations, including those in major college football markets like Seattle, Louisville, and Tucson where Nexstar has no presence today, while providing TEGNA stations access to this reporting and any other sports reporting from markets in which it does not have a presence.

---

[337] *See supra* Section IV.B.

[338] *Amendment of Section 73.3555 [formerly Sections 73.35, 73.240, and 73.636] of the Commission's Rules Relating to Multiple Ownership of AM, FM, and Television Broadcast Stations*, Report and Order, 100 FCC 2d 17, 27 ¶¶ 31–33 (1984) ("*1984 Multiple Ownership Order*"), *recon. granted in part*, Memorandum Opinion and Order, 100 FCC 2d 74 (1985), *recon. dismissed*, Order, 5 FCC Rcd 5338 (1990).

[339] *1984 Multiple Ownership Order*, 100 FCC 2d at 42–43 ¶ 73.

[340] *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1043 (D.C. Cir.), *reh'g granted in part on other grounds*, 293 F.3d 537 (D.C. Cir. 2002).

[341] *1984 Multiple Ownership Order*, 100 FCC 2d at 35 ¶ 53.

[342] *2002 Biennial Review Order* at 13841 ¶ 575.

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Depriving Nexstar of the ability to maintain and grow its local news and other programming undermines viewpoint diversity just as much as it undermines localism by increasing the likelihood that local broadcast stations will be replaced by automated and filtered non-local content provided by Big Tech. In addition, allowing Nexstar to achieve increased scale is urgently needed to improve its competitive standing in the national market for programming. For example, premium live sports rights are the single most valuable programming asset for retaining audience share and advertiser interest, but sports have migrated away from broadcast to new subscription-based entrants that operate without regulatory limits on national reach or ownership.[343]

Ultimately, the Transaction will enhance localism by allowing Nexstar to build upon the model currently employed by both Nexstar and TEGNA of developing strong local stations that are responsive to the needs of their communities and supporting them with the regional and national programming and journalistic resources that can only come with enhanced scale. Accordingly, the Commission should waive the National Cap to the extent needed to facilitate the benefits of the Transaction.

## VII.    PENDING APPLICATIONS AND CUT OFF RULES

The applicants separately will file applications in the appropriate bureaus requesting Commission consent for the transfer of control of the TEGNA subsidiaries' earth station, microwave, and land mobile facilities. It is intended that the applications filed in connection with the Transaction include all licenses and other authorizations held by the respective TEGNA subsidiaries. TEGNA's license subsidiaries may now have on file, and may hereafter file, additional requests for authorizations for new or modified facilities that may be granted before the Commission acts on the above-described transfer/assignment applications. Accordingly, the applicants request Commission approval of the applications filed in connection with the Transaction include: (1) any authorization issued to TEGNA or any of its subsidiaries while the Transaction is pending before the Commission and during the period required for consummation of the Transaction, and (2) any applications filed by TEGNA or any of its subsidiaries that are pending at the time of consummation. Inclusion of authorizations issued while the Transaction is pending and during the consummation period, and applications pending at the time of consummation, are consistent with prior Commission decisions.[344]

---

[343] Examples include YouTube's multi-billion-dollar NFL Sunday Ticket deal; Amazon's exclusive NFL Thursday Night Football package; Netflix's deals for NFL and WWE Raw; and Apple's MLB and MLS rights acquisitions. Given their unregulated status, streamers can aggregate massive subscriber and advertiser bases and pour unprecedented sums into bidding for sports rights. Their budgets and willingness to overpay for exclusivity are displacing broadcasters from rights that historically drove both audience and ad revenue, but allowing Nexstar to achieve greater scale will help it to compete for this highly valuable programming.

[344] *See, e.g.*, *Applications of AT&T Inc. and Cellco Partnership d/b/a Verizon Wireless For Consent to Assign or Transfer Control of Licenses and Authorizations and Modify a Spectrum Leasing Arrangement*, Memorandum Opinion and Order, 25 FCC Rcd 8704, 8773 ¶ 165 (2010); *Applications of AT&T Wireless Services, Inc. and Cingular Wireless Corp. For Consent to*

116

**App.158**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Additionally, pursuant to Sections 1.927(h), 1.929(a)(2), and 1.933(b) of the Commission's Rules, to the extent necessary, Nexstar requests a blanket exemption from any applicable cut-off rules in cases where Nexstar files amendments to pending applications in order to reflect consummation of the proposed Transaction so that such amendments are not treated as disqualifying amendments. The nature of the proposed Transaction demonstrates that the ownership changes would not be made for the purpose of acquiring any particular pending application, but as part of a larger transaction undertaken for an independent and legitimate business purpose. Grant of this request is consistent with prior Commission decisions that routinely have granted a blanket exemption in cases involving multiple-license transactions.[345]

---

*Transfer Control of Licenses and Authorizations, et al.*, Memorandum Opinion and Order, 19 FCC Rcd 21522, 21626 ¶ 275 (2004).

[345] *See, e.g., Applications of PacifiCorp Holdings, Inc. and Century Telephone Enterprises, Inc. for Consent to Transfer Control of Pacific Telecom, Inc, a Subsidiary of PacifiCorp Holdings, Inc*, Memorandum Opinion and Order, 13 FCC Rcd 8891, 8915–16 ¶ 47 (1997); *Applications of NYNEX Corp., Transferor, and Bell Atlantic Corp., Transferee, For Consent to Transfer Control of NYNEX Corp. and Its Subsidiaries*, Memorandum Opinion and Order, 12 FCC Rcd 19985, 20092 ¶ 234 (1997).

117

**App.159**

**REDACTED - FOR PUBLIC INSPECTION**
Form 2100, Schedule 315
Comprehensive Exhibit

**ATTACHMENTS A-1 AND A-2**
**PRE- AND POST-MERGER STRUCTURES**

**REDACTED - FOR PUBLIC INSPECTION**

FCC Form 315
November 2025
Attachment A-1

## Pre-Merger Corporate Structures



**REDACTED - FOR PUBLIC INSPECTION**

FCC Form 315
November 2025
Attachment A-2

**Combined Post-Merger Corporate Structure**



REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

**ATTACHMENT B**
**PUBLIC INTEREST SHOWING FOR**
**DMAS WITH TWO TOP FOUR STATIONS**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

1. **Sacramento-Stockton-Modesto, CA**

In this DMA (the "Sacramento DMA"), Nexstar is the licensee of KTXL, Sacramento, California (FOX/Antenna TV), the third-ranked station in the DMA when considering the P25–54 demographic or the fourth-ranked station in the DMA when considering the total household demographic. TEGNA is the licensee of KXTV, Sacramento, California (ABC), the fifth-ranked station in the DMA when considering the P25–54 demographic or the third-ranked station in the DMA when considering the total household demographic.[346] Nexstar's ownership of two stations in this DMA complies with the Local TVO Rule.

Following the Transaction, nine other full power television stations will continue to serve the Sacramento DMA. Several of these stations broadcast local news, as does KCSO-LD, the Telemundo affiliate in the Sacramento DMA.

In terms of ratings, according to the Nielsen Ratings Data for the key P25–54 advertising demographic, the top station in the market is Hearst-owned KCRA-TV (NBC/MyNetworkTV), followed by CBS-owned KOVR (CBS), KTXL, KUVS-DT (Univision), KXTV, KMAX-TV (Independent), KQCA (CW), KTFK-DT (UniMás), and others. Due to the large Hispanic population in the Sacramento DMA, Univision affiliate KUVS-DT competes directly with the affiliates of the Big Four networks. The ratings shift considerably when considering total households. There, Hearst-owned KCRA-TV and CBS-owned KOVR remain the top two stations, but KXTV moves from fifth to third, followed by KTXL, KMAX-TV, KUVS-DT, KQCA, KVIE (PBS), KSPX-TV (ION), and others. Top-ranked KCRA-TV's total household share ███████ ██████████ of KXTV and KXTL ████████████████████. In terms of advertising revenue, according to the BIA OTA Data, KCRA-TV is the dominant station in the market with a ██ share in 2024, ██████████████████ of KXTV and KTXL. Indeed, KTXL's revenue share has declined steadily over the past five years. Television stations in the Sacramento DMA compete for advertising revenue not only with each other, but with cable providers including Altice, Astound, Charter, and Comcast, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Sacramento DMA declined by ████████ (███), from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ████████ (███), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of total local advertising spend in the market declined from ██ to ██.

Top line revenue figures mask the underlying trends facing stations like KXTV and KTXL. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the

---

[346] The Local TVO Rule does not specify which demographic to use, *See* 47 C.F.R. § 73.3555(b)(1)(ii) (specifying only "the Sunday to Saturday, 7AM to 1AM daypart audience share from ratings averaged over a 12-month period immediately preceding the date of application"). The reference in the rule to "any comparable professional, accepted audience ratings service" indicates that the Commission intended for its application to be flexible. *Id.*

1

**App.164**

ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels.

Meanwhile, the need for trustworthy news and information provided by KXTV and KTXL has never been greater. At a time when political bias is rampant and opinion too frequently masquerades as news, KXTV and KTXL stand out for their commitment to delivering independent news and information to residents in the Sacramento DMA. The most recent Ad Fontes Media Bias and Reliability Ratings, confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, KXTV and KTXL must find a way to combat declining viewership and revenues. Combining KXTV and KTXL under a common owner will provide these stations with the scale needed in the Sacramento DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of KXTV and KTXL will position these stations to better compete for advertising revenue in the Sacramento DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on KXTV and KTXL with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Sacramento DMA, including other highly ranked television stations offering a broad reach, the Transaction will place KXTV and KTXL in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's KXTV by supplementing the station's already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, KXTV will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Sacramento DMA. With a Washington Bureau reporter assigned specifically to the Sacramento DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

As a result of the Transaction, TEGNA and Nexstar stations throughout California will receive expanded coverage of news from the Governor's office, the state legislature, and state agencies through the resources of Nexstar's California state capital bureau. Nexstar added this bureau in 2017, following Nexstar's acquisition of Media General. With the added resources of KXTV, this bureau will be able to provide even stronger coverage of state government matters that directly affect the lives of viewers in the Sacramento DMA and throughout the state.

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Additionally, the Transaction will make KXTV and KTXL stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, KXTV and KTXL will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Sacramento DMA.

The Transaction will allow Nexstar to include KXTV in the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[347] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[348] KXTV's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Sacramento DMA and provide new revenue opportunities for KXTV.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Sacramento DMA, Nexstar supports community organizations in their work to deliver meals to hungry families, support at-risk-youth and young adults, and replenish dwindling blood supplies, among other initiatives. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Sacramento DMA Stations to create even more meaningful engagement with residents and issues unique to Sacramento, in furtherance of the public interest.

As described above, the Transaction will provide KXTV and KTXL with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. Accordingly, common ownership of KXTV and KTXL would serve the public interest, convenience, and necessity.

2.    **Austin, TX**

In this DMA, Nexstar is the licensee of KXAN-TV, Austin, Texas (NBC/ION), the top-ranked station in the DMA, and TEGNA is the licensee of KVUE, Austin, Texas (ABC/Estrella TV), the second-ranked station in the DMA. Nexstar is also the licensee of KBVO, Llano, Texas, which

---

[347] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[348] *Id.*

3

**App.166**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

operates as an authorized satellite of KXAN-TV.[349] Nexstar's ownership of two stations and one satellite station in this DMA complies with the Local TVO Rule.

Following the transaction, five other full power television stations will continue to serve the Austin DMA. Several of these stations broadcast local news, as does KTFO-CD, the UniMás affiliate in the Austin DMA.

According to the Nielsen Ratings Data, competition for viewership is strong among broadcast television stations in the Austin DMA. KXAN-TV is the top-rated station in the DMA followed by KVUE, KEYE-TV (CBS/Telemundo), KTBC (FOX), KAKW-DT (Univision), KLRU (PBS), KNVA (CW), KBVO, and KTFO-CD (UniMás). Due to the large Hispanic population in the DMA, Univision affiliate KAKW-DT competes directly with the affiliates of the Big Four networks. Indeed, all five of the top-ranked stations have shares ███████. In terms of advertising revenue, according to the BIA OTA Data, the market is also highly competitive, with six stations ████████████ in advertising revenue in 2024. While KXAN-TV leads the market, its share has declined over the past five years while Univision affiliate KAKW-DT has seen its share increase by ██████.

Television stations in the Austin DMA compete for advertising revenue not only with each other, but with cable providers including Altice, Astound, Cable One, Charter, Guadalupe Valley Communications, Hotwire, and Vyve Broadband, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Austin DMA declined by ████████ (███) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ████████ (████), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ███ to ██.

Top line revenue figures mask the underlying trends facing stations like KXAN-TV and KVUE. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels.

KXAN-TV and KVUE stand out for their commitment to delivering independent news and information to residents in the Austin DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, KXAN-TV and KVUE must find a way to combat declining viewership and revenues. Combining KXAN-TV and KVUE under a common owner will provide these stations with the scale needed in the Austin DMA to take on the technology and media companies that are siphoning revenue away from local stations.

---

[349] *See Media General 2017 MO&O* at 200 ¶ 46 (2017). In addition, Nexstar is the broker pursuant to a grandfathered time brokerage agreement for KNVA, Austin, Texas.

4

**App.167**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Common ownership of KXAN-TV and KVUE will position these stations to better compete for advertising revenue in the Austin DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on KXAN-TV and KVUE with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Austin DMA, including other highly ranked television stations offering a broad reach, the Transaction will place KXAN-TV and KVUE in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's KVUE by supplementing the station's already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, KVUE will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Austin DMA. With a Washington Bureau reporter assigned specifically to the Austin DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else. This model has allowed Nexstar's stations to break stories and broadcast exclusive interviews relevant to specific markets, including a recent interview with Senator Ted Cruz and the Texas teenager behind the *Take It Down Act* (imposing stricter penalties for distribution of nonconsensual intimate imagery, or revenge porn).

As a result of the Transaction, TEGNA and Nexstar stations throughout Texas will receive expanded coverage of news from the Governor's office, the state legislature, and state agencies through the resources of Nexstar's Texas state capital bureau. With the added resources of KVUE, this bureau will be able to provide even stronger coverage of state government matters that directly affect the lives of viewers in the Austin DMA and throughout the state.

Additionally, the Transaction will make KXAN-TV and KVUE stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, KXAN-TV and KVUE will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Austin DMA.

The Transaction will enhance the efforts of Nexstar and TEGNA to keep local sports free for viewers in the Austin DMA. Nexstar has partnered with the Texas Rangers to broadcast at least 15 regular season games and four spring training games on KBVO and 16 other stations in Texas, Oklahoma, Arkansas, and Louisiana. This arrangement makes Rangers games available for free,

5

**App.168**

**REDACTED - FOR PUBLIC INSPECTION**
Form 2100, Schedule 315
Comprehensive Exhibit

over the air, and without the need for fans to subscribe to cable or a paid streaming service to support an in-state team with a significant following in the Austin DMA.[350] While live sporting events are popular with viewers and provide a significant public benefit, sports rights are expensive, and the Transaction will provide Nexstar with the scale in the Austin DMA to continue, if not expand, the broadcast of live sporting events.

The Transaction will allow Nexstar to expedite KVUE's transition to ATSC 3.0 and provide KVUE access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[351] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[352] KVUE's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Austin DMA, where KXAN-TV already broadcasts an ATSC 3.0 signal, and provide new revenue opportunities for KVUE.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Austin DMA, Nexstar's KXAN-TV participated in the Central Texas Food Bank's Friendsgiving Food Drive, raising $174,573—122% of the station's goal.[353] KXAN-TV also helped raise $1,000,000 for the Boys and Girls Club and participates in various other initiatives including the American Heart Association's Heart Ball, Cycle Nation, and Heart Walk events, and the Founders' Day event for Marbridge, a local residential facility for adults with cognitive disabilities.[354] As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Austin DMA Stations to create even more meaningful engagement with residents and issues unique to Austin, in furtherance of the public interest.

As described above, the Transaction will provide KXAN-TV and KVUE with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the

---

[350] *See* Nexstar-Rangers Press Release.

[351] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[352] *Id.*

[353] *See* Jaclyn Ramkissoon, *2024 Friendsgiving Challenge: Over $174,000 Raised for Central Texas Food Bank*, KXAN-TV (Nov. 1, 2024), https://tinyurl.com/4sbznf27.

[354] *See e.g.*, Kate Winkle, *Why KXAN is spending the day at Marbridge for "Founders Day of Caring,"* KXAN-TV (June 14, 2024), https://tinyurl.com/mr3jh3ty.

6

**App.169**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

future. Accordingly, common ownership of KXAN-TV and KVUE would serve the public interest, convenience, and necessity.

### 3.    Columbus, OH

In this DMA, TEGNA is the licensee of WBNS-TV, Columbus, Ohio (CBS), the second-ranked station in the DMA, and Nexstar is the licensee of WCMH-TV, Columbus, Ohio (NBC/ION), the third-ranked station in the DMA. Nexstar's ownership of two stations in this DMA complies with the Local TVO Rule.

Following the Transaction, seven other full power television stations will continue to serve the Columbus DMA. Several of these stations broadcast local news.

According to the Nielsen Ratings Data, when accounting for both primary and multicast streams, Sinclair-owned WSYX (ABC/FOX) is the top-rated station in the DMA, followed by WBNS-TV, WCMH-TV, WWHO (CW), WOSU-TV (PBS), WSFJ-TV (Bounce), WTTE (Independent), WOUB-TV (PBS), WCBZ-CD (COZI), WQMC-LD (Independent/Telemundo), and WCSN-LD (Independent). On an individual stream basis, WBNS-TV's CBS network affiliated stream ranks first followed by WSYX's ABC network affiliated stream, WCMH-TV's NBC network affiliated stream, and WSYX's FOX network affiliated stream. Television stations in the Columbus DMA compete for advertising revenue not only with each other, but with cable providers including Armstrong Utilities, Breezeline, Charter, Falcon 1, Frontier, and Shenandoah Cable, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Columbus DMA declined by ▮▮▮▮▮ (▮▮) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ▮▮▮▮▮ (▮▮▮), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ▮▮ to ▮.

Top line revenue figures mask the underlying trends facing stations like WBNS-TV and WCMH-TV. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels.

WBNS-TV and WCMH-TV stand out for their commitment to delivering independent news and information to residents in the Columbus DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, WBNS-TV and WCMH-TV must find a way to combat declining viewership and revenues. Combining WBNS-TV and WCMH-TV under a common owner will provide these stations with the scale needed in the Columbus DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of WBNS-TV and WCMH-TV will position these stations to better compete for advertising revenue in the Columbus DMA. The combined entity will be able to offer more

7

**App.170**

attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on WBNS-TV and WCMH-TV with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Columbus DMA, including other highly ranked television stations offering a broad reach, the Transaction will place WBNS-TV and WCMH-TV in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's WBNS-TV by supplementing the station's already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, WBNS-TV will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Columbus DMA. With a Washington Bureau reporter assigned specifically to the Columbus DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

As a result of the Transaction, TEGNA and Nexstar stations throughout Ohio will receive expanded coverage of news from the Governor's office, the state legislature, and state agencies through the resources of Nexstar's Ohio state capital bureau. With the added resources of WBNS-TV, this bureau will be able to provide even stronger coverage of state government matters that directly affect the lives of viewers in the Columbus DMA and throughout the state.

Additionally, the Transaction will make WBNS-TV and WCMH-TV stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, WBNS-TV and WCMH-TV will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Columbus DMA.

The Transaction will allow Nexstar to expedite WBNS-TV's transition to ATSC 3.0 and provide WBNS-TV access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[355] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[356] WBNS-TV's access to the network will increase the amount of

---

[355] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[356] *Id.*

8

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

spectrum available for Broadcast Internet services in the Columbus DMA, where WCMH-TV already broadcasts an ATSC 3.0 signal, and provide new revenue opportunities for WBNS-TV.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Columbus DMA, Nexstar's WCMH-TV helped raise approximately $250,000 in 2024 for its 46th annual Firefighters for Kids Toy Drive, which collects toys, gift cards, and monetary donations for local children.[357] Additionally, WCMH-TV partnered with Urban One and United Way of Central Ohio to provide 2,500 families with turkeys and sides for Thanksgiving.[358] Moreover, WCMH-TV's "Stuff The Backpack" school supply drive achieved a milestone year in 2024, collecting and distributing more than 20,000 backpacks, bringing the total number of backpacks distributed to 200,000 since the initiative began in 2018.[359] As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Columbus DMA Stations to create even more meaningful engagement with residents and issues unique to Columbus, in furtherance of the public interest.

As described above, the Transaction will provide WBNS-TV and WCMH-TV with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. Accordingly, common ownership of WBNS-TV and WCMH-TV would serve the public interest, convenience, and necessity.

### 4.    Harrisburg-Lancaster-Lebanon-York, PA

In this DMA (the "Harrisburg DMA"), Nexstar is the licensee of WHTM-TV, Harrisburg, Pennsylvania (ABC/ION), the third-ranked station in the Harrisburg DMA, and TEGNA is the licensee of WPMT, York, Pennsylvania (FOX), the fourth-ranked station in the Harrisburg DMA. Nexstar's ownership of two stations in this DMA complies with the Local TVO Rule.

Following the Transaction, five other television stations will continue to serve the Harrisburg DMA. Several stations in the Harrisburg DMA broadcast local news.

---

[357] *See* WCMH-TV, *2024 Firefighters 4 Kids Toy Drive*, https://tinyurl.com/ycxt2vz9 (last visited Nov. 11, 2025).

[358] *See* WCMH-TV, *'Thanksgiving Back' turkey drive with NBC4 and Urban One to Give Out 2,500 Turkeys Over 3 Days*, https://tinyurl.com/3cnr2pcf (last visited Nov. 11, 2025).

[359] *See* WCMH-TV, *NBC4's Stuff the Backpack Passes 200,000 Milestone* (Aug. 21, 2024), https://tinyurl.com/6afwyxfe.

9

**App.172**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is Hearst-owned WGAL (NBC/MeTV), followed by Sinclair-owned WHP-TV (CBS/Independent/CW), WHTM-TV, WPMT, WITF-TV (PBS), WLYH (Independent), and WXBU (Univision). The Harrisburg DMA is unique, because it includes the presence of a single dominant station—Hearst-owned WGAL—that is historically entrenched in that position and dominates in every relevant metric. WGAL's total television household share is greater than ███████████ of WHTM-TV and WPMT.

In terms of revenue, according to the BIA OTA Data, WGAL maintains a dominant share of OTA advertising revenue in the Harrisburg DMA, reaching ████ in 2024. The combined advertising revenue of both WHTM-TV and WPMT is ███████ this amount. Television stations in the Harrisburg DMA compete for advertising revenue not only with each other, but with stations providing significantly viewed signals from three adjacent DMAs, cable providers including Armstrong Utilities, Blue Ridge Cable Technologies, Breezeline, Comcast, Shenandoah Cable Television, Verizon, and Zito Media, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Harrisburg DMA declined by ███ ██████ (██) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ██████████ (██), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ███ to ██.

Top line revenue figures mask the underlying trends facing stations like WPMT and WHTM-TV. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. The challenge is particularly daunting in the Harrisburg DMA due to its coverage of four geographically separate population centers in four distinct counties, which requires a significant commitment of resources to serve the entire DMA.

WPMT and WHTM-TV stand out for their commitment to delivering independent news and information to residents in the Harrisburg DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, WPMT and WHTM-TV must find a way to combat declining viewership and revenues. Combining WPMT and WHTM-TV under a common owner will provide these stations with the scale, resources, and staffing needed to maintain a commitment to serving the many communities contained within the Harrisburg DMA and to take on technology and media companies that are siphoning revenue away from local stations.

Common ownership of WPMT and WHTM-TV will position these stations to better compete for advertising revenue in the Harrisburg DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on WPMT and

10

**App.173**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

WHTM-TV with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Harrisburg DMA, including other highly ranked television stations offering a broad reach, the Transaction will place WPMT and WHTM-TV in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's WPMT by supplementing the station's already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, WPMT will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Harrisburg DMA. With a Washington Bureau reporter specifically assigned to the Harrisburg DMA, Nexstar's reporting reflects the unique needs of each community encompassed within the DMA while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

As a result of the Transaction, TEGNA and Nexstar stations throughout Pennsylvania will receive expanded coverage of news from the Governor's office, the state legislature, and state agencies through the resources of Nexstar's Pennsylvania state capital bureau. With the added resources of WPMT, this bureau will be able to provide even stronger coverage of state government matters that directly affect the lives of viewers in the Harrisburg DMA and throughout the state.

Additionally, the Transaction will make WPMT and WHTM-TV stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, WPMT and WHTM-TV will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Harrisburg DMA.

The Transaction will allow Nexstar to expedite WPMT's transition to ATSC 3.0 and provide WPMT access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[360] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[361] WPMT's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Harrisburg DMA, where WHTM-TV already broadcasts an ATSC 3.0 signal, and provide new revenue opportunities for WPMT.

---

[360] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[361] *Id.*

11

**App.174**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Harrisburg DMA, Nexstar's WHTM-TV sponsored the Vickie's Angels Walk, a fundraiser to support cancer survivors in recovery, emceed by WHTM-TV anchor Valerie Pritchett.[362] WHTM-TV also helped raise over $5 million for "Give Local York," a campaign dedicated to facilitating community members' donations to area charities.[363] Additionally, on June 20, 2025, WHTM-TV celebrated its Founders Day by filling hygiene kits for the United Way of the Capital Region's initiatives, cleaning the facilities at the Humane Society of Harrisburg, and making craft kits for children in hospitals for Caitlin's Smiles.[364] As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Harrisburg DMA Stations to create even more meaningful engagement with residents and issues unique to Harrisburg, in furtherance of the public interest.

As described above, the Transaction will provide WPMT and WHTM-TV with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. Accordingly, common ownership of WPMT and WHTM-TV would serve the public interest, convenience, and necessity.

5.    **Greensboro-High Point-Winston Salem, NC**

In this DMA (the "Greensboro DMA"), TEGNA is the licensee of WFMY-TV, Greensboro, North Carolina (CBS), the second-ranked station in the DMA, and Nexstar is the licensee of WGHP, High Point, North Carolina (FOX/Antenna TV), the third-ranked station in the DMA. Allowing Nexstar to own both WFMY-TV and WGHP is in the public interest and would not create any countervailing harms.

Following the Transaction, seven other full power television stations will continue to serve the Greensboro DMA. Several of these stations broadcast local news.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is Hearst-owned WXII-TV (NBC), followed by WFMY-TV, WGHP, WXLV-TV (ABC), WGPX-TV (ION), and others. In terms of advertising revenue, according to the BIA OTA Data, the market is

---

[362] *See* Kaylee Lindenmuth, *Walk raises money to fight cancer in Midstate*, WHTM-TV (Oct. 13, 2024), https://tinyurl.com/v42ddwps.

[363] *See* WHTM-TV, *Give Local York 2024 Promo* (Apr. 18, 2024), https://tinyurl.com/2t8srchd (last visited Nov. 11, 2025).

[364] *See* WHTM-TV, *ABC27 WHTM-TV Gives Back During Nexstar's Founder's Day* (June 20, 2025), https://tinyurl.com/3fkrdmya.

12

**App.175**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

competitive, with four stations ▮▮▮▮▮▮▮ in advertising revenue share in 2024. Although WGHP garnered the third-highest advertising share, its share has been declining since 2020. Television stations in the Greensboro DMA compete for advertising revenue not only with each other, but with cable providers including ACTV Broadband, Charter, Comcast, Gridiron Fiber, Piedmont Communications Services, and SkyLine TMC, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Greensboro DMA declined by ▮▮▮▮ (▮▮) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ▮▮▮▮ (▮▮), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ▮▮ to ▮▮.

Top line revenue figures mask the underlying trends facing stations like WFMY-TV and WGHP. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. The challenge is particularly daunting in the Greensboro DMA due to its coverage of three geographically separate population centers, which requires a significant commitment of resources to serve the entire DMA.

WFMY-TV and WGHP stand out for their commitment to delivering independent news and information to residents in the Greensboro DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, WFMY-TV and WGHP must find a way to combat declining viewership and revenues. A 2021 Working Paper by economists in the FCC's OEA found that even in the more favorable economic environment for broadcasters in 2019 (before COVID shutdowns and the exponential growth of streaming services and social media as alternatives for video consumption), a DMA the size of Greensboro may only be able to support three local news operations.[365] Combining WFMY-TV and WGHP under a common owner will provide these stations with the scale needed in the Greensboro DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of WFMY-TV and WGHP will position these stations to better compete for advertising revenue in the Greensboro DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on WFMY-TV and WGHP with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Greensboro DMA, including other highly ranked television stations offering a broad reach, the Transaction will place WFMY-TV and WGHP in a much stronger

---

[365] *See* OEA Working Paper 52 at 4–5.

13

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's WFMY-TV by supplementing the station's already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, WFMY-TV will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Greensboro DMA. With a Washington Bureau reporter assigned specifically to the Greensboro DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else. For example, WGHP leveraged Nexstar's Washington Bureau to interview Senator Thom Tillis (R-N.C.) shortly after his June 2025 retirement announcement.

As a result of the Transaction, TEGNA's WFMY-TV will also gain access to Nexstar's North Carolina state capital bureau, which covers matters of interest from the Governor's office, the state legislature, and state agencies for Nexstar stations across North Carolina. Nexstar added coverage from Raleigh in 2019, following Nexstar's acquisition of Tribune Broadcasting. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will allow WFMY-TV to expand its coverage of meaningful proceedings in Raleigh that directly affect the lives of its viewers.

Additionally, the Transaction will make WFMY-TV and WGHP stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, WFMY-TV and WGHP will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Greensboro DMA.

The Transaction will allow Nexstar to expedite WFMY-TV's transition to ATSC 3.0 and provide WFMY-TV access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[366] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[367] WFMY-TV's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Greensboro DMA, where WGHP already broadcasts an ATSC 3.0 signal, and provide new revenue opportunities for WFMY-TV.

---

[366] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[367] *Id.*

14

**App.177**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Greensboro DMA, Nexstar's WGHP hosted its eighth annual Fox8 Community Baby Shower, collaborating with A Cleaner World and The Salvation Army to collect essential baby supplies including formula and diapers.[368] WGHP collected thousands of baby supplies, including more than 5,000 diapers. WGHP also raised more than $100,000 for the Signature Chef's Auction benefiting the March of Dimes and participates in various other community initiatives. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Greensboro DMA Stations to create even more meaningful engagement with residents and issues unique to Greensboro, in furtherance of the public interest.

As described above, the Transaction will provide WFMY-TV and WGHP with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. Accordingly, common ownership of WFMY-TV and WGHP would serve the public interest, convenience, and necessity.

6.    **Wilkes-Barre-Scranton-Hazelton, PA**

In this DMA (the "Wilkes-Barre DMA"), TEGNA is the licensee of WNEP-TV, Scranton, Pennsylvania (ABC), the top-ranked station in the DMA, and Nexstar is the licensee of WBRE-TV, Wilkes-Barre, Pennsylvania (NBC), the second-ranked station in the DMA. Allowing Nexstar to own both WNEP-TV and WBRE-TV is in the public interest and would not create any countervailing harms.

Following the Transaction, six other full power television stations will continue to serve the Wilkes-Barre DMA. Several stations in the Wilkes-Barre DMA broadcast local news.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is WNEP-TV, followed by WBRE-TV, WYOU (CBS/Independent), WQPX-TV (ION), WOLF-TV (FOX), WVIA-TV (PBS), WSWB (CW), WQMY (Independent), and WYLN-CD (Independent). Television stations in the Wilkes-Barre DMA compete for advertising revenue not only with each other, but with cable providers including Astound, Beaver Valley Cable, Blue Ridge Cable, Blue Ridge Cable Technologies, Breezeline, Charter, Comcast, Eagle Lake Cable TV, Hancel, Laurel Highland Television Company, NEP Datavision, Service Electric Cable T.V., Service Electric Cablevision, and Zito Media, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates

---

[368] *See* Justyn Araya DeBusk, *Join Us as We Help Local Moms with the 2024 FOX8 Community Baby Shower*, WGHP (Apr. 22, 2024), https://tinyurl.com/3m63bbx9.

15

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

that OTA television advertising revenue for the Wilkes-Barre DMA declined by ███████ (████) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by █████████ (████), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ██ to ██.

Top line revenue figures mask the underlying trends facing stations like WNEP-TV and WBRE-TV. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels.

WNEP-TV and WBRE-TV stand out for their commitment to delivering independent news and information to residents in the Wilkes-Barre DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, WNEP-TV and WBRE-TV must find a way to combat declining viewership and revenues. Combining WNEP-TV and WBRE-TV under a common owner will provide these stations with the scale needed in the Wilkes-Barre DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of WNEP-TV and WBRE-TV will position these stations to better compete for advertising revenue in the Wilkes-Barre DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on WNEP-TV and WBRE-TV with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Wilkes-Barre DMA, including other highly ranked television stations offering a broad reach, the Transaction will place WNEP-TV and WBRE-TV in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's WNEP-TV by supplementing the station's already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, WNEP-TV will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Wilkes-Barre DMA. With a Washington Bureau reporter assigned specifically to the Wilkes-Barre DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

16

**App.179**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

As a result of the Transaction, TEGNA's WNEP-TV will also gain access to Nexstar's Pennsylvania state capital bureau, which covers matters of interest from the Governor's office, the state legislature, and state agencies for Nexstar stations across Pennsylvania. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will allow WNEP-TV to expand its coverage of meaningful proceedings in Harrisburg that directly affect the lives of its viewers.

Additionally, the Transaction will make WNEP-TV and WBRE-TV stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, WNEP-TV and WBRE-TV will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Wilkes-Barre DMA.

The Transaction will allow Nexstar to expedite the transition of WBRE-TV and WNEP-TV to ATSC 3.0. WNEP-TV will also gain access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[369] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[370] WNEP-TV's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Wilkes-Barre DMA and provide new revenue opportunities for WNEP-TV.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Wilkes-Barre DMA, Nexstar's WBRE-TV produces several recurring news segments that highlight important causes within the Wilkes-Barre DMA, including "Veterans Views," which promotes resources for local veterans, "Opioid Crisis Awareness," and "Pet of the Week," which features pets available for adoption. Additionally, WBRE-TV participated in the Hunger Free Summer Food Drive, collecting 23,000 pounds of food for regional food banks. WBRE-TV also participates in various other initiatives including the Clear the Shelters initiative and Coats for Kids coat drive. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Wilkes-Barre DMA Stations to create even more meaningful engagement with residents and issues unique to Wilkes-Barre, in furtherance of the public interest.

---

[369] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[370] *Id.*

17

**App.180**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

As described above, the Transaction will provide WNEP-TV and WBRE-TV with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. Accordingly, common ownership of WNEP-TV and WBRE-TV would serve the public interest, convenience, and necessity.

7.    **Knoxville, TN**

In this DMA, TEGNA is the licensee of WBIR-TV, Knoxville, Tennessee (NBC), the top-ranked station in the DMA, and Nexstar is the licensee of WATE-TV, Knoxville, Tennessee (ABC), the third-ranked station in the DMA. Allowing Nexstar to own both WBIR-TV and WATE-TV is in the public interest and would not create any countervailing harms.

Following the Transaction, nine other full power television stations will continue to serve the Knoxville DMA. Several stations in the Knoxville DMA broadcast local news.

In terms of ratings, according to the Nielsen Ratings Data, the top station in the market is WBIR-TV, followed by WVLT-TV (CBS/Independent), WATE-TV, WTNZ (FOX), WPXK-TV (ION), WBXX-TV (CW/Telemundo), and others. Television stations in the Knoxville DMA compete for advertising revenue not only with each other, but with cable providers including Access Cable TV, Charter, Comcast, Highland Media, Holston Connect, Knoxville Utilities Board, Morristown Utility Systems, TDS Telecommunications, Twin Lakes Communications, Volunteer Wireless, Vyve Broadband, WideOpenWest, and Zito Media, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Knoxville DMA declined by ██████ (███) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ██████ (███), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ██ to ██.

Top line revenue figures mask the underlying trends facing stations like WBIR-TV and WATE-TV. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels.

WBIR-TV and WATE-TV stand out for their commitment to delivering independent news and information to residents in the Knoxville DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that WATE-TV serves as a politically balanced, reliable source of fact-based reporting.[371]

To sustain their investment in quality journalism, WBIR-TV and WATE-TV must find a way to combat declining viewership and revenues. Combining WBIR-TV and WATE-TV under a common owner will provide these stations with the scale needed in the Knoxville DMA to take on the technology and media companies that are siphoning revenue away from local stations.

---

[371] Ad Fontes has not rated WBIR-TV.

18

**App.181**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Common ownership of WBIR-TV and WATE-TV will position these stations to better compete for advertising revenue in the Knoxville DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on WBIR-TV and WATE-TV with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Knoxville DMA, including other highly ranked television stations offering a broad reach, the Transaction will place WBIR-TV and WATE-TV in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's WBIR-TV by supplementing the station's already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, WBIR-TV will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Knoxville DMA. With a Washington Bureau reporter assigned specifically to the Knoxville DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else.

As a result of the Transaction, TEGNA's WBIR-TV will also gain access to Nexstar's Tennessee state capital bureau, which covers matters of interest from the Governor's office, the state legislature, and state agencies for Nexstar stations across Tennessee. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will allow WBIR-TV to expand its coverage of meaningful proceedings in Nashville that directly affect the lives of its viewers.

Additionally, the Transaction will make WBIR-TV and WATE-TV stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, WBIR-TV and WATE-TV will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Knoxville DMA.

The Transaction will allow Nexstar to expedite the transition of WATE-TV and WBIR-TV to ATSC 3.0,.to ATSC 3.0. WBIR-TV will also gain access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[372] Nexstar's

---

[372] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

19

**App.182**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[373] WBIR-TV's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Knoxville DMA and provide new revenue opportunities for WBIR-TV.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Knoxville DMA, Nexstar's WATE-TV partnered with the MEDIC Regional Blood Center, Food City, and Knoxville Ice Bears to host the annual "Roll Up Your Sleeve Week" blood drive, which inspired more than 1,000 people to donate blood and help save lives in the community.[374] WATE-TV also participated in a day-long telethon event, "Operation Honor Guard," to raise more than $100,000 for East Tennessee's Honor Guard, which funds final tributes and military honors for veterans,[375] and has participated in numerous other initiatives. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Knoxville DMA Stations to create even more meaningful engagement with residents and issues unique to Knoxville, in furtherance of the public interest.

As described above, the Transaction will provide WBIR-TV and WATE-TV with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. Accordingly, common ownership of WBIR-TV and WATE-TV would serve the public interest, convenience, and necessity.

### 8.    Tyler-Longview (Lufkin & Nacogdoches), TX

In this DMA (the "Tyler-Longview DMA"), TEGNA is the licensee of KYTX, Nacogdoches, Texas (CBS/CW), the second-ranked station in the DMA, and Nexstar is the licensee of KETK-TV, Jacksonville, Texas (NBC/ION), the third-ranked station in the DMA. Allowing Nexstar to own both KETK-TV and KYTX is in the public interest and would not create any countervailing harms.

---

[373] *Id.*

[374] *See* Hannah Moore, *Where to Donate for MEDIC's Annual Roll Up Your Sleeve Week*, WATE-TV, (Jan. 19, 2024), https://tinyurl.com/yxjjkbav.

[375] *See* Hope McAlee, *Honor Guard Units Receive $100k+ Donated During 2024 Operation Honor Guard*, WATE-TV (Feb. 26, 2025), https://tinyurl.com/2bt8yue5.

20

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

Following the Transaction, three other full power television stations and a number of low power stations will continue to serve the Tyler-Longview DMA. Several stations in the Tyler-Longview DMA broadcast local news.

Gray-owned KLTV (ABC/Telemundo/Independent/Bounce) is the dominant station in the market by every relevant metric and provides strong competition for all of the other stations. In terms of ratings, according to the Nielsen Ratings Data, KLTV's ███ total household share nearly equals ████████████████████████████████ in the market and exceeds second-place KYTX's and third-place KETK-TV's ████████████████. Distantly following KETK-TV are KFXK-TV (FOX), Nexstar's KTPN-LD (Independent), and KCEB (Independent), each with shares of ███ ███.

In terms of advertising revenue, according to the BIA OTA Data, KLTV has claimed approximately ███ of the OTA advertising revenue in the market in each of the past five years, ████████████████████ of KETK-TV and KYTX. Television stations in the Tyler-Longview DMA compete for advertising revenue not only with each other, but with cable providers including Altice, Cable One, Charter, Vyve Broadband, and Wehco Video, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Tyler-Longview DMA declined by ████████ (███) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ████████ (███), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ███ to ███.

Top line revenue figures mask the underlying trends facing stations like KETK-TV and KYTX. A combination of declining subscribership to traditional MVPDs, network control over distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels. Journalistic coverage of the Tyler-Longview DMA is complicated by its four geographically separate population centers, with some located more than an hour away from each other, requiring a significant commitment of resources to serve the entire DMA.

KETK-TV and KYTX stand out for their commitment to delivering independent news and information to residents in the Tyler-Longview DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that KETK-TV and KYTX serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, KETK-TV and KYTX must find a way to combat declining viewership and revenues. A 2021 Working Paper by economists in the FCC's OEA found that even in the more favorable economic environment for broadcasters in 2019 (before COVID shutdowns and the exponential growth of streaming services and social media as alternatives for video consumption), a DMA the size of the Tyler-Longview DMA may only be able to support two local news operations.[376] Combining KETK-TV and KYTX under a common

---

[376] See OEA Working Paper 52 at 4–5.

21

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

owner will provide these stations with the scale needed in the Tyler-Longview DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of KETK-TV and KYTX will position these stations to better compete for advertising revenue in the Tyler-Longview DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on KETK-TV and KYTX with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Tyler-Longview DMA, including other highly ranked television stations offering a broad reach, the Transaction will place KETK-TV and KYTX in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's KYTX by supplementing the station's already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, KYTX will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Tyler-Longview DMA. With a Washington Bureau reporter assigned specifically to the Tyler-Longview DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else. This model has allowed Nexstar's stations to break stories and broadcast exclusive interviews relevant to specific markets, including a recent interview with Senator Ted Cruz and the Texas teenager behind the *Take It Down Act*.

As a result of the Transaction, TEGNA's KYTX will also gain access to Nexstar's Texas state capital bureau, which covers matters of interest from the Governor's office, the state legislature, and state agencies for Nexstar stations across Texas. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will allow KYTX to expand its coverage of meaningful proceedings in Austin that directly affect the lives of its viewers.

Additionally, the Transaction will make KETK-TV and KYTX stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, KETK-TV and KYTX will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Tyler-Longview DMA.

22

**App.185**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

The Transaction will enhance the efforts of Nexstar and TEGNA to keep local sports free for viewers in the Tyler-Longview DMA. Nexstar has partnered with the Texas Rangers to broadcast at least 15 regular season games and four spring training games on Nexstar's KTPN-LD and 16 other stations in Texas, Oklahoma, Arkansas, and Louisiana.[377] TEGNA, meanwhile, has an agreement with the Dallas Mavericks to broadcast all Mavericks games that are not exclusively on national television on several of TEGNA's Texas stations, including KYTX.[378] These arrangements make Rangers and Mavericks games available for free, over the air, and without the need for fans to subscribe to cable or a paid streaming service to support an in-state team with a significant following in the Tyler-Longview DMA. While live sporting events are popular with viewers and provide a significant public benefit, sports rights are expensive, and the Transaction will provide Nexstar with the scale in the Tyler-Longview DMA to continue, if not expand, the broadcast of live sporting events.

The Transaction will allow Nexstar to expedite the transition of KETK-TV and KYTX to ATSC 3.0. KYTX will also gain access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[379] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[380] KYTX's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Tyler-Longview DMA and provide new revenue opportunities for KYTX.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Tyler-Longview DMA, Nexstar's KETK-TV raised $12,000 for the 2024 Walk to End Alzheimer's with community partner the Alzheimer's Association.[381] KETK-TV also participates in numerous other initiatives, volunteering at the East Texas Food Bank to pack food for low-income seniors[382] and supporting the American Heart Association's Heart Ball. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Tyler-Longview DMA Stations to create even more

---

[377] *See* Nexstar-Rangers Press Release.

[378] *See* TEGNA-Mavericks Press Release.

[379] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[380] *Id.*

[381] *See* KETK-TV, *Tyler's Walk to End Alzheimer's* (Oct. 21, 2024), https://tinyurl.com/yc35v6d4.

[382] *See* KETK NBC, *KETK Volunteers at East Texas Food Bank for Founder's Day 2025*, (YouTube, June 20, 2025), https://tinyurl.com/3peuk9z7.

23

**App.186**

**REDACTED - FOR PUBLIC INSPECTION**
Form 2100, Schedule 315
Comprehensive Exhibit

meaningful engagement with residents and issues unique to Tyler-Longview, in furtherance of the public interest.

As described above, the Transaction will provide KETK-TV and KYTX with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. Accordingly, common ownership of KETK-TV and KYTX would serve the public interest, convenience, and necessity.

### 9.    Odessa-Midland, TX

In this DMA, TEGNA is the licensee of KWES-TV, Odessa, Texas (NBC), the third-ranked station in the DMA, and Nexstar is the licensee of KMID, Midland, Texas (ABC), the fifth-ranked station in the DMA when considering the P25–54 demographic or the fourth-ranked station in the DMA when considering the total household demographic. The Local TVO Rule does not specify which demographic to use.[383] Regardless, given the vacatur of the Top Four Prohibition, Nexstar's ownership of two stations in the DMA complies with the Local TVO Rule. Allowing Nexstar to own both KWES-TV and KMID is in the public interest and would not create any countervailing harms.

Following the Transaction, six other full power television stations will continue to serve the Odessa-Midland DMA. Several of these stations broadcast local news, as does KTLE-LD, the Telemundo affiliate in the Odessa-Midland DMA.

In terms of ratings, according to the Nielsen Ratings Data, for the key P25–54 advertising demographic, the top station in the market is Entravision-owned KUPB (Univision), followed by Gray-owned KOSA-TV (CBS), KTLE-LD (Telemundo/ION), KWES-TV, KMID, KPEJ-TV (FOX), and others. Due to the large Hispanic population in the DMA, Univision affiliate KUPB competes directly with the affiliates of the Big Four networks. The ratings reflect a significant shift when considering total households. There, Gray-owned KOSA-TV is the top-rated station in the market followed by Entravision-owned KUPB, KWES-TV, KMID, KTLE-LD, KPEJ-TV, KCWO-TV (CW), KWWT (Independent/MeTV), and others.

Television stations in the Odessa-Midland DMA compete for advertising revenue not only with each other, but with cable providers including Altice, Astound, Cable One, TDS Telecommunications, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Odessa-Midland DMA declined by ███████ (██) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ███████ (██), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ██ to ██.

Top line revenue figures mask the underlying trends facing stations like KWES-TV and KMID. A combination of declining subscribership to traditional MVPDs, network control over distribution

---

[383] *See supra* note 346.

24

**App.187**

on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels.

KWES-TV and KMID stand out for their commitment to delivering independent news and information to residents in the Odessa-Midland DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that these stations serve as politically balanced, reliable sources of fact-based reporting.

To sustain their investment in quality journalism, KWES-TV and KMID must find a way to combat declining viewership and revenues. A 2021 Working Paper by economists in the FCC's OEA found that even in the more favorable economic environment for broadcasters in 2019 (before COVID shutdowns and the exponential growth of streaming services and social media as alternatives for video consumption), a DMA the size of Odessa may only be able to support two local news operations.[384] Combining KWES-TV and KMID under a common owner will provide these stations with the scale needed in the Odessa-Midland DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of KWES-TV and KMID will position these stations to better compete for advertising revenue in the Odessa-Midland DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on KWES-TV and KMID with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Odessa-Midland DMA, including other highly ranked television stations offering a broad reach, the Transaction will place KWES-TV and KMID in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's KWES-TV by supplementing the station's already strong local journalism with additional newsgathering resources. For example, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, KWES-TV will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Odessa-Midland DMA. With a Washington Bureau reporter assigned specifically to the Odessa-Midland DMA, Nexstar's reporting reflects the unique needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else. This model has allowed Nexstar's stations to break stories and broadcast exclusive interviews relevant to specific markets, including a recent interview with Senator Ted Cruz and the Texas teenager behind the *Take It Down Act*.

---

[384] *See* OEA Working Paper 52 at 4–5.

**App.188**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

As a result of the Transaction, TEGNA's KWES-TV will also gain access to Nexstar's Texas state capital bureau, which covers matters of interest from the Governor's office, the state legislature, and state agencies for Nexstar stations across Texas. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will allow KWES-TV to expand its coverage of meaningful proceedings in Austin that directly affect the lives of its viewers.

Additionally, the Transaction will make KWES-TV and KMID stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, KWES-TV and KMID will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Odessa-Midland DMA.

The Transaction will enhance the efforts of Nexstar and TEGNA to keep local sports free for viewers in the Odessa-Midland DMA. TEGNA has an agreement with the Dallas Mavericks to broadcast all Mavericks games that are not exclusively on national television on several of TEGNA's Texas stations, including KWES-TV.[385] This arrangement makes Mavericks games available for free, over the air, and without the need for fans to subscribe to cable or a paid streaming service to support an in-state team with a significant following in the Odessa-Midland DMA. While live sporting events are popular with viewers and provide a significant public benefit, sports rights are expensive, and the Transaction will provide Nexstar with the scale in the Odessa-Midland DMA to continue, if not expand, the broadcast of live sporting events.

The Transaction will allow Nexstar to expedite the transition of KMID and KWES-TV to ATSC 3.0. KWES-TV will also gain access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[386] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[387] KWES-TV's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Odessa-Midland DMA and provide new revenue opportunities for KWES-TV.

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve

---

[385] *See* TEGNA-Mavericks Press Release.

[386] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[387] *Id.*

26

**App.189**

REDACTED - FOR PUBLIC INSPECTION

Form 2100, Schedule 315
Comprehensive Exhibit

local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Odessa-Midland DMA, Nexstar in 2024 partnered with over a dozen local organizations to participate in events, raise funds, and promote community initiatives including the American Heart Association's Heart Walk/Go Red Day, the Boys & Girls Club Gala, and the Tall City Memorial Stair Climb honoring the first responders who gave their lives during the September 11th attacks. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Odessa-Midland DMA Stations to create even more meaningful engagement with residents and issues unique to Odessa-Midland, in furtherance of the public interest.

As described above, the Transaction will provide KWES-TV and KMID with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. Accordingly, common ownership of KWES-TV and KMID would serve the public interest, convenience, and necessity.

### 10. Abilene-Sweetwater, TX

In this DMA, Nexstar is the licensee of KTAB-TV, Abilene, Texas (CBS/Telemundo/ION), the top-ranked station in the DMA. TEGNA is the licensee of KXVA, Abilene, Texas (FOX), the fourth-ranked station in the DMA. Allowing Nexstar to own both KTAB-TV and KXVA is in the public interest and would not create any countervailing harms.

Following the Transaction, three other full power television stations and a number of low power television stations will continue to serve the Abilene-Sweetwater DMA. Several stations in the Abilene-Sweetwater DMA broadcast local news.

In terms of ratings, according to the Nielsen Ratings Data, KTAB-TV is the top-rated station in the market, followed by KTXS-TV (ABC/CW) and KRBC-TV (NBC/Bounce). KXVA is a distant fourth in the ratings with just a ████████. When accounting for the key P25–54 advertising demographic, however, KTXS-TV ranks first and outpaces KTAB-TV ████████████████ ████████████. In terms of advertising revenue, according to the BIA OTA Data, KXVA also trails well behind the other stations in the market with an ███ share, which is ███████████ ██████████████████, KTAB-TV. Television stations in the Abilene-Sweetwater DMA compete for advertising revenue not only with each other, but with cable providers including Altice, Astound, and Vyve Broadband, national DBS providers, multiple so-called "virtual MVPDs," and several large technology companies. This is evident from the BIA Ad Market Data, which indicates that OTA television advertising revenue for the Abilene-Sweetwater DMA declined by ████████ (███) from 2019 to 2025. At the same time, the total media advertising spend in the market increased by ████████ (████), led by growth in mobile, computers, and connected TV. Over this time frame, OTA television's share of the total local advertising spend in the market declined from ███ to ██.

Top line revenue figures mask the underlying trends facing stations like KTAB-TV and KXVA. A combination of declining subscribership to traditional MVPDs, network control over

27

**App.190**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

distribution on virtual MVPDs and other digital platforms, and falling core advertising revenue threaten the ability of these stations to continue to invest in local programming and, specifically, local journalism at current levels.

KTAB-TV and KXVA stand out for their commitment to delivering independent news and information to residents in the Abilene-Sweetwater DMA. The Ad Fontes Media Bias and Reliability Ratings confirm that KTAB-TV serves as a politically balanced, reliable source of fact-based reporting.[388]

To sustain their investment in quality journalism, KTAB-TV and KXVA must find a way to combat declining viewership and revenues. A 2021 Working Paper by economists in the FCC's OEA found that even in the more favorable economic environment for broadcasters in 2019 (before COVID shutdowns and the exponential growth of streaming services and social media as alternatives for video consumption), a DMA the size of the Abilene-Sweetwater DMA may only be able to support two local news operations.[389] Combining KTAB-TV and KXVA under a common owner will provide these stations with the scale needed in the Abilene-Sweetwater DMA to take on the technology and media companies that are siphoning revenue away from local stations.

Common ownership of KTAB-TV and KXVA will position these stations to better compete for advertising revenue in the Abilene-Sweetwater DMA. The combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms. This will provide advertisers on KTAB-TV and KXVA with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital. While advertisers will still have many options to advertise on broadcast in the Abilene-Sweetwater DMA, including other highly ranked television stations offering a broad reach, the Transaction will place KTAB-TV and KXVA in a much stronger position to compete in the market for local video and digital advertising, which is critical to sustain their investment in local journalism.

The Transaction will provide particular benefits to viewers of TEGNA's KXVA. Nexstar plans to expand the amount of news on KXVA, leveraging the award-winning KTAB news team, which earned two Regional Edward R. Murrow Awards and three Texas State Broadcasting Awards in 2025.[390] Moreover, although TEGNA operates a station in Washington, D.C., TEGNA does not have a separate Washington Bureau with resources dedicated to serving TEGNA's other stations. Following consummation of the Transaction, KXVA will gain access to Nexstar's Washington Bureau, which will provide in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the Abilene-Sweetwater DMA. With a Washington Bureau reporter assigned specifically to the Abilene-Sweetwater DMA, Nexstar's reporting reflects the unique

---

[388] Ad Fontes has not rated KXVA.

[389] *See* OEA Working Paper 52 at 4–5.

[390] *See* 2025 Murrow Awards Regional Winners; Press Release, Nexstar Media Group, Inc., *Nexstar Wins 17 Texas Broadcast News Awards* (Mar. 3, 2025), https://tinyurl.com/jdt4v25u.

28

**App.191**

needs of the community while allowing Nexstar's reporters to develop relationships with legislators, administration officials, and their staffs that produce entrepreneurial reporting not available anywhere else. This model has allowed Nexstar's stations to break stories and broadcast exclusive interviews relevant to specific markets, including a recent interview with Senator Ted Cruz and the Texas teenager behind the *Take It Down Act*.

As a result of the Transaction, TEGNA's KXVA will also gain access to Nexstar's Texas state capital bureau, which covers matters of interest from the Governor's office, the state legislature, and state agencies for Nexstar stations across Texas. While most broadcasters lack the resources to assign a dedicated reporter to cover news from the state capital, the Transaction will allow KXVA to expand its coverage of meaningful proceedings in Austin that directly affect the lives of its viewers.

Additionally, the Transaction will make KTAB-TV and KXVA stronger competitors in their coverage of major sporting events and events of local interest. Nexstar sends teams of journalists to major sporting events including the Super Bowl, the Olympics, the Daytona 500, NASCAR weekly races, March Madness, The Masters, the NFL Draft, Indy 500, and the College Football Playoffs. Nexstar is only able to provide this coverage because it can spread the cost of travel and remote broadcast facilities across multiple stations. As a result, KTAB-TV and KXVA will be able to expand their coverage beyond the events themselves to the unique angles relevant to viewers in the Abilene-Sweetwater DMA.

The Transaction will enhance the efforts of Nexstar and TEGNA to keep local sports free for viewers in the Abilene-Sweetwater DMA. TEGNA has an agreement with the Dallas Mavericks to broadcast all Mavericks games that are not exclusively on national television on several of TEGNA's Texas stations, including KXVA.[391] This arrangement makes Mavericks games available for free, over the air, and without the need for fans to subscribe to cable or a paid streaming service to support an in-state team with a significant following in the Abilene-Sweetwater DMA. While live sporting events are popular with viewers and provide a significant public benefit, sports rights are expensive, and the Transaction will provide Nexstar with the scale in the Abilene-Sweetwater DMA to continue, if not expand, the broadcast of live sporting events.

The Transaction will allow Nexstar to expedite the transition of KTAB-TV and KXVA to ATSC 3.0. KXVA will also gain access to the EdgeBeam Wireless network, which "will provide expansive, reliable, and secure data delivery services."[392] Nexstar's partnership with EdgeBeam Wireless "creates a spectrum footprint that no individual broadcaster could achieve on its own, unlocking the potential of ATSC 3.0 to offer nationwide coverage for data delivery to billions of potential devices on market-disrupting terms."[393] KXVA's access to the network will increase the amount of spectrum available for Broadcast Internet services in the Abilene-Sweetwater DMA and provide new revenue opportunities for KXVA.

---

[391] *See* TEGNA-Mavericks Press Release.

[392] Local Broadcasters ATSC 3.0 Joint January 2025 Press Release.

[393] *Id.*

**App.192**

**REDACTED - FOR PUBLIC INSPECTION**
Form 2100, Schedule 315
Comprehensive Exhibit

Historically, engagement by local stations with their communities—which enables them to better tailor programming that keeps local viewers and listeners safe, heard, and informed—has been foundational to the public interest standard. In each of its markets, Nexstar's stations are part of a critical infrastructure of community service—these stations not only broadcast vital local information, but their employees also are out in the community determining how best to serve local interests and how to utilize their local platforms to meaningfully connect and communicate. These efforts manifest not only on-air but in off-air actions that support neighbors in need.

For example, in the Abilene-Sweetwater DMA, Nexstar in 2024 partnered with over 17 local organizations to raise funds for various community initiatives, including the "Jackets for Joy" coat drive, "Santa's Helpers" toy drive, and blood drives supporting the Hendrick Blood Bank. As a result of the Transaction, Nexstar will leverage TEGNA's own culture of community service to use the combined resources and reach of the Abilene-Sweetwater DMA Stations to create even more meaningful engagement with residents and issues unique to Abilene-Sweetwater, in furtherance of the public interest.

As described above, the Transaction will provide KTAB-TV and KXVA with the resources to not only sustain the high quality, local journalism they deliver today, but to better serve viewers in the future. Accordingly, common ownership of KTAB-TV and KXVA would serve the public interest, convenience, and necessity.

30

**App.193**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

## SCHEDULE 1 – FCC LICENSES TO BE TRANSFERRED OR ASSIGNED

The following lists the broadcast licenses currently held by TEGNA through its direct and indirect licensee subsidiaries to be transferred:

| Licensee | Station | City of License | State of License | Facility ID |
|---|---|---|---|---|
| Belo TV, Inc. | WUPL(TV) | Slidell | LA | 13938 |
| Belo TV, Inc. | WBXN-CD | New Orleans | LA | 70419 |
| Cape Publications, Inc. | KFSM-TV | Fort Smith | AR | 66469 |
| Cape Publications, Inc. | KTHV(TV) | Little Rock | AR | 2787 |
| Combined Communications of Oklahoma, LLC | WZZM(TV) | Grand Rapids | MI | 49713 |
| KENS-TV, Inc. | KENS(TV) | San Antonio | TX | 26304 |
| KFMB-TV, LLC | KFMB-TV | San Diego | CA | 42122 |
| KHOU-TV, Inc. | KHOU(TV) | Houston | TX | 34529 |
| KHOU-TV, Inc. | KTBU(TV) | Conroe | TX | 28324 |
| KING Broadcasting Company | KING-TV | Seattle | WA | 34847 |
| KING Broadcasting Company | KREM(TV) | Spokane | WA | 34868 |
| KING Broadcasting Company | KTVB(TV) | Boise | ID | 34858 |
| KING Broadcasting Company | K15IO-D | McCall & New Meadows | ID | 34869 |
| KING Broadcasting Company | K16JE-D | Glenns Ferry | ID | 188132 |
| KING Broadcasting Company | K17KF-D | Cambridge | ID | 188131 |
| KING Broadcasting Company | K21CC-D | Lewiston | ID | 50532 |
| KING Broadcasting Company | K23KY-D | Council | ID | 11446 |
| KING Broadcasting Company | K29NB-D | Cascade | ID | 34884 |
| KING Broadcasting Company | K30QA-D | Coeur d'Alene | ID | 34861 |
| KING Broadcasting Company | KTFT-LD | Twin Falls | ID | 167056 |
| KONG-TV, Inc. | KONG(TV) | Everett | WA | 35396 |
| KSKN Television, Inc. | KSKN(TV) | Spokane | WA | 35606 |
| KTTU-TV, Inc. | KTTU-TV | Tucson | AZ | 11908 |
| KVUE Television, Inc. | KVUE(TV) | Austin | TX | 35867 |
| KWES Television, LLC | KWES-TV | Odessa | TX | 42007 |
| KXTV, LLC | KXTV(TV) | Sacramento | CA | 25048 |
| LSB Broadcasting, Inc. | KBMT(TV) | Beaumont | TX | 10150 |
| LSB Broadcasting, Inc. | KCEN-TV | Temple | TX | 10245 |

1

**App.194**

REDACTED - FOR PUBLIC INSPECTION

| Licensee | Station | City of License | State of License | Facility ID |
|---|---|---|---|---|
| LSB Broadcasting, Inc. | KIDY(TV) | San Angelo | TX | 58560 |
| LSB Broadcasting, Inc. | KIII(TV) | Corpus Christi | TX | 10188 |
| LSB Broadcasting, Inc. | KXVA(TV) | Abilene | TX | 62293 |
| LSB Broadcasting, Inc. | KYTX(TV) | Nacogdoches | TX | 55644 |
| LSB Broadcasting, Inc. | KUIL-LD | Beaumont | TX | 168234 |
| LSB Broadcasting, Inc. | KAGS-LD | Bryan | TX | 10246 |
| LSB Broadcasting, Inc. | KIDU-LD | Brownwood | TX | 58559 |
| LSB Broadcasting, Inc. | KIDV-LD | Albany | TX | 58571 |
| LSB Broadcasting, Inc. | KVHP-LD | Jasper | TX | 168235 |
| Multimedia Entertainment, LLC | WGRZ(TV) | Buffalo | NY | 64547 |
| Multimedia Holdings Corporation | KARE(TV) | Minneapolis | MN | 23079 |
| Multimedia Holdings Corporation | KNAZ-TV | Flagstaff | AZ | 24749 |
| Multimedia Holdings Corporation | KPNX(TV) | Mesa | AZ | 35486 |
| Multimedia Holdings Corporation | K06AE-D | Prescott | AZ | 35274 |
| Multimedia Holdings Corporation | K26OD-D | Globe | AZ | 35487 |
| Multimedia Holdings Corporation | KPSN-LD | Payson | AZ | 63396 |
| Multimedia Holdings Corporation | KTVD(TV) | Denver | CO | 68581 |
| Multimedia Holdings Corporation | KUSA(TV) | Denver | CO | 23074 |
| Multimedia Holdings Corporation | WJXX(TV) | Orange Park | FL | 11893 |
| Multimedia Holdings Corporation | WTLV(TV) | Jacksonville | FL | 65046 |
| Multimedia KSDK, LLC | KSDK(TV) | St. Louis | MO | 46981 |
| Pacific and Southern, LLC | WATL(TV) | Atlanta | GA | 22819 |
| Pacific and Southern, LLC | WLTX(TV) | Columbia | SC | 37176 |
| Pacific and Southern, LLC | WMAZ-TV | Macon | GA | 46991 |
| Pacific and Southern, LLC | WXIA-TV | Atlanta | GA | 51163 |
| RadiOhio, Incorporated | WBNS(AM) | Columbus | OH | 54901 |
| RadiOhio, Incorporated | WBNS-FM | Columbus | OH | 54701 |
| Sander Operating Co. I LLC D/B/A WHAS Television | WHAS-TV | Louisville | KY | 32327 |
| Sander Operating Co. III LLC D/B/A KGW Television | KGW(TV) | Portland | OR | 34874 |
| Sander Operating Co. III LLC D/B/A KGW Television | K16ML-D | Corvallis | OR | 34851 |
| Sander Operating Co. III LLC D/B/A KGW Television | K17HA-D | Astoria | OR | 130923 |

2

**App.195**

**REDACTED - FOR PUBLIC INSPECTION**

| Licensee | Station | City of License | State of License | Facility ID |
|---|---|---|---|---|
| Sander Operating Co. III LLC D/B/A KGW Television | K19LT-D | Prineville, etc. | OR | 34864 |
| Sander Operating Co. III LLC D/B/A KGW Television | K25KS-D | The Dalles | OR | 34844 |
| Sander Operating Co. III LLC D/B/A KGW Television | K28MJ-D | Tillamook | OR | 189303 |
| Sander Operating Co. III LLC D/B/A KGW Television | K29AZ-D | Newport | OR | 34865 |
| Sander Operating Co. III LLC D/B/A KGW Television | K35HU-D | Grays River | OR | 34870 |
| Sander Operating Co. III LLC D/B/A KGW Television | KGWZ-LD | Portland | OR | 30810 |
| Sander Operating Co. V LLC D/B/A KMSB Television | KMSB(TV) | Tucson | AZ | 44052 |
| TEGNA Broadcast Holdings, LLC | KCWI-TV | Ames | IA | 51502 |
| TEGNA Broadcast Holdings, LLC | WCCT-TV | Waterbury | CT | 14050 |
| TEGNA Broadcast Holdings, LLC | WNEP-TV | Scranton | PA | 73318 |
| TEGNA Broadcast Holdings, LLC | WOI-DT | Ames | IA | 8661 |
| TEGNA Broadcast Holdings, LLC | WPMT | York | PA | 10213 |
| TEGNA Broadcast Holdings, LLC | WQAD-TV | Moline | IL | 73319 |
| TEGNA Broadcast Holdings, LLC | WTIC-TV | Hartford | CT | 147 |
| TEGNA Broadcast Holdings, LLC | WZDX(TV) | Huntsville | AL | 28119 |
| TEGNA Broadcast Holdings, LLC | W07DC-D | Allentown/ Bethlehem | PA | 73325 |
| TEGNA Broadcast Holdings, LLC | W10CP-D | Towanda | PA | 73320 |
| TEGNA Broadcast Holdings, LLC | W14CO-D | Clarks Summit, etc. | PA | 73326 |
| TEGNA Broadcast Holdings, LLC | W15CO-D | Towanda | PA | 73324 |
| TEGNA Broadcast Holdings, LLC | W20AD-D | Williamsport | PA | 73321 |
| TEGNA Broadcast Holdings, LLC | W26CV-D | Mansfield | PA | 129499 |
| TEGNA Broadcast Holdings, LLC | W29FQ-D | Pottsville | PA | 73327 |
| Tegna East Coast Broadcasting, LLC | WTSP(TV) | St. Petersburg | FL | 11290 |
| Tegna East Coast Broadcasting, LLC | WLBZ(TV) | Bangor | ME | 39644 |
| Tegna East Coast Broadcasting, LLC | WCSH(TV) | Portland | ME | 39664 |
| Tegna East Coast Broadcasting, LLC | WGCI-LD | Skowhegan | ME | 39642 |
| TEGNA Memphis Broadcasting, Inc. | WATN-TV | Memphis | TN | 11907 |
| TEGNA Memphis Broadcasting, Inc. | WLMT(TV) | Memphis | TN | 68518 |
| VideoIndiana, Inc. | WTHR(TV) | Indianapolis | IN | 70162 |

3

**App.196**

REDACTED - FOR PUBLIC INSPECTION

| Licensee | Station | City of License | State of License | Facility ID |
|---|---|---|---|---|
| VideOhio, Inc. | WALV-CD | Indianapolis | IN | 70161 |
| WBIR-TV, LLC | WBIR-TV | Knoxville | TN | 46984 |
| WBNS-TV, Inc. | WBNS-TV | Columbus | OH | 71217 |
| WCNC-TV, Inc. | WCNC-TV | Charlotte | NC | 32326 |
| WCNC-TV, Inc. | W17EE-D | Lilesville/ Wadesboro | NC | 32316 |
| WCNC-TV, Inc. | W36FB-D | Briscoe | NC | 32317 |
| WFAA-TV, Inc. | KFAA-TV | Decatur | TX | 73701 |
| WFAA-TV, Inc. | WFAA(TV) | Dallas | TX | 72054 |
| WFMY Television, LLC | WFMY-TV | Greensboro | NC | 72064 |
| WKYC-TV, LLC | WKYC(TV) | Cleveland | OH | 73195 |
| WTOL Television, LLC | WTOL(TV) | Toledo | OH | 13992 |
| WUSA-TV, Inc. | WUSA(TV) | Washington | DC | 65593 |
| WVEC Television, LLC | WVEC(TV) | Hampton | VA | 74167 |
| WVEC Television, LLC | WJHJ-LD | Newport News, etc. | VA | 35137 |
| WWL-TV, Inc. | WWL-TV | New Orleans | LA | 74192 |

4

**App.197**

REDACTED - FOR PUBLIC INSPECTION
Form 2100, Schedule 315
Comprehensive Exhibit

**SCHEDULE 2 – OTHER AUTHORIZATIONS HELD BY NEXSTAR**

Nexstar Media Inc. ("Nexstar") directly, or through wholly owned subsidiaries, holds the following broadcast station licenses:

| Call Sign | Facility ID | City | State | Service | Licensee Name |
|---|---|---|---|---|---|
| WHNT-TV | 48693 | Huntsville | AL | Full Service Television | Nexstar Media Inc. |
| WDHN | 43846 | Dothan | AL | Full Service Television | Nexstar Media Inc. |
| WFNA | 83943 | Gulf Shores | AL | Full Service Television | Nexstar Media Inc. |
| WHDF | 65128 | Florence | AL | Full Service Television | Nexstar Media Inc. |
| WIAT | 5360 | Birmingham | AL | Full Service Television | Nexstar Media Inc. |
| WKRG-TV | 73187 | Mobile | AL | Full Service Television | Nexstar Media Inc. |
| KARK-TV | 33440 | Little Rock | AR | Full Service Television | Nexstar Media Inc. |
| KARZ-TV | 37005 | Little Rock | AR | Full Service Television | Nexstar Media Inc. |
| KFTA-TV | 29560 | Fort Smith | AR | Full Service Television | Nexstar Media Inc. |
| KNWA-TV | 29557 | Rogers | AR | Full Service Television | Nexstar Media Inc. |
| KXNW | 81593 | Eureka Springs | AR | Full Service Television | Tribune Broadcasting Company II LLC |
| K30GL-D | 48582 | Many Farms | AZ | Digital TV Translator | Nexstar Media Inc. |
| KGET-TV | 34459 | Bakersfield | CA | Full Service Television | Nexstar Media Inc. |
| KGPE | 56034 | Fresno | CA | Full Service Television | Nexstar Media Inc. |
| KKEY-LP | 18750 | Bakersfield | CA | Low Power Digital TV | Nexstar Media Inc. |
| KRON-TV | 65526 | San Francisco | CA | Full Service Television | Nexstar Media Inc. |
| KSEE | 35594 | Fresno | CA | Full Service Television | Nexstar Media Inc. |
| KUSI-TV | 10238 | San Diego | CA | Full Service Television | Nexstar Media Inc. |
| KSWB-TV | 58827 | San Diego | CA | Full Service Television | Tribune Media Company |

1

**App.198**

**REDACTED - FOR PUBLIC INSPECTION**

| Call Sign | Facility ID | City | State | Service | Licensee Name |
|---|---|---|---|---|---|
| KTLA | 35670 | Los Angeles | CA | Full Service Television | Tribune Media Company |
| KTXL | 10205 | Sacramento | CA | Full Service Television | Tribune Media Company |
| K03AY-D | 70581 | Ridgway, etc. | CO | Digital TV Translator | Nexstar Media Inc. |
| K06HZ-D | 70591 | Paonia | CO | Digital TV Translator | Nexstar Media Inc. |
| K13ML-D | 70593 | Hotchkiss, etc. | CO | Digital TV Translator | Nexstar Media Inc. |
| K23OR-D | 51294 | Pagosa Springs | CO | Digital TV Translator | Nexstar Media Inc. |
| K28GE-D | 35990 | Woodland Park | CO | Low Power Digital TV | Nexstar Media Inc. |
| K31FV-D | 48593 | Durango & Hermosa | CO | Digital TV Translator | Nexstar Media Inc. |
| K34QD-D | 48595 | Bayfield & Ignacio | CO | Digital TV Translator | Nexstar Media Inc. |
| KGJT-CD | 71948 | Grand Junction | CO | Digital Class A | Nexstar Media Inc. |
| KREX-TV | 70596 | Grand Junction | CO | Full Service Television | Nexstar Media Inc. |
| KREY-TV | 70579 | Montrose | CO | Full Service Television | Nexstar Media Inc. |
| KREZ-TV | 48589 | Durango | CO | Full Service Television | Nexstar Media Inc. |
| KXRM-TV | 35991 | Colorado Springs | CO | Full Service Television | Nexstar Media Inc. |
| KXTU-LD | 22681 | Colorado Springs | CO | Low Power Digital TV | Nexstar Media Inc. |
| KDVR | 126 | Denver | CO | Full Service Television | Tribune Broadcasting Company II LLC |
| KFCT | 125 | Fort Collins | CO | Full Service Television | Tribune Broadcasting Company II LLC |
| KWGN-TV | 35883 | Denver | CO | Full Service Television | Tribune Media Company |
| WCTX | 33081 | New Haven | CT | Full Service Television | Nexstar Media Inc. |
| WTNH | 74109 | New Haven | CT | Full Service Television | Nexstar Media Inc. |
| WDCW | 30576 | Washington | DC | Full Service Television | Tribune Media Company |

2

**App.199**

REDACTED - FOR PUBLIC INSPECTION

| Call Sign | Facility ID | City | State | Service | Licensee Name |
|---|---|---|---|---|---|
| WFLA-TV | 64592 | Tampa | FL | Full Service Television | Nexstar Media Inc. |
| WMBB | 66398 | Panama City | FL | Full Service Television | Nexstar Media Inc. |
| WSNN-LD | 189978 | Sarasota | FL | Low Power Digital TV | Nexstar Media Inc. |
| WTTA | 4108 | St. Petersburg | FL | Full Service Television | Nexstar Media Inc. |
| WJBF | 27140 | Augusta | GA | Full Service Television | Nexstar Media Inc. |
| WRBL | 3359 | Columbus | GA | Full Service Television | Nexstar Media Inc. |
| WSAV-TV | 48662 | Savannah | GA | Full Service Television | Nexstar Media Inc. |
| KAII-TV | 4145 | Wailuku | HI | Full Service Television | Nexstar Media Inc. |
| KGMD-TV | 36914 | Hilo | HI | Full Service Television | Nexstar Media Inc. |
| KGMV | 36920 | Wailuku | HI | Full Service Television | Nexstar Media Inc. |
| KHAW-TV | 4146 | Hilo | HI | Full Service Television | Nexstar Media Inc. |
| KHII-TV | 36917 | Honolulu | HI | Full Service Television | Nexstar Media Inc. |
| KHON-TV | 4144 | Honolulu | HI | Full Service Television | Nexstar Media Inc. |
| KCAU-TV | 11265 | Sioux City | IA | Full Service Television | Nexstar Media Inc. |
| KGCW | 7841 | Burlington | IA | Full Service Television | Nexstar Media Inc. |
| WHO-DT | 66221 | Des Moines | IA | Full Service Television | Tribune Broadcasting Company II LLC |
| WCIA | 42124 | Champaign | IL | Full Service Television | Nexstar Media Inc. |
| WCIX | 42116 | Springfield | IL | Full Service Television | Nexstar Media Inc. |
| WHBF-TV | 13950 | Rock Island | IL | Full Service Television | Nexstar Media Inc. |
| WMBD-TV | 42121 | Peoria | IL | Full Service Television | Nexstar Media Inc. |
| WQRF-TV | 52408 | Rockford | IL | Full Service Television | Nexstar Media Inc. |
| WGN | 72114 | Chicago | IL | Full Power AM | Tribune Media Company |

3

**App.200**

**REDACTED - FOR PUBLIC INSPECTION**

| Call Sign | Facility ID | City | State | Service | Licensee Name |
|---|---|---|---|---|---|
| WGN-TV | 72115 | Chicago | IL | Full Service Television | Tribune Media Company |
| WANE-TV | 39270 | Fort Wayne | IN | Full Service Television | Nexstar Media Inc. |
| WEHT | 24215 | Evansville | IN | Full Service Television | Nexstar Media Inc. |
| WTWO | 20426 | Terre Haute | IN | Full Service Television | Nexstar Media Inc. |
| WTTK | 56526 | Kokomo | IN | Full Service Television | Tribune Media Company |
| WTTV | 56523 | Bloomington | IN | Full Service Television | Tribune Media Company |
| WXIN | 146 | Indianapolis | IN | Full Service Television | Tribune Media Company |
| KSNC | 72359 | Great Bend | KS | Full Service Television | Nexstar Media Inc. |
| KSNG | 72361 | Garden City | KS | Full Service Television | Nexstar Media Inc. |
| KSNL-LD | 168675 | Salina | KS | Low Power Digital TV | Nexstar Media Inc. |
| KSNT | 67335 | Topeka | KS | Full Service Television | Nexstar Media Inc. |
| KSNW | 72358 | Wichita | KS | Full Service Television | Nexstar Media Inc. |
| KTMJ-CD | 43649 | Topeka | KS | Digital Class A | Nexstar Media Inc. |
| WDKY-TV | 64017 | Danville | KY | Full Service Television | Tribune Media Company |
| K22NI-D | 16540 | Leesville | LA | Low Power Digital TV | Nexstar Media Inc. |
| K30QG-D | 10405 | Alexandria | LA | Digital TV Translator | Nexstar Media Inc. |
| KARD | 3658 | West Monroe | LA | Full Service Television | Nexstar Media Inc. |
| KLFY-TV | 35059 | Lafayette | LA | Full Service Television | Nexstar Media Inc. |
| KSHV-TV | 73706 | Shreveport | LA | Full Service Television | Nexstar Media Inc. |
| KZUP-CD | 24975 | Baton Rouge | LA | Digital Class A | Nexstar Media Inc. |
| WBRL-CD | 24976 | Baton Rouge | LA | Digital Class A | Nexstar Media Inc. |
| WGMB-TV | 12520 | Baton Rouge | LA | Full Service Television | Nexstar Media Inc. |

4

**App.201**

**REDACTED - FOR PUBLIC INSPECTION**

| Call Sign | Facility ID | City | State | Service | Licensee Name |
|---|---|---|---|---|---|
| WGNO | 72119 | New Orleans | LA | Full Service Television | Tribune Television New Orleans, Inc. |
| WNOL-TV | 54280 | New Orleans | LA | Full Service Television | Tribune Television New Orleans, Inc. |
| WFXQ-CD | 2650 | Springfield | MA | Digital Class A | Nexstar Media Inc. |
| WWLP | 6868 | Springfield | MA | Full Service Television | Nexstar Media Inc. |
| WDVM-TV | 25045 | Hagerstown | MD | Full Service Television | Nexstar Media Inc. |
| WLNS-TV | 74420 | Lansing | MI | Full Service Television | Nexstar Media Inc. |
| WOBC-CD | 67001 | Battle Creek | MI | Digital Class A | Nexstar Media Inc. |
| WOGC-CD | 17203 | Holland | MI | Digital Class A | Nexstar Media Inc. |
| WOHO-CD | 28926 | Holland | MI | Digital Class A | Nexstar Media Inc. |
| WOKZ-CD | 36841 | Kalamazoo | MI | Digital Class A | Nexstar Media Inc. |
| WOLP-CD | 167892 | Grand Rapids | MI | Digital Class A | Nexstar Media Inc. |
| WOMS-CD | 67895 | Muskegon | MI | Digital Class A | Nexstar Media Inc. |
| WOOD-TV | 36838 | Grand Rapids | MI | Full Service Television | Nexstar Media Inc. |
| WOTV | 10212 | Battle Creek | MI | Full Service Television | Nexstar Media Inc. |
| WXSP-CD | 36851 | Grand Rapids | MI | Digital Class A | Nexstar Media Inc. |
| KOZL-TV | 3659 | Springfield | MO | Full Service Television | Nexstar Media Inc. |
| KRBK | 166319 | Osage Beach | MO | Full Service Television | Nexstar Media Inc. |
| KSNF | 67766 | Joplin | MO | Full Service Television | Nexstar Media Inc. |
| KTVI | 35693 | St. Louis | MO | Full Service Television | Tribune Broadcasting Company II LLC |
| WDAF-TV | 11291 | Kansas City | MO | Full Service Television | WDAF License, Inc. |
| KPLR-TV | 35417 | St. Louis | MO | Full Service Television | KPLR, Inc. |

5

**App.202**

REDACTED - FOR PUBLIC INSPECTION

| Call Sign | Facility ID | City | State | Service | Licensee Name |
|---|---|---|---|---|---|
| WHLT | 48668 | Hattiesburg | MS | Full Service Television | Nexstar Media Inc. |
| WJTV | 48667 | Jackson | MS | Full Service Television | Nexstar Media Inc. |
| WNTZ-TV | 16539 | Natchez | MS | Full Service Television | Nexstar Media Inc. |
| K16DH-D | 5250 | Miles City | MT | Digital TV Translator | Nexstar Media Inc. |
| K16DZ-D | 5251 | Hardin | MT | Digital TV Translator | Nexstar Media Inc. |
| K19FF-D | 125455 | Miles City | MT | Digital TV Translator | Nexstar Media Inc. |
| K20LK-D | 125350 | Colstrip, etc. | MT | Digital TV Translator | Nexstar Media Inc. |
| K24KM-D | 5247 | Colstrip, etc. | MT | Low Power Digital TV | Nexstar Media Inc. |
| K25BP-D | 5244 | Billings | MT | Digital TV Translator | Nexstar Media Inc. |
| K27IM-D | 125462 | Billings | MT | Digital TV Translator | Nexstar Media Inc. |
| K33EA-D | 5249 | Columbus | MT | Digital TV Translator | Nexstar Media Inc. |
| KSVI | 5243 | Billings | MT | Full Service Television | Nexstar Media Inc. |
| W23ES-D | 66393 | Marshall | NC | Digital TV Translator | Nexstar Media Inc. |
| W35DT-D | 66394 | Beaver Dam | NC | Digital TV Translator | Nexstar Media Inc. |
| W08AT-D | 66406 | Cherokee | NC | Digital TV Translator | Nexstar Media Inc. |
| W09AF-D | 66408 | Sylva | NC | Digital TV Translator | Nexstar Media Inc. |
| W09AG-D | 66405 | Franklin | NC | Digital TV Translator | Nexstar Media Inc. |
| W10AD-D | 66396 | Montreat | NC | Digital TV Translator | Nexstar Media Inc. |
| W11AN-D | 66410 | Bryson City | NC | Digital TV Translator | Nexstar Media Inc. |
| W15EL-D | 66401 | Mars Hill | NC | Digital TV Translator | Nexstar Media Inc. |
| W18EP-D | 66397 | Weaverville | NC | Digital TV Translator | Nexstar Media Inc. |
| W23EY-D | 66409 | Canton | NC | Digital TV Translator | Nexstar Media Inc. |

6

**App.203**

REDACTED - FOR PUBLIC INSPECTION

| Call Sign | Facility ID | City | State | Service | Licensee Name |
|---|---|---|---|---|---|
| W32FI-D | 61683 | Brevard | NC | Digital TV Translator | Nexstar Media Inc. |
| WNCN | 50782 | Goldsboro | NC | Full Service Television | Nexstar Media Inc. |
| WNCT-TV | 57838 | Greenville | NC | Full Service Television | Nexstar Media Inc. |
| WYCW | 70149 | Asheville | NC | Full Service Television | Nexstar Media Inc. |
| WGHP | 72106 | High Point | NC | Full Service Television | Tribune Broadcasting Company II LLC |
| WGHP | 72106 | High Point | NC | Full Service Television | Tribune Broadcasting Company II LLC |
| WJZY | 73152 | Belmont | NC | Full Service Television | Tribune Media Company |
| KXMA-TV | 55684 | Dickinson | ND | Full Service Television | Nexstar Media Inc. |
| KXMB-TV | 55686 | Bismarck | ND | Full Service Television | Nexstar Media Inc. |
| KXMC-TV | 55685 | Minot | ND | Full Service Television | Nexstar Media Inc. |
| KXMD-TV | 55683 | Williston | ND | Full Service Television | Nexstar Media Inc. |
| KSNK | 72362 | McCook | NE | Full Service Television | Nexstar Media Inc. |
| K09EP-D | 48560 | Grants, etc. | NM | Digital TV Translator | Nexstar Media Inc. |
| K15LZ-D | 48581 | Tucumcari | NM | Digital TV Translator | Nexstar Media Inc. |
| K15MF-D | 48588 | Raton, etc. | NM | Digital TV Translator | Nexstar Media Inc. |
| K16BZ-D | 48554 | Ruidoso | NM | Digital TV Translator | Nexstar Media Inc. |
| K19MP-D | 11465 | Gallup | NM | Digital TV Translator | Nexstar Media Inc. |
| K20KT-D | 48557 | Dora | NM | Digital TV Translator | Nexstar Media Inc. |
| K21FD-D | 48572 | Taos, etc. | NM | Digital TV Translator | Nexstar Media Inc. |
| K22EW-D | 22272 | Mora | NM | Digital TV Translator | Nexstar Media Inc. |
| K22GE-D | 125926 | Dulce | NM | Digital TV Translator | Nexstar Media Inc. |

7

**App.204**

**REDACTED - FOR PUBLIC INSPECTION**

| Call Sign | Facility ID | City | State | Service | Licensee Name |
|---|---|---|---|---|---|
| K22LF-D | 190526 | Aztec | NM | Digital TV Translator | Nexstar Media Inc. |
| K22MS-D | 35562 | Eagles Nest | NM | Digital TV Translator | Nexstar Media Inc. |
| K24MW-D | 48551 | Clovis | NM | Digital TV Translator | Nexstar Media Inc. |
| K25HJ-D | 48568 | Hornsby Ranch, etc. | NM | Digital TV Translator | Nexstar Media Inc. |
| K25HV-D | 11568 | Truth Or Consequence | NM | Digital TV Translator | Nexstar Media Inc. |
| K26OV-D | 125596 | Zuni | NM | Digital TV Translator | Nexstar Media Inc. |
| K27NL-D | 8530 | Clovis | NM | Digital TV Translator | Nexstar Media Inc. |
| K29HR-D | 167895 | Farmington | NM | Digital TV Translator | Nexstar Media Inc. |
| K29KT-D | 190584 | Thoreau | NM | Digital TV Translator | Nexstar Media Inc. |
| K29LN-D | 59098 | Santa Rosa | NM | Digital TV Translator | Nexstar Media Inc. |
| K30KU-D | 181538 | Silver City | NM | Digital TV Translator | Nexstar Media Inc. |
| K30OJ-D | 48559 | Las Vegas | NM | Digital TV Translator | Nexstar Media Inc. |
| K32OE-D | 48563 | Alamogordo | NM | Digital TV Translator | Nexstar Media Inc. |
| K35HB-D | 48561 | Deming | NM | Digital TV Translator | Nexstar Media Inc. |
| K35JR-D | 181264 | Arrey & Derry | NM | Digital TV Translator | Nexstar Media Inc. |
| KBIM-TV | 48556 | Roswell | NM | Full Service Television | Nexstar Media Inc. |
| KRQE | 48575 | Albuquerque | NM | Full Service Television | Nexstar Media Inc. |
| K22DR-D | 35043 | Laughlin | NV | Digital TV Translator | Nexstar Media Inc. |
| K30PR-D | 48806 | Pahrump | NV | Digital TV Translator | Nexstar Media Inc. |
| KLAS-TV | 35042 | Las Vegas | NV | Full Service Television | Nexstar Media Inc. |
| WWTI | 16747 | Watertown | NY | Full Service Television | Nexstar Media Inc. |
| WBGH-CD | 15569 | Binghamton | NY | Digital Class A | Nexstar Media Inc. |

8

**App.205**

REDACTED - FOR PUBLIC INSPECTION

| Call Sign | Facility ID | City | State | Service | Licensee Name |
|---|---|---|---|---|---|
| WETM-TV | 60653 | Elmira | NY | Full Service Television | Nexstar Media Inc. |
| WFXV | 43424 | Utica | NY | Full Service Television | Nexstar Media Inc. |
| WIVB-TV | 7780 | Buffalo | NY | Full Service Television | Nexstar Media Inc. |
| WIVT | 11260 | Binghamton | NY | Full Service Television | Nexstar Media Inc. |
| WNLO | 71905 | Buffalo | NY | Full Service Television | Nexstar Media Inc. |
| WPNY-LD | 34335 | Utica, etc. | NY | Low Power Digital TV | Nexstar Media Inc. |
| WROC-TV | 73964 | Rochester | NY | Full Service Television | Nexstar Media Inc. |
| WSYR-TV | 73113 | Syracuse | NY | Full Service Television | Nexstar Media Inc. |
| WTEN | 74422 | Albany | NY | Full Service Television | Nexstar Media Inc. |
| WBNX-TV | 72958 | Akron | OH | Full Service Television | Nexstar Media Inc. |
| WCMH-TV | 50781 | Columbus | OH | Full Service Television | Nexstar Media Inc. |
| WDTN | 65690 | Dayton | OH | Full Service Television | Nexstar Media Inc. |
| WKBN-TV | 73153 | Youngstown | OH | Full Service Television | Nexstar Media Inc. |
| WYFX-LD | 68398 | Youngstown | OH | Low Power Digital TV | Nexstar Media Inc. |
| WJW | 73150 | Cleveland | OH | Full Service Television | Tribune Broadcasting Company II LLC |
| K28GI-D | 25697 | Guymon | OK | Digital TV Translator | Nexstar Media Inc. |
| KAUT-TV | 50182 | Oklahoma City | OK | Full Service Television | Nexstar Media Inc. |
| K14QP-D | 167258 | Woodward, etc. | OK | Digital TV Translator | Tribune Broadcasting Company II LLC |
| K15HL-D | 167263 | Cherokee & Alva | OK | Digital TV Translator | Tribune Broadcasting Company II LLC |
| K16DX-D | 59851 | Gage | OK | Digital TV Translator | Tribune Broadcasting Company II LLC |

9

**App.206**

**REDACTED - FOR PUBLIC INSPECTION**

| Call Sign | Facility ID | City | State | Service | Licensee Name |
|---|---|---|---|---|---|
| K16LQ-D | 167254 | Seiling | OK | Digital TV Translator | Tribune Broadcasting Company II LLC |
| K17ID-D | 167261 | Cherokee & Alva | OK | Digital TV Translator | Tribune Broadcasting Company II LLC |
| K18LY-D | 167253 | Seiling | OK | Digital TV Translator | Tribune Broadcasting Company II LLC |
| K20BR-D | 59840 | Gage, etc. | OK | Digital TV Translator | Tribune Broadcasting Company II LLC |
| K20JD-D | 167259 | Cherokee & Alva | OK | Digital TV Translator | Tribune Broadcasting Company II LLC |
| K21MT-D | 167256 | Seiling | OK | Digital TV Translator | Tribune Broadcasting Company II LLC |
| K22BR-D | 59849 | May, etc. | OK | Digital TV Translator | Tribune Broadcasting Company II LLC |
| K22ID-D | 167257 | Alva - Cherokee | OK | Digital TV Translator | Tribune Broadcasting Company II LLC |
| K23NH-D | 167252 | Seiling | OK | Digital TV Translator | Tribune Broadcasting Company II LLC |
| K25JQ-D | 167251 | May, etc. | OK | Digital TV Translator | Tribune Broadcasting Company II LLC |
| K26IS-D | 167265 | Woodward, etc. | OK | Digital TV Translator | Tribune Broadcasting Company II LLC |
| K28JX-D | 167255 | Alva - Cherokee | OK | Digital TV Translator | Tribune Broadcasting Company II LLC |
| K29HZ-D | 167264 | Woodward, etc. | OK | Digital TV Translator | Tribune Broadcasting Company II LLC |
| K31JQ-D | 167262 | Woodward, etc. | OK | Digital TV Translator | Tribune Broadcasting Company II LLC |
| K33JM-D | 167260 | Mooreland, etc. | OK | Digital TV Translator | Tribune Broadcasting Company II LLC |

10

**App.207**

REDACTED - FOR PUBLIC INSPECTION

| Call Sign | Facility ID | City | State | Service | Licensee Name |
|---|---|---|---|---|---|
| K36NR-D | 59848 | Seiling | OK | Digital TV Translator | Tribune Broadcasting Company II LLC |
| KFOR-TV | 66222 | Oklahoma City | OK | Full Service Television | Tribune Broadcasting Company II LLC |
| KOIN | 35380 | Portland | OR | Full Service Television | Nexstar Media Inc. |
| KRCW-TV | 10192 | Salem | OR | Full Service Television | Nexstar Media Inc. |
| K07YV-D | 35376 | The Dalles | OR | Digital TV Translator | Nexstar Media Inc. |
| K23OC-D | 35371 | Lincoln City/Newport | OR | Low Power Digital TV | Nexstar Media Inc. |
| K34DC-D | 35374 | Astoria | OR | Digital TV Translator | Nexstar Media Inc. |
| W24BL | 71222 | Pottsville, etc. | PA | Analog TV Translator | Nexstar Media Inc. |
| WBRE-TV | 71225 | Wilkes-Barre | PA | Full Service Television | Nexstar Media Inc. |
| WHTM-TV | 72326 | Harrisburg | PA | Full Service Television | Nexstar Media Inc. |
| WJET-TV | 65749 | Erie | PA | Full Service Television | Nexstar Media Inc. |
| WTAJ-TV | 23341 | Altoona | PA | Full Service Television | Nexstar Media Inc. |
| WPHL-TV | 73879 | Philadelphia | PA | Full Service Television | Tribune Media Company |
| WPRI-TV | 47404 | Providence | RI | Full Service Television | Nexstar Media Inc. |
| W10AJ-D | 66388 | Greenville | SC | Digital TV Translator | Nexstar Media Inc. |
| WBTW | 66407 | Florence | SC | Full Service Television | Nexstar Media Inc. |
| WCBD-TV | 10587 | Charleston | SC | Full Service Television | Nexstar Media Inc. |
| WMBE-LD | 187581 | Myrtle Beach | SC | Low Power Digital TV | Nexstar Media Inc. |
| WSPA-TV | 66391 | Spartanburg | SC | Full Service Television | Nexstar Media Inc. |
| WMYT-TV | 20624 | Rock Hill | SC | Full Service Television | Tribune Media Company |
| K24DT-D | 41979 | Aberdeen | SD | Digital TV Translator | Nexstar Media Inc. |

11

**App.208**

**REDACTED - FOR PUBLIC INSPECTION**

| Call Sign | Facility ID | City | State | Service | Licensee Name |
|---|---|---|---|---|---|
| KCLO-TV | 41969 | Rapid City | SD | Full Service Television | Nexstar Media Inc. |
| KDLO-TV | 41975 | Florence | SD | Full Service Television | Nexstar Media Inc. |
| KELO-TV | 41983 | Sioux Falls | SD | Full Service Television | Nexstar Media Inc. |
| KPLO-TV | 41964 | Reliance | SD | Full Service Television | Nexstar Media Inc. |
| WATE-TV | 71082 | Knoxville | TN | Full Service Television | Nexstar Media Inc. |
| WJHL-TV | 57826 | Johnson City | TN | Full Service Television | Nexstar Media Inc. |
| WJKT | 68519 | Jackson | TN | Full Service Television | Nexstar Media Inc. |
| WKRN-TV | 73188 | Nashville | TN | Full Service Television | Nexstar Media Inc. |
| WREG-TV | 66174 | Memphis | TN | Full Service Television | Tribune Broadcasting Company II, LLC |
| KBVO-CD | 35918 | Austin | TX | Digital Class A | Nexstar Media Inc. |
| KMID | 35131 | Midland | TX | Full Service Television | Nexstar Media Inc. |
| KAMR-TV | 8523 | Amarillo | TX | Full Service Television | Nexstar Media Inc. |
| KBVO | 35909 | Llano | TX | Full Service Television | Nexstar Media Inc. |
| KCPN-LD | 7739 | Amarillo | TX | Low Power Digital TV | Nexstar Media Inc. |
| KETK-TV | 55643 | Jacksonville | TX | Full Service Television | Nexstar Media Inc. |
| KFDX-TV | 65370 | Wichita Falls | TX | Full Service Television | Nexstar Media Inc. |
| KHPF-CD | 35923 | Fredericksburg | TX | Digital Class A | Nexstar Media Inc. |
| KHPL-CD | 35913 | La Grange | TX | Digital Class A | Nexstar Media Inc. |
| KHPM-CD | 35921 | San Marcos | TX | Digital Class A | Nexstar Media Inc. |
| KHPX-CD | 35911 | Georgetown | TX | Digital Class A | Nexstar Media Inc. |
| KHPZ-CD | 35910 | Round Rock | TX | Digital Class A | Nexstar Media Inc. |
| KJBO-LD | 7670 | Wichita Falls | TX | Low Power Digital TV | Nexstar Media Inc. |

12

**App.209**

**REDACTED - FOR PUBLIC INSPECTION**

| Call Sign | Facility ID | City | State | Service | Licensee Name |
|---|---|---|---|---|---|
| KLBK-TV | 3660 | Lubbock | TX | Full Service Television | Nexstar Media Inc. |
| KLST | 31114 | San Angelo | TX | Full Service Television | Nexstar Media Inc. |
| KTAB-TV | 59988 | Abilene | TX | Full Service Television | Nexstar Media Inc. |
| KTAL-TV | 35648 | Texarkana | TX | Full Service Television | Nexstar Media Inc. |
| KTPN-LD | 8098 | Tyler | TX | Low Power Digital TV | Nexstar Media Inc. |
| KTSM-TV | 67760 | El Paso | TX | Full Service Television | Nexstar Media Inc. |
| KVEO-TV | 12523 | Brownsville | TX | Full Service Television | Nexstar Media Inc. |
| KWKT-TV | 12522 | Waco | TX | Full Service Television | Nexstar Media Inc. |
| KXAN-TV | 35920 | Austin | TX | Full Service Television | Nexstar Media Inc. |
| KYLE-TV | 60384 | Bryan | TX | Full Service Television | Nexstar Media Inc. |
| KGBT-TV | 34457 | Harlingen | TX | Full Service Television | Tribune Broadcasting Company II, LLC |
| KDAF | 22201 | Dallas | TX | Full Service Television | Tribune Media Company |
| KIAH | 23394 | Houston | TX | Full Service Television | Tribune Media Company |
| K05BU-D | 70974 | Enterprise | UT | Digital TV Translator | Nexstar Media Inc. |
| K05NF-D | 128228 | Salina | UT | Digital TV Translator | Nexstar Media Inc. |
| K09SU-D | 70973 | Hildale, etc. (Az) | UT | Digital TV Translator | Nexstar Media Inc. |
| K11OO-D | 70957 | Pine Valley, etc. | UT | Digital TV Translator | Nexstar Media Inc. |
| K12XD-D | 68882 | Aurora, etc. | UT | Digital TV Translator | Nexstar Media Inc. |
| K13QK-D | 70949 | Virgin | UT | Digital TV Translator | Nexstar Media Inc. |
| K14LW-D | 128240 | Myton | UT | Digital TV Translator | Nexstar Media Inc. |
| K18FU-D | 68887 | Rural Beaver County | UT | Digital TV Translator | Nexstar Media Inc. |
| K20NP-D | 128236 | Spring Glen | UT | Digital TV Translator | Nexstar Media Inc. |

13

**App.210**

REDACTED - FOR PUBLIC INSPECTION

| Call Sign | Facility ID | City | State | Service | Licensee Name |
|---|---|---|---|---|---|
| K23NY-D | 167546 | St. George | UT | Digital TV Translator | Nexstar Media Inc. |
| K24HP-D | 167548 | Price, etc. | UT | Digital TV Translator | Nexstar Media Inc. |
| K27NP-D | 128242 | Duchesne | UT | Digital TV Translator | Nexstar Media Inc. |
| K28EA-D | 70995 | Washington | UT | Digital TV Translator | Nexstar Media Inc. |
| K28PG-D | 128241 | Price | UT | Digital TV Translator | Nexstar Media Inc. |
| K31IS-D | 70987 | Toquerville | UT | Digital TV Translator | Nexstar Media Inc. |
| K33PC-D | 129687 | Santa Clara | UT | Digital TV Translator | Nexstar Media Inc. |
| K34CX-D | 70970 | Apple Valley | UT | Low Power Digital TV | Nexstar Media Inc. |
| K36OI-D | 131215 | Manti/Ephraim | UT | Digital TV Translator | Nexstar Media Inc. |
| KTVX | 68889 | Salt Lake City | UT | Full Service Television | Nexstar Media Inc. |
| KUCW | 1136 | Ogden | UT | Full Service Television | Nexstar Media Inc. |
| KUWB-LD | 70960 | Bloomington | UT | Digital TV Translator | Nexstar Media Inc. |
| WAVY-TV | 71127 | Portsmouth | VA | Full Service Television | Nexstar Media Inc. |
| WFXR | 24813 | Roanoke | VA | Full Service Television | Nexstar Media Inc. |
| WITD-CD | 71119 | Chesapeake | VA | Digital Class A | Nexstar Media Inc. |
| WKTD-CD | 71121 | Portsmouth | VA | Digital Class A | Nexstar Media Inc. |
| WNLO-CD | 13060 | Norfolk | VA | Digital Class A | Nexstar Media Inc. |
| WPMC-CD | 71125 | Mappsville | VA | Digital Class A | Nexstar Media Inc. |
| WRIC-TV | 74416 | Petersburg | VA | Full Service Television | Nexstar Media Inc. |
| WVBT | 65387 | Virginia Beach | VA | Full Service Television | Nexstar Media Inc. |
| WWCW | 24812 | Lynchburg | VA | Full Service Television | Nexstar Media Inc. |
| WFFF-TV | 10132 | Burlington | VT | Full Service Television | Nexstar Media Inc. |

14

**App.211**

REDACTED - FOR PUBLIC INSPECTION

| Call Sign | Facility ID | City | State | Service | Licensee Name |
|---|---|---|---|---|---|
| K29IB-D | 35382 | Grays River, etc. | WA | Digital TV Translator | Nexstar Media Inc. |
| WEUX | 2709 | Chippewa Falls | WI | Full Service Television | Nexstar Media Inc. |
| WFRV-TV | 9635 | Green Bay | WI | Full Service Television | Nexstar Media Inc. |
| WLAX | 2710 | La Crosse | WI | Full Service Television | Nexstar Media Inc. |
| WBOY-TV | 71220 | Clarksburg | WV | Full Service Television | Nexstar Media Inc. |
| WOWK-TV | 23342 | Huntington | WV | Full Service Television | Nexstar Media Inc. |
| WTRF-TV | 6869 | Wheeling | WV | Full Service Television | Nexstar Media Inc. |
| WVNS-TV | 74169 | Lewisburg | WV | Full Service Television | Nexstar Media Inc. |
| K27KV-D | 74268 | Evanston | WY | Digital TV Translator | Nexstar Media Inc. |
| K31FW-D | 131213 | Lyman | WY | Digital TV Translator | Nexstar Media Inc. |
| K45IA-D | 131206 | Rock Springs | WY | Digital TV Translator | Nexstar Media Inc. |

Nexstar is the broker of grandfathered time brokerage agreements for television broadcast stations WFXP(TV), Erie, Pennsylvania, Facility No. 19707; KHMT(TV), Hardin, Montana, Facility No. 47670; KFQX(TV), Grand Junction, CO, Facility No. 31597; KNVA(TV), Austin, TX, Facility No. 144; and WNAC-TV, Providence, Rhode Island, Facility No. 73311, and a party to several joint sales agreements.

15

**App.212**

REDACTED - FOR PUBLIC INSPECTION

Form 2100, Schedule 315
Comprehensive Exhibit

## SCHEDULE 3 - PARTIES TO THE APPLICATIONS

## NEXSTAR MEDIA INC.

Nexstar Media Inc., the Transferee, is a wholly-owned subsidiary of Nexstar Media Group, Inc., a publicly traded company. The current officers and directors (none of whom holds an attributable interest in any other broadcast television station) as well as the attributable shareholders of Nexstar Media Inc., are listed below.

| Name / Address | Citizenship | Positional Interest | Percent of Votes | Percent of Total Assets (total equity) |
|---|---|---|---|---|
| Nexstar Media Inc. 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | Delaware Corporation | Transferee | N/A | N/A |
| Nexstar Media Group, Inc. 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | Delaware Corporation | Shareholder | 100% | 100% |
| Perry Sook 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Chief Executive Officer | 0% | 0% |
| Michael Biard 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | President and Chief Operating Officer | 0% | 0% |
| Rachel Morgan 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Executive Vice President, General Counsel and Corporate Secretary | 0% | 0% |
| Andrew Alford 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | President, Broadcasting | 0% | 0% |
| Sean Compton 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | President, Networks | 0% | 0% |
| Dana Zimmer 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | President, Distribution and Chief Strategy Officer | 0% | 0% |
| Lee Ann Gliha 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Executive Vice President, Chief Financial Officer | 0% | 0% |
| Brett Jenkins 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Executive Vice President, Chief Technology and Digital Officer | 0% | 0% |
| Blake Russell 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Executive Vice President, Operations | 0% | 0% |

1

**App.213**

REDACTED - FOR PUBLIC INSPECTION

| Name / Address | Citizenship | Positional Interest | Percent of Votes | Percent of Total Assets (total equity) |
|---|---|---|---|---|
| Gary Weitman 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Executive Vice President, Chief Communications Officer | 0% | 0% |

2

**App.214**

**REDACTED - FOR PUBLIC INSPECTION**

## NEXSTAR MEDIA GROUP, INC.

Nexstar Media Group, Inc. (NMGI) is a publicly-traded company and the sole shareholder of the Transferee, Nexstar Media Inc. The number of shares held by any one shareholder in NMGI is subject to change at any time. Except as set forth below, no NMGI shareholder owns a 5% or greater voting interest, or a 20% or greater voting interest to the extent such investor is an investment company under 15 U.S.C. § 80a–3. Should NMGI learn that any other shareholder obtains an attributable interest during the pendency of this application, the Transferee will submit an appropriate amendment. The current officers, directors, and attributable shareholders of NMGI, none of which holds an attributable interest in any other broadcast television station, are listed below.

| Name / Address | Citizenship | Positional Interest | Percent of Votes[394] | Percent of Total Assets (total equity) |
|---|---|---|---|---|
| Nexstar Media Group, Inc. 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | Delaware Corporation | Sole Shareholder | N/A | N/A |
| Perry Sook 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Chairman of the Board, Chief Executive Officer | 5.8% | 5.8% |
| Michael Biard 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | President and Chief Operating Officer | <1% | <1% |
| Lee Ann Gliha 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Executive Vice President, Chief Financial Officer | <1% | <1% |
| Rachel Morgan 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Executive Vice President General Counsel, and Corporate Secretary | <1% | <1% |
| Brett Jenkins 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Executive Vice President, Chief Technology and Digital Officer | <1% | <1% |
| Blake Russell 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Executive Vice President, Operations and Content Development | <1% | <1% |
| Gary Weitman 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Executive Vice President and Chief Communications Officer | <1% | <1% |

---

[394] *See* Nexstar Media Group, Inc*., Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934*, Securities & Exchange Commission (filed Apr. 30, 2025), https://tinyurl.com/wk8tw98y. Although certain of the officers and directors (other than Mr. Sook) collectively hold approximately 6.7% of votes and assets, no one individual holds a greater than 5% interest.

3

**App.215**

REDACTED - FOR PUBLIC INSPECTION

| Name / Address | Citizenship | Positional Interest | Percent of Votes[394] | Percent of Total Assets (total equity) |
|---|---|---|---|---|
| Randall Bradford<br>545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Executive Vice President and Chief Communications Officer | <1% | <1% |
| Patrick Cusick<br>545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Senior Vice President, Controller | <1% | <1% |
| Lindsey Knapp<br>545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Senior Vice President, Human Resources and Associate Counsel | <1% | <1% |
| Scott Weaver<br>545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Senior Vice President, Government Relations | <1% | <1% |
| Mark Hoyla<br>545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Vice President Financial Reporting | <1% | <1% |
| Jason Gray<br>545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Vice President, Assistant Corporate Controller | <1% | <1% |
| Kris Kettler<br>545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Vice President, Tax | <1% | <1% |
| Geoff Armstrong<br>545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Director | <1% | <1% |
| Bernadette S. Aulestia<br>545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Director | <1% | <1% |
| Jay M. Grossman<br>545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Director | <1% | <1% |
| Ellen Johnson<br>545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Director | <1% | <1% |
| C. Thomas McMillen<br>545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Director | <1% | <1% |
| Lisbeth McNabb<br>545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Director | <1% | <1% |
| John R. Muse<br>545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Director | <1% | <1% |

4

**App.216**

REDACTED - FOR PUBLIC INSPECTION

| Name / Address | Citizenship | Positional Interest | Percent of Votes[394] | Percent of Total Assets (total equity) |
|---|---|---|---|---|
| Tony Wells 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Director | <1% | <1% |

5

**App.217**

REDACTED - FOR PUBLIC INSPECTION

TEGNA is likewise a publicly traded company, and the number of shares held by any one shareholder is subject to change at any time. Currently, TEGNA has three shareholders that each hold a 5% or greater voting interest, all three of which are investment companies under 15 U.S.C. § 80a–3. These entities will not hold an attributable interest in Nexstar following the consummation of the Transaction. Should TEGNA learn that any other shareholder obtains an attributable interest during the pendency of this application, the applicants will submit an appropriate amendment. The current officers, directors, and attributable shareholder of TEGNA are listed below.

**TEGNA INC.**

| Name / Address | Citizenship | Positional Interest | Percent of Votes | Percent of Total Assets (total equity) |
|---|---|---|---|---|
| The Vanguard Group, Inc. 100 Vanguard Blvd. Malvern, PA 19355 | U.S. | Shareholder | 16.2% | 16.2% |
| BlackRock, Inc. 50 Hudson Yards New York, NY 10001 | U.S. | Shareholder | 15.5% | 15.5% |
| Dimensional Fund Advisors LP 6300 Bee Cave Road, Building One, Austin, TX 78746 | U.S. | Shareholder | 6.4% | 6.4% |
| Ed Busby 8350 Broad Street, Suite 2000 Tysons, VA 22102 | U.S. | Officer | <1% | <1% |
| Tom Cox 8350 Broad Street, Suite 2000 Tysons, VA 22102 | U.S. | Officer | <1% | <1% |
| Julie Heskett 8350 Broad Street, Suite 2000 Tysons, VA 22102 | U.S. | Officer | <1% | <1% |
| Jeffery Newman 8350 Broad Street, Suite 2000 Tysons, VA 22102 | U.S. | Officer | <1% | <1% |
| Kurt Rao 8350 Broad Street, Suite 2000 Tysons, VA 22102 | U.S. | Officer | <1% | <1% |

**App.218**

REDACTED - FOR PUBLIC INSPECTION

| | | | | |
|---|---|---|---|---|
| Adrienne Roark<br>8350 Broad Street, Suite 2000<br>Tysons, VA 22102 | U.S. | Officer | <1% | <1% |
| Dhanusha Sivajee<br>8350 Broad Street, Suite 2000<br>Tysons, VA 22102 | U.S. | Officer | <1% | <1% |
| Marc Sher<br>8350 Broad Street, Suite 2000<br>Tysons, VA 22102 | U.S. | Officer | <1% | <1% |
| Michael Steib<br>8350 Broad Street, Suite 2000<br>Tysons, VA 22102 | U.S. | Officer and Director | <1% | <1% |
| Alex Tolston<br>8350 Broad Street, Suite 2000<br>Tysons, VA 22102 | U.S. | Officer | <1% | <1% |
| Richard von Seelen<br>8350 Broad Street, Suite 2000<br>Tysons, VA 22102 | U.S. | Officer | <1% | <1% |
| Gina L. Bianchini<br>8350 Broad Street, Suite 2000<br>Tysons, VA 22102 | U.S. | Director | <1% | <1% |
| Catherine Dunleavy<br>8350 Broad Street, Suite 2000<br>Tysons, VA 22102 | U.S. | Director | <1% | <1% |
| Howard D. Elias<br>8350 Broad Street, Suite 2000<br>Tysons, VA 22102 | U.S. | Director | <1% | <1% |
| Stuart J. Epstein<br>8350 Broad Street, Suite 2000<br>Tysons, VA 22102 | U.S. | Director | <1% | <1% |
| Scott K. McCune<br>8350 Broad Street, Suite 2000<br>Tysons, VA 22102 | U.S. | Director | <1% | <1% |
| Henry W. McGee<br>8350 Broad Street, Suite 2000<br>Tysons, VA 22102 | U.S. | Director | <1% | <1% |

7

**App.219**

REDACTED - FOR PUBLIC INSPECTION

| | | | | |
|---|---|---|---|---|
| Neal B. Shapiro<br>8350 Broad Street, Suite 2000<br>Tysons, VA 22102 | U.S. | Director | <1% | <1% |
| Denmark West<br>8350 Broad Street, Suite 2000<br>Tysons, VA 22102 | U.S. | Director | <1% | <1% |
| Melinda C. Witmer<br>8350 Broad Street, Suite 2000<br>Tysons, VA 22102 | U.S. | Director | <1% | <1% |

8

**App.220**

REDACTED - FOR PUBLIC INSPECTION

Upon the closing of the Transaction, Nexstar Media Inc. will be the ultimate parent of TEGNA. Corporate structure charts illustrating the pre- and post-closing structures of the merging companies can be found in Attachments A-1 and A-2. Nexstar does not anticipate any changes in the board of directors or officers of Nexstar. Initially, it is anticipated that the following will serve as officers and directors of TEGNA and each of its direct and indirect subsidiaries:

**OFFICERS AND DIRECTORS OF POST-MERGER TEGNA**
**(and direct and indirect subsidiaries)**

| Name / Address | Citizenship | Positional Interest | Percent of Votes | Percent of Total Assets (total equity) |
|---|---|---|---|---|
| Perry Sook 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Chairman of the Board, Chief Executive Officer | 0 | 0 |
| Michael Biard 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | President and Chief Operating Officer | 0 | 0 |
| Lee Ann Gliha 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Executive Vice President, Chief Financial Officer | 0 | 0 |
| Rachel Morgan 545 E. John Carpenter Freeway, Suite 700 Irving, Texas 75062 | U.S. | Executive Vice President General Counsel, and Corporate Secretary | 0 | 0 |

9

**App.221**

REDACTED - FOR PUBLIC INSPECTION

Form 2100, Schedule 315
Comprehensive Exhibit

## SCHEDULE 4 - TRANSACTION DOCUMENTS

The parties are submitting with this application a copy of the Agreement and Plan of Merger by and among TEGNA Inc., TETON Merger Sub, Inc. and Nexstar Media Group, Inc. dated August 18, 2025 (the "Merger Agreement"). The following are the Schedules to the Merger Agreement (there are no exhibits):

### Parent Disclosure Schedule

Section 1.1—Knowledge

Section 5.3—Consents and Approvals; No Violation

Section 5.6—FCC Qualifications

Section 5.7—Finders and Brokers

### Company Disclosure Schedule

Section 1.1 (a)—Knowledge

Section 1.1 (b)—Radio Stations

Section 4.1(b)—Organization

Section 4.1(c)—Definition of "Company Material Adverse Effect"

Section 4.2—Capital Stock and Indebtedness

Section 4.4(a-b)—Consents and Approvals; No Violation

Section 4.7—No Undisclosed Liabilities

Section 4.8—Compliance with Law; Permits

Section 4.9—Company Station Licenses

Appendix 4.9(a)—Company Station Licenses

Section 4.11(a)—Employee Benefit Plans

Section 4.11(e)—Multiemployer Plans

Section 4.11(g)—Post-Employment Benefits

Section 4.11(h)—Gross-ups

Section 4.11(i)—Transaction-Related Payments

1

**App.222**

**REDACTED - FOR PUBLIC INSPECTION**

Section 4.13—Litigation

Section 4.15(a)—Tax Matters

Section 4.16—Employment and Labor Matters

Section 4.17(a-c)—Real Property

Section 4.18—Intellectual Property

Section 4.19(a-b)—Material Contracts

Section 4.20—MVPD Matters

Section 6.1—Conduct of Business

Section 6.1(b)(x)—Capital Plans

Section 6.1(b)(xxi)—Specified Actions

Section 6.1(d)—Cooperation

Section 6.6(e)—Regulatory Approvals; Efforts

These Schedules to the Merger Agreement have been excluded. The excluded documents contain proprietary information, are not germane to the Commission's consideration of this application, or duplicate information already included in the application or in the possession of the Commission.[395]

Copies of excluded portions of those documents and other material will be provided to the Commission upon request, subject to the right of the parties to ask that the material submitted be held in confidence and not be made available for public inspection pursuant to applicable rules and policies of the Commission that restrict public access to confidential and proprietary information.

---

[395] *See Application of LUJ, Inc. (Assignor) and Long Nine, Inc. (Assignee) For Assignment of License of Station WYVR(FM), Petersburg, Illinois*, Memorandum Opinion and Order, 17 FCC Rcd 16980 (2002).

2

**App.223**

**REDACTED - FOR PUBLIC INSPECTION**
Execution Version

**AGREEMENT AND PLAN OF MERGER**

**by and among**

**TEGNA INC.,**

**TETON MERGER SUB, INC.**

**and**

**NEXSTAR MEDIA GROUP, INC.**

**Dated as of August 18, 2025**

**App.224**

REDACTED - FOR PUBLIC INSPECTION

## TABLE OF CONTENTS

**Page**

### ARTICLE I.

### DEFINITIONS

Section 1.1    Certain Specified Definitions ............................................................................. 2
Section 1.2    Terms Defined Elsewhere ............................................................................... 13

### ARTICLE II.

### THE TETON MERGER

Section 2.1    The Teton Merger........................................................................................... 15
Section 2.2    Closing .......................................................................................................... 15
Section 2.3    Teton Merger Effective Time......................................................................... 16
Section 2.4    Effects of the Teton Merger .......................................................................... 16
Section 2.5    Organizational Documents of the Surviving Company ................................... 16
Section 2.6    Directors........................................................................................................ 16
Section 2.7    Officers.......................................................................................................... 16

### ARTICLE III.

### CONVERSION OF SHARES; EXCHANGE OF CERTIFICATES

Section 3.1    Effect on Capital Stock ................................................................................. 17
Section 3.2    Exchange of Certificates ............................................................................... 19
Section 3.3    Treatment of Company Equity Awards ........................................................... 21
Section 3.4    Further Assurances........................................................................................ 22

### ARTICLE IV.

### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Section 4.1    Organization .................................................................................................. 22
Section 4.2    Capital Stock and Indebtedness...................................................................... 24
Section 4.3    Corporate Authority Relative to this Agreement ............................................ 26
Section 4.4    Consents and Approvals; No Violation............................................................ 26
Section 4.5    Reports and Financial Statements .................................................................. 27
Section 4.6    Internal Controls and Procedures .................................................................. 28
Section 4.7    No Undisclosed Liabilities.............................................................................. 28
Section 4.8    Compliance with Law; Permits ...................................................................... 29
Section 4.9    Company Station Licenses.............................................................................. 29
Section 4.10   Environmental Matters.................................................................................. 31
Section 4.11   Employee Benefit Plans ................................................................................. 31
Section 4.12   Absence of Certain Changes or Events........................................................... 33

REDACTED - FOR PUBLIC INSPECTION

Section 4.13  Litigation ...................................................................................... 33
Section 4.14  Company Information ................................................................... 33
Section 4.15  Tax Matters ................................................................................... 33
Section 4.16  Employment and Labor Matters .................................................. 34
Section 4.17  Real Property ................................................................................ 35
Section 4.18  Intellectual Property ..................................................................... 36
Section 4.19  Material Contracts ........................................................................ 37
Section 4.20  MVPD Matters ............................................................................. 39
Section 4.21  Finders or Brokers ....................................................................... 39
Section 4.22  Opinion of the Company's Financial Advisor ............................ 39
Section 4.23  State Takeover Statutes ................................................................ 40
Section 4.24  Related Party Transactions .......................................................... 40
Section 4.25  Certain Business Practices ........................................................... 40
Section 4.26  No Other Representations ............................................................. 40

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF PARENT AND TETON MERGER SUB

Section 5.1   Organization .................................................................................. 41
Section 5.2   Corporate Authority Relative to this Agreement ........................ 41
Section 5.3   Consents and Approvals; No Violation ........................................ 42
Section 5.4   Litigation ...................................................................................... 43
Section 5.5   Parent and Teton Merger Sub Information ................................... 43
Section 5.6   FCC Qualifications ....................................................................... 43
Section 5.7   Finders or Brokers ........................................................................ 43
Section 5.8   Solvency ....................................................................................... 44
Section 5.9   Teton Merger Sub ......................................................................... 44
Section 5.10  Ownership of Shares of Company Common Stock ..................... 44
Section 5.11  No Vote of Parent Stockholders; Teton Merger Sub Required Vote ............... 44
Section 5.12  Financing. ..................................................................................... 44
Section 5.13  Investigation; No Other Representations ..................................... 46

## ARTICLE VI.

## COVENANTS AND AGREEMENTS

Section 6.1   Conduct of Business ..................................................................... 47
Section 6.2   Access............................................................................................ 51
Section 6.3   No Solicitation.............................................................................. 52
Section 6.4   Filings; Other Actions .................................................................. 56
Section 6.5   Employee Matters ......................................................................... 57
Section 6.6   Regulatory Approvals; Efforts ..................................................... 59
Section 6.7   Takeover Statutes .......................................................................... 63
Section 6.8   Public Announcements.................................................................. 63
Section 6.9   Indemnification and Insurance ..................................................... 64
Section 6.10  Section 16 Matters........................................................................ 66

**REDACTED - FOR PUBLIC INSPECTION**

Section 6.11    Transaction Litigation ............................................................ 66
Section 6.12    Obligations of Teton Merger Sub and Parent................................... 67
Section 6.13    [Reserved] ....................................................................... 67
Section 6.14    Stock Exchange Delisting; Deregistration ...................................... 67
Section 6.15    Financing and Financing Cooperation ........................................... 67
Section 6.16    Cooperation as to Certain Indebtedness. ........................................ 72

## ARTICLE VII.

## CONDITIONS TO THE TETON MERGER

Section 7.1    Conditions to Each Party's Obligation to Effect the Teton Merger .................. 76
Section 7.2    Conditions to Obligation of Parent and Teton Merger Sub to Effect the
                 Teton Merger ....................................................................... 76
Section 7.3    Conditions to Obligation of the Company to Effect the Teton Merger ............ 77

## ARTICLE VIII.

## TERMINATION

Section 8.1    Termination or Abandonment .......................................................... 78
Section 8.2    Effect of Termination ................................................................ 79
Section 8.3    Termination Fees..................................................................... 80

## ARTICLE IX.

## MISCELLANEOUS

Section 9.1    No Survival ........................................................................ 83
Section 9.2    Expenses; Transfer Taxes............................................................ 83
Section 9.3    Counterparts; Effectiveness......................................................... 83
Section 9.4    Governing Law; Jurisdiction......................................................... 84
Section 9.5    Specific Enforcement ............................................................... 84
Section 9.6    WAIVER OF JURY TRIAL ............................................................... 85
Section 9.7    Notices............................................................................. 85
Section 9.8    Assignment; Binding Effect ......................................................... 86
Section 9.9    Severability........................................................................ 86
Section 9.10   Entire Agreement ................................................................... 87
Section 9.11   Amendments; Waivers ................................................................ 87
Section 9.12   Headings............................................................................ 87
Section 9.13   No Third-Party Beneficiaries ....................................................... 87
Section 9.14   Debt Financing Provisions .......................................................... 88
Section 9.15   Interpretation ..................................................................... 89
Section 9.16   Disclosure Schedule Matters........................................................ 90

**App.227**

REDACTED - FOR PUBLIC INSPECTION

## AGREEMENT AND PLAN OF MERGER

This AGREEMENT AND PLAN OF MERGER (this "*Agreement*"), dated as of August 18, 2025, is by and among TEGNA Inc., a Delaware corporation (the "*Company*"), Nexstar Media Group, Inc., a Delaware corporation ("*Parent*"), and Teton Merger Sub, Inc., a Delaware corporation and a direct wholly owned subsidiary of Parent ("*Teton Merger Sub*").

### WITNESSETH:

WHEREAS, Parent desires to acquire the Company, on the terms and subject to the conditions set forth in this Agreement;

WHEREAS, in furtherance of such acquisition of the Company by Parent, and on the terms and subject to the conditions set forth in this Agreement and in accordance with the Delaware General Corporation Law (the "*DGCL*"), Teton Merger Sub shall be merged with and into the Company (the "*Teton Merger*"), with the Company surviving the Teton Merger as a wholly owned Subsidiary of Parent, and each outstanding share of Company Common Stock (other than Cancelled Shares, Converted Shares and Dissenting Shares) shall be converted into the right to receive the Merger Consideration;

WHEREAS, the Board of Directors of the Company (the "*Company Board*") has unanimously (a) determined that the transactions contemplated by this Agreement, including the Teton Merger, are advisable, fair to and in the best interests of the Company and its stockholders, (b) approved the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, including the Teton Merger, (c) resolved to recommend that the holders of Company Common Stock adopt this Agreement and (d) directed that the adoption of this Agreement be submitted for consideration by the Company's stockholders at a meeting thereof;

WHEREAS, the Board of Directors of Teton Merger Sub has unanimously (a) determined that the transactions contemplated by this Agreement, including the Teton Merger, are advisable, fair to and in the best interests of Teton Merger Sub and its sole stockholder, (b) approved the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, including the Teton Merger, and (c) resolved to recommend that the sole stockholder of Teton Merger Sub adopt this Agreement;

WHEREAS, the Board of Directors of Parent (the "*Parent Board*") has unanimously approved the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, including the Teton Merger; and

WHEREAS, Parent, Teton Merger Sub and the Company desire to make certain representations, warranties, covenants and agreements specified herein.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained herein, and intending to be legally bound hereby, Parent, Teton Merger Sub and the Company agree as follows:

REDACTED - FOR PUBLIC INSPECTION

# ARTICLE I.

## DEFINITIONS

Section 1.1    Certain Specified Definitions.  As used in this Agreement:

"*Acceptable Confidentiality Agreement*" means a confidentiality agreement that contains confidentiality and non-use provisions that are no less favorable in the aggregate to the Company than those contained in the Confidentiality Agreement and which shall not contain any exclusivity provisions or other terms that would restrict in any manner the Company's ability to consummate the Teton Merger or comply with its disclosure obligations to Parent and Teton Merger Sub pursuant this Agreement; provided, that any such confidentiality agreement need not contain any standstill or similar provision.

"*Affiliate*" means, as to any Person, any other Person that, directly or indirectly, controls, or is controlled by, or is under common control with, such Person.  As used in this definition, "*control*" (including, with its correlative meanings, "*controlled by*" and "*under common control with*") means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise; provided that in no event shall a Person control or be deemed to control any other Person solely by virtue of being a party to a  Sharing Agreement with such Person.

"*Antitrust Laws*" means the Sherman Act of 1890, the Clayton Act of 1914, the Federal Trade Commission Act of 1914, the HSR Act and all other federal, state and foreign Laws in effect from time to time that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization, lessening of competition or restraint of trade.

"*Book-Entry Shares*" means shares of Company Common Stock that, immediately prior to the Teton Merger Effective Time, are not represented by Certificates but are represented in book-entry form.

"*Business Day*" means any day other than a Saturday, Sunday or any other day on which commercial banks in New York, New York are authorized or required by Law to remain closed.

"*Certificate*" means a stock certificate that, immediately prior to the Teton Merger Effective Time, represents shares of Company Common Stock.

"*Clean Team Agreement*" has the meaning set forth on Section 1.1(a) of the Company Disclosure Schedule.

"*Code*" means the U.S. Internal Revenue Code of 1986.

"*Collective Bargaining Agreement*" means a collective bargaining agreement, labor union contract, or trade union agreement.

REDACTED - FOR PUBLIC INSPECTION

"*Communications Act*" means the U.S. Communications Act of 1934, including the Telecommunications Act of 1996.

"*Company Benefit Plan*" means each compensatory or employee benefit plan, program, agreement or arrangement, including each pension, retirement, profit-sharing, deferred compensation, stock option, change in control, retention, equity or equity-based compensation, stock purchase, employee stock ownership, severance pay, vacation, bonus or other incentive plans, medical, retiree medical, vision, dental or other health plans, life insurance plans, and each other material employee benefit plan or fringe benefit plan, including each "employee benefit plan" as that term is defined in Section 3(3) of ERISA, in each case, whether oral or written, funded or unfunded, or insured or self-insured, that is maintained by the Company or any of its Subsidiaries for the benefit of any current or former employee or director of the Company or any of its Subsidiaries, other than a Multiemployer Plan and other than any plan or program maintained by a Governmental Entity to which the Company or any of its Affiliates contributes pursuant to applicable Law.

"*Company Equity Awards*" means the Company RSU Awards, Company PSU Awards and Company Phantom Share Unit Awards.

"*Company Lease*" means any lease, sublease, license and other agreement under which the Company or any of its Subsidiaries leases, subleases, licenses, uses or occupies (in each case whether as landlord, tenant, sublandlord, subtenant or by other occupancy arrangement), or has the right to use or occupy, now or in the future, any real property.

"*Company Superior Proposal*" means a *bona fide* written Company Takeover Proposal, substituting "50%" for "20%" in the definition thereof, that the Company Board determines in good faith, after consultation with the Company's independent financial advisors and outside legal counsel, taking into account such factors as the Company Board considers in good faith to be appropriate (e.g., the timing, likelihood of consummation, legal, financial, regulatory and other aspects of the Company Takeover Proposal, including the terms and conditions (including financing terms) thereof, and such other factors as the Company Board considers to be relevant in good faith (including proposed revisions to this Agreement made by Parent prior to the time of such determination)), to be more favorable from a financial point of view to the Company's stockholders than the transactions contemplated by this Agreement.

"*Company Takeover Proposal*" means any *bona fide* proposal or offer made by any Person or group (as such term is used in Section 13(d) of the Exchange Act) of related Persons (including the Company's stockholders, but excluding Parent, Teton Merger Sub and their Affiliates), and whether involving a transaction or series of related transactions, for, or that would reasonably be expected to lead to, a direct or indirect acquisition, including by merger, reorganization, share exchange, consolidation, business combination, dissolution, liquidation, stock acquisition, asset acquisition, tender offer, joint venture or similar transaction involving the Company or any of its Subsidiaries (a) of assets or businesses representing more than 20% of the revenues, net income or assets of the Company and its Subsidiaries, in each case on a consolidated basis (in each case, including securities of the Subsidiaries of the Company or of any entity surviving a merger with such Subsidiary) or (b) of more than 20% of the beneficial ownership or

-3-

**App.230**

**REDACTED - FOR PUBLIC INSPECTION**

voting power of the shares of Company Common Stock (including options, warrants to purchase or securities convertible into or exchangeable therefor) then issued and outstanding.

"***Company Termination Fee***" means an amount in cash equal to $120,000,000.

"***Compliant***" means, with respect to the Required Information, that: (a) such Required Information does not contain any untrue statement of a material fact regarding the Company and its Subsidiaries or omit to state any material fact regarding the Company and its Subsidiaries necessary in order to make such Required Information in light of the circumstances under which it was made available, not misleading, (b) such Required Information complies in all material respects with all requirements of Regulation S-K and Regulation S-X under the Securities Act for a registered public offering of non-convertible debt securities on Form S-1 that would be applicable to such Required Information (other than such provisions for which compliance is not customary in a Rule 144A offering of high yield debt securities) and (c) the financial statements and other financial information included in such Required Information (i) would not be deemed stale or otherwise be unusable under customary practices for offerings of non-convertible, high yield debt securities issued under Rule 144A promulgated under the Securities Act and (ii) are sufficient to permit the Company's independent auditors to issue customary comfort letters to the Debt Financing Parties to the extent required as part of the Debt Financing, including as to customary negative assurances and change period, in order to consummate any offering of debt securities on any Business Day prior to the Closing (and such auditors have confirmed that they are prepared to issue a comfort letter subject to their completion of customary procedures, with it being understood that such issuance of the comfort letter shall not occur until the "pricing" of such debt securities).

"***Confidentiality Agreement***" has the meaning set forth on Section 1.1(a) of the Company Disclosure Schedule.

"***Contract***" means any contract, note, bond, mortgage, indenture, deed of trust, license, lease, agreement, arrangement, commitment or other instrument or binding obligation.

"***Credit Agreement***" means the Amended and Restated Competitive Advance and Revolving Credit Agreement, dated as of December 13, 2004 and effective as of January 5, 2005, and as amended and restated as of August 5, 2013, as further amended as of June 29, 2015, as further amended as of September 30, 2016, as further amended as of August 1, 2017, as further amended as of June 21, 2018, as further amended as of August 15, 2019. as further amended as of June 11, 2020 and as further amended as of May 14, 2023, among the Company, as borrower, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent, as amended, restated, supplemented or otherwise modified from time to time.

"***Debt Financing Parties***" means the entities that have committed to provide or otherwise entered into agreements in connection with the Debt Financing, or to purchase securities from or place securities or arrange or provide loans for Parent in lieu of the Debt Financing under the Debt Commitment Letter, in connection with the Teton Merger, including the parties to the Debt Commitment Letter and any joinder agreements, engagement letters, purchase or underwriting agreements, indentures or credit agreements relating thereto (the "***Debt Financing***

-4-

REDACTED - FOR PUBLIC INSPECTION

*Entities*") and their respective representatives, successors and assigns; <u>provided</u>, that Parent and its Subsidiaries shall not be Debt Financing Parties.

"*Deferred Compensation Plan*" means each of the (i) TEGNA Inc. Deferred Compensation Plan Rules for Post-2004 Deferrals, as amended and (ii) TEGNA Inc. Deferred Compensation Plan Restatement Rules for Pre-2005 Deferrals, as amended.

"*Distribution Matters*" means all matters related to the distribution, via MVPD or otherwise (including, for clarity, via over-the-top platforms) of the Company Stations or programming content thereof.

"*Environmental Permit*" means any permit, certificate, registration, notice, approval, identification number, license or other authorization required under any applicable Environmental Law.

"*ERISA Affiliate*" means, with respect to any entity, trade or business (whether or not incorporated), any other entity, trade or business (whether or not incorporated) that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes or included the first entity, trade or business, or that is, or was at the relevant time, a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

"*Exchange Act*" means the U.S. Securities Exchange Act of 1934.

"*Existing Company Notes*" means, collectively, the notes and debentures issued pursuant to the Indentures.

"*FCC*" means the U.S. Federal Communications Commission.

"*FCC Applications*" means those applications required to be filed with the FCC to obtain the approvals of the FCC pursuant to the Communications Act and FCC Rules necessary to consummate the transactions contemplated by this Agreement.

"*FCC Consent*" means the grant by the FCC of the FCC Applications, regardless of whether the action of the FCC in issuing such grant remains subject to reconsideration or other further review by the FCC or a court.

"*FCC Rules*" means the rules, regulations, orders and promulgated and published policy statements of the FCC.

"*Fraud*" means actual and intentional common law fraud under Delaware law with respect to the representations and warranties set forth in this Agreement (including <u>Article IV</u> or <u>Article V</u>) or any certificate delivered pursuant to this Agreement. For the avoidance of doubt, the term "Fraud" does not include any claim for equitable fraud, promissory fraud, or unfair dealings fraud, or any claim for fraud or misrepresentation based on negligence or recklessness.

"*Governmental Entity*" means any federal, state, local or foreign government, any transnational governmental organization or any court of competent jurisdiction, arbitral,

-5-

**App.232**

REDACTED - FOR PUBLIC INSPECTION

administrative agency or commission or other governmental or self-regulatory authority or instrumentality, domestic or foreign.

"*Hazardous Materials*" means all substances defined or regulated as hazardous, a pollutant or a contaminant under any Environmental Law, including any regulated pollutant or contaminant (including any constituent, raw material, product or by-product thereof), petroleum or natural gas hydrocarbons or any liquid or fraction thereof, asbestos or asbestos-containing material, polychlorinated biphenyls, any hazardous waste, and any toxic, radioactive, infectious or hazardous substance, material or agent.

"*Indebtedness*" means, with respect to any Person, all obligations of such Person with respect to (i) borrowed money, (ii) notes, bonds, debentures or other debt securities or similar instruments, (iii) the deferred purchase price of property or services, including amounts payable with respect to earnouts, purchase price adjustments or other deferred payments related to acquisitions (other than trade payables not overdue by more than sixty (60) days incurred in the ordinary course of such Person's business), (iv) any interest rate, currency or other hedging arrangement (assuming they were terminated on the date of determination), (v) any conditional sale or other title retention agreement with respect to property acquired by such Person, (vi) under leases that have been (or should have been) recorded as finance leases in accordance with GAAP, (vii) letters of credit, assurances against loss, bankers' acceptances or similar facilities, (viii) guarantees of any Indebtedness of another Person and (ix) all indebtedness and other payment obligations referred to in clause (i) through clause (viii) above of another Person secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness or other payment obligations.

"*Indentures*" means, collectively:

(1) that certain indenture, dated as of March 1, 1983, as subsequently amended, supplemented or otherwise modified, including by that (i) thirteenth supplemental indenture, dated as of September 13, 2019, relating to the Company's 5.000% Senior Notes due 2029, (ii) fourteenth supplemental indenture, dated as of January 9, 2020, relating to the Company's 4.625% Senior Notes due 2028 and (iii) fifteenth supplemental indenture, dated as of September 10, 2020, relating to the Company's 4.750% Senior Notes due 2026; and

(2) that certain indenture, dated as of June 1, 1997, as subsequently amended, supplemented or otherwise modified, relating to the Company's 7.75% Senior Debenture due 2027 and the Company's 7.25% Senior Debentures due 2027.

"*Injunction*" means any order, writ, injunction, judgment, decree or ruling.

"*Intellectual Property*" means all intellectual property and similar proprietary rights existing anywhere in the world, including: (a) patents and patent applications, including continuations, divisionals, continuations-in-part, reissues or reexaminations and patents issuing thereon (collectively, "*Patents*"); (b) trademarks, service marks, trade dress, logos, corporate names, trade names and Internet domain names, and all applications and registrations therefor

-6-

**App.233**

**REDACTED - FOR PUBLIC INSPECTION**

(collectively, "*Marks*"); (c) copyrights and any other equivalent rights in works of authorship (including rights in software as a work of authorship) and any other related rights of authors (collectively, "*Copyrights*"); (d) domain names, uniform resource locators, Internet Protocol addresses, social media accounts or user names (including handles), and other names, identifiers and locators associated with any of the foregoing or other Internet addresses, sites and services; and (e) trade secrets and industrial secret rights, inventions (whether or not patentable), and rights in know-how, data and confidential or proprietary business or technical information that derives independent economic value, whether actual or potential, from not being known to other persons ("*Trade Secrets*").

"*Intervening Event*" means any event, change, occurrence or development with respect to the Company or its Subsidiaries that (i) was not known or reasonably foreseeable to the Company Board (or any committee thereof) as of the date hereof and (ii) first becomes known to the Company Board (or any committee thereof) after the execution of this Agreement and prior to obtaining the Company Stockholder Approval; provided, however, that any event, change, occurrence or development (a) that involves or relates to a Company Takeover Proposal or a Company Superior Proposal (which, for purposes of this definition, shall be read without reference to any percentages set forth in the definitions of "Company Takeover Proposal" or "Company Superior Proposal") or the consequences thereof, (b) solely resulting from any change, in and of itself, after the execution and delivery of this Agreement in the market price or trading volume of the Company Common Stock (excluding any underlying causes thereof) (c) that relates to any change in the credit rating the Company or the fact that the Company meets or exceeds internal or published estimates, projections, forecasts or predictions for any period (provided, that the underlying causes thereof may be considered in determining whether an Intervening Event has occurred (or would reasonably be expected to occur) to the extent not otherwise excluded in this definition) or (d) that relates to any opportunity to acquire (by merger, joint venture, partnership, consolidation, acquisition of stock or assets), directly or indirectly, any assets, securities, properties or businesses from, or enter into any licensing, collaborating or similar arrangements with, any other Person, shall not be deemed to constitute an Intervening Event.

"*IT Assets*" means the computers, software and software platforms, databases, websites, servers, routers, hubs, switches, circuits, networks, data communications lines and all other information technology infrastructure and equipment of the Company and its Subsidiaries that are used in connection with the operation of the business of the Company or any of its Subsidiaries.

"*Knowledge*" means (a) with respect to Parent and its Subsidiaries, the actual knowledge of the individuals listed in Section 1.1 of the Parent Disclosure Schedule and (b) with respect to the Company and its Subsidiaries, the actual knowledge of the individuals listed on Section 1.1(a) of the Company Disclosure Schedule.

"*Liability*" means any and all debts, liabilities and obligations, whether fixed, contingent or absolute, matured or unmatured, accrued or not accrued, determined or determinable, secured or unsecured, disputed or undisputed, subordinated or unsubordinated, or otherwise.

-7-

**App.234**

**REDACTED - FOR PUBLIC INSPECTION**

"*Lien*" means any mortgage, lien, pledge, security interest, charge, easement, or similar encumbrance of any kind, other than restrictions on transfer arising under applicable securities Laws and non-exclusive licenses granted in the ordinary course of business.

"*Market*" means the "Designated Market Area," as determined by The Nielsen Company, of a television broadcast station.

"*Marketing Period*" means the first period of fifteen (15) consecutive Business Days commencing after the date of this Agreement throughout which and at the end of which (a) Parent has the Required Information and the Required Information is Compliant (provided that the filing by the Company with the SEC of an Annual Report on Form 10-K or a Quarterly Report on Form 10-Q that includes any annual audited financial statements or quarterly interim financial statements of the Company included in the Required Information will be deemed to satisfy any requirement to deliver such financial statements to the Parent so long as such financial statements otherwise comply with the requirements set forth in "Required Information" with respect thereto) and (b) the condition set forth in Section 7.1(a) is satisfied; provided that (i) the Marketing Period shall not commence earlier than September 2, 2025, (ii) if the Marketing Period has not ended on or prior to December 19, 2025, the Marketing Period shall not commence earlier than January 5, 2026, (iii) if the Marketing Period has not ended on or prior to August 21, 2026, the Marketing Period shall not commence earlier than September 8, 2026, (iv) if the Marketing Period has not ended on or prior to December 18, 2026, the Marketing Period shall not commence earlier than January 4, 2027 and (v)  November 27, 2025, November 28, 2025, May 25, 2026, July 4, 2026, November 26, 2026 and November 27, 2026 shall not constitute days for purposes of calculating such fifteen consecutive Business Day period (provided, however, that such exclusion shall not restart such period); provided, further, that if the Company shall in good faith reasonably believe that it has provided the Required Information, it may deliver to Parent a written notice to that effect (stating the date upon which it believes it completed such delivery of Required Information), in which case the Company shall be deemed to have complied with such obligation to deliver Required Information on the date such notice is delivered to Parent, unless Parent in good faith reasonably believes the Company has not completed delivery of the Required Information and, within two Business Days after the delivery of such notice by the Company, delivers a written notice to the Company to that effect (stating in good faith and with specificity which items of the Required Information the Company has not delivered).  Notwithstanding the foregoing, (a) the Marketing Period will end on any earlier date that is the date on which the Debt Financing is closed and (b) the Marketing Period will not commence or be deemed to have commenced if, after the date of this Agreement and prior to the completion of the fifteen consecutive Business Day period referenced herein, (i) the Company's independent auditor has withdrawn its audit opinion or announced its intention to do so with respect to any audited financial statements that are included in the Required Information, in which case the Marketing Period will not be deemed to commence unless and until, at the earliest, a new unqualified audit opinion is issued with respect to the audited financial statements of the Company for the applicable periods by such independent auditor or another independent public accounting firm reasonably acceptable to Parent or such auditor has announced that it has concluded that no restatement will be required in accordance with GAAP and that it no longer intends to withdraw its audit opinion, (ii) the Company issues a public statement indicating its intent to, or determines that it must, restate any historical financial statements or other financial information included in the Required Information, in which case the Marketing Period will not be deemed to commence unless and until, at the earliest, such

-8-

**App.235**

REDACTED - FOR PUBLIC INSPECTION

restatement has been completed and the relevant Required Information has been amended or the Company has announced that it has concluded that no restatement will be required in accordance with GAAP, (iii) any Required Information would not be Compliant at any time during such fifteen consecutive Business Day period (it being understood that if any Required Information provided at the commencement of the Marketing Period ceases to be Compliant during such fifteen consecutive Business Day period, then the Marketing Period will be deemed not to have started unless and until the Required Information becomes Compliant) or otherwise meet the requirements of "Required Information" as defined, in each case unless and until the Required Information becomes Compliant or otherwise meets the requirements of "Required Information" as defined, as applicable, or (iv) the Company has failed to file any report on Form 10-K, Form 10-Q or Form 8-K required to be filed with the SEC by the date required under the Exchange Act, in which case (A) in the case of a failure to file a Form 10-K or Form 10-Q, the Marketing Period will not be deemed to commence unless and until, at the earliest, such reports have been filed; and (B) in the case of a failure to file a Form 8-K, the Marketing Period will be tolled until such report has been filed; provided, that if the failure to file such report occurs during the final five days of the Marketing Period, the Marketing Period will be extended so that the final day of the Marketing Period will be no earlier than the fifth day after such report has been filed.

"*MVPD*" means any multi-channel video programming distributor, including cable systems, wireline telecommunications companies and direct broadcast satellite systems (in each case, solely to the extent that such system or company qualifies as a multi-channel video programming distributor, as such term is defined by the FCC).

"*Order*" means any charge, order, writ, injunction, judgment, decree, ruling, determination, directive, award, consent decree, settlement or stipulation issued, promulgated, made, rendered or entered into by or with any Governmental Entity, whether civil, criminal or administrative.

"*Parent Credit Agreement*" means that certain Credit Agreement, dated as of January 17, 2017, by and among Nexstar Media Inc., a Delaware corporation., as the borrower, Nexstar Media Group, Inc., a Delaware corporation, as holdings, the lenders party thereto and Bank of America, N.A., as the administrative agent (as amended by that Amendment No. 1 dated July 19, 2017, that Amendment No. 2 dated October 26, 2018, that certain Amendment No. 3 dated as of September 19, 2019, that certain Amendment No. 4 dated as of September 3, 2020, that certain Amendment No. 5 dated as of June 21, 2022, that certain Amendment No. 6 dated as of June 6, 2023, that certain Amendment No. 7 dated as of June 27, 2025).

"*Parent Regulatory Termination Fee*" means an amount in cash equal to $125,000,000.

"*Permitted Lien*" means (a) any Lien for Taxes not yet due and payable or that are being contested in good faith by appropriate proceedings or for which adequate reserves have been established by the Company or Parent, as applicable, in accordance with GAAP, (b) vendors', mechanics', materialmen's, carriers', workers', landlords', repairmen's, warehousemen's, construction and other similar Liens (i) with respect to Liabilities that are not yet due and payable, (ii) that are being contested in good faith by appropriate proceedings and for which adequate reserves (based on good faith estimates of management) have been set aside for the payment

-9-

**App.236**

REDACTED - FOR PUBLIC INSPECTION

thereof in accordance with GAAP or (iii) arising or incurred in the ordinary and usual course of business and which are not, individually or in the aggregate, material to the business operations of the Company or Parent, as applicable, and its Subsidiaries and do not materially adversely affect the market value or continued use of the asset encumbered thereby, (c) Liens imposed or promulgated by applicable Law or any Governmental Entity with respect to real property, including zoning, building or similar restrictions but only to the extent that the Company or Parent, as applicable, and its Subsidiaries and their assets are materially in compliance with the same, (d) pledges or deposits in connection with workers' compensation, unemployment insurance, and other social security legislation, (e) Liens relating to intercompany borrowings among a Person and its wholly owned subsidiaries, (f) utility easements, minor encroachments, rights of way, imperfections in title, charges, easements, rights of way (whether recorded or unrecorded), restrictions, declarations, covenants, conditions, defects and similar Liens, but not including any monetary Liens, that are imposed by any Governmental Entity having jurisdiction thereon or otherwise are typical for the applicable property type and locality as do not individually or in the aggregate materially interfere with the present occupancy or use or market value of the applicable real property or otherwise materially impair the business operations of the Company or Parent, as applicable, and its Subsidiaries or (g) Liens to be released at or prior to Closing.

"*Person*" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or any other entity, group (as such term is used in Section 13 of the Exchange Act) or organization, including a Governmental Entity and any permitted successors and assigns of such person.

"*Proceeding*" means any action, suit, claim, hearing, arbitration, litigation or other proceeding, in each case, by or before any Governmental Entity.

"*Program Rights*" means rights to broadcast and rebroadcast television programs, feature films, shows or other video programming.

"*Radio Stations*" means the radio stations owned and operated by the Company or any of its Subsidiaries, all of which are listed on Section 1.1(b) of the Company Disclosure Schedule.

"*Required Information*" means (a) all financial statements, financial data, audit reports and other information regarding the Company and its Subsidiaries of the type customarily included in offering memoranda for offering(s) of non-convertible, high yield debt securities issued pursuant to Rule 144A promulgated under the Securities Act as contemplated by the Debt Commitment Letter, assuming that such offering(s) were consummated at the same time during the Company's fiscal year as such offering(s) of debt securities will be made (including all audited financial statements and all unaudited financial statements (which will have been reviewed by the Company's independent accountants as provided in Statement on Auditing Standards 100)) and (b) such other pertinent and customary information regarding the Company and its Subsidiaries (including their assets and stations) (i) requested by Parent to the extent that such information is required in connection with the Debt Commitment Letter or the Debt Financing or of the type and form customarily included in offering memoranda for an offering of non-convertible, high-yield debt securities issued pursuant to Rule 144A promulgated under the Securities Act as contemplated by the Debt Commitment Letter or marketing documents used in connection with the Debt

-10-

**App.237**

**REDACTED - FOR PUBLIC INSPECTION**

Financing (including, but not limited to, (A) the historical financial, business and other information of the Company and its Subsidiaries that is requested by Parent to the extent necessary to permit Parent to prepare (x) pro forma financial statements (provided, however, that the Company and its Subsidiaries shall have no obligation to prepare any pro forma financial statements), (y) "Management's Discussion and Analysis of Financial Condition and Results of Operations" and (z) to the extent reasonably requested by Parent for disclosure and reasonably reliable and readily available without unreasonable effort, "flash" or "recent developments" financial information, in each case of (x), (y) and (z), in all material respects in compliance with the requirements of Regulation S-X under the Securities Act for registered offerings of securities on Form S-1 (or any successor form thereto) under the Securities Act (other than such provisions for which compliance is not customary in a Rule 144A offering of high yield debt securities), and for the periods (including for the twelve (12)-month period ending on the last day of the most recently completed fiscal quarter) customarily included in such offering memoranda and (B) all cost savings initiatives initiated or implemented by the Company or any of its Subsidiaries and any realized synergies) or (ii) as otherwise necessary to receive from the Company's independent auditors (and any other auditor to the extent that financial statements audited or reviewed by such auditors are or would be included in such offering memorandum) customary "comfort" (including "negative assurance" comfort and change period comfort), together with drafts of customary comfort letters that such independent auditors are prepared to deliver upon the "pricing" of any high-yield bonds being issued in connection with the Debt Financing, with respect to the financial information to be included in such offering memorandum.  Notwithstanding anything to the contrary in this definition, nothing herein will require the Company or any of its Affiliates to provide (or be deemed to require any of them to prepare) any (A) pro forma financial statements, (B) description of all or any portion of the Debt Financing, including any "description of notes", "plan of distribution" and information customarily provided by investment banks or their counsel or advisors in preparation of an offering memorandum for private placements of non-convertible, high-yield debt securities issued pursuant to Rule 144A promulgated under the Securities Act, (C) risk factors relating to all or any component of the Debt Financing, (D) (1) historical financial statements or other information required by Rule 3-05, Rule 3-09, Rule 3-10, Rule 3-16, Rule 13-01 or Rule 13-02 of Regulation S-X under the Securities Act, (2) any compensation discussion and analysis or other information required by Item 10, Item 402, Item 404 and Item 601 of Regulation S-K under the Securities Act, XBRL exhibits or any information regarding executive compensation or related persons related to SEC Release Nos. 33-8732A, 34-54302A and IC-27444A or (3) separate Subsidiary financial statements, (E) projections or (F) information regarding any post-Closing or pro-forma cost savings, synergies, capitalization or ownership desired to be incorporated into any information used in connection with the Debt Financing.  The information described in clauses (A)-(F) of this definition is collectively referred to as the "***Excluded Information***."

"***SEC***" means the U.S. Securities and Exchange Commission.

"***Securities Act***" means the U.S. Securities Act of 1933.

"***Sensitive Data***" means cardholder data and sensitive authentication data that must be protected in accordance with the requirements of the Payment Card Industry Data Security Standard.

REDACTED - FOR PUBLIC INSPECTION

"*Sharing Agreement*" means a time brokerage, local marketing or shared services Contract with respect to a television broadcast station.

"*Solvent*" when used with respect to any Person, means that, as of any date of determination, (a) the fair value of the assets of such Person and its Subsidiaries on a consolidated basis, at a fair valuation, will exceed the debts and liabilities, direct, subordinated, contingent or otherwise, of such Person and its Subsidiaries on a consolidated basis, (b) the present fair saleable value of the property of such Person and its Subsidiaries on a consolidated basis will be greater than the amount that will be required to pay the probable liability of such Person and its Subsidiaries on a consolidated basis on their debts and other liabilities, direct, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured, (c) such Person and its Subsidiaries on a consolidated basis will be able to pay their debts and liabilities, direct, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured and (d) such Person and its Subsidiaries on a consolidated basis will not have unreasonably small capital with which to conduct the businesses in which they are engaged as such businesses are now conducted and are proposed to be conducted following the Closing Date.

"*Subsidiary*" means, with respect to any Person, any corporation, partnership, association, trust or other form of legal entity of which (a) such first Person directly or indirectly owns or controls a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions or (b) of which such first Person is a general partner or managing member.

"*Tax*" or "*Taxes*" means any and all federal, state, local or foreign taxes imposed by any Taxing Authority, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, environmental, stamp, occupation, premium, and property (real or personal) or other taxes of any kind whatsoever, including any and all interest, penalties, additions to tax or additional amounts imposed by any Governmental Entity with respect thereto.

"*Tax Return*" means any return, declaration, report or similar filing filed or required to be filed with respect to Taxes, including any information return, claim for refund, amended return, or declaration of estimated Taxes.

"*Taxing Authority*" means any Governmental Entity responsible for the administration or the imposition of any Tax.

"*TV Stations*" means all television broadcast stations (including stations operated as "satellites" pursuant to Section 73.3555, Note 5, of the FCC Rules), low power television stations (including Class A stations) and TV translator stations owned by the Company or any of its Subsidiaries.

"*Willful Breach*" means a deliberate act or failure to act, which act or failure to act constitutes in and of itself a material breach of this Agreement, and such action or failure to take action was undertaken with actual knowledge that the taking of such action or the failure to act would reasonably be expected to cause a breach of this Agreement.

-12-

**App.239**

**REDACTED - FOR PUBLIC INSPECTION**

Section 1.2    Terms Defined Elsewhere.  The following terms are defined elsewhere in this Agreement, as indicated below:

**Section**

Actions .................................................................................................Section 9.4(b)
Agreement.............................................................................................. Preamble
Cancelled Shares ......................................................................... Section 3.1(a)(ii)
Change ................................................................................................Section 4.1(c)
Chosen Courts.....................................................................................Section 9.4(b)
Clearance Date ...................................................................................Section 6.4(a)
Closing ................................................................................................ Section 2.2
Closing Date.......................................................................................... Section 2.2
Company................................................................................................ Preamble
Company Acquisition Agreement........................................................Section 6.3(e)
Company Adverse Recommendation Change .......................................Section 6.3(e)
Company Board ................................................................................... Recitals
Company Common Stock ...................................................................Section 4.2(a)
Company Disclosure Schedule ........................................................... Article IV
Company Employee.............................................................................Section 6.5(a)
Company Indenture Officers' Certificates..........................................Section 6.16(a)
Company Internal Controls Disclosures ............................................. Section 4.6
Company Material Adverse Effect ......................................................Section 4.1(c)
Company Material Contracts ..............................................................Section 4.19(a)
Company Note Offers and Consent Solicitations ...............................Section 6.16(a)
Company Organizational Documents..................................................Section 4.1(b)
Company Phantom Share Unit Award.................................................Section 3.3(b)
Company PSU Award..........................................................................Section 3.3(a)
Company Recommendation................................................................ Section 4.3
Company Redemption Notice.............................................................Section 6.16(b)
Company Redemption Officers' Certificate .......................................Section 6.16(b)
Company Registered Intellectual Property .........................................Section 4.18(a)
Company Related Parties....................................................................Section 8.3(f)(i)
Company RSU Award .........................................................................Section 3.3(a)
Company SEC Documents ..................................................................Section 4.5(a)
Company Station License ...................................................................Section 4.9(a)
Company Stations ...............................................................................Section 4.9(a)
Company Stockholder Approval.......................................................... Section 4.3
Company Stockholders' Meeting ........................................................Section 6.4(b)
Company Supplemental Indenture......................................................Section 6.16(a)
Consent Solicitations ..........................................................................Section 6.16(a)
Continuation Period ...........................................................................Section 6.5(a)
control ..................................................................................See definition of Affiliate
controlled by ........................................................................See definition of Affiliate
Converted Shares ...............................................................................Section 3.1(a)(ii)
Copyrights...........................................................See definition of Intellectual Property
Covered Persons..................................................................................Section 6.9(a)

-13-

**App.240**

**REDACTED - FOR PUBLIC INSPECTION**

D&O Insurance ...................................................................................................Section 6.9(c)

days ................................................................................................................... Section 9.15

Debt Commitment Letter ....................................................................................Section 5.12(a)

Debt Financing...................................................................................................Section 5.12(a)

Debt Financing Entities................................................................ See definition of Debt Financing Parties

Debt Financing Related Parties.......................................................................... Section 9.14

Debt Offer Documents........................................................................................Section 6.16(a)

Definitive Agreements .......................................................................................Section 6.15(a)

DGCL.................................................................................................................. Recitals

Disclosure Schedule........................................................................................... Section 9.16

Dissenting Shares...............................................................................................Section 3.1(b)(i)

Enforceability Exceptions .................................................................................. Section 4.3

Enforcement Expenses........................................................................................Section 8.3(d)

Environmental Laws ..........................................................................................Section 4.10(a)

Excluded Information ........................................................... See definition of Required Information

Existing Credit Facilities Termination................................................................Section 6.16(c)

extent.................................................................................................................. Section 9.15

Financing Amount .............................................................................................Section 5.12(c)

GAAP.................................................................................................................Section 4.5(b)

HSR Act .............................................................................................................Section 4.4(a)

IRS ..................................................................................................................... Section 4.11(a)(iv)

Laws...................................................................................................................Section 4.8(a)

Marks ................................................................................See definition of Intellectual Property

Merger Consideration ........................................................................................Section 3.1(a)(iii)

Multiemployer Plan ...........................................................................................Section 4.11(e)

Offers to Purchase..............................................................................................Section 6.16(a)

Outside Date.......................................................................................................Section 8.1(b)

Owned Real Property..........................................................................................Section 4.17(a)

Parent ................................................................................................................. Preamble

Parent Board....................................................................................................... Recitals

Parent Disclosure Schedule................................................................................ Article V

Parent Expenses .................................................................................................Section 8.3(e)

Parent Material Adverse Effect...........................................................................Section 5.1(b)

Parent Related Parties ........................................................................................Section 8.3(f)(i)

participate........................................................................................................... Section 6.11

Patents ...............................................................................See definition of Intellectual Property

Paying Agent......................................................................................................Section 3.2(a)

Payment Fund ....................................................................................................Section 3.2(b)

Payoff Amount...................................................................................................Section 6.16(c)

Post-Closing Plans .............................................................................................Section 6.5(c)

Prohibited Modifications ...................................................................................Section 6.15(b)

Proxy Statement ................................................................................................ Section 4.14

Qualified Plan ....................................................................................................Section 4.11(c)

Qualifying Transaction ......................................................................................Section 8.3(a)

Redemption ........................................................................................................Section 6.16(b)

Reimbursement Obligations...............................................................................Section 6.16(d)

-14-

App.241

**REDACTED - FOR PUBLIC INSPECTION**

Renewal Application...............................................................................Section 6.6(d)
Representatives ....................................................................................... Section 5.13
Sarbanes-Oxley Act ...............................................................................Section 4.5(a)
Specified Date........................................................................................Section 4.2(a)
Surviving Company ..................................................................................... Section 2.1
Takeover Statute ......................................................................................... Section 4.23
Teton Certificate of Merger ......................................................................... Section 2.3
Teton Merger .......................................................................................................... Recitals
Teton Merger Effective Time ....................................................................... Section 2.3
Teton Merger Sub ......................................................................................... Preamble
to the extent................................................................................................ Section 9.15
Trade Secrets...............................................................See definition of Intellectual Property
Transaction Approvals..............................................................................Section 4.4(a)
Transaction Litigation................................................................................... Section 6.11
under common control with................................................................. See definition of Affiliate

## ARTICLE II.

## THE TETON MERGER

Section 2.1    The Teton Merger.  At the Teton Merger Effective Time, upon the terms and subject to the conditions set forth in this Agreement and in accordance with the applicable provisions of the DGCL, Teton Merger Sub shall be merged with and into the Company, whereupon the separate corporate existence of Teton Merger Sub shall cease, and the Company shall continue its existence under Delaware law as the surviving corporation in the Teton Merger (the "*Surviving Company*") and a wholly owned subsidiary of Parent.

Section 2.2    Closing.  The closing of the Teton Merger (the "*Closing*") shall take place (a) at 10:00 a.m. local time at the offices of Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York, 10019, or remotely by exchange of documents and signatures (or their electronic counterparts) on the third Business Day following the day on which the last of the conditions set forth in Article VII to be satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing) shall be satisfied or, to the extent permitted by applicable Law, waived in accordance with this Agreement; provided, that if the Marketing Period has not ended at the time of the satisfaction or waiver of the conditions set forth in Article VII (other than any condition that by its nature is to be satisfied at the Closing), the Closing shall be delayed and occur instead on the date following such satisfaction or waiver of such conditions that is the earlier to occur of (i) any Business Day before or during the Marketing Period as may be specified by Parent on no less than three Business Days' prior written notice to the Company and (ii) three Business Days following the final day of the Marketing Period (subject, in each case of (i) and (ii), to the satisfaction or waiver (to the extent permitted hereunder) of all conditions set forth in Article VII (other than any condition that by its nature is to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at Closing)), or (b) at such other place, date and time as the Company and Parent may agree in writing.  The date on which the Closing actually occurs is referred to as the "*Closing Date*".

-15-

**App.242**

**REDACTED - FOR PUBLIC INSPECTION**

Section 2.3     Teton Merger Effective Time.  On the Closing Date, the Company and Teton Merger Sub shall file with the Secretary of State of the State of Delaware a certificate of merger (the "***Teton Certificate of Merger***"), executed in accordance with, and containing such information as is required by, the applicable provisions of the DGCL in order to effect the Teton Merger.  The Teton Merger shall become effective at such time as the Teton Certificate of Merger has been filed with the Secretary of State of the State of Delaware or at such other time as may be agreed in writing between the parties hereto and specified in the Teton Certificate of Merger in accordance with the relevant provisions of the DGCL (such time is hereinafter referred to as the "***Teton Merger Effective Time***").

Section 2.4     Effects of the Teton Merger.  The effects of the Teton Merger shall be as provided in this Agreement and in the applicable provisions of the DGCL.

Section 2.5     Organizational Documents of the Surviving Company.

(a)     At the Teton Merger Effective Time, the certificate of incorporation of Teton Merger Sub, as in effect immediately prior to the Teton Merger Effective Time, shall be the certificate of incorporation of the Surviving Company until thereafter amended in accordance with the provisions thereof and applicable Law, except that the name of the Surviving Company shall be "TEGNA Inc." and provided that the certificate of incorporation of the Surviving Company shall contain provisions no less favorable with respect to exculpation, indemnification of and advancement of expenses to Covered Persons for periods at or prior to the Teton Merger Effective Time than are currently set forth in the certificate of incorporation of the Company.

(b)     At the Teton Merger Effective Time, the bylaws of Teton Merger Sub, as in effect immediately prior to the Teton Merger Effective Time, shall be the bylaws of the Surviving Company until thereafter amended in accordance with the provisions thereof and applicable Law, except that the name of the Surviving Company shall be "TEGNA Inc." and provided that the bylaws of the Surviving Company shall contain provisions no less favorable with respect to exculpation, indemnification of and advancement of expenses to Covered Persons for periods at or prior to the Teton Merger Effective Time than are currently set forth in the bylaws of the Company.

Section 2.6     Directors.  The directors of Teton Merger Sub immediately prior to the Teton Merger Effective Time shall be the initial directors of the Surviving Company and shall hold office until their respective successors are duly elected and qualified, or their earlier death, resignation or removal, in each case in accordance with the certificate of incorporation and bylaws of the Surviving Company.

Section 2.7     Officers.  Except as otherwise determined by Parent prior to the Teton Merger Effective Time, the officers of the Teton Merger Sub immediately prior to the Teton Merger Effective Time shall be the initial officers of the Surviving Company and shall hold office until their respective successors are duly elected and qualified, or their earlier death, resignation or removal, in each case in accordance with the certificate of incorporation and bylaws of the Surviving Company.

**App.243**

**REDACTED - FOR PUBLIC INSPECTION**

**ARTICLE III.**

**CONVERSION OF SHARES; EXCHANGE OF CERTIFICATES**

Section 3.1    Effect on Capital Stock.

(a)    At the Teton Merger Effective Time, by virtue of the Teton Merger and without any action on the part of Parent, the Company, Teton Merger Sub or any holder of Company Common Stock or shares of common stock of Teton Merger Sub:

(i)    Common Stock of Teton Merger Sub.  Each share of common stock, par value $0.01 per share, of Teton Merger Sub issued and outstanding immediately prior to the Teton Merger Effective Time shall be converted into and become one validly issued, fully paid and nonassessable share of common stock, par value $0.01 per share, of the Surviving Company.  From and after the Teton Merger Effective Time, all certificates representing shares of common stock of Teton Merger Sub shall be deemed for all purposes to represent the number of shares of common stock of the Surviving Company into which they were converted in accordance with the immediately preceding sentence.

(ii)    Cancellation and Conversion of Certain Stock.  Each share of Company Common Stock issued and outstanding immediately prior to the Teton Merger Effective Time that is owned by Parent or owned or held in treasury by the Company shall no longer be outstanding and shall automatically be cancelled and shall cease to exist (such shares of Company Common Stock, the "*Cancelled Shares*"), and no consideration shall be delivered in exchange therefor.  Each share of Company Common Stock issued and outstanding immediately prior to the Teton Merger Effective Time that is owned or held by any wholly owned Subsidiary of the Company shall be converted into such number of shares of stock of the Surviving Company such that each such Subsidiary shall own the same percentage of the outstanding capital stock of the Surviving Company immediately following the Teton Merger Effective Time as such Subsidiary owned in the Company immediately prior to the Teton Merger Effective Time (such shares of Company Common Stock, the "*Converted Shares*").

(iii)    Conversion of Shares of Company Common Stock.  Each share of Company Common Stock issued and outstanding immediately prior to the Teton Merger Effective Time (other than Cancelled Shares, Converted Shares and Dissenting Shares) shall be automatically converted into the right to receive $22.00 in cash, without interest (the "*Merger Consideration*") in accordance with the provisions of Section 3.2 (or in the case of a lost, stolen or destroyed certificate, upon delivery of an affidavit (and bond, if required) in accordance with the provisions of Section 3.2(i)).

Each share of Company Common Stock converted into the right to receive Merger Consideration pursuant to this Article III shall no longer be outstanding and shall automatically be cancelled and shall cease to exist as of the Teton Merger Effective Time, and all Book-Entry Shares and Certificates that, immediately prior to the Teton Merger Effective Time, represented any such shares of Company Common Stock shall thereafter represent only the right to receive the Merger

-17-

**App.244**

**REDACTED - FOR PUBLIC INSPECTION**

Consideration into which the shares of Company Common Stock represented by such shares have been converted pursuant to this <u>Section 3.1</u>.

       (b)    <u>Shares of Dissenting Stockholders</u>.

       (i)    Notwithstanding anything in this Agreement to the contrary, if required by the DGCL (but only to the extent required thereby), shares of Company Common Stock that are issued and outstanding immediately prior to the Teton Merger Effective Time (other than the Cancelled Shares and the Converted Shares) and that are held by holders of such shares who have not voted in favor of the adoption of this Agreement or consented thereto in writing and who have properly exercised appraisal rights with respect thereto in accordance with, and who have complied with, Section 262 of the DGCL with respect to such shares held by any such holder (such shares of Company Common Stock, the "***Dissenting Shares***") shall not be converted into the right to receive the Merger Consideration, and holders of such Dissenting Shares shall be entitled to receive payment of the fair value of such Dissenting Shares in accordance with the provisions of such Section 262, unless and until any such holder fails to perfect or effectively withdraws or loses its rights to appraisal and payment under the DGCL.  If, after the Teton Merger Effective Time, any such holder fails to perfect or effectively withdraws or loses such rights, such Dissenting Shares shall thereupon be no longer considered Dissenting Shares under this Agreement and shall be treated as if they had been converted into, at the Teton Merger Effective Time, the right to receive the Merger Consideration, without any interest thereon, and the Surviving Company shall remain liable for payment of the Merger Consideration for such shares.  At the Teton Merger Effective Time, any holder of Dissenting Shares shall cease to have any rights with respect thereto, except the rights provided in Section 262 of the DGCL and as provided in the previous sentence.

       (ii)    The Company shall give Parent (A) prompt notice (but in any event within two (2) Business Days of receipts) of any demands (or threats in writing thereof) received by the Company for appraisals of any shares of its capital stock under Section 262 of the DGCL, withdrawals of such demands and any other instruments served pursuant to the DGCL received by the Company relating to appraisal demands and (B) the opportunity to participate in, direct and control all negotiations and proceedings with respect to such demands.  The Company shall not, except with the prior written consent of Parent (which consent may be given, conditioned or withheld in Parent's sole discretion), make any payment with respect to any such demands for appraisal, settle or offer to settle any such demands, or agree to do any of the foregoing.

       (c)    <u>Certain Adjustments</u>.  If, between the date of this Agreement and the Teton Merger Effective Time, the outstanding shares of Company Common Stock shall have been changed into a different number of shares or a different class of shares by reason of any stock dividend, subdivision, reorganization, reclassification, recapitalization, stock split, reverse stock split, combination or exchange of shares, or any similar event shall have occurred, then the Merger Consideration shall be equitably adjusted, without duplication, to proportionally reflect such change; <u>provided</u>, that nothing in this <u>Section 3.1(c)</u> shall be construed to permit the Company to take any action with respect to its securities that is prohibited by the terms of this Agreement.

-18-

**App.245**

**REDACTED - FOR PUBLIC INSPECTION**

Section 3.2    Exchange of Certificates.

(a)    Appointment of Paying Agent.  Prior to the Closing, Parent shall appoint a bank or trust company reasonably acceptable to the Company to act as paying agent (the "***Paying Agent***") for the payment of the Merger Consideration and shall enter into a paying agent agreement reasonably acceptable to the Company relating to the Paying Agent's responsibilities under this Agreement.

(b)    Deposit of Merger Consideration.  Prior to or as of the Teton Merger Effective Time, Parent shall deposit, or cause to be deposited, with the Paying Agent, in trust for the benefit of the holders of shares of Company Common Stock that are converted in accordance with this Agreement, a cash amount that is sufficient to pay the aggregate Merger Consideration payable pursuant to this Article III (such cash, the "***Payment Fund***").  The Payment Fund shall not be used for any purpose other than to fund payments of the Merger Consideration pursuant to this Article III.

(c)    Exchange Procedures.  As promptly as practicable (and no later than the fifth Business Day) after the Teton Merger Effective Time, Parent shall cause the Paying Agent to mail (i) to each holder of record of one or more Certificates whose shares of Company Common Stock were converted into the right to receive the Merger Consideration payable pursuant to Section 3.1(a)(iii), (A) a form of letter of transmittal (which shall specify that delivery shall be effected, and risk of loss and title to the Certificates shall pass, only upon proper delivery of the Certificates to the Paying Agent and which shall be in customary form and contain customary provisions) and (B) instructions for use in effecting the surrender of the Certificates in exchange for the Merger Consideration and (ii) to each holder of record of Book-Entry Shares whose shares of Company Common Stock were converted into the right to receive the Merger Consideration payable pursuant to Section 3.1(a)(iii), instructions for use in effecting the surrender of such Book-Entry Shares in exchange for the Merger Consideration.  Each holder of record of one or more Certificates, upon surrender to the Paying Agent of such Certificate or Certificates, together with such letter of transmittal, duly executed, and such other documents as may reasonably be required by Parent or the Paying Agent, and each holder of record of Book-Entry Shares, upon surrender to the Paying Agent of such Book-Entry Shares (which shall be deemed surrendered upon receipt by the Paying Agent of an "agent's message" in customary form or such other evidence as the Paying Agent may reasonably request), shall be entitled to receive in exchange therefor the amount of Merger Consideration to which such holder is entitled pursuant to Section 3.1(a)(iii), and the Certificates or Book-Entry Shares so surrendered shall forthwith be canceled.  In the event of a transfer of ownership of Company Common Stock that is not registered in the transfer or stock records of the Company, payment of the Merger Consideration may be made to a Person other than the Person in whose name the Certificate or Book-Entry Share so surrendered is registered if such Certificate or Book-Entry Share shall be properly endorsed or otherwise be in proper form for transfer and the Person requesting such payment shall pay any transfer or other Taxes required by reason of the transfer or establish to the reasonable satisfaction of Parent that such Taxes have been paid or are not applicable.  Until surrendered as contemplated by this Section 3.2(c), each Certificate or Book-Entry Share shall be deemed at any time after the Teton Merger Effective Time to represent only the right to receive upon such surrender the Merger Consideration.  No interest shall be paid or shall accrue on any payment to holders of Certificates or Book-Entry Shares pursuant to the provisions of this Article III.

-19-

**App.246**

REDACTED - FOR PUBLIC INSPECTION

(d)    No Further Ownership Rights in Company Common Shares.  From and after the Teton Merger Effective Time, subject to applicable Law in the case of Dissenting Shares, (i) all holders of Certificates and Book-Entry Shares shall cease to have any rights as stockholders of the Company other than the right to receive the Merger Consideration into which the shares represented by such Certificates or Book-Entry Shares have been converted pursuant to this Agreement upon the surrender of such Certificate or Book-Entry Share in accordance with Section 3.2(c), without interest and (ii) the stock transfer books of the Company shall be closed with respect to all shares of Company Common Stock outstanding immediately prior to the Teton Merger Effective Time, and there shall be no further registration of transfers on the stock transfer books of the Surviving Company of shares of Company Common Stock that were outstanding immediately prior to the Teton Merger Effective Time.  If, after the Teton Merger Effective Time, any Certificates or Book-Entry Shares formerly representing shares of Company Common Stock are presented to the Surviving Company, Parent or the Paying Agent for any reason, such Certificates or Book-Entry Shares shall be cancelled and exchanged as provided in this Article III, subject to applicable Law in the case of Dissenting Shares.

(e)    Investment of Payment Fund.  The Paying Agent shall invest any cash included in the Payment Fund as directed by Parent; provided, that any such investments shall be in obligations of, or guaranteed by, the United States government, in commercial paper rated A-1 or P-1 or better by Moody's Investors Service, Inc. or Standard & Poor's Corporation, respectively, or in certificates of deposit, bank repurchase agreements or banker's acceptances of commercial banks with capital exceeding $10 billion (based on the most recent financial statements of such bank that are then publicly available); provided, further, that no such investment or loss thereon shall affect the amounts payable to holders of Certificates or Book-Entry Shares pursuant to this Article III, and following any losses from any such investment, Parent shall promptly provide additional funds to the Paying Agent for the benefit of the holders of shares of Company Common Stock immediately prior to the Teton Merger Effective Time in the amount of such losses, which additional funds shall be deemed to be part of the Payment Fund.  Any net profits resulting from or income arising out of such investments shall be paid to the Surviving Company.

(f)    Termination of Payment Fund.  Any portion of the Payment Fund (including any interest or other amounts received with respect thereto) that remains unclaimed by, or otherwise undistributed to, the holders of Certificates and Book-Entry Shares for 12 months after the Teton Merger Effective Time shall be delivered to Parent, upon demand, and any holder of Certificates or Book-Entry Shares that has not theretofore complied with this Article III shall thereafter look only to Parent or the Surviving Company (subject to abandoned property, escheat or other similar Laws), as general creditors thereof, for satisfaction of its claim for Merger Consideration that such holder has the right to receive pursuant to this Article III, without any interest thereon.

(g)    No Liability.  Subject to applicable Law, none of Parent, the Company, Teton Merger Sub or the Paying Agent shall be liable to any Person in respect of any portion of the Payment Fund or the Merger Consideration delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law.  Subject to applicable Law, notwithstanding any other provision of this Agreement, any portion of the Merger Consideration or the cash to be paid in accordance with this Article III that remains undistributed to the holders of Certificates and Book-Entry Shares as of immediately prior to the date on which the Merger

-20-

**App.247**

**REDACTED - FOR PUBLIC INSPECTION**

Consideration or such cash would otherwise escheat to or become the property of any Governmental Entity, shall, to the extent permitted by applicable Law, become the property of the Surviving Company, free and clear of all claims or interest of any Person previously entitled thereto.

(h)    Withholding Rights.    Each of the Company, the Surviving Company, Parent, Teton Merger Sub and the Paying Agent (without duplication) shall be entitled to deduct and withhold (or cause to be deducted and withheld) from amounts otherwise payable pursuant to this Agreement, any amounts required to be deducted or withheld with respect to the making of such payment under applicable Tax Law.  To the extent that any amounts are so deducted, withheld and remitted to the appropriate Taxing Authority, such deducted or withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction or withholding was made.

(i)    Lost Certificates.  If any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such Certificate to be lost, stolen or destroyed and, if required by Parent or the Paying Agent, the posting by such Person of a bond in such amount as Parent or the Paying Agent may determine is reasonably necessary as indemnity against any claim that may be made against it or the Surviving Company with respect to such Certificate, the Paying Agent (or, if subsequent to the termination of the Payment Fund and subject to Section 3.2(f), Parent) shall deliver, in exchange for such lost, stolen or destroyed Certificate, the Merger Consideration in accordance with the terms of this Agreement.

Section 3.3    Treatment of Company Equity Awards.

(a)    Except as set forth on Section 6.1 of the Company Disclosure Schedule,  at the Teton Merger Effective Time, each time-based restricted stock unit award in respect of shares of Company Common Stock (a "***Company RSU Award***") and each performance-based restricted stock unit or performance share award in respect of shares of Company Common Stock (a "***Company PSU Award***"), in each case, whether vested or unvested and that is outstanding as of immediately prior to the Teton Merger Effective Time, shall be cancelled by virtue of the Teton Merger and without any action on the part of the holder thereof, in consideration for the right to receive, as promptly as practicable (but no later than five Business Days) following the Teton Merger Effective Time, the Merger Consideration (without interest and less such amounts as are required to be withheld or deducted under applicable Tax Law with respect to the making of such payment) with respect to the number of shares of Company Common Stock subject to such Company RSU Award or Company PSU Award as of immediately prior to the Teton Merger Effective Time.  With respect to each Company PSU Award, the number of shares subject to such award as of immediately prior to the Teton Merger Effective Time shall be determined in accordance with the provisions of the applicable award agreement that apply upon a "Change in Control" (within the meaning of the applicable award agreement).  Notwithstanding the foregoing, the Merger Consideration payable with respect to a Company RSU Award or Company PSU Award that constitutes nonqualified deferred compensation subject to Section 409A of the Code shall be paid at the earliest time permitted under the terms of such award that will not result in the application of a tax or penalty under Section 409A of the Code.

(b)    At the Teton Merger Effective Time, each hypothetical investment in

-21-

**App.248**

REDACTED - FOR PUBLIC INSPECTION

Company Common Stock under the Deferred Compensation Plan (other than a Company RSU Award) with a value equal to the value of a share of Company Common Stock (a "**Company Phantom Share Unit Award**") shall, automatically and without any action on the part of the holder thereof, be converted by virtue of the Teton Merger and without any action on the part of the holder thereof, into an amount equal to the Merger Consideration with respect to the number of shares of Company Common Stock subject to such Company Phantom Share Unit Award as of immediately prior to the Teton Merger Effective Time.  For clarity, any Company RSU Award or award of restricted shares of Company Common Stock (or right thereto) that has been deferred under the Deferred Compensation Plan shall be considered a Company RSU Award and treated in accordance with Section 3.3(a).

(c)    At or prior to the Teton Merger Effective Time, the Company shall adopt appropriate resolutions of the Company Board (or any committee thereof) approving the treatment of Company Equity Awards contemplated by this Section 3.3.

Section 3.4    Further Assurances.  Subject to the terms and conditions of this Agreement, if at any time before the Teton Merger Effective Time, Parent or the Company reasonably believes that any further instruments, deeds, assignments or assurances are reasonably necessary to consummate the Teton Merger, then Parent, Teton Merger Sub and the Company and their respective officers and directors shall execute and deliver all such instruments, deeds, assignments or assurances reasonably necessary to consummate the Teton Merger.

### ARTICLE IV.

### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except (a) as disclosed in any Company SEC Document publicly filed after January 1, 2024 and at least one Business Day prior to the date of this Agreement (excluding any disclosures set forth in any "risk factors," "forward-looking statements" or "market risk" sections to the extent they are cautionary, predictive or forward-looking in nature), it being agreed that this clause (a) shall not be applicable to Section 4.1, Section 4.2, Section 4.3, Section 4.4 or Section 4.23, or (b) subject to Section 9.16, as disclosed in the disclosure schedule delivered by the Company to Parent concurrently with the execution of this Agreement (the "**Company Disclosure Schedule**"), the Company represents and warrants to Parent and Teton Merger Sub as follows:

Section 4.1    Organization.

(a)    The Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware.  The Company has all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted, except where the failure to have such power or authority would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.  Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, each of the Company's Subsidiaries is a legal entity duly organized, validly existing and (where such concept is recognized) in good standing under the Laws of its respective jurisdiction of organization and has all requisite corporate or similar power

**REDACTED - FOR PUBLIC INSPECTION**

and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted.  Each of the Company and its Subsidiaries is duly qualified or licensed, and has all necessary governmental approvals, to do business and (where such concept is recognized) is in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such approvals, qualification or licensing necessary, except where the failure to be so duly approved, qualified or licensed and in good standing would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(b)     The Company has made available to Parent prior to the date of this Agreement a true and complete copy of the Company's certificate of incorporation and bylaws (collectively, the "***Company Organizational Documents***"), in each case, as amended through the date hereof.  The Company Organizational Documents are in full force and effect, and the Company is not in material violation of any of their provisions.  Section 4.1(b) of the Company Disclosure Schedule sets forth a list of all Subsidiaries of the Company.

(c)     As used in this Agreement, "***Company Material Adverse Effect***" means any effect, change, event, occurrence or development (each, a "***Change***") that, individually or in the aggregate with other Changes, has had or would reasonably be expected to have a material adverse effect on the business, operations, financial condition or assets of the Company and its Subsidiaries, taken as a whole, excluding, however, the impact of (i) any Changes in domestic, foreign or global markets or domestic, foreign or global economic conditions generally, including (A) any Changes in or affecting the domestic or any foreign securities, equity, credit, currency or financial markets or (B) any Changes in or affecting domestic or any foreign interest or exchange rates or tariffs, (ii) Changes after the date of this Agreement in GAAP or official interpretation thereof, (iii) Changes after the date of this Agreement in applicable Law or in the official interpretation or enforcement thereof, (iv) Changes in domestic, foreign or global government spending or political conditions (including the outbreak or escalation of war, military actions, acts of terrorism or trade wars), including any worsening of such conditions threatened or existing on the date of this Agreement, (v) Changes in the business or regulatory conditions affecting the broadcast television industry, (vi) the announcement or the existence of, compliance with or performance under (in each case except for the obligation of the Company and its Subsidiaries set forth in Section 6.1(a)) the express terms of this Agreement or the transactions contemplated hereby, including resulting from or relating to the identity of Parent, Teton Merger Sub or any of their respective Affiliates (including the impact thereof on the relationships, contractual or otherwise, of the Company or any of its Subsidiaries with employees, labor unions, financing sources, customers, suppliers or partners), except that this clause (vi) shall not apply to the representations and warranties set forth in Sections 4.4 and 4.11(i), (vii) natural disasters or weather or public health developments, including earthquakes, hurricanes, tsunamis, typhoons, lightning, hail storms, blizzards, tornadoes, droughts, floods, cyclones, mudslides and wildfires, epidemics, pandemics, plagues or disease outbreaks, manmade disasters or acts of God, (viii) any matter expressly disclosed in Section 4.1(c) of the Company Disclosure Schedule or otherwise expressly disclosed in Section 4.12(a) of the Company Disclosure Schedule with respect to the representations and warranties in Section 4.12(a), (ix) compliance by the Company and its Subsidiaries with applicable Law, (x) a decline in the trading price or trading volume of the Company's common stock or any change in the ratings or ratings outlook for the Company or any of its Subsidiaries (provided, that the underlying causes thereof may be considered in determining

-23-

REDACTED - FOR PUBLIC INSPECTION

whether a Company Material Adverse Effect has occurred (or would reasonably be expected to occur) to the extent not otherwise excluded in this definition), (xi) the failure to meet any projections, guidance, budgets, forecasts or estimates (provided, that the underlying causes thereof may be considered in determining whether a Company Material Adverse Effect has occurred (or would reasonably be expected to occur) to the extent not otherwise excluded in this definition; provided, further, that this clause (xii) shall not be construed as implying that the Company is making any representation or warranty hereunder with respect to any projections, guidance, budgets, forecasts or estimates)), (xii) seasonal Changes on the business, operations or financial condition of the Company, (xiii) except for obligations of the Company and its Subsidiaries set forth in Section 6.1(a), any action required by this Agreement, and any action taken or omitted to be taken by the Company or any of its Subsidiaries at the written request of Parent or Teton Merger Sub or their respective Representatives after the date of this Agreement, (xiv) the failure to take any action requiring Parent's consent pursuant to this Agreement that is not taken as a result of the failure of Parent to consent to such action (under circumstances where under the terms hereof Parent's consent is required) following request for such consent, (xv) any actions or claims made or brought by any of the current or former stockholders of the Company (or on their behalf or on behalf of the Company) against the Company or any of its directors, officers or employees arising out of this Agreement or the Teton Merger, (xvi) the failure to obtain any approvals, consents or waivers from any Governmental Entity or other Person in connection with the transactions contemplated by this Agreement or (xvii) any breach by Parent or Teton Merger Sub of this Agreement; provided, however, that, to the extent such Change referred to in clauses (i), (ii), (iii), (iv), (v) or (vii) has a disproportionate adverse effect on the business, operations, financial condition or assets of the Company and its Subsidiaries, taken as a whole, relative to others in the broadcast television industry, only the incremental disproportionate Change may be taken into account when determining whether there has been or would reasonably be expected to be a "Company Material Adverse Effect".

Section 4.2    Capital Stock and Indebtedness.

(a)    The authorized capital stock of the Company consists of 800,000,000 shares of common stock, par value $1.00 per share (the "*Company Common Stock*") and 2,000,000 shares of preferred stock, par value $1.00 per share.  As of August 14, 2025 (the "*Specified Date*"), (i) 161,021,328 shares of Company Common Stock were issued and outstanding (not including shares held in treasury), (ii) 163,397,304 shares of Company Common Stock were held in treasury, (iii) 3,211,249 shares of Company Common Stock were subject to Company RSU Awards, (iv) 3,581,021 shares of Company Common Stock were subject to Company PSU Awards (assuming achievement of the applicable performance goals at the maximum level), (v) Company Phantom Share Unit Awards in respect of 457,994 shares of Company Common Stock were outstanding and (vi) no other shares of capital stock, restricted stock or other voting securities of the Company were issued, reserved for issuance or outstanding.

(b)    Except as set forth in Section 4.2(a), as of the date of this Agreement, there are no outstanding (i) subscriptions, options, warrants, calls, puts, convertible, exercisable or exchangeable securities or other similar rights, agreements or commitments to which the Company or any of its Subsidiaries is a party (A) obligating the Company or any of its Subsidiaries to (1) issue, transfer, exchange or sell any shares of capital stock, voting securities or other equity interests of the Company or securities convertible into or exchangeable for such shares, securities

-24-

**App.251**

**REDACTED - FOR PUBLIC INSPECTION**

or equity interests, (2) grant, extend or enter into any such subscription, option, warrant, call, put, convertible, exercisable or exchangeable securities or other similar right, agreement or commitment relating to the capital stock, voting securities or other equity interest of the Company, (3) redeem or otherwise acquire any such shares of capital stock, securities or other equity interests or (4) grant any preemptive rights, antidilutive rights, exchange rights, exercise rights or similar rights with respect to any capital stock, voting securities or other equity interests issued by the Company, (ii) stock appreciation, phantom stock, restricted stock units, profit participation or similar rights with respect to the Company or (iii) obligations by the Company or any of its Subsidiaries to make any payments based on the price or value of any of the foregoing stock, securities or interests covered in clauses (i) through (ii) above.  Since the Specified Date through the date of this Agreement, neither the Company nor any of its Subsidiaries has issued any shares of capital stock of the Company (other than in connection with the exercise, settlement or vesting of Company Equity Awards in accordance with their respective terms) or granted any Company Equity Awards.

(c)    Neither the Company nor any of its Subsidiaries has outstanding any bonds, debentures, notes or other Indebtedness, the holders of which have the right to vote (or which are convertible or exchangeable into or exercisable for securities having the right to vote) with the stockholders of the Company on any matter.  There are no voting trusts, proxies or other agreements or understandings to which the Company or any of its Subsidiaries is a party with respect to the voting or registration of any capital stock or other equity interest of the Company or any of its Subsidiaries.  All outstanding shares of Company Common Stock are duly authorized, validly issued, fully paid and nonassessable and free of preemptive rights.

(d)    The Company or a Subsidiary of the Company owns, directly or indirectly, all of the issued and outstanding shares of capital stock or other equity interests of each Subsidiary of the Company, and all of such shares of capital stock or other equity interests are duly authorized, validly issued, fully paid and nonassessable and free of preemptive rights in favor of any Person other than the Company or a Subsidiary of the Company.  Except for equity interests in the Company's Subsidiaries, as of the date hereof, neither the Company nor any of its Subsidiaries owns, directly or indirectly, any equity interest in any Person (or any security or other right, agreement or commitment convertible or exercisable into, or exchangeable for, any equity interest in any Person).

(e)    As of the date of this Agreement, there are no outstanding (i) subscriptions, options, warrants, calls, puts, convertible, exercisable or exchangeable securities or other similar rights, agreements or commitments to which the Company or any of its Subsidiaries is a party (A) obligating the Company or any of its Subsidiaries to (1) issue, transfer, exchange or sell any shares of capital stock, voting securities or other equity interests of any Subsidiary of the Company or securities convertible into or exchangeable for such shares, securities or equity interests or (2) grant, extend or enter into any such subscription, option, warrant, call, put, convertible, exercisable or exchangeable securities or other similar right, agreement or commitment relating to the capital stock, voting securities or other equity interest of any Subsidiary of the Company, or (B) granting any preemptive rights, antidilutive rights, exchange rights, exercise rights or similar rights with respect to any capital stock, voting securities or other equity interests issued by the Company's Subsidiaries, (ii) stock appreciation, phantom stock, restricted stock units, profit participation or similar rights with respect to any Subsidiaries of the Company or (iii) obligations by the Company

-25-

REDACTED - FOR PUBLIC INSPECTION

or any of its Subsidiaries to make any payments based on the price or value of any of the foregoing stock, securities or interests covered in clauses (i) through (ii) above. Neither the Company nor any of its Subsidiaries is a party to any Contract or commitment obligating it to make any investment or capital contribution in any Person (other than a wholly-owned Subsidiary of the Company).

(f)    Since the Specified Date and through the date of this Agreement, all dividends and distributions (including dividend equivalents) on shares of the capital stock of the Company that have been declared or authorized prior to the date hereof have been paid in full.

(g)    As of the date of this Agreement, there is no outstanding Indebtedness of the Company and its Subsidiaries in excess of $5,000,000 in principal amount, other than Indebtedness identified by instrument in Section 4.2(g) of the Company Disclosure Schedule and the intercompany Indebtedness set forth in Section 4.2(g) of the Company Disclosure Schedule.

Section 4.3    Corporate Authority Relative to this Agreement.  The Company has the requisite corporate power and authority to execute and deliver this Agreement and, subject to adoption of this Agreement by holders of at least a majority of the outstanding shares of Company Common Stock entitled to vote thereon (the "*Company Stockholder Approval*"), to consummate the transactions contemplated hereby, including the Teton Merger.  The execution, delivery and performance by the Company of this Agreement and the consummation of the transactions contemplated hereby, including the Teton Merger, have been duly and validly authorized by the Company Board and, except for the Company Stockholder Approval and the filing of the Teton Certificate of Merger with the Secretary of State of the State of Delaware, no other corporate action or proceedings on the part of the Company or vote of the Company's stockholders is necessary to authorize the execution and delivery by the Company of this Agreement or the consummation of the transactions contemplated hereby, including the Teton Merger.  On or prior to the date hereof, the Company Board, has unanimously (a) determined that the transactions contemplated by this Agreement, including the Teton Merger, are advisable, fair to and in the best interests of the Company and its stockholders, (b) approved the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, including the Teton Merger, (c) resolved to recommend that the holders of Company Common Stock adopt this Agreement (the "*Company Recommendation*") and (d) directed that the adoption of this Agreement be submitted for consideration by the Company's stockholders at a meeting thereof. The Company Recommendation has not, as of the date of this Agreement, been rescinded, modified or withdrawn. This Agreement has been duly and validly executed and delivered by the Company and, assuming this Agreement constitutes the legal, valid and binding agreement of Parent and Teton Merger Sub, this Agreement constitutes the legal, valid and binding agreement of the Company and is enforceable against the Company in accordance with its terms, except as such enforcement may be subject to applicable bankruptcy, reorganization, fraudulent conveyance, insolvency, moratorium or other similar Laws affecting creditor's rights generally and the availability of equitable relief (the "*Enforceability Exceptions*").

Section 4.4    Consents and Approvals; No Violation.

(a)    Other than in connection with or in compliance with (i) the filing of the Teton Certificate of Merger with the Secretary of State of the State of Delaware; (ii) the Securities

-26-

**App.253**

**REDACTED - FOR PUBLIC INSPECTION**

Act, the Exchange Act and any other applicable U.S. state or federal securities, takeover or "blue sky" Laws; (iii) the rules and regulations of the New York Stock Exchange; (iv) the Communications Act and the FCC Rules; and (v) the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder (the "***HSR Act***") (clauses (i) - (v), collectively, the "***Transaction Approvals***"), no authorization, consent, order, license, permit or approval of, or registration, declaration, notice or filing with, any Governmental Entity is required to be made or obtained under applicable Law for the consummation by the Company of the transactions contemplated by this Agreement, except for such authorizations, consents, orders, licenses, permits, approvals, registrations, declarations, notices and filings that the failure to make or obtain would not reasonably be expected to (A) have, individually or in the aggregate, a Company Material Adverse Effect or (B) prevent, materially impair or materially delay the ability of the Company to consummate the Teton Merger by the Outside Date.

(b)    The execution and delivery by the Company of this Agreement does not, and (assuming the Transaction Approvals are obtained) the consummation of the transactions contemplated hereby and compliance with the provisions hereof will not, (i) require any consent or approval under, violate, conflict with, result in any breach of or any loss of any benefit under, constitute a change of control or default under, or result in termination or give to others any right of termination, vesting, amendment, acceleration or cancellation of, or result in the creation of a Lien (other than Permitted Liens) upon any of the respective properties or assets of the Company or any of its Subsidiaries pursuant to, any Contract to which the Company or any of its Subsidiaries is a party or by which it or any of its respective properties or assets is bound, except as would not reasonably be expected to (A) have, individually or in the aggregate, a Company Material Adverse Effect or (B) prevent, materially impair or materially delay the ability of the Company to consummate the Teton Merger by the Outside Date, (ii) conflict with or result in any violation of any provision of the Company Organizational Documents or (iii) conflict with or violate any applicable Laws except as would not reasonably be expected to (A) have, individually or in the aggregate, a Company Material Adverse Effect or (B) prevent, materially impair or materially delay the ability of the Company to consummate the Teton Merger by the Outside Date.

Section 4.5    Reports and Financial Statements.

(a)    The Company has timely filed with or furnished to the SEC all forms, documents and reports required to be filed with or furnished by it to the SEC on or after January 1, 2024 (all such forms, documents and reports, the "***Company SEC Documents***").  As of their respective dates or, if amended, as of the date of the last such amendment (and, in the case of registration statements and proxy statements, on the dates of effectiveness and the dates of the relevant meetings, respectively), the Company SEC Documents complied in all material respects with the applicable requirements of the Securities Act, the Exchange Act and the Sarbanes-Oxley Act of 2002 (the "***Sarbanes-Oxley Act***") and none of the Company SEC Documents contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.  None of the Company's Subsidiaries is, or at any time since January 1, 2024 has been, required to file any forms, reports or other documents with the SEC.

(b)    The consolidated financial statements (including all related notes and schedules) of the Company included in or incorporated by reference into the Company SEC

-27-

**App.254**

REDACTED - FOR PUBLIC INSPECTION

Documents (i) fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries as of the respective dates thereof, and the consolidated results of their operations and their consolidated cash flows for the respective periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments and to any other adjustments described therein, including the notes thereto), (ii) were prepared in all material respects in conformity with U.S. generally accepted accounting principles ("*GAAP*") (except, in the case of the unaudited statements, as permitted by the SEC) applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto), and (iii) comply in all material respects with the applicable accounting requirements under the Securities Act, the Exchange Act and the applicable rules and regulations of the SEC.  None of the Company or its Subsidiaries is a party to any securitization transaction, off-balance sheet partnership or any similar Contract (including any structured finance, special purpose or limited purpose entity or any "off-balance sheet arrangements" (as defined in Item 303(a) of Regulation S-K under the Exchange Act)) not otherwise disclosed in its consolidated financial statements included in the Company SEC Documents where the purpose or intended effect of such Contract is to avoid disclosure of any material transaction involving, or material liabilities of, the Company in any of the Company's consolidated financial statements.  As of the date of this Agreement, there are no outstanding or unresolved comments in comment letters received from the SEC with respect to the Company SEC Documents.  To the Knowledge of the Company, none of the Company SEC Documents is the subject of ongoing SEC review and there are no inquiries or investigations by the SEC or any internal investigations pending or threatened, in each case regarding any accounting practices of the Company.

Section 4.6     Internal Controls and Procedures.  The Company has established and maintains disclosure controls and procedures and internal control over financial reporting (as such terms are defined in paragraphs (e) and (f), respectively, of Rule 13a-15 under the Exchange Act) as required by Rule 13a-15 under the Exchange Act.  The Company's disclosure controls and procedures are designed to ensure that all information required to be disclosed by the Company in the reports that it files or furnishes under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC, and that all such information is accumulated and communicated to the Company's management as appropriate to allow timely decisions regarding required disclosure.  Since January 1, 2024, the Company's principal executive officer and its principal financial officer have disclosed to the Company's auditors and audit committee (i) any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, (ii) any fraud, whether or not material, that involves management or other employees of the Company or any of its Subsidiaries who have a significant role in the Company's internal control over financial reporting and (iii) any material claim or allegation regarding any of the foregoing (any such disclosures, the "*Company Internal Controls Disclosures*").  The Company has made available to Parent copies of any Company Internal Controls Disclosures existing as of the date hereof.  Since January 1, 2024, to the Knowledge of the Company, neither the Company nor any of its Subsidiaries nor the Company's independent auditor has received any material written complaint, allegation, assertion or claim regarding the accounting or auditing practices, procedures, methodologies or methods of the Company or its Subsidiaries, or their respective internal accounting controls.

Section 4.7     No Undisclosed Liabilities.  There are no Liabilities of the Company or any of its Subsidiaries of any nature whatsoever (whether accrued, absolute, determined, contingent or

-28-

REDACTED - FOR PUBLIC INSPECTION

otherwise and whether due or to become due) that would be required by GAAP to be reflected on a consolidated balance sheet of the Company and its Subsidiaries, except for (a) Liabilities that are reflected or reserved against on the audited consolidated balance sheet of the Company and its Subsidiaries included in its Annual Report on Form 10-K for the annual period ended December 31, 2024 (including any notes thereto) or the unaudited interim consolidated balance sheet of the Company and its Subsidiaries included in its Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2025, (b) Liabilities arising in connection with the transactions contemplated hereby or in connection with obligations under existing Contracts or applicable Law, (c) Liabilities incurred in the ordinary course of business since June 30, 2025, (d) Liabilities that have been discharged or paid in full in the ordinary course of business and (e) Liabilities that would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

Section 4.8    Compliance with Law; Permits.

(a)    Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, the Company and each of its Subsidiaries are, and since January 1, 2024 have been, in compliance with all applicable federal, state, local and foreign laws, statutes, ordinances, rules, regulations, judgments, orders, injunctions, decrees or agency requirements of Governmental Entities (collectively, "*Laws*").  Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, since January 1, 2024, neither the Company nor any of its Subsidiaries has received any written notice or, to the Company's Knowledge, other communication from any Governmental Entity regarding any actual or alleged failure to comply with any Law in a material respect.

(b)    Except as would not reasonably be expected to (i) have, individually or in the aggregate, a Company Material Adverse Effect or (ii) prevent, materially impair or materially delay the ability of the Company to consummate the Teton Merger by the Outside Date, the Company and its Subsidiaries hold all authorizations, licenses, permits, certificates, variances, exemptions, approvals, orders, registrations and clearances of any Governmental Entity necessary for the Company and its Subsidiaries to own, lease and operate their properties and assets, and to carry on and operate their businesses as currently conducted.

(c)    Notwithstanding anything contained in this Section 4.8, no representation or warranty shall be deemed to be made in this Section 4.8 in respect of the matters referenced in any other section of this Article IV, including in respect of environmental, Tax, FCC, employee benefits or labor matters.

Section 4.9    Company Station Licenses.

(a)    Section 4.9(a) of the Company Disclosure Schedule sets forth a true and complete list (by each applicable Subsidiary of the Company), as of the date hereof, of all TV Stations and Radio Stations (collectively, the "*Company Stations*"), and, with respect to each such Company Station, all material authorizations issued by the FCC with respect to such Company Station (each, a "*Company Station License*").

-29-

**App.256**

REDACTED - FOR PUBLIC INSPECTION

(b)    Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect:

(i)    (A) each of the Company Station Licenses is held by the Company or one of its Subsidiaries, as the case may be and (B) each of the Company Station Licenses is in effect in accordance with its terms and has not been revoked, suspended, canceled, rescinded, terminated or expired;

(ii)    the Company and its Subsidiaries (A) are, and since January 1, 2024 have been, with respect to each Company Station, in compliance with the Communications Act and the FCC Rules and the terms of the applicable Company Station License, (B) hold all FCC authorizations necessary to operate the Company Stations as they are currently being operated, (C) have timely filed all registrations and reports required to have been filed with the FCC relating to the Company or the Company Station Licenses, and (D) have paid or caused to be paid all FCC regulatory fees due in respect of the Company and its Subsidiaries;

(iii)    there is not (A) pending, or, to the Knowledge of the Company, threatened, any action by or before the FCC to revoke, suspend, cancel, rescind or materially adversely modify any Company Station License (other than in connection with Proceedings of general applicability) or (B) issued or outstanding, by or before the FCC, any (1) order to show cause, (2) notice of violation, (3) notice of apparent liability or (4) order of forfeiture, in each case, against the Company Stations, the Company or any of its Subsidiaries that would reasonably be expected to result in any action described in the foregoing clause (A) with respect to the Company Station Licenses; and

(iv)    (A) to the Knowledge of the Company there are no material applications, petitions, Proceedings, or other material actions, complaints or investigations, pending or threatened before the FCC relating to the Company or the Company Stations, other than Proceedings affecting broadcast stations of such type generally, and (B) neither the Company nor any of its Subsidiaries, nor any of the Company Stations, has entered into a tolling agreement or otherwise waived any statute of limitations relating to the Company Stations during which the FCC may assess any fine or forfeiture or take any other action or agreed to any extension of time with respect to any FCC investigation or Proceeding as to which the statute of limitations time period so waived or tolled or the time period so extended remains open as of the date of this Agreement.

(c)    The Company Station Licenses have been issued for the terms expiring as indicated on Section 4.9(a) of the Company Disclosure Schedule and the Company Station Licenses are not subject to any material condition except for those conditions appearing on the face of the Company Station Licenses and conditions applicable to broadcast licenses generally or otherwise disclosed in Section 4.9(a) of the Company Disclosure Schedule.  Except as set forth in Section 4.9(a) of the Company Disclosure Schedule or except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, there are no facts or circumstances with respect to the Company (for clarity, excluding any facts or circumstances pertaining to Parent or Teton Merger Sub or their respective Affiliates) that would (i) require any grant or renewal of any waiver granted by the FCC applicable to the Company or its Subsidiaries

-30-

**App.257**

REDACTED - FOR PUBLIC INSPECTION

or for any of the Company Stations or (ii) reasonably be expected to (a) result in the FCC's refusal to grant the FCC Consent or otherwise disqualify the Company from transferring control of the Company Stations to Parent or Teton Merger Sub, (b) materially delay obtaining the FCC Consent or (c) cause the FCC to impose a material condition or conditions on its granting of the FCC Consent or to designate the FCC Applications for a hearing.

(d)     Notwithstanding anything herein to the contrary, the representations and warranties contained in this Section 4.9 are the sole and exclusive representations of the Company with respect to the FCC matters.

Section 4.10    Environmental Matters.  Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (a) the Company and each of its Subsidiaries since January 1, 2024 have been and are, to the Company's Knowledge, in compliance with applicable Laws intended to protect the environment (collectively, "***Environmental Laws***"), and each has, or has applied for, all Environmental Permits necessary for the conduct and operation of their respective businesses as presently conducted, (b) since January 1, 2024, none of the Company or any of its Subsidiaries has received any written notice, demand, letter or claim alleging that the Company or such Subsidiary is in violation of, or liable under, any Environmental Law and (c) none of the Company or any of its Subsidiaries is subject to any judgment, decree or judicial order relating to compliance with Environmental Laws, Environmental Permits or the investigation, sampling, monitoring, treatment, remediation, removal or cleanup of Hazardous Materials.  Notwithstanding anything herein to the contrary, the representations and warranties contained in this Section 4.10 are the sole and exclusive representations of the Company with respect to Environmental Laws, Environmental Permits, Hazardous Materials or any other matter related to the environment or the protection of human health and worker safety.

Section 4.11    Employee Benefit Plans.

(a)     Section 4.11(a) of the Company Disclosure Schedule sets forth a correct and complete list, as of the date hereof, of each material Company Benefit Plan.  With respect to each material Company Benefit Plan, to the extent applicable, correct and complete copies of the following have been delivered or made available to Parent by the Company:  (i) all plan documents (including all material written amendments thereto) (which, for the avoidance of doubt, with respect to any material Company Benefit Plan for which a form agreement is used, shall consist of a copy of such form); (ii) all related trust documents; (iii) all insurance contracts or other funding arrangements; (iv) the most recent annual report (Form 5500) filed with the Internal Revenue Service (the "***IRS***"); (v) the most recent determination, opinion or advisory letter from the IRS for any Company Benefit Plan that is intended to qualify under Section 401(a) of the Code; and (vi) the most recent summary plan description.

(b)     Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (i) each Company Benefit Plan has been established, operated and administered in accordance with its terms and the requirements of all applicable Laws, including ERISA and the Code; and (ii) all contributions required to be made to any Company Benefit Plan by applicable Law or by any plan document or other contractual undertaking, and all premiums due or payable with respect to insurance policies funding any

-31-

**App.258**

REDACTED - FOR PUBLIC INSPECTION

Company Benefit Plan, for any period in the prior three years through the date hereof, have been timely made.

(c)    With respect to each Company Benefit Plan that is intended to be qualified under Section 401(a) of the Code (each, a "*Qualified Plan*"), (i) the IRS has issued a favorable determination, opinion or advisory letter with respect to each Qualified Plan and its related trust, and such letter has not been revoked (nor has revocation been threatened in writing), and (ii) to the Knowledge of the Company, there are no existing circumstances and no events have occurred that would reasonably be expected to result in disqualification of any Qualified Plan or the related trust.

(d)    With respect to each Company Benefit Plan that is subject to Title IV or Section 302 of ERISA or Section 412 of the Code, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect:  (i) such Company Benefit Plan satisfies all minimum funding requirements under Sections 412, 430 and 431 of the Code and Sections 302, 303 and 304 of ERISA, whether or not waived; (ii) such Company Benefit Plan is not in "at risk status" within the meaning of Section 430(i) of the Code or Section 303(i) of ERISA; (iii) the Company has delivered or made available to Parent a copy of the most recent actuarial valuation report for such Company Benefit Plan and such report is complete and accurate in all material respects; and (iv) the Pension Benefit Guaranty Corporation has not instituted Proceedings to terminate such Company Benefit Plan.

(e)    Neither the Company, its Subsidiaries nor any of their respective ERISA Affiliates has, in the past six years, maintained, established, contributed to or been obligated to contribute to any plan that is a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA (a "*Multiemployer Plan*") or a plan that has two or more contributing sponsors at least two of whom are not under common control, within the meaning of Section 4063 of ERISA.

(f)    Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, there are no pending or, to the Knowledge of the Company, threatened claims (other than claims for benefits in the ordinary course), lawsuits or arbitrations, in each case with respect to any Company Benefit Plan, which have been asserted or instituted.

(g)    No Company Benefit Plan provides for any post-employment or post-retirement medical or life insurance benefits for retired, former or current employees or beneficiaries or dependents thereof, except as required by Section 4980B of the Code.

(h)    The Company is not party to, or otherwise obligated under, any contract, agreement, plan or arrangement that provides for the gross-up of Taxes imposed by Section 409A(a)(1)(B) or Section 4999 of the Code.

(i)    Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, neither the execution of this Agreement nor the completion of the transactions contemplated hereby (either alone or in conjunction with any other event) will result in (i) any compensation payment becoming due to any employee of the Company or any of its Subsidiaries, (ii) the acceleration of vesting or payment or provision of any other rights or benefits (including funding of compensation or benefits through a trust or otherwise) to

-32-

**App.259**

any employee of the Company or any of its Subsidiaries, or (iii) any increase to the compensation or benefits otherwise payable under any Company Benefit Plan.

Section 4.12   Absence of Certain Changes or Events.

(a)     Since June 30, 2025, there has not been any Change that has had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(b)     Since June 30, 2025, there has not been any action taken or agreed to be taken by the Company or any of its Subsidiaries that, if taken after the date of this Agreement, would constitute a breach of, or require the consent of Parent under, clauses (iii) (solely to the extent relating to dividends or distributions), (vi), (viii), (ix), (xv), (xvi) or (xxi) (solely as it relates to the foregoing) of Section 6.1(b).

Section 4.13   Litigation.  As of the date hereof, (a) there is no Proceeding (or, to the Knowledge of the Company, any investigation) to which the Company or any of its Subsidiaries is a party pending or, to the Knowledge of the Company, threatened that would reasonably be expected to (i) have, individually or in the aggregate, a Company Material Adverse Effect or (ii) prevent, materially impair or materially delay the ability of the Company to consummate the Teton Merger by the Outside Date and (b) neither the Company nor any of its Subsidiaries is subject to any outstanding Order that would reasonably be expected to (1) have, individually or in the aggregate, a Company Material Adverse Effect or (2) prevent, materially impair or materially delay the ability of the Company to consummate the Teton Merger by the Outside Date.

Section 4.14   Company Information.  The information supplied or to be supplied by the Company for inclusion in the proxy statement relating to the Company Stockholders' Meeting (together with any amendments or supplements thereto, the "***Proxy Statement***") will not, at the time the Proxy Statement is first mailed to the Company's stockholders or at the time of the Company Stockholders' Meeting contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, except that no representation or warranty is made by the Company with respect to statements made therein based on information supplied by Parent or Teton Merger Sub for inclusion or incorporation by reference therein.

Section 4.15   Tax Matters.   Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect:

(a)     (i) The Company and each of its Subsidiaries have timely filed (taking into account any valid extension of time within which to file) all Tax Returns required to be filed by any of them and all filed Tax Returns are true, correct and complete; (ii) the Company and each of its Subsidiaries have paid all Taxes required to be paid by any of them (whether or not shown as due and payable on any Tax Return); (iii) there are not pending, or to the Company's Knowledge, threatened in writing, audits, examinations, investigations or other administrative or judicial Proceedings in respect of Taxes of the Company or any of its Subsidiaries; and (iv) no deficiency of Taxes has been asserted in writing that has not been paid, withdrawn or settled.

**REDACTED - FOR PUBLIC INSPECTION**

(b)    There are no Liens for Taxes on any property or asset of the Company or any of its Subsidiaries other than Permitted Liens.

(c)    Neither the Company nor any of its Subsidiaries has been a "controlled corporation" or a "distributing corporation" (in each case, within the meaning of Section 355(a)(1)(A) of the Code) in any distribution that was purported or intended to be governed by Section 355 of the Code occurring during the two-year period ending on the date hereof.

(d)    None of the Company or any of its Subsidiaries has participated in any "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4(b)(2).

(e)    The Company and each of its Subsidiaries (i) have timely paid, deducted, withheld and collected all amounts required to be paid, deducted, withheld or collected by any of them, including in connection with amounts paid or owing to any employee, shareholder, creditor, independent contractor or third party, and have timely paid over any amounts so withheld, deducted or collected to the appropriate Taxing Authority; and (ii) have complied with all applicable Laws in connection therewith (including information reporting requirements).

(f)    No written claim has been made by a Taxing Authority in a jurisdiction where the Company or any of its Subsidiaries does not file Tax Returns that it is or may be subject to taxation by, or required to file any Tax Return in, that jurisdiction.

(g)    Neither the Company nor any of its Subsidiaries: (i) is a party to or bound by, or currently has any liability pursuant to, any Tax sharing, allocation or indemnification agreement or obligation other than any such agreement or obligation entered into in the ordinary course of business, the primary purpose of which is unrelated to Taxes, or any agreement solely among any of the Company or its Subsidiaries; or (iii) has any liability for the Taxes of any Person other than the Company and its Subsidiaries pursuant to Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or non-U.S. Law) as a transferee or successor, or otherwise by operation of Law.

(h)    Notwithstanding anything herein to the contrary, the representations and warranties contained in this Section 4.15 and, to the extent expressly referring to Code sections, Section 4.11 are the sole and exclusive representations of the Company with respect to Taxes and Tax matters.

Section 4.16    Employment and Labor Matters. Section 4.16 of the Company Disclosure Schedule sets forth a true and complete list, as of the date hereof, of each Collective Bargaining Agreement that the Company or any of its Subsidiaries is a party to or bound, and except as set forth thereon, no other employees of the Company or any of its Subsidiaries is represented by a labor union, works council, or other labor organization. Since January 1, 2024, there has been no pending or, to the Company's Knowledge, threatened Proceeding against the Company or any of its Subsidiaries by the National Labor Relations Board or any comparable Governmental Entity. Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect: (a) there is, and since January 1, 2024 has been, no strike, lockout, slowdown or work stoppage against the Company or any of its Subsidiaries pending or, to the

-34-

**App.261**

**REDACTED - FOR PUBLIC INSPECTION**

Company's Knowledge, threatened; (b) there is, and since January 1, 2024 has been, no pending charge or complaint against the Company or any of its Subsidiaries by the National Labor Relations Board or any comparable Governmental Entity; and (c) the Company and its Subsidiaries are, and since January 1, 2024 have been, in compliance with all Laws regarding employment and employment practices, including anti-discrimination, terms and conditions of employment and, wages and hours (including classification of employees and equitable pay practices), and other Laws in respect of any reduction in force (including notice, information and consultation requirements), and no claims relating to non-compliance with the foregoing are pending or, to the Company's Knowledge, threatened. To the Company's Knowledge, there is no activity or proceeding by a labor union or labor organization or representative thereof to organize any employees of the Company or any of its Subsidiaries, and there has been no such activity or proceeding since January 1, 2024. During the past three (3) years, to the Company's Knowledge, no Proceedings or allegations relating to sexual harassment or sexual misconduct have been made against any executive officer or director of the Company or any executive or management employee of the Company or any of its Subsidiaries at the level of Vice President or above.

Section 4.17    Real Property.

(a)    Section 4.17(a) of the Company Disclosure Schedule sets forth (i) a true and complete list, as of the date hereof, of all material real properties (by name and location) owned by the Company or any of its Subsidiaries (the "***Owned Real Property***") and (ii) a true and complete list, as of the date hereof, of the material Company Leases. The Owned Real Property and the Company Leases identified in Section 4.17(b)(i) and (ii) of the Company Disclosure Schedule comprise all of the material real property owned or leased by the Company and its Subsidiaries.

(b)    Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (i) the Company or a Subsidiary of the Company has good and valid title to the real estate owned by the Company or any of its Subsidiaries and to all of the buildings, structures and other improvements thereon, free and clear of all Liens (other than Permitted Liens), (ii) there are no (A) unexpired options to purchase agreements, rights of first refusal or first offer or any other rights to purchase or otherwise acquire such Owned Real Property or any portion thereof or (B) other outstanding rights or agreements to enter into any contract for sale, ground lease or letter of intent to sell or ground lease such Owned Real Property, which, in each case, is in favor of any party other than the Company or any of its Subsidiaries, and (iii) there are no existing, pending, or to the Knowledge of the Company, threatened condemnation, eminent domain or similar proceedings affecting such Owned Real Property.

(c)    Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (i) the Company or a Subsidiary of the Company has a good and valid leasehold interest in each Company Lease, free and clear of all Liens (other than Permitted Liens), (ii) each Company Lease is valid, binding and in full force and effect and (iii) none of the Company or any of its Subsidiaries or, to the Knowledge of the Company, any other party to such Company Lease has violated any provision of, or taken or failed to take any act which, with or without notice, lapse of time, or both, would constitute a default or breach under the provisions of such Company Lease.

**REDACTED - FOR PUBLIC INSPECTION**

Section 4.18    Intellectual Property.

(a)    The issued Patents, Patent applications, registered Marks, applications for registration of Marks and registered Copyrights, applications for registration of Copyrights, in each case as owned by the Company or any of its Subsidiaries are referred to collectively as the "***Company Registered Intellectual Property***".  Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, no material Company Registered Intellectual Property (other than any applications for Company Registered Intellectual Property) has expired or been cancelled or abandoned except in accordance with the expiration of the term of such rights, or in the ordinary course of business based upon a reasonable business judgment of the Company.

(b)    The Company and its Subsidiaries own all right, title, and interest in all Company Registered Intellectual Property, free and clear of all Liens (other than Permitted Liens), except as would not reasonably be expected to have, individually or in the aggregate a Company Material Adverse Effect.

(c)    Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (i) to the Company's Knowledge, the conduct of the business of the Company and its Subsidiaries does not infringe, violate or constitute misappropriation of any Intellectual Property of any third Person, (ii) to the Company's Knowledge, as of the date hereof, no third Person is infringing, violating, or misappropriating any Intellectual Property owned by the Company or its Subsidiaries, and (iii) as of the date hereof, there is no pending claim or asserted claim in writing asserting that the Company or any Subsidiary has infringed, violated or misappropriated, or is infringing, violating or misappropriating any Intellectual Property of any third Person.

(d)    Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (i) the Company and its Subsidiaries have implemented commercially reasonable data backup, data storage, system redundancy and disaster avoidance and recovery procedures and (ii) the IT Assets used by the Company and its Subsidiaries perform the functions necessary to carry on the conduct of their respective businesses.

(e)    Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (i) the Company and its Subsidiaries have taken commercially reasonable measures to protect the confidentiality of the material Trade Secrets of the Company and its Subsidiaries and third party confidential information provided to the Company or any Subsidiary that the Company or such Subsidiary is obligated to maintain in confidence, (ii) there are no claims pending or, to the Knowledge of the Company, threatened against the Company or its Subsidiaries alleging a violation of any third Person's privacy or personal information or data rights.

(f)    Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, all IT Assets of the Company and its Subsidiaries are in operating condition and in a good state of maintenance and repair (ordinary wear and tear excepted) and are suitable for the purposes for which they are presently being used or held for use. Except as would not reasonably be expected to have, individually or in the aggregate, a Company

-36-

**REDACTED - FOR PUBLIC INSPECTION**

Material Adverse Effect, to the Knowledge of the Company, none of the IT Assets contains any unauthorized "back door", "drop dead device", "time bomb", "Trojan horse", "virus" or "worm" (as such terms are commonly understood in the software industry) or any other unauthorized code intended to disrupt, disable, harm or otherwise impede the operation of, or provide unauthorized access to, a computer system or network or other device on which such code is stored or installed.

(g)    Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, since January 1, 2024, the Company and its Subsidiaries have not had any unauthorized access or use, intrusion, or breach of security, or material disruption affecting any of the IT Assets of the Company and its Subsidiaries.  Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, since January 1, 2024, to the Company's Knowledge, there has been no unauthorized access, unauthorized acquisition or disclosure, or any loss or theft, of Sensitive Data of the Company, its Subsidiaries or its customers while such Sensitive Data is in the possession or control of the Company, its Subsidiaries or third-party vendors.

Section 4.19    Material Contracts.

(a)    Section 4.19(a) of the Company Disclosure Schedule sets forth, as of the date of this Agreement, a correct and complete list of each of the following Contracts to which the Company or any of its Subsidiaries is a party, or by which any of their respective properties or assets is bound:

(i)    any "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K promulgated by the SEC) (other than any Company Benefit Plan);

(ii)    any Contract that imposes any material restriction on the right or ability of the Company or any of its Subsidiaries to compete with any other Person or solicit any client or customer;

(iii)    any Contract that obligates the Company or its Subsidiaries to conduct business with any third party on a preferential or exclusive basis and that is material to the Company and its Subsidiaries, taken as a whole;

(iv)    any Contract relating to Indebtedness (other than intercompany indebtedness owed by the Company or any wholly owned Subsidiary to any other wholly owned Subsidiary, or by any wholly owned Subsidiary to the Company) of the Company or any of its Subsidiaries having an outstanding principal amount in excess of $5,000,000 or that grants a Lien (other than a Permitted Lien) on properties or assets of the Company or any of its Subsidiaries;

(v)    any Contract with respect to an interest, rate, currency or other swap or derivative transaction (other than those between the Company and its Subsidiaries) with a fair value in excess of $5,000,000;

(vi)    any Contract that grants any right of first refusal, right of first offer or similar right with respect to any material assets, rights or properties of the Company or its Subsidiaries;

-37-

**App.264**

**REDACTED - FOR PUBLIC INSPECTION**

(vii)    any Contract entered into on or after January 1, 2024 that provides for the acquisition or disposition of any assets (other than acquisitions or dispositions of sale in the ordinary course of business) or business (whether by merger, sale of stock, sale of assets or otherwise) or capital stock or other equity interests of any Person, and with any outstanding obligations as of the date of this Agreement, in each case with a value in excess of $5,000,000;

(viii)    any material joint venture, partnership or limited liability company agreement or other similar Contract relating to the formation, creation, operation, management or control of any material joint venture, partnership or limited liability company, other than any such Contract solely between the Company and its wholly owned Subsidiaries or among the Company's wholly owned Subsidiaries or any organizational documents of the Company's wholly owned Subsidiaries;

(ix)    any Contract pursuant to which the Company or any of its Subsidiaries has continuing "earn-out" or similar obligations that could result in payments in excess of $5,000,000 in the aggregate;

(x)    any Contract relating to Program Rights under which it would reasonably be expected that the Company and its Subsidiaries would make annual payments in excess of $3,000,000 per year;

(xi)    any network affiliation Contract (or similar Contract) with ABC, CBS, Fox, NBC, CW, MyNetworkTV or Spanish language networks;

(xii)    any Contract that is a material Sharing Agreement and any related option agreement (other than those among the Company and its Subsidiaries);

(xiii)    any Contract that is a channel sharing agreement with a third party or parties with respect to the sharing of spectrum for the operation of two (2) or more separately owned television stations;

(xiv)    any Contract relating to retransmission or distribution by any MVPD that reported more than 25,000 paid subscribers to the Company and its Subsidiaries for May 2025 with respect to at least one Company Station; and

(xv)    any Contract with an affiliate or other Person that would be required to be disclosed by the Company under Item 404(a) of Regulation S-K promulgated under the Exchange Act.

All contracts of the types referred to in clauses (i) through (xv) above are referred to herein as "***Company Material Contracts***."

(b)    Neither the Company nor any Subsidiary of the Company is in breach of or default in any respect under the terms of any Company Material Contract and, to the Knowledge of the Company, no other party to any Company Material Contract is in breach of or default in any respect under the terms of any Company Material Contract, and no event has occurred or not occurred through the Company's or any of its Subsidiaries' action or inaction or, to the Company's

-38-

**App.265**

REDACTED - FOR PUBLIC INSPECTION

Knowledge, through the action or inaction of any third party, that with notice or the lapse of time or both would constitute a breach of or default or result in the termination of or a right of termination or cancelation thereunder, accelerate the performance or obligations required thereby, or result in the loss of any benefit under the terms of any Company Material Contract, in each case except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.  To the Knowledge of the Company, each Company Material Contract (i) is a valid and binding obligation of the Company or the Subsidiary of the Company that is party thereto and of each other party thereto, and (ii) is in full force and effect, subject to the Enforceability Exceptions, in each case except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.  There are no disputes pending or, to the Company's Knowledge, threatened with respect to any Company Material Contract, and neither the Company nor any of its Subsidiaries has received any written notice of the intention of any other party to a Company Material Contract to terminate for default, convenience or otherwise any Company Material Contract, in each case except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. True and complete copies of the Company Material Contracts and any material amendments thereto have been made available to Representatives of Parent prior to the date of this Agreement, except if providing any such Contract would reasonably be expected to violate any applicable Law or such Company Material Contract.

Section 4.20    MVPD Matters.  Section 4.20 of the Company Disclosure Schedule sets forth, a list, as of the date of this Agreement, of all TV Station retransmission consent agreements with MVPDs or over-the-top platforms that reported more than 25,000 paid subscribers to the Company or any of its Subsidiaries as of May 2025 with respect to at least one Company Station in such Company Station's DMA (designated market area).  Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, since January 1, 2024 through the date of this Agreement:  (a) no such MVPD has provided written notice to the Company of any material signal quality issue (excluding any such issue that has been resolved) or, to the Knowledge of the Company, sought any form of relief from carriage of a Company Station from the FCC; (b) the Company has not received any written notice from any such MVPD of such MVPD's intention to cease its carriage of a Company Station in such Company Station's DMA; and (c) the Company has not received written notice of any petition seeking FCC modification of any Market in which a Company Station is located. Notwithstanding anything herein to the contrary, the representations and warranties contained in this Section 4.20 are the sole and exclusive representations of the Company with respect to Distribution Matters.

Section 4.21    Finders or Brokers.  Except for Allen & Company LLC, neither the Company nor any of its Subsidiaries has employed any investment banker, broker or finder in connection with the transactions contemplated by this Agreement who would be entitled to any fee or any commission in connection with or upon consummation of the Teton Merger.

Section 4.22    Opinion of the Company's Financial Advisor.  The Company Board has received the opinion of Allen & Company LLC, dated the date of this Agreement, to the effect that, as of the date of such opinion and based on and subject to various assumptions, qualifications, limitations and other matters as forth in such opinion, the Merger Consideration to be received by the holders of Company Common Stock in the Teton Merger pursuant to this Agreement is fair, from a financial point of view, to such holders. The Company will, following the execution of this

-39-

**App.266**

**REDACTED - FOR PUBLIC INSPECTION**

Agreement, make available to Parent, solely for informational purposes and on a non-reliance basis, a signed copy of such opinion.

Section 4.23    State Takeover Statutes.    Assuming the accuracy of the Parent's representations and warranties set forth in Section 5.10, no state "fair price," "moratorium," "control share acquisition," "supermajority," "affiliate transactions" or "business combination statute or regulation" or other anti-takeover or similar Laws (including the restrictions on "business combinations" with an "interested stockholder" (each as defined in Section 203 of the DGCL)) (each, a "*Takeover Statute*") is applicable to this Agreement, the Teton Merger or any of the other transactions contemplated by this Agreement.  The Company Board has taken all actions necessary to render all potentially applicable Takeover Statutes inapplicable to this Agreement, the Teton Merger and the other transactions contemplated by this Agreement.

Section 4.24    Related Party Transactions.  Except for Contracts, transactions and other arrangements that are solely among the Company and its wholly owned Subsidiaries, Contracts that are listed in Section 4.19(a)(xv) of the Company Disclosure Schedule or that relate solely to director or officer compensation and/or benefits, no officer or director of the Company or any of its Subsidiaries (a) is a party to any Contract, transaction or other arrangement with the Company or any of its Subsidiaries or has any interest in any property or asset of the Company or any of its Subsidiaries or (b) to the Knowledge of the Company, beneficially owns a controlling interest in an entity engaged in a transaction of the type described in clause (a) above, in the case of clauses (a) and (b), that have not been disclosed in the Company SEC Documents.

Section 4.25    Certain Business Practices.  Since January 1, 2022, none of the Company or any of its Subsidiaries, and, to the Knowledge of the Company, any director, officer, employee or agent of the Company or any of its Subsidiaries with respect to any matter relating to the Company or any of its Subsidiaries, has:  (a) used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity; or (b) made any unlawful payment to foreign or domestic government officials or employees or to foreign or domestic political parties or campaigns or otherwise violated any provision of the Foreign Corrupt Practices Act of 1977, as amended, or the UK Bribery Act, in each case, except as would not, individually or in the aggregate, have a Company Material Adverse Effect.

Section 4.26    No Other Representations.    The Company acknowledges that neither Parent, Teton Merger Sub nor any Person on behalf of Parent or Teton Merger Sub makes, and the Company has not relied on and hereby disclaims, any express or implied representation or warranty with respect to Parent or Teton Merger Sub or their respective businesses or with respect to the accuracy or completeness of any other information provided to the Company in connection with the transactions contemplated by this Agreement other than the representations and warranties contained in Article V (as qualified by the Parent Disclosure Schedule), or with respect to future operating or financial results, estimates, projections, forecasts, plans or prospects (including the reasonableness of the assumptions underlying such estimates, projections, forecasts, plans or prospects), except in the case of fraud with respect to the representations and warranties contained herein.    Without limiting the foregoing, except in the case of fraud with respect to the representations and warranties contained herein, the Company acknowledges and agrees that, except for any remedies available under this Agreement with respect to the representations and warranties expressly set forth in Article V (as qualified by the Parent Disclosure Schedule), neither

**App.267**

**REDACTED - FOR PUBLIC INSPECTION**

Parent, Teton Merger Sub nor any other Person shall have or be subject to any liability or other obligation to the Company or its Representatives or Affiliates or any other Person resulting from the Company's or its Representatives' or Affiliates' use of any information, documents or other material made available to the Company or its Representatives or Affiliates.

**ARTICLE V.**

**REPRESENTATIONS AND WARRANTIES OF PARENT AND TETON MERGER SUB**

Subject to Section 9.16, except as disclosed in the disclosure schedule delivered by Parent to the Company concurrently with the execution of this Agreement (the "***Parent Disclosure Schedule***"), Parent and Teton Merger Sub jointly and severally represent and warrant to the Company as follows:

Section 5.1    Organization.

(a)    Each of Parent and Teton Merger Sub is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware. Each of Parent and Teton Merger Sub has all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted, except where the failure to have such power or authority would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect. Each of Parent and Teton Merger Sub is duly qualified or licensed, and has all necessary governmental approvals, to do business and (where such concept is recognized) is in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such approvals, qualification or licensing necessary, except where the failure to be so duly approved, qualified or licensed and in good standing would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect.

(b)    As used in this Agreement, "***Parent Material Adverse Effect***" means any Change that would or would reasonably be expected to prevent, materially impair or materially delay the ability of Parent or Teton Merger Sub to consummate the Teton Merger by the Outside Date.

Section 5.2    Corporate Authority Relative to this Agreement.

(a)    Each of Parent and Teton Merger Sub has the requisite corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby, including the Teton Merger and the Debt Financing. The execution, delivery and performance by Parent and Teton Merger Sub of this Agreement and the consummation by each of them of the transactions contemplated hereby, including the Teton Merger and the Debt Financing, have been duly and validly authorized by the Parent Board and the Board of Directors of Teton Merger Sub, Except, in the case of the Teton Merger, for the adoption of this Agreement by Parent, as the sole stockholder of Teton Merger Sub (which such adoption shall occur immediately following the execution of this Agreement) and the filing of the Teton Certificate of Merger with the Secretary of State of the State of Delaware, no other corporate action or proceedings on the part of any of Parent or Teton Merger Sub, or other vote of any of the

-41-

**App.268**

**REDACTED - FOR PUBLIC INSPECTION**

equityholders of Parent or Teton Merger Sub, is necessary to authorize the execution and delivery by Parent and Teton Merger Sub of this Agreement or the consummation of the transactions contemplated hereby, including the Teton Merger and the Debt Financing.  This Agreement has been duly and validly executed and delivered by Parent and Teton Merger Sub and, assuming this Agreement constitutes the legal, valid and binding agreement of the Company, this Agreement constitutes the legal, valid and binding agreement of Parent and Teton Merger Sub and is enforceable against Parent and Teton Merger Sub in accordance with its terms, except as such enforcement may be subject to the Enforceability Exceptions.

(b)     The Parent Board has approved the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, including the Teton Merger and the Debt Financing.

(c)     The Board of Directors of Teton Merger Sub has (i) determined that the transactions contemplated by this Agreement, including the Teton Merger, are advisable, fair to and in the best interests of Teton Merger Sub and Parent, as its sole stockholder, (ii) approved the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, including the Teton Merger and the Debt Financing and (iii) resolved to recommend that Parent, as the sole stockholder of Teton Merger Sub, adopt this Agreement.

Section 5.3     Consents and Approvals; No Violation.

(a)     Other than in connection with or in compliance with the Transaction Approvals, no authorization, consent, order, license, permit or approval of, or registration, declaration, notice or filing with, any Governmental Entity is required to be made or obtained, under applicable Law, for the consummation by Parent and Teton Merger Sub of the transactions contemplated by this Agreement, including the Teton Merger and the Debt Financing, except for such authorizations, consents, orders, licenses, permits, approvals, registrations, declarations, notices and filings that the failure to make or obtain would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect.

(b)     The execution and delivery by Parent and Teton Merger Sub of this Agreement does not, and (assuming the Transaction Approvals are obtained) the consummation of the transactions contemplated hereby, and compliance with the provisions hereof will not, (i) require any consent or approval under, violate, conflict with, result in any breach of or any loss of any benefit under, constitute a change of control or default under, or result in termination or give to others any right of termination, vesting, amendment, acceleration or cancellation of, or result in the creation of a Lien (other than Permitted Liens) upon any of the respective properties or assets of Parent or Teton Merger Sub or any of their respective Affiliates pursuant to, any Contract to which Parent or Teton Merger Sub or any of their respective Affiliates is a party or by which any of them or any of their respective properties or assets are bound, except as would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect, (ii) conflict with or result in any violation of any provision of the certificate of organization or bylaws or applicable organizational document of Parent or Teton Merger Sub or (iii) conflict with or violate any applicable Laws except as would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect.

**App.269**

**REDACTED - FOR PUBLIC INSPECTION**

Section 5.4    <u>Litigation</u>.  As of the date hereof, (a) there is no Proceeding to which Parent or Teton Merger Sub or any of their respective Affiliates is a party pending or, to the Knowledge of Parent, threatened that would reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect and (b) none of Parent or Teton Merger Sub nor their respective Affiliates are subject to any outstanding Order by a Governmental Entity that would reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect.

Section 5.5    <u>Parent and Teton Merger Sub Information</u>.  The information supplied or to be supplied by Parent or Teton Merger Sub (including any information regarding any of their Affiliates) for inclusion in the Proxy Statement will not, at the time the Proxy Statement is first mailed to the Company's stockholders or at the time of the Company Stockholders' Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, except that no representation or warranty is made by Parent or Teton Merger Sub with respect to statements made therein based on information supplied by the Company for inclusion or incorporation by reference therein.

Section 5.6    <u>FCC Qualifications</u>.  Each of Parent and Teton Merger Sub is, and through the Closing shall continue to be, legally, technically, financially and otherwise qualified to be the licensee of, acquire control of, and to own and operate each of the Company Stations under the Communications Act and FCC Rules (for purposes of this <u>Section 5.6</u>, as they exist and have been interpreted by the FCC in its written rules, policies and decisions as of the date of this Agreement), including but not limited to the provisions relating to media ownership and attribution and character qualifications.  Each of Parent and Teton Merger Sub shall be, as of the Closing Date, in compliance with Section 310(b) of the Communications Act and the FCC's rules governing alien ownership.  There are no, and through the Closing there shall not be any, facts or circumstances relating to Parent or any of its Subsidiaries that would reasonably be expected, under the Communications Act or FCC Rules or the existing procedures of the FCC (for purposes of this <u>Section 5.6,</u> all as they exist and have been interpreted by the FCC in its written rules, policies and decisions as of the date of this Agreement) or any other applicable Law, to disqualify Parent or Teton Merger Sub or any of their Subsidiaries as a holder of any of the FCC licenses held by the Company with respect to its business, as applicable, or as the owner and operator of the Company Stations.  There are no facts or circumstances relating to Parent or any of its Subsidiaries that would reasonably be expected to require a waiver of or exemption from any provision of the Communications Act or FCC Rules (for purposes of this <u>Section 5.6</u>, as they exist and have been interpreted by the FCC in its written rules, policies and decisions as of the date of this Agreement) for the FCC Consent to be obtained.  Neither Parent nor Teton Merger Sub is, or prior to the Closing shall be, a "foreign person" within the meaning of 31 C.F.R. § 800.224.  There are no, and prior to the Closing shall not be any, facts or circumstances relating to Parent or any of its Subsidiaries that would reasonably be expected to (a) result in the FCC's refusal to grant the FCC Consent or otherwise disqualify Parent or Teton Merger Sub or their Subsidiaries, (b) materially delay obtaining the FCC Consent or (c) cause the FCC to impose a material condition or conditions on its granting of the FCC Consent or to designate the FCC Applications for a hearing.

Section 5.7    <u>Finders or Brokers</u>.  Except as set forth on <u>Section 5.7</u> of the Parent Disclosure Schedule, neither Parent nor any of Parent's Subsidiaries has employed any investment banker, broker or finder in connection with the transactions contemplated by this Agreement who

-43-

**App.270**

REDACTED - FOR PUBLIC INSPECTION

would be entitled to any fee or any commission in connection with or upon consummation of the Teton Merger.

Section 5.8    Solvency.  No transfer of property is being made by Parent or Teton Merger Sub and no obligation is being incurred in connection with the execution of this Agreement and the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Parent and its Affiliates (including, from and after Closing, the Company).  Assuming that the conditions to the obligations of Parent and Teton Merger Sub to consummate the Teton Merger set forth in Section 7.1 and Section 7.2 have been satisfied or waived, then as of the Effective Time and after giving effect to the transactions contemplated by this Agreement, including the funding of the Debt Financing, Parent and its Subsidiaries, on a consolidated basis, will be Solvent.

Section 5.9    Teton Merger Sub.  Teton Merger Sub is a direct wholly owned subsidiary of Parent.  The authorized capital stock of Teton Merger Sub consists of 1,000 shares of common stock, par value $0.01 per share, of which 1,000 shares are validly issued and outstanding.  All of the issued and outstanding capital stock of Teton Merger Sub is, and at the Teton Merger Effective Time will be, owned by Parent.  There is no outstanding option, warrant, right or any other agreement pursuant to which any Person other than Parent may acquire any equity securities of Teton Merger Sub.  Since its date of incorporation, Teton Merger Sub has not, and prior to the Teton Merger Effective Time will not have, carried on any business or conducted any operations other than the execution of this Agreement, the performance of its obligations hereunder and matters ancillary thereto and has, and prior to the Teton Merger Effective Time will have, no assets, liabilities or obligations of any nature other than those incident to its formation and pursuant to this Agreement and the Teton Merger and the other transactions contemplated by this Agreement.

Section 5.10    Ownership of Shares of Company Common Stock.  None of Parent or any of its Affiliates beneficially own any shares of Company Common Stock or are, or have been at any time during the period commencing three years prior to the date hereof through the date hereof, an "interested stockholder" of the Company, as such term is defined in Section 203 of the DGCL.

Section 5.11    No Vote of Parent Stockholders; Teton Merger Sub Required Vote.  No vote of the stockholders of Parent or the holders of any other securities of Parent (equity or otherwise) is required by Law, the organizational documents of Parent or the applicable rules of any exchange on which securities of Parent are traded in order for Parent to consummate the transactions contemplated by this Agreement, including the Teton Merger and the Debt Financing.  Other than the adoption of this Agreement by Parent, as the sole stockholder of Teton Merger Sub (which such adoption shall occur immediately following the execution of this Agreement), no vote of the stockholders of Teton Merger Sub or the holders of any other securities of Teton Merger Sub (equity or otherwise) is required by Law, the organizational documents of Teton Merger Sub or the applicable rules of any exchange on which securities of Teton Merger Sub are traded in order for Teton Merger Sub to consummate the transactions contemplated by this Agreement, including the Teton Merger and the Debt Financing.

Section 5.12    Financing.

(a)    As of the date of this Agreement, Parent has delivered to the Company true,

-44-

**App.271**

REDACTED - FOR PUBLIC INSPECTION

complete and correct copies of (i) the fully executed commitment letter dated as of the date hereof (together with all exhibits and schedules thereto and any fee letter related thereto, the "***Debt Commitment Letter***") from the Debt Financing Parties party thereto pursuant to which such Debt Financing Parties have agreed, subject to the terms and conditions thereof, to provide debt financing in the amounts set forth therein, and (ii) all of the fee letters related thereto, subject, in the case of such fee letters, to redaction solely of fee amounts, securities demand, "flex terms", other economic terms and other provisions (including any dates related thereto) that are customarily redacted in connection with transactions of this type so long as no redaction covers terms that would reduce the amount of the Debt Financing below the amount required to satisfy the Financing Amount or adversely affects the conditionality, enforceability, availability or termination of the Debt Financing. The debt financing contemplated by the Debt Commitment Letter is collectively referred to in this Agreement as the "***Debt Financing***."

(b)    Except as expressly set forth in the Debt Commitment Letter and in the unredacted portions of any fee letters, there are no conditions precedent to the obligations of the Debt Financing Parties to provide the Debt Financing that would permit the Debt Financing Parties to reduce the aggregate principal amount of the Debt Financing below an amount necessary to satisfy the Financing Amount, including any condition relating to the amount or availability of the Debt Financing pursuant to any "flex" provision. As of the date of this Agreement, Parent does not have any reason to believe that it will be unable to satisfy on a timely basis all terms and conditions to be satisfied by it in the Debt Commitment Letter on or prior to the Closing Date, nor does Parent have knowledge that any of the Debt Financing Parties will not perform its obligations thereunder. As of the date of this Agreement, there are no side letters, understandings or other agreements, contracts or arrangements of any kind to which Parent or Teton Merger Sub is a party relating to the funding of the full amount of the Debt Financing required to fund the Financing Amount, other than as expressly set forth in the Debt Commitment Letter and the unredacted portions of any fee letters and other than customary engagement letters and customary fee credit letters (in each case, the terms of which do not (i) reduce the amount of the Debt Financing below the amount required to fund the Financing Amount or (ii) impose any new or additional conditions or otherwise adversely amend, modify or expand any conditions precedent to the Debt Financing).

(c)    Assuming (x) the accuracy in all material respects of the representations and warranties set forth in Article IV and (y) the performance by the Company and its Subsidiaries of the covenants and agreements contained in this Agreement in all material respects, the Debt Financing, when funded in accordance with the Debt Commitment Letter and giving effect to any "flex" provision in or related to the Debt Commitment Letter (including with respect to fees and original issue discount) shall provide Parent with cash proceeds on the Closing Date sufficient for the satisfaction of all of Parent's payment obligations under this Agreement and the Debt Commitment Letter, including the payment of the Merger Consideration, the payment of any debt required to be repaid, redeemed, retired, cancelled, terminated or otherwise satisfied or discharged in connection with the Teton Merger (including the Payoff Amount), and any fees, expenses and other amounts of or payable by Parent or any of its Affiliates, in each case required to be paid on the Closing Date by Parent or Teton Merger Sub in connection with the transactions contemplated hereby (such amounts, collectively, the "***Financing Amount***").

(d)    As of the date of this Agreement, each of the obligations set forth in the Debt Commitment Letter constitutes the legal, valid, binding and enforceable obligation of Parent

-45-

**App.272**

**REDACTED - FOR PUBLIC INSPECTION**

and, to the knowledge of Parent, all the other parties thereto and such Debt Commitment Letter is legal, valid, binding and enforceable in accordance with their terms and is in full force and effect. As of the date of this Agreement, no event has occurred which (with or without notice, lapse of time or both) would constitute a default, breach or failure to satisfy a condition by Parent under the terms and conditions of the Debt Commitment Letter, and, as of the date of this Agreement, Parent has no reason to believe that the Debt Financing will not be available to Parent on the date of the Closing in an amount necessary to satisfy the Financing Amount.  Parent has paid in full any and all commitment fees or other fees required to be paid pursuant to the terms of the Debt Commitment Letter on or before the date hereof, and will pay in full any such amounts due on or before the Closing Date.  Except in accordance with the terms hereof, the Debt Commitment Letter has not been modified, amended or altered and, as of the date of this Agreement, none of the respective commitments thereunder have been terminated, reduced, withdrawn or rescinded in any respect, and, to the knowledge of Parent, as of the date of this Agreement, no termination, reduction, withdrawal or rescission thereof is contemplated.  As of the date of this Agreement, no modification or amendment to the Debt Commitment Letter is contemplated (other than, in accordance with Section 6.15(c), to add lenders, lead arrangers, bookrunners, syndication agents or similar entities that have not executed the Debt Commitment Letter as of the date of this Agreement).

(e)     In no event shall the receipt or availability of any funds or financing (including the Debt Financing) by Parent, Teton Merger Sub or any of their respective Affiliates be a condition to any of Parent's or Teton Merger Sub's obligations under this Agreement.

Section 5.13     Investigation; No Other Representations.  Each of Parent and Teton Merger Sub has conducted its own independent review and analysis of the business, operations, assets, Contracts, Intellectual Property, real estate, technology, liabilities, results of operations, financial condition and prospects of the Company and its Subsidiaries, and each of them acknowledges that it and its Affiliates, officers, directors, employees, accountants, consultants, legal counsel, investment bankers, advisors, representatives or authorized agents (collectively, "***Representatives***") have received access to such books and records, facilities, equipment, Contracts and other assets of the Company and its Subsidiaries that it and its Representatives have requested to review and that it and its Representatives have had the opportunity to meet with the management of the Company and to discuss the business and assets of the Company and its Subsidiaries.  Each of Parent and Teton Merger Sub acknowledges that neither the Company nor any Person on behalf of the Company makes, and neither Parent nor Teton Merger Sub has relied upon and hereby disclaims, any express or implied representation or warranty with respect to the Company or any of its Subsidiaries or its and their Subsidiaries' respective businesses or with respect to the accuracy or completeness of any other information provided to Parent or Teton Merger Sub in connection with the transactions contemplated by this Agreement other than the representations and warranties contained in Article IV (as qualified by the Company Disclosure Schedule), or with respect to future operating or financial results, estimates, projections, forecasts, plans or prospects (including the reasonableness of the assumptions underlying such estimates, projections, forecasts, plans or prospects), except in the case of fraud with respect to the representations and warranties contained herein.  Without limiting the foregoing, except in the case of fraud with respect to the representations and warranties contained herein, each of Parent and Teton Merger Sub acknowledges and agrees that neither the Company nor any other Person shall have or be subject to any liability or other obligation to Parent, Teton Merger Sub or their

-46-

**App.273**

REDACTED - FOR PUBLIC INSPECTION

Representatives or Affiliates or any other Person resulting from Parent's, Teton Merger Sub's or their Representatives' or Affiliates' use of any information, documents or other material made available to Parent, Teton Merger Sub or their Representatives or Affiliates, including any information made available in the electronic data room maintained by or on behalf of the Company or its Representatives for purposes of the transactions contemplated by this Agreement, teasers, marketing materials, consulting reports or materials, confidential information memoranda, management presentations, functional "break-out" discussions, responses to questions submitted on behalf of Parent, Teton Merger Sub or their respective Representatives or in any other form in connection with the transactions contemplated by this Agreement.

## ARTICLE VI.

## COVENANTS AND AGREEMENTS

Section 6.1    Conduct of Business.

(a)    During the period from the date hereof until the earlier of the termination of this Agreement in accordance with its terms and the Teton Merger Effective Time, except (v) as may be required by applicable Law, (w) with the prior written consent of Parent (which shall not be unreasonably withheld, conditioned or delayed), (x) as expressly contemplated or expressly required by this Agreement or (y) as set forth in Section 6.1 of the Company Disclosure Schedule, the Company shall, and shall cause each of its Subsidiaries to, use reasonable best efforts to (1) conduct its operations in all material respects in the ordinary course of business, (2) maintain in all material respects the Company Station Licenses and the rights of the Company or any of its Subsidiaries thereunder and (3) preserve intact in all material respects its current business organizations, ongoing businesses and material relationships with third parties; provided, however, that no action by the Company or its Subsidiaries with respect to matters addressed by any provision of Section 6.1(b) shall be deemed a breach of this sentence unless such action would constitute a breach of such other provision.

(b)    During the period from the date hereof until the earlier of the termination of this Agreement in accordance with its terms and the Teton Merger Effective Time, except (w) as may be required by applicable Law, (x) with the prior written consent of Parent (which shall not be unreasonably withheld, conditioned or delayed), (y) as expressly contemplated or required by this Agreement, or (z) as set forth in Section 6.1 of the Company Disclosure Schedule, the Company shall not, and shall not permit any of its Subsidiaries to (whether by merger, consolidation, operation of law or otherwise):

(i)    amend, adopt any amendment to, take any action to exempt any Person from, or otherwise change any provision of the Company Organizational Documents or (except for immaterial changes that do not adversely affect Parent) other equivalent organizational or governing documents of any Subsidiary of the Company;

(ii)    adjust, split, reverse split, consolidate, subdivide, combine or reclassify any shares of capital stock, voting securities or other ownership interests of the Company or any of its Subsidiaries (or any warrants, options or other rights to acquire the foregoing), except for any such transaction by a wholly owned Subsidiary of the Company;

-47-

**App.274**

REDACTED - FOR PUBLIC INSPECTION

(iii)    make, declare or pay any dividend, or make any other distribution on, or directly or indirectly redeem, purchase or otherwise acquire, any shares of its capital stock, or any other securities or obligations convertible (whether currently convertible or convertible only after the passage of time or the occurrence of certain events) into or exchangeable for any shares of its capital stock, except for (A) any such transactions solely among the Company and its wholly owned Subsidiaries or among the Company's wholly owned Subsidiaries, or (B) the acceptance of shares of Company Common Stock, or withholding of shares Company Common Stock otherwise deliverable, to satisfy withholding Taxes incurred in connection with the exercise, vesting and/or settlement of Company Equity Awards in accordance with their terms as in effect as of the date hereof; provided, that the Company may make, declare and pay quarterly cash dividends (and, with respect to the Company Equity Awards, as and if applicable, dividends or dividend equivalents) in an amount per share not in excess of $0.125 per quarter and with record dates consistent with the record dates customarily used by the Company for the payment of quarterly cash dividends, including with respect to the quarter in which the Teton Merger Effective Time occurs unless the Teton Merger Effective Time precedes the record date for such quarter;

(iv)    grant any Company Equity Awards or other equity-based awards or interests, or grant any individual, corporation or other entity any right to acquire any shares of its capital stock, in each case other than Company Equity Awards granted in accordance with Section 6.1(b) of the Company Disclosure Schedule;

(v)    (A) issue, sell or otherwise permit to become outstanding any additional shares of its capital stock or securities convertible or exchangeable into, or exercisable for, any shares of its capital stock or any options, warrants, or other rights of any kind to acquire any shares of its capital stock, except pursuant to the due exercise, vesting and/or settlement of Company Equity Awards outstanding as of the date hereof in accordance with their terms as in effect as of the date hereof or issued after the date hereof not in contravention of this Agreement, or in transactions solely among the Company and its Subsidiaries or among the Company's Subsidiaries or as permitted by the foregoing clause (iv), or (B) enter into any agreement, understanding or arrangement with respect to the sale or voting of its capital stock or equity interests;

(vi)    adopt a plan of complete or partial liquidation, dissolution, merger, consolidation or other reorganization, other than the Teton Merger and other than solely among the Company and its Subsidiaries or among the Company's Subsidiaries;

(vii)    incur, assume, endorse, guarantee or otherwise become liable for or modify the terms of any Indebtedness or issue or sell any debt securities or any rights to acquire any debt securities, except for (A) any Indebtedness among the Company and/or its wholly owned Subsidiaries or among wholly owned Subsidiaries of the Company or (B) guarantees by the Company of Indebtedness of wholly owned Subsidiaries of the Company or guarantees by Subsidiaries of the Company of Indebtedness of the Company or any of its wholly owned Subsidiaries, which indebtedness is incurred in compliance with this clause (vii);

-48-

**App.275**

**REDACTED - FOR PUBLIC INSPECTION**

(viii)    other than in accordance with contracts or agreements in effect on the date hereof, sell, transfer, license, create any Lien (other than a Permitted Lien) or otherwise dispose of any of its properties or assets (other than to the Company or a wholly owned Subsidiary of the Company and other than (A) sales of inventory, (B) sales of rental equipment or obsolete or worthless equipment in the ordinary course of business, and (C) immaterial properties or assets);

(ix)    acquire any assets (other than acquisitions of assets in the ordinary course of business) or any other Person or business of any other Person (whether by merger or consolidation, acquisition of stock or assets or by formation of a joint venture or otherwise) or make any investment in any Person, in each case other than a wholly owned Subsidiary of the Company (or any assets thereof), either by purchase of stock or securities, contributions to capital, property transfers or purchase of property or assets of any Person;

(x)    make, authorize or commit to any capital expenditures, except for capital expenditures (A) not to exceed $5,000,000 more than set forth in the capital plans set forth in Section 6.1(b)(x) of the Company Disclosure Schedule, (B) as required by a Governmental Entity to the extent not otherwise reflected in the capital plans set forth in Section 6.1(b)(x) of the Company Disclosure Schedule or (C) to remedy any matters set forth in clause (vii) of the definition of Company Material Adverse Effect (and not otherwise reflected in the capital plans set forth in Section 6.1(b)(x) of the Company Disclosure Schedule);

(xi)    make any loans, advances or capital contributions to, or investments in, any Person, other than to or in the Company or its wholly-owned Subsidiaries, ordinary course advancements and reimbursements to employees or as may be permitted pursuant to Section 6.1(b)(ix) or Section 6.1(b)(x);

(xii)    except as required by the terms of any Collective Bargaining Agreement or Company Benefit Plan, (A) establish, adopt, materially amend or terminate any (1) Company Benefit Plan or any plan, agreement, program, policy, trust, fund or other arrangement that would be a Company Benefit Plan if it were in existence as of the date of this Agreement, except for amendments in the ordinary course of business that are consistent with past practice and that do not materially increase the Company's or its Subsidiaries' cost of providing compensation or benefits or (2) except as a result of good-faith negotiations with a labor union or labor organization in the ordinary course of business consistent with past practice, Collective Bargaining Agreement, (B) increase in any manner the compensation (including severance, change-in-control and retention compensation) or benefits of any current or former employees, officers, directors or other individual service providers of the Company or its Subsidiaries, except in the ordinary course of business with respect to individuals with annual base compensation at or below $500,000 that are consistent with past practice and that do not constitute or result in any increase in any employee's actual or potential severance entitlements (other than increases in severance entitlements occurring as a result of an increase in such employee's or service provider's base compensation or incentive opportunity), (C) pay or award, or commit to pay or award, any bonuses or incentive compensation, retention, change in control, transaction, severance or severance or similar compensation, (D) accelerate any rights or

-49-

**App.276**

**REDACTED - FOR PUBLIC INSPECTION**

benefits under any Company Benefit Plan, (E) accelerate the time of vesting or payment of any award under any Company Benefit Plan, (F) hire, promote or engage, or otherwise enter into any employment or consulting agreement or arrangement with, any current or former employee, officer, director or other individual service provider of the Company or its Subsidiaries whose annual base compensation exceeds $500,000, (G) terminate any employee, officer, director or other service provider of the Company or its Subsidiaries, other than for cause or, following good faith consultation with Parent, due to performance, whose annual base compensation exceeds $500,000 or (H) withdraw from, or incur any withdrawal liability with respect to, any Multiemployer Plan, or commence an obligation to contribute to any Multiemployer Plan (other than existing contributions to the AFTRA Retirement Plan);

(xiii)   other than (x) in the ordinary course of business, (y) for those Contracts that can be cancelled by the Company without cause (and without material penalty) on less than 90 days' notice or (z) with respect to Contracts with a term of one (1) year or less, (i) amend or modify in any material respect or terminate any Company Material Contract, (ii) enter into any Contract that would constitute a Company Material Contract if in effect on the date hereof or (iii) waive, release or assign any material rights, claims or benefits under any such Company Material Contract; <u>provided</u> that, notwithstanding the foregoing, except in the ordinary course of business, neither the Company nor any of its Subsidiaries shall enter into, amend or modify any Contract that would result in annual payments by or proceeds to the Company or its Subsidiaries (or, following Closing, Parent or its Subsidiaries) in excess of $5,000,000;

(xiv)   change the fiscal year of the Company or any of its Subsidiaries (other than any change to make the fiscal year of a Subsidiary the same as of the Company);

(xv)   implement or adopt any material change in its financial accounting principles or its methods, other than as may be required by GAAP or applicable Laws;

(xvi)   settle, offer or propose to settle any Proceeding involving or against the Company or any of its Subsidiaries in excess of $5,000,000 per Proceeding or $20,000,000 in the aggregate (excluding, for the avoidance of doubt, amounts paid by insurance and other amounts not paid out-of-pocket by the Company) or otherwise discharge, settle or satisfy any Proceeding which discharge, settlement or satisfaction would materially limit or restrict the operation of the business of the Company and its Subsidiaries, taken as a whole;

(xvii)   (A) apply for a construction permit or modify any of the Company Station Licenses if doing so is reasonably likely to be materially adverse to the interests of Parent and its Subsidiaries, after giving effect to the Teton Merger, except as required by applicable Law or the FCC, or (B) fail to provide Parent with a copy of (and a reasonable opportunity to review and comment on) any application for the material modification of any of the Company Station Licenses reasonably in advance of filing with the FCC, except, in the case of this clause (B), (1) the Company may redact the portion of any such application that contains information regarding third parties that the Company is contractually prohibited from disclosing or (2) if doing so would, in the reasonable

-50-

**App.277**

REDACTED - FOR PUBLIC INSPECTION

judgment of the Company's outside legal counsel, (x) jeopardize or cause a risk of loss or waiver of the attorney-client, attorney work product or other similar privilege of the Company or any of its Subsidiaries or (y) violate any Law applicable to the Company or any of its Subsidiaries or the assets, or operation of the business, of the Company or any of its Subsidiaries; provided, that in such instances the Company shall inform Parent of the general nature of the information being redacted or withheld and, on Parent's request, reasonably cooperate with the other party to use reasonable best efforts to provide such information, in whole or in part, in a manner that would not result in any of the outcomes described in the foregoing clauses (1) and (2);

(xviii) implement or announce any mass employee layoff, including any such layoff that would require notice or pay in lieu of notice under the Worker Adjustment and Retraining Notification Act and the regulations promulgated thereunder;

(xix) make (other than in the ordinary course of business), change or revoke any material Tax election, adopt or change any Tax accounting period or material method of Tax accounting, amend any material Tax Return, settle or compromise any material liability for Taxes or any Tax audit, claim or other proceeding for a material amount of Taxes, enter into any "closing agreement" within the meaning of Section 7121 of the Code (or any similar provision of state, local or non U.S. Law), surrender any right to claim a material refund of Taxes, or agree to an extension or waiver of the statute of limitations with respect to a material amount of Taxes (other than in connection with any automatic or automatically granted extension to file any Tax Return);

(xx) change any retransmission consent election with any MVPDs or, to the extent applicable due to a change in applicable Law, any over-the-top platform;

(xxi) take any action set forth on Section 6.1(b)(xxi) of the Company Disclosure Schedule; or

(xxii) agree to take, or make any commitment to take, any of the foregoing actions that are prohibited pursuant to this Section 6.1(b).

(c) Nothing contained in this Agreement shall give Parent or Teton Merger Sub, directly or indirectly, the right to control or direct the Company's operations prior to the Teton Merger Effective Time. Prior to the Teton Merger Effective Time, the Company shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its operations.

(d) The parties shall take the actions set forth on Section 6.1(d) of the Company Disclosure Schedule.

Section 6.2    Access.

(a) The Company shall afford Parent and its Representatives reasonable access during normal business hours upon reasonable advance notice to the Company, throughout the period from the date hereof until the earlier of the termination of this Agreement and the Teton Merger Effective Time, to its and its Subsidiaries' personnel, properties, assets, Contracts,

-51-

App.278

**REDACTED - FOR PUBLIC INSPECTION**

commitments, books and records and such other information concerning its business, properties, finances, operations, assets, litigation matters, environmental compliance matters, cash-flow reports and personnel as Parent may reasonably request. The Company shall use its commercially reasonable efforts to cause its Representatives to reasonably cooperate with Parent and Parent's Representatives in connection with such access and examination. Notwithstanding anything to the contrary contained in this Section 6.2(a), any document, correspondence or information or other access provided pursuant to this Section 6.2(a) may be redacted or otherwise limited to prevent disclosure of information concerning the valuation of the Company and the Teton Merger or other similarly confidential or competitively sensitive information. All access pursuant to this Section 6.2(a) shall be (i) conducted in such a manner as not to interfere unreasonably with the normal operations of the Company or any of its Subsidiaries and (ii) coordinated through the Chief Legal Officer of the Company or a designee thereof.

(b) Notwithstanding anything to the contrary contained in this Section 6.2, neither the Company nor any of its Subsidiaries shall be required to provide any access, or make available any document, correspondence or information, if doing so would, in the reasonable judgment of the Company's legal counsel, (i) jeopardize or cause a risk of loss or waiver of the attorney-client, attorney work product or other similar privilege of the Company or any of its Subsidiaries or (ii) violate any (A) Law applicable to the Company or any of its Subsidiaries or the assets, or operation of the business, of the Company or any of its Subsidiaries or (B) Contract to which the Company or any of its Subsidiaries is a party or by which any of their assets or properties are bound; provided, that in such instances the Company shall inform Parent of the general nature of the information being withheld and, on Parent's request, reasonably cooperate with the other party to use reasonable best efforts to provide such information, in whole or in part, in a manner that would not result in any of the outcomes described in the foregoing clauses (i) and (ii).

(c) The parties hereto hereby agree that all information provided to them or their respective Representatives in connection with this Agreement and the consummation of the transactions contemplated hereby shall be governed in accordance with the Confidentiality Agreement and the Clean Team Agreement, each of which shall continue in full force and effect in accordance with their terms.

Section 6.3    No Solicitation.

(a) Except as expressly permitted by this Section 6.3, the Company shall not, and shall cause each of its Subsidiaries not to, and shall not authorize or permit and use reasonable best efforts to cause each of its and their respective officers, directors and other Representatives not to, directly or indirectly, (i) solicit, initiate, or knowingly encourage or facilitate any proposal or offer or any inquiries regarding the making of any proposal or offer, including any proposal or offer to its stockholders, that constitutes, or would reasonably be expected to lead to, a Company Takeover Proposal, (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any other Person any information, or provide or afford access to the Company or its Subsidiaries or their respective properties, books and records, assets, facilities or personnel, in connection with or for the purpose of encouraging or facilitating, any inquiry, proposal or offer that constitutes, or would reasonably be expected to lead to, a Company Takeover Proposal (other than, in response to an unsolicited inquiry, to refer the inquiring Person

REDACTED - FOR PUBLIC INSPECTION

to this Section 6.3 and to limit its conversation or other communication exclusively to such referral), (iii) enter into, or publicly propose to enter into, any letter of intent, memorandum of understanding, agreement (including an acquisition agreement, merger agreement, joint venture agreement or other agreement), commitment or agreement in principle with respect to a Company Takeover Proposal (other than an Acceptable Confidentiality Agreement) or (iv) authorize, commit or resolve to do any of the foregoing; provided, that the Company and its Representatives shall be permitted, upon a good faith determination by the Company Board (after consultation with its outside legal advisors) that not doing so would be inconsistent with the Company Board's fiduciary duties to its stockholders under applicable Law, to grant a confidential waiver of any provision of any confidentiality or standstill agreement solely to permit a Company Takeover Proposal to be made and, subject to the terms of this Agreement, negotiated and entered into.

(b)     The Company shall, and shall cause each of its Subsidiaries to, and shall direct its Representatives to, immediately (i) cease and cause to be terminated any discussions or negotiations with any Persons (other than Parent, Teton Merger Sub and their respective Affiliates and Representatives) that may be ongoing with respect to a Company Takeover Proposal, (ii) terminate access for any Person (other than Parent, Teton Merger Sub and their respective Affiliates and Representatives) to any data room and (iii) request the return or destruction of any non-public information provided to any Person (other than Parent, Teton Merger Sub and their respective Affiliates and Representatives) in connection with a potential Company Takeover Proposal.  The Company shall not release any third party from, or waive, amend or modify any provision of, or grant permission under, any standstill or confidentiality provision with respect to a Company Takeover Proposal or similar matter in any agreement to which the Company is a party; provided, that, notwithstanding anything in this Agreement to the contrary, if the Company Board determines in good faith, after consultation with its outside legal counsel that the failure to take such action would reasonably be expected to be inconsistent with the directors' fiduciary duties under applicable Law, the Company may take such actions solely to the extent necessary to permit a third party to make a Company Takeover Proposal and, subject to the terms of this Agreement, thereafter negotiate and enter into any transaction in connection therewith.

(c)     Notwithstanding anything to the contrary contained in this Agreement, if at any time after the date of this Agreement and prior to obtaining the Company Stockholder Approval, the Company receives a bona fide written Company Takeover Proposal from any Person, and if the Company Board determines in good faith, after consultation with the Company's independent financial advisor and outside legal counsel, that such Company Takeover Proposal constitutes, or could reasonably be expected to lead to, a Company Superior Proposal, then the Company may enter into an Acceptable Confidentiality Agreement with such Person making such Company Takeover Proposal and the Company and its Representatives may (i) furnish, pursuant to an executed Acceptable Confidentiality Agreement between the Company and such Person making such Company Takeover Proposal, information with respect to the Company and its Subsidiaries to such Person that has made such Company Takeover Proposal and its Representatives and (ii) engage in or otherwise participate in discussions or negotiations with such Person making such Company Takeover Proposal and its Representatives regarding such Company Takeover Proposal; provided, that promptly after (and in any event within 24 hours of) furnishing any non-public information after the date of this Agreement about the Company and its Subsidiaries to such Person making such Company Takeover Proposal, the Company furnishes such non-public information to Parent (to the extent such non-public information has not been

-53-

**App.280**

REDACTED - FOR PUBLIC INSPECTION

previously so furnished to Parent or its Representatives).  The Company shall promptly (and in any event within 24 hours) notify Parent in writing if the Company takes any of the actions in clauses (i) and (ii) above.

(d)    The Company shall promptly (and in no event later than 24 hours after receipt) notify Parent in writing in the event that the Company or any of its controlled Affiliates or Representatives (on the Company's behalf) receives, after the date of this Agreement, a Company Takeover Proposal or any offer, proposal, inquiry or request for information or discussions relating to the Company or its Subsidiaries that contemplates or that would reasonably be likely to lead to a Company Takeover Proposal.  Such notice shall indicate (to the extent permitted by existing contractual obligations) the identity of the Person making the Company Takeover Proposal or offer, proposal, inquiry or request, and the material terms and conditions thereof and, if written, a copy thereof.  In addition, the Company shall promptly (but in any event within 24 hours) after the receipt thereof provide to Parent (to the extent permitted by existing contractual obligations) copies of any material written documentation setting forth the terms of such Company Takeover Proposal which is received by the Company from the Person making such Company Takeover Proposal (or from any Representatives of such Person) and thereafter, the Company shall keep Parent reasonably informed, on a prompt basis (and in any event within 24 hours), regarding any material changes to the status and material terms of any such Company Takeover Proposal or offer, proposal, inquiry or request (including any material amendments thereto or any material change to the scope or material terms or conditions thereof) and provide to Parent copies of all material correspondence and written materials relating to such Company Takeover Proposal or offer, proposal, inquiry or request received by the Company.

(e)    Except as permitted by this Section 6.3, neither the Company Board nor any committee thereof shall (i) (A) change, qualify, modify, withhold, rescind or withdraw, or authorize or resolve to, or publicly propose or announce its intention to, change, qualify, modify, withhold, rescind or withdraw, in each case in any manner adverse to Parent, the Company Recommendation, (B) adopt, approve or recommend to the stockholders of the Company, make any public statement approving, endorsing or recommending, or resolve to approve or recommend to the stockholders of the Company or make any public statement approving, endorsing or recommending, a Company Takeover Proposal or (C) fail to include the Company Recommendation in the Proxy Statement (any action described in this clause (i) being referred to as a "*Company Adverse Recommendation Change*"), (ii) authorize, cause or permit the Company or any of its Subsidiaries to enter into any letter of intent, memorandum of understanding, agreement (including an acquisition agreement, merger agreement, joint venture agreement or other agreement), commitment or agreement in principle with a counterparty making a Company Takeover Proposal (other than an Acceptable Confidentiality Agreement entered into in accordance with Section 6.3(c)) (a "*Company Acquisition Agreement*") or (iii) submit any Company Takeover Proposal to a vote of the stockholders of the Company, or agree to do any of the foregoing.  Notwithstanding anything to the contrary set forth in this Agreement, at any time after the date of this Agreement and prior to the time the Company Stockholder Approval is obtained, in response to an Intervening Event, the Company Board (or any committee thereof) may make a Company Adverse Recommendation Change if, prior to taking such action, the Company Board has determined in good faith, after consultation with outside legal counsel, that the failure to take such action would reasonably be expected to be inconsistent with the Company Board's fiduciary duties under applicable Law; provided, that prior to making such Company Adverse

-54-

**App.281**

**REDACTED - FOR PUBLIC INSPECTION**

Recommendation Change, (1) the Company has given Parent at least four (4) Business Days prior written notice of its intention to take such action specifying, in reasonable detail, the reasons therefor and the Intervening Event, (2) during such four (4) Business Day period, has negotiated with Parent and its Representatives in good faith (if Parent and its Representatives desire to so negotiate) to make adjustments to the terms and conditions of this Agreement, and (3) upon the end of such notice period, the Company Board shall have considered any revisions to the terms of this Agreement proposed in writing by, and that are legally binding on, Parent and Teton Merger Sub, and shall have determined in good faith, after consultation with its outside legal counsel, that the failure to make a Company Adverse Recommendation Change would reasonably be expected to be inconsistent with the Company Board's fiduciary duties under applicable Law.

(f)      Notwithstanding the foregoing, at any time after the date of this Agreement and prior to the time the Company Stockholder Approval is obtained, if the Company Board has determined in good faith, after consultation with the Company's independent financial advisor and outside legal counsel, that a *bona fide* written Company Takeover Proposal made after the date hereof constitutes a Company Superior Proposal, the Company Board may (A) make a Company Adverse Recommendation Change with respect to such Company Superior Proposal or (B) cause the Company to terminate this Agreement in accordance with Section 8.1(h) in order to enter into a definitive agreement relating to such Company Superior Proposal; provided, that prior to so making a Company Adverse Recommendation Change or terminating this Agreement, (1) the Company has given Parent at least four Business Days' prior written notice of its intention to take such action, including the material terms and conditions of, and the identity of the Person making, any such Company Superior Proposal and has contemporaneously provided to Parent a copy of the Company Superior Proposal and a copy of any proposed Company Acquisition Agreements related to such Company Superior Proposal, (2) at the end of such notice period, the Company Board shall have considered any revisions to the terms of this Agreement proposed in writing by, and that are legally binding on, Parent and Teton Merger Sub, and shall have determined, after consultation with the Company's independent financial advisor and outside legal counsel, that the Company Superior Proposal would nevertheless continue to constitute a Company Superior Proposal if the revisions proposed by Parent were to be given effect, and (3) in the event of any change to any of the financial terms or any other material terms of such Company Superior Proposal, the Company shall, in each case, have delivered to Parent an additional notice consistent with that described in clause (1) above of this proviso and a new two (2) Business Day notice period under clause (1) of this proviso shall commence during which time the Company shall be required to comply with the requirements of this Section 6.3(f) anew with respect to such additional notice, including clauses (1) through (3) above of this proviso.

(g)      Nothing contained in this Section 6.3 shall prohibit the Company or the Company Board from (i) taking and disclosing to the stockholders of the Company a position contemplated by Rule 14e-2(a) or Rule 14d-9 or Item 1012(a) of Regulation M-A promulgated under the Exchange Act (it being understood that such action may constitute a Company Adverse Recommendation Change for purposes of Section 8.1(g) if it otherwise satisfies the definition thereof), (ii) from making any "stop, look and listen" communication to the stockholders of the Company pursuant to Rule 14d-9(f) under the Exchange Act or (iii) making any disclosure to its stockholders if the Company Board determines in good faith, after consultation with the Company's outside legal counsel, that the failure of the Company Board to make such disclosure would be reasonably likely to be inconsistent with applicable Law (it being understood that such

REDACTED - FOR PUBLIC INSPECTION

action may constitute a Company Adverse Recommendation Change for purposes of Section 8.1(g) if it otherwise satisfies the definition thereof).

(h)     The Company agrees that any breach of this Section 6.3 or any action taken by a Subsidiary of the Company or Representative of the Company or its Subsidiaries (other than an employee or consultant of the Company or any of its Subsidiaries who is not an executive or other officer of the Company) which if taken by the Company would constitute a breach of this Section 6.3, will be deemed to constitute a breach by the Company of this Section 6.3.

Section 6.4     Filings; Other Actions.

(a)     As promptly as reasonably practicable, and in any event within 30 days, following the date of this Agreement, the Company shall prepare and file with the SEC the preliminary Proxy Statement.  The Company shall not file the Proxy Statement (or any amendments or supplements thereto) with the SEC without first providing Parent and its counsel a reasonable opportunity to review and comment thereon, and the Company shall give due consideration to, and consider in good faith, all reasonable additions, deletions or changes suggested by Parent and its counsel.  Parent shall cooperate with the Company in the preparation of the Proxy Statement and shall furnish all information concerning Parent and Teton Merger Sub (and their respective Affiliates) that is required in connection with the preparation of the Proxy Statement.  The Company shall respond promptly to any comments from the SEC or the staff of the SEC.  The Company shall notify Parent promptly of the receipt of any comments (whether written or oral) from the SEC or the staff of the SEC and of any request by the SEC or the staff of the SEC for amendments or supplements to the Proxy Statement or for additional information and shall supply Parent with copies of all correspondence between the Company and any of its Representatives, on the one hand, and the SEC or the staff of the SEC, on the other hand, with respect to the Proxy Statement or the transactions contemplated by this Agreement.  The Proxy Statement shall comply as to form in all material respects with the applicable requirements of the Exchange Act.  If at any time prior to the Company Stockholders' Meeting (or any adjournment or postponement thereof) any information relating to Parent or the Company, or any of their respective Affiliates, officers or directors, is discovered by Parent or the Company that should be set forth in an amendment or supplement to the Proxy Statement, so that the Proxy Statement would not include a misstatement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, the party that discovers such information shall promptly notify the other parties hereto and an appropriate amendment or supplement describing such information shall be promptly filed by the Company with the SEC and, to the extent required by applicable Law, disseminated to the stockholders of the Company.  The Company shall cause the Proxy Statement to be mailed to the Company's stockholders as promptly as reasonably practicable after the resolution of any comments of the SEC or the staff of the SEC with respect to the preliminary Proxy Statement (such date, the "*Clearance Date*") (but in any event within five (5) Business Days thereafter).

(b)     Subject to Section 6.3(e), Section 6.3(f) and Section 6.4(c), the Company shall (i) reasonably promptly following any written request by Parent (but in any event not more than once in any ten Business Day period), conduct a "broker search" in accordance with Rule 14a-13 of the Exchange Act and (ii) take all action necessary in accordance with applicable Law and the Company Organizational Documents to, following consultation with Parent, set a record

-56-

**App.283**

**REDACTED - FOR PUBLIC INSPECTION**

date for, duly give notice of, convene and hold a meeting of its stockholders following the mailing of the Proxy Statement for the purpose of obtaining the Company Stockholder Approval (the "***Company Stockholders' Meeting***") as soon as reasonably practicable following the Clearance Date. Unless the Company shall have made a Company Adverse Recommendation Change in accordance with <u>Section 6.3(e)</u> or <u>Section 6.3(f)</u>, the Company shall include the Company Recommendation in the Proxy Statement and shall solicit, and use its reasonable best efforts to keep soliciting, the Company Stockholder Approval at the Company Stockholders' Meeting (including by soliciting proxies in favor of the adoption of this Agreement).

(c)    The Company shall cooperate with and keep Parent informed on a reasonably current basis regarding its solicitation efforts and voting results following the dissemination of the Proxy Statement to its stockholders. The Company may adjourn or postpone the Company Stockholders' Meeting (i) if the Company is required to adjourn or postpone the Company Stockholders' Meeting by applicable Law, order or a request from the SEC or the review or official interpretation of the SEC Staff, (ii) if as of the time that the Company Stockholders' Meeting is originally scheduled (as set forth in the Proxy Statement) there are insufficient shares of Company Common Stock represented (either in person or by proxy) to constitute a quorum necessary to conduct the business of the Company Stockholders' Meeting, (iii) if the Company reasonably determines in good faith that the Company Stockholder Approval is unlikely to be obtained or (iv) with the prior written consent of Parent (which shall not be unreasonably withheld, conditioned or delayed). Without the prior written consent of Parent (which consent shall not be unreasonably withheld, conditioned or delayed), the Company Stockholders' Meeting will not be postponed or adjourned (A) by more than ten (10) days at a time, or (B) by more than 30 days after the date on which the Company Stockholders' Meeting was (or was required to be) originally scheduled. In no event will the record date of the Company Stockholders' Meeting be changed without Parent's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed), unless required by applicable Law or the Company's bylaws. Without the prior written consent of Parent (which shall not be unreasonably withheld, conditioned or delayed), the adoption of this Agreement shall be the only matter (other than matters of procedure and matters required by applicable Law to be voted on by the Company's stockholders in connection with the adoption of this Agreement) that the Company shall propose to be acted on by the stockholders of the Company at the Company Stockholders' Meeting.

Section 6.5    <u>Employee Matters</u>.

(a)    Effective as of the Teton Merger Effective Time and during the one-year period immediately following the Teton Merger Effective Time (the "***Continuation Period***"), Parent shall provide, or shall cause the Surviving Company to provide, to each employee of the Company or its Subsidiaries who continues to be employed by Parent or the Surviving Company or any of their respective Subsidiaries following the Teton Merger Effective Time (a "***Company Employee***"), (a) base compensation and short-term cash incentive target opportunities that, in the aggregate, are no less favorable than the base compensation and short-term cash incentive target opportunities provided by the Company to such Company Employee immediately before the Teton Merger Effective Time, provided that such Company Employee's base compensation shall not be reduced from that in effect immediately before the Teton Merger Effective Time, (b) target long-term incentive compensation opportunities that are no less favorable than the target long-term incentive compensation opportunities provided by Parent to similarly-situated employees of Parent

REDACTED - FOR PUBLIC INSPECTION

and (c) all other compensation and employee benefits (excluding employee stock ownership plan benefits under a tax-qualified retirement plan) that (i) from the Teton Merger Effective Time through December 31, 2026, are no less favorable in the aggregate than the other compensation and employee benefits (excluding employee stock ownership plan benefits under a tax-qualified retirement plan) that are provided by the Company to such Company Employee under the Company Benefit Plans in effect immediately before the Teton Merger Effective Time and (ii) from January 1, 2027, through the end of the one-year period immediately following the Teton Merger Effective Time, are no less favorable in the aggregate than the other compensation and employee benefits (excluding employee stock ownership plan benefits under a tax-qualified retirement plan) that are provided by Parent to similarly-situated employees of Parent. In addition, Parent shall provide, or shall cause the Surviving Company to provide, to each Company Employee whose employment is involuntarily terminated by the Company or any of its Subsidiaries during the Continuation Period, severance benefits no less favorable than (x) through December 31, 2026, the severance benefits due under the severance plan of the Company applicable to such Company Employee pursuant to its terms as of immediately before the Teton Merger Effective Time and (y) from January 1, 2027, through the end of the one-year period immediately following the Teton Merger Effective Time, the severance benefits due under the applicable severance plan of Parent for similarly situated employees of Parent (it being understood that this sentence does not limit the obligations of Parent or the Surviving Company to honor the terms of any Company Benefit Plan providing severance benefits as then in effect).

(b)      To the extent any payment under any bonus or incentive plans maintained by the Company or its Subsidiaries in respect of a Company fiscal year (or such shorter performance period) that commences prior to the Effective Time has not been made as of immediately prior to the Effective Time, Parent shall, or shall cause the Surviving Company to, make such payment to the applicable Company Employee in accordance with applicable Company plan in the ordinary course consistent with the Company's past practice, including that the amount will be determined based on actual performance in accordance with the applicable Company plan and paid at the same time as the Company historically pays such bonuses or incentives.

(c)      Following the Closing Date, Parent shall, or shall cause the Surviving Company to, cause any employee benefit or compensation plans (including equity or equity-based and nonqualified deferred compensation plans to the extent applicable; other than defined benefit pension or retiree or post-employment health or welfare benefit plans or arrangements) sponsored or maintained by Parent or the Surviving Company or their Subsidiaries in which the Company Employees participate following the Closing Date (collectively, the "***Post-Closing Plans***") to recognize the service of each Company Employee with the Company and its Subsidiaries (and any predecessor thereto) prior to the Closing Date for purposes of eligibility, vesting, severance benefit determinations and future vacation benefit accrual, except to the extent it would result in duplication of compensation or benefits for the same period of service.

(d)      Notwithstanding anything contained herein to the contrary, with respect to any Company Employees who are covered by a Collective Bargaining Agreement, the terms and conditions of employment for such employees shall be governed by the applicable Collective Bargaining Agreement until the expiration, modification or termination of such Collective Bargaining Agreement in accordance with its terms or applicable Law. With respect to any Post-Closing Plan that provides welfare benefits, for the plan year in which the Teton Merger Effective

-58-

App.285

REDACTED - FOR PUBLIC INSPECTION

Time occurs, Parent shall (i) cause any preexisting condition limitations or eligibility waiting periods under such plan to be waived with respect to such Company Employee and his or her eligible dependents to the extent such limitation was waived or satisfied under the Company Benefit Plan in which such Company Employee participated immediately prior to the Teton Merger Effective Time and (ii) credit each Company Employee and his or her eligible dependents for any co-payments or deductibles paid by such Company Employee and his or her eligible dependents during the portion of such plan year prior to the Teton Merger Effective Time for purposes of any applicable deductible and annual out-of-pocket expense requirements under any such Post-Closing Plan. Such credited expenses shall also count toward any annual or lifetime limits, treatment or visit limits or similar limitations that apply under the terms of the applicable plan.

(e)     Parent hereby acknowledges that a "change in control" or "change of control" of the Company or other event with similar import, within the meaning of the Company Benefit Plans that contain such terms, will occur upon the Teton Merger Effective Time.

(f)     Nothing in this Agreement shall confer upon any Company Employee or other service provider any right to continue in the employ or service of Parent, the Surviving Company or any Affiliate of Parent. In no event shall the terms of this Agreement be deemed to (i) establish, amend, or modify any Company Benefit Plan or any "employee benefit plan" as defined in Section 3(3) of ERISA, or any other benefit plan, program agreement or arrangement maintained or sponsored by Parent, the Surviving Company, the Company or any of their Subsidiaries (including, after the Closing Date, the Company and its Subsidiaries) or Affiliates, or (ii) alter or limit the ability of Parent, the Surviving Company or any of their Subsidiaries (including, after the Closing Date, the Company and its Subsidiaries) or Affiliates to amend, modify or terminate any Company Benefit Plan or any other compensation or benefit or employment plan, program, agreement or arrangement after the Closing Date. Notwithstanding any provision in this Agreement to the contrary, nothing in this Section 6.5 shall create any third-party beneficiary rights in any Company Employee or current or former service provider of the Company or its Affiliates (or any beneficiaries or dependents thereof).

Section 6.6     Regulatory Approvals; Efforts.

(a)     Prior to the Closing, Parent, Teton Merger Sub and the Company shall, and shall cause their respective Affiliates to, use their respective reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under any applicable Laws to consummate and make effective the Teton Merger as promptly as reasonably practicable and in any event by the Outside Date, including (i) preparing and filing all forms, registrations and notifications required to be filed to consummate the Teton Merger, (ii) using reasonable best efforts to satisfy the conditions to consummating the Teton Merger, (iii) using reasonable best efforts to obtain (and to cooperate with each other in obtaining) any consent, authorization, expiration or termination of a waiting period, permit, Order or approval of, waiver or any exemption by, any Governmental Entity required to be obtained or made by Parent, Teton Merger Sub or any of their respective Affiliates or the Company or any of its Subsidiaries, in connection with the Teton Merger or the taking of any action contemplated by this Agreement, (iv) defending any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the Teton Merger and (v)

-59-

**App.286**

**REDACTED - FOR PUBLIC INSPECTION**

executing and delivering any reasonable additional instruments necessary to consummate the Teton Merger and to fully carry out the purposes of this Agreement.

(b)     Without limiting the foregoing or the remaining provisions of this Section 6.6, Parent and the Company shall cooperate in all respects regarding the strategy for obtaining all required consents, authorizations, Orders or approvals of, or any exemptions or waivers by, any Governmental Entity undertaken in accordance with the provisions of this Section 6.6, provided that in connection with the foregoing, without limiting the foregoing or the remaining provisions of this Section 6.6, Parent shall be entitled to take the lead in and control the development and implementation of such strategy subject to good faith consultation with the Company.  Parent and the Company shall consult and cooperate with each other in all respects and each keep the other apprised of the status of matters relating to the completion of the Teton Merger, including the expiration or termination of the waiting period applicable to the Teton Merger under the HSR Act and the receipt of the FCC Consent, and work cooperatively in connection with obtaining all required consents, authorizations, Orders or approvals of, or any exemptions or waivers by, any Governmental Entity undertaken pursuant to the provisions of this Section 6.6.  In that regard, each party shall (i) promptly provide any information and assistance as the other parties may reasonably request with respect to all notices, submissions or filings made by or on behalf of such party or any of its Affiliates with any Governmental Entity in connection with this Agreement or the Teton Merger, and (ii) promptly inform the other parties to this Agreement, and if in writing, furnish the other parties with copies of (or, in the case of oral communications, advise the other parties orally of) any communication from or to any Governmental Entity regarding this Agreement or the Teton Merger (in advance, in the case of communications to any Governmental Entity), and permit the other parties to review and discuss in advance, and consider in good faith the views of the other parties in connection with, any proposed communication or submission with any such Governmental Entity.  No party or any of its Affiliates shall participate in any meeting or teleconference with any Governmental Entity in connection with this Agreement or the Teton Merger unless it consults with the other parties in advance and, to the extent not prohibited by such Governmental Entity, gives the other parties the opportunity to attend and participate thereat.  Notwithstanding the foregoing, Parent and the Company may, as each deems advisable and necessary, reasonably designate any sensitive materials provided to the other under this Section 6.6(b) as "Outside Counsel Only Material."  Such materials and the information contained therein shall be given only to the outside counsel of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient or its Affiliates unless express permission is obtained in advance from the source of the materials (Parent or the Company, as the case may be).  Notwithstanding anything to the contrary contained in this Section 6.6, materials provided pursuant to this Section 6.6 may be redacted (A) to remove references concerning the valuation of the Company and the Teton Merger, (B) as necessary to comply with bona fide existing contractual arrangements and (C) as necessary to address reasonable privilege concerns.

(c)     The Company and Parent shall (and, if applicable, Parent shall cause its Affiliates to) make or file, as promptly as practicable, with the appropriate Governmental Entity all filings, forms, registrations and notifications required to be filed to consummate the Teton Merger and, subsequent to such filings, the Company and Parent each shall (and shall cause their Affiliates to), as promptly as practicable, respond to inquiries from Governmental Entities and provide any supplemental information that may be requested by Governmental Entities, in connection with filings made with such Governmental Entities.  All such filings, forms,

REDACTED - FOR PUBLIC INSPECTION

registrations, notifications and supplemental information shall comply as to form with all requirements applicable thereto and all of the data and information reported therein shall be accurate and complete in all material respects.  In furtherance and not in limitation of the foregoing: (i) the Company and Parent shall jointly file the FCC Applications no later than thirty (30) Business Days after the date of this Agreement; (ii) until such time as the FCC Consent shall have been obtained, Parent and the Company shall oppose any petitions to deny or other objections filed with respect to the FCC Applications to the extent such petition or objection relates to such party; (iii) on and following receipt of the FCC Consent, the Company and Parent shall (and shall cause their respective Affiliates to) use their respective reasonable best efforts to maintain in effect the FCC Consent to permit consummation of the Teton Merger and the other transactions contemplated hereby; (iv) if the Closing shall not have occurred for any reason within the original effective periods of the FCC Consent, the Company and Parent shall (and shall cause their respective Affiliates to) use their reasonable best efforts to obtain one or more extensions of the effective period of the FCC Consent to permit consummation of the Teton Merger and the other transactions contemplated hereby; (v) the Company and Parent shall each file their respective notification and report forms under the HSR Act as promptly as reasonably practicable (and in any event no later than 30 Business Days) after the date of this Agreement, and supply as promptly as reasonably practicable and advisable any additional information and documentary materials that may be requested pursuant to the HSR Act and to use reasonable best efforts to cause the expiration or termination of the applicable waiting periods under the HSR Act as soon as reasonably practicable, and in any event before the Outside Date.  No party hereto shall (x) cause any HSR Act filing applicable to it to be withdrawn or refiled for any reason, including to provide the applicable Governmental Entity with additional time to review any of the transactions contemplated by this Agreement, or (y) consent to any voluntary delay of the consummation of the transactions contemplated by this Agreement, except, in each case, with the prior written consent of each of the other parties hereto.  Without limiting the foregoing, during the period from the date hereof until the earlier of the termination of this Agreement in accordance with its terms and the Teton Merger Effective Time, (I) Parent shall not (and shall cause its Subsidiaries not to) issue or otherwise transfer any common or preferred equity interests (or rights to obtain any common or preferred equity interests) in Parent or any of its Subsidiaries to any other person, unless, in each case, the obtaining of such common or preferred equity interests or rights to obtain such common or preferred equity interests would not, in the aggregate, reasonably be expected to prevent, materially delay or materially impair the ability of Parent or Merger Sub to perform its obligations under this Agreement or to consummate the Merger prior to the Outside Date, and (II) the Company and Parent shall not (and shall cause their respective Affiliates not to) acquire (or enter into any agreement to acquire) ownership or control, directly or indirectly, of any assets, or of any Person or business of any Person, if such acquisition would require an application to, or an approval, consent or waiver of or from the FCC.

(d)    If, between the date of this Agreement and the Closing, an application for the renewal of any FCC license of the Company or its Subsidiaries (a "*Renewal Application*") is required to be filed pursuant to the Communications Act and FCC Rules, the Company shall execute, file and prosecute with the FCC such Renewal Application with respect to such FCC license.  If an FCC Application is granted by the FCC subject to a renewal condition, then the term "FCC Consent" shall, for all purposes hereunder, thereafter be deemed to also include satisfaction of such renewal condition.  To avoid disruption or delay in the processing of the FCC Applications, each of Parent and Teton Merger Sub shall, as a part of the FCC Applications, request that the

-61-

**App.288**

**REDACTED - FOR PUBLIC INSPECTION**

FCC apply its policy permitting the transfer of control of FCC licenses in transactions involving multiple stations to proceed, notwithstanding the pendency of one or more Renewal Applications. Each of the Parent and Teton Merger Sub shall make such representations and undertakings as are necessary or appropriate to invoke such policy, including undertakings to assume, as between the parties hereto and the FCC, the position of the applicant before the FCC with respect to any pending Renewal Application and to assume the corresponding regulatory risks relating to any such Renewal Application.  Each of Parent, Teton Merger Sub and the Company acknowledge that, to the extent reasonably necessary to expedite the grant by the FCC of any Renewal Application and thereby to facilitate the grant of the FCC Consent with respect to such Company Station, each of Parent, Teton Merger Sub and their respective Affiliates, and the Company and its Subsidiaries shall be permitted to enter into tolling agreements with the FCC to extend the statute of limitations for the FCC to determine or impose a forfeiture penalty against such Company Station in connection with (i) any pending complaints that such Company Station aired programming that contained obscene, indecent or profane material or (ii) any other enforcement matters against such Company Station with respect to which the FCC may permit Parent, Teton Merger Sub or the Company (or any of their respective Affiliates) to enter into a tolling agreement.

(e)  In furtherance and not in limitation of their obligations set forth in this Agreement, each of Parent and Teton Merger Sub shall, and shall cause their respective Affiliates to, take all actions necessary to avoid or eliminate each and every impediment under any Antitrust Laws or the Communications Act (including the FCC Rules) so as to cause the satisfaction of the conditions in Sections 7.1(b) and 7.1(c), so as to permit the Closing to occur as promptly as practicable, and in any event before the Outside Date, including: (i) supplying as promptly as reasonably practicable any information and documentary materials that may be requested by the FCC or any other Governmental Entity; (ii) proposing, negotiating, committing to, effecting and agreeing to, by consent decree, hold separate order, or otherwise, the sale, divestiture, license, holding separate, behavioral or other operational conditions or changes, and other disposition of and restriction on the businesses, assets, properties, product lines, and equity interests of, or changes to the conduct of business of, the Company, the Company's Subsidiaries, Parent and its Affiliates (including the Surviving Company and its Subsidiaries); (iii) creating, terminating, or divesting relationships, ventures, contractual rights or obligations of the Company, the Company's Subsidiaries, Parent or their respective Affiliates (including the Surviving Company and its Subsidiaries); and (iv) otherwise taking or committing to take any action that would limit any of the Company's, the Company's Subsidiaries', Parent's and their respective Affiliates' (including the Surviving Company and its Subsidiaries) freedom of action with respect to, or their ability to retain or hold, directly or indirectly, any businesses, assets, equity interests, product lines or properties of any of Parent or its Affiliates or the Company or its Subsidiaries (including the Surviving Company and its Subsidiaries) (the foregoing actions, the "***Remedial Actions***"); provided, however, that, notwithstanding any provision in this Agreement to the contrary, neither Parent nor any of its Affiliates shall be required to agree to or consummate any Remedial Action that would, individually or in the aggregate, reasonably be expected to result in a loss of EBITDA of Parent, the Company and their respective Subsidiaries, taken as a whole and after giving effect to the Teton Merger and any Remedial Actions, of greater than $150,000,000 as compared to the EBITDA of Parent, the Company and their respective Subsidiaries, taken as a whole and after giving effect to the Teton Merger, as if such Remedial Actions had not been taken; provided, further, that Parent shall use reasonable best efforts to structure any Remedial Action that is the sale, divestiture or other disposition of any particular television station of the Company, its

-62-

**App.289**

**REDACTED - FOR PUBLIC INSPECTION**

Subsidiaries, Parent and its Affiliates (including the Surviving Company and its Subsidiaries) in a manner intended to minimize the loss of EBITDA from the sale, divestiture or other disposition of the applicable television station, including (but not limited to) with respect to selection of the buyer for such television station.  For purposes of this Section 6.6, the calculation of EBITDA shall (x) be calculated using the average of the actual (or projected if actual is not available) EBITDA for the fiscal years ended December 31, 2024 and December 31, 2025 of Parent, the Company and their respective Subsidiaries, taken as a whole and after giving effect to the Teton Merger, (y) give pro forma effect to the expected synergies to be derived by Parent, the Company and their Subsidiaries from the Teton Merger during 12-month period following the Closing (assuming that all such synergies are achieved immediately and applied to the calculation of EBITDA described in clause (x)) and (z) be calculated in accordance with the calculation of EBITDA pursuant to the Parent Credit Agreement, as in effect on the date hereof, in a manner consistent with Parent's past practice.  If requested by Parent, the Company shall agree to any action contemplated by this Section 6.6; provided, that any such agreement or action is conditioned on the consummation of the Teton Merger.  Without in any way limiting Parent's and its Affiliates' obligations under this Agreement, in no event shall the Company (and the Company shall not permit any of its Affiliates to) effect or agree to any Remedial Action without the prior written consent of Parent.

(f)      In furtherance and not in limitation of their obligations set forth in this Agreement, if any administrative or judicial action or proceeding, including any proceeding by a private party, is instituted (or threatened to be instituted) challenging the Teton Merger or any other transaction contemplated by this Agreement as violative of any Antitrust Law or the Communications Act (including the FCC Rules) or other applicable Law, each of the Company, Parent and Teton Merger Sub shall use reasonable best efforts to as promptly as practicable contest and resist any such action or proceeding and to have vacated, lifted, changed, reversed or overturned any decree, judgment, injunction or other Order or other Law, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the Teton Merger or any of the other transactions contemplated by this Agreement.

Section 6.7      Takeover Statutes.  If any Takeover Statute may become, or may purport to be, applicable to this Agreement, the Teton Merger or any other transactions contemplated by this Agreement, each of the Company and Parent and their respective boards of directors shall grant such approvals and take such actions as are reasonably necessary so that the transactions contemplated hereby may be consummated as promptly as practicable on the terms contemplated hereby and otherwise act to eliminate or minimize the effects of such Takeover Statute on the transactions contemplated hereby.

Section 6.8      Public Announcements.  The Company and Parent agree that the initial press release to be issued with respect to the execution and delivery of this Agreement shall be in a form agreed to by the parties hereto and that the parties hereto shall consult with each other before issuing any press release or making any public announcement with respect to this Agreement and the transactions contemplated hereby and shall not issue any such press release or make any such public announcement without the prior consent of the other party (which shall not be unreasonably withheld, delayed or conditioned); provided, that a party may, without the prior consent of the other party issue such press release or make such public statement (a) so long as such statements are consistent with previous public statements made jointly by or otherwise agreed to between the Company and Parent or (b) (after prior consultation, to the extent practicable in the

-63-

App.290

REDACTED - FOR PUBLIC INSPECTION

circumstances) to the extent required by applicable Law or the applicable rules of any stock exchange.  None of the limitations set forth in this Section 6.8 shall apply to any disclosure of any information (a) in connection with or following a Company Takeover Proposal or Company Adverse Recommendation Change and matters related thereto (provided, that in the case of the Company, any such disclosure shall be effected in accordance with Section 6.3), (b) in connection with any dispute between the parties relating to this Agreement or the transactions contemplated hereby or (c) consistent with previous press releases, public disclosures or public statements made by Parent or the Company in compliance with this Section 6.8.

Section 6.9     Indemnification and Insurance.

(a)     For a period of six (6) years from and after the Teton Merger Effective Time, the Surviving Company shall (and Parent shall cause the Surviving Company to) indemnify and hold harmless all past and present directors and officers of the Company or any of its Subsidiaries and each Person who served as a director, officer, member, trustee or fiduciary of another corporation, partnership, joint venture, trust, pension or other employee benefit plan or enterprise at the request or for the benefit of the Company or any of its Subsidiaries, in each case, to the extent acting in such capacity (collectively, together with such Persons' heirs, executors and administrators, the "*Covered Persons*") to the fullest extent permitted by Law against any costs and expenses (including advancing attorneys' fees and expenses in advance of the final disposition of any claim, suit, proceeding or investigation to each Covered Person to the fullest extent permitted by Law), judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any actual or threatened Proceeding or investigation, whether civil, criminal, administrative or investigative, arising out of acts or omissions occurring at or prior to the Teton Merger Effective Time.  Without limiting the foregoing, from and after the Teton Merger Effective Time, the Surviving Company shall (and Parent shall cause the Surviving Company to) indemnify and hold harmless the Covered Persons to the fullest extent permitted by Law for acts or omissions occurring in connection with the process resulting in and the adoption and approval of this Agreement and the consummation of the transactions contemplated hereby.  From and after the Teton Merger Effective Time, the Company and the Surviving Company shall (and Parent shall cause the Surviving Company to) advance expenses (including reasonable and documented legal fees and expenses) incurred in the defense of any Proceeding or investigation with respect to the matters subject to indemnification pursuant to this Section 6.9(a) in accordance with the procedures (if any) set forth in the Company Organizational Documents, the certificate of incorporation and bylaws, or other organizational or governance documents, of any Subsidiary of the Company, and indemnification agreements, if any, in existence on the date of this Agreement; provided, that, notwithstanding anything to the contrary set forth herein or otherwise, the Person to whom expenses are advanced provides an undertaking to repay such advances if it is ultimately determined that such Person is not entitled to indemnification pursuant to this Section 6.9(a).  In the event of any such Proceeding, (A) the Surviving Company shall have the right to control the defense thereof after the Teton Merger Effective Time; (B) each Covered Person shall be entitled to retain his or her own counsel (the reasonable and documented fees and expenses of which will be paid by the Surviving Company), whether or not the Surviving Company elects to control the defense of any such Proceeding; and (C) no Covered Person shall be liable for any settlement of such Proceeding effected without his or her prior written consent (unless such settlement relates only to monetary damages for which the Surviving Company is entirely responsible).

-64-

**App.291**

**REDACTED - FOR PUBLIC INSPECTION**

(b)    For not less than six (6) years from and after the Teton Merger Effective Time, the certificate of incorporation and bylaws of the Surviving Company shall contain provisions no less favorable with respect to exculpation, indemnification of and advancement of expenses to Covered Persons for periods at or prior to the Teton Merger Effective Time than are currently set forth in the Company Organizational Documents.  Notwithstanding anything herein to the contrary, if any Proceeding or investigation (whether arising before, at or after the Teton Merger Effective Time) is made against such persons with respect to matters subject to indemnification hereunder on or prior to the sixth anniversary of the Teton Merger Effective Time, the provisions of this Section 6.9(b) shall continue in effect until the final disposition of such Proceeding or investigation.  Following the Teton Merger Effective Time, the indemnification agreements, if any, in existence on the date of this Agreement with any of the directors, officers or employees of the Company or any its Subsidiaries shall be assumed by the Surviving Company, without any further action, and shall continue in full force and effect in accordance with their terms.

(c)    For a period of six (6) years from and after the Teton Merger Effective Time, Parent and the Surviving Company shall cause to be maintained in effect the current policies of directors' and officers' and fiduciary liability insurance maintained by or for the benefit of the Company and its Subsidiaries and their respective current and former directors and officers or provide substitute policies for the Company and its Subsidiaries and their respective current and former directors and officers who are currently covered by the directors' and officers', employment practices and fiduciary liability insurance coverage currently maintained by or for the benefit of the Company and its Subsidiaries as of the date of this Agreement and as of the Teton Merger Effective Time, in either case, of not less than the existing coverage and having other terms not less favorable to the insured persons than the directors' and officers', employment practices and fiduciary liability insurance coverage currently maintained by or for the benefit of the Company and its Subsidiaries and their respective current and former directors and officers with respect to claims arising from facts or events that occurred at or before the Teton Merger Effective Time (regardless of when such claims are brought) (with insurance carriers having at least an "A" rating by A.M. Best with respect to directors' and officers', employment practices and fiduciary liability insurance) (the "***D&O Insurance***") that is substantially equivalent to and in any event not less favorable in the aggregate than the existing policies of the Company and its Subsidiaries or, if substantially equivalent insurance coverage is unavailable, the best available coverage; provided, that the Surviving Company shall not be required to pay an annual premium for such D&O Insurance in excess of 300% of the last annual premium paid by the Company prior to the date of this Agreement, but in such case shall purchase as much coverage as is available for such amount.  The provisions of the immediately preceding sentence shall be deemed to have been satisfied if prepaid policies have been obtained prior to the Teton Merger Effective Time (which the Company shall be permitted to, and at Parent's written request shall, purchase prior to the Teton Merger Effective Time, subject to the aggregate premium for such prepaid policies not exceeding 300% of the last annual premium paid by the Company prior to the date of this Agreement), which policies provide such directors and officers with coverage for an aggregate period of at least six (6) years from and after the Teton Merger Effective Time with respect to claims arising from facts or events that occurred on or before the Teton Merger Effective Time, including in respect of the transactions contemplated by this Agreement.  If such prepaid policies have been obtained prior to the Teton Merger Effective Time, the Surviving Company shall, and Parent shall cause the Surviving Company to, maintain such policies in full force and effect, and continue to honor the

REDACTED - FOR PUBLIC INSPECTION

obligations thereunder.

(d)    In the event that Parent or the Surviving Company (i) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any Person, then proper provision shall be made so that such continuing or surviving corporation or entity or transferee of such assets, as the case may be, shall assume the obligations set forth in this Section 6.9.

(e)    The obligations under this Section 6.9 shall not be terminated or modified in any manner that is adverse to the Covered Persons (and their respective successors and assigns), it being expressly agreed that the Covered Persons (including their respective successors and assigns) shall be third party beneficiaries of this Section 6.9.  In the event of any breach by the Surviving Company or Parent of this Section 6.9, the Surviving Company shall pay all reasonable expenses, including attorneys' fees, that may be incurred by Covered Persons in enforcing the indemnity and other obligations provided in this Section 6.9 as such fees are incurred, upon the written request of such Covered Person.

Section 6.10    Section 16 Matters.    Prior to the Teton Merger Effective Time, the Company shall take all such steps as may be required to cause any dispositions of Company Common Stock (including derivative securities with respect to Company Common Stock) resulting from the transactions contemplated by this Agreement by each individual who is subject to the reporting requirements of Section 16(a) of the Exchange Act with respect to the Company, to be exempt under Rule 16b-3 promulgated under the Exchange Act.

Section 6.11    Transaction Litigation.    Each party hereto shall promptly (and in any event within two (2) Business Days) notify the other parties hereto in writing of any stockholder litigation or other litigation or Proceedings brought or threatened in writing against it or its directors or executive officers or other Representatives relating to this Agreement, the Teton Merger and/or the other transactions contemplated by this Agreement (the "*Transaction Litigation*") and shall keep the other parties hereto informed on a reasonably current basis with respect to the status thereof (including by promptly furnishing to the other parties hereto and their Representatives such information and copies of all pleadings and other material documents relating to such litigation or Proceedings as may be reasonably requested).  The Company will (a) give Parent the opportunity to participate (at Parent's expense) in the defense, settlement or prosecution of any Transaction Litigation; and (b) reasonably consult with Parent with respect to the defense, settlement and prosecution of any Transaction Litigation.  The Company may not compromise, settle or come to an arrangement regarding, or agree to compromise, settle or come to an arrangement regarding, any Transaction Litigation unless Parent has consented thereto in writing (which consent shall not be unreasonably withheld, delayed or conditioned).  For purposes of this Section 6.11, "*participate*" means that Parent will be kept reasonably apprised of proposed strategy and other significant decisions with respect to the Transaction Litigation by the Company (to the extent that the attorney-client, work product, or any other privilege, doctrine or protection between the Company and its counsel is not undermined), and Parent will be provided an opportunity to review, and the Company will provide Parent with an opportunity to review, and Parent may offer comments or suggestions with respect to all filings or written responses to be made by the Company with respect to such Transaction Litigation (and the Company shall give good-faith

-66-

**App.293**

REDACTED - FOR PUBLIC INSPECTION

consideration to any such comments or suggestions). For the avoidance of doubt, any Proceeding related to Dissenting Shares will be governed by Section 3.1(b)(ii).

Section 6.12    Obligations of Teton Merger Sub and Parent. Parent shall cause Teton Merger Sub and the Surviving Company to perform their respective obligations under this Agreement and to consummate the transactions contemplated hereby upon the terms and subject to the conditions set forth in this Agreement. Immediately after the execution of this Agreement, Parent shall execute and deliver, in accordance with applicable Law and its organizational documents, in its capacity as sole stockholder of Teton Merger Sub, a written consent adopting this Agreement. Such consent shall not be modified or rescinded and Parent shall deliver such consent to the Company promptly upon the execution thereof.

Section 6.13    [Reserved].

Section 6.14    Stock Exchange Delisting; Deregistration. Prior to the Teton Merger Effective Time, the Company and, following the Teton Merger Effective Time, Parent and the Surviving Company, shall use reasonable best efforts to take, or cause to be taken, all actions, and do or cause to be done all things, necessary, proper or advisable on its part under applicable Law and rules and policies of the New York Stock Exchange to cause the delisting of the Company and of the Company Common Stock from the New York Stock Exchange as promptly as practicable after the Teton Merger Effective Time and the deregistration of the Company Common Stock under the Exchange Act as promptly as practicable after such delisting.

Section 6.15    Financing and Financing Cooperation.

(a)      Parent and Teton Merger Sub shall use their respective reasonable best efforts to take, or cause to be taken, all actions, and do, or cause to be done, all things necessary, proper or advisable to obtain the Debt Financing in an amount sufficient to fund the Financing Amount on the date upon which the Teton Merger is required to be consummated pursuant to the terms hereof and on the terms and conditions (including, to the extent applicable, the "flex" provisions) described in the Debt Commitment Letter and any related fee letters (or on other terms that, with respect to conditionality, are not less favorable to Parent than the terms and conditions (including any "flex" provisions) set forth in the Debt Commitment Letter, subject to the Prohibited Modifications), including by using their respective reasonable best efforts to (i) maintain in effect the Debt Commitment Letter, (ii) negotiate and enter into definitive agreements (which, with respect to any bridge facility documentation, shall not be required until reasonably necessary in connection with the funding of the Debt Financing) with respect to the Debt Financing on the terms and subject only to the conditions (including, as necessary, "flex" provisions contained in any fee letter) contemplated by the Debt Commitment Letter and the related fee letter (or on other terms that, with respect to conditionality, are not less favorable to Parent than the terms and conditions (including any "flex" provisions) set forth in the Debt Commitment Letter, subject to the Prohibited Modifications) (the "***Definitive Agreements***") and (iii) after taking into account the timing of the Marketing Period, satisfy on a timely basis all conditions to funding that are applicable to Parent or Teton Merger Sub in the Debt Commitment Letter and the Definitive Agreements that are within their (or any of their respective controlled Affiliates') control (or, if deemed advisable by Parent, seek the waiver of conditions applicable to Parent and Teton Merger Sub contained in the Debt Commitment Letter and such Definitive Agreements) and comply with

-67-

**App.294**

**REDACTED - FOR PUBLIC INSPECTION**

its obligations thereunder.  Parent and Teton Merger Sub shall use their respective reasonable best efforts to comply with their obligations, and enforce their rights, under the Debt Commitment Letter and Definitive Agreements in a timely and diligent manner.  Without limiting the generality of the foregoing, in the event that all conditions contained in the Debt Commitment Letter or the Definitive Agreements (other than the consummation of the Teton Merger and those conditions that by their nature are to be satisfied or waived at Closing, but which conditions are capable of being satisfied) have been satisfied or waived, Parent shall use its reasonable best efforts to cause the Debt Financing Parties to comply with their obligations thereunder, including to fund the Debt Financing.

(b)     Parent shall not without the prior written consent of the Company: (i) permit any amendment or modification to, or any waiver of any provision or remedy under, the Debt Commitment Letter or the Definitive Agreements if such amendment, modification or waiver (A) adds new (or adversely modifies any existing) conditions to the consummation of the Debt Financing required to satisfy the Financing Amount, (B) reduces the aggregate principal amount of the Debt Financing to an amount below the amount necessary to satisfy the Financing Amount, (C) adversely affects the ability of Parent to enforce its rights against other parties to the Debt Commitment Letter or the Definitive Agreements as so amended, modified or waived, relative to the ability of Parent to enforce its rights against the other parties to the Debt Commitment Letter as in effect on the date hereof or (D) would otherwise reasonably be expected to prevent, impede or materially delay the consummation of the Teton Merger and the other transactions contemplated by this Agreement (clauses (A)-(D), collectively, the "***Prohibited Modifications***") (provided, that Parent may, without the Company's prior written consent, (1) amend, supplement or otherwise modify the Debt Commitment Letter to add lenders, lead arrangers, book runners, syndication agents or similar entities that have not executed the Debt Commitment Letter as of the date of this Agreement so long as any such addition would not effect a Prohibited Modification and/or (2) otherwise replace or amend the Debt Commitment Letter so long as any such replacement or amendment would not effect a Prohibited Modification); or (ii) terminate the Debt Commitment Letter or any Definitive Agreement.  Parent shall promptly notify the Company of any such amendment, modification, waiver or replacement and deliver to the Company copies of any such amendment, modification, waiver or replacement.  For the purposes of this Agreement, the term "Debt Commitment Letter" shall be deemed to include any commitment letter (or similar agreement) with respect to any replacement, amended or modified debt financing arranged in compliance herewith and the term "Debt Financing" shall be deemed to include any replacement, amended or modified debt financing obtained in compliance herewith.

(c)     In the event that any portion of the Debt Financing becomes unavailable, regardless of the reason therefor, Parent will (i) use reasonable best efforts to arrange and obtain, as promptly as reasonably practicable, alternative debt financing (in an amount sufficient, when taken together with the available portion of the Debt Financing, to pay the Financing Amount) from the same or other sources on terms and conditions (including market "flex" provisions) that are not materially less favorable to Parent and Teton Merger Sub than the terms and conditions set forth in the Debt Commitment Letter as of the date hereof (after giving effect to any market "flex" provisions therein) and (ii) promptly notify the Company of such unavailability and the reason therefor.  In furtherance of and not in limitation of the foregoing, in the event that (A) any portion of the Debt Financing structured as permanent financing is unavailable, regardless of the reason therefor, (B) all conditions contained in Section 7.1 and Section 7.2 have been satisfied or waived

-68-

**App.295**

REDACTED - FOR PUBLIC INSPECTION

(other than (x) any such conditions that by their nature are to be satisfied at the Closing, but which conditions are capable of being satisfied, and (y) those conditions the failure of which to be satisfied is attributable to a breach of this Agreement by Parent or Teton Merger Sub) and (C) the bridge facilities contemplated by the Debt Commitment Letter (or alternative bridge facilities obtained in accordance with this Section 6.15(c)) are available on the terms and conditions described in the Debt Commitment Letter, then Parent shall use its reasonable best efforts to cause the proceeds of such bridge financing to be used promptly in lieu of such affected portion of the permanent financing. For the purposes of this Agreement, the term "Debt Commitment Letter" shall be deemed to include any commitment letter (or similar agreement) with respect to any alternative debt financing arranged in compliance herewith and the term "Debt Financing" shall be deemed to include any alternative debt financing obtained in compliance herewith. Parent shall provide the Company with prompt notice in writing of any actual or threatened (in writing) breach, default, termination or repudiation by any party to the Debt Commitment Letter or any Definitive Agreement of which Parent is aware and a copy of any written notice or other written communication from any Debt Financing Party or other financing source with respect to any such actual or threatened breach, default, termination or repudiation by any party to the Debt Commitment Letter or any Definitive Agreement of any provision thereof that is received by Parent (i) relating to the availability of the Debt Financing or any condition to the consummation of the Debt Financing or (ii) that could reasonably be expected to (A) reduce the aggregate principal amount of the Debt Financing to an amount below the amount necessary to satisfy the Financing Amount, (B) adversely affect the ability of Parent to enforce its rights against other parties to the Debt Commitment Letter or the Definitive Agreements or (C) prevent, impede or materially delay the Closing. Parent shall, upon the request of the Company, keep the Company reasonably informed on a current basis of the status of its efforts to consummate the Debt Financing.

(d)    The parties hereto acknowledge and agree that the provisions contained in this Section 6.15 represent the sole obligation of the Company and its Subsidiaries with respect to cooperation in connection with the arrangement of any financing (including the Debt Financing) to be obtained by Parent with respect to the transactions contemplated by this Agreement and the Debt Commitment Letter, and no other provision of this Agreement (including the Schedules hereto) or the Debt Commitment Letter shall be deemed to expand or modify such obligations. In no event shall the receipt or availability of any funds or financing (including the Debt Financing) by Parent, Teton Merger Sub or any of their respective Affiliates be a condition to any of Parent's or Teton Merger Sub's obligations under this Agreement. Notwithstanding anything to the contrary contained in this Agreement, nothing contained in this Section 6.15 will require, and in no event will the reasonable best efforts of Parent or Teton Merger Sub be deemed or construed to require, either Parent or Teton Merger Sub to pay any material fees, original issue discount or interest coupons, as applicable, or agree to any prepayment premiums, in each case, in excess of those contemplated by the Debt Commitment Letter as in effect on the date hereof (after giving effect to any market "flex" provisions therein).

(e)    Subject to Section 6.16(d), the Company shall use its reasonable best efforts to provide, and to cause its Subsidiaries to use their reasonable best efforts to provide, all cooperation reasonably requested by Parent necessary and customary for the arrangement of the Debt Financing, including using reasonable best efforts to:

-69-

**REDACTED - FOR PUBLIC INSPECTION**

(i)    assist in preparation for and participate (and cause senior management and representatives of the Company and its Subsidiaries to participate) in a reasonable number of lender and investor meetings (including meetings with the parties acting as lead arrangers or agents for, and prospective lenders and investors with respect to, the Debt Financing), calls, presentations, road shows, due diligence sessions (including accounting due diligence sessions), drafting sessions, and sessions with rating agencies, in each case, upon reasonable advance notice and at mutually agreeable dates and times and assist Parent in obtaining ratings as contemplated by the Debt Financing;

(ii)    assist with Parent's and the Debt Financing Parties' preparation of materials for rating agency presentations and bank books, lender and investor presentations, offering memoranda, private placement memoranda, prospectuses, bank information memoranda, and other marketing documents required in connection with the Debt Financing, including reviewing and commenting on Parent's draft of (x) a business description and (y) "Management's Discussion and Analysis" of the financial statements to be included in offering documents contemplated by the Debt Financing and delivering customary authorization letters (authorizing the distribution of information to prospective lenders and containing customary representations with respect to the presence or absence of material nonpublic information about the Company and its Subsidiaries and regarding the accuracy of the information provided by, or with respect to, the Company and its Subsidiaries), executed by or on behalf of the Company;

(iii)    as promptly as reasonably practicable, (A) furnish Parent with the Required Information that (x) is Compliant and (y) upon request of Parent prior to launch and during any period between launch and settlement of any portion of the Debt Financing consisting of an offering of non-convertible, high yield debt securities issued under Rule 144A promulgated under the Securities Act, remains Compliant (after giving effect to any update thereto furnished by the Company) and (B) inform Parent if the chief executive officer, chief financial officer, treasurer or controller of the Company shall have knowledge of any facts as a result of which a restatement of any financial statements to comply with GAAP is reasonably probable;

(iv)    assist Parent with its preparation of projections and pro forma financial information (including pro forma financial statements) of the type customarily included in offering documents or marketing materials for debt financings similar to the Debt Financing, it being agreed that the Company will not be required to provide any information or assistance relating to (A) the proposed aggregate amount of debt financing, together with assumed interest rates, dividends (if any) and fees and expenses relating to the incurrence of such debt, (B) any post-Closing or pro forma cost savings, synergies, capitalization or ownership desired to be incorporated into any information used in connection with the Debt Financing or (C) any financial information related to Parent or any of its Subsidiaries;

(v)    execute and deliver as of the Closing (but, except as otherwise expressly required pursuant to Section 6.16, not prior to the Closing) any credit agreements, indentures, pledge, guarantee and security documents, supplemental indentures, currency or interest hedging arrangements, other definitive financing documents, or other

-70-

**App.297**

REDACTED - FOR PUBLIC INSPECTION

certificates or documents as may be reasonably requested by Parent or the Debt Financing Parties and otherwise reasonably facilitate the granting of security interests (and perfection thereof) in collateral in respect of the Debt Financing, it being understood that the effectiveness of such documents shall be conditioned upon, or become operative only after, the occurrence of the Teton Merger Effective Time;

(vi)    cause the Company's independent auditors to (A) furnish customary consents for use of their auditor opinions in any materials related to any non-convertible, high-yield debt securities issued in lieu of all or a portion of the Debt Financing, (B) provide, consistent with customary practice, customary comfort letters (including "negative assurance" comfort and change period comfort) with respect to financial information relating to the Company and its Subsidiaries as reasonably requested by Parent or as necessary or customary for financings similar to the Debt Financing (including any offering or private placement of debt securities pursuant to Rule 144A under the Securities Act in lieu of all or a portion of the Debt Financing) and (C) attend a reasonable number of accounting due diligence sessions and drafting sessions; and

(vii)    furnish Parent promptly (and in any event at least three (3) Business Days prior to the Closing Date) with all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act, and the requirements of 31 C.F.R. §1010.230, to the extent reasonably requested by Parent in writing at least seven (7) Business Days prior to the Closing Date.

(f)    The Company shall, and shall cause each of its Subsidiaries to, update any Required Information provided to Parent and the Debt Financing Parties as may be necessary so that such Required Information (i) (x) is Compliant and (y) upon request of Parent prior to launch and during any period between launch and settlement of any portion of the Debt Financing consisting of an offering of non-convertible, high yield debt securities issued under Rule 144A promulgated under the Securities Act, remains Compliant (after giving effect to any update thereto furnished by the Company), (ii) meets the applicable requirements set forth in the definition of "Required Information" and (iii) would not, after giving effect to such update(s), cause the Marketing Period to cease pursuant to the definition of "Marketing Period", with respect the foregoing clauses (i) and (ii), until Closing and, with respect to clause (iii), prior to the completion of the Marketing Period.

(g)    For the avoidance of doubt, Parent may, to most effectively access the financing markets, require the cooperation of the Company and its Subsidiaries under this Section 6.15 at any time, and from time to time and on multiple occasions, between the date hereof and the Closing Date (including, for the avoidance of doubt, after completion of the Marketing Period); provided, that, for the avoidance of doubt, the Marketing Period shall not be applicable as to each attempt to access the markets (it being understood and agreed that once the "Marketing Period" has commenced and then been completed in accordance with the definition thereof, there shall not be a subsequent "Marketing Period" hereunder). The Company agrees to use reasonable best efforts to file all reports on (i) Form 10-K and Form 10-Q, (ii) to the extent required to include financial information pursuant to Item 9.01 thereof, Form 8-K, and (iii) to the extent that the failure to file any Form 8-K would result in the Required Information containing

**REDACTED - FOR PUBLIC INSPECTION**

material non-public information with regard to the Company and its Subsidiaries, such other Form 8-K, in each case, required to be filed with the SEC pursuant to the Exchange Act prior to the Closing Date in accordance with the time periods required by the Exchange Act. In addition, if, in connection with a marketing effort contemplated by the Debt Commitment Letter, Parent reasonably requests the Company to file a Current Report on Form 8-K pursuant to the Exchange Act that contains material non-public information with respect to the Company and its Subsidiaries, which Parent reasonably determines (and the Company does not reasonably object) to include in a customary offering document or marketing materials for the Debt Financing, then, upon the Company's review of and reasonable satisfaction with such filing, the Company shall file such Current Report on Form 8-K.

(h)    The Company hereby consents to the use of its and its Subsidiaries' logos in connection with the Debt Financing so long as such logos are used solely in a manner that is not intended or reasonably likely to harm, disparage or otherwise adversely affect the Company or any of its Subsidiaries or the reputation or goodwill of the Company or any of its Subsidiaries.

(i)    All non-public or otherwise confidential information regarding the Company or any of its Affiliates obtained by Parent or its representatives pursuant to this Section 6.15 shall be kept confidential in accordance with the Confidentiality Agreement; provided, that Parent shall be permitted to disclose information as necessary and consistent with customary practices in connection with the Debt Financing, subject to customary confidentiality arrangements reasonably satisfactory to the Company.

Section 6.16    Cooperation as to Certain Indebtedness.

(a)    Parent or one of its Subsidiaries may (a) commence and conduct one or more offers to purchase, including any offer required to be made in connection with any "Change of Control" or equivalent term (each as defined in the applicable Indenture governing each series of Existing Company Notes), tender offers or exchange offers with respect to any or all of the outstanding aggregate principal amount of the Existing Company Notes identified by Parent to the Company prior to, on or after the date hereof on terms that are acceptable to Parent (the "***Offers to Purchase***") and/or (b) solicit the consent of the holders of debt issued under the Indentures regarding certain proposed amendments to the applicable Indenture (the "***Consent Solicitations***" and, together with the Offers to Purchase, if any, the "***Company Note Offers and Consent Solicitations***"); provided that the closing of any such Offers to Purchase shall not occur, and the amendments in connection with any such Consent Solicitations shall not become operative (although any supplemental indentures entered into in connection with any such Consent Solicitations may become effective upon execution), prior to the Closing; provided, further, that the consummation of any Company Note Offers and Consent Solicitations shall not be a condition to the Closing. Any Company Note Offers and Consent Solicitations shall be made on such terms and conditions (including price to be paid and conditionality) as are proposed by Parent and which are permitted by the terms of the applicable Indenture and applicable Laws, including applicable SEC rules and regulations. Parent will reasonably consult with the Company regarding the material terms and conditions of any Company Note Offers and Consent Solicitations, including the timing and commencement of any Company Note Offers and Consent Solicitations and any relevant tender or consent deadlines. Parent shall not be permitted to commence any applicable Company Note Offers and Consent Solicitations until Parent shall have provided the Company

-72-

**App.299**

**REDACTED - FOR PUBLIC INSPECTION**

with the related offer to purchase, consent solicitation statement, letter of transmittal, if any, or press release, if any, in connection therewith, and each other material document relevant to the transaction that will be distributed by the Parent in the applicable Company Note Offers and Consent Solicitations (collectively, the "***Debt Offer Documents***") a reasonable period of time in advance of Parent commencing the applicable Offer to Purchase or Consent Solicitation to allow the Company and its counsel to review and comment on such Debt Offer Documents, and Parent shall give reasonable and good faith consideration to any comments made or input provided by the Company and its legal counsel.  Subject to the receipt of the requisite holder consents, in connection with any or all of the Consent Solicitations, the Company shall execute one or more supplemental indentures to the applicable Indenture in accordance with the terms thereof amending the terms and provisions of such Indenture as described in the applicable Debt Offer Documents in a form as reasonably requested by Parent (each, a "***Company Supplemental Indenture***"), which such supplemental indentures shall become effective upon the execution thereof but shall not become operative until the Teton Merger Effective Time, and the Company shall use reasonable best efforts to cause the trustee under each such Indenture to enter into such supplemental indentures.  Subject to Section 6.16(d), the Company shall, and shall cause each of its Subsidiaries to, and shall use reasonable best efforts to cause its and their Representatives to, provide all reasonable and customary cooperation as may be reasonably requested by Parent in writing to assist Parent in connection with any Company Note Offers and Consent Solicitations; provided that neither the Company nor counsel for the Company shall be required to furnish any certificates, legal opinions or negative assurance letters in connection with any Company Note Offers and Consent Solicitation (other than in connection with the execution of any Company Supplemental Indenture relating to the Consent Solicitations, with respect to which the Company shall deliver customary officer's certificates (the "***Company Indenture Officers' Certificates***") and (solely to the extent the trustee under the applicable Indenture requires an opinion of counsel to the Company) counsel to the Company shall provide customary legal opinions, in each case, to the trustee under each applicable Indenture and solely to the extent such certificates or legal opinions, as applicable, would not conflict with applicable Laws and would be accurate in light of the facts and circumstances at the time delivered) or execute any other instruments or agreements in connection therewith other than any Company Supplemental Indenture described in the immediately preceding sentence.  The solicitation agent, information agent, depositary or other agent retained in connection with any Company Note Offers and Consent Solicitations will be selected by Parent, retained by Parent, and their fees and out-of-pocket expenses will be paid directly by Parent.  If, at any time prior to the completion of the Company Note Offers and Consent Solicitations, the Company or any of its Subsidiaries, on the one hand, or Parent or any of its Subsidiaries, on the other hand, discovers any information that should be set forth in an amendment or supplement to the Debt Offer Documents, so that the Debt Offer Documents shall not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of circumstances under which they are made, not misleading, such party that discovers such information shall use reasonable best efforts to promptly notify the other party, and an appropriate amendment or supplement prepared by Parent describing such information shall be disseminated to the holders of the applicable notes, debentures or other debt securities of the Company outstanding under the applicable Indenture.

(b)      If requested by Parent, in lieu of or in addition to Parent commencing or closing any Company Note Offer and Consent Solicitation for any series of Existing Company Notes, the Company shall use its reasonable best efforts, to the extent permitted by such series of

-73-

**REDACTED - FOR PUBLIC INSPECTION**

Existing Company Notes and the applicable Indenture, to (A) issue a notice of redemption ("***Company Redemption Notice***") for all or portion of the outstanding aggregate principal amount of such series of Existing Company Notes, pursuant to the redemption provisions of the applicable Indenture, which notice of redemption shall be expressly conditioned on the occurrence of the Closing and (B) take any other actions reasonably requested by Parent to facilitate the redemption and satisfaction and discharge of any series of Existing Company Notes at the Teton Merger Effective Time pursuant to the redemption and satisfaction and discharge provisions of the applicable Indenture and the other provisions of the Indenture applicable thereto, <u>provided</u> that, for the avoidance of doubt, no such Redemption (as defined below) shall be effective prior to the Teton Merger Effective Time and <u>provided</u> <u>further</u> that neither the Company nor counsel for the Company shall be required to furnish any certificates, legal opinions or negative assurance letters in connection with any Redemption (except that the Company shall deliver customary officers' certificates (each, a "***Company Redemption Officers' Certificate***") and (solely to the extent the trustee under the applicable Indenture requires an opinion of counsel to the Company) counsel to the Company shall provide customary legal opinions, in each case, to the trustee under each applicable Indenture and solely to the extent such certificates or legal opinions, as applicable, would not conflict with applicable Laws and would be accurate in light of the facts and circumstances at the time delivered).  If a notice of conditional redemption or satisfaction and discharge is given, Parent shall ensure that at the Teton Merger Effective Time, so long as the applicable conditions of such redemption or satisfaction and discharge are satisfied, the Company has all funds necessary in connection with any such redemption or satisfaction and discharge.  The redemption or satisfaction and discharge of any series of Existing Company Notes pursuant to this clause (b) are referred to collectively as the "***Redemption***" of such series of Existing Company Notes.

(c)     Subject to <u>Section 6.16(d)</u>, the Company shall, and shall cause its Subsidiaries to, deliver, in each case, prior to the Closing Date (and as more specifically stated below), all notices and to take all other actions reasonably requested by Parent to facilitate (A) the repayment in full on the Closing Date (or in the case of any letters of credit, cash collateralization, to the extent Parent shall not have entered into an alternative arrangement with the issuing bank) of all amounts and other obligations then outstanding under and (B) the termination (to the extent provided therein and pursuant to the terms thereof) on the Closing Date of (such repayments and terminations, the "***Existing Credit Facilities Termination***") the Credit Agreement, including by providing to Parent a payoff letter from the agent under the Credit Agreement, in form and substance reasonably satisfactory to Parent, which payoff letter shall, among other things, (i) indicate the total amount required to be paid to fully satisfy all principal, interest, prepayment premiums, penalties and any other monetary obligations then due and payable under the Credit Agreement (the "***Payoff Amount***"), (ii) provide that upon receipt of the Payoff Amount under the payoff letter, such indebtedness and all related loan documents (or similar agreements) shall be terminated and (iii) provide that all security interests (if any) granted to secure the obligations under the Credit Agreement and guarantees by Subsidiaries of the Company under the Credit Agreement shall be released and terminated upon receipt of the Payoff Amount.  Parent shall provide all funds required to effect the Existing Credit Facilities Termination; <u>provided</u> that the Existing Credit Facilities Termination and any notices related thereto shall be expressly conditioned on the Closing.

-74-

**App.301**

**REDACTED - FOR PUBLIC INSPECTION**

(d)    Notwithstanding the foregoing or anything to the contrary set forth in Section 6.15 or this Section 6.16, neither the Company nor any of its Affiliates shall be required to (i) take or permit the taking of any action pursuant to Section 6.15 or this Section 6.16 that (A) would require the Company, its Affiliates or any Persons who are directors or officers of the Company or its Affiliates or any of their respective Representatives to pass resolutions or consents to approve or authorize the execution of the Debt Financing, any Company Note Offers and Consent Solicitations or any Redemption or execute or deliver any certificate (including any solvency certificate), document, instrument, opinion, negative assurance letter or agreement or agree to any change or modification of any existing certificate, document, instrument, opinion, negative assurance letter or agreement (other than (w) authorization letters contemplated by Section 6.15(e)(ii), (x) to the extent required by Section 6.16(a), applicable Company Supplemental Indentures and related Company Indenture Officers' Certificates and customary legal opinions in connection therewith, (y) to the extent required by Section 6.16(b), applicable Company Redemption Notices, notices of satisfaction and discharge and Company Redemption Officers' Certificates and legal opinions in connection therewith and (z) to the extent required by Section 6.16(c), the applicable payoff letter and related notices) that is, in each case, effective prior to the Teton Merger Effective Time, (B) would cause any representation or warranty in this Agreement to be breached by the Company or any of its Affiliates, (C) would require the Company or any of its Affiliates to (1) pay any commitment or other similar fee or (2) incur any other expense, liability or obligation in connection with the Debt Financing, any Company Note Offers and Consent Solicitations or any Redemption prior to the Teton Merger Effective Time, in each case of this clause (2) that would not be reimbursed or indemnified in full by Parent in accordance with the last sentence of this Section 6.16(d), (D) would cause any director, officer, employee or stockholder of the Company or any of its Subsidiaries to incur any personal liability, or (E) would result in a violation or breach of, conflict with, or a default (with or without notice, lapse of time, or both) under any Company Material Contract to which the Company or any of its Subsidiaries is a party, the organizational documents of the Company or its Subsidiaries or any applicable Law; (ii) provide any access, or make available any document, correspondence or information, if doing so would, in the reasonable judgment of the Company's legal counsel, jeopardize or cause a risk of loss or waiver of the attorney-client, attorney work product or other similar privilege of the Company or any of its Subsidiaries; provided, that in such instance the Company shall inform Parent of the general nature of the information being withheld and, on Parent's request, reasonably cooperate with the other party to provide such information, in whole or in part, in a manner that would not result in any of the outcome described in this clause (ii); (iii) without otherwise limiting the obligations of the Company pursuant to Section 6.15 to assist Parent in Parent's preparation of any materials that include any Excluded Information, prepare any Excluded Information or (iv) take or permit the taking of any action pursuant to Section 6.15 or this Section 6.16 that would unreasonably interfere with the ongoing business or operations of the Company and its Subsidiaries.  Nothing contained in Section 6.15 or this Section 6.16 or otherwise shall require the Company or any of its Affiliates, prior to the Closing, to be an issuer or other obligor with respect to the Debt Financing or to commence any Company Note Offers and Consent Solicitations. Parent and Teton Merger Sub shall, on a joint and several basis, promptly upon request by the Company, reimburse the Company or any of its Affiliates for all reasonable and documented out-of-pocket costs and expenses (including reasonable and documented attorneys' fees) incurred by them or their respective Representatives in connection with such cooperation pursuant to Section 6.15 and this Section 6.16 (whether or not the Teton Merger is consummated or this

REDACTED - FOR PUBLIC INSPECTION

Agreement is terminated) and shall (on a joint and several basis) indemnify and hold harmless the Company and its Affiliates and their respective Representatives from and against any and all losses, claims, damages, liabilities, reasonable out-of-pocket costs, reasonable and documented out-of-pocket attorneys' fees, judgments, fines, penalties and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of any thereof) suffered or incurred by them in connection with the Debt Financing, the Company Note Offers and Consent Solicitations or any Redemption, any action taken by them at the request of Parent or its representatives pursuant to Section 6.15 and this Section 6.16 and any information used in connection therewith (other than information provided by the Company, its Subsidiaries or their respective Representatives), in each case, except to the extent suffered or incurred as a result of the bad faith, gross negligence, willful misconduct or material breach of this Agreement by the Company or any of its Subsidiaries or their respective Representatives, as determined in a final and non-appealable judgement by a court of competent jurisdiction (the "***Reimbursement Obligations***").

## ARTICLE VII.

## CONDITIONS TO THE TETON MERGER

Section 7.1    Conditions to Each Party's Obligation to Effect the Teton Merger. The respective obligations of each party hereto to effect the Teton Merger shall be subject to the fulfillment (or waiver by the Company and Parent, to the extent permissible under applicable Law and provided that such waiver shall only be effective as to the conditions of the waiving party) at or prior to the Teton Merger Effective Time of the following conditions:

(a)    The Company Stockholder Approval shall have been obtained.

(b)    No Injunction by any court or other tribunal of competent jurisdiction in the United States shall have been entered and shall continue to be in effect and no Law in the United States shall have been adopted that remains in effect or is effective, in each case that prevents, enjoins, prohibits or makes illegal the consummation of the Teton Merger.

(c)    (i) The waiting period applicable to the Teton Merger under the HSR Act, and any agreement with a Governmental Entity not to consummate the transactions contemplated by this Agreement that was entered into with the prior written consent of each of Parent and the Company, shall have expired or been terminated, and (ii) the FCC Consent shall have been granted by the FCC and shall be in effect as issued by the FCC or extended by the FCC.

Section 7.2    Conditions to Obligation of Parent and Teton Merger Sub to Effect the Teton Merger. The respective obligations of Parent and Teton Merger Sub to effect the Teton Merger are further subject to the fulfillment (or the waiver by Parent) at or prior to the Teton Merger Effective Time of the following conditions:

(a)    (i) Other than Section 4.2(a), Section 4.2(b), Section 4.2(f), Section 4.3 and Section 4.21, the representations and warranties of the Company set forth in Article IV (disregarding all materiality and "Company Material Adverse Effect" qualifiers contained therein) shall be true and correct in all respects at and as of the Closing Date as though made at and as of

-76-

**App.303**

REDACTED - FOR PUBLIC INSPECTION

the Closing Date, except for such failures to be so true and correct that have not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (ii) the representations and warranties of the Company set forth in Section 4.2(a) and Section 4.2(b) shall be true and correct in all respects at and as of the Closing Date as though made at and as of the Closing Date, other than in each case for *de minimis* inaccuracies and (iii) the representations and warranties of the Company set forth in Section 4.2(f), Section 4.3 and Section 4.21 shall be true and correct in all material respects at and as of the Closing Date as though made at and as of the Closing Date; provided, that representations and warranties that are made as of a particular date or period shall be true and correct (in the manner set forth in clauses (i), (ii) or (iii), as applicable) as of such date or period.

(b)     The Company shall have performed and complied in all material respects with all covenants required by this Agreement to be performed or complied with by it prior to the Teton Merger Effective Time.

(c)     Since June 30, 2025, there shall not have been any Change that has had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect that is continuing.

(d)     The Company shall have delivered to Parent a certificate, dated the Closing Date and signed by a duly authorized executive officer, certifying to the effect that the conditions set forth in Section 7.2(a), Section 7.2(b) and Section 7.2(c) have been satisfied.

Section 7.3     Conditions to Obligation of the Company to Effect the Teton Merger.  The obligation of the Company to effect the Teton Merger is further subject to the fulfillment (or waiver by the Company) at or prior to the Teton Merger Effective Time of the following conditions:

(a)     (i) Other than Section 5.2, the representations and warranties of Parent and Teton Merger Sub set forth in Article V (disregarding all materiality and "Parent Material Adverse Effect" qualifiers contained therein) shall be true and correct in all respects at and as of the Closing Date as though made at and as of the Closing Date, except for such failures to be true and correct as would not, individually or in the aggregate, reasonably be expected to have a Parent Material Adverse Effect and (ii) the representations and warranties of Parent and Teton Merger Sub set forth in Section 5.2 shall be true and correct in all material respects at and as of the Closing Date as though made at and as of the Closing Date; provided, that representations and warranties that are made as of a particular date or period shall be true and correct (in the manner set forth in clauses (i) or (ii), as applicable) as of such date or period.

(b)     Parent and Teton Merger Sub shall have performed and complied in all material respects with all covenants required by this Agreement to be performed or complied with by them prior to the Teton Merger Effective Time.

(c)     Parent and Teton Merger Sub each shall have delivered to the Company a certificate, dated the Closing Date and signed by a duly authorized executive officer of each of Parent and Teton Merger Sub, certifying to the effect that the conditions set forth in Section 7.3(a) and Section 7.3(b) for each of Parent and Teton Merger Sub have been satisfied.

**App.304**

**REDACTED - FOR PUBLIC INSPECTION**

## ARTICLE VIII.

## <u>TERMINATION</u>

Section 8.1    <u>Termination or Abandonment</u>.    Notwithstanding anything in this Agreement to the contrary, this Agreement may be terminated and abandoned at any time prior to the Teton Merger Effective Time, whether before or after the Company Stockholder Approval (except as otherwise provided in this Agreement), only as follows (it being understood and agreed that this Agreement may not be terminated for any other reason or on any other basis):

(a)    by the mutual written consent of the Company and Parent;

(b)    by either the Company or Parent, if the Teton Merger shall not have been consummated at or prior to 5:00 p.m. Eastern Time, on August 18, 2026 (as may be extended pursuant to the following proviso, the "***Outside Date***"); <u>provided</u>, that if as of the Outside Date any of the conditions set forth in <u>Section 7.1(b)</u> (solely if such condition has not been satisfied due to any Antitrust Law or the Communications Act or FCC Rules or an Injunction arising under any Antitrust Law or the Communications Act or FCC Rules) or <u>Section 7.1(c)</u> shall not have been satisfied, the Outside Date may be extended by either Parent or the Company, upon delivery of written notice to the other party, for a period of three (3) months, and such date, as so extended, shall be the new Outside Date; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 8.1(b)</u> shall not be available to a party if the failure of the Teton Merger to be consummated by such date was primarily attributable to the material breach by such party of any representation, warranty, covenant or other agreement of such party set forth in this Agreement; <u>provided</u>, further, that in the event (A) the Marketing Period has commenced but has not completed as of the Outside Date, the Outside Date shall automatically be extended to the date (the "***Extension Date***") that is three Business Days after the then-scheduled expiration date of the Marketing Period or (B) the Marketing Period has commenced but has not completed as of the Outside Date and would subsequently be deemed not to have commenced under clause (b)(iii) of the second sentence set forth in the definition thereof solely as a result of any Required Information being not Compliant by virtue of becoming stale on or prior to the Extension Date, the Outside Date may be extended (or further extended) by either the Company or Parent for a period of up to 45 days by written notice to the other at least one Business Day prior to the Outside Date; <u>provided</u>, further, that in the event the date on which the conditions set forth in <u>Article VII</u> (other than those conditions that by their nature are to be satisfied or waived at Closing, provided such conditions are capable of being satisfied) is (1) on or after the third Business Day prior to the Outside Date and (2) on or prior to the Outside Date, the Outside Date shall be automatically extended for a period of four (4) Business Days to permit the Closing to occur pursuant to <u>Section 2.2</u>;

(c)    (i) by either the Company or Parent, if an Injunction by any court or other tribunal of competent jurisdiction in the United States shall have been issued permanently restraining, enjoining or otherwise prohibiting the consummation of the Teton Merger and such Injunction shall have become final and nonappealable or (ii) by the Company or Parent, if the FCC issues a Hearing Designation Order with respect to the Teton Merger; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 8.1(c)</u> shall not be available to a party if such Injunction was primarily attributable to the material breach by such party of any representation, warranty, covenant or other agreement of such party set forth in this Agreement;

REDACTED - FOR PUBLIC INSPECTION

(d)      by either the Company or Parent, if the Company Stockholders' Meeting (as it may be adjourned or postponed in accordance with this Agreement) at which a vote on the Company Stockholder Approval was taken shall have concluded and the Company Stockholder Approval shall not have been obtained;

(e)      by the Company, if Parent or Teton Merger Sub shall have breached or there is any inaccuracy in any of its representations or warranties, or shall have breached or failed to perform any of its covenants or other agreements contained in this Agreement, which breach, inaccuracy or failure to perform (i) would result in a failure of a condition set forth in Section 7.3(a) or Section 7.3(b) and (ii) is either not curable or is not cured by the earlier of (A) the Outside Date and (B) the date that is 30 days following written notice from the Company to Parent of such breach, inaccuracy or failure; provided, however, that the right to terminate this Agreement pursuant to this Section 8.1(e) shall not be available to the Company if the Company is then in breach of any of its representations, warranties, covenants or other agreements such that Parent has the right to terminate this Agreement pursuant to Section 8.1(f) without giving effect to any cure right contained therein;

(f)      by Parent, if the Company shall have breached or there is any inaccuracy in any of its representations or warranties, or shall have breached or failed to perform any of its covenants or other agreements contained in this Agreement, which breach, inaccuracy or failure to perform (i) would result in a failure of a condition set forth in Section 7.2(a) or Section 7.2(b) and (ii) is either not curable or is not cured by the earlier of (A) the Outside Date and (B) the date that is 30 days following written notice from Parent to the Company of such breach, inaccuracy or failure; provided, however, that the right to terminate this Agreement pursuant to this Section 8.1(f) shall not be available to Parent if Parent or Teton Merger Sub is then in breach of any of its representations, warranties, covenants or other agreements such that the Company has the right to terminate this Agreement pursuant to Section 8.1(e) without giving effect to any cure right contained therein;

(g)      at any time prior to the receipt of the Company Stockholder Approval, by Parent in the event of a Company Adverse Recommendation Change; or

(h)      at any time prior to the receipt of the Company Stockholder Approval, by the Company, if: (i) the Company has received a Company Superior Proposal; (ii) the Company Board has authorized the Company to enter into a definitive agreement with respect to such Company Superior Proposal; (iii) the Company pays, or causes to be paid, to Parent or its designee the Company Termination Fee pursuant to Section 8.3(a); and the Company has complied in all material respects with Section 6.3.

Section 8.2      Effect of Termination.  Notwithstanding anything set forth herein to the contrary, in the event of a valid termination of this Agreement pursuant to Section 8.1, this Agreement shall terminate immediately upon delivery of written notice by the terminating party and will be of no further force or effect, and there shall be no Liability of any party (or any direct or indirect equity holder, controlling person, partner, member, manager, stockholder, director, officer, employee, Affiliate, agent or other representative of such party or such party's Affiliates or any of the foregoing's successors or assigns), except that the Confidentiality Agreement, the Clean Team Agreement, the Reimbursement Obligations, this Section 8.2, Section 8.3 and Article

-79-

**App.306**

**REDACTED - FOR PUBLIC INSPECTION**

IX shall survive any termination, in each case, in accordance with their respective terms and conditions; provided that, except on the terms and subject to the limitations set forth in Section 8.3, nothing herein shall relieve any party from Liability for a Willful Breach of its covenants or agreements set forth in this Agreement prior to such valid termination or for Fraud, in which case the aggrieved party shall be entitled to all rights and remedies available at law or in equity (which the parties acknowledge and agree will not be limited to reimbursement of expenses or out-of-pocket costs, and in the case of any damages sought by the non-breaching party, such damages may include, if proven and as determined by the court of competent jurisdiction, the benefit of the bargain lost by the non-breaching party (including damages based on loss of the economic benefits of the Teton Merger to holders of shares of Company Common Stock and Company Equity Awards, including loss of premium offered to such holders)) (the "Permitted Claims").

Section 8.3    Termination Fees; Expenses.

(a)    Company Termination Fee. If (i) this Agreement is validly terminated (A) by Parent pursuant to Section 8.1(g) or (B) by the Company pursuant to Section 8.1(h) or (ii) (A) after the date of this Agreement and prior to the receipt of the Company Stockholder Approval, a Company Takeover Proposal (substituting 50% for the 20% threshold set forth in the definition of "Company Takeover Proposal") (a "*Qualifying Transaction*") shall have been publicly made or publicly disclosed, (B) thereafter this Agreement is validly terminated by Parent or the Company pursuant to Section 8.1(d) or by Parent pursuant to Section 8.1(f) due to a breach of, or a failure to perform or comply with, (x) one or more covenants or agreements under this Agreement following the making of such Company Takeover Proposal or (y) Section 6.3 that leads to or results in such Company Takeover Proposal and (C) at any time on or prior to the date that is twelve months after the date of such termination, (x) the Company or any of its Subsidiaries completes or enters into a definitive agreement with respect to a Qualifying Transaction or (y) consummates a Qualifying Transaction (in each case, which need not be the same Qualifying Transaction that was made or disclosed prior to the termination hereof), then the Company shall pay Parent the Company Termination Fee (less the amount of any Parent Expenses previously paid by the Company) in immediately available funds (1) in the case of clause (i), within one Business Day of such termination or (2) in the case of clause (ii), upon the earlier of the entry into a definitive agreement providing for such Qualifying Transaction and the consummation of such Qualifying Transaction.  In no event shall the Company be required to pay the Company Termination Fee on more than one occasion.

(b)    Parent Termination Fee.

(i)    [Reserved.]

(ii)    If this Agreement (A) is validly terminated pursuant to Section 8.1(b) and at the time of such termination, any condition set forth in Section 7.1(b) (solely as it relates to any Antitrust Law or the Communications Act or FCC Rules or if the Injunction arises under any Antitrust Law or the Communications Act or FCC Rules) or in Section 7.1(c) has not been satisfied, but all other conditions to the Closing set forth in Section 7.1 and Section 7.2 have been satisfied or waived (other than (x) those conditions that by their nature are to be satisfied at the Closing, but which conditions are capable of being satisfied and (y) those conditions the failure of which to be satisfied is

-80-

**App.307**

REDACTED - FOR PUBLIC INSPECTION

primarily attributable to a breach by Parent or Teton Merger Sub of their representations, warranties, covenants or agreements contained in this Agreement), (B) is validly terminated pursuant to Section 8.1(c)(i) (solely if based on an Injunction arising under any Antitrust Law or the Communications Act or FCC Rules) or pursuant to Section 8.1(c)(ii), or (C) is terminated pursuant to Section 8.1(e) due to Parent's or Teton Merger Sub's breach of Section 6.6 which breach results in any condition set forth in Section 7.1(b) (solely as it relates to any Antitrust Law or the Communications Act or FCC Rules or if the Injunction arises under any Antitrust Law or the Communications Act or FCC Rules) or in Section 7.1(c) being incapable of being satisfied by the Outside Date, then Parent shall pay to the Company the Parent Regulatory Termination Fee (x) in the case of any such termination by Parent, in immediately available funds prior to or concurrently with, and as a condition to, such termination or (y) in the case of any such termination by the Company, within one Business Day of such termination.

(iii)     In no event shall Parent be required to pay the Parent Regulatory Termination Fee on more than one occasion.

(c)     Each of the parties hereto acknowledges that none of the Company Termination Fee or the Parent Regulatory Termination Fee is intended to be a penalty but rather is liquidated damages in a reasonable amount that will compensate Parent or the Company, as applicable, in the circumstances in which such Company Termination Fee or such Parent Regulatory Termination Fee, as applicable, is due and payable, for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.  Each of the parties hereto acknowledges and agrees that in no event will the Company or Parent be required to pay the Company Termination Fee or the Parent Regulatory Termination Fee, as applicable, on more than one occasion, whether or not the Company Termination Fee or the Parent Regulatory Termination Fee, as applicable, may be payable pursuant to more than one provision of this Agreement at the same or at different times and upon the occurrence of different events.

(d)     Each of the parties hereto acknowledges that the agreements contained in this Section 8.3 are an integral part of the transactions contemplated hereby, and that, without these agreements, the Company, Parent and Teton Merger Sub would not enter into this Agreement. Accordingly, if the Company fails to pay in a timely manner the Company Termination Fee, or if Parent fails to pay in a timely manner the Parent Regulatory Termination Fee, as applicable, then the Company shall pay to Parent, or Parent shall pay to the Company, as applicable, interest on such amount from and including the date payment of such amount was due to but excluding the date of actual payment at the prime rate set forth in *The Wall Street Journal* in effect on the date such payment was required to be made plus 2% per annum (the "***Enforcement Expenses***").

(e)     Expenses.  If this Agreement is validly terminated by Parent or the Company pursuant to Section 8.1(d) and Parent is not then in breach of any of its representations, warranties, covenants or other agreements such that the Company has the right to terminate this Agreement pursuant to Section 8.1(e) without giving effect to any cure right contained therein, as promptly as practicable following such termination (and, in any event, within one Business Day thereof), the Company shall pay to Parent, by wire transfer in immediately available funds, an

-81-

**App.308**

**REDACTED - FOR PUBLIC INSPECTION**

amount equal to the reasonable and documented and out-of-pocket costs and expenses incurred by Parent in connection with this Agreement and the transactions contemplated hereby (including obtaining the Debt Financing), subject to a cap of $30,000,000 (the "***Parent Expenses***").

(f)    Sole and Exclusive Remedy.

(i)    If this Agreement is validly terminated pursuant to Section 8.1 and the Parent Regulatory Termination Fee shall become due and payable in accordance with Section 8.3(b), from and after such termination and payment of the Parent Regulatory Termination Fee in full pursuant to and in accordance with Section 8.3(b), except pursuant to Permitted Claims, (A) none of the Parent Related Parties or the Debt Financing Related Parties will have any further Liability to any of (1) the Company and its Affiliates and (2) the former, current and future holders of any equity, controlling persons, directors, officers, employees, agents, attorneys, Affiliates, members, managers, general or limited partners, stockholders and assignees of each of the Company and its Affiliates (the Persons in clauses (1) and (2) collectively, the "***Company Related Parties***") arising out of this Agreement for any matters forming the basis of such termination, and (B) in no event will any of the Company Related Parties seek or obtain any monetary recovery or award from (1) Parent or Teton Merger Sub or (2) the former, current and future holders of any equity, controlling persons, directors, officers, employees, agents, attorneys, Debt Financing Related Parties, Affiliates (other than Parent or Teton Merger Sub), members, managers, general or limited partners, stockholders and assignees of any of Parent or Teton Merger Sub (the Persons in clauses (1) and (2), collectively, the "***Parent Related Parties***"), in the case of clauses (A) and (B), other than as set forth in this Article VIII (it being understood and agreed that if the Company has received the Parent Regulatory Termination Fee, the amount of the Parent Regulatory Termination Fee shall reduce the amount of any monetary recovery or award obtained pursuant to a Permitted Claim on a dollar-for-dollar basis). Other than the Liabilities, obligations and agreements of Parent and/or Teton Merger Sub under or in connection with this Agreement on the terms and subject to the limitations set forth herein, following the valid termination of this Agreement pursuant to Section 8.1 in no event will any Parent Related Party have any Liability for monetary damages (including damages for fraud or breach, whether willful, intentional, unintentional or otherwise, or monetary damages in lieu of specific performance) to any Company Related Party arising out of this Agreement or the transactions contemplated hereby, including the Teton Merger. Notwithstanding the foregoing, this Section 8.3(f)(i) will not relieve any party from Liability with respect to the Confidentiality Agreement or the Clean Team Agreement.

(ii)    If this Agreement is validly terminated pursuant to Section 8.1 and the Company Termination Fee shall become due and payable in accordance with Section 8.3(a), from and after such termination and payment of the Company Termination Fee in full pursuant to and in accordance with Section 8.3(a), except pursuant to Permitted Claims, (A) none of the Company Related Parties will have any further Liability to any of Parent, Teton Merger Sub, or any of the other Parent Related Parties arising out of this Agreement for any matters forming the basis of such termination and (B) in no event will any of the Parent Related Parties seek or obtain any monetary recovery or award from the Company Related Parties, in each case of clauses (A) and (B), other than as set forth in this Article VIII (it being understood and agreed that if Parent has received the Company

-82-

**App.309**

REDACTED - FOR PUBLIC INSPECTION

Termination Fee, the amount of the Company Termination Fee shall reduce the amount of any monetary recovery or award obtained pursuant to a Permitted Claim on a dollar-for-dollar basis). Other than the Liabilities, obligations and agreements of the Company under or in connection with this Agreement on the terms and subject to the limitations set forth herein, following the valid termination of this Agreement pursuant to Section 8.1 in no event will any Company Related Party have any Liability for monetary damages (including damages for fraud or breach, whether willful, intentional, unintentional or otherwise, or monetary damages in lieu of specific performance) to any Parent Related Party arising out of this Agreement or the transactions contemplated hereby, including the Teton Merger. Notwithstanding the foregoing, this Section 8.3(f)(ii) will not relieve any party from Liability with respect to the Confidentiality Agreement or the Clean Team Agreement.

## ARTICLE IX.

## MISCELLANEOUS

Section 9.1    No Survival.   None of the representations, warranties, covenants and agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the consummation of the Teton Merger, except for covenants and agreements that contemplate performance after the Teton Merger Effective Time or otherwise expressly by their terms survive the Teton Merger Effective Time.

Section 9.2    Expenses; Transfer Taxes.

(a)    Except as otherwise provided in this Agreement (including in Section 8.3), whether or not the Teton Merger is consummated, all costs and expenses incurred in connection with the Teton Merger, this Agreement and the transactions contemplated hereby shall be paid by the party incurring or required to incur such expenses; provided, that Parent and the Company shall each pay 50% of all filing fees payable with regard to the FCC Applications and under the HSR Act.

(b)    Except as otherwise provided in Section 3.2(c), all transfer, documentary, sales, use, stamp, registration and other such Taxes imposed with respect to the transfer of Company Common Stock pursuant to the Teton Merger shall be borne by Parent or the Surviving Company and expressly shall not be a liability of holders of Company Common Stock.

Section 9.3    Counterparts; Effectiveness.   This Agreement may be executed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument, and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by telecopy, electronic delivery or otherwise) to the other parties. Signatures to this Agreement transmitted by facsimile transmission, by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, shall have the same effect as physical delivery of the paper document bearing the original signature.

**REDACTED - FOR PUBLIC INSPECTION**

Section 9.4    Governing Law; Jurisdiction.

(a)    This Agreement, and all claims or causes of action (whether at Law, in contract or in tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance hereof, shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

(b)    Each of the parties hereto irrevocably agrees that it shall bring any Proceeding in respect of any claim arising out of or related to this Agreement and the rights and obligations arising in connection herewith, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and obligations arising hereunder brought by any other party hereto or its successors or assigns ("*Actions*"), exclusively in (i) the Delaware Court of Chancery, (ii) in the event (but only in the event) that such court does not have subject matter jurisdiction over such suit, action or other proceeding, the United States District Court for the District of Delaware or (iii) in the event (but only in the event) such courts identified in clauses (i) and (ii) do not have subject matter jurisdiction over such suit, action or other proceeding, any other Delaware state court (the "*Chosen Courts*"), and solely in connection with Actions (A) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (B) irrevocably waives any claim that it is not personally subject to the jurisdiction of the Chosen Courts for any reason other than the failure to serve in accordance with this Section 9.4 and any claim that it or its property is exempt or immune from the jurisdiction of any such court or from any legal process commenced in the Chosen Courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), (C) irrevocably submits to the exclusive venue of any such Action in the Chosen Courts and waives any objection to laying venue in any such Action in the Chosen Courts and (D) waives any objection that the Chosen Courts are an inconvenient forum, do not have jurisdiction over any party hereto or that this Agreement, or the subject matter hereof, may not be enforced in or by such courts.  Each party agrees that a final judgment in any Action brought in the Chosen Courts shall be conclusive and binding upon each of the parties hereto and may be enforced in any other courts the jurisdiction of which each of the parties hereto is or may be subject, by suit upon such judgment.  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.7 and agrees that service made in such manner shall have the same legal force and effect as if served upon such party personally within the State of Delaware.  Nothing in this Agreement shall affect the right of any party to this Agreement to serve process in any other manner permitted by Law.

Section 9.5    Specific Enforcement.  The parties hereto agree that if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and damages would be difficult to determine, and accordingly (a) the parties hereto shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to specific performance of the terms hereof, in each case in the Chosen Courts (in the order expressed in Section 9.4(b)), this being in addition to any other remedy to which they are entitled at law or in equity (provided, however, that the Company shall not be entitled to obtain specific performance to cause the Teton Merger to be consummated if this Agreement has been validly terminated and the Parent Regulatory Termination Fee has been paid to the Company in accordance with this Agreement),

-84-

**App.311**

**REDACTED - FOR PUBLIC INSPECTION**

(b) the parties hereto waive any requirement for the securing or posting of any bond in connection with the obtaining of any specific performance or injunctive relief and (c) the parties hereto shall waive, in any action for specific performance, the defense of adequacy of a remedy at law.  The Company's pursuit of an injunction, specific performance or other equitable remedies at any time shall not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which the Company may be entitled, including the right to pursue remedies for liabilities or damages incurred or suffered by the Company and its stockholders.  It is explicitly agreed that, subject only to the next sentence of this Section 9.5, the Company shall have the right to an injunction, specific performance or other equitable remedies in connection with enforcing Parent's and Teton Merger Sub's obligations under this Agreement, including to consummate the Teton Merger.

Section 9.6    WAIVER OF JURY TRIAL.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY OF THE AGREEMENTS DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE EITHER OF SUCH WAIVERS, (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVERS, (III) IT MAKES SUCH WAIVERS VOLUNTARILY AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.6.

Section 9.7    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed given (a) upon personal delivery to the party to be notified; (b) when received (with confirmation of receipt) when sent by email by the party to be notified; or (c) when delivered by a courier (with confirmation of delivery); in each case to the party to be notified at the following address:

To Parent or Teton Merger Sub:

Nexstar Media Group, Inc.
545 E. John Carpenter Freeway
Suite 700
Irving, Texas 75062
Attention:  Perry A. Sook, Rachel Morgan
Email:  psook@nexstar.tv; rmorgan@nexstar.tv

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP

**App.312**

**REDACTED - FOR PUBLIC INSPECTION**

601 Lexington Avenue
New York, NY 10022
Attention:  Armand Della Monica, P.C.
                   Sarkis Jebejian, P.C.
                   Ravi Agarwal, P.C.
                   Email:     armand.dellamonica@kirkland.com
                   sarkis.jebejian@kirkland.com
                   ravi.agarwal@kirkland.com


To the Company:

TEGNA Inc.
8350 Broad Street
Suite 2000
Tysons, Virginia 22102
Attention:  Mike Steib, Thomas R. Cox, Alex J. Tolston
Email:         mike@tegna.com; tomcox@tegna.com; atolston@tegna.com

with a copy (which shall not constitute notice) to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Attention:  Igor Kirman, Esq.
                   Viktor Sapezhnikov, Esq.
Email:         IKirman@wlrk.com
                   VSapezhnikov@wlrk.com

or to such other address as any party hereto shall specify by written notice so given.

Section 9.8     Assignment; Binding Effect.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned or delegated by any of the parties hereto without the prior written consent of the other parties; provided, that each of Teton Merger Sub and Parent may assign any of their rights hereunder to any Debt Financing Party pursuant to the terms of the Debt Financing solely for purposes of creating a security interest herein or otherwise assigning as collateral in respect of the Debt Financing, but no such assignment shall relieve Parent or Teton Merger Sub of any of its obligations hereunder.  Subject to the first sentence of this Section 9.8, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.  Any purported assignment not permitted under this Section 9.8 shall be null and void.

Section 9.9     Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is

-86-

**App.313**

REDACTED - FOR PUBLIC INSPECTION

invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

Section 9.10    Entire Agreement.  This Agreement (together with the exhibits hereto and the other documents delivered pursuant hereto), the Confidentiality Agreement and the Clean Team Agreement constitute the entire agreement of the parties hereto and supersede all prior agreements (except the Confidentiality Agreement and the Clean Team Agreement, each of which shall survive in accordance with their terms) and understandings, both written and oral, among the parties hereto, or any of them, with respect to the subject matter hereof.  The Company Disclosure Schedule and the Parent Disclosure Schedule are "facts ascertainable" as that term is used in Section 251(b) of the DGCL, and do not form part of this Agreement but instead operate upon the terms of this Agreement as provided herein.

Section 9.11    Amendments; Waivers.  At any time prior to the Teton Merger Effective Time, any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by the Company, on the one hand, and Parent and Teton Merger Sub, on the other hand or in the case of a waiver, by the party against whom the waiver is to be effective; provided, that after receipt of Company Stockholder Approval, if any such amendment or waiver shall by applicable Law or in accordance with the rules and regulations of the New York Stock Exchange require further approval of the stockholders of the Company, the effectiveness of such amendment or waiver shall be subject to the approval of the stockholders of the Company.  Notwithstanding the foregoing, no failure or delay by any party hereto in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise of any other right hereunder.

Section 9.12    Headings.  Headings of the Articles and Sections of this Agreement are for convenience of the parties hereto only and shall be given no substantive or interpretive effect whatsoever.  The table of contents to this Agreement is for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.13    No Third-Party Beneficiaries.  Each of Parent, Teton Merger Sub and the Company agrees that (a) its representations, warranties, covenants and agreements set forth herein are solely for the benefit of the other parties hereto, in accordance with and subject to the terms of this Agreement, and (b) this Agreement is not intended to, and does not, confer upon any Person other than the parties hereto any rights or remedies hereunder, including the right to rely upon the representations and warranties set forth herein.  Notwithstanding the foregoing, (i) each Covered Person shall be an express third-party beneficiary of and shall be entitled to rely upon Section 6.9; (ii) prior to the Teton Merger Effective Time, the Company shall have the right, on behalf of the holders of shares of Company Common Stock or Company Equity Awards (each of which are express third party beneficiaries of this Agreement to the extent required for this provision to be enforceable) to pursue claims for damages (which may include, if proven and as determined by a court of competent jurisdiction, damages based on the loss of the economic benefits of the Teton Merger to holders of shares of Company Common Stock and Company Equity Awards, taking into account the amount of the Merger Consideration and the loss of premium offered to such holders) under this Agreement in the event of a breach of this Agreement by Parent or Teton

-87-

**App.314**

**REDACTED - FOR PUBLIC INSPECTION**

Merger Sub (provided, that the Company shall have the sole and exclusive right to enforce the rights granted under this clause (ii) as agent for such holders of shares of Company Common Stock and Company Equity Awards, and any amounts received by the Company in connection therewith may be (x) distributed, in whole or in part, by the Company to the holders of shares of Company Common Stock of record as of any date determined by the Company or (y) retained by the Company for the use and benefit of the Company on behalf of the holders of shares of Company Common Stock and Company Equity Awards in any manner the Company deems fit); and (iii) following the Teton Merger Effective Time, each holder shares of Company Common Stock and each holder of Company Equity Awards, in each case, as of immediately prior to the Teton Merger Effective Time, shall be an express third-party beneficiary of and shall be entitled to rely on Article III and shall be entitled to obtain the Merger Consideration to which it is entitled for its shares of Company Common Stock or Company Equity Awards, as applicable, pursuant to this Agreement.

Section 9.14   Debt Financing Provisions.  Notwithstanding anything in this Agreement to the contrary, the Company on behalf of itself, its Subsidiaries and each of the Company Related Parties hereby:  (a) agrees that any proceeding, whether in law or in equity, whether in contract or in tort or otherwise, involving any of the Debt Financing Parties or any of their respective affiliates, or any of their and their affiliates' current or future officers, directors, employees, agents, representatives, stockholders, shareholders, general or limited partners, managers, members, controlling persons, attorneys, advisors or partners or any of their respective successor or assigns (in each case, excluding Parent and Teton Merger Sub) (collectively all of the foregoing persons mentioned in this clause (a) that are not so excluded pursuant to the immediately preceding parenthetical phrase, the "***Debt Financing Related Parties***"), arising out of or relating to, this Agreement, the Debt Financing or any of the agreements (including the Debt Commitment Letter) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder shall be subject to the exclusive jurisdiction of any federal or state court in the Borough of Manhattan, New York, New York, and any appellate court thereof and each party hereto irrevocably submits itself and its property with respect to any such proceeding to the exclusive jurisdiction of such court; (b) agrees that any such proceeding shall be governed by the laws of the State of New York (without giving effect to any conflicts of law principles that would result in the application of the laws of another state), except as otherwise provided in the Debt Commitment Letter or other applicable definitive document relating to the Debt Financing; (c) agrees not to bring or support, or permit any Company Related Party to bring or support, any proceeding of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any Debt Financing Related Party in any way arising out of or relating to, this Agreement, the Debt Financing, the Debt Commitment Letter or any of the transactions contemplated hereby or thereby or the performance of any services thereunder in any forum other than any federal or state court in the Borough of Manhattan, New York, New York; (d) agrees that service of process upon any Company Related Party in any such proceeding shall be effective if notice is given in accordance with Section 9.7; (e) irrevocably waives, to the fullest extent that it may effectively do so, the defense of an inconvenient forum to the maintenance of such proceeding in any such court; (f) knowingly, intentionally and voluntarily waives to the fullest extent permitted by applicable law trial by jury in any proceeding brought against any Debt Financing Related Party in any way arising out of or relating to, this Agreement, the Debt Financing, the Debt Commitment Letter or any of the transactions contemplated hereby or thereby or the performance of any services thereunder; (g) agrees that none of the Debt Financing Related Parties will have any liability to Company or any other Company Related Party

-88-

**App.315**

REDACTED - FOR PUBLIC INSPECTION

(in each case, other than Parent and its Subsidiaries as expressly set forth in the Debt Commitment Letter) relating to or arising out of this Agreement, the Debt Financing, the Debt Commitment Letter or any of the transactions contemplated hereby or thereby or the performance of any services thereunder, whether in law or in equity, whether in contract or in tort or otherwise; and (h) agrees that the Debt Financing Related Parties are express third party beneficiaries of, and may enforce, any of the provisions of this Section 9.14, Section 8.3(f) and Section 9.8, and that such provisions (and the applicable defined terms used therein) shall not be amended in any way adverse to the Debt Financing Related Parties without the prior written consent of the Debt Financing Entities.

Section 9.15    Interpretation.  (a) When a reference is made in this Agreement to an Article or Section, such reference shall be to an Article or Section of this Agreement unless otherwise indicated; (b) whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation"; (c) the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, unless the context otherwise requires; (d) the word "or" shall not be deemed to be exclusive; (e) the word "*extent*" and the phrase "*to the extent*" when used in this Agreement shall mean the degree to which a subject or other thing extends, and such word or phrase shall not mean simply "if"; (f) all references herein to "$" or "dollars" shall be to U.S. dollars; (g) references to "written" or "in writing" include in electronic form; (h) all terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant thereto unless otherwise defined therein; (i) the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms; (j) a reference to any Person includes such Person's successors and permitted assigns; (k) any reference to "*days*" means calendar days unless Business Days are expressly specified; (l) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day; (m) any Law defined or referred to in this Agreement or in any agreement or instrument that is referred to herein means such Law as from time to time amended, modified or supplemented, including (in the case of statutes) by succession of comparable successor Laws and the related rules and regulations thereunder and published interpretations thereof, and references to any Contract or instrument are to that Contract or instrument as from time to time amended, modified or supplemented; provided, that for purposes of any representations and warranties contained in this Agreement that are made as of a specific date or dates, references to any Law shall be deemed to refer to such Law, as amended, and the related rules and regulations thereunder and published interpretations thereof, in each case, as of such date; (n) to the extent that any covenant or agreement in this Agreement requires an Affiliate of any party hereto to take or omit to take any action, such covenant or agreement includes the obligation of such party to cause such Affiliate to take or omit to take such action, whether or not such covenant or agreement expressly so states; and (o) any reference to any documents or information "furnished," "provided" or "made available" by the Company shall mean such documents and information as are included in the electronic data room administered by or on behalf of the Company by 11:59 p.m. Eastern Time on the date that is one (1) day prior to the date of this Agreement.  Each of the parties hereto has participated in the drafting and negotiation of this Agreement and if an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if it is drafted by all the parties hereto, and no presumption or

-89-

**App.316**

**REDACTED - FOR PUBLIC INSPECTION**

burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement.

    Section 9.16  <u>Disclosure Schedule Matters</u>.  All capitalized terms not defined in the Company Disclosure Schedule or Parent Disclosure Schedule (as applicable, the "***Disclosure Schedule***") shall have the meanings assigned to them in this Agreement.  The Disclosure Schedule shall, for all purposes in this Agreement, be arranged in numbered and lettered parts and subparts corresponding to the numbered and lettered sections and subsections contained in this Agreement. Each item disclosed in the Disclosure Schedule shall constitute an exception to or, as applicable, disclosure for the purposes of, the representations and warranties (or covenants, as applicable) to which it makes express reference and shall also be deemed to be disclosed or set forth for the purposes of every other part in the Disclosure Schedule relating to the representations and warranties (or covenants, as applicable) set forth in this Agreement to the extent a cross-reference within the Disclosure Schedule is expressly made to such other part in the Disclosure Schedule, as well as to the extent that the relevance of such item as an exception to or, as applicable, disclosure for purposes of, such other section of this Agreement is reasonably apparent from the face of such disclosure.  The listing of any matter on the Disclosure Schedule shall not be deemed to constitute an admission by the Company or Parent, as applicable, or to otherwise imply, that any such matter is material, is required to be disclosed by the Company or Parent, as applicable, under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement.  No disclosure in the Disclosure Schedule relating to any possible breach or violation by the Company or Parent, as applicable, of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  In no event shall the listing of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of the representations, warranties, covenants or agreements set forth in this Agreement.

[<em>Signature page follows</em>]

Docusign Envelope ID: 3A8F33FA-E81D-4B59-9443-BC679A53B83F

**REDACTED - FOR PUBLIC INSPECTION**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

COMPANY:

**TEGNA INC.**

By: _____
Name:    Mike Steib
Title:    President and Chief Executive Officer

*[Signature Page to Agreement and Plan of Merger]*

**App.318**

REDACTED - FOR PUBLIC INSPECTION

PARENT:

**NEXSTAR MEDIA GROUP, INC.**

By: _____

Name: Lee Ann Gliha
Title: Chief Financial Officer

TETON MERGER SUB:

**TETON MERGER SUB, INC.**

By: _____

Name: Lee Ann Gliha
Title: Treasurer

*[Signature Page to Agreement and Plan of Merger]*

**App.319**

**REDACTED - FOR PUBLIC INSPECTION**

# EXHIBIT A

Nielsen Ratings Data

(Filed Confidentially)

**REDACTED - FOR PUBLIC INSPECTION**

# EXHIBIT B

## Comscore Ratings Data

(Filed Confidentially)

**REDACTED - FOR PUBLIC INSPECTION**

# EXHIBIT C

## BIA OTA Data

(Filed Confidentially)

REDACTED - FOR PUBLIC INSPECTION

# EXHIBIT D

BIA Ad Market Data

(Filed Confidentially)

**REDACTED - FOR PUBLIC INSPECTION**

# EXHIBIT E

## Ad Fontes Media Bias and Reliability Ratings

(Filed Confidentially)

REDACTED - FOR PUBLIC INSPECTION

# EXHIBIT F

## Comscore Ratings -  Ft. Smith DMA

(Filed Confidentially)

**Before the**
**Federal Communications Commission**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| *Applications to Transfer Control of Tegna* | )    MB Docket No. 25-331 |
| *Inc. to Nexstar Media Inc.* | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**PETITION TO DENY OF**
**BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA,**
**BROADBAND COMMUNICATIONS ASSOCIATION OF WASHINGTON, INDIANA**
**CABLE AND BROADBAND ASSOCIATION, MISSISSIPPI CABLE**
**TELECOMMUNICATIONS ASSOCIATION, TENNESSEE CABLE & BROADBAND**
**ASSOCIATION, AND VCTA – BROADBAND ASSOCIATION OF VIRGINIA**

Todd Eachus
President
BROADBAND COMMUNICATIONS
ASSOCIATION OF PENNSYLVANIA
127 State St.
Harrisburg, PA 17101

Joseph Dant
Executive Director
INDIANA CABLE AND BROADBAND
ASSOCIATION
150 W. Market St., Ste. 412
Indianapolis, IN 46204

Ann Marie Walp
President
TENNESSEE CABLE & BROADBAND
ASSOCIATION
414 Union St., Ste. 1900
Nashville, Tennessee 37219

David Ducharme
Executive Director
BROADBAND COMMUNICATIONS
ASSOCIATION OF WASHINGTON
4217 Williams Ave. N.
Renton, WA 98056

T.J. Taylor
Executive Director
MISSISSIPPI CABLE
TELECOMMUNICATIONS
ASSOCIATION
PO Box 55867
Jackson, MS 39296

Ray LaMura
President
VCTA – BROADBAND ASSOCIATION
OF VIRGINIA
1111 East Main St., Ste. 802
Richmond, VA 23219

December 31, 2025

**App.326**

**Table of Contents**

I.   INTRODUCTION AND SUMMARY ............................................................................. 3

II.  STANDARD OF REVIEW ......................................................................................... 7

III. THE TRANSACTION WOULD VIOLATE THE NATIONAL CAP, WHICH THE COMMISSION HAS NO AUTHORITY TO WAIVE ............................................................ 10

   A.  The Commission Lacks Authority to Modify or Waive the Statutory 39 Percent Cap ................. 11

   B.  Applicants' Contrary Arguments Do Not Withstand Scrutiny ....................................... 17

   C.  The 2004 CAA Establishes and Subsequent FCC Precedent Confirms That Divestiture Is the Exclusive Remedy for National Cap Violations ........................................ 24

IV.  THE TRANSACTION WOULD VIOLATE THE LOCAL TELEVISION OWNERSHIP RULE .... 26

V.   THE TRANSACTION WOULD VIOLATE THE DOJ'S NEXSTAR/TRIBUNE SETTLEMENT .. 32

VI.  NEXSTAR'S SIDECAR RELATIONSHIPS ALREADY PUT IT IN VIOLATION OF THE NATIONAL CAP AND LOCAL TELEVISION OWNERSHIP RULE, THUS COMPOUNDING THE PUBLIC INTEREST HARMS FROM THE TRANSACTION .................................. 33

VII. THE TRANSACTION WOULD CAUSE IMMEDIATE, IRREPARABLE, AND SUSTAINED PUBLIC INTEREST HARMS ................................................................ 36

   A.  The Transaction Will Increase Costs for MVPDs and Consumers and Accelerate MVPD Market Exits ................................................................................................. 36

       1.  Applicants Will Use Their Massive National Reach to Raise Retransmission Consent Rates for MVPDs and Their Customers .................................................. 36

       2.  Applicants Will Also Be Able to Leverage Local Duopolies and Triopolies to Raise Retransmission Consent Rates ................................................................ 44

   B.  The Transaction Will Lead to Job Cuts and Reductions in Local News ....................... 48

       1.  Nexstar Acquisitions Result in Significant Workforce Cuts and Nexstar Expects the Same if the Transaction Were to Close. .............................................. 49

       2.  The Transaction Will Lead to Duplicated, Centrally Produced Programming That Replaces Independent Local Programming ...................................................... 51

   C.  The Transaction Will Increase Prices for Local Advertisers ....................................... 54

   D.  Applicants' Claims of ATSC 3.0-Related Benefits Are Speculative and Unsupported by Marketplace Evidence ........................................................................ 55

VIII. CONCLUSION .................................................................................................... 57

CERTIFICATE OF SERVICE

VERIFICATION

DECLARATION OF JOE LORAH, BLUE RIDGE COMMUNICATIONS

DECLARATION OF PAUL BEAUDRY, COGECO US FINANCE, LLC d/b/a BREEZELINE ("BREEZELINE")

DECLARATION OF JACK CAPPARELL, SERVICE ELECTRIC CABLE TV & COMMUNICATIONS

**Before the**
**Federal Communications Commission**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| *Applications to Transfer Control of Tegna* | )    MB Docket No. 25-331 |
| *Inc. to Nexstar Media Inc.* | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**PETITION TO DENY OF**
**BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA,**
**BROADBAND COMMUNICATIONS ASSOCIATION OF WASHINGTON, INDIANA**
**CABLE AND BROADBAND ASSOCIATION, MISSISSIPPI CABLE**
**TELECOMMUNICATIONS ASSOCIATION, TENNESSEE CABLE & BROADBAND**
**ASSOCIATION, AND VCTA – BROADBAND ASSOCIATION OF VIRGINIA**

The Broadband Communications Association of Pennsylvania ("BCAP"),[1] Broadband

Communications Association of Washington ("BCAW"),[2] Indiana Cable and Broadband

Association ("ICBA"),[3] Mississippi Cable Telecommunications Association,[4] Tennessee Cable

---

[1] Broadband Communications Association of Pennsylvania (BCAP) is an association of Pennsylvania cable and broadband operators, equipment suppliers, programmers, and other allied companies. BCAP advocates, communicates, and educates about industry positions to public policy makers, opinion leaders, and the general public in order to enhance member companies' operations, competitiveness, and profitability.

[2] The Broadband Communications Association of Washington (BCAW) is a 501(c)(6) organization under the Internal Revenue Code. BCAW's membership consists of franchised cable companies that are major providers of cable, voice, and internet services to subscribers throughout Washington State. BCAW is governed by a Board of Directors comprised of member company leaders.

[3] Founded in 1985 as the Indiana Cable Telecommunications Association (ICTA), the Indiana Cable and Broadband Association (ICBA) represents an industry building the world's most powerful technology platform. ICBA believes that connectivity has the power to transform the state of Indiana. ICBA unites leaders in broadband infrastructure, technology, and entertainment to connect Hoosiers to the world—transforming how we live, learn, work, and play. ICBA believes in creating progress through stronger connections and are proud to play a key role as the industry continues to develop.

[4] The Mississippi Cable Telecommunications Association (MCTA) is the statewide trade association representing cable operators and other companies who supply programming, hardware and services to the cable industry. MCTA members continually work to provide Mississippians with the latest technology and capabilities in advanced video, voice and data over our broadband networks. From the suburbs of Memphis, Tennessee in the northwestern part of the State, to the capitol in Jackson to the Gulf Coast cities of Biloxi and Gulfport, MCTA's operators strive to be technology leaders in the state and the region.

**App.328**

& Broadband Association,[5] and VCTA – Broadband Association of Virginia ("VCTA")[6] (collectively, "State Cable Petitioners") respectfully petition the Commission to deny the proposed transfer of control ("Transaction") of the broadcast licenses of TEGNA Inc. ("Tegna") to Nexstar Media Group, Inc. ("Nexstar") (collectively, the "Applicants") in the above-captioned proceeding.  Grant of the Transaction would violate the Communications Act and the Commission's rules, and would result in immediate and irreparable public interest harms to multichannel video programming distributors ("MVPDs") and American consumers across 80 percent of the country.

State Cable Petitioners collectively represent more than 20 providers, operating across more than 100 designated market areas ("DMAs") served by Nexstar and Tegna stations.  Of those, more than a dozen are Tegna-only markets in which the acquisition of stations would put Nexstar in further violation of the National Television Ownership Rule's national audience reach limitation ("National Cap" or "Cap"); more than two dozen are overlap markets where Nexstar's acquisition of Tegna stations would violate the Local Television Ownership Rule; and more than two dozen are overlap markets in which Nexstar and Tegna could combine to own multiple Big Four network affiliates, with the remainder being Nexstar-only markets.  As representatives of

---

[5] Since 1967, the Tennessee Cable & Broadband Association (TCBA) has been steadfast in its commitment to bolstering the cable and broadband sector.  By offering expert guidance in government affairs and public relations, ensuring regulatory compliance, and addressing the diverse needs of Tennesseans, TCBA has played a crucial role in fostering the industry's development and serving the community.

[6] Founded in 1966, the VCTA – Broadband Association of Virginia (VCTA) is an association representing providers of fiber optic cable services across the Commonwealth of Virginia.  VCTA members provide high-speed internet connections to over 2.6 million Virginia homes, more than 1500 schools and libraries, as well as businesses of all sizes, educational institutions, hospitals, data centers, nonprofit organizations and many of Virginia's government and military facilities.  VCTA members are committed to expanding broadband access for unserved populations in urban, suburban, and rural areas throughout the Commonwealth of Virginia.

market competitors, including several with declarations appended hereto, State Cable Petitioners have standing as "parties in interest" and petition the Commission to deny the Transaction.[7]

## I.    INTRODUCTION AND SUMMARY

Applicants propose massive national and local consolidation of broadcast television station ownership that will significantly drive up consumer prices and reduce local news.  If approved, the combined company would control 265 full-power stations in 44 states and the District of Columbia, reaching *80 percent* of U.S. television households.[8]  It would have stations in nine of the top 10 DMAs, 41 of the top 50 DMAs, and 82 of the top 100 DMAs.[9]  And, as illustrated below, it would reach nearly every corner of the country.

---

[7] *See* Declaration of Joe Lorah, Blue Ridge Communications; Declaration of Paul Beaudry, Cogeco US Finance, LLC d/b/a Breezeline; Declaration of Jack Capparell, Service Electric Cable TV & Communications; *Tribune Media Company (Transferor) and Nexstar Media Group, Inc. (Transferee), et al.*, Memorandum Opinion and Order, 34 FCC Rcd. 8436 ¶ 24 (2019) ("*Nexstar/Tribune Order*") ("[W]e find that DISH has demonstrated that it meets the requirements for standing.  In its petition, DISH claims that it 'has retransmission consent agreements with both Applicants' and that grant of the transaction will have specific, negative effects on it, specifically related to retransmission consent fee negotiations, and that those harms can be cured by dismissal or denial of the Applications.  Based on these claims and consistent with recent precedent, we find that DISH has met the requirements for standing."); *see also id.* ¶ 23 ("An organization can establish standing on behalf of its members if it provides an affidavit or declaration 'of one or more individuals entitled to standing.'").

[8] *See* Press Release, Nexstar Media Group, Inc., *Nexstar Media Group, Inc. Enters Into Definitive Agreement To Acquire TEGNA Inc. for $6.2 Billion in Accretive Transaction* (Aug. 19, 2025), https://www.nexstar.tv/nexstar-media-group-inc-enters-into-definitive-agreement-to-acquire-tegna-inc-for-6-2-billion-in-accretive-transaction/ ("Nexstar/Tegna Press Release"); Applications of Nexstar Media Inc. and TEGNA Inc., FCC File Nos. 0000280646, et seq., Comprehensive Exhibit (filed Nov. 18, 2025) ("Nexstar/Tegna Comprehensive Exhibit").

[9] *See* Nexstar/Tegna Press Release.

3

**App.330**

**Fig. I. Nexstar and Tegna DMAs with at Least One Station**[10]



This consolidation will result in widespread harms to the public interest, including immediate and irrecoverable economic damage to State Cable Petitioners and MVPDs generally (in the form of higher retransmission consent fees) and to American consumers (in the form of higher monthly MVPD bills)—not to mention a dramatically increased risk of wide-scale programming blackouts. If approved, the combined company would immediately increase prices as Tegna stations automatically "step up" to Nexstar's industry-leading retransmission consent rates. As existing agreements come up for renewal, it would also wield unrivaled leverage to extract ever-higher retransmission consent fees from MVPDs. This comes at a time when retransmission consent fees have skyrocketed over the past decade, pushing consumers away

---

[10] *See* Nexstar Media Group, Inc., Annual Report (Form 10-K) (Feb. 27, 2025); TEGNA Inc., Annual Report (Form 10-K) (Feb. 27, 2025). Note: This map plots the national footprint of Nexstar and Tegna based on their owned or operated stations as of December 31, 2024.

**App.331**

from MVPD service. If MVPDs do not accede to these artificial extreme price increases, the combined company could simultaneously black out stations in 132 markets—including blackouts of multiple Big Four network affiliates in 43 markets. And it will. Nexstar has withheld more station signals in the past five years than any other broadcast station group owner—cumulatively accounting for blackouts on MVPD services in 370 markets (including repeat markets) for over 1,200 days. Allowing any one entity to control dissemination of high-value news, sports, and emergency programming with this level of concentration at both the national and local levels would be harmful to the American people, contrary to the public interest, and devastating for competition, localism, and viewpoint diversity.[11]

The Commission should deny the Transaction on multiple legal grounds.

- *First*, the Transaction would violate the statutory 39 percent National Cap, which the Commission may not modify or waive.

- *Second*, the Transaction would violate the Local Television Ownership Rule in 23 markets, and Applicants have not shown that waiver would serve the public interest. In fact, it would do the opposite, granting Applicants waivers on an unprecedented scale that flies in the face of the Commission's prior understanding of its waiver authority.

- *Third*, the Transaction would violate the settlement between Nexstar and the Department of Justice ("DOJ"), which prohibits Nexstar from reacquiring 11 stations that it divested to Tegna to avoid loss of competition in the 2019 Tribune transaction.

- *Fourth*, these violations would come atop the Commission's recent determination that Nexstar already is in apparent violation of the National Cap as a result of its de facto control over—or, alternatively, Equity/Debt Plus Rule-based attributable interest in— Mission Broadcasting-licensed WPIX in the New York, NY market. There is reason to believe Nexstar's sidecar arrangements also violate the Local Ownership Rule in numerous other markets on the same Equity/Debt Plus Rule basis.

---

[11] *See 2022 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Notice of Proposed Rulemaking, FCC 25-64 ¶ 3 (2025).

5

These myriad rule violations are grounds enough for outright denial of the applications. But even if Applicants could overcome these legal obstacles, which they cannot, the Commission should still deny the applications because the public interest harms far outweigh the meager public interest benefits Applicants assert. The combined company would leverage its massive national scale, post-approval, to demand higher retransmission consent rates. Likewise, local duopolies and triopolies would provide the combined company an additional cudgel to insist on higher rates. The Commission has found that (1) joint negotiation of retransmission consent among top-rated stations gives broadcasters the incentive and ability to impose higher prices to the detriment of consumers; and (2) retransmission consent price increases that are not consistent with competitive marketplace conditions are public interest harms. Notwithstanding the Eighth Circuit's recent decision to vacate the Top-Four Prohibition, these public interest harms remain valid and weigh heavily against approval of the Transaction given that the combined company would own new Big Four station affiliate duopolies in 28 overlap markets and Big Four station affiliate *triopolies* in three more markets.

In contrast with these clear harms, the purported benefits of the Transaction ring hollow. Any claimed news-related benefits must be taken with a grain of salt in light of Nexstar's history of centralized "must-run" segments, duplication of content across stations, and prioritization of national stories at the expense of genuine local news. Indeed, Nexstar has cut more than 27 percent of its workforce since 2019 (the year it closed the Tribune transaction) and has established a pattern and practice of large-scale layoffs following consolidation. Its acquisition of Tegna will result in more of the same. Applicants have boasted to Wall Street about the nine-figure operational "synergies" they will achieve through consolidated national and local market

6

**App.333**

operations and layoffs, and, unsurprisingly, offer no details about how many facilities will be closed and how many jobs will be cut.

Applicants also boast of other public interest benefits that, upon closer inspection, will *raise* prices on local businesses and consumers. For example, Applicants claim that greater local market concentration will result in greater ad revenue. What that means, in practice, is that local businesses will have to pay more for spot television ads because they will no longer be able to choose between Nexstar and Tegna stations for more competitive rates. Likewise, claims that the Transaction will somehow accelerate the ATSC 3.0 transition and facilitate the rollout of new advanced services are belied by over a decade of failed efforts to deliver such services and paltry consumer interest in ATSC 3.0. Applicants also make no mention of the actual costs to consumers associated with the ATSC 3.0 transition, from having to buy new TV sets to paying more for broadcast services.

In sum, Applicants fail to demonstrate why the public interest benefits of the Transaction outweigh the significant harms. Accordingly, the Commission must deny the Transaction.

## II.    STANDARD OF REVIEW

Under Section 309 of the Communications Act, the Commission must consider "whether the public interest, convenience, and necessity will be served" by granting a broadcast license assignment application.[12] In making this assessment, the Commission must first determine whether the proposed transaction would comply with the specific provisions of the Act, other applicable statutes, and the Commission's rules.[13] If the proposed transaction violates a

---

[12] 47 U.S.C. § 309(a).

[13] *See, e.g.*, *Consent to Assign the License of WADL(TV), Mount Clements, Michigan, from Adell Broadcasting Corporation to Mission Broadcasting, Inc.*, Memorandum Opinion and Order, 39 FCC Rcd. 4014 ¶ 21 (MB 2024) ("*WADL Order*") (citing *SBC Commc'ns Inc. and AT&T Corp. Applications for Approval of Transfer of Control*, Memorandum Opinion and Order, 20 FCC Rcd. 18290 ¶ 16 (2005)).

7

**App.334**

Commission rule, the FCC must deny the transaction unless the applicant provides "good cause" to waive the rule (assuming such rule is waivable).[14]  However, the Commission will reject such waiver requests where the request (a) would "frustrate the underlying purpose of the rules at issue";[15] (b) fails to demonstrate "a sufficiently 'unique . . . situation'"[16] that is "significantly different" from "similarly situated" regulatees;[17] or (c) would "seek[] a permanent rule change, which is inappropriate in the form of a waiver request."[18]  Moreover, such waiver must be granted pursuant to a "relevant standard . . . that obviates discriminatory approaches."[19]

---

[14] *Nat'l Ass'n of Broads. v. FCC*, 569 F.3d 416, 426 (D.C. Cir. 2009) (explaining that "the Commission has authority under its rules, *see* 47 C.F.R. § 1.3, to waive requirements *not* mandated by statute" under certain circumstances); *Johnston Broad. Co. v. FCC*, 175 F.2d 351, 354-55 (D.C. Cir. 1949) (finding that where "Congress imposed [a] requirement and put no qualification in it . . . [t]he Commission has no authority to waive it.  Congress did not leave it to administrative discretion.").  Congress has further specified that the FCC's general waiver authority is subordinate to the Administrative Procedure Act and the requirement that the agency may not act contrary to or "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(C).

[15] *See, e.g.*, *DPA Mac LLC Application for Authority to Construct or Make Changes in an International or Experimental Broadcast Station*, Order, 40 FCC Rcd. 502 ¶ 42 (OIA 2025) ("*DPA Mac Order*") (denying requests for general waiver under Section 1.3).

[16] *NetworkIP, LLC v. FCC*, 548 F.3d 116, 127 (D.C. Cir. 2008) (quoting *Northeast Cellular Tel. Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir.1990)) ("As we explained in [*Northeast Cellular*], before the FCC can invoke its good cause exception, it *both* 'must explain why deviation better serves the public interest, *and* articulate the nature of the special circumstances to prevent discriminatory application and to put future parties on notice as to its operation,' [*Northeast Cellular*, 897 F.2d] at 1166.  The reason for this two-part test flows from the principle 'that an agency must adhere to its own rules and regulations,' and '*[a]d hoc* departures from those rules, even to achieve laudable aims, cannot be sanctioned, for therein lie the seeds of destruction of the orderliness and predictability which are the hallmarks of lawful administrative action.'" (citing *Reuters Ltd. v. FCC*, 781 F.2d 946, 950-51 (D.C. Cir. 1986))).

[17] *Benedek License Corp.*, Letter, 13 FCC Rcd. 18913 (MMB 1998) ("*Benedek Order*") (rejecting waiver request because broadcaster "ha[d] not demonstrated why its case is significantly different from the many other station combinations across the country that are similarly situated").

[18] *Hull Broadcasting, Inc.*, Order, 19 FCC Rcd. 16710 ¶ 3 & n.7 (EB 2004) ("*Hull Broadcasting Order*") (citing *Applications of Empire State Broadcasting Corporation (WWKB) Buffalo, New York For Renewal of License Bursam Communications Corporation (WTHE) For Construction Permit*, 4 FCC Rcd. 7008 ¶ 63 (1989)) ("[R]esolution of this broad policy dispute properly belongs in a rule making proceeding, not a waiver request."); *see also Tribune Co. v. FCC*, 133 F.3d 61, 69 (D.C. Cir. 1998) ("[I]t is hornbook administrative law that an agency need not—indeed should not—entertain a challenge to a regulation, adopted pursuant to notice and comment, in an adjudication or licensing proceeding.").

[19] *See WAIT Radio v. FCC*, 418 F.2d 1153, 1159 (D.C. Cir. 1969), *aff'd* 459 F.2d 1203 (D.C. Cir. 1972) ("The agency may not act out of unbridled discretion or whim in granting waivers any more than in any other aspect of its regulatory function.").

8

**App.335**

Even if the transaction would not violate a statute or rule, the Commission must consider whether it could result in public interest harms by substantially frustrating or impairing the objectives or implementation of the Act or related statutes.[20]  At this point, the Commission may deny a transaction, or, "[i]f a substantial and material question of fact is presented or if the Commission for any reason is unable to find that grant of the application would be consistent" with this public interest standard, Section 309(e) of the Communications Act requires that "it shall formally designate the application for hearing."[21]

For any transaction, the Commission must find "that the public interest, convenience, and necessity will be served thereby."[22]  Applicants bear the burden of proving, by a preponderance of the evidence, that a proposed transaction will serve the public interest.[23]  The claimed benefits must be: (1) transaction specific—i.e., arising from the transaction itself and cannot be achieved by other practical means that have fewer anti-competitive effects; (2) verifiable—both in likelihood and magnitude; and (3) beneficial for consumers, and not solely for the applicants' benefit.[24]  In a broadcast merger, the Commission places particular emphasis on "policies in favor of competition, diversity, and localism."[25]

---

[20] *Applications of Level 3 Communications Inc. and CenturyLink for Consent to Transfer Control of Licenses and Authorizations*, Memorandum Opinion and Order, 32 FCC Rcd. 9581, 9585 ¶ 9 (2017); *WADL Order* ¶ 21.

[21] 47 U.S.C. §§ 309(d)(2), (e).  If the Commission does not hold a hearing, the Communications Act requires the FCC to "issue a concise statement of the reasons for denying [a] petition" to deny that "dispose[s] of all substantial issues raised by the petition."  *Id.* § 309(d)(2).

[22] *Id.* § 310(d).

[23] *Applications of AT&T Inc. and DIRECTV for Consent to Assign or Transfer Control of Licenses and Authorizations*, Memorandum Opinion and Order, 30 FCC Rcd. 9131, 9139 ¶ 18 (2015).

[24] *Applications of Level 3 Communications Inc. and CenturyLink for Consent to Transfer Control of Licenses and Authorizations*, Memorandum Opinion and Order, 32 FCC Rcd. 9581, 9585 ¶ 8 (2017).

[25] *Applications for Consent to Transfer Control of License Subsidiaries of Media General, Inc., from Shareholders of Media General, Inc., to Nexstar Media Group, Inc.*, Memorandum Opinion and Order, 32 FCC Rcd. 183 ¶ 35 (MB 2017) ("*Nexstar/Media General Order*").

9

### III.    THE TRANSACTION WOULD VIOLATE THE NATIONAL CAP, WHICH THE COMMISSION HAS NO AUTHORITY TO WAIVE

As the FCC found last year in the *WPIX NAL*, Nexstar's national audience reach already well exceeds the statutory 39 percent National Cap—an apparently willful statutory violation exposing Nexstar to divestitures and $1.2 million in potential liability.[26]  To state the obvious, the acquisition of any station in one of the 18 Tegna-only markets would put Nexstar in further violation of the Cap.  Rather than proposing divestiture of stations in these 18 markets, as required by Congress, Applicants request that the Commission waive the Cap, in direct violation of the statute, so that the combined company can extend its reach to 80 percent of U.S. Television households (without the UHF discount) and 54.5 percent (with the discount).[27]  Stated simply, the Commission has no authority to waive or adjust the statutory Cap,[28] making the Transaction a dead letter.

---

[26] *See Mission Broadcasting, Inc., Licensee of Station WPIX, New York, NY*, Notice of Apparent Liability for Forfeiture, 39 FCC Rcd. 3676 ¶¶ 54, 85, 87 (2024) ("*WPIX NAL*") ("Prior to acquiring an attributable interest in WPIX, Nielsen reported that Nexstar had an aggregate national audience reach of approximately 39.0%. . . .  With WPIX added, then, Nexstar's national reach apparently exceeded 45%, well in excess of the 39% limit set by the National Ownership Cap.").

[27] *See* Nexstar/Tegna Comprehensive Exhibit at 4, 114-16.  For the purpose of determining compliance with the National Cap, the Commission attributes television stations operating on UHF channels (14 and above) with only half (50 percent) of the number of TV households in the DMA, as opposed to 100 percent of the number of households for stations operating on VHF channels (13 and below).  The Commission established this "UHF discount" in 1985 to account for the "inherent physical limitations" of the UHF television band, as compared to the VHF band, in an analog environment.  *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Report and Order, 31 FCC Rcd. 10213 ¶ 5 (2016) ("*2016 UHF Discount Order*").  The transition to digital service flipped the script, as the UHF band had more favorable characteristics in that environment than the VHF band.  *See id.* ¶¶ 4-15 (recounting history of discount).  As a result, "some station owners have therefore opted to migrate their signals from VHF to UHF," and get the added benefit of the UHF discount in the process.  *Id.* ¶ 14.  Nexstar, for example, has used such station migrations in combination with aggressive station acquisitions to increase its national audience reach to 70 percent.  *See* Nexstar Media Group, Investor Presentation – June 2025 at 3, 7 (June 11, 2025), https://www.nexstar.tv/wp-content/uploads/2025/06/Nexstar-Investor-Deck-2025-6.10.25.pdf ("Nexstar June 2025 Investor Presentation").

[28] *See* Reply Comments of Broadband Communications Association of Pennsylvania, Broadband Communications Association of Washington, Colorado Cable Telecommunications Association, Florida Internet and Television Association, Indiana Cable and Broadband Association, Louisiana Internet & Television – The Broadband Association, Michigan Cable Telecommunications Association, Minnesota Cable Communications Association, New England Connectivity and Telecommunications Association, and VCTA – Broadband Association of Virginia, MB Docket No. 17-318, at 2-5, 7-19 (filed Aug. 22, 2025) ("State Cable Associations National Cap Reply Comments"); Kannon Shanmugam & William Marks, *The FCC Lacks Statutory Authority to Revise the*

10

A.      **The Commission Lacks Authority to Modify or Waive the Statutory 39 Percent Cap**

Approval of the Transaction turns on whether the Commission has authority to modify or waive "the 39 percent national audience reach limitation for television stations" codified in Section 629 of the 2004 Consolidated Appropriations Act of 2004 ("CAA").[29] As the statutory text, legislative history, and basic principles of administrative law all indicate, the answer is no.

Beginning in the 1940s, the Commission sought to carry out Congress's directive to promote localism, diversity, and competition in broadcasting by restricting the number of stations that any one person may own nationwide.[30] By the 1980s, the question of whether to also limit any one station group owner's national audience reach became a central focus for both Congress and the Commission. In 1985, amidst dueling proposals by the Senate and House to limit one owner's national audience reach to 22.5 percent and 25 percent, respectively, the Commission exercised its general rulemaking and licensing authority to set the Cap at 25 percent.[31] The Commission at that time explained that a 25 percent Cap was a "reasonable" and

---

*Telecommunications Act's 39% National Ownership Cap for Television* (2025), available at https://americantelevisionalliance.org/wp-content/uploads/2025/12/NationalOwnershipCapWhitePaper_12-15-25.pdf ("Shanmugam-Marks White Paper").

[29] Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 ("2004 CAA").

[30] *See Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule,* Notice of Proposed Rulemaking, 32 FCC Rcd. 10785 ¶ 2 (2017) ("*National Cap NPRM*").

[31] *See Amendment of Section 73.3555 of the Commission's Rules Relating to the Multiple Ownership of AM, FM, and Television Broadcast Stations*, Memorandum Opinion and Order, 100 F.C.C.2d 74 ¶¶ 39-40, 63, n.45 (1985) ("Authority for the actions taken herein is contained in Sections 4(i) and (j), 301, 303, 308, 309 and 405 of the Communications Act of 1934, as amended.").

11

**App.338**

"administra[ble]" limit that would "temper" the growth of the largest station group owners while giving smaller group owners "a greater opportunity to expand."[32]

Although the Commission's 1985 action prompted Congress to temporarily stay its hand, Congress re-asserted its authority in remarkably specific terms in the Telecommunications Act of 1996 ("1996 Act"). In particular, Section 202(c)(1) of the 1996 Act opted to eliminate the Commission's numerical restrictions on the number of stations any one person may own nationally, instead prioritizing the national audience reach limit as a key mechanism to promote localism, diversity, and competition.[33] To that end, Congress mandated that the Commission increase the National Cap from 25 to 35 percent of U.S. television households.[34]

While setting a specific limit in the 1996 Act, Congress also established, for the first time, a regularized process for the Commission to consider further adjustments to the National Cap and other broadcast ownership rules in subsequent Commission proceedings. It displaced the Commission's general rulemaking authority—which the Commission had relied upon before the 1996 Act to set and revise the National Cap—in favor of requiring the Commission to undertake a "Biennial Review" of the broadcast ownership rules to "determine whether any of such rules are necessary in the public interest as a result of competition" and "repeal or modify any regulation it determines to be no longer in the public interest."[35] Underscoring its intent for

---

[32] *See id.* ¶ 40.

[33] *See* Telecommunications Act of 1996, Pub. L. No. 104-04, § 202(c)(1)(a), 110 Stat. 56, 111 ("1996 Act").

[34] *See id.* § 202(c)(1)(b).

[35] *Id.* § 202(h); *see Bridging the Digital Divide for Low-Income Consumers; Lifeline and Link Up Reform and Modernization; Telecommunications Carriers Eligible for Universal Service Support*, Fifth Report and Order, Memorandum Opinion and Order and Order on Reconsideration, and Further Notice of Proposed Rulemaking, 34 FCC Rcd. 10886 ¶ 50 (2019) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) for the proposition that "the specific governs the general"); *see also Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996) ("This Court has understood the present canon ('the specific governs the general') as a warning against applying a general provision when doing so would undermine limitations created by a more specific provision.").

12

**App.339**

the Biennial Review process to serve as the *sole* regulatory vehicle for changing the ownership rules, Congress also directed the FCC to "conclude [separate, then-existing broadcast deregulatory proceedings] in a timely manner."[36]

In the inaugural 1998 Biennial Review Order, the Commission rebuffed calls to adjust the 35 percent National Cap set by Congress just two years prior, noting "that it was *required* to defer to the decision of the Congress to set the initial ownership cap in the 1996 Act at 35%."[37] However, in the subsequent 2002 Biennial Review, the Commission elected to revise the Cap upwards by nearly a third to 45 percent while rejecting broadcasters' proposal to eliminate it altogether.[38]  This FCC decision prompted Congress to make a full course correction.  In the 2004 CAA, Congress directed the Commission to "modify" the National Cap back down to 39 percent.[39]  And to make its intent to set a hard cap crystal clear, Congress specified that "[t]h[e] subsection" prescribing periodic reviews of broadcast ownership rules (which it also switched from biennial to quadrennial) "does not apply to any rules relating to the 39 percent national audience reach limitation."[40]  In other words, Congress narrowed the scope of the now-Quadrennial Review process to strip the Commission of discretion to consider further changes to

---

[36] S. Rep. No. 104-230, at 164 (1996) (Conf. Rep.) ("1996 Act Conference Report").

[37] *See Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1042-43 (D.C. Cir. 2002) (emphasis added); *see also 1998 Biennial Review Order – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Biennial Review Order, 15 FCC Rcd. 11058, 19949 ¶¶ 25-30 (2000).

[38] *See 2002 Biennial Review Order – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Biennial Review Order, 18 FCC Rcd. 13620 ¶¶ 578-80 (2003).

[39] 47 U.S.C. § 303 note (as amended).

[40] 2004 CAA § 629(3).

13

the 39 percent cap—in stark contrast to other broadcast ownership rules that still are subject to that process and thus still eligible for change or elimination.[41]

In so doing, Congress underscored that the Commission should not attempt to tinker with that number, either through subsequent rulemaking (which would flout multiple specific statutory references to a "39 percent national audience reach limitation") or through exercise of the FCC's waiver authority (which would contravene the basic rule that the Commission cannot waive requirements "mandated by statute").[42]  Indeed, Congress went so far as amending the 1996 Act to prevent the Commission from using its Section 10 forbearance authority to waive application of "the 39 percent national audience reach limitation"[43]—an especially deliberate step that would make no sense if the Commission retained the ability to alter the 39 percent threshold some other way.[44]  In short, Congress could not be more clear that 39 percent means 39 percent.

---

[41] *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 420, n.1 (2021) ("The FCC has one additional [broadcast] ownership rule, the National Television Ownership Rule, which is not subject to review under Section 202(h)."); *cf. Zimmer Radio of Mid-Missouri, Inc. v. FCC*, 145 F.4th 828, 843, n.5 (8th Cir. 2025) ("The only three rules that remain subject to Section 202(h) review are the Local Television Ownership Rule, the Local Radio Ownership Rule, and the Dual Network Rule.").

[42] *Nat'l Ass'n of Broads.*, 569 F.3d at 426 (explaining that "the Commission has authority under its rules, see 47 C.F.R. § 1.3, to waive requirements *not* mandated by statute" under certain circumstances) (emphasis added).

[43] *See* 2004 CAA § 629(2) (amending "section 202(c) by adding the following new paragraph[] at the end: (4) FORBEARANCE.—Section 10 of the Communications Act of 1934 (47 U.S.C. 160) shall not apply to any person or entity that exceeds the 39 percent national audience reach limitation for television stations in paragraph (1)(B)").

[44] As a matter of statutory construction, the Supreme Court has long instructed that "statutes should be read to avoid superfluity."  *Marx v. General Revenue Corp.*, 568 U.S. 371, 392 (2013) (Sotomayor, J., dissenting); *see also TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (internal quotations omitted).  Hence, even if the forbearance language has no practical effect in the broadcast context, it must nonetheless be read to provide some insight into Congress's statutory purpose.  Here, and consistent with Congress's decision to remove the National Cap from the Quadrennial Review process, the provision plainly signals Congress's intent that the Commission would have no role in setting the Cap going forward.  Indeed, as discussed further below, the most rational reading of the prohibition against exercise of forbearance authority is that Congress understood the Commission's Section 10 forbearance authority to be the only mechanism built into the Communications Act by which the Commission could effectively waive application of a *statutory* requirement, and Congress made sure to expressly block that source of authority with respect to the National Cap.

14

Moreover, Congress codified a two-year divestment period during which "[a] person or entity that exceeds the 39 percent national audience reach limitation for television stations . . . through grant, transfer, or assignment of an additional license for a commercial television broadcast station" can "come into compliance with such limitation," even as it exempted from the Cap "persons or entities that exceed the 39 percent national audience reach limitation through population growth."[45]  The only logical explanation for Congress's inclusion of the two-year divestiture provision is that Congress intended the 39 percent Cap to be permanent and not subject to periodic adjustment by the Commission.[46]

The legislative history accompanying the 2004 CAA further confirms that Congress intended its 39 percent Cap to be authoritative.  In floor debates in both the Senate and the House, multiple members of Congress referred to the 39 percent Cap as "permanent."[47]  Then-Chairman of the House Energy and Commerce Committee and original co-sponsor of the 1996 Act, Rep. Billy Tauzin (R-LA), was even clearer on this point, stating that "*this bill will forbid the FCC from raising or lowering the 39 percent limit.*"[48]

---

[45] *See* 2004 CAA § 629(2).

[46] *See* Letter from Brian Fitzpatrick, Milton R. Underwood Chair in Free Enterprise and Professor of Law, Vanderbilt Law School, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 2-3 (filed Nov. 3, 2025) ("Fitzpatrick Letter") ("[I]t is hard to see how the Commission could raise Congress's 39% cap without running afoul of Congress's 2004 provision requiring any entity to divest when they exceed 39%:  this provision clearly applies to future growth, not just to those entities that were too big on the date the 2004 amendments came into law."); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must . . . interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into an harmonious whole.'" (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995); *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959))); *id.* ("[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand.").

[47] *See* 149 Cong. Rec. S16087-88 (2003) (statement of Sen. Robert Byrd) ("The 1-year limitation on the FCC media ownership rule was turned into a *permanent cap at 39 percent*.") (emphasis added); 150 Cong. Rec. S141 (2004) (statement of Sen. Patrick Leahy) ("[T]he White House successfully lobbied for last-minute increase of a *permanent cap at 39 percent*.") (emphasis added).

[48] 149 Cong. Rec. H12766 (2003) (Statement of Rep. Billy Tauzin) (emphasis added).

15

Former FCC Commissioner Michael O'Rielly, who was directly involved in negotiating the National Cap provisions in the 2004 CAA as a Congressional staffer, has underscored this conclusion.  In a statement accompanying the 2017 NPRM asking whether the Commission can or should change the Cap, Commissioner O'Rielly said:  "The language in the law cannot be clearer:  it statutorily sets the national ownership limit and correspondingly removes it from the quadrennial review under section 202(h) of the Telecommunications Act."[49]  Likewise, in a dissent to the Commission's 2016 order that briefly eliminated the UHF discount, Commissioner O'Rielly stated:  "The result [of negotiations] was a national ownership cap that remains one of the few media ownership rules specifically set by statute and the only one exempted from the Quadrennial Review process governing the other ownership rules, in order to protect a tenuous compromise from the whims of the Commission."[50]

---

[49] *National Cap NPRM* (Statement of Commissioner Michael O'Rielly).

[50] *2016 UHF Discount Order* (Dissenting Statement of Commissioner Michael O'Rielly) ("The pertinent language ultimately included in the 2004 Consolidated Appropriations Act . . . was heavily negotiated and painstakingly crafted in order to settle a recurring and particularly contentious media ownership issue.  I know since I was there at the time and helped reach the agreement. . . .  Since enactment, many parties have advocated changes in different elements of this compromise for a wide variety of reasons, including those cited here.  But the only acceptable venue for these arguments is Congress.").

Advocates are grasping at straws when they argue that the 2004 CAA did not serve to permanently codify the 39 percent Cap.  For example, a recent letter from former FCC general counsel Thomas Johnson attempts to infer special meaning from the fact that "Congress considered—and rejected—a version of the statute" that would have enacted a new subchapter devoted to addressing the National Cap.  *See* Letter from Thomas M. Johnson Jr., Partner, Wiley Rein LLP, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, 4-5 (filed Dec. 15, 2025) ("Johnson Ex Parte").  But as the Supreme Court has explained, "[t]he private intent behind a drafter's rejection of one version of a text is shoddy evidence of the public meaning of an altogether different text."  *Gamble v. United States*, 587 U.S. 678, 684 (2019); *see also United States v. Craft*, 535 U.S. 274, 287 (2002) ("[F]ailed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute") (internal quotations omitted).  Furthermore, the Supreme Court has repeatedly found that "[c]ongressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction."  *Id.* (citing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994)).  In the instant case, neither the House nor Senate bill in question received a floor vote.  And in all events, the *enacted* text of the 2004 CAA provides direct and clear evidence that Congress intended to establish a 39 percent Cap that could only be altered by Congress itself.

16

### B.    Applicants' Contrary Arguments Do Not Withstand Scrutiny

In light of the above, the Commission must reject Applicants' argument that, while the Commission no longer has the authority to adjust the Cap via the Quadrennial Review process, it still has authority to make changes pursuant to its general powers under other provisions of the Act.[51]  Applicants are wrong to suggest that the Commission can simply waive or ignore the Cap to approve a transaction that brazenly defies statutory limitations.[52]  Congress passed—and the President signed—a law expressly referring to "the 39 percent national audience reach limitation" not once, but four separate times.[53]  The 2004 CAA overrode the Commission's prior effort to impose a different numerical threshold, repeatedly enshrined "the 39 percent national audience reach limitation" in the statutory text, and took the additional step of insulating the National Cap from the Commission's periodic reviews of its broadcast ownership rules.[54]

---

[51] *See* Nexstar/Tegna Comprehensive Exhibit at 114-15 (citing the FCC's general waiver standard under 47 C.F.R § 1.3).

[52] *See id.*; *see also* Fitzpatrick Letter at 3 ("Although the Commission may be able to give itself permission to waive regulations that it is under no obligation to promulgate in the first place, it cannot give itself permission to waive regulations that Congress requires it to maintain.").

[53] *See id.* ("Agencies are subordinate to Congress, not the other way around."); Shanmugam-Marks White Paper at 1-2 ("The revised Telecommunications Act also expressly refers to 'the 39 percent national audience reach limitation' no less than four times.  Each textual signal points in the same direction—and together, overwhelmingly so:  Congress intentionally set the cap at 39% and made clear the FCC has no authority to alter that cap.").

[54] In the nearly three decades since the 1996 Act and more than two decades since the 2004 CAA, the only substantive revisions to the Commission's structural television and radio broadcast ownership rules in 47 C.F.R. § 73.3555 were adopted either in the context of a Biennial or Quadrennial Review proceeding, or stemmed from one of the proceedings that preexisted the 1996 Act that Congress instructed the FCC to "timely" conclude.  *See* 1996 Act Conference Report at 164.  Any other modifications to Section 73.3555 have been ministerial in nature.  *See, e.g.*, *Amendment of Part 73 of the Commission's Rules to Update Television and Class A Television Broadcast Station Rule and Rule Applicable to All Broadcast Stations*, Report and Order, 38 FCC Rcd. 8706 (2023) (updating, among other code provisions, the service contour requirements in the local television ownership rule to revise provisions "for full power and Class A television stations that no longer have any practical effect given the transition from analog to digital-only operations"); *Streamlined Reauthorization Procedures for Assigned or Transferred Television Satellite Stations*, Report and Order, 34 FCC Rcd. 1539 (2019) (updating reauthorization rules for satellite television stations, including Note 5 of Section 73.3555, which since 1985 has exempted satellite stations from the structural ownership rules).  The Commission also considers changes to its attribution standards to be separate from its structural broadcast ownership rules.  *See 1998 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Notice of Inquiry, 13 FCC Rcd. 11276 ¶ 10 (1998) ("Nor do we seek comment on our attribution standards.  Our attribution rules define what the Commission will consider a cognizable interest for purposes of its ownership rules.  They do not of themselves establish limits on ownership or restrict

**App.344**

Even under now-repealed principles of *Chevron* deference, that would be the end of the story, as Congress set an unambiguous numerical limit in statute. But the Supreme Court's *Loper Bright*[55] decision has since eliminated any remaining doubt: The best reading of the 2004 CAA's text is that Congress laid down a clear statutory directive impervious to agency second-guessing. No principle of law or logic suggests that the Commission retains some residual well of authority allowing it to do at a moment's notice what Congress said it could not do periodically, or at all in this case. Far from "empower[ing] an agency to prescribe rules to 'fill up the details' of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable,'"[56] the 2004 CAA effectively did the opposite, *taking away* power that Congress had previously granted to modify the National Cap and repeatedly referring to "the 39 percent national audience reach limitation" in the statutory text.[57] Understanding that enactment to have no effect on the Commission's authority to adjust the Cap by other means "would effectively create one of the biggest backdoors in the history of legislating."[58]

---

cross-ownership combinations. Accordingly, we do not consider them to be broadcast ownership rules subject to biennial review.").

[55] *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 395 (2024).

[56] *Id.* at 395 (internal citations omitted).

[57] Nor would *Skidmore* support a contrary conclusion. *See Skidmore v. Swift & Co*, 323 U.S. 134, 140 (1944) (permitting courts to give "weight" to an agency's judgment based "upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control"); Shanmugam-Marks White Paper at 13-14 ("Applying *Skidmore*, a federal court would be skeptical of an assertion of FCC authority to alter the 39% cap, because of the agency's inconsistency on that issue" over the years).

[58] *National Cap NPRM* (Statement of Commissioner Michael O'Rielly); Comments of Sinclair Broadcasting Group, MB Docket No. 13-236, at 6 (filed Dec. 16, 2013) ("It simply makes no sense for Congress to go to such great lengths to set a specific 39 percent limit, forbid the FCC to make any changes to any rules relating to that limit and remove the FCC's authority to review that rule as part of its periodic ownership review, but allow the FCC to change the 39% Cap and related rules in any other proceeding the FCC initiates. Such a strained interpretation of the CAA, which creates a gaping loophole in the CAA, is not a rational interpretation of the statute."); *see also Rumsfeld v. FAIR*, 547 U.S. 47, 57-58 (2006) ("We refuse to interpret" a statute "in a way that negates its recent revision, and indeed would render it a largely meaningless exercise."); *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 218 (2024) (explaining that a reviewing court should "afford a statute the scope a reasonable reader would attribute to

18

**App.345**

Even under the *Chevron* regime, when "statutory ambiguities" constituted "implicit delegations to agencies,"[59] a guiding principle was that "[i]t is hard to imagine a statutory term less ambiguous than . . . precise numerical thresholds."[60]  Especially now that Congress must expressly "delegate[] discretionary authority to an agency,"[61] any attempt by the Commission "to substitute a dramatically higher number"—or no number at all—for a "particular number used by the statute" is a non-starter.[62]  Even accepting that "the power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration," the best reading of the statutory text, structure, and history is that a 39 percent limit is mandatory—not that the Commission has *carte blanche* to waive that limit or "to revise clear statutory terms that turn out not to work in practice."[63]

The Commission's general authority to promulgate "necessary" broadcast licensing rules "not inconsistent with law" does not change this result—let alone support waiving the 39 percent

---

it," while declining to interpret a statute in such a way as "to endow [a delegated authority] with [a] radically different power") (internal quotations omitted).

[59] *Loper Bright*, 603 U.S. at 399 (discussing *Chevron, U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984)).

[60] *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 326 (2014).

[61] *Loper Bright*, 603 U.S. at 395.

[62] *Util. Air Regul. Grp.*, 573 U.S. at 328, n.8.

[63] *Id.* at 327; *see generally* Fitzpatrick Letter ("The best reading [of the statute] is clear.  In 1996, Congress said the Commission's cap is *too low*, it should be *increased*, and the Commission should periodically consider whether it should be *even higher*.  In 2004, Congress flipped:  it said the Commission's cap is *too high*, it should be *lower*, and the Commission should *not* periodically consider whether it should be higher.  We are still living under the 2004 regime.  As such, the Commission is foreclosed from considering whether Congress's 39% cap should be higher.") (emphasis in original).  Broadcast advocates assert that the FCC has the authority to adjust the UHF discount and that Congress's decision not to address the discount in the 2004 CAA is dispositive of its intent to retain similar authority for the FCC to adjust the Cap.  *See* Johnson Ex Parte at 6.  That misreads the statute.  The UHF discount and the Cap serve two different purposes; the discount concerns how the Cap is calculated, while the Cap sets the actual ownership limit.  *See* State Cable Associations National Cap Reply Comments at 15, n.54 (explaining that the UHF discount is analogous to the FCC's attribution rules in that it "relates to how UHF stations are counted for purposes of the Cap (i.e., at 50 percent of VHF stations), but not the level of the overall Cap itself").  Congress spoke directly to the Cap in the 2004 CAA but made no specific reference to the discount.  Even to the extent Congress intended *sub silentio* to leave the FCC's authority over the discount undisturbed, that silence cannot be read as overriding Congress's clear instructions on the Cap, particularly given the different functions of the Cap and discount.  Rather, the FCC must follow what Congress actually said in the statute, not what advocates wish it might have said.

19

**App.346**

Cap here.[64]  For one, substituting a dramatically higher number—or eliminating the Cap entirely—*would be* "inconsistent" with the 2004 CAA.[65]  For another, "the grant of authority to promulgate 'necessary' regulations cannot expand the scope of the provisions the agency is tasked with 'carry[ing] out.'"[66]  Indeed, given the "economic and political significance" of national broadcast ownership limits, the Commission must identify not just "a merely plausible textual basis," but rather "clear congressional authorization" to modify the 39 percent Cap.[67]  Generalized provisions that say nothing at all about broadcast ownership fall well short of that mark.  It was one thing for the Commission to rely on Section 303 and other general grants of authority when it first adopted a National Cap; it would be quite another to rely on them after Congress specifically enshrined "the 39 percent national audience reach limitation" in the statutory text and affirmatively insulated its preferred numerical threshold from FCC review.[68]

---

[64] *See* 47 U.S.C. § 303(r) (empowering the FCC to "[m]ake such rules and regulations and prescribe such restrictions and conditions, *not inconsistent with law*, as may be necessary to carry out the provisions of this chapter") (emphasis added); *see also id.* § 154(i) ("The Commission may perform any and all acts, make such rules and regulations, and issue such orders, *not inconsistent with this chapter*, as may be necessary in the execution of its functions.") (emphasis added).

[65] *See* Fitzpatrick Letter at 3 ("[T]he 1934 Act itself says the Commission's authority can only be exercised in a way that is 'not inconsistent with law.'  Is the Telecommunications Act of 1996, as amended in 2004, not a 'law'?  Of course it is.").

[66] *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 465 (5th Cir. 2020) (alteration original).

[67] *West Virginia v. EPA*, 597 U.S. 697, 721, 723 (2022).

[68] *See generally* 2004 CAA § 629.  Broadcast advocates' arguments that "Congress 'knew exactly' how to remove the FCC's discretion over the national cap if it so intended," Johnson Ex Parte at 5, ignore the plain language of the statute itself, which removed the National Cap from the Quadrennial Review process and forbade the FCC from exercising its forbearance authority to waive application of the Cap.  The fact that Congress chose to use certain language in removing the FCC's discretion in the Radio Broadcast Preservation Act, *see id.*, does not mean that the language it used in a completely different statute to remove the FCC's discretion with respect to the Cap is any less effective.  In fact, the better points of comparison are the radio and television ownership provisions in the 1996 Act itself.  As the Shanmugam-Marks White Paper shows, when setting caps on local market radio ownership in the 1996 Act, Congress granted the FCC express authority to modify those caps in the future if certain conditions were met.  Conversely, in the National Cap provisions of the same Act (as amended by the 2004 CAA), Congress did not include a similar grant of authority, but rather, as noted, expressly eliminated the FCC's authority to adjust the Cap. *See* Shanmugam-Marks White Paper at 8-9 ("Further support for [the conclusion that Congress intended the Cap to be permanent] can be drawn from the Telecommunications Act's provisions concerning local radio diversity.  Those sections provide that the FCC 'shall revise' its regulations to cap the number of radio stations an entity may own, operate, or control in a particular radio market.  Notably, the local-radio-diversity provision also allows the FCC to permit a person or entity to own, operate, or control radio stations beyond the statutorily imposed cap 'if the

20

More to the point, as mentioned above, the Commission may not waive any rule "mandated by statute,"[69] unless the statute itself authorizes an exception, waiver, or similar relief.[70]  Congress knows how to provide the FCC with such exceptions.  For example, Section 310(b)(4) of the Communications Act prohibits foreign ownership of more than 25 percent in a U.S.-organized entity that directly or indirectly controls certain licensees (including broadcast licensees), expressly subject to the Commission's determination of public interest harm from any greater level of foreign ownership.[71]  There, Congress imposed a numerical cap applicable to broadcast licensees but expressly authorized the Commission to waive application of such limitation where it would serve the public interest.  Conversely, here, Congress enacted no similar waiver mechanism.

---

Commission determines' that it 'will result in an increase in the number of radio broadcast stations in operation.' Yet again, however, Congress omitted any such discretion-conferring language from the national-ownership provision.  The contrast between those provisions reinforces the conclusion that Congress intended for the 39% cap to be fixed absent further congressional action.").

[69] *Nat'l Ass'n of Broads.*, 569 F.3d at 426 (explaining that "the Commission has authority under its rules, *see* 47 C.F.R. § 1.3, to waive requirements *not* mandated by statute" under certain circumstances) (emphasis added).

[70] *See Johnston Broad. Co.*, 175 F.2d at 354-55 (Where "Congress imposed [a] requirement and put no qualification in it . . . [t]he Commission has no authority to waive it.  Congress did not leave it to administrative discretion."); *see also Rural Health Care Support Mechanism*, Order, 22 FCC Rcd. 20360 ¶ 106 (2007) ("As an initial matter, we note that although the Commission has authority to waive regulatory requirements, it does not have authority to waive a requirement imposed by statute.  *Although Rural Nebraska Healthcare Network couches its request as one of waiver of our rules, it is actually requesting a waiver of the statute*.  The implementation of rule 54.617 (a) flowed directly from the plain meaning of the statute.  Thus, regardless of whether we were to waive our rule, the statutory prohibition on resale would still remain.  We conclude, because rule 54.617(a) is based on a statute, it cannot be waived.") (emphasis added); Shanmugam-Marks White Paper at 11 n.73 (Given the directive in the Administrative Procedure Act that an agency may not act contrary to or in excess of statutory jurisdiction, authority, or limitations, the FCC is barred from using its waiver authority as "an end run to Congress's statutory commands in the 2004 amendments, including the prohibition on FCC forbearance from the 39% cap."); Fitzpatrick Letter at 3 ("The Commission cannot 'waive' . . . statutory commands.  Agencies are subordinate to Congress, not the other way around.").

[71] 47 U.S.C. § 310(b)(4).  Similar express statutory waiver provisions can be found in the Communications Act. *See, e.g.*, *id.* § 312(g) (automatically terminating a broadcast license that is silent for 12 consecutive months, but authorizing the Commission to "extend or reinstate" the license under limited circumstances, including to "promote equity or fairness"); *id.* § 337(c) (reserving certain spectrum bands for public safety purposes, but expressly authorizing the Commission to "waive" such requirements upon specific showing).

21

**App.348**

But even assuming *arguendo* that the Commission had the authority to grant such a waiver under the Commission's general waiver standard,[72] it could not exercise such authority here. Longstanding precedent dictates that a waiver is only appropriate when strict compliance would be inconsistent with the public interest and grant of a waiver would not undermine the policy served by the rule.[73] Conversely, where grant of a waiver would "frustrate the underlying purpose of the rules at issue," the waiver will be rejected.[74] For all the reasons detailed in Section VII herein, waiver of the National Cap would unquestionably undermine the public interest while frustrating Congress's mandate that the FCC establish and not modify a 39 percent National Cap.

Likewise, a waiver request must demonstrate "a sufficiently 'unique . . . situation'"[75] that is "significantly different" from "similarly situated" regulatees.[76] In this regard, Applicants "do[] not identify any unique circumstances" that might justify waiver.[77] In fact, their threadbare "justification" for the waiver makes no attempt to differentiate their situation from other station groups that would still be subject to the Cap;[78] rather, they argue that the Cap is outdated and does not reflect current marketplace realities, which (putting aside the merits) are arguments for

---

[72] 47 C.F.R. § 1.3.

[73] *See WAIT Radio*, 418 F.2d at 1159; *Application of Maurice Rosenfield, Lois F. Rosenfield, Harold A. Weiss, Robert G. Weiss, and Devoe, Shadur, Plotkin, Krupp & Miller, A Copartnership, D.B.A. WAIT RADIO, Chicago, Ill.*, 22 F.C.C.2d 934 ¶ 9 (1970) ("*WAIT Radio Order*") (denying a request for waiver after appeal, noting "An applicant for waiver faces a high hurdle even at the starting gate. 'When an applicant seeks a waiver of a rule, it must plead with particularity the facts and circumstances which warrant such action.' . . . The applicant simply has not presented facts which warrant a waiver[.]") (quoting *WAIT Radio*).

[74] *See, e.g.*, *DPA Mac Order* ¶ 42 (denying requests for general waiver under Section 1.3).

[75] *NetworkIP, LLC*, 548 F.3d at 127 (citing *Northeast Cellular,* 897 F.2d at 1166).

[76] *Benedek License Corp.*, Letter, 13 FCC Rcd. 18913 (MMB 1998) (rejecting waiver request because broadcaster "ha[d] not demonstrated why its case is significantly different from the many other station combinations across the country that are similarly situated").

[77] *Hull Broadcasting Order* ¶ 3 ("In fact, Hull's argument regarding efficiency might be invoked by many other stations that are co-located but not co-owned.").

[78] *See* Nexstar/Tegna Comprehensive Exhibit at 114-16.

eliminating the Cap entirely, not waiving it.[79]  As the Commission has explained when rejecting similar waiver requests, "seeking a permanent rule change . . . is inappropriate in the form of a waiver request."[80]  The Commission must find the same here.

In essence, Applicants want the Commission to craft a waiver *ad hoc* for their unique benefit.[81]  Doing so would violate longstanding precedent against such "discriminatory approaches":

> Sound administrative procedure contemplates waivers, or exceptions granted *only pursuant to a relevant standard—expressed at least in decisions accompanied by published opinions, especially during a period when an approach is in formation, but best expressed in a rule that obviates discriminatory approaches.  The agency may not act out of unbridled discretion or whim in granting waivers* any more than in any other aspect of its regulatory function.[82]

It is undisputed that the Commission has established no such standard to waive the National Cap. So even if Congress left the Commission any authority to do so—which it did not—an *ad hoc* transaction approval would not be the place to start.[83]

For all these reasons, the Commission cannot and may not grant Applicants' requested waiver of the Cap.  Moreover, the Media Bureau may not grant this waiver request on delegated

---

[79] *See id.* at 114-15.

[80] *Hull Broadcasting Order* ¶ 3 & n.7 ("[R]esolution of this broad policy dispute properly belongs in a rule making proceeding, not a waiver request."); *see also Benedek Order* ("To grant Benedek the relief it requests could invite similar requests from other stations which could *fundamentally change the scope of the rule through a piecemeal process.  Benedek's arguments, rather than raising special circumstances, relate to the appropriate scope of the rule in general.  As such, they are more appropriately addressed in the context of the pending rule making concerning the rule.*") (emphases added); *see also Tribune Co.*, 133 F.3d at 69 ("[I]t is hornbook administrative law that an agency need not—indeed should not—entertain a challenge to a regulation, adopted pursuant to notice and comment, in an adjudication or licensing proceeding.").

[81] *See* Nexstar/Tegna Comprehensive Exhibit at 114-16.

[82] *WAIT Radio*, 418 F.2d at 1159 (emphasis added); *Nat'l Ass'n of Broads.*, 569 F.3d at 426.

[83] *See NetworkIP, LLC*, 548 F.3d at 127 (citing *Reuters Ltd.*, 781 F.2d at 950-51 (D.C. Cir. 1986)) ("[A]n agency must adhere to its own rules and regulations," and "*[a]d hoc* departures from those rules, even to achieve laudable aims, cannot be sanctioned, for therein lie the seeds of destruction of the orderliness and predictability which are the hallmarks of lawful administrative action.").  Even assuming *arguendo* that the Commission could waive the statutory National Cap, the appropriate forum to consider the issue in a non-discriminatory way would be in the pending proceeding examining the National Cap in MB Docket No. 17-318.

23

**App.350**

authority.  The Media Bureau is barred from addressing "novel" questions of law or policy under its delegated authority.[84]  Such a "novel" question exists when there is an "issue[] of first impression,"[85] or where "[t]he legal and factual questions to be resolved . . . are [not] well-established" and are not "routine [or] well-adjudicated."[86]  That would plainly be the case here given that the Commission has never expressly held that the Cap may be waived, nor has it issued any guidance for the Bureau to follow in adjudicating waiver requests.

### C.     The 2004 CAA Establishes and Subsequent FCC Precedent Confirms That Divestiture Is the Exclusive Remedy for National Cap Violations

As noted, Congress in the 2004 CAA established "divestiture" as the exclusive remedy for violations of the Cap that occur "through grant, transfer, or assignment of an additional license for a commercial television broadcast station."[87]  To date, the Commission has never deviated from that statutory directive.  For example, when Nexstar sought approval to acquire Tribune in 2019, the Commission affirmed Nexstar's compliance with the 39 percent Cap only after it divested stations in three markets—WPIX in New York, NY; WSFL-TV in Miami, FL; and KASW in Phoenix, AZ.[88]  Likewise, when Scripps purchased Ion, Scripps divested 23 stations in 21 markets to ensure it would comply with the 39 percent Cap post-closing.[89]  And when Nexstar sought approval for its purchase of Media General, it "committed to divesting five

---

[84] *See* 47 C.F.R. § 0.283.

[85] *See Blanca Tel. Co. Seeking Relief from Demand for Repayment of A Universal Serv. Fund Debt*, 32 FCC Rcd. 10594 ¶ 42 n.120 (2017) (citing 47 C.F.R. § 0.283).

[86] *Cf. Graphnet, Inc. Application for Supplemental Auth. to Provide Certain Digital Commc'ns Servs.*, Memorandum Opinion & Order, 84 F.C.C.2d 240, 242 ¶ 5 (1981); *Fones4all Corp. Petition for Expedited Forbearance*, Memorandum Opinion & Order, 21 FCC Rcd. 11125 ¶ 6 n.17 (2006).

[87] 2004 CAA § 629(2).

[88] *Nexstar/Tribune Order* ¶ 8.

[89] *See Media Bureau Establishes Pleading Cycle for Applications to Transfer Control of ION Media Networks, Inc., To Scripps Media, Inc., And Divestiture Applications to Assign Licenses to Inyo Broadcast Holdings, LLC*, Public Notice, 35 FCC Rcd. 12788 (MB 2020).

24

additional stations at or prior to consummation of the transaction to comply with the national audience reach cap."[90]

The Commission followed the same approach when it voted unanimously to find Nexstar in apparent violation of the National Cap as a result of its de facto control over and attributable interest in Mission-licensed WPIX in New York City (the very station it formally divested as a result of the Tribune acquisition). The Commission proposed as a remedy "two divestiture options under which (1) Nexstar and Mission can remedy their unauthorized transfer of control, and (2) *Nexstar can remedy its noncompliance with the National Ownership Cap*."[91] The Commission would be acting out of "unbridled discretion or whim"[92] were it to now grant the waiver request here.[93]

It also bears emphasis that the parties have bound themselves in the merger agreement to "take all actions necessary to avoid or eliminate each and every impediment under . . . the Communications Act (including the FCC Rules) . . . so as to permit the Closing to occur as promptly as practicable." This includes, among other things, "proposing, negotiating, committing to, effecting and agreeing to . . . *sale[s]*, *divestiture[s]*, licens[ing], holding separate, [and] *behavioral or other operational conditions or changes*" and "*terminating, or divesting*

---

[90] *Consent to Transfer Control and Assign Licenses to Nexstar Media Group, Inc. and Associated Divestiture License Assignments*, Memorandum Opinion and Order, 32 FCC Rcd. 183 ¶ 7 (MB 2017).

[91] *WPIX NAL* ¶ 21; *id.* ¶ 85 ("Under the second option, Nexstar would formally acquire the license for WPIX and file an application seeking Commission consent to the assignment. Simultaneously, Nexstar must divest a sufficient number of stations in other markets as necessary to clear space under the National Ownership Cap in order to maintain the company's nationwide footprint at 39% or less.").

[92] *WAIT Radio*, 418 F.2d at 1159.

[93] *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016) (holding that, while agencies may change their positions on issues, "an '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice'" (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005))); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009) (explaining that "[i]t would be arbitrary or capricious to ignore" where a "new policy rests upon factual findings that contradict those which underlay its prior policy" or where an agency "disregard[s] facts and circumstances that underlay or were engendered by the prior policy," without detailed justification).

25

*relationships, ventures, contractual rights or obligations*."[94]  Yet, Applicants do not even suggest in their applications that they would divest stations to comply with the National Cap.[95]  This is unsurprising given the scale of divestitures that would be required.  To stay under the Cap, Nexstar would have to either divest Tegna stations in 18 markets, including some of the largest involved in the Transaction such as Atlanta, Phoenix, Seattle, Minneapolis, San Antonio, and Jacksonville; divest its own stations in an equivalent number of Nexstar markets; or a combination of the two.

## IV.    THE TRANSACTION WOULD VIOLATE THE LOCAL TELEVISION OWNERSHIP RULE

The Local Television Ownership Rule's Duopoly Rule has long prohibited any entity from owning more than two full-power stations in the same DMA.[96]  In the most recent 2018 Quadrennial Review, the Commission once more retained this rule, because "allowing station owners to acquire a third station 'would mean the loss of an independent station operator, to the detriment of competition, localism, and viewpoint diversity.'"[97]  The Commission also noted that most television markets are already highly concentrated, weighing further against loosening the rule.  The Eighth Circuit affirmed these findings on appeal, concluding that "[b]y adequately discussing its decision not to adjust the limit in either direction, the FCC effectively explained why two stations is the proper limitation."[98]

---

[94] Agreement and Plan of Merger by and among Tegna Inc., Teton Merger Sub, Inc., and Nexstar Media Group, Inc., § 6.6(e) (Aug. 18, 2025) (emphases added).

[95] *See* Nexstar/Tegna Comprehensive Exhibit at 114-16 (seeking a waiver of the National Cap without suggesting divestitures).

[96] 47 C.F.R. § 73.3555(b)(1); *Zimmer Radio*, 145 F.4th at 841 ("The Two-Station Limit prohibits an entity from owning more than two full-power television stations in the same geographic market.").

[97] *Zimmer Radio*, 145 F.4th at 842 (citing *2018 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Report and Order, 38 FCC Rcd. 12782 ¶ 83 (2023) ("*2018 Quadrennial Review Order*")).

[98] *Zimmer Radio*, 145 F.4th at 853.

26

**App.353**

Nexstar would violate the Duopoly Rule in nearly *two dozen* markets.[99]  But rather than agree to divest stations to come into compliance with the Local Television Ownership Rule as FCC precedent would dictate,[100] Applicants once more believe they are entitled to relief on a scale that the Commission has never granted before:  requesting *23* separate waivers of the Local Television Ownership Rule.[101]  The Commission must reject that unprecedented request.

As noted above, although the Commission may grant a waiver "for good cause shown,"[102] waiver is only appropriate when strict compliance would be inconsistent with the public interest and grant of a waiver would not undermine the policy served by the rule.[103]  Where grant of a waiver would "frustrate the underlying purpose of the rules at issue," the waiver will be rejected.[104]

This is precisely the case here.  The Commission has repeatedly found that the Local Television Ownership Rule remains in the public interest, and the Duopoly Rule's very purpose is to prevent excessive consolidation of ownership in television markets that already are highly concentrated.  "For example, when the Commission adopted the current version of the TV

---

[99] These markets include:  Dallas-Ft. Worth, TX; Houston, TX; Washington, DC; Tampa-St. Petersburg, FL; Phoenix, AZ; Denver, CO; Cleveland-Akron, OH; Charlotte, NC; Portland, OR; St. Louis, MO; Indianapolis, IN; San Diego, CA; Hartford & New Haven, CT; Grand Rapids-Kalamazoo-Battle Creek, MI; Norfolk-Portsmouth-Newport News, VA; New Orleans, LA; Memphis, TN; Buffalo, NY; Little Rock-Pine Bluff, AR; Des Moines-Ames, IA; Huntsville-Decatur, AL; Ft. Smith-Fayetteville-Springdale-Rodgers, AR; and Davenport-Rock Island-Moline, IA-IL.

[100] *See, e.g.*, *Nexstar/Tribune Order* ¶ 5 (granting a transaction where Nexstar divested stations in 10 markets to comply with the Local Television Ownership Rule and sought a waiver under the formal case-by-case process that applied to the Top-Four Prohibition in one); *Nexstar/Media General Order* ¶ 6 (granting a transaction where Nexstar divested stations in all seven overlap markets to comply with the Local Television Ownership Rule).

[101] *See* Nexstar/Tegna Comprehensive Exhibit at 21-113.

[102] 47 C.F.R. § 1.3.

[103] *See WAIT Radio*, 418 F.2d at 1159; *WAIT Radio Order* ¶ 9 (denying a request for waiver after appeal, noting "An applicant for waiver faces a high hurdle even at the starting gate.  'When an applicant seeks a waiver of a rule, it must plead with particularity the facts and circumstances which warrant such action.' . . . The applicant simply has not presented facts which warrant a waiver[.]") (quoting *WAIT Radio*).

[104] *See, e.g.*, *DPA Mac Order* ¶ 42 (denying requests for general waiver under Section 1.3).

27

**App.354**

duopoly rule in 1964, it stated that its multiple ownership rules 'seek to promote maximum diversification of program and service viewpoints and to prevent undue concentration of economic power contrary to the public interest.'"[105]

The Commission reiterated that the Duopoly Rule promotes these core public interest benefits in its *2018 Quadrennial Review Order*, explaining that "the competition-based [Duopoly Rule] helps to ensure the presence of a number of independently owned broadcast television stations in the local market, thereby indirectly increasing the likelihood of a variety of viewpoints (including a variety of viewpoints within local programming) and preserving ownership opportunities for new entrants."[106]  The Commission added in that same order that "[s]purring competition among broadcast television stations also promotes localism, as licensees seek to differentiate themselves while fulfilling their obligation to air programming responsive to the needs and interests of their local communities."[107]  In light of these benefits, the Commission

---

[105] *See, e.g.*, *Review of the Commission's Regulations Governing Television Broadcasting, Television Satellite Stations Review of Policy and Rules*, Report and Order, 14 FCC Rcd. 12903 ¶ 15 (1999) (citing *Amendment of Sections 73.35, 73.240, and 73.636 of the Commission's Rules Relating to Multiple Ownership of Standard, FM, and Television Broadcast Stations*, Report and Order, 45 FCC 1476, 1477 (1964) ("*1964 Order*")); *1964 Order* at 1477 ("The concept embodied in these rules is not complex:  When two stations in the same broadcast service are close enough together so that a substantial number of people can receive both, it is highly desirable to have the stations owned by different people.  This objective flows logically from two basic principles underlying the multiple ownership rules.  First, in a system of broadcasting based upon free competition, it is more reasonable to assume that stations owned by different people will compete with each other, for the same audience and advertisers, than stations under the control of a single person or group.  Second, the greater the diversity of ownership in a particular area, the less chance there is that a single person or group can have an inordinate effect, in a political, editorial, or similar programming sense, on public opinion at the regional level.") (internal citation omitted).

[106] *2018 Quadrennial Review Order* ¶ 81; *see also 2018 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Notice of Proposed Rulemaking, 33 FCC Rcd. 12111 ¶ 52 (2018) ("The Commission has stated that competition within a local market motivates a broadcast television station to invest in better programming and to provide programming tailored to the needs and interests of the local community in order to gain market share.").

[107] *2018 Quadrennial Review Order* ¶ 78.

"*reject[ed]* the broadcasters' assertions that in order to preserve localism we must allow greater consolidation than is permitted under our current rule."[108]

This tracks the Commission's conclusion in its *2010/2014 Quadrennial Review Order*, where it found that "*excessive consolidation remains likely to threaten the Commission's competition and diversity goals*" and that "[w]ithout significant evidence of the public interest benefits that could result from the ownership of three stations in a local market that are not already available from the ownership of two stations, we do not believe that there is adequate justification . . . for increasing the numerical limits."[109]

Waiver of the Duopoly Rule on the scale sought here would result in the same harms.  It would reduce the presence of independently-owned broadcast stations in *23* different markets, eliminate the new entries to those markets that would otherwise occur via the normal divestiture process, and impair viewpoint diversity and localism.  Because each requested waiver of the Local Television Ownership Rule would "undermine the polic[ies] served by the rule" and "frustrate [its] underlying purpose,"[110] the FCC must reject the waivers.

Applicants' justifications for the 23 waiver requests ring hollow, as detailed further below in Section VII.  Their claims that the Transaction would boost news quality[111] are belied by the two companies' long track record of cutting local news operations as they have grown larger and relying extensively on nationally produced content.  Likewise, claims that the combined company will boost ad competition also blink reality, as local businesses will have to

---

[108] *Id.* ¶ 79 (emphasis added).

[109] *2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Report and Order, 31 FCC Rcd. 9864 ¶ 39 (2016) (emphasis added).

[110] *See WAIT Radio*, 418 F.2d at 1159; *DPA Mac Order* ¶ 42.

[111] *See* Nexstar/Tegna Comprehensive Exhibit at 10-15.

29

**App.356**

pay higher ad prices in the absence of another independent station group owner in their markets.[112]   And Applicants' arguments that waiving the Local Television Ownership Rule will advance the ATSC 3.0 transition are undercut by a decade of failure in deploying promised new services.[113]

Critically, Applicants are *silent* on the concrete, immediate, and irreparable price increases to consumers and MVPDs that will arise from the Transaction, and also *silent* on the job losses—particularly at the newsroom level—that would result from such local market concentration.[114]   Moreover, it is illogical and would be an absurd result for the Commission to find that there just so happened to be *nearly two-dozen instances* of "*special circumstances* that would make strict application of the rules contrary to the public interest."[115]   For the Commission to grant a waiver of its rules, "[t]here must . . . be a sufficiently 'unique . . . situation.'"[116] Applicants have presented none here.   As the D.C. Circuit has found in a challenge to a prior element of the Local Television Ownership Rule, "if the FCC were to grant waivers on the grounds [the applicant] suggests, virtually all like combinations would also be entitled to a waiver, and nothing would remain of the rule."[117]   Instead, "[Applicants'] arguments, rather than

---

[112] *See id.* at 4, 8-9.

[113] *See id.* at 15-16.

[114] When discussing "synergies" with investors, however, Nexstar was more direct:  "I think as we've talked about on our call when we announced the transaction, there's about *$300 million of synergies.*  It breaks out very similarly to how the synergies broke out on the Tribune deal, which was *about 45% from net retrans* and the remainder coming from operations."  Nexstar Media Group, Inc., *Q3 2025 Earnings Call Transcript* (Nov. 6, 2025) ("Nexstar Q3 2025 Earnings Call Transcript").

[115] *See, e.g.*, *DPA Mac Order* ¶ 42 (denying requests for general waiver under Section 1.3).

[116] *NetworkIP, LLC*, 548 F.3d at 127 (quoting *Northeast Cellular*, 897 F.2d at 1166); *id.* (citing *Northeast Cellular*) ("If discretion is not restrained by a test more stringent than 'whatever is consistent with the public interest (by the way, as best determined by the agency),' then how to effectively ensure power is not abused?  *The 'special circumstances' requirement is that additional restraint.*  Otherwise, we are left with 'nothing more than a "we-know-it-when-we-see-it" standard,' and 'future [parties]—and this court—have no ability to evaluate the applicability and reasonableness of the Commission's waiver policy.'") (emphasis added) (alteration in original).

[117] *Tribune Co.*, 133 F.3d at 69 (rejecting the appeal of the FCC's denial of a waiver of the newspaper-television cross-ownership rule, finding that "[c]hanges in the media marketplace are not unique to South Florida").

raising special circumstances, relate to the appropriate scope of the rule in general.  As such, they are more appropriately addressed in the context of the pending rule making concerning the rule."[118]

Finally, Applicants request, in the alternative, that waivers should be granted under the "failing station" waiver standard.[119]  However, the relevant FCC rule—Note 7 to 47 C.F.R. § 73.3555—specifies that waiver applicants must demonstrate, among other things, that Applicants do "not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA,"[120] indicating that the failing station waiver was not intended to be used to waive Duopoly Rule violations.  Indeed, the FCC has *never* granted a failing station waiver to permit ownership of more than two full power stations.  To do so here would make a mockery of the FCC's waiver standard and be arbitrary and capricious.  The D.C. Circuit has made clear that the Commission's grant of any waiver must be "founded upon an 'appropriate general standard.'"[121]  That is because, to reiterate, "[s]ound administrative procedure contemplates waivers, or exceptions granted *only pursuant to a relevant standard— expressed at least in decisions accompanied by published opinions, especially during a period when an approach is in formation, but best expressed in a rule that obviates discriminatory approaches.  The agency may not act out of unbridled discretion or whim in granting waivers*

---

[118] *Benedek Order* (rejecting a request for waiver of the FCC's broadcast territorial exclusivity rules).

[119] *See* Nexstar/Tegna Comprehensive Exhibit at 25-26, 30-31, 33-34, 37-38, 41-42, 46-47, 49-50, 54-55, 57-58, 61-62, 69-70, 73-74, 77-78, 84-85, 89-90, 93-94, 96-97, 100-01, 105-06, 109-10, 113.

[120] 47 C.F.R. § 73.3555, Note 7; *see also* Nexstar/Tegna Comprehensive Exhibit at 26, 30, 34, 38, 42, 46, 50, 54, 58, 61, 69, 74, 78, 85, 89, 93, 97, 101, 105, 109, 113 (acknowledging this limitation).

[121] *Nat'l Ass'n of Broads.*, 569 F.3d at 426; *WAIT Radio*, 418 F.2d at 1159; *Northeast Cellular*, 897 F.2d at 1166.

31

any more than in any other aspect of its regulatory function."[122]  Because any such "failing

station" waivers would violate the standard articulated in Note 7, they must be denied.

## V.    THE TRANSACTION WOULD VIOLATE THE DOJ'S NEXSTAR/TRIBUNE SETTLEMENT

The DOJ has required divestitures where any one entity would own more than one Big

Four network affiliate within a market—for the very reason that concentrated Big Four affiliate

ownership dramatically increases the risks of harms such as blackouts and price increases.

Indeed, as part of Nexstar's acquisition of Tribune just five years ago, the DOJ reaffirmed that

"[v]iewers typically consider the Big 4 stations to be close substitutes for one another."[123]  It

therefore found that Nexstar's proposed acquisition would "likely lead[] to increased

retransmission consent fees [for] any MVPD whose footprint" included those markets where the

two companies were direct competitors, because Nexstar would have a greater ability to black

out more Big Four stations simultaneously.[124]  Separately but relatedly, the DOJ found that

because Nexstar and Tribune competed head-to-head in the markets for broadcast television spot

advertising, local market station overlaps would increase advertising prices, reduce programming

quality, and reduce advertising innovation.[125]

To remedy these consumer harms, the DOJ required Nexstar to divest stations such that it

retained only one Big Four station affiliate in a market.  In addition, DOJ specifically included a

provision in the Final Judgment that expressly prohibited Nexstar from reacquiring the stations it

was required to divest (along with prohibiting other business arrangements) for a period of 10

---

[122] *WAIT Radio*, 418 F.2d at 1159 (emphasis added).

[123] Competitive Impact Statement at 5, *United States v. Nexstar Media Grp., Inc.*, No. 1-19-cv-02295-DLF (D.D.C. Feb. 10, 2020), https://www.justice.gov/atr/case-document/file/1192116/dl?inline ("Nexstar/Tribune Competitive Impact Statement").

[124] *Id*. at 8.

[125] *Id.* at 16-17.

32

**App.359**

years.[126]  Yet, *Nexstar now seeks to reacquire from Tegna 11 stations across eight markets that the DOJ required it to divest as part of the Tribune transaction.*[127]  *The fact that these reacquisitions would violate the clear terms of DOJ's settlement with Nexstar is yet another reason why the proposed Transaction is not in the public interest and must be denied.*[128]

## VI.   NEXSTAR'S SIDECAR RELATIONSHIPS ALREADY PUT IT IN VIOLATION OF THE NATIONAL CAP AND LOCAL TELEVISION OWNERSHIP RULE, THUS COMPOUNDING THE PUBLIC INTEREST HARMS FROM THE TRANSACTION

As noted above, as recently as March 2024, the Commission, on a 5-0 vote, found that Nexstar apparently violated the Commission's rules, including the National Cap, when Nexstar assumed de facto control over WPIX, one of the exact stations it had purported to divest in order to come into compliance with the National Cap as part of the Tribune transaction.[129] Specifically, the Commission found that "[w]ith WPIX added, then, Nexstar's national reach apparently exceed[s] 45%, well in excess of the 39% limit set by the National Ownership Cap."[130]  Yet nowhere in the application do Applicants disclose this fact or anywhere discuss the

---

[126] Final Judgment at 17-18, *United States v. Nexstar Media Grp., Inc.*, No. 1-19-cv-02295-DLF (D.D.C. Feb. 10, 2020) ("NO REACQUISITION AND LIMITATIONS ON COLLABORATIONS.  A. During the term of this Final Judgment, Defendants may not (1) reacquire any part of the Divestiture Assets, unless approved by the United States in its sole discretion; (2) acquire any option to reacquire any part of the Divestiture Assets or to assign the Divestiture Assets to any other person; (3) enter into any Cooperative Agreement, . . . or conduct other business negotiations jointly with any Acquirer with respect to the Divestiture Assets divested to such Acquirer; or (4) provide financing or guarantees of financing with respect to the Divestiture Assets."); *id.* at 20 ("Unless the Court grants an extension, this Final Judgment shall expire ten years from the date of its entry, except that after five years from the date of its entry, this Final Judgment may be terminated upon notice by the United States . . . to the Court and Defendants that the divestitures have been completed and that the continuation of the Final Judgment no longer is necessary or in the public interest.").

[127] These are WTIC (FOX) and WCCT (CW) in the Hartford-New Haven, CT market; WPMT (FOX) in the Harrisburg-Lancaster-Lebanon-York, PA market; WATN (ABC) and WLMT (CW) in the Memphis, TN market; WNEP (ABC) in the Wilkes Barre-Scranton-Hazleton, PA market; WOI-DT (ABC) and KCWI (CW) in the Des Moines-Ames, IA market; WZDX (FOX) in the Huntsville-Decatur (Florence), AL market; KFSM (CBS) in the Ft. Smith-Fayetteville-Springdale-Rodgers, AR market; and WQAD (ABC) in the Davenport-Rock Island-Moline, IA-IL market.  *See id.* at 3-6.

[128] *See id.* at 17-18.

[129] *See generally WPIX NAL.*

[130] *Id.* ¶ 54.

*WPIX NAL*; that in and of itself is a basis for the Commission to deny the applications.[131]  The FCC's finding in the *WPIX NAL* has direct implications on Nexstar's compliance with the National Cap.  Not only would Nexstar need to divest stations in all 18 Tegna-only markets (or some equivalent set of divestitures involving its own stations or a mix of its own and Tegna stations), it would also need to divest stations sufficient to offset the addition of WPIX's New York, NY DMA to its existing national audience reach.

Separately, the findings in the *WPIX NAL* raise substantial and material questions of fact as to whether Nexstar has been violating other bright-line ownership rules via its relationships with its sidecar entities Mission Broadcasting, White Knight, and Vaughan.[132]  Specifically, the Commission found that in addition to its de facto control over WPIX, Nexstar is also apparently attributed with the station via the Equity/Debt Plus ("EDP") rule.  Under that rule, an entity will be attributed with another station where it (A) holds an interest greater than 33 percent of the total assets of the licensee (aggregating both debt and equity holdings); and (B) either (i) also

---

[131] The FCC's Form 2100, Schedule 315 requires broadcast transfer of control applicants "to certify that neither it nor any party to the application has had any interest in or connection with an application that was or is the subject of unresolved character issues," which include, among other things, misrepresentation or lack of candor in a statement included in a broadcast application before the Commission.  FCC Form 2100, Schedule 315, Instructions at 21, https://www.fcc.gov/sites/default/files/2100-315-instructions.pdf.  In this regard, Nexstar failed to disclose to the Commission in the WPIX matter that it exercised total retransmission consent negotiation authority over the station.  *WPIX NAL* ¶ 47.  Applicants make no mention of this prior lack of candor, let alone make any attempt to "fully explain why the unresolved character issue is not an impediment to a grant of th[e] application"—which is itself a lack of candor in the instant Transaction.  FCC Form 2100, Schedule 315, Instructions at 21, https://www.fcc.gov/sites/default/files/2100-315-instructions.pdf.  In these circumstances, the Commission is well within its discretion to deny or designate for formal hearing the instant application for this reason alone.  *See, e.g.*, *Applications of Tribune Media Company and Sinclair Broadcast Group*, Hearing Designation Order, 33 FCC Rcd. 6830 (2018) (designating for formal hearing a broadcast transaction where substantial and material questions of fact exist whether the applicant engaged in misrepresentation and/or lack of candor in its application, including with respect to its compliance with the broadcast ownership rules).

[132] Broadcast stations that take on outsourced management and operational functions for, and have other financial arrangements with, other stations are known as "sidecars."  *See, e.g.*, Letter from Tom Wheeler, Chairman, FCC, to Hon. John D. Rockefeller IV et al. 3 (Mar. 27, 2014), https://docs.fcc.gov/public/attachments/DOC-326470A1.pdf (noting that, aside from service agreements, sidecars also involve financial linkages between stations, and that "[t]aken in their totality, these sharing and financial arrangements can serve to transfer effective, if not complete, control of one supposedly 'independently-owned' station to [another] party").

34

**App.361**

holds an interest in a broadcast licensee in the same market that is subject to the broadcast multiple ownership rules; or (ii) is also a major program supplier to the station, supplying more than 15 percent of the station's total weekly broadcast programming hours.[133]  By providing Mission collateral to secure Mission's revolving credit facility (for which Nexstar also served as guarantor), Nexstar's EDP interest far exceeded 33 percent of the total assets of the station, for which Nexstar also programmed (and still does) 100 percent of WPIX's airtime.

The Commission should not approve the Transaction without setting this matter for a hearing and requiring Applicants to show that Nexstar neither exercises de facto control nor is attributed with a sidecar station in markets where Nexstar and Tegna each already own at least one full power station.[134]  Indeed, even in Nexstar-only markets, finding that Nexstar exercises de facto control or is attributed with a sidecar station would give rise to a violation if Nexstar and its sidecar collectively own more than two full-power stations.  This is precisely the sort of issue that the Commission "shall formally designate the application for hearing on;"[135] the Commission cannot simply take Nexstar's word for it, especially in light of these prior rule violations.

---

[133] *See* 47 C.F.R. § 73.3555, Note 2(i).

[134] These markets include Little Rock-Pine Bluff, AR; Wilkes Barre-Scranton-Hazleton, PA; Odessa-Midland, TX; Abilene-Sweetwater, TX; San Angelo, TX.  If Nexstar sidecars White Knight and Vaughan have similar financing arrangements, then this would also include Austin, TX and Tyler-Longview (Lufkin & Nacogdoches), TX.  Separately, the Commission should make these same conclusions with respect to the second prong of the EDP Rule, at minimum, for any sidecar-licensed CW affiliate given that the financial relationships remain the same and Nexstar, as the owner of the CW network, is a program supplier of more than 15 percent of those stations' weekly airtime.  As a result, the Nexstar would be in independent apparent violation of the Local Ownership Rule in at least two other markets involved in this Transaction:  Austin, TX and Little Rock-Pine Bluff, AR.

[135] 47 U.S.C. § 309(e).

35

**App.362**

**VII.    THE TRANSACTION WOULD CAUSE IMMEDIATE, IRREPARABLE, AND SUSTAINED PUBLIC INTEREST HARMS**

Even assuming the Commission could overcome the legal obstacles to considering the requested waivers, it would still need to determine whether the Transaction is in the public interest.  As detailed below, the public interest harms far outweigh the claimed benefits.  Consequently, the Transaction must be denied for this independent reason.

### A.    The Transaction Will Increase Costs for MVPDs and Consumers and Accelerate MVPD Market Exits

As Nexstar's actions over the last decade reveal, the massive consolidation enabled by the Transaction would increase Nexstar's leverage to demand ever-higher retransmission consent rates from its distributors.[136]  These increases would flow from Nexstar's growth on a nationwide basis, as well as its acquisition of additional stations, particularly Big Four stations, in local markets.

#### 1.    Applicants Will Use Their Massive National Reach to Raise Retransmission Consent Rates for MVPDs and Their Customers

Nexstar describes itself as "the largest local television broadcast group" with 201 full-power stations reaching "~70% of the U.S." and with a "local footprint ~75%+ larger than the other major broadcast network owners."[137]  Nexstar amassed these holdings through aggressive consolidation and liberal use of the UHF discount and "sidecar" arrangements.  Over the past decade and a half, Nexstar has made more than two dozen acquisitions of broadcast stations and station groups, including the acquisition of Media General's 67 stations in 2017, and Tribune's 41 stations in 2019.[138]  CEO Perry Sook attributed Nexstar's ability to "continue to grow

---

[136] *See* State Cable Associations National Cap Reply Comments at 5-7, 20-33.

[137] Nexstar June 2025 Investor Presentation at 5, 7; *see also supra* Fig. I.

[138] *See generally Nexstar/Media General Order*; *Nexstar/Tribune Order*.

36

**App.363**

distribution revenue" as "a testament to our position as the largest owner of local broadcast television."[139]

Nexstar, in turn, uses its massive scale to obtain higher retransmission consent fees from MVPDs. Nexstar negotiates retransmission consent on a nationwide basis, across its station footprint.[140] As Nexstar has grown, greater numbers of stations are subject to single negotiations.

Nexstar Executive Vice President and Chief Financial Officer Lee Ann Gliha recently explained, "because of our scale . . . when we have these negotiations that enables us to do some things that maybe some of the smaller companies in our sector can't do."[141] Those "things" include the ability to threaten widescale blackouts to consumers, thereby increasing the leverage Nexstar has to extract supra-competitive retransmission consent fees. Quarter after quarter, Nexstar imposes the highest average retransmission consent rates in the country on MVPDs and their customers.[142]

---

[139] Transcript of Nexstar Media Group, Inc. Q4 2024 Earnings Call (Feb. 27, 2025).

[140] Press Release, Nexstar Media Group, Inc., *Viewers Deprived Of Critical Local News, Important Weather Updates, Women's World Cup Soccer Matches, And MLB All-Star Game, Following DIRECTV's Removal Of 159 Nexstar Local TV Stations In 113 Markets And National Cable News Network NewsNation* (Jul. 2, 2023), https://www.nexstar.tv/viewers-deprived-following-directvs-removal-of-159-nexstar-local-tv-stations-in-113-markets-and-newsnation/ (explaining that as a result of failed distribution agreement negotiations with DIRECTV "millions of Americans across the country" lost access to programming); *see also* Nexstar/Tribune Competitive Impact Statement at 4 ("A retransmission agreement is negotiated directly between a broadcast station group, such as Nexstar or Tribune, and a given MVPD, and this agreement typically covers all of the station group's stations located in the MVPD's service area, or 'footprint.'"). As of July 31, 2025, Nexstar, which also owns The CW Network, NewsNation, Antenna TV, Rewind TV, and has interests in Cooking Channel and Food Network, among other media interests, has a market capitalization of $5.64 billion. *See* Nexstar Media Group, Inc. (NXST), Stock Analysis, https://stockanalysis.com/stocks/nxst/market-cap/. TEGNA, which also owns True Crime Network and Quest, has a market capitalization of $2.68 billion. *See* TEGNA Inc. (TGNA), Stock Analysis, https://stockanalysis.com/stocks/tgna/market-cap/.

[141] Transcript of Nexstar Media Group, Inc. Presentation at Morgan Stanley Technology, Media & Telecom Conference (Mar. 5, 2025).

[142] *See* Justin Nelson, *Retransmission-Per-Subscriber Rates Continue To Climb in Q2 2025*, S&P Global Market Intelligence (Sept. 24, 2025) (showing Nexstar continues to have the highest monthly retrans per sub fees on both a station/network and owner/market basis); *see also* Nexstar June 2025 Investor Presentation at 12 (depicting

37

*The DOJ has highlighted this very concern. It explained that the ability "to black out more . . . stations simultaneously . . . lead[s] to increased retransmission consent fees"* for in-*footprint MVPDs and their "subscribers in the form of higher subscription fees."*[143] Likewise, an economic analysis that NCTA – The Internet and Television Association submitted in the Commission's Sinclair/Tribune merger proceeding found that "broadcaster size is positively correlated with broadcaster bargaining power" and "a threatened blackout across a substantially larger portion of an MVPD's footprint has the prospect to impose disproportionately higher costs on the MVPD in dealing with the repercussions of the blackout."[144] Additionally, in the ongoing National Cap proceeding, DirecTV submitted an economic analysis finding "the level of the monthly retransmission fee per subscriber charged to DIRECTV is, in fact, higher for larger station groups."[145] Even the Eighth Circuit recently acknowledged that "the exponential increase in retransmission consent fees could provide broadcasters with excessive market leverage."[146]

---

36 percent growth in retrans revenue from 2020—the first full year following the Tribune acquisition—to 2024, including a compound annual growth rate of eight percent over that period).

[143] Nexstar/Tribune Competitive Impact Statement at 8; *see also* Competitive Impact Statement at 7, *United States v. Gray Television, Inc. and Quincy Media*, Inc., No. 1:21-cv-02041 (D.D.C. July 28, 2021), https://www.justice.gov/opa/press-release/file/1418011/download ("Gray/Quincy Competitive Impact Statement") (finding consumer harms via increased retransmission consent fees where a broadcaster would have greater ability to black out more stations simultaneously); Competitive Impact Statement at 7, *United States v. Gray Television, Inc. and Raycom Media, Inc.,* No. 1:18-cv-02951, at 10-11 (D.D.C. Dec. 14, 2018), https://www.justice.gov/atr/case-document/file/1120521/dl?inline ("Gray/Raycom Competitive Impact Statement"); Competitive Impact Statement at 8-9, *United States v. Nexstar Broad. Grp., Inc.*, No. 1:16-cv-01772-JDB (D.D.C. Nov. 16, 2016), https://www.justice.gov/atr/case-document/file/910661/dl?inline ("Nexstar/Media General Competitive Impact Statement") (same).

[144] Comments of NCTA – The Internet & Television Association, MB Docket No. 17-179, Att. A (Economic Analysis of Bryan Keating and Jon Orszag) ¶ 35 (filed June 20, 2018) ("Such costs may take the form of disproportionately higher customer service costs or disproportionately higher costs to the brand as a result of adverse publicity from the blackout. Such costs place the MVPD in a weaker bargaining position (effectively, they create a concave surplus function) and create an incentive to agree to higher retransmission consent fees in order to avoid incurring those costs.").

[145] Letter from DIRECTV to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, Exh. A ¶ 5 (filed Sept. 19, 2025) (submitting an economic analysis from Dr. Allan Shapine of Compass Lexecon).

[146] *Zimmer Radio*, 145 F.4th at 850; *see also* Kressin Powers, *From Local Stations to Nationwide Conglomerates: The High Cost of TV Mega-Mergers* 16 (Dec. 4, 2025), https://www.kressinpowers.com/post/why-consolidation-in-local-tv-is-bad-for-consumers-and-local-news-and-about-to-get-much-worse ("Kressin Powers White Paper") ("It is fundamental that a limited number of competitors controlling large market shares can increase

38

**App.365**

App.366

This correlation between Nexstar's (and Tegna's) increased size and dramatically higher revenues, primarily from higher transmission consent rates, is illustrated in the charts below.

---

their profits by reducing supply and increasing prices. This is a particular concern among TV station groups, which are uniquely insulated from disruptive competition compared to other industries due to FCC-granted licenses and the protections of the Must-Carry/Retransmission Consent regime.").

39

**App.366**

**Fig. II. Nexstar and Tegna Consolidation Metrics**[147]





These trends track sharp increases in retransmission consent fees industry wide. Overall annual retransmission consent fees have increased from about $24 per subscriber in 2013 to

---

[147] Nexstar Broadcasting Group, Inc., Annual Report (Form 10-K) (Mar. 15, 2012); Gannett Co., Inc., Annual Report (Form 10-K) (Feb. 22, 2012); Nexstar Media Group, Inc., Annual Report (Form 10-K) (Feb. 27, 2025); TEGNA INC., Annual Report (Form 10-K) (Feb. 27, 2025). Notes: Station counts include sidecar stations, as applicable. *See supra* note 132. 2011 revenue for Gannett Co., Inc. (the predecessor of Tegna) is limited to its broadcasting segment (i.e., excludes since spun-off publishing segments). Gannett Co., Inc. did not report on UHF-discounted national audience reach in 2011.

40

**App.367**

about $269 in 2023.[148]  This represents an increase of more than a 1,000 percent in retransmission consent fees per subscriber, compared to a 31 percent increase in overall consumer prices during this period.[149]

Moreover, Nexstar has been clear that it will follow the same script if the Commission allows its merger with Tegna to go forward.  The Transaction would super-size the company, reaching almost every corner of the country and creating Big Four duopolies in every region of the country.[150]

Nexstar will achieve higher rates immediately through so-called "after-acquired station" clauses in its existing contracts with MVPDs.  Under these contractual terms which Nexstar insists on as a condition of granting retransmission consent, if Nexstar were to acquire the Tegna stations at issues, MVPDs would be forced to pay the higher Nexstar rate on the newly-acquired station, rather than any pre-existing rate that the MVPD paid the prior station owner.  Nexstar will then leverage its enormous size to extract ever higher rates in renewal negotiations.

Nexstar has described such "retrans synergies" as "number one" in its "playbook": "[W]e have the ability to step up any targets['] retrans if it is lower to our level.  And that's a very nice synergy to have.  It's easy to achieve."[151]  When describing the potential for the

---

[148] *See Communications Marketplace Report*, 2024 Communications Marketplace Report, 39 FCC Rcd. 14116, App. E:  2024 Report on Cable Industry Prices at 15, Fig. 10 (2024), https://docs.fcc.gov/public/attachments/FCC-24-136A8.pdf ("2024 Report on Cable Industry Prices").

[149] ($269 - $24 / $24) = 1,021%.  $100 in 2013 is worth $130.8 in 2023 according to Consumer Price Index data from the Federal Reserve.  ($130.8 - $100) / $100 = 30.8%.  *See* Inflation Calculator, Federal Reserve Bank of Minneapolis, https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator.  Retransmission consent fees per subscriber have increased by at least 14 percent in every year between 2014 and 2023.  2024 Report on Cable Industry Prices at 15, Fig. 10.

[150] *See* Kressin Powers White Paper at 21 (detailing how, if the Transaction is approved, Nexstar would control nearly 15 percent of all full power stations owned in the U.S; reach 80 percent of U.S. households; and have 25 percent of revenue of the largest 25 station groups).

[151] Transcript of Nexstar Media Group, Inc. Presentation at 53rd Annual JPMorgan Global Technology, Media and Communications Conference (May 14, 2025); *see also* Nexstar June 2025 Investor Presentation at 22 ("The Nexstar

41

elimination of broadcast ownership regulations, Nexstar's Gliha said, "[I]f those things went away, I do think there's going to be significant opportunity for additional consolidation. . . . [I]n the past, we've been able to accomplish a lot of value . . . through application of our retransmission agreements[] onto the new assets."[152]  And with respect to the proposed Tegna transaction, Gliha confirmed that the "the synergy playbook here is very similar to the playbook that you've seen us execute in the past," including "contractual retrans synergies"—foremost among "$300 million of synergies we expect" in the transaction's first year.[153]

Nexstar's financial windfall from its increased national size extends well beyond higher retransmission consent fees for Big Four-affiliated stations.  Retransmission consent negotiations typically cover a wide range of carriage issues, not just carriage of Big Four affiliates, but also carriage of non-Big-Four affiliate stations, carriage of broadcaster-affiliated cable networks, and other terms that impose fees on the MVPDs.  In addition, large station groups like Nexstar can build flexibility into their carriage agreements to adjust the programming content on their

---

Consolidation Playbook: 1. Retransmission Revenue Synergies:  Acquired stations move to Nexstar's retransmission consent agreements.").

[152] Transcript of Nexstar Media Group, Inc. Presentation at UBS Global Media & Communications Conference (Dec. 9, 2024); *see also* Transcript of Nexstar Media Group, Inc. Q2 2025 Earnings Call (Aug. 7, 2025) ("I would say that as far as acquisition opportunity, growing our national footprint probably has more strategic importance to the company than simply doubling up in markets where we had a single station, which is—we're already kind of doubled up in about half of our markets.").

[153] Transcript of Nexstar Media Group, Inc. M&A Call (Aug. 19, 2025).  Gliha went on to advise the audience to "go back and sort of take a look at what we disclosed on the Tribune side and . . . use that sort of as your guidepost in terms of allocation" of synergies among those at the retrans-, corporate-, and station-levels. *Id.* There, Nexstar estimated $75 million of the $160 million total estimated synergies (i.e., 46.875 percent) to come from "net retransmission revenue" (described as "[a]pplying Nexstar rates to Tribune subscriber counts").  Nexstar Media Group, Inc., *Acquisition of Tribune Media Company* 10 (Dec. 3, 2018), https://www.nexstar.tv/wp-content/uploads/2018/12/Nexstar-Tribune-Investor-Presentation-FINAL-12-3-18.pdf.  Applying that same "allocation" to the $300 million in expected Tegna transaction synergies yields a *$140 million year-one windfall* in net retransmission consent revenues—all on the backs of MVPDs and their customers. *See* Nexstar Q3 2025 Earnings Call Transcript ("I think as we've talked about on our call when we announced the transaction, there's about *$300 million of synergies*.  It breaks out very similarly to how the synergies broke out on the Tribune deal, which was *about 45% from net retrans* and the remainder coming from operations.") (emphasis added).

42

stations (such as by changing the affiliation of the station) and thus demand higher retransmission consent fees mid-contract.  For example, since Nexstar acquired a controlling stake in the CW Network in late 2022, it has systematically pulled back CW affiliations from independent station group owners and shifted them to its owned-and-operated stations or multicast streams, resulting in substantial price increases for MVPDs that must now pay Nexstar's top-of-market prices for the same programming.[154]  MVPDs and their customers can also expect rates for current Tegna CW affiliates to also increase post-transaction once Nexstar can apply its own higher rates to these stations.  Nexstar would also likely use its increased leverage post-Transaction to force MVPDs to carry—and consumers to pay for—supra-inflationary rate increases for its affiliated cable network, NewsNation, despite little demand for the network.[155]

---

[154] *See* Dade Hayes, *The CW Will Turn a Profit 'At Some Point' In 2026, Parent Company Nexstar's CFO Says*, Deadline (Dec. 8, 2025), https://deadline.com/2025/12/the-cw-network-profit-nexstar-1236642530/ ("Owning The CW enabled Nexstar to 'bring back a number of those affiliates onto Nexstar stations, and that's been very profitable for us,' [Nexstar CFO Lee Ann] Gliha said."); Alex Weprin, *Nexstar Embarks on CW Expansion Push, Stations in Philadelphia, San Francisco and Tampa to Become Affiliates*, The Hollywood Reporter (June 14, 2023), https://www.hollywoodreporter.com/business/business-news/nexstar-flips-new-cw-stations-phialdelphia-san-francisco-1235515270/ (reporting the announcement that Nexstar would be switching the affiliations of WPHL in Philadelphia, KRON in San Francisco, and WTTA in Tampa from MyNetworkTV to CW as other CW stations in those markets, among others, go independent); Dade Hayes, *CW Affiliates In Chicago & Two Other Markets Switch to Nexstar-Owned Stations*, Deadline (May 1, 2024), https://deadline.com/2024/05/cw-affiliates-chicago-nexstar-stations-local-tv-1235901269/ (reporting that Nexstar took the CW affiliation off of Weigel Broadcasting's WCIU in the Chicago market and moved it to Nexstar's own station in the market, WGN-TV, and similarly moved CW affiliations onto Nexstar stations in the Norfolk, VA and Lafayette, LA markets).

[155] *See, e.g.*, Verified Retransmission Consent Complaint of Cincinnati Bell Extended Territories LLC dba altafiber, Complainant, v. Nexstar Media Inc., Defendant, MB Docket No. 25-197, at ii (filed June 13, 2025) ("Nexstar conditions any grant of retransmission consent for WDTN on altafiber's continued distribution of Nexstar-owned cable network, NewsNation, not only to roughly 900 subscribers in the Dayton DMA but also to about 87,000 subscribers in the Cincinnati DMA (where Nexstar has no broadcast television stations) and, despite extremely low viewership and engagement, demands a fee increase of more than 15 times the rate of inflation."); Reply to Answer of Cincinnati Bell Extended Territories LLC dba altafiber, Complainant, v. Nexstar Media Inc., Defendant, MB Docket No. 25-197, at 2 (filed July 14, 2025) ("[W]hen altafiber agreed to distribute NewsNation to Cincinnati three years ago, it was based on the expectation that viewership of its fledgling NewsNation service would grow with time.  That has not happened, and subscribers today largely do not care whether or not altafiber distributes NewsNation as evidenced by the fact that only about 100 subscribers have expressed displeasure with its loss and fewer have cancelled their subscriptions.").

These imminent harms are not lost on consumers:  a recent poll of likely voters found "very broad and intense opposition to corporate broadcast TV station mergers from voters across all demographics, political parties, and ideologies" with *three-quarters* of voters believing such mergers will lead to higher consumer prices.[156]

### 2.     Applicants Will Also Be Able to Leverage Local Duopolies and Triopolies to Raise Retransmission Consent Rates

The Commission has long recognized that ownership of two or more stations— particularly among top-four stations—gives broadcast station owners enhanced leverage to demand higher retransmission consent fees from MVPDs and results in higher prices for MVPD customers.[157]  For example, the Commission banned joint negotiations by two top-four broadcasters in a market, expressly finding that joint negotiations "give[] [the] stations both the incentive and the ability to impose on MVPDs higher fees for retransmission consent than they otherwise could impose if the stations conducted negotiations for carriage of their signals independently."[158]  Moreover, the Commission found that "[w]ith regard to Top Four

---

[156] *See* Celinda Lake & David Mermin, Lake Research Partners, *Polling Data on Corporate Broadcast TV Mergers* 3, 5, 6 (Dec. 2025), https://www.nhmc.org/new-national-poll-shows-likely-voters-fiercely-oppose-corporate-broadcast-tv-station-mergers/ (also finding that "[e]ight in ten voters prefer their local TV stations to remain locally owned than for them to be owned by large national broadcast corporations.  This is a very strong preference across race and party identification.").

[157] *See* Comments of NCTA – The Internet & Television Association, MB Docket No. 22-459, at 2-5 (filed Mar. 3, 2023).

[158] *Amendment of the Commission's Rules Related to Retransmission Consent*, Report and Order and Further Notice of Proposed Rulemaking, 29 FCC Rcd. 3351, 3358 ¶ 13 (2014) ("*2014 Retransmission Consent Order*") ("We conclude that joint negotiation by same market, separately owned Top Four stations is not consistent with 'competitive marketplace considerations' within the meaning of Section 325(b)(3)(C) because it eliminates price rivalry between and among stations that otherwise would compete directly for carriage on MVPD systems and the associated retransmission consent revenues. . . .  Because same market, Top Four stations are considered by an MVPD seeking carriage rights to be at least partial substitutes for one another, their joint negotiation prevents an MVPD from taking advantage of the competition or substitution between or among the stations to hold retransmission consent payments down.  The record also demonstrates that joint negotiation enables Top Four stations to obtain higher retransmission consent fees because the threat of simultaneously losing the programming of the stations negotiating jointly gives those stations undue bargaining leverage in negotiations with MVPDs.  This leverage is heightened because MVPDs may be prohibited from importing out-of-market broadcast stations carrying the same network programming as the broadcast stations at issue in the negotiations.").

44

broadcasters, [the Commission] can confidently conclude that . . . such negotiation on balance hurts consumers."[159]  Congress went further, amending Section 325 of the Communications Act to prevent joint negotiations by any two stations in the market unless the stations are commonly owned.[160]

Although the Eighth Circuit in *Zimmer Radio* vacated the Top-Four Prohibition based on the FCC's failure to justify the way it applied and implemented this rule, the Commission's and Congress's underlying concerns about the retransmission consent-related harms associated with multiple station ownership still stand.  Even the Eighth Circuit acknowledged the link between industry consolidation and higher consumer costs.[161]

Moreover, "an overwhelming amount of evidence" has been submitted to the FCC over the years demonstrating that top-four duopolies drive up consumer prices.[162]  As the Media Bureau summarized in the Standard General/Tegna Hearing Designation Order:

> The caselaw makes clear that increases in retransmission consent rates can constitute a public interest harm if such increases are not simply the product of a properly functioning competitive marketplace.  In particular, evidence that anticompetitive practices or other wrongdoing could distinguish what would

---

[159] *Id.* ¶ 10.

[160] 47 U.S.C. § 325(b)(3)(C)(iv).

[161] The Eighth Circuit noted, in particular, the connection between "excessive market leverage" associated with broadcaster consolidation and "the exponential increase in retransmission consent fees." *Zimmer Radio*, 145 F.4th at 850.  The Eighth Circuit further recognized the possibility that consumers could "suffer from combinations between the larger stations in a market."  *Id.* at 856.

[162] *See, e.g.*, Petition to Deny of DIRECTV, Pleading No. 0000280877, LMS File No. 0000276662, at 13 (filed Nov. 18, 2025) ("DirecTV Petition"); *see also 2014 Retransmission Consent Order* ¶ 16 ("Empirical data in the record lends support to the theory that joint negotiation by Top Four stations leads to increases in retransmission consent fees.  In particular, ACA references an example indicating that, where a single entity controls retransmission consent negotiations for more than one Top Four station in a single market, the average retransmission consent fees paid for such stations was more than twenty percent higher than the fees paid for other Top Four stations in those same markets.  Data filed in the record from three cable operators also lends support to our conclusion that joint negotiation between or among separately owned, same market Top Four stations leads to supra-competitive increases in retransmission consent fees.  We find these empirical data to be persuasive evidence of how joint negotiation can affect the level of retransmission consent fees in cases involving Top Four stations operating in the same market.").

perhaps constitute a market-driven rate increase from one that is anti-competitive, unwarranted, and harmful to consumers and the public interest.[163]

Here, the retransmission consent price increases that would result from Nexstar's new accumulation of two[164] and three[165] top-four stations—and Big Four affiliates—across 31 overlap markets involved in the Transaction would plainly be the product of a non-"properly functioning," non-"competitive marketplace."  For this reason, the DOJ too has required divestitures where any one entity would own more than one Big Four network affiliate within a market—finding increased risks of harms such as blackouts and price increases on MVPDs and consumers.[166]

For example, as noted above, when reviewing Nexstar's acquisition of Tribune for competition concerns, the DOJ reaffirmed that "[v]iewers typically consider the Big 4 stations to be close substitutes for one another."[167]  It therefore found that Nexstar's proposed acquisition would "likely lead[] to increased retransmission consent fees [for] any MVPD whose footprint" included those markets where the two companies were direct competitors, because Nexstar would have a greater ability to black out more Big Four stations simultaneously.[168]  To remedy

---

[163] *Applications of SGCI Holdings III LLC; TEGNA, Inc.; and CMG Media Corporation*, Hearing Designation Order, 38 FCC Rcd. 1282 ¶ 21 (MB 2023) ("*Standard General/Tegna HDO*").

[164] The combined company would create new top-four (and Big Four) duopolies in 28 markets:  Tampa-St. Petersburg, FL; Denver, CO; Cleveland-Akron (Canton), OH; Sacramento-Stockton-Modesto, CA; Charlotte, NC; Portland, OR; St. Louis, MO; San Diego, CA; Hartford & New Haven, CT; Austin, TX; Columbus, OH; Harrisburg-Lancaster-Lebanon-York, PA; Grand Rapids-Kalamazoo-Battle Creek, MI; Greensboro-High Point-Winston Salem, NC; New Orleans, LA; Memphis, TN; Buffalo, NY; Little Rock-Pine Bluff, AR; Wilkes Barre-Scranton-Hazleton, PA; Knoxville, TN; Des Moines-Ames, IA; Huntsville-Decatur (Florence), AL; Waco-Temple-Bryan, TX; Davenport-Rock Island-Moline, IA-IL; Tyler-Longview (Lufkin & Nacogdoches), TX; Odessa-Midland, TX; Abilene-Sweetwater, TX; and San Angelo, TX.

[165]  The combined company would create new top-four (and Big Four) triopolies in three additional markets: Indianapolis, IN; Norfolk-Portsmouth-Newport News, VA; Ft. Smith-Fayetteville-Springdale-Rodgers, AR.

[166] *See* DirecTV Petition at 14-15 (citing the DOJ's conclusion that the Nexstar/Tribune and Gray/Quincy transactions would substantially lessen competition through common ownership of multiple Big Four affiliate stations).

[167] Nexstar/Tribune Competitive Impact Statement at 5.

[168] *Id*. at 8.

46

these consumer harms, the DOJ required Nexstar to divest stations such that it retained only one Big Four station affiliate in a market.[169]

The very same risks are at play here. If Nexstar were to get its way, it would be able to simultaneously black out (a) TV stations across 80 percent of the U.S. Television households, (b) three or more full-power stations in 23 markets; and (c) at least two Big Four station affiliates in 31 markets, including three Big Four station affiliates in three of those markets. These risks are not theoretical. Nexstar and its sidecar entity Mission Broadcasting have a long history of using blackouts to extract higher retransmission consent fees. Nexstar and Mission have blacked out local stations in a cumulative total of 370 markets for more than 1,200 days in the past five years, more than any other provider in that same time period. Even if Mission's blackouts are excluded, Nexstar's blackouts in over 290 cumulative markets still surpass any other broadcaster.[170] Likewise, Tegna has routinely blacked out stations in local markets over the

---

[169] *See* Final Judgment at 6-10, *United States v. Nexstar Media Grp., Inc*., No. 1-19-cv-02295-DLF (D.D.C. Feb. 10, 2020).

[170] *See Retrans-Blackouts-Overview-2010-Nov-2025*, American Television Alliance (Nov. 2025), https://americantelevisionalliance.org/wp-content/uploads/2025/11/Retrans-Blackouts-Overview-2010-Nov-2025.xlsx.  For example:

- In 2025, Nexstar blacked out 63 stations across 42 markets during an eight-day impasse with Altice.
- Also in 2025, Nexstar blacked out local stations in 11 markets during a one-day impasse with Verizon.
- From 2023 to 2024, Nexstar's sidecar entity Mission blacked out 29 stations in 26 markets during a 383-day impasse with Dish.
- In 2023, Nexstar blacked out 163 stations across 112 markets during a 77-day impasse with DirecTV.
- Also in 2023, Nexstar blacked out two stations in the Honolulu, HI market during a 16-day impasse with Hawaiian Telcom.
- In 2022, Nexstar blacked out 12 local television stations in 10 Verizon markets for 14 days.
- From 2022 to 2024, Nexstar's sidecar Mission blacked out local stations in 23 markets during a 526-day impasse with DirecTV.
- From 2020 to 2021, Nexstar's sidecar entity Mission blacked out local stations in 24 markets during a 201-day impasse with Dish.
- In 2020, Nexstar blacked out local stations in 118 markets during a 22-day impasse with Dish.

47

**App.374**

same period.[171]  Grant of the Transaction here would only compound the problem for the State

Cable Petitioners and their millions of customers.

**B.      The Transaction Will Lead to Job Cuts and Reductions in Local News**

While Applicants tout to Wall Street the nine-figure "synergies" that the Transaction will

create, they omit any discussion in their applications of how the Transaction will affect their

workforce—and the harms that may result to localism and viewpoint diversity from consolidated

operations.[172]  In their applications, Applicants make unsubstantiated claims that increased scale

and additional resources are "the only means to preserve the local television service each

company historically has provided to its communities,"[173] yet they offer no plan to preserve

newsroom headcount, local beats, or field reporting, and make no station-level commitments to

minimum local origination or news hours.  Similarly, Applicants emphasize the "operational

efficiencies," "economies of scale," and the ability to "reduce costs"[174] following the

Transaction, but provide no explanation of how these benefits will materialize in practice and at

what cost to local journalism.  In reality, Nexstar has used its station acquisitions to make

significant job cuts and centralize its production of "local" news content.

---

[171] *See id.*  For Tegna, these include:

- A 33-day blackout from 2023-2024 in 52 markets during an impasse with DirecTV.
- A four-day blackout in 2022 in 4 markets during an impasse with Verizon.
- A 121-day blackout from 2021-2022 in 52 markets during an impasse with Dish.
- A 409-day blackout from 2020 to 2022 in 12 markets during an impasse with Mediacom.
- A 19-day blackout in 2020 in 52 markets during an impasse with AT&T.

[172] *See* Nexstar Q3 2025 Earnings Call Transcript.

[173] Nexstar/Tegna Comprehensive Exhibit at 2.

[174] *Id.* at 4, 9, 19.

48

**App.375**

### 1. Nexstar Acquisitions Result in Significant Workforce Cuts and Nexstar Expects the Same if the Transaction Were to Close.

Nexstar has a long history of cutting jobs shortly after acquiring new stations. In 2003, after acquiring the FOX and ABC affiliates in Billings, MT, Nexstar promptly shut down both stations' news operations.[175] In 2009, Nexstar combined the news operations of WBRE and WYOU (for which it had a shared services agreement with its sidecar-alter ego, Mission Broadcasting) in Wilkes-Barre, PA, and laid off the entire WYOU news staff.[176] In 2012, Nexstar acquired ten stations from Newport Broadcasting in a $285 million deal that also involved Mission and promptly cut jobs at the newly acquired stations across the country, including on-air talent, staffers, photographers, and entire accounting and research departments.[177] In 2015, after Nexstar acquired KLAS-TV in Las Vegas, NV, the company laid

---

[175] Derek S. Turner, Free Press, *Cease to Resist: How the FCC's Failure to Enforce its Rules Created a New Wave of Media Consolidation* 35 (2014), https://www.freepress.net/sites/default/files/legacy-policy/Cease_to_Resist_Oct._2013.pdf.

[176] *See* Mark. K. Miller, *WYOU Dumps Local News, Fires 14*, TVNewsCheck (Apr. 3, 2009), https://tvnewscheck.com/uncategorized/article/wyou-dumps-local-news-fires-14/?rcp_action=lostpassword; Letter from Jim Joyce, President, National Association of Broadcast Employees and Technicians/Communications Workers of America to Tom Wheeler, Chairman, FCC 2 (Mar. 12, 2014).

[177] *See* Scott D. Pierce, *New Owners Lay Off KTVX and KUCW Staffers*, The Salt Lake Tribune (Dec. 19, 2012), https://archive.sltrib.com/article.php?id=55491871&itype=CMSID (describing how Nexstar eliminated the accounting, research, and traffic departments from KTVX and KUCW); Merrill Knox, *Richard Doutree'Jones Named GM at Salt Lake City's KTVX-KUCW*, AdWeek (Jan. 7, 2013), https://www.adweek.com/tvspy/richard-doutrejones-named-gm-at-salt-lake-citys-ktvx-kucw/ (noting that Nexstar replaced the local station's GM following layoffs before Christmas); Kevin Eck, *Layoffs Hit Little Rock's KLRT and KARK*, AdWeek (Jan. 30, 2013), https://www.adweek.com/tvspy/layoffs-hit-little-rocks-klrt-and-kark/; Arkansas Business Staff, *Almost 30 Lose Jobs at KARK, KLRT as TV Owners Consolidate*, Arkansas Business (Jan. 29, 2013), https://archive.ph/ju9PX#selection-929.0-934.0 (noting that layoffs included on-air personalities, off-air employees, a sports anchors, and a news director); *UPDATE: More Layoffs from Nexstar at NewsChannel9*, CNYRadio.com (Dec. 3, 2012), https://cnyradio.com/2012/12/03/layoffs-rumored-as-new-owners-arrive-at-newschannel-9/ (noting that Nexstar laid off WSYR's accounting, traffic, and human resources departments; all of the part-time photographers working at the station; and two senior managers).

49

**App.376**

off approximately 30 employees and relocated a number of the station's functions to a regional hub in Salt Lake City.[178]

This trend continues today. While Applicants boast about the alleged benefits of Nexstar's 2019 acquisition of Tribune, they ignore the fact that the transaction led directly to layoffs at local stations.[179] As recently as 2024, Nexstar announced that it would be laying off two percent of its workforce—260 employees—to "streamline" the organization and "reduce operating costs."[180] In fact, *from year-end 2019 to year-end 2024, Nexstar cut a staggering 4,420 jobs representing 27.3 percent of its total workforce*.[181]

As explained to shareholders, should the Transaction be approved, Nexstar will continue this pattern of layoffs to deliver promised "operational efficiencies" and to "reduce costs." On Nexstar's Q3 2025 earnings call in November, Nexstar CFO Lee Ann Gliha noted about the instant Transaction:

> [T]here are many areas where we do things a little bit differently that generates synergy. . . . [T]here is obviously the . . . 35 of 51 markets that are the overlap markets that we can really operate two stations off of one infrastructure. . . . [T]hat is an area where there's a significant portion of those synergies coming out of

---

[178] Christopher Lawrence, *Layoffs Hit Las Vegas' KLAS-TV*, Las Vegas Rev. J. (June 4, 2015), https://www.reviewjournal.com/business/layoffs-hit-las-vegass-klas-tv/.

[179] *Compare* Nexstar/Tegna Comprehensive Exhibit at 10-17 *with* Alexandria Burris, *Fox Affiliate WXIN-59 and CBS Affiliate WTTV-4 See Job Cuts after Nexstar Acquisition*, IndyStar (Dec. 11, 2019), indystar.com/story/money/2019/12/11/fox-59-cbs-4-layoffs-samantha-myers-nexstar/4402949002/ (noting that Nexstar laid off as many as 30 employees across all departments at FOX and CBS affiliate stations).

[180] *See* Dade Hayes & Ted Johnson, *Nexstar Laying Off 2% Of Workforce, Focusing Cuts On Local Stations; The Hill Editor-In-Chief Bob Cusack Also Sets Exit*, Deadline (Dec. 11, 2024), https://deadline.com/2024/12/nexstar-layoffs-local-stations-the-hill-editor-in-chief-bob-cusack-exits-1236200879/; Matthew Keys, *Nexstar Readies Plan to Lay Off Broadcast TV, Sales Workers*, The Desk (Dec. 11, 2024), https://thedesk.net/2024/12/nexstar-media-group-layoffs/.

[181] Nexstar Media Group, Inc., Annual Report (From 10-K) (Feb. 27, 2025); Nexstar Media Group, Inc., Annual Report (From 10-K) (Feb. 28, 2024); Nexstar Media Group, Inc., Annual Report (From 10-K) (Feb. 28, 2023); Nexstar Media Group, Inc., Annual Report (From 10-K) (Feb. 28, 2022); Nexstar Media Group, Inc., Annual Report (From 10-K) (Mar. 1, 2021); Nexstar Media Group, Inc., Annual Report (From 10-K) (Mar. 2, 2020).

50

**App.377**

that. . . . *We did a very deep analysis in terms of looking at line by line, person by person, what these costs could be.*[182]

Industry analysts and journalists across the country also understand that Nexstar's "path to 'synergies' runs through pink slips."[183]  Furthermore, the efficiencies that Applicants promise may also come from reduced wages as Nexstar forces Tegna workers to accept below-market wages and substandard working conditions.[184]

### 2. The Transaction Will Lead to Duplicated, Centrally Produced Programming That Replaces Independent Local Programming

Given Nexstar's strategy of cutting workforces at local stations, it should come as no surprise that the Transaction will result in the elimination of locally produced news and public interest content.  As discussed above, Applicants offer no verifiable, merger-specific local news commitments in their Application.  Instead, Applicants focus on the "economic viability" of broadcast stations, making generalized assertions about market size and the need for

---

[182] Nexstar Q3 2025 Earnings Call Transcript (emphasis added).

[183] *See* Adam Shapiro, *Nexstar-Tegna $6.2B Deal: Layoffs and a Formula for Future Mergers*, AInvest (Aug. 22, 2025), https://www.ainvest.com/news/nexstar-tegna-6-2b-deal-layoffs-formula-future-mergers-2508/. *See also* Ryan Krull, *Tegna Purchase Could Lead to Layoffs or Consolidation in St. Louis Newsrooms*, St. Louis Magazine (Aug. 20, 2025), https://www.stlmag.com/news/tegna-nexstar-purchase-st-louis/; Noe Padilla, *Former WTHR Employee Concerned Acquisition Between TEGNA and Nexstar May Lead to Layoffs*, IndyStar (Aug. 20, 2025), https://www.indystar.com/story/news/local/2025/08/20/wthr-acquistion-tegna-layoffs-nexstar-fcc-fox59-cbs4-indianapolis/85727773007; Jim Heaney, *Bad News on the Horizon for Channels 2 and 4*, Investigative Post, (Aug. 18, 2025), https://www.investigativepost.org/2025/08/18/bad-news-on-the-horizon-for-channels-2-and-4/ ("Media consolidations are rarely a good thing, and the Buffalo market is likely to be ill-served by a Nexstar-TEGNA merger.  Competition is likely to take a hit and a downsizing of the joined operations is likely, although the station would maintain separate newsrooms."); Kyle Massey, *Nexstar-Tegna Merger: What It Might Mean in Arkansas*, Arkansas Business (Sept. 8, 2025), https://www.arkansasbusiness.com/article/nexstar-tegna-merger-job-cuts/ ("The public will suffer, jobs will suffer, news coverage will suffer."); Scott Jones, *Nexstar Sees Big Drop in Revenue*, FTVLive (Nov. 7, 2025), https://www.ftvlive.com/sqsp-test/2025/11/6/nexstar-sees-big-drop-in-revenue ("[T]he Tegna deal will likely lead to large job cuts across the stations."); Hank Price, *The Reality of Local TV Station Consolidation*, TVNewsCheck (June 27, 2025), https://tvnewscheck.com/business/article/the-reality-of-local-tv-station-consolidation/ ("[E]liminating staff will top the list of cuts.  Sadly, a lot of good people are going to lose their jobs.")

[184] *See* National Ass'n of Broad. Emp. and Technicians & Communications Workers of Am., *Breaking the Story: The Real Cost of Low Wages at America's Largest Broadcaster*, https://cwa-union.org/making-ends-meet-at-nexstar (finding that Nexstar pays some of the lowest wages in the industry and chronically understaffs stations).

51

**App.378**

consolidation.[185]  To make their case, Applicants also cite a 2021 working paper from the FCC's Office of Economics and Analysis that generally concludes that smaller markets do not have sufficient revenue to support four or more local news operations.[186]  Even if this study is accurate, it says nothing about whether consolidation will increase the number of unique local news operations, versus just syndicating the same news broadcasts on multiple stations.  Indeed, Nexstar CFO Lee Ann Gliha has conceded that a key part of Nexstar's strategy is to "operate two stations off of one infrastructure."[187]  Similarly, rather than making commitments to local news hours or beats, Applicants emphasize in their application access to Nexstar's D.C. Capital News Bureau, State Capital News Bureaus, and other remotely produced content.[188]

Far from a public benefit, these centralized reporting bureaus will *reduce* local news and replace it with national coverage reflective of the combined company's outsized national footprint.  Consistent with the company's strategy of cutting local station workforces to generate efficiencies through resource sharing, Nexstar's "banner projects are designed to share state and national stories with regional audiences."[189]  In fact, a recent study found that Nexstar is the country's leading "duplicator" of news content, airing word-for-word, identical news segments

---

[185] *See* Nexstar/Tegna Comprehensive Exhibit at 19-21.

[186] Nexstar/Tegna Comprehensive Exhibit at 20-21 (citing Kim Makuch & Jonathan Levy, *Market Size and Local Television News*, OEA Working Paper 52 (2021)).

[187] Nexstar Q3 2025 Earnings Call.

[188] Nexstar/Tegna Comprehensive Exhibit at 11-15.  Nexstar has made clear that these out-of-market news bureaus are a key part of their consolidation strategy, emphasizing the Washington D.C. news bureau in previous transactions with Media General and with Tribune.  *See* Applications of Nexstar Broadcasting Group, Inc. and Media General, Inc., FCC File Number BTCTTV-20160210AHO, Comprehensive Exhibit at 8 (filed Mar. 2016); Applications of Nexstar Media Group, Inc. and Tribune Media Company, FCC File Number BTCCDT-20190107ADH, Comprehensive Exhibit at 3-5 (filed Jan. 2019) ("Nexstar/Tribune Comprehensive Exhibit").

[189] Meaghan Winter, *Nexstar Nation*, Columbia Journalism Review, (July 20, 2020), https://www.cjr.org/special_report/nexstar-nation.php.

across multiple stations in the same market.[190]  As station managers at Nexstar-owned stations are increasingly pressured to maintain financial profitability, they are incentivized to run centralized content over quality and in-depth local news coverage.[191]  Far from saving local news operations, media analysts have warned that the Transaction will lead to "a homogenization of content" in local communities.[192]  Indeed, Nexstar has been found to duplicate content in seven markets where it proposes to acquire new Tegna stations, demonstrating that approval of the Transaction will only exacerbate this race to the bottom.[193]

In addition to reducing locally produced news content, the Transaction will further enable Nexstar to replace independent local news with corporate "must-run" segments to further its own political agenda.  In April 2025, Nexstar ordered the majority of its local television stations to air

---

[190] Danilo Yanich & Benjamin E. Bagorri, *Reusing The News: Duplicating Local TV Content* (Aug. 2025), https://www.reusingthenews.org/ (finding that Nexstar controlled approximately 22 percent of all 96 station pairings nationwide that duplicate content at least 50 percent of the time, more than any other group).

[191] *See* Meaghan Winter, *Nexstar Nation*, Columbia Journalism Review, (July 20, 2020), https://www.cjr.org/special_report/nexstar-nation.php ("And regardless of how much an individual station manager personally values accountability reporting, in the end that manager is tasked with keeping the station profitable, which means running more hours of news programming with a lean staff, making it much more difficult for a reporter to spend two months setting up a necessary interview with a government official.")

[192] Wyatte Grantham-Philips & Michelle Chapma, *Nexstar Media Group buying Tegna in deal worth $6.2 billion*, Associated Press (Aug. 19, 2025), https://www.ksat.com/business/2025/08/19/nexstar-media-group-buying-tegna-in-deal-worth-62-billion/; *see also* Kressin Powers White Paper at 28 ("As consolidation among major conglomerates continues, locally branded newscasts risk becoming increasingly homogenized, drawing more heavily from centralized or corporate-level content rather than locally produced reporting.").

[193] *See* Danilo Yanich & Benjamin E. Bagorri, *Reusing The News: Duplicating Local TV Content* (Aug. 2025), https://www.reusingthenews.org/.  These markets include, but are not limited to:  (1) Tampa, FL where Nexstar duplicated on average 82 percent of content on WFLA-TV and NTTA for 100 percent of the time studied; (2) Norfolk-Portsmouth-Newport News, VA where Nexstar duplicated on average 63 percent of content on WAVY and WVBT for 99 percent of the time studied; (3) Buffalo, NY where Nexstar duplicated on average 58 percent of content on WIVB and WNLO for 60 percent of the time studied; (4) Wilkes-Barre-Scranton-Hazleton, PA where Nexstar duplicated on average 71 percent of content on WBRE and WYOU (through a shared services agreement with Nexstar sidecar Mission Broadcasting) for 100 percent of the time studied; (5) Ft. Smith-Fayetteville-Springdale-Rodgers, AR where Nexstar duplicated on average 55 percent of content on KNWA and KFTA for 24 percent of the time studied; (6) Davenport-Rock Island-Moline, IA-IL where Nexstar duplicated on average 51 percent of content on WHBF and KLJB (through a shared services agreement with Mission) for five percent of the time studied; and (7) San Angelo, TX where Nexstar duplicated on average 52 percent of content on KLST and KSAN (through a shared services agreement with Mission) for one percent of the time studied.

53

segments pushing for broadcast ownership deregulation on its behalf.[194]  These must-run segments included pre-produced scripts with talking points for anchors, with one news producer arguing that the packages "were an attempt by Nexstar to influence the outcome of a regulatory matter through its local TV newscasts."[195]  Rather than empowering local stations, Nexstar's consolidation efforts serve only to benefit Nexstar and its shareholders, at the expense of local stations and the public.[196]  The same will be true of this Transaction.

In the *Standard General/Tegna Hearing Designation Order*, the Media Bureau determined that substantial and material questions of fact existed about whether the "apparent intent to provide local news services remotely will promote or harm localism."[197]  This Transaction raises the same questions even more pointedly—and provides still one more reason why the Commission, at minimum, must "designate the application for hearing."[198]

### C.    The Transaction Will Increase Prices for Local Advertisers

Applicants argue that the Transaction is necessary to "achieve the scale necessary to demonstrate a significant audience to advertisers" in the face of growing competition from digital platforms.[199]  Additionally, in their request for waiver of the FCC's bright-line Duopoly Rule in 23 markets, Applicants repeat the claim that common ownership would enable the

---

[194] *See* Matthew Keys, *Nexstar Orders Stations to Run News Stories about FCC Deregulation Efforts*, The Desk (Apr. 7, 2025) https://thedesk.net/2025/04/nexstar-fcc-must-runs-ownership-caps-deregulation/.

[195] *Id*.

[196] These "must-run" segments demonstrate how consolidation hinders viewpoint diversity.  In fact, several conservative leaning organizations (e.g., Newsmax, the Conservative Political Action Conference, One America News Network) have warned that consolidation in local broadcasting threatens conservative oriented media outlets. *See* Kressin Powers White Paper at 31-33.

[197] *Standard General/Tegna HDO* ¶ 49.

[198] 47 U.S.C. § 309(e); *see Encino Motorcars*, 579 U.S. at 221-22; *FCC v. Fox Television Stations*, 556 U.S. at 515-16.

[199] Nexstar/Tegna Comprehensive Exhibit at 4, 8-9.

combined stations "to better compete for advertising revenue."[200]  These claims ring hollow.  If anything, approval of the Transaction will lead to higher prices for local businesses that rely on local broadcast television spot advertisements and reduce competition as a result of in-market consolidation.

The DOJ has repeatedly found that broadcast stations compete head-to-head in the sale of broadcast television spot advertising, allowing advertisers to obtain lower prices through competition.[201]  Small business owners continue to rely on broadcast television spot advertisements to reach DMA-specific audiences.  The Transaction would result in the loss of Tegna as a competitor in the affected markets and, as the DOJ agrees, inevitably increase prices: As the DOJ found in its assessment of the Nexstar/Tribune transaction, advertisers seeking to reach audiences in DMAs where Applicants' footprints overlap will

> have fewer competing broadcast television alternatives available to meet their advertising needs, and would find it more difficult and costly to buy around higher prices imposed by the combined stations.  This would likely result in increased advertising prices, lower quality local programming to which the spot advertising is attached (for example, less investment in local news), and less innovation in providing advertising solutions to advertisers.[202]

### D.    Applicants' Claims of ATSC 3.0-Related Benefits Are Speculative and Unsupported by Marketplace Evidence

Applicants assert that Nexstar's ability to newly include Tegna stations in its ATSC 3.0-based EdgeBeam Wireless network is a public interest benefit that justifies waiver of the

---

[200] *Id*. at 23, 28, 32, 36, 40, 44, 48, 52, 56, 60, 64, 67, 71, 76, 80, 83, 87, 91, 95, 99, 103, 108, 111.

[201] *See, e.g.*, Nexstar/Tribune Competitive Impact Statement at 17; Gray/Quincy Competitive Impact Statement at 12-13; Gray/Raycom Competitive Impact Statement at 10-11; Nexstar/Media General Competitive Impact Statement at 8.

[202] Nexstar/Tribune Competitive Impact Statement at 17; *see also* Gray/Quincy Competitive Impact Statement at 12-13 (same); Gray/Raycom Competitive Impact Statement at 10-11 (same); Nexstar/Media General Competitive Impact Statement at 8 ("Because a significant number of advertisers would likely be unable to reach their desired audiences as effectively unless they advertise on at least one station that Nexstar would control after the proposed acquisition, those advertisers' bargaining positions would be weaker, and the advertising rates they pay would likely increase.").

Duopoly Rule in 23 markets.[203]  Although broadcasters like Nexstar have touted these types of "benefits" for the better part of a decade, including in the context of the Nexstar/Tribune transaction nearly seven years ago,[204] the absence of any demonstrated marketplace success or consumer demand for ATSC 3.0 generally, and allegedly new and innovative ATSC 3.0-enabled services, belie these claimed benefits.

Indeed, only eight percent of the nation's full power stations have transitioned to the standard,[205] and the "innovative" service offerings and applications that broadcasters purported ATSC 3.0 would bring—like "ATSC 3.0 Broadcast Internet services," "wake-up signaling," "automotive connectivity, content delivery networks, and enhanced GPS services"—have been slow to develop or have yet to be brought to market.[206]  Nexstar similarly touted the deployment of "innovative" ATSC 3.0 features in its application to acquire Tribune stations in 2019,[207] but has made little progress on this front in the intervening years.  The Commission should therefore be skeptical of any similar claims in this Transaction.  Moreover, consumers have, unsurprisingly, shown little interest in ATSC 3.0.  Years after the Commission authorized permissive use of the 3.0 standard, "device penetration remains exceedingly low," with the vast majority of consumers unable to view ATSC 3.0 content due to the standard's lack of backward compatibility.[208]  The fact that Applicants are asking the Commission to impose ATSC 3.0-

---

[203] *See* Nexstar/Tegna Comprehensive Exhibit at 25, 29, 33, 37, 41, 45, 49, 53, 57, 60-61, 65, 68, 72-73, 77, 81, 84, 88, 92, 96, 100, 104, 108-109, 112.

[204] *See, Nexstar/Tribune Order* ¶ 10 (citing Nexstar/Tribune Comprehensive Exhibit at 9-10).

[205] *ATSC 3.0 Station List*, RabbitEars, https://www.rabbitears.info/market.php?request=atsc3 (last visited Dec. 1, 2025).

[206] Nexstar/Tegna Comprehensive Exhibit at 15-16; *see also Nexstar/Tribune Order* ¶ 10.

[207] Nexstar/Tribune Comprehensive Exhibit at 9-10 ("The Transaction will also permit Nexstar to increase its investments in innovative new technologies and service offerings—including offerings made possible by the expanded launch of ATSC 3.0—to which Nexstar is deeply committed.").

[208] *See* Comments of Pub. Knowledge, Access Humboldt, Consumer Reports, Elec. Frontier Found., Media Council Hawaii, & Open Tech. Inst. at New America, MB Docket No. 16-142, at 13 (filed May 7, 2025) ("PK et al. ATSC

56

**App.383**

related mandates, rather than relying on market forces to build interest in the service, further undercuts claims that the Transaction will be a game changer when it comes to the transition.

Even assuming the legitimacy of Applicants' 3.0-related claims, Applicants fail to acknowledge, let alone address, the tangible consumer harms that will result from stations transitioning to 3.0.  For example, consumers will have to purchase new 3.0-compatible equipment at a "price premium" or risk being cut off from stations broadcasting exclusively in 3.0.[209]  These financial burdens will disproportionately impact the very households that are among the "most reliant on broadcast television for news, emergency alerts, and educational content."[210]  Despite these harms, Applicants make no commitments to ensure that those that do not have 3.0 compatible equipment—which is the vast majority of consumers today—or that cannot afford such equipment will be able to continue to receive their local broadcast channels, such as by simulcasting their main broadcast feeds in ATSC 1.0.[211]

## VIII.  CONCLUSION

The proposed Transaction would violate the Communications Act and the Commission's rules, and must be rejected on this ground alone.  And even if these legal obstacles could be overcome, Applicants have not come close to meeting their burden to show affirmative public interest benefits that outweigh the clear and substantial transaction-related harms.  The massive consolidation of station ownership—both nationally and in numerous local markets—would

---

3.0 Comments") ("Less than 2% of televisions sold in the United States currently include ATSC 3.0 tuners."); Comments of Weigel Broadcasting Co., MB Docket No. 16-142, at i (filed May 7, 2025) ("[I]n light of [ATSC 3.0-related] costs and burdens, Weigel has not seen consumer demand for broadcasting using the ATSC 3.0 standard.").

[209] PK et al. ATSC 3.0 Comments at 5-7.

[210] *Id*. at 6.

[211] In fact, rather than ensuring no consumers get left behind, broadcasters have pushed the Commission to eliminate the simulcasting requirement entirely in petitioning for a mandatory transition to ATSC 3.0.  *See* National Association of Broadcasters Petition for Rulemaking, GN Docket No. 16-142, at 11, 28 (filed Feb. 26, 2025).

**App.384**

harm MVPDs and their customers by increasing retransmission consent fees while undermining the Commission's traditional policy goals of competition, localism, and viewpoint diversity in broadcasting.  For all of these reasons, the proposed transaction must be denied.

Respectfully submitted,

/s/ _____

Todd Eachus
President
BROADBAND COMMUNICATIONS
ASSOCIATION OF PENNSYLVANIA
127 State St.
Harrisburg, PA 17101

Joseph Dant
Executive Director
INDIANA CABLE AND BROADBAND
ASSOCIATION
150 W. Market St., Ste. 412
Indianapolis, IN 46204

Ann Marie Walp
President
TENNESSEE CABLE & BROADBAND
ASSOCIATION
414 Union St., Ste. 1900
Nashville, Tennessee 37219

David Ducharme
Executive Director
BROADBAND COMMUNICATIONS
ASSOCIATION OF WASHINGTON
4217 Williams Ave. N.
Renton, WA 98056

T.J. Taylor
Executive Director
MISSISSIPPI CABLE
TELECOMMUNICATIONS ASSOCIATION
PO Box 55867
Jackson, MS 39296

Ray LaMura
President
VCTA – BROADBAND ASSOCIATION OF
VIRGINIA
1111 East Main St., Ste. 802
Richmond, VA 23219

December 31, 2025

58

**App.385**

**CERTIFICATE OF SERVICE**

I, Todd Eachus, certify that on this 31st day of December, I caused true and correct

copies of the foregoing Petition to Deny to be served by electronic mail on the following:

Jennifer A. Johnson
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-5552
jjohnson@cov.com

*Counsel to TEGNA, Inc.*

Kathleen Kirby
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-3360
kkirby@wiley.law

*Counsel to Nexstar Media Inc.*

/s/ *Todd Eachus*
Todd Eachus

December 31, 2025

**App.386**

## VERIFICATION

The foregoing Petition to Deny has been prepared using facts of which I have personal knowledge or based upon information provided to me. I declare under penalty of perjury that the foregoing is true and correct to the best of my current information, knowledge, and belief.

December 31, 2025

Todd Eachus
President
BROADBAND COMMUNICATIONS
ASSOCIATION OF PENNSYLVANIA

**App.387**

**DECLARATION OF JOE LORAH, BLUE RIDGE COMMUNICATIONS**

I, Joe Lorah, being over 18 years of age, swear and affirm as follows:

1.      My name is Joe Lorah.  I make this declaration using facts of which I have personal knowledge of, or based on information provided to me, in connection with the proposed transfer of control ("Transaction") of the broadcast licenses of TEGNA Inc. ("Tegna") to Nexstar Media Group, Inc. ("Nexstar") (collectively, the Applicants), and the likely effects of the Transaction on Blue Ridge Communications ("Blue Ridge").

2.      I am currently Director of Government & Public Affairs at Blue Ridge.  Blue Ridge has been connecting Pennsylvanians since 1950 and today provides cable, Internet, and phone services to the Poconos and other areas of central Pennsylvania.  In my role, I develop and implement Blue Ridge's policy agenda and advocacy based on our operational strategy, and serve as the primary point of contact between the company and state and local officials.

3.      Blue Ridge is a member of the Broadband Communications Association of Pennsylvania.

4.      Today, Blue Ridge has over 200,000 subscribers in six designated market areas ("DMAs") across Pennsylvania.  All six markets are served by Nexstar and/or Tegna stations.[1] Of those, one is a market in which approval of the transaction would result in Nexstar owning three or more full-power stations:  Buffalo, NY where Nexstar proposes to combine its WIVB-TV (CBS) and WNLO (CW) with Tegna's WGRZ (NBC); and three are markets in which approval of the transaction would grant Nexstar ownership of a new Big Four station affiliate *duopoly*:  Buffalo, NY with Nexstar's WIVB-TV (CBS) and Tegna's WGRZ (NBC);

---

[1] The markets include Buffalo, NY; Elmira, NY; Harrisburg-Lancaster-Lebanon-York, PA; New York, NY; Philadelphia, PA; and Wilkes Barre-Scranton-Hazleton, PA.

**App.388**

Harrisburg-Lancaster-Lebanon-York, PA with Nexstar's WHTM-TV (ABC) and Tegna's WPMT (FOX); and Wilkes Barre-Scranton-Hazleton, PA with Nexstar's WBRE-TV (NBC) and Tegna's WNEP-TV (ABC).

5.    Blue Ridge has existing retransmission consent agreements with both Nexstar and Tegna.

6.    Over the past decade, industry-wide, retransmission consent fees imposed on Multichannel Video Programming Distributors ("MVPDs") like Blue Ridge have increased at a staggering pace, all while MVPDs' subscribership has declined substantially.

7.    Nexstar is the largest broadcast station group owner in the United States, and already imposes substantial rates on Blue Ridge's cable systems.  As Nexstar has acknowledged in public filings, it includes "after-acquired station" clauses in its retransmission consent agreements[2] that would require MVPDs to pay, immediately upon closing of the Transaction, higher retransmission consent rates on the newly acquired Tegna stations, rather than the lower,

---

[2] *See, e.g.*, Nexstar Media Inc.'s Answer to Retransmission Consent Complaint of Cincinnati Bell Extended Territories LLC dba altafiber, MB Docket No. 25-197, at 11-12 (filed July 3, 2025) (describing "[t]he decades-long and widespread inclusion of these [after-acquired station] clauses across the industry" and in Nexstar's own contracts); Press Release, Nexstar Media Group, Inc., *Nexstar Media Group Fourth Quarter Net Revenue Rises 37.9% to a Record $1.1 Billion* (Feb. 20, 2020), https://www.nexstar.tv/wp-content/uploads/2020/02/NXST_Q419_2-26-20.pdf (attributing retransmission consent revenue increases in the first quarter following the close of the Nexstar/Tribune transaction to "Tribune Media revenue synergies related to the *after acquired clauses in our retransmission consent contracts*") (emphasis added).

pre-existing rate that MVPDs currently pay to Tegna.[3]  Nexstar has made it clear that increasing retransmission consent rates in this way is a key part of their strategy to achieve "synergies."[4]

8.    Increasing the local market concentration for Nexstar, particularly in the three markets where Blue Ridge operates and Nexstar will acquire a new Big-Four network affiliate duopoly, will increase Nexstar's leverage to demand ever-higher retransmission consent rates from Blue Ridge, which results in higher prices for our company and our customers.

9.    Moreover, Nexstar typically negotiates retransmission consent on a nationwide basis, across its station footprint.[5]  As Nexstar has grown over the last decade, a greater number of stations are subject to this single negotiation.  Nexstar can then use its massive scale to threaten widescale blackouts to consumers and thereby increase its leverage in retransmission consent negotiations to extract supra-competitive fees.

10.    The blackout risks for our company are substantial if we do not accede to Nexstar's pricing demands.  In our footprint, Nexstar would newly have the ability to

---

[3] Nexstar CFO Lee Ann Gliha has explained that, with respect to the Nexstar-Tegna transaction, "the synergy playbook here is very similar to the playbook that you've seen us execute in the past," including "contractual retrans synergies" such as "$300 million of synergies we expect" in the transaction's first year.  Transcript of Nexstar Media Group, Inc. M&A Call (Aug. 19, 2025).  *See also* Transcript of Nexstar Media Group, Inc., Q3 2025 Earnings Call (Nov. 6, 2025), ("I think as we've talked about on our call when we announced the transaction, there's about *$300 million of synergies*.  It breaks out very similarly to how the synergies broke out on the Tribune deal, which was *about 45% from net retrans* and the remainder coming from operations.") (emphasis added).  These immediate "contractual retrans synergies" would not be possible if Tegna's retransmission consent rates were not lower than those of Nexstar.

[4] Transcript of Nexstar Media Group, Inc. Presentation at 53rd Annual JPMorgan Global Technology, Media and Communications Conference 7 (May 14, 2025) ("[W]e have the ability to step up any targets' retrans if it is lower to our level.  And that's a very nice synergy to have.  It's easy to achieve.").

[5] *See* Press Release, Nexstar Media Group, Inc., *Viewers Deprived Of Critical Local News, Important Weather Updates, Women's World Cup Soccer Matches, And MLB All-Star Game, Following DIRECTV's Removal Of 159 Nexstar Local TV Stations In 113 Markets And National Cable News Network NewsNation* (Jul. 2, 2023), https://www.nexstar.tv/viewers-deprived-following-directvs-removal-of-159-nexstar-local-tv-stations-in-113-markets-and-newsnation/ (explaining that as a result of failed distribution agreement negotiations with DIRECTV "millions of Americans across the country" lost access to programming); *see also* Competitive Impact Statement at 4, *United States v. Nexstar Media Grp., Inc.*, No. 1-19-cv-02295-DLF (D.D.C. Feb. 10, 2020), https://www.justice.gov/atr/case-document/file/1192116/dl?inline ("A retransmission agreement is negotiated directly between a broadcast station group, such as Nexstar or Tribune, and a given MVPD, and this agreement typically covers all of the station group's stations located in the MVPD's service area, or 'footprint.'").

simultaneously black out (a) three full-power stations in one market where Blue Ridge operates and (b) two Big Four affiliates in three markets where Nexstar will own new Big Four affiliate combinations.  These blackouts are not merely theoretical, as Nexstar has routinely used blackouts as a negotiating tactic with MVPDs if they balk at Nexstar's exorbitant price hikes.[6]

11.     Additionally, because retransmission consent negotiations typically cover a wide range of carriage issues (e.g., carriage of Top Four and non-Top Four stations, carriage of broadcaster-affiliated cable networks), Nexstar can use this leverage in negotiations to demand price increases across its portfolio of programming assets, including higher rates for its CW-affiliated stations and for its affiliated cable network, NewsNation, notwithstanding relatively low consumer demand for the network.[7]

12.     As a result, the increased scale and leverage of the combined company will also cause even larger fee increases for carriage of stations in current Nexstar-only markets, like WTEM, Nexstar's NBC affiliate in the Elmira, NY market; WPHL, Nexstar's CW affiliate in the

---

[6] *See Retrans-Blackouts-Overview-2010-Nov-2025*, American Television Alliance (Nov. 2025), https://americantelevisionalliance.org/wp-content/uploads/2025/11/Retrans-Blackouts-Overview-2010-Nov-2025.xlsx (showing that, since 2020, Nexstar has blacked out local stations six different times with five different MVPDs).

[7] *See, e.g.*, Dade Hayes, *The CW Will Turn a Profit 'At Some Point' In 2026, Parent Company Nexstar's CFO Says*, Deadline (Dec. 8, 2025), https://deadline.com/2025/12/the-cw-network-profit-nexstar-1236642530/ ("Owning The CW enabled Nexstar to 'bring back a number of those affiliates onto Nexstar stations, and that's been very profitable for us,' [Nexstar CFO Lee Ann] Gliha said."); Verified Retransmission Consent Complaint of Cincinnati Bell Extended Territories LLC dba altafiber, Complainant, v. Nexstar Media Inc., Defendant, MB Docket No. 25-197, at ii (filed June 13, 2025) ("Nexstar conditions any grant of retransmission consent for WDTN on altafiber's continued distribution of Nexstar-owned cable network, NewsNation . . . and, despite extremely low viewership and engagement, demands a fee increase of more than 15 times the rate of inflation."); Reply to Answer of Cincinnati Bell Extended Territories LLC dba altafiber, Complainant, v. Nexstar Media Inc., Defendant, MB Docket No. 25-197, at 2 (filed July 14, 2025) ("[W]hen altafiber agreed to distribute NewsNation to Cincinnati three years ago, it was based on the expectation that viewership of its fledgling NewsNation service would grow with time.  That has not happened, and subscribers today largely do not care whether or not altafiber distributes NewsNation as evidenced by the fact that only about 100 subscribers have expressed displeasure with its loss and fewer have cancelled their subscriptions.").

Philadelphia market; and WPIX, the CW affiliate in the New York market for which Nexstar negotiates retransmission consent.

13.     Beyond the increases to retransmission consent fees and risks of widescale blackouts, the Transaction would harm Blue Ridge's subscribership.  MVPD subscribers have been "cutting the cord" for over a decade now, and many smaller MVPDs have already exited the cable marketplace altogether when faced with higher programming costs and a smaller subscriber base to defray those costs.  This Transaction will only accelerate this trend due to increased consumer costs, which will be largely attributable to higher programming costs.

14.     In sum, approval of the Transaction will directly cause an immediate increase in retransmission consent fees for our company and our customers, given Nexstar's greater leverage to impose even higher fees in retransmission consent negotiation renewals moving forward, and create a greater risk of program blackouts in all six markets where Blue Ridge operates within the combined company's footprint.

15.     The FCC can prevent these harms to Blue Ridge and our customers by denying the Transaction.

**App.392**

App.393

*     *     *     *

The foregoing declaration has been prepared using facts of which I have personal knowledge or based upon information provided to me. I declare under penalty of perjury that the foregoing is true and correct to the best of my current information, knowledge, and belief.

Dated:
613 3rd Street
Palmerton, PA  18071
December 19, 2025

Joe Lorah
Director of Government & Public Affairs

**DECLARATION OF PAUL BEAUDRY, COGECO US FINANCE, LLC d/b/a
BREEZELINE ("BREEZELINE")**

I, Paul Beaudry, being over 18 years of age, swear and affirm as follows:

1.      My name is Paul Beaudry.  I make this declaration using facts of which I have personal knowledge of, or based on information provided to me, in connection with the proposed transfer of control ("Transaction") of the broadcast licenses of TEGNA Inc. ("Tegna") to Nexstar Media Group, Inc. ("Nexstar") (collectively, the Applicants), and the likely effects of the Transaction on Breezeline.

2.      I am currently Vice President, Regulatory and Corporate Affairs at Breezeline.  I am responsible for all of Breezeline's U.S. regulatory advocacy and compliance activities at the federal, state, and local levels.

3.      Breezeline is a member of the Broadband Communications Association of Pennsylvania and VCTA – Broadband Association of Virginia.

4.      Today, Breezeline serves video customers in 20 designated market areas ("DMAs") across 13 states, with services concentrated in primarily rural areas.  This includes 15 markets served by Nexstar and Tegna stations.  Of those, one is currently a Tegna-only market, which, if the transaction is approved, would expand Nexstar's national audience reach: Portland-Auburn, ME where Tegna owns WCSH (NBC); five are markets in which approval of the transaction would result in Nexstar owning three or more full-power stations: Washington, DC where Nexstar proposes to combine its WDVM-TV (Ind.) and WDCW (CW) with Tegna's WUSA (CBS); Cleveland-Akron (Canton), OH where Nexstar proposes to combine its WJW (FOX) and WBNX-TV (CW) with Tegna's WKYC (NBC); Hartford-New Haven, CT where Nexstar proposes to combine its WTNH (ABC) and WCTX (MyNetworkTV) with Tegna's WTIC-TV (FOX) and WCCT-TV (CW); Norfolk-Portsmouth-Newport News, VA where

**App.394**

Nexstar proposes to combine its WAVY-TV (NBC) and WVBT (FOX) with Tegna's WVEC (ABC); and Buffalo, NY where Nexstar proposes to combine its WIVB-TV (CBS) and WNLO (CW) with Tegna's WGRZ (NBC); six are markets in which approval of the transaction would grant Nexstar ownership of a new Big Four station affiliate *duopoly*: Cleveland-Akron (Canton), OH with Nexstar's WJW (FOX) and Tegna's WKYC (NBC); Hartford-New Haven, CT with Nexstar's WTNH (ABC) and Tegna's WTIC-TV (FOX); Columbus, OH with Nexstar's WCMH-TV (NBC) and Tegna's WBNS-TV (CBS); Harrisburg-Lancaster-Lebanon-York, PA with Nexstar's WHTM-TV (ABC) and Tegna's WPMT (FOX); Buffalo, NY with Nexstar's WIVB-TV (CBS) and Tegna's WGRZ (NBC); and Wilkes Barre-Scranton-Hazleton, PA with Nexstar's WBRE-TV (NBC) and Tegna's WNEP-TV (ABC); and one is a market in which approval of the transaction would give Nexstar ownership of a new Big Four station *triopoly*: Norfolk-Portsmouth-Newport News, VA with Nexstar's WAVY-TV (NBC) and WVBT (FOX) and Tegna's WVEC (ABC).

5.    Breezeline has existing retransmission consent agreements with both Nexstar and Tegna.

6.    Over the past decade, industry-wide retransmission consent fees imposed on Multichannel Video Programming Distributors ("MVPDs") like Breezeline have increased at a staggering pace, all while MVPDs' subscribership has declined substantially.

7.    Nexstar is the largest broadcast station group owner in the United States, and already imposes substantial rates on Breezeline's cable systems.  As Nexstar has acknowledged in public filings, it includes "after acquired station" clauses in its retransmission consent agreements[1] that would require MVPDs to pay, immediately upon closing of the Transaction,

---

[1] *See, e.g.*, Nexstar Media Inc.'s Answer to Retransmission Consent Complaint of Cincinnati Bell Extended Territories LLC dba altafiber, MB Docket No. 25-197, at 11-12 (filed July 3, 2025) (describing "[t]he decades-long

higher retransmission consent rates on the newly acquired Tegna stations, rather than the lower, pre-existing rate that MVPDs currently pay to Tegna.[2]  Nexstar has made it clear that increasing retransmission consent rates in this way is a key part of their strategy to achieve "synergies."[3]

8.    Increasing the local market concentration for Nexstar, particularly in the seven markets where Breezeline operates and Nexstar will acquire a new Big-Four network affiliate duopoly or triopoly, will increase Nexstar's leverage to demand ever-higher retransmission consent rates from Breezeline, which results in higher prices for our company and our customers.

9.    Moreover, Nexstar typically negotiates retransmission consent on a nationwide basis, across its station footprint.[4]  As Nexstar has grown over the last decade, a greater number of stations are subject to this single negotiation.  Nexstar can then use its massive scale to

---

and widespread inclusion of these [after-acquired station] clauses across the industry" and in Nexstar's own contracts); Press Release, Nexstar Media Group, Inc., *Nexstar Media Group Fourth Quarter Net Revenue Rises 37.9% to a Record $1.1 Billion* (Feb. 20, 2020), https://www.nexstar.tv/wp-content/uploads/2020/02/NXST_Q419_2-26-20.pdf (attributing retransmission consent revenue increases in the first quarter following the close of the Nexstar/Tribune transaction to "Tribune Media revenue synergies related to the *after acquired clauses in our retransmission consent contracts*") (emphasis added).

[2] Nexstar CFO Lee Ann Gliha has explained that, with respect to the Nexstar-Tegna transaction, "the synergy playbook here is very similar to the playbook that you've seen us execute in the past," including "contractual retrans synergies" such as "$300 million of synergies we expect" in the transaction's first year.  Transcript of Nexstar Media Group, Inc. M&A Call (Aug. 19, 2025).  *See also* Transcript of Nexstar Media Group, Inc., Q3 2025 Earnings Call (Nov. 6, 2025), ("I think as we've talked about on our call when we announced the transaction, there's about *$300 million of synergies*.  It breaks out very similarly to how the synergies broke out on the Tribune deal, which was *about 45% from net retrans* and the remainder coming from operations.") (emphasis added).  These immediate "contractual retrans synergies" would not be possible if Tegna's retransmission consent rates were not lower than those of Nexstar.

[3] Transcript of Nexstar Media Group, Inc. Presentation at 53rd Annual JPMorgan Global Technology, Media and Communications Conference 7 (May 14, 2025) ("[W]e have the ability to step up any targets' retrans if it is lower to our level.  And that's a very nice synergy to have.  It's easy to achieve.").

[4] *See* Press Release, Nexstar Media Group, Inc., *Viewers Deprived Of Critical Local News, Important Weather Updates, Women's World Cup Soccer Matches, And MLB All-Star Game, Following DIRECTV's Removal Of 159 Nexstar Local TV Stations In 113 Markets And National Cable News Network NewsNation* (Jul. 2, 2023), https://www.nexstar.tv/viewers-deprived-following-directvs-removal-of-159-nexstar-local-tv-stations-in-113-markets-and-newsnation/ (explaining that as a result of failed distribution agreement negotiations with DIRECTV "millions of Americans across the country" lost access to programming); *see also* Competitive Impact Statement at 4, *United States v. Nexstar Media Grp., Inc.*, No. 1-19-cv-02295-DLF (D.D.C. Feb. 10, 2020), https://www.justice.gov/atr/case-document/file/1192116/dl?inline ("A retransmission agreement is negotiated directly between a broadcast station group, such as Nexstar or Tribune, and a given MVPD, and this agreement typically covers all of the station group's stations located in the MVPD's service area, or 'footprint.'").

**App.396**

threaten widescale blackouts to consumers and thereby increase its leverage in retransmission consent negotiations to extract supra-competitive fees.

10.    The blackout risks for our company are substantial if we do not accede to Nexstar's pricing demands.  In our footprint, Nexstar would newly have the ability to simultaneously black out (a) three full-power stations in five markets where Breezeline operates and (b) seven markets where Nexstar will own new Big Four affiliate combinations, including one market where Nexstar will own a new Big Four triopoly.  These blackouts are not merely theoretical, as Nexstar has routinely used blackouts as a negotiating tactic with MVPDs if they balk at Nexstar's exorbitant price hikes.[5]

11.    Additionally, because retransmission consent negotiations typically cover a wide range of carriage issues (e.g., carriage of Top Four and non-Top Four stations, carriage of broadcaster-affiliated cable networks), Nexstar can use this leverage in negotiations to demand price increases across its portfolio of programming assets, including higher rates for its CW-affiliated stations and for its affiliated cable network, NewsNation, notwithstanding relatively low consumer demand for the network.[6]

---

[5] *See Retrans-Blackouts-Overview-2010-Nov-2025*, American Television Alliance (Nov. 2025), https://americantelevisionalliance.org/wp-content/uploads/2025/11/Retrans-Blackouts-Overview-2010-Nov-2025.xlsx (showing that, since 2020, Nexstar has blacked out local stations six different times with five different MVPDs).

[6] *See, e.g.*, Dade Hayes, *The CW Will Turn a Profit 'At Some Point' In 2026, Parent Company Nexstar's CFO Says*, Deadline (Dec. 8, 2025), https://deadline.com/2025/12/the-cw-network-profit-nexstar-1236642530/ ("Owning The CW enabled Nexstar to 'bring back a number of those affiliates onto Nexstar stations, and that's been very profitable for us,' [Nexstar CFO Lee Ann] Gliha said."); Verified Retransmission Consent Complaint of Cincinnati Bell Extended Territories LLC dba altafiber, Complainant, v. Nexstar Media Inc., Defendant, MB Docket No. 25-197, at ii (filed June 13, 2025) ("Nexstar conditions any grant of retransmission consent for WDTN on altafiber's continued distribution of Nexstar-owned cable network, NewsNation . . . and, despite extremely low viewership and engagement, demands a fee increase of more than 15 times the rate of inflation."); Reply to Answer of Cincinnati Bell Extended Territories LLC dba altafiber, Complainant, v. Nexstar Media Inc., Defendant, MB Docket No. 25-197, at 2 (filed July 14, 2025) ("[W]hen altafiber agreed to distribute NewsNation to Cincinnati three years ago, it was based on the expectation that viewership of its fledgling NewsNation service would grow with time.  That has not happened, and subscribers today largely do not care whether or not altafiber distributes NewsNation as

12.    As a result, the increased scale and leverage of the combined company will also cause even larger fee increases for carriage of stations in current Nexstar-only markets, like WPHL, Nexstar's CW affiliate in the Philadelphia market; WRIC-TV, Nexstar's ABC affiliate in the Richmond-Petersburg, VA market; WJBF, Nexstar's ABC affiliate in the Augusta-Aiken, GA-SC market; WTAJ-TV, Nexstar's CBS affiliate in the Johnstown-Altoona-State College, PA market; WJET-TV, Nexstar's ABC affiliate in the Erie, PA market; and WBOY-TV, Nexstar's dual NBC/ABC affiliate in the Clarksburg-Weston, WV market.

13.    Beyond the increases to retransmission consent fees and risks of widescale blackouts, the Transaction would harm Breezeline's subscribership.  MVPD subscribers have been "cutting the cord" for over a decade now, and many smaller MVPDs have already exited the cable marketplace altogether when faced with higher programming costs and a smaller subscriber base to defray those costs.  This Transaction will only accelerate this trend due to increased consumer costs, which will be largely attributable to higher programming costs.

14.    In sum, approval of the Transaction will directly cause an immediate increase in retransmission consent fees for our company and our customers, given Nexstar's greater leverage to impose even higher fees in retransmission consent negotiation renewals moving forward, and create a greater risk of program blackouts in all 15 markets where Breezeline operates within the combined company's footprint.

15.    The FCC can prevent these harms to Breezeline and our customers by denying the Transaction.

---

evidenced by the fact that only about 100 subscribers have expressed displeasure with its loss and fewer have cancelled their subscriptions.").

\* \* \* \*

The foregoing declaration has been prepared using facts of which I have personal knowledge or based upon information provided to me. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my current information, knowledge, and belief.

Dated:
Montreal, Canada
December 24, 2025

Paul Beaudry
Vice-President, Regulatory and Corporate Affairs

App.399

**DECLARATION OF JACK CAPPARELL, SERVICE ELECTRIC CABLE TV & COMMUNICATIONS**

I, Jack Capparell, being over 18 years of age, swear and affirm as follows:

1.      My name is Jack Capparell.  I make this declaration using facts of which I have personal knowledge of, or based on information provided to me, in connection with the proposed transfer of control ("Transaction") of the broadcast licenses of TEGNA Inc. ("Tegna") to Nexstar Media Group, Inc. ("Nexstar") (collectively, the Applicants), and the likely effects of the Transaction on Service Electric Cable TV & Communications.

2.      I am currently the General Manager at Service Electric Cable TV & Communications.  I oversee overall operations, as well as build new market opportunities for business development.

3.      Service Electric Cable TV & Communications is a member of the Broadband Communications Association of Pennsylvania.

4.      Today, Service Electric Cable TV & Communications has over 119,000 subscribers in four designated market areas ("DMAs"), all served by Nexstar and/or Tegna stations.[1]  Of those, two are markets in which approval of the transaction would grant Nexstar ownership of a new Big Four station affiliate *duopoly*:  Harrisburg-Lancaster-Lebanon-York, PA where Nexstar proposes to combine its WHTM-TV (ABC) with Tegna's WPMT (FOX); and Wilkes-Barre-Scranton-Hazleton, PA where Nexstar proposes to combine its WBRE-TV (NBC) with Tegna's WNEP-TV (ABC).

5.      Service Electric Cable TV & Communications has existing retransmission consent agreements with both Nexstar and Tegna.

---

[1] These markets are New York, NY; Philadelphia, PA; Harrisburg-Lancaster-Lebanon-York, PA; and Wilkes-Barre-Scranton-Hazleton, PA.

**App.400**

6.     Over the past decade, industry-wide, retransmission consent fees imposed on Multichannel Video Programming Distributors ("MVPDs") like Service Electric Cable TV & Communications have increased at a staggering pace, all while MVPDs' subscribership has declined substantially.

7.     Nexstar is the largest broadcast station group owner in the United States, and already imposes substantial rates on Service Electric Cable TV & Communications's cable systems.  As Nexstar has acknowledged in public filings, it includes "after-acquired station" clauses in its retransmission consent agreements[2] that would require MVPDs to pay, immediately upon closing of the Transaction, higher retransmission consent rates on the newly acquired Tegna stations, rather than the lower, pre-existing rate that MVPDs currently pay to Tegna.[3] Nexstar has made it clear that increasing retransmission consent rates in this way is a key part of their strategy to achieve "synergies."[4]

---

[2] *See, e.g.*, Nexstar Media Inc.'s Answer to Retransmission Consent Complaint of Cincinnati Bell Extended Territories LLC dba altafiber, MB Docket No. 25-197, at 11-12 (filed July 3, 2025) (describing "[t]he decades-long and widespread inclusion of these [after-acquired station] clauses across the industry" and in Nexstar's own contracts); Press Release, Nexstar Media Group, Inc., *Nexstar Media Group Fourth Quarter Net Revenue Rises 37.9% to a Record $1.1 Billion* (Feb. 20, 2020), https://www.nexstar.tv/wp-content/uploads/2020/02/NXST_Q419_2-26-20.pdf (attributing retransmission consent revenue increases in the first quarter following the close of the Nexstar/Tribune transaction to "Tribune Media revenue synergies related to the *after acquired clauses in our retransmission consent contracts*") (emphasis added).

[3] Nexstar CFO Lee Ann Gliha has explained that, with respect to the Nexstar-Tegna transaction, "the synergy playbook here is very similar to the playbook that you've seen us execute in the past," including "contractual retrans synergies" such as "$300 million of synergies we expect" in the transaction's first year.  Transcript of Nexstar Media Group, Inc. M&A Call (Aug. 19, 2025).  *See also* Transcript of Nexstar Media Group, Inc., Q3 2025 Earnings Call (Nov. 6, 2025), ("I think as we've talked about on our call when we announced the transaction, there's about *$300 million of synergies*.  It breaks out very similarly to how the synergies broke out on the Tribune deal, which was *about 45% from net retrans* and the remainder coming from operations.") (emphasis added).  These immediate "contractual retrans synergies" would not be possible if Tegna's retransmission consent rates were not lower than those of Nexstar.

[4] Transcript of Nexstar Media Group, Inc. Presentation at 53rd Annual JPMorgan Global Technology, Media and Communications Conference 7 (May 14, 2025) ("[W]e have the ability to step up any targets' retrans if it is lower to our level.  And that's a very nice synergy to have.  It's easy to achieve.").

**App.401**

8.      Increasing the local market concentration for Nexstar, particularly in the two markets where Service Electric Cable TV & Communications operates and Nexstar will acquire a new Big-Four network affiliate duopoly, will increase Nexstar's leverage to demand ever-higher retransmission consent rates from Service Electric Cable TV & Communications, which results in higher prices for our company and our customers.

9.      Moreover, Nexstar typically negotiates retransmission consent on a nationwide basis, across its station footprint.[5]  As Nexstar has grown over the last decade, a greater number of stations are subject to this single negotiation.  Nexstar can then use its massive scale to threaten widescale blackouts to consumers and thereby increase its leverage in retransmission consent negotiations to extract supra-competitive fees.

10.     The blackout risks for our company are substantial if we do not accede to Nexstar's pricing demands.  In our footprint, Nexstar would newly have the ability to simultaneously black out two markets where Nexstar will own new Big Four affiliate combinations.  These blackouts are not merely theoretical, as Nexstar has routinely used blackouts as a negotiating tactic with MVPDs if they balk at Nexstar's exorbitant price hikes.[6]

---

[5] *See* Press Release, Nexstar Media Group, Inc., *Viewers Deprived Of Critical Local News, Important Weather Updates, Women's World Cup Soccer Matches, And MLB All-Star Game, Following DIRECTV's Removal Of 159 Nexstar Local TV Stations In 113 Markets And National Cable News Network NewsNation* (Jul. 2, 2023), https://www.nexstar.tv/viewers-deprived-following-directvs-removal-of-159-nexstar-local-tv-stations-in-113-markets-and-newsnation/ (explaining that as a result of failed distribution agreement negotiations with DIRECTV "millions of Americans across the country" lost access to programming); *see also* Competitive Impact Statement at 4, *United States v. Nexstar Media Grp., Inc.*, No. 1-19-cv-02295-DLF (D.D.C. Feb. 10, 2020), https://www.justice.gov/atr/case-document/file/1192116/dl?inline ("A retransmission agreement is negotiated directly between a broadcast station group, such as Nexstar or Tribune, and a given MVPD, and this agreement typically covers all of the station group's stations located in the MVPD's service area, or 'footprint.'").

[6] *See Retrans-Blackouts-Overview-2010-Nov-2025*, American Television Alliance (Nov. 2025), https://americantelevisionalliance.org/wp-content/uploads/2025/11/Retrans-Blackouts-Overview-2010-Nov-2025.xlsx (showing that, since 2020, Nexstar has blacked out local stations six different times with five different MVPDs).

11.     Additionally, because retransmission consent negotiations typically cover a wide range of carriage issues (e.g., carriage of Top Four and non-Top Four stations, carriage of broadcaster-affiliated cable networks), Nexstar can use this leverage in negotiations to demand price increases across its portfolio of programming assets, including higher rates for its CW-affiliated stations and for its affiliated cable network, NewsNation, notwithstanding relatively low consumer demand for the network.[7]

12.     As a result, the increased scale and leverage of the combined company will also cause even larger fee increases for carriage of stations in current Nexstar-only markets, like WPHL, Nexstar's CW affiliate in the Philadelphia market; and WPIX, the CW affiliate in the New York market for which Nexstar negotiates retransmission consent.

13.     Beyond the increases to retransmission consent fees and risks of widescale blackouts, the Transaction would harm Service Electric Cable TV & Communications's subscribership.  MVPD subscribers have been "cutting the cord" for over a decade now, and many smaller MVPDs have already exited the cable marketplace altogether when faced with higher programming costs and a smaller subscriber base to defray those costs.  This Transaction will only accelerate this trend due to increased consumer costs, which will be largely attributable to higher programming costs.

---

[7] *See, e.g.*, Dade Hayes, *The CW Will Turn a Profit 'At Some Point' In 2026, Parent Company Nexstar's CFO Says*, Deadline (Dec. 8, 2025), https://deadline.com/2025/12/the-cw-network-profit-nexstar-1236642530/ ("Owning The CW enabled Nexstar to 'bring back a number of those affiliates onto Nexstar stations, and that's been very profitable for us,' [Nexstar CFO Lee Ann] Gliha said."); Verified Retransmission Consent Complaint of Cincinnati Bell Extended Territories LLC dba altafiber, Complainant, v. Nexstar Media Inc., Defendant, MB Docket No. 25-197, at ii (filed June 13, 2025) ("Nexstar conditions any grant of retransmission consent for WDTN on altafiber's continued distribution of Nexstar-owned cable network, NewsNation . . . and, despite extremely low viewership and engagement, demands a fee increase of more than 15 times the rate of inflation."); Reply to Answer of Cincinnati Bell Extended Territories LLC dba altafiber, Complainant, v. Nexstar Media Inc., Defendant, MB Docket No. 25-197, at 2 (filed July 14, 2025) ("[W]hen altafiber agreed to distribute NewsNation to Cincinnati three years ago, it was based on the expectation that viewership of its fledgling NewsNation service would grow with time.  That has not happened, and subscribers today largely do not care whether or not altafiber distributes NewsNation as evidenced by the fact that only about 100 subscribers have expressed displeasure with its loss and fewer have cancelled their subscriptions.").

App.404

14.     In sum, approval of the Transaction will directly cause an immediate increase in retransmission consent fees for our company and our customers, given Nexstar's greater leverage to impose even higher fees in retransmission consent negotiation renewals moving forward, and create a greater risk of program blackouts in all four markets where Service Electric Cable TV & Communications operates within the combined company's footprint.

15.     The FCC can prevent these harms to Service Electric Cable TV & Communications and our customers by denying the Transaction.

\*        \*        \*        \*

The foregoing declaration has been prepared using facts of which I have personal knowledge or based upon information provided to me. I declare under penalty of perjury that the foregoing is true and correct to the best of my current information, knowledge, and belief.

Dated:
2200 Avenue A, 3rd Floor
Bethlehem, PA 18017
December 12, 2025

Jack Capparell
General Manager

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of | **)** |
| | **)** |
| Applications to Transfer Control of TEGNA | **)** |
| Inc. to Nexstar Media Inc. | **)** |
| | **)** |
| | **)** |
| | **)** |

MB Docket No. 25-331

**PETITION TO DENY OF PUBLIC INTEREST PETITIONERS**

Cheryl Leanza
**United Church of Christ**
 **Media Justice Ministry**
100 Maryland Avenue, NE
Suite 330
Washington, DC 20002

S. Derek Turner
Matthew F. Wood
**Free Press**
1025 Connecticut Avenue, NW
Suite 1110
Washington, DC 20036
202-265-1490

John Bergmayer
**Public Knowledge**
1818 N Street, NW
Suite 410
Washington, DC 20036

Nell Geiser
Ceilidh Gao
**Communications Workers of America**
501 Third Street, NW
Washington, DC 20001

December 31, 2025

**App.406**

**REDACTED – FOR PUBLIC INSPECTION**

**EXECUTIVE SUMMARY**

The Federal Communications Commission should deny the transfer of licenses from TEGNA, Inc. to Nexstar Media Group. Nexstar's current UHF-discounted national television household reach is at the Congressionally set limit of 39 percent. Nexstar is therefore legally barred from acquiring TEGNA's stations in any of the 17 Designated Market Areas ("DMAs") in which Nexstar does not currently operate. Though Nexstar and TEGNA seek a waiver of this limit, the Commission is prohibited by law from waiving, altering, or eliminating this National Cap. Because it is legally barred from granting Applicants' request to waive the National Multiple Ownership rule, the Commission should immediately deny those waiver requests and deny the Application in full.

In addition to those new-to-Nexstar local markets, in which the post-merger entity's entry would impermissibly exceed the National Cap, the Transaction also involves proposed license transfers in 35 overlapping markets where Nexstar and TEGNA both currently operate FCC-licensed stations. Applicants seek a waiver of the Local Multiple Ownership rule—which prohibits a single entity from owning more than two full-power TV stations in a single market—in 23 of these overlapping markets. In addition to forming triopolies (or quadopolies) in these 23 local markets, Applicants also seek to form top four-ranked duopolies in ten of the remaining overlapping DMAs, combinations that were impermissible under the now-vacated prohibition in the Top Four-Ranked Duopoly rule. The Commission should deny Applicants' license transfer requests in all of the overlapping DMAs, because granting them would increase concentration in these local markets to incredibly high levels, conferring upon Nexstar immense market power that when exercised would cause irreparable harm to the public interest. If the Commission were to grant these transfer requests, Nexstar would control well over half of the local television advertising and retransmission consent revenues in many of these local markets, and control a dominant share of the local TV news production and broadcast labor markets, as well as a dominant share of the local TV news viewing audience. These outcomes run contrary to the Commission's policy to promote the public interest by fostering greater competition, localism, and diversity in local broadcast markets. In the alternative, the Commission should deny all requests to waive the Local Multiple Ownership rule. Divestiture of stations would not offset the public interest harms that would follow Nexstar's formation of new Top Four duopolies, but would potentially mitigate these harms and preserve a modicum of local broadcast TV competition and diversity.

Applicants center their conclusory claims about the Transaction's public interest benefits in the school of trickle-down economics, where a massive loss of competition will supposedly benefit the public by "allowing" Nexstar to "invest in local newsrooms and local programming, to innovate, including with respect to ATSC 3.0, and to deliver the freely available content Americans expect." However, whatever "synergies" Nexstar might derive from forming new duopolies, triopolies, and even quadopolies—derived invariably by shrinking newsrooms, further eroding broadcast labor's ability to bargain, muzzling workers, and depressing wages—those financial benefits would not accrue to the viewing public. Communities would be harmed by the loss of competition, diminished localism, and decreased viewpoint diversity. Applicants fail to demonstrate any affirmative, merger-specific, verifiable, and cognizable public interest benefits to counter these harms. The Commission should therefore deny the Application in its entirety.

2

**App.407**

**REDACTED – FOR PUBLIC INSPECTION**

**TABLE OF CONTENTS**

EXECUTIVE SUMMARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.   THE PUBLIC INTEREST PETITIONERS HAVE STANDING . . . . . . . . . . . . . . . . . . . . 7

    A.  Standing Is Established by Section 309 of the Communications Act
       and Binding Interpretations of It . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B.  The Commission Should Grant Broader Participation Than the Minimum
       Required by Article III. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    C.  NABET-CWA and TNG-CWA Have Organizational Standing
       as Labor Unions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    D.  Free Press and UCC Media Justice Have Organizational Standing . . . . . . . . . . . . . . 16

       1.  Free Press. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       2.  UCC Media Justice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    E.  NABET-CWA, TNG-CWA, Free Press and UCC Media Justice have
       representational standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

       1.  NABET-CWA and TNG-CWA have representational standing based on
          local and national impact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

       2.  NABET-CWA, TNG-CWA, Free Press and UCC Media Justice have
          representational standing based on local harm to First Amendment and
          economic interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

       3.  The Commission must grant Petitioners representational standing as parties
          in interest based on national impact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

III.  THE COMMISSION SHOULD DENY THE APPLICATION. NEXSTAR'S
    ACQUISITION OF TEGNA IS IMPERMISSIBLE UNDER FEDERAL LAW
    AND WOULD NOT SERVE THE PUBLIC INTEREST. . . . . . . . . . . . . . . . . . . . . . . 25

    A.  The Transaction is Presumptively Unlawful Under U.S. Antitrust Law.
       Allowing Nexstar to Dominate Local TV Markets Would Harm the
       Public Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

       1.  The Transaction would massively increase the level of concentration in
          the relevant product markets in the overlapping DMAs, well past the level
          that current DOJ and FTC guidelines consider presumptively unlawful. . . . . . . . . 29

       2.  Evidence from past broadcast consolidation waves demonstrates that
          granting Applicants' transfers in the overlapping DMAs, including
          Applicants' requests for waivers of the Local Multiple Ownership rule,
          would cause irreparable harm to the public interest . . . . . . . . . . . . . . . . . . . . . . 40

    B.  Applicants Fail to Identify Any Merger-Specific, Verifiable Benefits that
       Would Offset the Transaction's Public Interest Harms. Applicants' Claimed
       Benefits Are Conclusory and Non-Cognizable . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

3

**App.408**

**REDACTED – FOR PUBLIC INSPECTION**

IV.  THIS MERGER WOULD ENTRENCH AND EXTEND NEXSTAR'S
     DOMINANT POSITION IN LOCAL LABOR MARKETS . . . . . . . . . . . . . . . . . . . . . . . 51

     A.  Local Labor Markets for Broadcast Technicians Are Already Concentrated . . . . . . . . 52

     B.  The Nexstar-TEGNA Merger Would Eliminate Substantial Competition
         Between Firms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

         1.  Nexstar plans to consolidate production departments where it owns
             multiple stations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

         2.  Nexstar and TEGNA workers uniformly agree the proposed merger would
             result in layoffs and negative impact on their local labor market . . . . . . . . . . . . . 57

         3.  Exemplar markets show that a Nexstar-TEGNA merger would reduce
             employer competition for broadcast technician labor . . . . . . . . . . . . . . . . . . . . . 59

     C.  Nexstar Already Exercises Monopsonistic Power over the Labor Market and
         Greater Market Power Would Further Entrench its Dominant Position . . . . . . . . . . . 61

         1.  Wages, tenure, and practices of competing firms suggest that Nexstar
             already exercises monopsonistic domination of the labor market and
             disproportionate bargaining power with workers and unions . . . . . . . . . . . . . . . . 62

         2.  Nexstar's consistent, continued, and centrally coordinated unlawful
             behavior to suppress worker collective action prevents unions from
             exercising effective bargaining power, and the proposed merger would
             further harm union bargaining power . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

V.   THE COMMISSION CANNOT MODIFY, WAIVE, OR ELIMINATE THE
     NATIONAL MULTIPLE OWNERSHIP RULE AND SHOULD NOT GRANT
     WAIVERS OF THE LOCAL MULTIPLE OWNERSHIP RULE OR
     APPLICANTS' RELATED REQUESTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

     A.  Nexstar's Current Reach is Already at the Maximum Level Set by Congress.
         The Commission Does Not Have Authority to Waive the National Cap. . . . . . . . . . . 67

     B.  Applicants Fail to Demonstrate that Allowing Nexstar to Form Top
         Four-Ranked Duopolies and Triopolies is in the Public Interest. Applicants
         Have Not Met the High Bar for Waiver of the Commission's Local Multiple
         Ownership Rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

         1.  Dallas-Ft. Worth, TX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

         2.  Houston, TX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

         3.  Washington, D.C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

         4.  Tampa-St. Petersburg (Sarasota), FL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

         5.  Phoenix (Prescott), AZ. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

         6.  Denver, CO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

         7.  Cleveland-Akron (Canton), OH. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

         8.  Charlotte, NC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

4

**App.409**

**REDACTED – FOR PUBLIC INSPECTION**

9.  Portland, OR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

10. St. Louis, MO. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

11. Indianapolis, IN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

12. San Diego, CA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

13. Hartford-New Haven, CT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

14. Grand Rapids-Kalamazoo-Battle Creek, MI. . . . . . . . . . . . . . . . . . . . . . . . . . . 104

15. Norfolk-Portsmouth-Newport News, VA . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

16. New Orleans, LA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

17. Memphis, TN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

18. Buffalo, NY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

19. Little Rock-Pine Bluff, AR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

20. Des Moines-Ames, IA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

21. Huntsville-Decatur (Florence), AL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

22. Ft. Smith-Fayettville-Springdale-Rodgers, AR. . . . . . . . . . . . . . . . . . . . . . . . . 124

23. Davenport, IA-Rock Island-Moline, IL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

24. Austin, TX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

25. Waco-Temple-Bryan, TX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

C.  The Transaction Would Not Serve the Public Interest in Other Local Markets Where Nexstar Would Form New De Jure and De Facto Top Four-Ranked Duopolies and Triopolies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

VI.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

CERTIFICATES OF SERVICE

APPENDIX A: Pre- and Post-Transaction DMAs and National Reach

APPENDIX B: License Transfer Applications

APPENDIX C: Declarations of Parties in Interest

5

**App.410**

**REDACTED – FOR PUBLIC INSPECTION**

Petitioners,[1] pursuant to Sections 309(d) and 310(d) of the Communications Act (the "Act"), 47 U.S.C. §§ 309(d), 310(d), and 47 C.F.R. § 73.3584, hereby petition the Federal Communications Commission ("FCC" or "Commission") to deny the transfer of licenses from TEGNA Inc. ("TEGNA") to Nexstar Media Inc. ("Nexstar") (together, "Applicants").

## I.    INTRODUCTION

On August 19, 2025, Nexstar Media Group announced it had reached a deal to acquire TEGNA (the "Transaction").[2] This deal combines the largest and fourth-largest (by revenue) broadcast TV station groups . If approved without any divestitures, Nexstar would own and/or operate 265 full-power television stations in 44 states and D.C.[3] The merger would increase Nexstar's actual national reach to more than 80 percent of U.S. television households.[4] This reach is more than twice as large as the 39 percent limit set by Congress. Even using the FCC's anachronistic "UHF discount" methodology, Nexstar would blow through the 39 percent cap—where its reach currently sits—to a discounted 55 percent of TV households.[5]

---

[1] Petitioners are Free Press, the National Association of Broadcast Employees and Technicians - Communications Workers of America ("NABET-CWA"), The NewsGuild - Communications Workers of America ("TNG-CWA"), and the United Church of Christ Media Justice Ministry ("UCC Media Justice"), along with Public Knowledge.

[2] On December 1, 2025, the Media Bureau released a Public Notice in this docket establishing the pleading cycle for petitions to deny the Transaction. *See Media Bureau Establishes Pleading Cycle for Applications to Transfer Control of TEGNA Inc. to Nexstar Media Inc. and Permit-But-Disclose* Ex Parte *Status for the Proceeding*, MB Docket No. 25-331, Public Notice, DA 25-1000 (rel. Dec. 1, 2025). It notes that copies of individual station applications are available in the Commission's Licensing and Management System ("LMS"), with the callsigns, communities of license, LMS file numbers, and Facility ID numbers for stations listed in an attachment to the Public Notice. Petitioners reproduce that list in Appendix B to this Petition. Unless otherwise specified, all page references herein to the "Application" are to the Comprehensive Exhibit Redacted for Public Inspection, likewise available in LMS.

[3] Nexstar-TEGNA Acquisition Presentation at 6 (Aug. 19, 2025).

[4] *Id.*

[5] Application at 4.

6

**App.411**

REDACTED – FOR PUBLIC INSPECTION

In numerous markets, a post-merger Nexstar would control half or more of the commercial stations airing English-language news, massively increasing concentration in already highly concentrated markets. For example, in Indianapolis, Nexstar would control the CBS, FOX, and NBC affiliates. In Norfolk, it would control the ABC, FOX, and NBC affiliates.

Applicants claim the merger would serve the public interest, but offer only vague, non-verifiable and non-merger-specific benefits that would not mitigate the public interest harms caused by facilitating Nexstar's domination of local TV markets. Because the Commission is barred by law from waiving the national cap, it has no choice but to deny the Application in its entirety. And because Applicants have failed to demonstrate that the formation of local station triopolies or quadopolies would be in the public interest, the Commission should deny Nexstar's request to own three or more stations in DMAs where Applicants seek waivers of the Local Multiple Ownership rule. Failure to deny the Application would enable post-merger Nexstar to monopolize local TV news markets, increase its market power in local television advertising markets and retransmission consent negotiations, reduce competition in the market for broadcast technicians, and cut newsroom staff along with original local reporting.

## II.     THE PUBLIC INTEREST PETITIONERS HAVE STANDING.

Petitioners undeniably meet the Communications Act's requirements to file a petition to deny with the Commission as "parties in interest."[6] As detailed below, NABET-CWA, TNG-CWA, Free Press, and UCC Media Justice meet the constitutional and statutory requirements as organizations that would be directly harmed by the proposed transaction and as associations of their members who would be harmed.

---

[6] 47 U.S.C. § 309(d)(1). Public Knowledge joins this Petition to Deny as an informal objector to the Transaction.

7

**App.412**

REDACTED – FOR PUBLIC INSPECTION

Parties meet the statutory standard regardless of the Commission's prior determination that representational petitions to deny are "geographically limited to those markets where it identified viewer membership in its declaration,"[7] which is wrong as a matter of law and must be overturned. The Commission may not exclude parties that meet the definition of a party in interest under Section 309(d)(1) if they possess Article III standing. Harm by a transaction is not limited to geographic regions. Organizations can be harmed regardless of the markets where station transfers would occur. And members of organizations do not need to live in a station's particular market to be harmed by a transaction of this scope and scale.

Nor can the Commission's decision to deny standing in a particular market jeopardize the claims and arguments made by parties where they do not have standing: the Commission retains its obligation to affirmatively conclude that any transaction before it is in the public interest.

A.  **Standing Is Established by Section 309 of the Communications Act and Binding Interpretations of It.**

The right to seek judicial review of a licensing decision and the right to file in a license proceeding at the FCC both originate in the Communications Act itself. Congress has directly granted parties in interest the right to challenge broadcast license assignments in the D.C. Circuit, a right given to "any other person aggrieved or whose interests are adversely affected by any decision of the Commission granting or refusing any such application."[8] Congress also granted parties in interest a right to challenge a license approval at the FCC.[9]

---

[7] *Applications of Tribune Media Company and Nexstar Media Group, Inc.*, MB Docket No. 19-30, Memorandum Opinion and Order, 34 FCC Rcd 8436, 8449 ¶25, n.112 (2019) ("*Nexstar-Tribune Order*").

[8] 47 U.S.C. § 402(b)(6).

[9] *Id.* § 309(d)(1).

8

**REDACTED – FOR PUBLIC INSPECTION**

The Supreme Court when interpreting these statutes has concluded that Congress's decision to grant the right to appeal an FCC decision was broad, finding that the Commission could not deny standing to a party adversely affected even if the harm alleged by the party was not a harm the Commission would necessarily take into account in considering the licensing decision.[10] Similarly, the D.C. Circuit has found multiple times that the plain language of Section 309 works to "insure that persons having the right to appeal from Commission decisions 'can make this complaint first before the Commission.'"[11] In light of the Supreme Court's decision in *Loper Bright* overturning *Chevron* deference,[12] the Commission has even less latitude then it might have had in the past to overturn these statutory interpretations.

Article III standing applies more broadly than the Commission's ruling in the *Nexstar-Tribune Order*. The Supreme Court's test for standing pursuant to Article III of the Constitution for parties to invoke federal courts' jurisdiction requires: (1) injury-in-fact (2) fairly traceable to the challenged conduct (3) likely to be redressed by a favorable judicial decision.[13] "[W]here the plaintiff is an organization . . . [e]ither it can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'"[14]

---

[10] *FCC v. Sanders Brothers Radio Station*, 309 U.S. 470, 476-77 (1940); *see also Scripps-Howard Radio v. FCC*, 316 U.S. 4, 14 (1942).

[11] *Elm City Broadcasting Corp. v. U.S.*, 235 F.2d 811, 816 (D.C. Cir. 1956); *Broad. Enters., Inc. v. FCC*, 390 F.2d 483, 485 (D.C. Cir. 1968). The D.C. Circuit's conclusion align with a broader string of cases asserting that "a party entitled to judicial review of agency action clearly qualifies as an 'interested person' who normally may intervene in the administrative proceeding," *Nichols v. Bd. of Trs. of Asbestos Workers Loc. 24 Pension Plan*, 835 F.2d 881, 896 (D.C. Cir. 1987) (citing cases).

[12] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).

[13] *See, e.g.*, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

[14] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023).

9

**App.414**

REDACTED – FOR PUBLIC INSPECTION

Organizations themselves have standing when the harm "perceptibly impairs" core activities.[15] "To demonstrate injury in fact, an organization must allege a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'"[16] This standing is similar to that of a business competitor—the corporate entity is harmed. For example, unions can show standing via harm to their organizing capacity.[17] On the other hand, representational or associational standing—on behalf of members—results when (a) members would have standing in their own right; (b) the interests they seek to protect are germane to the organization's purpose; and (c) neither the claim nor relief require participation of individual members.[18]

While many public interest participants in broadcast license transfer matters have relied upon their members who are viewers to assert representational standing, the Commission may not assume that every non-industry petition to deny is based on "viewer" standing in which every declarant "must allege that he or she is a resident of the station's service area or a regular viewer of the station."[19] Parties in interest must articulate harm caused by the transaction, but that harm could be derived from the impact on an organization, regardless of where it is located, or on the local or national impact on members who may not necessarily reside in the geographic market where stations are changing hands but still experience harm.

---

[15] *Food & Drug Admin. v. All. for Hippocratic Med.,* 602 U.S. 367, 395 (2024).

[16] *Am. Anti-Vivisection Soc'y v. United States Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

[17] *AFGE Local 1 v. Stone*, 502 F.3d 1027, 1032–33 (9th Cir. 2007); *EEOC v. AT&T*, 556 F.2d 167, 173 (3d Cir. 1977).

[18] *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

[19] *E.g.*, *Nexstar-Tribune Order* ¶23.

REDACTED – FOR PUBLIC INSPECTION

Because harm need not be confined to geographically based harm to viewers, a Commission decision limiting participation at the agency level to only organizations that make a showing in geographic markets where stations will be transferred would violate the statute, impairing rights given to parties by Congress, by the Constitution, and at common law.[20]

### B. The Commission Should Grant Broader Participation Than the Minimum Required by Article III.

Commissioner Starks's cogent dissent in the *Nexstar-Tribune Order* explained the importance of public participation in FCC license transfers:

> Since 1966, when the seminal case on standing was decided, the Commission has relied upon members of the public to present evidence of whether the licenses we grant or transactions we approve square with our public interest standard and better serve local communities. Indeed, even during the broadcast deregulatory era of the 1980s, the Commission noted that input from the public would be crucial to allowing the agency to exercise its core licensing functions. As we said in another matter, the Commission "relies on members of the public to act as private attorneys general to assist in overseeing the conduct of applicants and licensees and in fulfilling our statutory functions."[21]

The D.C. Circuit similarly observed in the seminal *United Church of Christ v. FCC* case, "[u]nless the Commission is to be given staff and resources to perform the enormously complex and prohibitively expensive task of maintaining constant surveillance over every licensee, some

---

[20] Moreover, the Commission must correct the implication of its decision in the *Nexstar-Tribune Order* that the failure of an organization party-in-interest that is asserting representational standing to file affidavits in every market impacted by a transaction somehow impairs its rights to file in the markets where it does submit affidavits. As Commissioner Starks' dissent explained, the decision was unclear and likely to thereby discourage parties from filing to the detriment of the Commission's processes. *See Nexstar-Tribune Order*, 34 FCC Rcd at 8473, 8480 (Statement of Commissioner Geoffrey Starks, Dissenting). Where a party establishes its right to participate as a party in interest the Commission may not block that participation, whether the status is obtained in one market or 100 markets.

[21] *Nexstar-Tribune Order*, 34 FCC Rcd at 8480 ( Starks dissent) (citing *1998 Biennial Regulatory Review -- Streamlining of Mass Media Applications, Rules, And Processes*, Report and Order, 13 FCC Rcd 23056, 23064-65, ¶18 (1998)).

11

**REDACTED – FOR PUBLIC INSPECTION**

mechanism must be developed so that the legitimate interests of listeners can be made a part of the record which the Commission evaluates."[22] In fact, because active Commission monitoring of the nation's broadcasters would be highly problematic in light of the First Amendment, the Commission has often pointed to its reliance upon public input and comment.[23]

To pursue these ends, the FCC has the freedom to permit the participation of parties even without Article III standing:

> Within their legislative mandates, agencies are free to hear actions brought by parties who might be without party standing if the same issues happened to be before a federal court. The agencies' responsibility for implementation of statutory purposes justifies a wider discretion, in determining what actions to entertain, than is allowed to the courts by either the constitution or the common law.[24]

Not only should the FCC adopt permissive participation standards, but it may not arbitrarily limit who may participate. "Courts willingly overturn" agency decisions to reject requests to participate under their authorizing statutes "when the responsible agency, either by failing to fashion equitable procedures or by employing its power in an unreasonably overbroad or otherwise arbitrary manner, has not acted to preserve the participation opportunities of interested persons."[25]

---

[22] *Office of Communication of United Church of Christ v. F.C.C.*, 359 F.2d 994, 1005 (D.C. Cir. 1966).

[23] Federal Communications Commission, *Obscene, Indecent and Profane Broadcasts*, https://www.fcc.gov/consumers/guides/obscene-indecent-and-profane-broadcasts; *see FCC v. Pacifica Foundation*, 438 U.S. 726, 734-37 (1978).

[24] *Gardner v. FCC*, 530 F.2d 1086, 1090 (D.C. Cir. 1976); see also *Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21, 25 (D.C. Cir. 2002) ("Because agencies are not constrained by Article III, they may permit persons to intervene in the agency proceedings who would not have standing to seek judicial review of the agency action.").

[25] *Nichols*, 835 F.2d at 897.

12

**App.417**

REDACTED – FOR PUBLIC INSPECTION

As the D.C. Circuit once said, "Some consumers need bread; others need Shakespeare; others need their rightful place in the national society—what they all need is processors of law who will consider the people's needs more significant than administrative convenience."[26]

### C. NABET-CWA and TNG-CWA Have Organizational Standing as Labor Unions.

NABET-CWA and TNG-CWA as organizations in their own right—not just through their members—will be harmed by this transaction if it is approved. NABET-CWA is a labor union working to improve its 10,000 members' "wages, working conditions and job security"[27] and it is the legal collective bargaining representative for workers at Nexstar and TEGNA locations in multiple markets.[28] Its members unquestionably will suffer concrete and particular harm through the merger of Nexstar and TEGNA.[29] The proposed merger, if approved, would:

> further constrict the market for NABET-CWA members and would force NABET-CWA to spend more resources on representing our members at the bargaining table and reduce NABET-CWA's negotiating power. Consolidation in the broadcast industry increases the power of the industry vis-a-vis organized labor in the context of collective bargaining negotiations. Increased consolidation will make it more difficult for NABET-CWA to secure adequate salary and benefit packages for our members, which harms our members, reduces membership dues, and harms our negotiating power.[30]

Furthermore, if Nexstar is permitted to acquire TEGNA, it will expand its anti-union tactics and strategies to more bargaining units and workplaces,[31] creating a further burden on the resources

---

[26] *United Church of Christ*, 359 F.2d at 1005 (citation omitted).

[27] Braico Declaration ¶¶5–6.

[28] *Id.* ¶12.

[29] Organizations have standing if challenged actions "perceptibly impair" their mission, which can be shown through a diversion of resources injurious to the organization's mission. *Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 76 (3d Cir. 1998).

[30] Braico Declaration ¶19.

[31] *Id.* ¶19 (noting challenges to the National Labor Relations Board).

13

REDACTED – FOR PUBLIC INSPECTION

necessary to accomplish NABET-CWA's organizational function of representing, bargaining, and organizing its membership.

TNG-CWA similarly is a labor union seeking to "advance the economic interests and to improve the working conditions" of its 27,000 members and it is the legal collective bargaining representative for workers at TEGNA in St. Louis.[32] Its members will also suffer concrete and particular harm through the merger of Nexstar and TEGNA. Similar to NABET-CWA, the proposed merger would "further constrict the market for TNG-CWA members, reduce TNG-CWA's bargaining power and force TNG-CWA to spend more resources on representing our members at the bargaining table."[33] The merger would increase "the power of the industry vis-a-vis organized labor in the context of collective bargaining negotiations" and "make it more difficult for TNG-CWA to secure adequate salary and benefit packages for our members."[34]

The unions are not merely speculating as to the increased resource burdens that the proposed merger would cause: both have navigated consolidations in the past, and know from experience that the proposed merger would result in requirements for greater staff resources and changed realities at the bargaining table.[35] The Nexstar-TEGNA merger, like mergers in this

---

[32] Schleuss Declaration ¶¶4, 6.

[33] *Id.* ¶22.

[34] *Id.*

[35] *See* Braico Declaration ¶21 ("In the last three decades, NABET-CWA has seen many mergers and thousands of lost jobs. As a result of past mergers and consolidations, NABET-CWA staff representatives supporting bargaining units have had to spend more time negotiating contracts and worsened negotiating conditions have forced NABET-CWA bargaining units to accept lower wage increases. The proposed merger would cause these same harms to NABET-CWA's organizational goals of collective bargaining, organizing, and contract administration."); Schleuss Declaration ¶23 ("As the result of past mergers and consolidation, TNG-CWA staff representatives supporting bargaining units have had to spend more time negotiating contracts. Worsened negotiating conditions translate to worsened offers from employers and collective bargaining agreements that are not as strong for workers as they otherwise would be. The proposed merger would force TNG-CWA to spend more resources on

14

REDACTED – FOR PUBLIC INSPECTION

industry before it, will result in NABET-CWA and TNG-CWA staff representatives "spend[ing] more time negotiating contracts."[36] It would force NABET-CWA "to accept lower wage increases," harming NABET-CWA's organizational goals of collective bargaining, organizing, and contract administration.[37] Similarly for TNG-CWA, the loss of jobs and more challenging bargaining climate "requires more resources to further TNG-CWA's goals" and would force TNG-CWA to "spend more resources on bargaining and organizing," harming TNG-CWA's goals of "advanc[ing] the economic interests" and "improv[ing] the working conditions" of its members.[38]

Moreover, the harm to the labor market means "fewer workers are eligible to become members of NABET-CWA," and fewer union-represented jobs means NABET-CWA would lose dues-paying members, reducing its financial resources.[39] Similarly for TNG-CWA, the proposed merger would "reduce the number of jobs for members of TNG-CWA, leading to reduced pay, reduced benefits, and less market demand for TNG-CWA members."[40] As Declarant Halpin explains, "When there are fewer potential employers of NABET members, it harms individual workers and our union."[41]

---

bargaining and organizing, and would cause harm to the job market for news workers and to TNG-CWA's organizational goals of collective bargaining, organizing, and contract administration.").

[36] Braico Declaration ¶¶6, 19; Schleuss Declaration ¶23.

[37] Braico Declaration ¶¶6, 19.

[38] *Id.* ¶23.

[39] Braico Declaration ¶20.

[40] Schleuss Declaration ¶14.

[41] Halpin Declaration ¶8 (emphasis added).

15

**App.420**

REDACTED – FOR PUBLIC INSPECTION

Courts reviewing standing often grant it to unions when their core functions of collective bargaining and organizing are made more difficult or harmed.[42] This is no different from when the Commission grants standing to corporate market participants harmed by a transaction.[43]

### D. Free Press and UCC Media Justice Have Organizational Standing.

#### 1. Free Press

Free Press's mission is to "change the media to transform democracy to realize a just society."[44] On behalf of its members, Free Press seeks to increase the quantity, quality, and responsiveness of local news on TV, on radio, and in newspapers, particularly "to promote democratic outcomes, racial justice, and social justice initiatives only possible with an informed electorate and a public served by media responsive to communities' needs for local journalism and civic information."[45]

Those organizational goals are frustrated by corporate media consolidation because mergers like this make it "significantly more difficult and more costly" for Free Press "to raise awareness about issues and move people to take action."[46] If the Transaction were approved, "Free Press would be obligated to expend significantly more staff time and other budgetary resources on the programs that depend on this kind of civic information," including on program

---

[42] *AFGE Local 1 v. Stone*, 502 F.3d 1027, 1032-33 (9th Cir. 2007); *EEOC v. AT&T*, 556 F.2d 167, 173 (3d Cir. 1977); *Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt.*, 781 F. Supp. 3d 920, 937 (N.D. Cal. 2025).

[43] The Commission granted standing to DISH in *Nexstar-Tribune* because DISH "has retransmission consent agreements with both Applicants"; grant of the transaction would have specific, negative effects on it, specifically related to retransmission fee negotiations; and those harms could be cured by dismissal or denial of the Applications. *Nexstar-Tribune Order* ¶24.

[44] Aaron Declaration ¶4.

[45] *Id.* ¶4.

[46] *Id.* ¶12.

16

**App.421**

**REDACTED – FOR PUBLIC INSPECTION**

areas that make up a third of its annual budget.[47] It would need to hire additional full-time employees, organize more in-person community meetings, and expend more money and staff resources on member outreach, press placements, and other media education efforts.

For example, the organization works with community-based and other competitive journalism outlets to foster production of local news and information responsive to local communities' needs, including by holding regular meetings in cities and states impacted by the Transaction like California, Maryland, Oregon, and others. Free Press also depends on quality journalism and civic information to create affordable broadband options in communities; to inform people on how to fight harmful, ecologically damaging, and resource-draining data center construction in their areas; and to defend in court journalists and other individuals exercising their First Amendment rights.[48] In the end, "[t]he resources Free Press expends on all of these programs are less effective when local journalists cannot successfully gain placement of locally responsive stories," and fewer people will even learn about and be willing to support the organization's work.[49]

Organizations that demonstrate "concrete and demonstrable injury" to their core activities have organizational standing.[50]

### 2. UCC Media Justice

The United Church of Christ Media Justice Ministry has organizational standing in its own right. The United Church of Christ describes itself as "a prophetic church" in "the tradition

---

[47] *Id.* ¶¶12–13.

[48] *See id.* ¶¶13–15.

[49] *Id.* ¶¶17–18.

[50] *E.g.*, *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 988 (9th Cir. 2025).

17

**App.422**

**REDACTED – FOR PUBLIC INSPECTION**

of the prophets and apostles" and the UCC believes that "God calls the church to speak truth to power, liberate the oppressed, care for the poor and comfort the afflicted."[51] The UCC believes "No matter who – no matter what – no matter where we are on life's journey – notwithstanding race, gender identity or expression, sexual orientation, class or creed – we all belong to God and to one worldwide community of faith." It believes that "To believe is to care; to care is to do."[52]

The mission of the United Church of Christ and its auxiliary, the UCC Media Justice Ministry, is directly impaired when the diversity and depth of news coverage is reduced. After a merger that would reduce resources spent on newsgathering and newsmaking, UCC members would be less likely to learn about opportunities and harms to further the denomination's goals regarding anti-racism, LGBTQ inclusion, and stewardship of the earth.[53] This would require the church to expend more resources educating its members about anti-racism, LGBTQ rights, and important environmental issues such as data centers. According to the Vice Chair of the board of directors UCC Media Justice: "If the transaction is approved, it will take more resources to live out God's call to fulfill the mission of the church, such as holding more webinars, writing more reports, doing more outreach workshops and the like."[54] Similarly, "[t]he work of the denomination is made more difficult when it must first educate its members about issues and then members must investigate facts themselves rather than relying on the media to learn about new data centers and the impacts on their communities."[55]

---

[51] Williams Declaration ¶6.

[52] *Id.*

[53] *Id.* ¶¶12–18.

[54] *Id.* ¶19.

[55] *Id.* ¶16.

18

**App.423**

REDACTED – FOR PUBLIC INSPECTION

**E. NABET-CWA, TNG-CWA, Free Press and UCC Media Justice have representational standing.**

Organizations have representational standing on behalf of members when (a) members would have standing in their own right; (b) the interests they seek to protect are germane to the organization's purpose; and (c) neither the claim nor relief require participation of individual members.[56]

**1. NABET-CWA and TNG-CWA have representational standing based on local and national impact.**

In addition to standing as an organization, NABET-CWA and TNG-CWA also have representational standing through members, most of whom will suffer economic harm as a result of the transaction. Economic harm is the most widely recognized, but not the only permissible, injury-in-fact.[57] The proposed transaction, if approved, would reduce the number of jobs for members of NABET-CWA, leading to reduced pay, reduced benefits, and less market demand for NABET-CWA members.[58] The transaction would harm NABET-CWA members in local markets and nationwide. NABET-CWA represents workers in several markets where Nexstar and TEGNA control stations: Portland, OR; Denver, CO; Cleveland, OH; Buffalo, NY; and Hartford, CT.[59] For example, one NABET-CWA member explains the harm to the local job market in Hartford as jobs would disappear much as they have after previous transactions,[60] and how

---

[56] *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

[57] *Spokeo, Inc. v. Robins*, 578 U.S. at 340.

[58] Braico Declaration ¶11.

[59] *Id.* ¶12. NABET-CWA represents Nexstar workers in Portland, OR; Denver, CO; Cleveland, OH; Buffalo, NY; and Hartford, CT, and TEGNA workers in Cleveland, OH and Hartford, CT. NABET-CWA also represents Nexstar workers in Evansville, IN/Henderson, KY, and Rochester, NY.

[60] Halpin Declaration ¶¶5–8.

19

REDACTED – FOR PUBLIC INSPECTION

reduced competition would harm the quality of broadcast news, making the product less competitive and interesting for audiences.[61]

Similarly, the proposed transaction would reduce the number of jobs for TNG-CWA members, leading to reduced pay, reduced benefits, and less market demand for TNG-CWA members. TNG-CWA represents members in several markets where Nexstar and TEGNA control stations, including Dallas, TX; Tampa, FL; Denver, CO; Akron, OH; St. Louis, MO; Indianapolis, IN; Memphis, TN; Phoenix, AZ, Wilkes-Barre, PA; Buffalo, NY; Hartford, CT, Portland OR, and Sacramento, CA, and represents TEGNA workers in St. Louis, MO.[62] As stated by a TNG-CWA member in St. Louis, MO, consolidation in the market has resulted in elimination of jobs in the past, and the proposed merger would result in layoffs and a reduction in jobs available in St. Louis, causing economic harm to TNG-CWA members and harm to the quality of local news.[63]

Beyond harm to members in certain local markets, harm will occur to all NABET-CWA and TNG-CWA members nationwide, regardless of whether they work in a particular local market where Nexstar or TEGNA controls stations. The national impact would occur because the acquisition by Nexstar of TEGNA would also:

> reduce competition in the market for broadcast technicians, eliminate substantial competition between firms, and expand Nexstar's monopsonic domination of the labor market. A post-merger Nexstar would employ 28.4% of all television broadcast workers in the country. The increased economic negotiating power of Nexstar would make it more difficult for NABET-CWA to negotiate increased pay and benefits for [its] members.[64]

---

[61] *Id.* ¶¶13-16.

[62] Schleuss Declaration ¶16.

[63] Carson Declaration ¶¶7, 17.

[64] Braico Declaration ¶15; *see also* Schleuss Declaration ¶17.

20

**App.425**

**REDACTED – FOR PUBLIC INSPECTION**

The harm here would occur across the whole labor market for broadcast technicians and other occupations. It would harm the labor market even where Nexstar or TEGNA do not have stations because of the overall contraction in the market. Thus, NABET-CWA and TNG-CWA cannot be precluded as a party in interest in certain markets even if they do not submit declarations from those markets.

Moreover, NABET-CWA and TNG-CWA members' harm would extend beyond the purely economic. They also would be impacted as individuals and as professionals if newsgathering declines.[65]

NABET-CWA and TNG-CWA clearly meet the other prongs of standing: their missions are germane,[66] and they can obtain relief by participating in this FCC review without the individual participation of their members.

---

[65] Halpin Declaration ¶¶12–16 ("Competition is good for the industry. With multiple news stations, we appreciate each other, and challenge each other to create better news. With this merger, that will go away. There will be fewer people challenging each other to do better. It's not good for viewers, and worsens the quality of the local news."); Blake Declaration ¶¶13–16; Biggs Declaration ¶¶12–15 ("In order to effectively perform my job in the news industry, I need to be aware of local news concerns and how they are covered by competing outlets. A decrease in the quality and quantity of local news will harm me and my community. I know from my work that when we have more outlets reporting news, there is better verification of the facts, and the public obtains a better understanding of the issues."); Jenkins Declaration ¶¶13–16; Koscick Declaration ¶¶13–16; McCarty Declaration ¶¶14–18; Luberto Declaration ¶¶14–19 ("I know from my work that when we have more outlets reporting news, the quality of news is better… If we all become one large conglomerate, it will discourage new ideas and make coverage worse… Local news is made by workers. If we have fewer journalists with less experience being paid less money to produce news, we receive lower quality journalism"); Carson Declaration ¶¶14–18. *See infra* for discussion of legal recognition of non-economic harm.

[66] NABET-CWA's mission is to "use[ ] collective bargaining, contract enforcement, job training, political activity, and organizing to improve wages, working conditions, and job security." Braico Declaration ¶6; Schleuss Declaration ¶4.

21

**App.426**

REDACTED – FOR PUBLIC INSPECTION

### 2. NABET-CWA, TNG-CWA, Free Press and UCC Media Justice have representational standing based on local harm to First Amendment and economic interests.

Free Press, UCC Media Justice, NABET-CWA, and TNG-CWA members submitting affidavits fear that their local stations will not cover local news after the transaction. The FCC's regulation of broadcast media to promote broadcast competition, localism, and diversity—including robust access to local news and information—is recognized as a First Amendment right[67] that is a cognizable injury in standing analysis.[68] Declarants explain their concern that Nexstar, of all the U.S. broadcasting chains, airs the most duplicated news content,[69] and that its claims that the post-merger entity would realize $300 million in annual synergies would mean less resources for newsgathering and news coverage.[70] Declarants fear less news coverage of local educational issues;[71] LGBTQ stories and stories about anti-racism protests;[72] or news from nearby suburbs, or on statewide elections, local elections, and politics and activity in their state capitals.[73]

---

[67] *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390 (1969).

[68] *Spokeo*, 578 U.S. at 340 (noting that "intangible injuries can…be concrete."); *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) (explaining that courts exercise maximum leniency with regard to First Amendment injury-in-fact).

[69] *E.g.*, Pinkham Declaration ¶10.

[70] *E.g.*, Bahr Declaration ¶¶9–10.

[71] Braun Declaration ¶8.

[72] Diane Miller Declaration ¶8.

[73] Fitzgerald Declaration ¶¶8–9; Diane Miller Declaration ¶¶9, 12; Koscick Declaration ¶¶14-15; Biggs Declaration ¶12.

22

**REDACTED – FOR PUBLIC INSPECTION**

Free Press, UCC, NABET-CWA, and TNG-CWA members reasonably fear economic injuries as well because their pay television costs would increase because of this transaction.[74]

Free Press and UCC Media Justice meet the other prongs of standing: their missions are germane,[75] and they can obtain relief by participating in this FCC review without the individual participation of their respective members.

### 3. The Commission must grant Petitioners representational standing as parties in interest based on national impact.

The Commission cannot limit the Petitioners' participation to particular geographic markets because Petitioners experience nationwide harm, regardless of where they live or watch television. Particularly in a day of nationally consolidated broadcast owners, the question of broadcasting for viewers often implicates national policies and national impact.

NABET-CWA and TNG-CWA explained how their members are harmed nationwide regardless of where they live.[76] A particularly good example of the national impact of local journalism on the whole nation is the local reporting in 2020 and 2021 on the Arizona election recount or the presidential election. Local journalists with deep expertise could ask questions about particular individuals involved in the recount. Without those questions, the recount would have been conducted differently, and the 2020 national election and future recounts are impacted by the standards set locally.[77] Further, UCC members explain that they fear they would be

---

[74] *E.g.*, Rev. Lukens Declaration ¶15; Koscick Declaration ¶¶17–18; Braico Declaration ¶¶25-27; Schleuss Declaration ¶¶27–29.

[75] *See* Aaron Declaration ¶11–18; Williams Declaration ¶¶5-9.

[76] *See supra* Part II.E.1.

[77] Luberto Declaration ¶17.

23

**App.428**

**REDACTED – FOR PUBLIC INSPECTION**

harmed by this transaction regardless of whether they live in markets directly impacted by the transaction. For example:

> Harm to news coverage in other local communities harms me and harms the United Church of Christ and the UCC Media Justice Ministry. I monitor developments in other states in order to anticipate likely policy initiatives in my own state or in my own local area. . . . Many good and bad policy proposals begin in other states or cities, or, are part of an intentional nationwide strategy to alter local laws around the country. When news gathering is poor in those places, local people are less likely to adequately vet those policies and poor policies are more likely to be adopted. Moreover, I am less likely to know about those policies and their impacts before they are adopted because there is less newsgathering locally in those communities.[78]

In addition, consolidation of media ownership lessens employment opportunities for traditionally underrepresented groups, harming UCC Media Justice's and Free Press's missions of racial and gender equity and diversity. UCC members are not only concerned with fairness and equity in hiring in their own local communities. The harm occurs regardless of whether UCC members watch television, and occurs nationally and locally.

Increased prices for pay television nationwide cause harm regardless of where individual members live.[79]

Petitioners presented declarations from local markets in: Dallas-Ft. Worth, TX; Washington, DC (Hagerstown, MD); Denver, CO; Cleveland-Akron (Canton), OH; Portland, OR; St. Louis, MO; Indianapolis, IN; San Diego, CA; Hartford & New Haven, CT; Grand

---

[78] Williams Declaration ¶14; *see also, e.g.*, Fitzgerald Declaration ¶13.

[79] For example, charges for increased retransmission costs are set nationwide, not differentiated among markets. Jon Brodkin, "Charter's nationwide price hike could cost you another $91 a year," *Ars Technica* (Oct. 23, 2018), https://arstechnica.com/information-technology/2018/10/charters-nationwide-price-hike-could-cost-you-another-91-a-year/; David Lazarus, "When Companies Say a Merger Will Result in Lower Prices, Try Laughing in Their Face," *L.A. Times* (July 10, 2018), https://www.latimes.com/business/lazarus/la-fi-lazarus-att-time-warner-price-hike-20180710-story.html (discussing the increase in price of "DirecTV Now" after DirecTV was acquired by AT&T).

24

**App.429**

REDACTED – FOR PUBLIC INSPECTION

Rapids-Kalamazoo-Battle Creek, MI; New Orleans, LA; Des Moines-Ames, IA; Phoenix, AZ, and Sacramento-Stockton-Modesto, CA.[80] The Commission must address the harms in those markets by denying the transaction as a whole and must grant standing as parties in interest to organizations whose members experience harms nationwide, regardless of where they live or whether they watch a station that is owned by Nexstar or TEGNA.

The Commission should also grant NABET-CWA, TNG-CWA, Free Press, and UCC Media Justice status as parties in interest in the other markets to serve its institutional needs regardless of whether they have submitted declarations from every market. To the extent that the issues are the same in each market, the harm is not conjectural and should provide the basis for representational standing regardless of whether a declaration is filed for each and every market in the transaction. Yet the organizations' individual members who have filed declarations also have established their standing to file as parties in interest.

## III.   THE COMMISSION SHOULD DENY THE APPLICATION. NEXSTAR'S ACQUISITION OF TEGNA IS IMPERMISSIBLE UNDER FEDERAL LAW AND WOULD NOT SERVE THE PUBLIC INTEREST.

Under Section 310(d) of the Communications Act, the Commission must determine whether a proposed license transfer will serve the public interest, convenience, and necessity. In making its determination, the Commission must assess whether any transaction complies with the Act and the Commission's rules. The proposed merger of Nexstar and TEGNA complies with neither. It would violate the Act and the Commission's rules, and would give Nexstar monopoly market power in numerous communities. Under any reasonable analysis, this deal clearly would not be in the public interest.

---

[80] Declarations of Miller, Fitzgerald, Fazio, Jefferson, Jenkins, Bathke, Ogden, Bahr, Gonzalez, Lukens, Madsen-Bibeau, Edwards, Pinkham, Braun, Luberto.

25

**App.430**

REDACTED – FOR PUBLIC INSPECTION

Nexstar currently owns full-power TV licenses that in aggregate reach 39 percent of U.S. television households, even with the so-called "UHF discount" decreasing this number below the actual population reach for many stations.[81] This Transaction, if approved, would increase even that UHF-discounted reach to 54.5 percent of the country.[82] Nexstar's actual post-merger reach, as it stated in an August 2025 press release, would be 80 percent.[83] Therefore the proposed Transaction would violate the congressionally mandated national audience reach cap (the "National Cap"), and the National Multiple Ownership rule which the Commission is legally barred from eliminating, increasing, or waiving.[84]

---

[81] Free Press calculated Nexstar's current reach based on Nielsen's 2025–2026 television household estimates for the population in each of the 210 Designated Market Areas ("DMAs"). Without application of the technologically anachronistic UHF discount, Nexstar's reach today would be 62 percent. *See* Appendix A.

[82] *Id.* Free Press estimates that Nexstar's post-merger, un-discounted reach would be 74 percent; *see also* Application at 4.

[83] Free Press estimates that if the Commission recognized Nexstar's *de facto* control over WPIX (VHF Channel 11) in the New York City DMA, its pre-merger reach would be 45 percent even with the UHF discount, and 68 percent in reality. Nexstar's post-merger reach would be 60 percent UHF-discounted, 80 percent actual. Free Press's estimate of Nexstar's actual post-merger reach exactly matches what Nexstar itself stated in its merger announcement press release, when describing the combined reach of Nexstar-owned stations and Mission Broadcasting's WPIX. *See* "Nexstar Media Group, Inc. Enters into Definitive Agreement To Acquire TEGNA Inc. for $6.2 Billion in Accretive Transaction" (Aug. 19, 2025) ("Upon closing, Nexstar, together with its partners will have [ ] full-power television stations. . . covering, in total, 80% of U.S. television households.") (emphasis added).

[84] *See infra* Part V.A; *see also* Comments of Free Press, *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 17-318 (filed Aug. 4, 2025) ("Free Press National Cap Comments"). Congress directed the Commission to adopt the 39 percent cap in the Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3 (2004) ("CAA"). The CAA also expressly removed this national cap from Commission consideration in the quadrennial review, and even specified that Section 10 forbearance is unavailable for parties exceeding it.

26

**REDACTED – FOR PUBLIC INSPECTION**

Nexstar's proposed acquisition of TEGNA also violates the Commission's Local Multiple Ownership rule in 23 markets.[85] It would violate this rule as well in the Austin DMA and the Waco DMA if the Commission properly declined to extend and transfer previous satellite duopoly waivers, which allow broadcast conglomerates to hold more than two licenses in a market if one of those additional stations is a satellite "repeater" of the other stations making up the common ownership group.[86] Nexstar would violate the Local Multiple Ownership Rule in an additional six unique markets if the Commission properly enforced its rules prohibiting unlawful *de facto* control over FCC-licensed broadcast stations.[87]

Nexstar and TEGNA seek a waiver of the Local Multiple Ownership rule in 23 DMAs where the combined entity post-transaction would own three or more full-power TV stations. As we discuss herein, waiving the Local Multiple Ownership rule to grant the Application would increase Nexstar's market power in those 23 markets well beyond the level that the U.S. antitrust agencies consider to be presumptively unlawful. Granting Nexstar that much market power would do substantial harm to television viewers, news consumers, multichannel video subscribers, broadcast television workers, and advertisers. The merger would not and could not serve the public interest.

Aside from these outright violations of the law and the Commission's rules, this deal would create Nexstar-dominated local TV news markets in the 34 DMAs where Nexstar and TEGNA both currently hold full-power TV licenses. That runs contrary to the Commission's

---

[85] *See infra* Part V.B for discussion of these 23 markets in which Applicants seek a waiver of the Local Multiple Ownership rule.

[86] *See id.* for a discussion of the Austin DMA and Waco DMA, where Applicants did not seek a waiver of the Local Multiple Ownership rule, but where Nexstar would own three uniquely affiliated full-power licenses post-merger.

[87] *See infra* Part V.C for discussion of these six markets.

27

**App.432**

**REDACTED – FOR PUBLIC INSPECTION**

policy to promote the public interest by fostering greater competition, localism, and diversity in local broadcast markets. It would allow Nexstar to dominate the local news production market, the Local Broadcast Television Spot advertising market (a relevant product market recognized by the Department of Justice, as we describe below), and local retransmission consent markets.[88] This in turn would irreparably harm local communities and broadcast workers. Applicants fail to demonstrate any affirmative, merger-specific, verifiable and cognizable public interest benefits to counter these harms. The Commission should therefore deny the Application in its entirety.

**A. The Transaction is Presumptively Unlawful Under U.S. Antitrust Law. Allowing Nexstar to Dominate Local TV Markets Would Harm the Public Interest.**

The Transaction involves 34 overlapping markets where Nexstar and TEGNA both currently own FCC-licensed television stations.[89] Applicants seek a waiver of the Local Multiple Ownership rule in 22 of these 34 overlapping markets, plus a waiver of this rule in the Phoenix DMA where Nexstar operates a station under an attributable Local Marketing Agreement (for a total of 23 Local Multiple Ownership rule waiver requests; we will refer to all 35 DMAs as "overlapping DMAs" or "overlapping markets").[90] In addition, Applicants seek to form top four-ranked duopolies in ten of the overlapping DMAs, combinations that were impermissible

---

[88] *See infra* Part III.A.1  for discussion of relevant product markets. Our analysis focuses on both the local retransmission consent market as well as the market for the licensing of Big 4 Network Affiliated retransmission consent. The Department of Justice has identified "the licensing of Big 4 television retransmission consent" as "a relevant product market and line of commerce under Section 7 of the Clayton Act." *See United States and Plaintiff States v. Nexstar Media Group, Inc. and Tribune Media Company*, Case 1:19-cv-02295, Complaint, ¶24 (D.D.C. filed July 31, 2019) ("*Nexstar-Tribune* Complaint").

[89] There are 34 DMAs where Nexstar and TEGNA both currently own FCC licenses, plus the Phoenix DMA, where TEGNA owns licenses and Nexstar operates a station under a LMA that will become attributable. *See* Appendix A.

[90] *See infra* Part V.B for discussion on why Applicants should have requested a waiver of the Local Multiple Ownership rule in the Waco DMA and the Austin DMAs, where Nexstar operates station pairs in which one station was previously operated as a satellite repeater but is now operated as a separate affiliate.

28

**App.433**

**REDACTED – FOR PUBLIC INSPECTION**

under the now-vacated prohibition in the Top Four-Ranked Duopoly rule.[91] As we discuss in Part V.C below, in six of these overlapping DMAs, post-merger Nexstar would be in violation of the Local Multiple Ownership rule if the Commission recognized Nexstar's *de facto* control over stations it operates although a Nexstar "sidecar" company that holds the FCC license and exercises *de jure* control.[92]

For reasons we detail below, the Commission should deny Applicants' license transfer requests in all of the overlapping DMAs, because granting them would increase concentration in these local markets to an incredibly high level and cause irreparable harm to the public interest.

**1. The Transaction would massively increase the level of concentration in the relevant product markets in the overlapping DMAs, well past the level that current DOJ and FTC guidelines consider presumptively unlawful.**

We identify four relevant product markets that are impacted by the Transaction[93]:

---

[91] Application at Attachment B, 1–30. These 10 DMAs are: Sacramento-Stockton-Modesto, CA; Austin, TX; Columbus, OH; Harrisburg-Lancaster-Lebanon-York, PA; Greensboro-High Point-Winston Salem, NC; Wilkes Barre-Scranton-Hazleton, PA; Knoxville, TN; Tyler-Longview (Lufkin & Nacogdoches), TX; Odessa-Midland, TX; and Abilene-Sweetwater, TX.

[92] These six DMAs are: Abilene-Sweetwater, TX; Austin, TX; Odessa-Midland, TX; Tyler-Longview (Lufkin & Nacogdoches), TX; San Angelo, TX; and Wilkes Barre-Scranton-Hazleton, PA.

[93] *See, e.g., Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. Because § 7 of the Clayton Act prohibits any merger which may substantially lessen competition 'in any line of commerce' (emphasis supplied), it is necessary to examine the effects of a merger in each such economically significant submarket to determine if there is a reasonable probability that the merger will substantially lessen competition. If such a probability is found to exist, the merger is proscribed." (internal citations omitted).

29

**REDACTED – FOR PUBLIC INSPECTION**

1) The Local Broadcast TV Spot Advertising product market: This is a product market for advertising segments, otherwise known as broadcast commercial "spots" on television, that the Department of Justice ("DOJ") has previously and consistently identified as a relevant product market in antitrust analysis of television conglomerate mergers.[94]

2) The Licensing of Local Big 4 Network TV Retransmission Consent product market: DOJ has previously recognized what it refers to as the licensing of "Big 4" network affiliate (*i.e.* ABC, CBS, FOX, NBC) programming, via retransmission consent agreements between broadcasters and multichannel video programming distributors ("MVPDs") such as cable or satellite companies, as a relevant product market.[95] The DOJ's rationale is sound, and reflects the unique demand for Big 4 affiliated local and national programming. These stations air the most watched broadcast sports and entertainment programs, and they are also often the only stations that produce original local TV news. Therefore, it comes as no surprise that Big 4 affiliates accounted for ■ percent of all retransmission revenues earned by broadcasters during 2024.[96]

3) The Licensing of Local Broadcast TV Retransmission Consent product market: We also propose the larger local retransmission consent market as a relevant product market, because increasingly owners of Big 4 affiliates tie retransmission consent payments for their non-Big 4 affiliates and other stations to the payments and permissions for their more highly demanded Big

---

[94] *See, e.g., Nexstar-Tribune* Complaint, *supra* note 88, ¶35 ("Broadcast television spot advertising, including spot advertising on both Big 4 and non-Big 4 broadcast stations, constitutes a relevant product market and line of commerce under Section 7 of the Clayton Act, 15 U.S.C. § 18. Advertisers' inability or unwillingness to substitute to other types of advertising in response to a price increase in broadcast television spot advertising supports this relevant market definition.").

[95] *See id.* ¶24.

[96] Free Press estimated this percentage based on S&P Global Market Intelligence station-level retransmission consent revenues for 2024.

30

**App.435**

**REDACTED – FOR PUBLIC INSPECTION**

4 affiliates.[97] The DOJ's rationale for a more narrow Big 4 retransmission consent product market is well founded, and focuses on the fact that consumers do not view cable networks and non-Big 4 broadcast affiliates as substitutes for Big 4 affiliates.[98] From the perspective of an MVPD, and ultimately of their retail customers, broadcasters tying retrans payments for non-Big 4 affiliates to those for their Big 4 affiliates makes this slightly larger market boundary relevant for the purpose of the Commission's public interest analysis of the Transaction.

4) The Local TV News Production product market: This product market involves both the hiring and management of labor to produce broadcast TV news, as well as the consumer side of the market as viewers seek relevant local news and civic information. The Local TV News Production product market is a two-sided market in another respect too. Broadcasters produce and air programming blocks of local news, attracting a local viewing audience, made up of people who incur no marginal monetary cost for accessing this news product but instead "pay" with their attention to the advertisements interspersed throughout these broadcasts. On the other side of this two-sided market are advertisers, who pay the broadcasters to air their ads during the broadcast. The advertiser side of this two-sided market is itself a unique and relevant product market (the Local Broadcast TV Spot Advertising product market described above).

But though notions of "price" and "quality" are less quantifiable on the viewing side of this two-sided market, the viewing market for local TV news broadcasts should be of paramount concern as well to the Commission as it reviews the Transaction.[99] As Free Press extensively

---

[97] *See, e.g.*, George Winslow, "Nexstar Stations Dropped from Altice USA's Optimum Cable Systems," *TV Technology* (Jan. 10, 2025) (quoting an Altice representative stating "Nexstar is using an anti-consumer negotiation tactic—tying local channels to less popular ones."); *see also Direct TV, LLC v. Nexstar Media Group, Inc.; Mission Broadcasting, Inc.; and White Knight Broadcasting, Inc.*, Complaint (S.D.N.Y. 2023).

[98] *See, e.g.*, *Nexstar-Tribune* Complaint, *supra* note 88, ¶¶17–24.

[99] Courts have routinely found it necessary to investigate impacts to both sides of

31

**REDACTED – FOR PUBLIC INSPECTION**

documented in its comments in the Commission's 2025 proceeding on the National Cap, local TV news remains the dominant media source that people use to inform themselves about their communities, and it is particularly important to civics and democratic participation.[100] These civic and democratic health concerns are the reason that decades of jurisprudence uphold the idea that media policy is about more than just owner economics,[101] and concerns the airing of robust debate[102] and a diversity of views[103] on a broad swath of issues.[104]

The Applicants do not suggest any formal relevant product market definitions. Their pleading makes it quite clear that they want the Commission to view the content and advertising markets as broadly as possible, to include "global technology companies, on-demand streaming

---

two-sided markets when analyzing mergers. *See, e.g.*, *Ohio v. Am. Express Co.*, 585 U.S. 529, 544–47 (2018).

[100] *See* Free Press National Cap Comments at 21–31.

[101] *See, e.g.*, *Associated Press v. United States*, 326 U.S. 1, 20 (1945) ("The First Amendment, far from providing an argument against application of the Sherman Act, here provides powerful reasons to the contrary. That Amendment rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society. Surely a command that the government itself shall not impede the free flow of ideas does not afford non-governmental combinations a refuge if they impose restraints upon that constitutionally guaranteed freedom."); *Fox Television Stations, Inc., v. FCC*, 280 F.3d 1027, 1047 (D.C. Cir. 2002) ("An industry with a larger number of owners may well be less efficient than a more concentrated industry. Both consumer satisfaction and potential operating cost savings may be sacrificed as a result of the Rule. But that is not to say the Rule is unreasonable because the Congress may, in the regulation of broadcasting, constitutionally pursue values other than efficiency—including in particular diversity in programming, for which diversity of ownership is perhaps an aspirational but surely not an irrational proxy.").

[102] *See, e.g.*, *Red Lion*, 395 U.S. at 390 (1969) ("It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee."); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 638–39 (1994).

[103] *See, e.g.*, *Associated Press*, 326 U.S. at 20.

[104] *See, e.g.*, *Red Lion*, 395 U.S. at 390.

32

**App.437**

**REDACTED – FOR PUBLIC INSPECTION**

services, and ubiquitous social media."[105] But this self-serving argument cannot be the basis for the Commission's public interest analysis. Courts have found that when reviewing the legality of proposed mergers, "a relevant market cannot meaningfully encompass that infinite range."[106] Indeed, it matters little to the Commission's public interest analysis that Nexstar and a web platform like Amazon both sell advertising space, and that Nexstar perceives Amazon's growing ad business as another competitor. Advertising-supported media firms "may compete at some level," but that does not mean all such firms compete in the same relevant product market.[107] The entire purpose of drawing boundaries around the relevant product market is to include all firms that would present potential blocks to a merging firm's exercise of market power.[108] It is nonsensical to suggest, for example, that the rates Instagram sets for its ads in any way impact or are impacted by the rates Nexstar sets for ads during its stations' news broadcasts. It is even more nonsensical to suggest that distant media firms impose any materially relevant competitive pressures on Nexstar's local news production.

Our four proposed relevant product markets are supported by economic data and legal precedent. DOJ has identified the Local Broadcast TV Spot Advertising market and Local Big 4 Network TV Retransmission Consent market as relevant product markets.[109] The slightly larger product market of local retransmission consent for all stations is also empirically a relevant product market for the purposes of reviewing the Transaction, as Nexstar jointly negotiates

---

[105] Application at 5.

[106] *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953).

[107] *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 54 (D.D.C. 2011).

[108] *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986).

[109] *See, e.g.*, *Nexstar-Tribune* Complaint, *supra* note 88, ¶¶24, 35.

33

**App.438**

REDACTED – FOR PUBLIC INSPECTION

carriage of all of its stations with MVPDs. And the Local TV News Production product market is a relevant product market, even though users do not incur a direct marginal monetary cost to view local news broadcasts.[110] Recent research demonstrates that leading broadcast firms are able to impose increases in their news broadcasts' ad load without losing viewers, and this increased ad load is an indirect form of viewer "payment."[111] In addition to this empirical evidence, the

---

[110] We can understand the viewer-side of the two-sided broadcast TV news market as a market in which price equals $0, and then consider the hypothetical monopolist test ("HMT") where a firm controlled all of the local broadcast TV news-airing stations. Here it is almost certain that the hypothetical monopolist could impose a quality-adjusted "price" increase above 5 percent without losing a greater share of viewers to other local news producers. *See Federal Trade Commission v. Meta Platforms, Inc.*, Civil Action No. 20-3590, Memorandum Opinion, at 38–40 (D.D.C. filed Dec. 2, 2025) ("*FTC v. Meta*") ("What if the products are free, like Facebook and Instagram? Courts can update the hoary HMT for the digital age by asking whether a hypothetical monopolist would impose a small but significant and nontransitory increase in the apps' quality-adjusted price — basically, whether it would make them significantly worse than they would be in a competitive market (say, by bloating them with ads). Of course, the answer is unobservable (by definition, it is hypothetical). But the HMT at least tells the Court what question to ask: would a firm that controlled both Facebook and Instagram maximize its profit by making them about 5% worse than they would be under competitive conditions? If it would not because, say, too many users would substitute time on Instagram for time on TikTok, then TikTok belongs in the product market. Note that this test does not focus on whether items have abstract qualitative differences but instead on the reality of what consumers would do. After all, whether a hypothetical monopolist could profitably raise prices—and therefore where the product market's borders lie—depends on which alternatives consumers would turn to and how readily they would do so, not on how different the products seem to a judge. . . . The HMT does not ask whether consumers would stop buying a product entirely. Instead, the question is whether they would cut back enough to make a significant price increase unprofitable.") (internal citations omitted).

[111] Empirical research demonstrates that recent waves of consolidation in the local broadcast TV markets conferred meaningful market power on broadcasters, in a manner that violates the so-called "hypothetical monopolist" test used by courts to adjudicate allegations of monopoly. *See, e.g.*, *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 (3d Cir. 2016). A 2024 study revealed that after acquiring stations, "conglomerate owners consistently increase advertising duration during local newscasts," often above a five percent increase in time devoted to advertisements, with no significant loss of viewers. Because advertising time is a proxy for price in an otherwise zero-price market (users "pay" by bearing the nuisance of ads), this ability for conglomerates to increase the ad load by five percent or more without a similar proportional loss of viewers (and without a proportional loss in profits either) satisfies the "small by significant and non-transitory increase in price" test (the "SSNIP" test). This indicates that the local TV news market is a unique and relevant product market for antitrust purposes, distinct from some kind of larger market for advertising-supported content. It also indicates that the large

34

**REDACTED – FOR PUBLIC INSPECTION**

breadth of how the local TV market functions and how it is perceived by the public also support treating it as a unique product market. Local TV news has "peculiar characteristics and uses;" it has "industry [and] public recognition . . . as a separate economic entity"; it has "unique production facilities," as well as "distinct customers, distinct prices [and] sensitivity to price changes;" and local TV news operations have "specialized vendors."[112]

Below we present pre- and post-merger concentration ratios using the Herfindahl-Hirschman Index ("HHI") to measure market concentration.[113] These tables illustrate Nexstar's post-merger market share of local broadcast <u>total</u> market revenues (*i.e.*, the combined entity's local broadcast TV gross advertising revenues and retransmission consent revenues) (Figure 1); then the local broadcast TV gross advertising revenues alone (Figure 2); the local broadcast TV retransmission consent revenues alone (Figure 3); and finally, local broadcast TV Big 4 affiliate station retransmission consent revenues (Figure 4).

---

local broadcast TV conglomerates demonstrably possess monopoly power in this local TV news market. *See* Gregory Martin *et al.*, "Media Consolidation," Kilts Center at Chicago Booth Marketing Data Center Paper, at 1; 22–25 (May 28, 2024) ("The effects on advertisement duration, though slightly smaller in magnitude, are also present for Nexstar, for which we find an increase of about 4.3-5.3%. Moreover, Nexstar acquisitions exhibit a pronounced effect on revenues which is remarkably stable across specifications. . . . If viewers have a preference for coverage of local events or dislike advertising, we expect them to react to the changes induced by Sinclair or Nexstar acquisitions by switching out or in. This is not what we find.").

[112] *FTC v. Meta* at 61–62, citing *Brown Shoe*, 370 U.S. at 325.

[113] *See* U.S. Department of Justice and Federal Trade Commission, Merger Guidelines, at 5–6 (2023) ("Horizontal Merger Guidelines") ("The HHI is defined as the sum of the squares of the market shares; it is small when there are many small firms and grows larger as the market becomes more concentrated, reaching 10,000 in a market with a single firm. Markets with an HHI greater than 1,800 are highly concentrated, and a change of more than 100 points is a significant increase. A merger that creates or further consolidates a highly concentrated market that involves an increase in the HHI of more than 100 points is presumed to substantially lessen competition or tend to create a monopoly. The Agencies also may examine the market share of the merged firm: a merger that creates a firm with a share over thirty percent is also presumed to substantially lessen competition or tend to create a monopoly if it also involves an increase in HHI of more than 100 points.") (internal citations omitted).

35

**App.440**

REDACTED – FOR PUBLIC INSPECTION

**Figure 1: Local Broadcast TV Market Total Revenue Concentration**

Markets Where Nexstar and TEGNA Both Currently Operate Full-Power TV Stations
(Sidecar Revenues NOT Attributed to Station Operator)

| Most recent market rank | Market name | Pre-Merger HHI based on Total Market Revenue | Post-Merger HHI based on Total Market Revenue | Change | Nexstar's Post-Merger Total Revenue Share |
|---|---|---|---|---|---|
| 4 | Dallas-Ft. Worth, TX | | | | |
| 6 | Houston, TX | | | | |
| 8 | Washington, DC (Hagerstown, MD) | | | | |
| 11 | Tampa-St.Petersburg (Sarasota), FL | | | | |
| 12 | Phoenix (Prescott), AZ | | | | |
| 17 | Denver, CO | | | | |
| 19 | Cleveland-Akron (Canton), OH | | | | |
| 20 | Sacramento-Stockton-Modesto, CA | | | | |
| 21 | Charlotte, NC | | | | |
| 23 | Portland, OR | | | | |
| 24 | St. Louis, MO | | | | |
| 25 | Indianapolis, IN | | | | |
| 30 | San Diego, CA | | | | |
| 32 | Hartford & New Haven, CT | | | | |
| 34 | Austin, TX | | | | |
| 35 | Columbus, OH | | | | |
| 42 | Harrisburg-Lancaster-Lebanon-York, PA | | | | |
| 43 | Grand Rapids-Kalamazoo-Battle Creek, MI | | | | |
| 44 | Norfolk-Portsmouth-Newport News, VA | | | | |
| 46 | Greensboro-High Point-Winston Salem, NC | | | | |
| 50 | New Orleans, LA | | | | |
| 51 | Memphis, TN | | | | |
| 54 | Buffalo, NY | | | | |
| 58 | Little Rock-Pine Bluff, AR | | | | |
| 59 | Wilkes Barre-Scranton-Hazleton, PA | | | | |
| 60 | Knoxville, TN | | | | |
| 67 | Des Moines-Ames, IA | | | | |
| 75 | Huntsville-Decatur (Florence), AL | | | | |
| 83 | Waco-Temple-Bryan, TX | | | | |
| 96 | Ft. Smith-Fayettville-Springdale-Rodgers, AR | | | | |
| 104 | Davenport-Rock Island-Moline, IA-IL | | | | |
| 106 | Tyler-Longview (Lufkin & Nacogdoches), TX | | | | |
| 144 | Odessa-Midland, TX | | | | |
| 166 | Abilene-Sweetwater, TX | | | | |
| 197 | San Angelo, TX | | | | |

Source: Free Press analysis of 2024 station-level data estimates from S&P Global Market Intelligence; Company SEC filings.

36

**App.441**

REDACTED – FOR PUBLIC INSPECTION

**Figure 2: Local Broadcast TV Market Advertising Revenue Concentration**

Markets Where Nexstar and TEGNA Both Currently Operate Full-Power TV Stations
(Sidecar Revenues NOT Attributed to Station Operator)

| Most recent market rank | Market name | Pre-Merger HHI based on Gross Advertising Revenue | Post-Merger HHI based on Gross Advertising Revenue | Change | Nexstar's Post-Merger Gross Advertising Revenue Share |
|---|---|---|---|---|---|
| 4 | Dallas-Ft. Worth, TX | | | | |
| 6 | Houston, TX | | | | |
| 8 | Washington, DC (Hagerstown, MD) | | | | |
| 11 | Tampa-St.Petersburg (Sarasota), FL | | | | |
| 12 | Phoenix (Prescott), AZ | | | | |
| 17 | Denver, CO | | | | |
| 19 | Cleveland-Akron (Canton), OH | | | | |
| 20 | Sacramento-Stockton-Modesto, CA | | | | |
| 21 | Charlotte, NC | | | | |
| 23 | Portland, OR | | | | |
| 24 | St. Louis, MO | | | | |
| 25 | Indianapolis, IN | | | | |
| 30 | San Diego, CA | | | | |
| 32 | Hartford & New Haven, CT | | | | |
| 34 | Austin, TX | | | | |
| 35 | Columbus, OH | | | | |
| 42 | Harrisburg-Lancaster-Lebanon-York, PA | | | | |
| 43 | Grand Rapids-Kalamazoo-Battle Creek, MI | | | | |
| 44 | Norfolk-Portsmouth-Newport News, VA | | | | |
| 46 | Greensboro-High Point-Winston Salem, NC | | | | |
| 50 | New Orleans, LA | | | | |
| 51 | Memphis, TN | | | | |
| 54 | Buffalo, NY | | | | |
| 58 | Little Rock-Pine Bluff, AR | | | | |
| 59 | Wilkes Barre-Scranton-Hazleton, PA | | | | |
| 60 | Knoxville, TN | | | | |
| 67 | Des Moines-Ames, IA | | | | |
| 75 | Huntsville-Decatur (Florence), AL | | | | |
| 83 | Waco-Temple-Bryan, TX | | | | |
| 96 | Ft. Smith-Fayettville-Springdale-Rodgers, AR | | | | |
| 104 | Davenport-Rock Island-Moline, IA-IL | | | | |
| 106 | Tyler-Longview (Lufkin & Nacogdoches), TX | | | | |
| 144 | Odessa-Midland, TX | | | | |
| 166 | Abilene-Sweetwater, TX | | | | |
| 197 | San Angelo, TX | | | | |

Source: Free Press analysis of 2024 station-level data estimates from S&P Global Market Intelligence; Company SEC filings.

37

**App.442**

**REDACTED – FOR PUBLIC INSPECTION**

**Figure 3: Local Broadcast TV Market Retransmission Consent Revenue Concentration**

Markets Where Nexstar and TEGNA Both Currently Operate Full-Power TV Stations
(Sidecar Revenues NOT Attributed to Station Operator)

| Most recent market rank | Market name | Pre-Merger HHI based on Retrans Revenue | Post-Merger HHI based on Retrans Revenue | Change | Nexstar's Post-Merger Retrans Revenue Share |
|---|---|---|---|---|---|
| 4 | Dallas-Ft. Worth, TX | | | | |
| 6 | Houston, TX | | | | |
| 8 | Washington, DC (Hagerstown, MD) | | | | |
| 11 | Tampa-St.Petersburg (Sarasota), FL | | | | |
| 12 | Phoenix (Prescott), AZ | | | | |
| 17 | Denver, CO | | | | |
| 19 | Cleveland-Akron (Canton), OH | | | | |
| 20 | Sacramento-Stockton-Modesto, CA | | | | |
| 21 | Charlotte, NC | | | | |
| 23 | Portland, OR | | | | |
| 24 | St. Louis, MO | | | | |
| 25 | Indianapolis, IN | | | | |
| 30 | San Diego, CA | | | | |
| 32 | Hartford & New Haven, CT | | | | |
| 34 | Austin, TX | | | | |
| 35 | Columbus, OH | | | | |
| 42 | Harrisburg-Lancaster-Lebanon-York, PA | | | | |
| 43 | Grand Rapids-Kalamazoo-Battle Creek, MI | | | | |
| 44 | Norfolk-Portsmouth-Newport News, VA | | | | |
| 46 | Greensboro-High Point-Winston Salem, NC | | | | |
| 50 | New Orleans, LA | | | | |
| 51 | Memphis, TN | | | | |
| 54 | Buffalo, NY | | | | |
| 58 | Little Rock-Pine Bluff, AR | | | | |
| 59 | Wilkes Barre-Scranton-Hazleton, PA | | | | |
| 60 | Knoxville, TN | | | | |
| 67 | Des Moines-Ames, IA | | | | |
| 75 | Huntsville-Decatur (Florence), AL | | | | |
| 83 | Waco-Temple-Bryan, TX | | | | |
| 96 | Ft. Smith-Fayettville-Springdale-Rodgers, AR | | | | |
| 104 | Davenport-Rock Island-Moline, IA-IL | | | | |
| 106 | Tyler-Longview (Lufkin & Nacogdoches), TX | | | | |
| 144 | Odessa-Midland, TX | | | | |
| 166 | Abilene-Sweetwater, TX | | | | |
| 197 | San Angelo, TX | | | | |

*Source: Free Press analysis of 2024 station-level data estimates from S&P Global Market Intelligence; Company SEC filings.*

38

**App.443**

REDACTED – FOR PUBLIC INSPECTION

**Figure 4: Local Broadcast TV Market**
**Big 4 Affiliate Retransmission Consent Revenue Concentration**

| Most recent market rank | Market name | Markets Where Nexstar and TEGNA Both Currently Operate Full-Power TV Stations (Sidecar Revenues NOT Attributed to Station Operator) | | | | |
|---|---|---|---|---|---|---|
| | | Pre-Merger HHI based on Market's Big 4 Affiliate Retrans Revenue | Post-Merger HHI based on Market's Big 4 Affiliate Retrans Revenue | Change | Nexstar's Post-Merger Share of Market's Big 4 Affiliate Retrans Revenue | |
| 4 | Dallas-Ft. Worth, TX | | | | | |
| 6 | Houston, TX | | | | | |
| 8 | Washington, DC (Hagerstown, MD) | | | | | |
| 11 | Tampa-St.Petersburg (Sarasota), FL | | | | | |
| 12 | Phoenix (Prescott), AZ | | | | | |
| 17 | Denver, CO | | | | | |
| 19 | Cleveland-Akron (Canton), OH | | | | | |
| 20 | Sacramento-Stockton-Modesto, CA | | | | | |
| 21 | Charlotte, NC | | | | | |
| 23 | Portland, OR | | | | | |
| 24 | St. Louis, MO | | | | | |
| 25 | Indianapolis, IN | | | | | |
| 30 | San Diego, CA | | | | | |
| 32 | Hartford & New Haven, CT | | | | | |
| 34 | Austin, TX | | | | | |
| 35 | Columbus, OH | | | | | |
| 42 | Harrisburg-Lancaster-Lebanon-York, PA | | | | | |
| 43 | Grand Rapids-Kalamazoo-Battle Creek, MI | | | | | |
| 44 | Norfolk-Portsmouth-Newport News, VA | | | | | |
| 46 | Greensboro-High Point-Winston Salem, NC | | | | | |
| 50 | New Orleans, LA | | | | | |
| 51 | Memphis, TN | | | | | |
| 54 | Buffalo, NY | | | | | |
| 58 | Little Rock-Pine Bluff, AR | | | | | |
| 59 | Wilkes Barre-Scranton-Hazleton, PA | | | | | |
| 60 | Knoxville, TN | | | | | |
| 67 | Des Moines-Ames, IA | | | | | |
| 75 | Huntsville-Decatur (Florence), AL | | | | | |
| 83 | Waco-Temple-Bryan, TX | | | | | |
| 96 | Ft. Smith-Fayettville-Springdale-Rodgers, AR | | | | | |
| 104 | Davenport-Rock Island-Moline, IA-IL | | | | | |
| 106 | Tyler-Longview (Lufkin & Nacogdoches), TX | | | | | |
| 144 | Odessa-Midland, TX | | | | | |
| 166 | Abilene-Sweetwater, TX | | | | | |
| 197 | San Angelo, TX | | | | | |

Source: Free Press analysis of 2024 station-level data estimates from S&P Global Market Intelligence; Company SEC filings.

39

**App.444**

REDACTED – FOR PUBLIC INSPECTION

Unfortunately, we do not have access to news daypart viewership data, so we cannot provide estimates of how the merger would specifically concentrate audience shares in that relevant product market for Local TV News. However, we expect that such data would show similarly high levels of concentration, if not higher, than those observed in the retransmission consent and advertising markets.

These extremely high concentration ratios are especially concerning given the local broadcast TV market's already steep barriers to entry. In any DMA, there are only a finite number of FCC-licensed broadcast TV channels, and only four major broadcast networks. As the broadcast TV market becomes more concentrated, with fewer standalone stations, market entry becomes even more difficult. If market entry is unlikely, or would not be timely or sufficient to challenge a merged-firm's dominance, then regulators and courts look even more skeptically at potential mergers by and between dominant firms.[114]

> **2. Evidence from past broadcast consolidation waves demonstrates that granting Applicants' transfers in the overlapping DMAs, including Applicants' requests for waivers of the Local Multiple Ownership rule, would cause irreparable harm to the public interest.**

The Commission's ownership policies are its tool for promoting the Communications Act's goals of broadcast competition, localism, and diversity. This standard is rightly different from and far more rigorous than the one at the center of an antitrust inquiry, which is concerned with price and market power alone. Yet despite this clear public interest-based need for the Commission to foster local broadcasting markets that are more competitive and certainly more diverse than any other commercial market, local broadcasting markets are already highly concentrated. The local TV markets where Nexstar proposes to acquire TEGNA stations have

---

[114] *See id.* at 31–32.

REDACTED – FOR PUBLIC INSPECTION

concentration levels well above the line that DOJ and the FTC draw to prevent "presumptively unlawful" mergers.[115]

And while the economic data demonstrates the folly in the Commission allowing any more consolidation of the local broadcast TV market, the agency's job goes well beyond antitrust economics. The marketplace of ideas is fundamentally different from the marketplace for goods and services. Allowing Nexstar to consolidate control over the local TV news market to the degree that Applicants propose would impart devastating consequences on the public's welfare and ultimately democracy itself. These concerns and predictions are not hypothetical. Empirical evidence demonstrates that two-plus decades of FCC-enabled consolidation undermined competition, localism, and diversity in broadcasting.[116]

This evidence confirms, for example, that conglomerates acted on their economic incentives to favor national content over local journalism.[117] Other research demonstrates how conglomerates take over stations with promises of expanding coverage, only to wind up replacing original news reporting with repackaged and repurposed content.[118] It should therefore come as no surprise that years of conglomerate consolidation have decimated newsroom morale.[119] The conglomerates may benefit financially from this market monopolization strategy; Nexstar's stock price increasing more than twenty-thousand percent since 2009 certainly reflects

---

[115] *Id.* at 5–6.

[116] *See, e.g.*, Comments of Free Press, *In the Matter of 2022 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 22-459, at 19–43 (Dec. 17, 2025).

[117] *Id.* at 19–21.

[118] *Id.* at 34–36.

[119] *Id.* at 26–31.

41

**App.446**

REDACTED – FOR PUBLIC INSPECTION

that.[120] But the public and dedicated local news employees are the parties that must pay the steep price exacted by this ceaseless pursuit of profit growth.

If Nexstar is permitted to acquire one of its closest competitors, it would increase the combined company's ability to reduce the amount of money and resources these firms currently allocate in aggregate to local news production. The same scale economics that Applicants claim will "allow" them to continue to produce local news in fact favor centralized production of nationally focused and formulaic content, dealing a huge blow to the Commission's mission to preserve and promote localism. That loss of localism comes at the price of a loss of competition and viewpoint diversity. And while this kind of consolidation leads by design to what the merged entity euphemistically calls "synergies," that necessarily means reduced employment opportunities and worsened job conditions for journalists, news production workers, and other local station personnel, as discussed in Part IV, *infra*. Without having to compete against TEGNA in the overlapping DMAs, Nexstar also will have more market power to raise the prices they charge advertisers for airtime. More consolidation would also enhance Nexstar's market power they've already abused to extract excessive retransmission consent payments from pay-TV distributors and their weary customers. In short, the Transaction's harms are substantial, and approving Applicants' transfer requests would not serve the public interest.

**B. Applicants Fail to Identify Any Merger-Specific, Verifiable Benefits that Would Offset the Transaction's Public Interest Harms. Applicants' Claimed Benefits Are Conclusory and Non-Cognizable.**

Applicants center their public interest benefit claims in the school of trickle-down economics, where a massive loss of competition would supposedly benefit the public by "allowing" Nexstar to "invest in local newsrooms and local programming, to innovate, including

---

[120] Free Press National Cap Comments at 79.

REDACTED – FOR PUBLIC INSPECTION

with respect to ATSC 3.0, and to deliver the freely available content Americans expect."[121] However, whatever synergies Nexstar might derive from new duopolies, triopolies, and even quadopolies, those financial benefits would not accrue to the viewing public, who would be harmed by the loss of competition, diminished localism, and decreased viewpoint diversity.

Nexstar needs the Commission to waive its rule that prevents broadcasters from holding three or more full-power TV licenses in a single market, and claims that letting the merged entity amass this much control over the local airwaves is the "the only means to preserve the local television service each company historically has provided to its communities."[122] This argument is unmoored from the facts and economics. The synergies to be realized from acquiring a third station outside of the top four-ranked stations are dubious, and will primarily be reaped from Nexstar exercising its enhanced market power in the Local Broadcast TV Spot Advertising and retransmission consent markets.

What's more, for synergies to actually translate into consumer benefits, there needs to be robust post-merger competition. That scenario might arise from the merger of two market participants with low shares, or even between asymmetric firms.[123] Empirical research suggests that for synergies to arguably be pro-competitive and pro-consumer, the degree to which a merger concentrates the market must be relatively small, and the synergies relatively large.[124]

---

[121] Application at 2.

[122] *Id.*

[123] *See, e.g.*, Charles J. Thomas, "The Competitive Effects of Mergers Between Asymmetric Firms," Federal Trade Commission (1998).

[124] Volker Nocke and Michael D. Whinston, "Concentration Thresholds for Horizontal Mergers" 112 *American Economic Review* 1915, 1934 (2022) ("[E]ven mergers among small firms would require significant synergies for the merger not to harm consumers. For example, a merger between two firms with a 10 percent premerger market share each (raising the HHI by 200) would require type synergies exceeding 10 percent, and cost synergies exceeding 3 percent when the firm-level own-price elasticity is 5.").

43

REDACTED – FOR PUBLIC INSPECTION

That is clearly not the case in this Transaction, as Applicants propose to combine the largest and fourth-largest broadcast chains as measured by revenue. This is not a transaction to make a weak competitor stronger. It is one that proposes to combine two giants, and to let Nexstar control half or more of the news-producing stations in many of the overlapping DMAs.

As we discuss below in detail for each DMA in which they request a waiver, Applicants' public interest claims fall into three categories: 1) claims that continued production of local news is only possible if Nexstar increases its scale;[125] 2) claims about the supposed benefits from the Transaction of continued deployment of ATSC 3.0 technology;[126] and 3) claims about charitable community service.[127] But all of these alleged public interest benefits are non-cognizable.[128] As the current Trump administration's DOJ and the FTC wrote just this past June 2025 to the OECD: though "no court has ever found that efficiencies justified an otherwise anticompetitive merger," antitrust authorities will consider arguments that merger efficiencies reduce and offset competitive harms, but only if these efficiencies are "merger-specific, verifiable, passed through to prevent a reduction in competition in the relevant market, and of sufficient magnitude and

---

[125] *See, e.g.*, Application at 20 ("Separately, neither Nexstar nor TEGNA will be able to sustain their commitment to the localized, independent, fact-based journalism that these markets currently enjoy.").

[126] *See id.* at 15–16.

[127] *See, e.g.*, Application at 16–17.

[128] *See* "Working Party No. 3 on Co-operation and Enforcement, Efficiencies in Merger Control – Note by the United States," Organisation for Economic Co-operation and Development, Directorate for Financial and Enterprise Affairs Competition Committee, ¶3 (June 15, 2025); *see also id.* ¶7 ("Courts and Agencies require merging parties to show that efficiencies meet four criteria to be legally recognized, or 'cognizable.' They must: (1) be merger-specific; (2) be verifiable, not speculative; (3) prevent the threatened harm to competition in the relevant markets; and (4) not arise from anticompetitive reductions in output or service.").

44

REDACTED – FOR PUBLIC INSPECTION

likelihood such that no substantial lessening of competition or tendency to create a monopoly would be threatened in any relevant market."[129]

The supposed benefits Applicants claim fail to meet this standard. They are not specific to this Transaction, they are speculative and impossible to verify, and they would not make up for the lost competition. Nexstar and TEGNA separately are financially thriving and investing in their local news operations.[130] They separately have led on ATSC 3.0 deployment for years.[131] And they separately engage in the type of community charitable work that many local news station owners perform.[132]

---

[129] *Id.* ¶2.

[130] *See* Free Press National Cap Comments at 71–87. During 2024, when unlawful consolidation was still politically off the table, both Nexstar and TEGNA repeatedly told their investors and Wall Street that their businesses were thriving, and insulated from competition in the larger media and content markets. *See, e.g.*, Comments of David Lougee, President and CEO, TEGNA Inc., Q2 2024 Investor Call (Aug. 7, 2024) ("[W]e have a tremendous amount of assets. We've got strong local brands in local communities, which are not nearly as competitive as the national landscape, that's a valuable asset. To have valuable local content that is strongly branded is—can be a jumping off point to source significant new business, whether organic or inorganic, as Julie and we have said many times."); Comments of Perry A. Sook, Founder, Chairman & CEO, Nexstar Media Group, Inc., Nexstar Q2 2025 Investor Call (Aug. 8, 2024) ("Nexstar's strong second quarter financial results mark another quarter of record total net revenue and our third consecutive quarter of all-time high quarterly distribution revenue. We translated this revenue growth into another quarter of solid adjusted EBITDA and adjusted free cash flow growth, reflecting our disciplined operating strategies. Just stop and think about that for a minute. At a time when the pay-TV industry continues to experience subscriber attrition and there is intense competition for national advertising dollars, Nexstar generated the highest first and second quarter distribution and total revenue levels in the company's history. Why is that? Well, it comes down to the value of our programming and reach delivered to our audiences, customers and programming partners. The power of broadcast television was again validated in a few recent high-profile settings.") (emphasis added).

[131] *See, e.g.*, Tom Butts, "Station Groups Announce Investment in ATSC 3.0 Software Platform," *TV Technology* (April 12, 2024); Daniel Frankel, "Fox, NBC, Univision, TEGNA and Nexstar Stations Lead Broad Coalition Formally Committing to ATSC 3.0," *Multichannel News* (Sept. 7, 2020).

[132] *See, e.g.*, "TEGNA Named One of the Most Community-Minded Companies in the U.S. by The Civic 50 for Fifth Consecutive Year," TEGNA Inc. Press Release (May 14, 2024); "Our Foundation," Nexstar Media Group Inc. (last accessed Dec. 22, 2025) (available at

45

**App.450**

REDACTED – FOR PUBLIC INSPECTION

Taking out a competitor in an already highly concentrated market is presumptively unlawful, and the burden falls on merging parties to demonstrate that the likely harms to competition arising from further market concentration <u>would actually be offset</u> by cognizable benefits.[133] Applicants here repeatedly claim that "[t]o sustain their investment in quality journalism," the stations that the combined entity seeks to control after the merger "must find a way to combat declining viewership and revenues."[134] Applicants assert that combining three or more stations "under a common owner will provide these stations with the scale needed" to compete with technology companies that the Applicants haughtily accuse of "siphoning revenue away from local stations."[135] But these vague claims of harm absent the Transaction are unsupported and uncognizable.

First, efficiencies have to be related to the product market in which competition is being reduced. Claimed efficiencies that would impact competition with firms outside of the relevant geographic market, outside of the relevant product market, or outside of both—such as the "media and technology conglomerates" Applicants cite[136]—are not cognizable.[137] Second, as Applicants themselves document throughout their pleading, TEGNA's and Nexstar's stations

---

https://www.nexstar.tv/our-foundation).

[133] *See, e.g.*, *U.S. v. Anthem, Inc.*, 855 F.3d 345, 369 (D.C. Cir. 2017) (Millett, J., concurring) ("The proffered efficiencies, even if they are verifiable and merger specific, must at least neutralize if not outweigh the harm caused by the loss of competition and innovation.").

[134] *See, e.g.*, Application at 67.

[135] *See, e.g.*, *id.*

[136] *Id.* at 43.

[137] Under U.S. antitrust jurisprudence, merger efficiencies must be related to competition <u>in the relevant product market</u>. Courts do not consider out-of-market efficiencies to be cognizable. *See, e.g.*, *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 370–71 (1963); *see also U.S. v. Anthem, Inc.,* 855 F.3d at 353–54.

46

REDACTED – FOR PUBLIC INSPECTION

have robust local news operations that are highly viewed. Because local TV stations derive much of their financial success through their news operations, we fully expect that Applicants each separately would continue to produce local news for their stations. They've given no indication to the contrary in any other public statements made prior to striking this deal. Indeed, as Free Press documented previously, Applicants each separately have spoken highly of the future prospects for their businesses and for the local broadcast TV market generally.[138]

Not only do Applicants fail to specify the nature or amount of benefits they would gain from combining these stations, Applicants also fail to describe the specific benefits that the public would reap from the combination of these stations, net of any public interest harms. They only offer the repeated lament that other firms also offer advertising services, and that somehow more consolidation is the answer to secular trends in the larger media ecosystem. Nexstar points to potential increases in the time devoted to airing local news as a public interest benefit.[139] However, the public interest benefits from more minutes of news previously aired—repeatedly—across multiple stations, are *de minimis* compared to the harms from the loss of a thriving independent news production operation.[140] Because Nexstar and TEGNA separately have re-aired news segments in the absence of the Transaction, and could continue to do so, this claimed benefit is not cognizable.

---

[138] Free Press National Cap Comments at 52–92.

[139] *See, e.g.*, Application at 13–15.

[140] Nexstar is notorious for acquiring stations, consolidating newsrooms, and then airing duplicative news across their in- and out-of-market stations. *See* Danilo Yanich & Benjamin E. Bagozzi, "Reusing the News: Duplication of Local Content" at 3, University of Delaware, (May 2025).

47

**App.452**

REDACTED – FOR PUBLIC INSPECTION

Similarly, Applicants claim that the Transaction will benefit the public because it will facilitate transitioning the TEGNA stations to ATSC 3.0.[141] While the actual benefits of this technology to the public are themselves speculative and in no way offset the harms of reduced local TV market competition, they are also entirely non-merger specific. TEGNA and Nexstar each are leaders in ATSC 3.0 deployment, working in coalition with other broadcasters to advance this technology.[142] ATSC 3.0 deployment is already robust, reaching 76 percent of the U.S. population as of January 2025.[143] Similarly, broadcasters' charity work is always welcome, but it is in no way related to the Transaction nor offsetting its harms.

Whatever operational synergies and financial benefits Nexstar itself may obtain from concentrating even more already concentrated local TV spot advertising and retransmission consent markets across the country, those internal benefits would not result in any cognizable public interest benefits. Under U.S. antitrust jurisprudence, merging parties that claim efficiencies must base those claims on more than "speculative assurances that a benefit enjoyed by the [merging parties] will also be enjoyed by the public."[144] Courts require merging parties to offer "clear evidence showing that the merger will result in efficiencies that will . . . ultimately benefit consumers."[145] This is a high bar for merging parties to clear. And the Commission's

---

[141] *See, e.g.*, Application at 68.

[142] *See, e.g.*, Jeff Baumgartner, "Huawei's chipmaker gets tossed into the 'NextGenTV' fracas," *Light Reading* (July 21, 2025) (describing the ATSC 3.0 industry advocacy group Pearl TV, "a consortium of Cox Media Group, E.W. Scripps, Graham Media Group, Hearst Television, Nexstar, Gray Television, Sinclair Broadcast Group and Tegna that is pushing hard to complete the ATSC 3.0 transition.").

[143] "ATSC 3.0 Deployments: Where and When Will NextGen TV be Available?," *TV Technology* (Jan. 23, 2025).

[144] *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d at 351.

[145] *Id.* at 350.

48

**REDACTED – FOR PUBLIC INSPECTION**

public interest-based merger review standard requires an even higher bar for parties seeking to eliminate an in-market broadcast competitor. The Commission's waiver standard is not, and cannot be, based on whether or not a station's balance sheet would be better off as a result of reducing the number of market competitors.

Applicants do imply—and in many places, claim outright—that if the Commission allows the post-merger entity to form new top four-ranked duopolies but prohibits it from forming triopolies or quadopolies, the divested stations in that scenario would fail.[146] But the Application does not offer concrete, verifiable evidence that these stations could satisfy the Commission's failing station waiver policy criteria today under the *status quo* situation, in the absence of the proposed Transaction. A claim of a low market share alone is not sufficient to support a failing station waiver. Applicants also admit that this kind of waiver has been unavailable till now for buyers seeking to violate the Local Multiple Ownership by acquiring more than two licenses.

Nexstar and TEGNA thus argue that they should be able to form top four duopolies while retaining their existing smaller, non-top four stations as well. They claim absurdly that allowing a single entity to control three or more stations "sharing" and airing the same news programs, all "under common ownership," would somehow "preserve [ ] stronger competitor[s] in the market."[147] This comes immediately after Applicants justify their "failing station" suppositions by noting that the rationale for such waivers in the first place is that these stations' "financial

---

[146] *See, e.g.*, Application at 105.

[147] *Id*. at 105–06.

49

REDACTED – FOR PUBLIC INSPECTION

situation typically hampers their ability to be a viable 'voice' in the market" and they "often struggle to provide significant local programming at all."[148]

So the Application simultaneously says these supposedly failing stations are important competitors to preserve yet <u>not</u> viable local voices for purposes of the Commission's analysis. This self-contradiction demonstrates that Applicants, once again, imagine they are competing against media and tech companies outside of the relevant local broadcasting product market. They contend implausibly that <u>eliminating</u> in-market competition that exists today between Nexstar and TEGNA would somehow preserve competition. The Commission should dismiss this nonsensical notion that fewer competitors somehow means more competitors, and focus on preserving and promoting the public interest in competition between local broadcast stations.

Indeed, taken at face value, Applicants' arguments and threats of failing stations actually make a great case for maintaining the *status quo*. Clearly, viewers in markets where TEGNA and Nexstar both operate stations (and one or both already have duopolies) would be better off with two strong and independent local news operations competing against each other than they would be if those parties merged to save from "failing" another non-news producing station. And these viewers would also be better off if Nexstar were forced to divest a non-top four-ranked station to another firm (potentially another licensee of a top four-ranked news station that has no duopoly) rather than allowed to keep three or more of the market's scarce full-power licenses for itself.

Therefore, Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in any of the overlapping DMAs. The transaction would give Nexstar too much market power in the local TV news, local broadcast TV spot advertising, and local

---

[148] *Id*. at 105 (quoting *Review of the Commission's Regulations Governing Television Broadcasting*, MM Docket Nos. 96–222, 91–221, 87–8, Report and Order, 14 FCC Rcd 12903, 12939 ¶79 (1999).

50

**App.455**

REDACTED – FOR PUBLIC INSPECTION

retransmission consent markets, as well as the labor market for broadcast technicians and other broadcast station personnel in front of and behind the camera.

Applicants have failed to meet their burden to show that there would be <u>any</u> cognizable public interest benefits offsetting the public interest harms from further concentration of these relevant product markets. Applicants' claimed benefits are not merger-specific or verifiable, and they would not offset the public interest harms resulting from the reduction in the number of competitors in the overlapping DMAs. Therefore the Commission should deny all of the transfer applications. In the alternative, if it does approve new top four-ranked Nexstar duopolies the Commission should deny Applicants' requests for waivers of the Local Multiple Ownership rule.

## IV. THIS MERGER WOULD ENTRENCH AND EXTEND NEXSTAR'S DOMINANT POSITION IN LOCAL LABOR MARKETS.

Nexstar currently has significant market power in relation to its broadcast technician workforce. Should this merger close, the dramatic change in market composition would further erode broadcast technicians' ability to counterbalance Nexstar's market power and would extend Nexstar's dominant position in local labor markets. We focus on the labor market for broadcast technicians in particular because among the occupations employed by television stations, it is most impacted by a reduction in the number of firms operating television stations, and CWA represents workers within this occupation; however, the merger will also negatively impact other labor markets like those for announcers, journalists, and producers.

First, the most relevant labor market for review of this transaction is broadcast technicians at the level of the metro-area commuting zone, which is already a concentrated market. This merger would substantially reduce competition in the market for broadcast technicians and create a more concentrated labor market for broadcast technician labor, reducing wages. Nexstar has publicly referenced its plans to consolidate production departments where it

51

**App.456**

**REDACTED – FOR PUBLIC INSPECTION**

would own multiple stations. Workers uniformly agree that the proposed merger would result in a substantial reduction in job options in their local labor markets, and exemplar markets show that the proposed merger would reduce employment competition for broadcast technician labor.

Second, Nexstar already exercises its market power to keep wages low and muzzle its employees' freedom of association, and greater market power would exacerbate this dynamic. Nexstar exercises its market power to suppress its broadcast technicians' wages below industry medians, and above-industry-average tenure demonstrates its monopsonistic domination of the local labor market. Nexstar's past actions to prevent workers from engaging in protected concerted activity, achieving union recognition, or negotiating collective bargaining agreements, indicate that this workforce cannot adequately offset Nexstar's market power through negotiations and collective action. The Application does not state any benefit of the merger to the company's workforce. Accordingly, the Commission's "degree of scrutiny and concern [should] increase in proportion to the strength and durability of the dominant firm's market power" in these labor markets.[149]

### A.  Local Labor Markets for Broadcast Technicians Are Already Concentrated.

The federal antitrust agencies have stated that labor markets "exhibit high switching costs,"[150] and one reason is the "investments specific to a type of job."[151] In the case of television broadcasting, these specific investments often include post-secondary education in broadcast technology or communications; on-the-job training on the operation of broadcast equipment, production processes, editing software, set-up of cables, audio equipment, lighting, microphones, grip gear, and automation systems; and testing, troubleshooting, and maintenance of camera and

---

[149] Horizontal Merger Guidelines at 19.

[150] *Id.* at 27.

[151] *Id.*

**REDACTED – FOR PUBLIC INSPECTION**

electrical equipment.[152] This combination of competencies is unique to broadcast occupations; because of this, broadcast workers often experience job and industry "stickiness."

Broadcast technicians' unique skills and labor are applicable primarily to the broadcast industry. Broadcast technicians are specialized, highly skilled professionals. Employees typically complete some post-secondary education program (usually an associate's or bachelor's degree) and/or on-the-job training. These workers set up, operate, and maintain equipment that regulates the signal strength, clarity, and sound for television broadcasts. They also operate transmitters, either in studios or on location in the field, for their station.[153]

Broadcast technician employment is heavily concentrated in two closely related industries: Radio and Television Broadcasting Stations (NAICS: 516120; *e.g.*, Nexstar, Gray Media, TEGNA) and Media Streaming Distribution Services, Social Networks, and Other Media Networks & Content Providers (NAICS: 516210; *e.g.*, Comcast, NBCUniversal, Warner Bros. Discovery). Of the 21,080 Broadcast Technicians in the United States, 14,690 (69.7%) work in the broadcasting industry, with the remainder working for universities, motion picture companies, or spectator sports companies. This level of occupational concentration shows there are few adjacent industries into which broadcast technicians could easily "cross over" without significant retraining.[154] Technicians interviewed by NABET-CWA agreed that there are few viable employment opportunities outside of the broadcasting industry, and most technicians who

---

[152] Occupational Outlook Handbook. Broadcast, Sound, and Video Technicians, https://www.bls.gov/ooh/media-and-communication/broadcast-and-sound-engineering-technicians.htm#tab-4.

[153] *Id.*

[154] Bureau of Labor Statistics, OEWS Survey, Occupational Employment and Wage Statistics, Profiles–Broadcast Technicians (27-4012) (May 2024).

53

**App.458**

REDACTED – FOR PUBLIC INSPECTION

leave it do not apply their broadcast experience and skills to new employment outside of the broadcast industry, but are instead forced to transition to a new field.

Most local labor markets are already an oligopsony or monopsony for broadcast workers' labor, meaning there are few employers or only one employer that hires broadcast technicians in their local labor market. The consolidation of broadcast studios has already reduced the number of employers of highly skilled technicians. Technicians interviewed by NABET-CWA who work in cities with both Nexstar and TEGNA stations stated that the only other job postings for broadcast technician positions outside of those from television stations are from production companies that broadcast sports or live events, but these jobs are casual, short-term engagements, not full-time employment.

Nexstar is the largest television station chain in the United States by both revenues and employees,[155] employing approximately 19.5% of the 66,660 workers (all job titles) in the Television Broadcasting Station Industry.[156] The top five broadcasters employed 40,223 workers (60.3% of all TV Broadcast workers) at the end of 2024 (see Figure 5).

---

[155] "Updated Top 30 Station Groups: Nexstar Retains Top Spot, Gray Now No. 2 As FCC-Rejected Standard General Drops Off," *TV Newscheck* (Aug. 30, 2024).

[156] Bureau of Labor Statistics, OEWS Survey, May 2024.Occupational Employment and Wage Statistics. Television Broadcasting Stations (NAICS: 516120) https://data.bls.gov/oes/#/industry/516120

54

**App.459**

REDACTED – FOR PUBLIC INSPECTION

**Figure 5:**
**Employment of the Top Five Largest Television Broadcast Station Operators and**
**Nationwide Employment Share of All Broadcast Employees**

| Company | Number of Employees | Share of TV Broadcast Station Labor Market (%) |
|---|---|---|
| Nexstar | 13,005 | 19.5% |
| Gray | 9,118 | 13.7% |
| Sinclair | 7,200 | 10.8% |
| TEGNA | 5,900 | 8.9% |
| EW Scripps | 5,000 | 7.5% |

Source: Company 10-Ks (2024); Bureau of Labor Statistics, OEWS Survey, Television Broadcasting Stations (May 2024).

**B. The Nexstar-TEGNA Merger Would Eliminate Substantial Competition Between Firms.**

A post-merger Nexstar would employ 28.4% of all workers in the Television Broadcast industry, reducing the bargaining power of workers in the face of monopsonistic employer power and enabling the combined firm to cut jobs. Notably, this nationwide figure underrepresents the concentration in specific markets, as the merger would have outsized effects in local markets where it would result in the elimination of an existing employer.[157]

**1. Nexstar plans to consolidate production departments where it owns multiple stations.**

The Transaction would result in fewer potential employers for broadcast technicians in local markets that are already heavily concentrated. It is appropriate to assess the effects of this merger in geographic markets where Nexstar and TEGNA currently compete for workers. As noted above, Nexstar's station footprint overlaps with TEGNA's station footprint in 35 of TEGNA's 51 DMAs. The overlapping DMAs have 74 stations that could potentially share services and consolidate production functions.

_____

[157] Commuting zones are the appropriate geographic market for evaluating the impact of this transaction on labor markets.

55

**App.460**

**REDACTED – FOR PUBLIC INSPECTION**

Nexstar executives' references to merger-related synergies have emphasized the company's supposed commitment to local journalism while touting station-level synergies in the markets where Nexstar and TEGNA overlap, including by consolidating their real estate footprint. The approval of the Transaction would enable the post-merger company to combine television production departments in DMAs where there are overlapping broadcast areas that can operate with one studio to produce broadcasts for all Nexstar programming in the local market.

Nexstar, which pioneered the "shared services" strategy to cut station-level costs,[158] intends to replicate its strategy with newly acquired TEGNA stations and consolidate production functions of its news broadcasts.  Nexstar has said it plans to extract $300 million in synergies in the first twelve months after the deal closes, which will flow partly from this consolidation of production.

As we note throughout this Petition, Nexstar has described the "synergy" that this merger would produce as coming from (1) greater scale in retransmission negotiations, (2) combining station operations in markets with overlap between the two companies and (3) more efficient corporate operations. Nexstar's August 2025 acquisition presentation states, "[i]dentified synergies include contractual revenue synergies, station-level and corporate overhead cost savings."[159] Nexstar refers to the "significant amount of markets (35 of 51) that are the overlap markets," and says that "we can really operate two stations off of, one infrastructure." It identifies these overlap markets as "an area where… a significant portion of those synergies are

---

[158] Rich Mates, "Nexstar buying WBRE, selling WYOU," *The Tribune* (Apr. 18, 1997).

[159] Nexstar-TEGNA Acquisition Presentation at 8 (emphasis added).

56

**App.461**

**REDACTED – FOR PUBLIC INSPECTION**

coming out of," and adds that in reaching this conclusion it conducted " a very deep analysis in terms of looking at, line by line, person by person, what these costs could be."[160]

Analysts have similarly identified the 35 overlapping DMAs and the resulting layoffs as a key financial consideration in this merger. Deutsche Bank analysts estimate that "an in-market station duopoly could lead to a 20%+ increase in station-level EBITDA by streamlining technical and production infrastructure across multiple affiliates, while preserving the local journalism layer."

### 2. Nexstar and TEGNA workers uniformly agree the proposed merger would result in layoffs and negative impact on their local labor market.

Nexstar and TEGNA broadcast technicians uniformly agree that the proposed merger would have a substantial negative impact on the labor market for their occupation. Nexstar and TEGNA broadcast technicians reported that there are already only a few television broadcast employers in their local markets and few workers moving between employers. There are limited opportunities for comparable work, such as small production houses or sporting events, but these positions offer only intermittent contingent work and are not comparable. Technicians report that their colleagues who have left their jobs at the Nexstar and TEGNA stations typically leave the industry entirely, given the limited job options for technicians, and report too that there are very few job openings at other stations.

Nexstar and TEGNA broadcast technicians state that they fear more layoffs from consolidation and fewer job opportunities with one fewer major employer in their local market. Many NABET-CWA members have worked at companies that were acquired during their employment and witnessed mergers during their time in the industry, including the acquisition of Tribune Media by Nexstar, and the acquisition of smaller production companies by larger parent

---

[160] Nexstar 3Q 2025 Earnings Call (Nov. 6, 2025) (emphasis added).

57

**App.462**

REDACTED – FOR PUBLIC INSPECTION

companies. These members have seen layoffs and a reduction in jobs as ownership has consolidated. One member observed that part-time employees at their location already have been laid off, they presume in anticipation of this proposed Transaction. Technicians who were employed at Nexstar and TEGNA during previous mergers observed the consolidation of job duties into new job titles, for example, the creation of a new "multi-media journalist" title, where reporters are expected to shoot their own video; and reduction in headcount, for example, the use of one person on-location crews, all as a direct result of previous mergers.

The likelihood that Nexstar will cut jobs following the merger is further evidenced by the company's history of layoffs after previous acquisitions, including:

- In 2012, Nexstar acquired ten stations from Newport Television and cut staff in functions including accounting, research, traffic, and human resources departments as well as reporters, part-time photographers, and station-level managers.[161]

- In 2013, Nexstar proxy Mission Broadcasting acquired two stations in Little Rock, Arkansas, where Nexstar already owned two stations, and cut nearly thirty jobs including on-air staff and behind-the-scenes roles.[162]

- In 2015, Nexstar acquired KLAS in Las Vegas and cut more than 30 jobs, including news, digital, and business office positions.[163]

- In 2019, Nexstar acquired 42 stations from Tribune Media and laid off dozens of employees, particularly those in newsroom positions, across stations in markets including

---

[161] *See, e.g.*, "More Layoffs from Nexstar at NewsChannel 9," CNYTVNews (Dec. 3 2012); Scott D. Pierce, "New owners lay off KTVX and KUCW staffers," *The Salt Lake Tribune* (Dec. 19, 2012).

[162] "Almost 30 Lose Jobs at KARK, KLRT as TV Owners Consolidate," *Arkansas Business* (Jan. 29, 2013).

[163] Christopher Lawrence, "Layoffs hit Las Vegas's KLAS-TV," *Las Vegas Review Journal* (June 4, 2015).

58

REDACTED – FOR PUBLIC INSPECTION

Denver, Des Moines, Indianapolis, Oklahoma City and Greensboro.[164] The company cut more than two dozen jobs at WXIN-59 and WTTV-4 in Indianapolis.[165]

### 3. Exemplar markets show that a Nexstar-TEGNA merger would reduce employer competition for broadcast technician labor.

Nexstar and TEGNA technicians interviewed by NABET-CWA reported that news stations employed the majority of broadcast technicians in their local markets, and that other employers (such as content channels, public broadcasting, and religious programming) employed very few broadcast technicians and rarely advertised relevant job postings. Technicians reported that in some areas production companies hire casual daily workers and master control hubs, but these positions were either not stable, not full-time employment, or involved a significantly different skill set. Technicians stated that the consolidation of production departments at news stations would cause a significant reduction in potential employers in their local markets, which are already highly concentrated.

In the three exemplar markets profiled below, news broadcast production departments would likely decrease from four stations to three.

Denver

The Denver market has four local daily news broadcasts from ABC, CBS, NBC, and Fox affiliates. These programs are broadcast by Nexstar (KDVR/KWGN), TEGNA (KUSA/KTVD), Scripps (KMGH/KCDO), and CBS/Paramount (KCNC). For labor market purposes, a Nexstar-TEGNA merger would effectively reduce the number of news broadcast studios to three stations that broadcast on seven channels. Denver-area broadcast technicians interviewed by NABET-CWA said there are production companies that hire some broadcast technicians for

---

[164] Matthew Keys, "After merging with Tribune, Nexstar issues Christmas pink slips," *The Desk* (Dec. 13, 2019).

[165] Alexandria Burris, "Fox affiliate WXIN-59 and CBS affiliate WTTV-4 see job cuts after Nexstar acquisition," *Indianapolis Star* (Dec. 11, 2019).

59

**App.464**

REDACTED – FOR PUBLIC INSPECTION

sports and live event broadcasts, but the work is part-time and casual employment. Master control broadcast hubs located in Denver also employ master control operators, but are not similar to television station broadcast employment.

**Figure 6: Denver Stations**

| Channel | City of License | Primary Network | Owner |
|---------|-----------------|-----------------|-------|
| KWGN | Denver, CO | The CW | Nexstar Media Group (shares studio with KDVR) |
| KDVR | Denver, CO | Fox | Nexstar Media Group (shares studio with KWGN) |
| KUSA | Denver, CO | NBC | Tegna Inc. (shares studio with KTVD) |
| KTVD | Denver, CO | MyNetworkTV | Tegna Inc. (shares studio with KUSA) |
| KMGH | Denver, CO | ABC | E. W. Scripps Company (shares studio with KCDO) |
| KCDO | Sterling, CO | Independent | E. W. Scripps Company (shares studio with KMGH) |
| KCNC | Denver, CO | CBS | CBS News and Stations / Paramount Global |

*Source: Company websites*

### Cleveland

The Cleveland market has four local daily news broadcasts from ABC, CBS, NBC, and Fox affiliates. These programs are broadcast by Nexstar (WJW/WBNX), TEGNA (WKYC), Scripps (WEWS), and Gray Media (WOIO/WUAB). A Nexstar-TEGNA merger would likely reduce the number of news broadcast studios to three stations that broadcast on six channels. Cleveland area broadcast technicians interviewed by NABET-CWA said there are production companies that hire some broadcast technicians for sports and live event broadcasts, but the work is part-time and casual employment.

**Figure 7: Cleveland Stations**

| Channel | City of License | Primary Network | Owner |
|---------|-----------------|-----------------|-------|
| WBNX | Akron, OH | The CW | Nexstar Media Group (shares studio with WJW |
| WJW | Cleveland, OH | Fox | Nexstar Media Group (shares studio with WBNX) |
| WKYC | Cleveland, OH | NBC | Tegna Inc. |
| WEWS | Cleveland, OH | ABC | E. W. Scripps Company |
| WOIO | Shaker Heights, OH | CBS | Gray Media (shares studio with WUAB) |
| WUAB | Lorain, OH | MyNetworkTV | Gray Media (shares studio with WOIO) |

*Source: Company websites*

60

**App.465**

REDACTED – FOR PUBLIC INSPECTION

Hartford

The Hartford market has four local daily news broadcasts from ABC, CBS, NBC, and Fox affiliates. These programs are broadcast by Nexstar (WTNH/WCTX), TEGNA (WCCT/WTIC), Gray Media (WFSB), and NBCUniversal (WVIT). A Nexstar-TEGNA merger would likely reduce the number of news broadcast studios to three stations that broadcast on six channels.

**Figure 8: Hartford Stations**

| Channel | City of License | Primary Network | Owner |
|---|---|---|---|
| WTNH | New Haven, CT | ABC | Nexstar Media Group (shares studio with WCTX) |
| WCTX | New Haven, CT | MyNetworkTV | Nexstar Media Group (shares studio with WTNH) |
| WCCT | Waterbury, CT | The CW | Tegna Inc. (shares studio with WTIC) |
| WTIC | Hartford, CT | Fox | Tegna Inc. (shares studio with WCCT) |
| WFSB | Hartford, CT | CBS | Gray Television |
| WVIT | New Britain, CT | NBC | NBCUniversal |

Source: Company websites

### C. Nexstar Already Exercises Monopsonistic Power over the Labor Market and Greater Market Power Would Further Entrench its Dominant Position.

The logic that mergers can be counter to the public interest when they entrench a dominant position, and that the Commission's "degree of scrutiny and concern" should increase "in proportion to the strength and durability of the dominant firm's market power,"[166] extends to labor markets; and as stated in *FTC v. Kroger*, while the 2023 Merger Guidelines were the first to expressly discuss labor markets, "the concept of antitrust protections that extend to workers, not just consumers is not [new]."[167] Nexstar already exercises substantial market power over its employees, driving workers' wages down both at Nexstar and at other firms. A Nexstar-TEGNA

---

[166] Horizontal Merger Guidelines at 17, 27.

[167] *FTC v. Kroger Co.*, No. 3:24-CV-00347-AN, 2024 WL 5053016, at *55 (D. Or. Dec. 10, 2024).

61

REDACTED – FOR PUBLIC INSPECTION

merger would extend Nexstar's market power over a larger workforce and further entrench its low standards across the television broadcast industry. Nexstar's aggressive and centralized opposition to worker organizing and collective bargaining suppresses wages at the industry's largest employer and sets a lower standard for wages and working conditions for other television broadcasters as they seek to compete with the largest market actor.

1.  **Wages, tenure, and practices of competing firms suggest that Nexstar already exercises monopsonistic domination of the labor market and disproportionate bargaining power with workers and unions.**

Multiple factors indicate Nexstar's monopsonistic dominance in the labor market. Wages are low and below industry medians, average tenure is above industry median, and other smaller companies in the industry point to Nexstar's size and labor practices as a factor suppressing industry wages.

Nexstar's wages are not only below living-wage standards, they are significantly below industry medians. A 2025 survey conducted by NABET-CWA confirmed that workers struggle to get by on Nexstar's low wages, with 62% of Nexstar workers reporting wages below the living wage for a single adult with no children for their metro area, and 89% reporting wages below the living wage for a single adult with one child.[168] Survey respondents reported an average hourly wage of $22.88 and a median wage of $20.13. Twenty-five percent of respondents reported earning less than $18/hour.[169]

---

[168] NABET-CWA, "Breaking the Story: The Real Cost of Low Wages at America's Largest Broadcaster," https://cwa-union.org/making-ends-meet-at-nexstar, citing Economic Policy Institute Family Budget Calculator, https://www.epi.org/resources/budget/.

[169] *Id.*

**App.467**

**REDACTED – FOR PUBLIC INSPECTION**

These wages are significantly below the Broadcast Industry median.[170] The largest occupational groups of survey respondents reported average wages between 3% and 55% below the average wage for these occupations in the broadcast industry, or 38% below on average:

**Figure 9: Broadcast Industry Wages by Occupation**

| Occupational Title | Average Hourly Rate Reported by Nexstar Survey Respondents | Median Broadcast Industry Hourly Rate |
|---|---|---|
| Director/Producer | $20.25 | $38.53 |
| Anchor/Reporter | $22.68 | $51.95 |
| Studio Technician | $22.36 | $30.35 |
| Photographer | $25.47 | $32.34 |
| Engineer | $27.00 | $34.79 |

Source: NABET-CWA; BLS Occupational Employment Survey (May 2024).

Nexstar's employer domination of the local labor market is also evidenced by Nexstar employees' tenure. Despite low wages, workers at Nexstar exceed the average tenure for workers in the broadcast industry. Survey respondents reported an average of 7.9 years experience in the industry and 7 years working for Nexstar. This compares to the industry's average tenure of 3.8 years at one employer.[171] The disparity between the average tenure at Nexstar and the industry average suggests that Nexstar workers' job options are already restricted by limited outside options due to monopsonistic employer domination of the local labor market.

NABET-CWA staff report that at the bargaining table with other smaller firms, other broadcast companies tell the union that in order to stay competitive with Nexstar, they can't offer workers higher wages.[172] As evidenced by the information on wages and tenure, the reports of

---

[170] U.S. Bureau of Labor Statistics, Occupational Employment and Wage Statistics, Television Broadcast Industry/NAICS 516120, https://data.bls.gov/oes/#/industry/516120

[171] U.S. Bureau of Labor Statistics, "Employer Tenure in 2024," 926/2024, https://www.bls.gov/news.release/pdf/tenure.pdf.

[172] NABET-CWA, "Breaking the Story," *supra* note 168.

63

**App.468**

REDACTED – FOR PUBLIC INSPECTION

other firms suggest that Nexstar already exercises outsized bargaining power over workers and unions in the sector, and monopsonistic wage-setting power.

**2. Nexstar's consistent, continued, and centrally coordinated unlawful behavior to suppress worker collective action prevents unions from exercising effective bargaining power, and the proposed merger would further harm union bargaining power.**

The Transaction if approved would harm unions' bargaining power and further suppress worker collective action, further entrenching Nexstar's dominant labor position. The court in *FTC v. Kroger* recognized that market concentration could harm workers' bargaining power in collective negotiations and this could constitute an independent harm, separate from solely an impact on wages.[173] Nexstar's actions at the bargaining table evidence that the proposed merger stands to harm workers' collective bargaining power, in addition to their individual bargaining power, and further entrench the dominant labor market position of the largest local broadcast company in America, a market position from which the firm already exercises monopsonistic power to suppress wages and work conditions.

Nexstar has centrally coordinated an aggressive campaign to deny employees their legally protected rights to organize a union and prevent collective bargaining. Recent union elections at three locations demonstrate Nexstar's consistent and continued approach. In Rochester, NY; Henderson, KY; and two worksites in Denver, CO, workers won union elections certified by the National Labor Relations Board ("NLRB"), joining workers at thirty-five other Nexstar stations that are already unionized.[174] Despite these federally certified elections and

---

[173] *FTC v. Kroger Co.* at *68 (finding that unions can more credibly threaten a strike when they can divert customers to an alternative union grocery); *see also* Federal Trade Commission, Statement of Chair Lina M. Khan Joined by Commissioners Rebecca Kelly Slaughter and Alvaro M. Bedoya, *In the Matter of The Kroger Company and Albertsons Companies, Inc.*, Commission File No. D9428, (Jan. 2, 2025).

[174] NABET-CWA, "Breaking the Story," *supra* note 168.

64

**REDACTED – FOR PUBLIC INSPECTION**

Nexstar's legal obligation to bargain with the union as the workers' collective representative, Nexstar has refused to bargain. After investigations, the NLRB found that Nexstar illegally refused to recognize the union and to bargain at WROC (Rochester, NY), KDVR (Denver, CO), and the Denver Hub (Denver, CO).[175] Despite these findings, Nexstar has expended and continues to expend significant resources appealing the NLRB rulings to federal court, further delaying its legal responsibility to bargain with their employees.[176] In November 2025, the Fifth Circuit ordered that the NLRB's bargaining orders be enforced for both the Denver Hub and KDVR. Nexstar's appeal to the Second Circuit is ongoing. At WEHT in Kentucky, NABET-CWA has filed a charge with the NLRB over Nexstar's refusal to bargain and the charge is currently under investigation. Nexstar has also fired multiple workers for engaging in protected union activity along with other violations of federal labor law, which Nexstar intended to prevent workers from exercising their rights to collective bargaining.[177] Instead of bargaining

---

[175] NLRB Election Cases: 25-RC-347192 (WEHT), 27-RC-333280 (Denver Hub), 03-RC-309322 (WROC); 27-RC-333229 (KDVR)

[176] *NLRB v. Nexstar Media Inc.*, 133 F.4th 201 (2d Cir. 2025) (WROC-TV); *Nexstar Media, Inc. v. NLRB, No. 24-60658*, 2025 LX 438670 (5th Cir. Oct. 15, 2025) (KDVR-TV); *Nexstar Media Grp., Inc. v. NLRB*, No. 24-60654, 2025 LX 408438 (5th Cir. Oct. 15, 2025).

[177] NABET-CWA has filed unfair labor practice charges with the NLRB challenging Nexstar's refusal to bargain over changes to working conditions. These actions include terminations, laying off workers without bargaining, denying workers a union steward in disciplinary meetings, and explicitly firing workers for engaging in protected union activity. NLRB Unfair Labor Practice Cases: 27-CA-340984; 27-CA-340990; 27-CA-361721. Three employees in Denver were fired for minor offenses in retaliation for their union work, while two employees in Kentucky were fired for their union activity outright. NLRB Unfair Labor Practice Cases: 03-CA-332930 (WROC); 27-CA-342708 (KDVR); 27-CA-342797 (Denver Hub); 25-CA-365619 (WEHT); 25-CA-363552 (WEHT). TEGNA also has open unfair labor practices cases against its employees. The International Brotherhood of Electrical Workers has filed an Unfair Labor Practice charge against TEGNA at WUSA in Tysons Corner, VA for refusal to bargain/bad faith bargaining. NLRB Unfair Labor Practice Case: 05-CA-374713 (WUSA).

REDACTED – FOR PUBLIC INSPECTION

constructively with their workers' unions, Nexstar has engaged in a campaign of lawfare and unlawful action to prevent workers from bargaining collectively.

Nexstar's record of aggressive unlawful action at the bargaining table has prevented unions from exercising collective bargaining power, as required by federal law. Not only would the proposed merger harm unions' bargaining power in relation to Nexstar, the company's unlawful actions prevent workers from even exercising collective bargaining power and acting as a countervailing bargaining force as intended by federal labor law.[178] NABET-CWA has sought to challenge Nexstar's conduct by gaining the support of local elected officials for a boycott of recently unionized stations, refusing to give them comment until they respect their workers' right to freedom of association.[179] If Nexstar and TEGNA merge, the union will be less able to redirect public officials away from a station intransigent in labor negotiations, because elected officials will have fewer alternatives, thus harming the union's bargaining power.

Nexstar already holds a dominant position in many local labor markets for broadcast technicians, as evidenced by their low wages at Nexstar and the difficulty NABET-CWA has in bargaining with Nexstar-owned stations. The proposed merger would exacerbate Nexstar's existing monopsonistic position.

---

[178] National Labor Relations Act, 29 U.S.C. § 151 (describing a core purpose of federal labor law as seeking to correct the "inequality of bargaining power" between employers and employees by promoting collective bargaining between trade unions and employers).

[179] "Local elected officials back union effort at WROC," *Rochester Beacon* (Aug. 5, 2025).

66

**App.471**

REDACTED – FOR PUBLIC INSPECTION

V. **THE COMMISSION CANNOT MODIFY, WAIVE, OR ELIMINATE THE NATIONAL MULTIPLE OWNERSHIP RULE AND SHOULD NOT GRANT WAIVERS OF THE LOCAL MULTIPLE OWNERSHIP RULE OR APPLICANTS' RELATED REQUESTS.**

A. **Nexstar's Current Reach is Already at the Maximum Level Set by Congress. The Commission Does Not Have Authority to Waive the National Cap.**

Nexstar's current UHF-discounted national television household reach, even excluding its sidecar stations that it operates in markets where it holds no licenses, is 39.2 percent. The Transaction as proposed would increase this reach to (a UHF-discounted) 54.5 percent of U.S. TV households.[180] Therefore, because it already is at the statutory limit with the markets in which it is present today, Nexstar is legally barred from acquiring TEGNA's stations in <u>any</u> of the 17 Designated Market Areas in which Nexstar does not currently operate (see Appendix A).[181]

Applicants request a waiver of the National Multiple Ownership rule to overcome this insurmountable legal barrier.[182] However, in addition to fixing the national audience reach limit at 39 percent of U.S. TV households and removing the Commission's authority to modify that value or eliminate the cap, <u>Congress specifically barred the Commission from granting waivers of this limit</u>.[183] The Commission simply lacks the authority to grant the National Cap waivers that Applicants seek. If Congress intended for the Commission to retain its normal authority to determine when waiver of a Commission rule is in the public interest, it would not have amended

---

[180] Application at 4.

[181] *Id.* Applicants did not include any estimates of Nexstar's pre-merger reach. Free Press calculated Nexstar's UHF-discounted pre-merger reach at 39.2 percent of U.S. TV households, and its UHF-discounted post-merger reach at 54.5 percent. Free Press' UHF-discounted post-merger reach estimate is identical to the one in the merger Application. *See* Appendix A.

[182] Application at 4, 114–16.

[183] *See* CAA, *supra* note 84. While the CAA's reference to Section 10 forbearance is unusual, it must be read as meaningful and not as mere legislative surplusage.

67

REDACTED – FOR PUBLIC INSPECTION

Section 202 of the Telecommunications Act of 1996 to specifically bar the agency from granting waivers to the 39 percent cap Congress likewise dictated in the CAA.[184]

Therefore there is no need at this time for the Commission to make any public interest finding as to the proposed transfer of TEGNA licenses to Nexstar in the 17 markets where Nexstar does not currently own any broadcast TV station licenses.[185] Because it is legally barred from granting Applicants' request to waive the National Multiple Ownership rule, the Commission should immediately deny those waiver requests and deny the Application in full.

### B. Applicants Fail to Demonstrate that Allowing Nexstar to Form Top Four-Ranked Duopolies and Triopolies is in the Public Interest. Applicants Have Not Met the High Bar for Waiver of the Commission's Local Multiple Ownership Rule.

We now turn to examination of the 23 markets in which Applicants request waivers of the Commission's Local Multiple Ownership rule. We present these in order from the most- to least-populated market. We conclude this section with discussion of the Austin and Waco markets, where post-merger Nexstar would be in violation of Local Multiple Ownership rule if the Commission properly recognized that Applicants' pre-merger holdings in these DMAs already include satellite stations that now operate as unique affiliates.

### 1. Dallas-Ft. Worth, TX

The Dallas-Ft. Worth, TX Designated Market Area is the fourth-largest U.S. TV market, with approximately 3.3 million TV households. Nexstar currently owns KDAF (CW), while TEGNA owns WFAA (ABC) and KFAA (Ind.). KDAF is a UHF station (digital channel 32).

---

[184] *Id.*

[185] Nexstar is acquiring TV licenses in 18 DMAs where it does not currently own any FCC-licensed stations. However, the station Nexstar is acquiring in the Twin Falls, ID DMA (KTFT-LD, NBC) is a low-power station and therefore not considered for the application of the Commission's National and Local Multiple Ownership Rules.

68

REDACTED – FOR PUBLIC INSPECTION

Therefore this DMA currently contributes 1.31 percentage points towards Nexstar's National Cap limit of 39 percent.[186] TEGNA's WFAA is a VHF station though, so if Nexstar were to acquire it the post-merger entity's National Cap contribution for Dallas would rise to 2.6 percentage points.

This market is already highly concentrated, with an HHI of ▨ for total market revenue (local TV gross advertising revenues plus retransmission consent revenues during 2024).[187] Nexstar's acquisition of WFAA (ABC) and KFAA (Ind.) would increase this to an HHI of ▨, giving Nexstar control of nearly ▨ percent of the local TV ad and retransmission revenue in the Dallas-FT. Worth DMA. Nexstar's control over the market's retransmission revenues would be even greater, with the HHI increasing from ▨ to ▨.

When asking the Commission for a waiver of the Local Multiple Ownership rule in this DMA, Applicants trot out the argument they invariably repeat in each market: that this consolidation "will position these stations to better compete for advertising revenue"[188] in the Dallas market. In explaining this assertion, Applicants state that the combined entity "will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms."[189] Applicants describe this

---

[186] There are approximately 125.8 million television households in the 210 U.S. Designated Market Areas as of 2025.

[187] Unless otherwise noted, all HHI values and post-merger market share estimates presented in this Petition to Deny are based on Free Press's analysis of S&P Global Market Intelligence's station-level estimates of local television advertising and retransmission consent revenues during 2024.

[188] Application at 23.

[189] *Id.*

**REDACTED – FOR PUBLIC INSPECTION**

alleged benefit as a way of providing brands "with more effective advertising opportunities that combine the reach and effectiveness of broadcast with the customization of digital."[190]

However, Applicants fail to demonstrate that the TEGNA and Nexstar-owned stations in the Dallas DMA cannot currently, and separately, offer potential ad buyers such a combination of digital and traditional advertising services. Applicants fail to demonstrate that merging the TEGNA stations and the Nexstar station actually offers potential ad buyers access to "viewer demographics" that these ad buyers could not access but for the merger. Presumably, ad buyers in this market would prefer the benefits of competition between Nexstar and TEGNA when it comes to the price and characteristics of Local Broadcast TV Spot Advertising services available in the Dallas DMA. Indeed, Applicants fail to describe how they would price their advertising services if allowed to merge the Dallas stations, and fail to describe how these prices would differ from those they currently offer as standalone firms. Presumably, "better competing" for revenues in Applicants' view means charging advertisers more, not less.

Thus, implicit in Applicants narrative is that merging these three Dallas area stations would benefit Nexstar financially, <u>not</u> the ad buyers posited as beneficiaries of the Transaction. But Applicants do not specify even the sources of that potential financial benefit to Nexstar in the Dallas DMA. In general, the financial benefits from a horizontal merger come from elimination of duplicative or redundant facilities and staff, as well as increased profits resulting from the merged firm's enhanced post-merger market power. Presumably Nexstar expects increased profits in the Dallas Broadcast TV Spot Advertising and retransmission consent markets, the latter buoyed by Nexstar's ability to tie carriage payments for the lower-rated CW affiliate and Nexstar's cable network (NewsNation) to retransmission consent agreements made

---

[190] *Id.*

70

**App.475**

REDACTED – FOR PUBLIC INSPECTION

with MVPDs that have significant demand for TEGNA's highly viewed ABC affiliate (WFAA).[191]

Nexstar also would generate some amount of operational savings by shuttering the facilities of its smaller station, KDAF, and originating programming out of TEGNA's already combined facility for WFAA and KFAA. However, because KDAF does not currently produce any local news, the level of potential layoff-related synergies in Dallas is *de minimis* relative to the financial benefits Nexstar would gain from exercising its enhanced market power in the Dallas Broadcast TV Spot Advertising and retransmission consent markets.

Applicants likewise and most importantly fail to describe the specific benefits that the public allegedly would reap from the combination of these stations, net of any public interest harms. They only offer the repeated lament that there are other firms that also offer advertising services, and the baseless threat that Dallas's local news market is doomed if Nexstar isn't allowed to own three stations in this already highly concentrated market. But this vague claim is unsupported, and uncognizable too. First, efficiencies have to be related to the product market in which competition is being reduced; efficiencies that would impact competition with out-of-market firms, such as the "technology and media companies" Applicants cite, are not cognizable.[192] Second, TEGNA's ABC affiliate has a robust local news operation and appears to be highly viewed.[193] Local TV stations derive much of their financial success through their news

_____

[191] The Commission has documented that Nexstar negotiates for carriage of NewsNation as it also negotiates retransmission consent for its local broadcast stations. *See, e.g.*, *Cincinnati Bell Extended Territories LLC dba altafiber, Complainant, v. Nexstar Media Inc., Defendant*, MB Docket No. 25-197, Memorandum Opinion and Order, DA 25-1054, ¶4 (rel. Dec. 12, 2025).

[192] *See supra* note 137 (explaining that courts do not consider out-of-market efficiencies cognizable, requiring merger efficiencies from competition in the relevant product market).

[193] Applicants state WFAA is the market's second-ranked station. *See* Application at 21.

71

**App.476**

REDACTED – FOR PUBLIC INSPECTION

operations, and therefore we fully expect that TEGNA would continue to produce local news for WFAA in the absence of this Transaction. If Nexstar were allowed to form a full-power triopoly, it would not result in an increase in the number of news-producing stations in Dallas, and would instead increase the likelihood of Nexstar replacing local coverage (and local newsroom jobs) with duplicative content from out-of-market stations.[194]

Applicants do describe potential benefits of transitioning the TEGNA stations to ATSC 3.0, and allude to some unstated benefit resulting from the combination of Nexstar and TEGNA's existing distribution rights, as well as Nexstar's charity work. However, none of these potential benefits are cognizable, nor would they offset the harms that would follow the consolidation of these three stations into a triopoly.

Applicants state that if they were forced to divest either KFAA or KDAF after the proposed merger, the divested station would fail.[195] But they offer no concrete, verifiable evidence that these stations could satisfy the Commission's failing station waiver policy criteria today, under the *status quo* situation, in the absence of the proposed Transaction.  Further, a claim of a low market share alone is not sufficient to support a failing station waiver.

Therefore, Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the Dallas-Ft. Worth DMA. The Transaction is "presumptively unlawful" under existing DOJ guidelines,[196] and Applicants have failed to meet their burden to show that there would be any cognizable public interest benefits that would offset the public interest harms from further concentration of the Dallas-Ft. Worth advertising, retransmission consent, local TV

---

[194] See *supra* note 140.

[195] Application at 25–26.

[196] Horizontal Merger Guidelines at 6.

72

**App.477**

**REDACTED – FOR PUBLIC INSPECTION**

news, and broadcast labor markets. Applicants' claimed benefits are not merger-specific or verifiable, and they would not offset the harm the public interest harms caused by the reduction of the number of competitors in the Dallas DMA. Therefore the Commission should deny the transfer applications for both WFAA and KFAA; or in the alternative, deny Applicants' waiver request in the Dallas-Ft. Worth, TX DMA.

### 2. Houston, TX

The Houston, TX Designated Market Area is the sixth-largest U.S. TV market, with approximately 2.9 million TV households. Nexstar currently owns KIAH (CW), while TEGNA owns KHOU (CBS) and KTBU (Quest).[197] KIAH is a UHF station (digital channel 34). Therefore this DMA currently contributes 1.1 percentage points towards Nexstar's National Cap limit of 39 percent. TEGNA's KHOU is a VHF station though, so if Nexstar were to acquire it the post-merger entity's National Cap contribution for Houston would rise to 2.3 percentage points.

Data from 2024 indicates that the Houston DMA is currently moderately concentrated, based on control of local TV revenues. The HHI during 2024 was ███, based on total market revenue (which again we define to mean local TV gross advertising revenues plus retransmission consent revenues). However Nexstar's acquisition of KHOU and KTBU would make this a highly concentrated market, increasing the total market revenue-based HHI to ███, and giving Nexstar control of █ percent of the combined local TV spot ad market and retransmission consent market revenues in the Houston DMA. Nexstar's control over the market's retransmission revenues would be even greater, with the HHI changing from ███ to ███, and

───────────────

[197] Quest is a digital multicast network owned by TEGNA.

**App.478**

**REDACTED – FOR PUBLIC INSPECTION**

Nexstar's share increasing to ▉ percent.[198] These post-merger values are above the thresholds that DOJ and the FTC consider as giving rise to potential unilateral and coordinated market power abuses.

Applicants fail to provide verifiable evidence of any cognizable public interest benefits that would arise from the combination of Nexstar's CW affiliate with TEGNA's CBS and Quest affiliates. They claim that "[t]o sustain their investment in quality journalism, the Houston DMA Stations must find a way to combat declining viewership and revenues," and that "[c]ombining the Houston DMA Stations under a common owner will provide these stations with the scale needed in the Houston DMA to take on the technology and media companies that are siphoning revenue away from local stations."[199] But this vague claim is unsupported and uncognizable. First, efficiencies have to be related to the product market in which competition is being reduced; efficiencies that would impact competition with out-of-market firms, such as the "technology and media companies" Applicants cite, are not cognizable.[200] Second, TEGNA's CBS affiliate has a robust local news operation and appears to be highly viewed.[201] Local TV stations derive much of their financial success through their news operations, and therefore we fully expect that

---

[198] Horizontal Merger Guidelines at 5–6 ("Markets with an HHI greater than 1,800 are highly concentrated, and a change of more than 100 points is a significant increase. A merger that creates or further consolidates a highly concentrated market that involves an increase in the HHI of more than 100 points is presumed to substantially lessen competition or tend to create a monopoly. The Agencies also may examine the market share of the merged firm: a merger that creates a firm with a share over thirty percent is also presumed to substantially lessen competition or tend to create a monopoly if it also involves an increase in HHI of more than 100 points.") (internal citations omitted); *see also United States v. Phila. Nat'l Bank*, 374 U.S. at 364–65 ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat.").

[199] Application at 28.

[200] *See supra* note 137 (explaining that courts do not consider out-of-market efficiencies cognizable, requiring merger efficiencies from competition in the relevant product market).

[201] Applicants state KHOU is the market's second-ranked station. *See* Application at 27.

74

**App.479**

REDACTED – FOR PUBLIC INSPECTION

TEGNA would continue to produce local news for KHOU in the absence of this Transaction. If Nexstar were allowed to form a triopoly with no divestiture required, that would not increase the number of news-producing stations in the market. It is highly unlikely that whatever synergies and financial benefits Nexstar obtains from concentrating the local TV spot advertising and retransmission consent markets would result in any cognizable public interest benefits. The Commission's waiver standard is not, and cannot be, based on whether or not a station's balance sheet would be better off as a result of reducing the number of market competitors.

Applicants once again also fail to describe the specific benefits that the public allegedly would reap from the combination of these stations, net of any public interest harms. They lament once more that there are other firms that also offer advertising services, and suggest that somehow more consolidation is the answer to secular trends in the larger media ecosystem. Applicants describe some potential benefits of transitioning the TEGNA stations to ATSC 3.0, and allude to some unstated benefits resulting from the combination of Nexstar's and TEGNA's existing distribution rights, as well as Nexstar's charity work. However, none of these potential benefits are compared to what would happen at these stations absent this Transaction. The claimed benefits therefore simply are neither merger-specific nor cognizable, whether for purposes of the Commission's public interest determination or in a proper antitrust analysis.

Applicants state that if they were forced to divest either KIAH or KTBU after the proposed merger, the divested station would fail.[202] But they offer no concrete, verifiable evidence that these stations could satisfy the Commission's failing station waiver policy criteria today, under the *status quo* situation, in the absence of the proposed Transaction. Further, a claim of a low market share alone is not sufficient to support a failing station waiver.

---

[202] *Id.* at 30.

**REDACTED – FOR PUBLIC INSPECTION**

Therefore Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the Houston DMA. The Transaction would give Nexstar too much market power in the Houston Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets, and taking advantage of that increased market power is Applicants' driving financial motivation for this Transaction. They have failed to meet their burden to show there would be any cognizable public interest benefits offsetting the public interest harms from such further concentration and reduction in the number of competitors in the relevant local broadcast television product markets. Applicants' claimed benefits are not merger-specific or verifiable, and the transaction is "presumptively unlawful" under existing DOJ guidelines.[203] The Commission should deny the transfer applications for both KHOU and KTBU; or in the alternative, deny Applicants' waiver request in the Houston, TX DMA.

### 3. Washington, D.C.

The Washington, D.C. Designated Market Area is the eighth-largest U.S. TV market, with approximately 2.7 million TV households. Nexstar currently owns WDCW (CW) and WDVM (Independent), while TEGNA owns WUSA (CBS). WDCW and WDVM are UHF stations (digital channel 15 and 23 respectively). Therefore this DMA currently contributes 1.1 percentage points towards Nexstar's National Cap limit of 39 percent. However, WUSA is a VHF station (digital channel 9), so acquisition of this license would make the Washington, D.C. DMA contribute 2.1 percentage points towards the post-merger Nexstar's National Cap limit.

Data from 2024 indicates that the Washington, D.C. DMA is already highly concentrated, based on control of local TV revenues. The HHI during 2024 was ▮▮▮, based on total market revenue (local TV gross advertising revenues plus retransmission consent revenues). Nexstar's

---

[203] Horizontal Merger Guidelines at 6.

76

**App.481**

REDACTED – FOR PUBLIC INSPECTION

acquisition of WUSA would increase that total market revenue HHI figure to ▨▨, and would give Nexstar control of ▨ percent of the combined local TV spot ad market and retransmission consent market revenues in the Washington, D.C. DMA. Nexstar's control over the market's retransmission revenues would be even greater, with the HHI changing from ▨▨ to ▨▨, and Nexstar's share increasing to nearly ▨ percent.

Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the combination of Nexstar's Washington, D.C. stations with TEGNA's CBS affiliate. They parrot claims made for other DMAs as well that "[t]o sustain their investment in quality journalism, the Washington DMA Stations must find a way to combat declining viewership and revenues" and that "[c]ombining the Washington DMA Stations under a common owner will provide these stations with the scale needed in the Washington DMA to take on the technology and media companies that are siphoning revenue away from local stations."[204] But this vague claim is unsupported and uncognizable. First, efficiencies have to be related to the product market in which competition is being reduced; efficiencies that would impact competition with out-of-market firms, such as the "technology and media companies" Applicants cite, are not cognizable.[205] Second, TEGNA's WUSA has a robust local news operation and appears to be highly viewed.[206] Local TV stations derive much of their financial success through their news operations, and therefore we fully expect that TEGNA would continue to produce local news for WUSA in the absence of this Transaction. If Nexstar were allowed to form a triopoly, it would not increase the number of news-producing stations in the

---

[204] Application at 32.

[205] *See supra* note 137 (explaining that courts do not consider out-of-market efficiencies cognizable, requiring merger efficiencies from competition in the relevant product market).

[206] Applicants state WUSA is the market's second-ranked station. *See* Application at 31.

77

**App.482**

REDACTED – FOR PUBLIC INSPECTION

market, and instead would be a loss of the independent news-producing operation at the TEGNA station today.

Applicants again fail to describe the specific benefits that the public allegedly would reap from the combination of these stations, net of any public interest harms. They repeat, yet again, that other firms offer advertising services, and that somehow more consolidation is the answer to secular trends in the larger media ecosystem. Applicants describe again the supposed potential benefits of transitioning the TEGNA stations to ATSC 3.0, and allude to some unstated benefits resulting from the combination of Nexstar and TEGNA's existing distribution rights, as well as Nexstar's charity work. However, none of these potential benefits are compared to the "but-for" world and what would happen at these stations absent the Transaction. The claimed public interest benefits are once again neither merger-specific nor cognizable.

Whatever operational synergies and financial benefits Nexstar itself may obtain from further concentrating the Washington DMA's already highly concentrated local TV spot advertising and retransmission consent markets, those internal benefits would not result in any cognizable public interest benefits. As noted above in this Petition to Deny: Under U.S. antitrust jurisprudence, merging parties must base efficiency claims on more than "speculative assurances that a benefit enjoyed by the [merging parties] will also be enjoyed by the public."[207] Courts require merging parties to offer "clear evidence showing that the merger will result in efficiencies that will . . . ultimately benefit consumers."[208] This is a high bar for merging parties to clear. And the Commission's public interest-based merger review standard requires an even higher bar for parties seeking to eliminate an in-market broadcast competitor. The Commission's

---

[207] *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d at 351.

[208] *Id.* at 350.

78

**App.483**

REDACTED – FOR PUBLIC INSPECTION

waiver standard is not, and cannot be, based on whether or not a station's balance sheet would be better off as a result of reducing the number of market competitors.

Applicants state that if they were forced to divest either WDCW or WDVM after the proposed merger, the divested station would fail.[209] But they offer no concrete, verifiable evidence that these stations could satisfy the Commission's failing station waiver policy criteria today, under the *status quo* situation, in the absence of the proposed Transaction. Further, a claim of a low market share alone is not sufficient to support a failing station waiver.

Therefore, Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the Washington, D.C. DMA. The Transaction would give Nexstar too much market power in the Washington Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets, and taking advantage of that increased market power is Applicants' driving financial motivation for the overall Transaction. Put simply, Applicants have failed to meet their burden to show that there would be <u>any</u> cognizable public interest benefits offsetting the public interest harms from further concentration. Applicants' claimed benefits are not merger-specific or verifiable, and the transaction is "presumptively unlawful" under existing DOJ guidelines.[210] Therefore the Commission should deny the transfer application for WUSA; or in the alternative, deny Applicants' waiver request in the Washington, D.C. DMA.

### 4.  Tampa-St. Petersburg (Sarasota), FL

The Tampa-St. Petersburg (Sarasota), FL Designated Market Area is the 11th-largest U.S. TV market, with approximately 2.3 million TV households. Nexstar currently owns WFLA (NBC) and WTTA (CW) as well as low-power digital station WSNN-LD (MyNetworkTV),

---

[209] Application at 30.

[210] Horizontal Merger Guidelines at 6.

REDACTED – FOR PUBLIC INSPECTION

while TEGNA owns WTSP (CBS). Nexstar's WFLA and WTTA are VHF stations (sharing digital channel 9). Therefore this DMA currently contributes 1.8 percentage points towards Nexstar's National Cap limit of 39 percent.

Data from 2024 indicates that the Tampa DMA is already highly concentrated, based on control of local TV revenues. The 2024 HHI for total market revenue (meaning local TV gross advertising revenues plus retransmission consent revenues) was ▨▨. Nexstar's acquisition of WTSP would increase the total market revenue HHI to ▨▨, and give Nexstar control of nearly ▨▨ of these combined local TV revenues in the Tampa DMA. Nexstar's control over the market's retransmission revenues would be even greater, with an HHI increasing from ▨▨ to ▨▨ and Nexstar's share of the retrans market shooting well above ▨ percent.

Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the combination of Nexstar's NBC, CW, and MyNetworkTV affiliates with TEGNA's CBS affiliate. They claim that "[t]o sustain their investment in quality journalism, the Tampa DMA Stations must find a way to combat declining viewership and revenues,"[211] and that "[c]ombining the Tampa DMA Stations under a common owner will provide these stations with the scale needed in the Tampa DMA to take on the technology and media companies that are siphoning revenue away from local stations."[212] This by now familiar yet still vague claim is unsupported and uncognizable. First, efficiencies have to be related to the product market in which competition is being reduced; efficiencies that would impact competition with out-of-market firms, such as the "technology and media companies" Applicants cite, are not

---

[211] Application at 36.

[212] Id.

80

**App.485**

**REDACTED – FOR PUBLIC INSPECTION**

cognizable.[213] Second, TEGNA's CBS affiliate has a robust local news operation and appears to be highly viewed.[214] And Nexstar's WFLA, which produces news for WTTA too, is also highly viewed and appears to be in good operational and financial condition.[215] Local TV stations derive much of their financial success through their news operations, and therefore we fully expect that TEGNA would continue to produce local news for WTSP in the absence of this transaction, while Nexstar would continue to compete against TEGNA's news coverage by producing programming for its three FCC-licensed stations in the Tampa DMA. If Nexstar were allowed to form a full-power triopoly (a quadopoly, if we consider low-power WSNN-LD), that would not result increase the number of news-producing stations in the market, and instead would cost the DMA the competing "voice" and independent newscast at TEGNA's successful station WTSP.

Applicants as always also fail to describe the specific benefits that the public allegedly would reap from the combination of these stations, net of any public interest harms. They repeat the now tired refrain that there are other firms that also offer advertising services in the DMA, and that somehow more consolidation is the answer to secular trends in the larger media ecosystem. Applicants describe potential benefits of transitioning the TEGNA stations to ATSC 3.0, and allude to some unstated benefits resulting from the combination of Nexstar and TEGNA's existing distribution rights, as well as Nexstar's charity work. However, the Application yet again fails to compare these supposed potential benefits to the results at these

---

[213] *See supra* note 137 (explaining that courts do not consider out-of-market efficiencies cognizable, requiring merger efficiencies from competition in the relevant product market).

[214] Applicants state that WTSP is the market's second-ranked station. *See* Application at 35.

[215] Applicants state that WFLA is the market's third-ranked station. *See id.*

81

**App.486**

REDACTED – FOR PUBLIC INSPECTION

stations and in this community but for this Transaction. The claimed public interest benefits are neither merger-specific nor cognizable.

Whatever operational synergies and financial benefits Nexstar itself may obtain from further concentrating Tampa's already highly concentrated local TV spot advertising and retransmission consent markets, those internal benefits would not result in any cognizable public interest benefits. Under U.S. antitrust jurisprudence, merging parties that claim efficiencies must base those claims on more than "speculative assurances that a benefit enjoyed by the [merging parties] will also be enjoyed by the public."[216] Courts require merging parties to offer "clear evidence showing that the merger will result in efficiencies that will . . . ultimately benefit consumers."[217] This is a high bar for merging parties to clear. And the Commission's public interest-based merger review standard requires an even higher bar for parties seeking to eliminate an in-market broadcast competitor. The Commission's waiver standard is not, and cannot be, based on whether or not a station's balance sheet would be better off as a result of reducing the number of market competitors.

Applicants state that if they were forced to divest WTTA after the proposed merger, the station would fail.[218] But as we explained in detail above with respect to this same empty argument about stations in larger DMAs, Applicants offer no concrete evidence for this claim.

Therefore, Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the Tampa market. The Transaction would give Nexstar too much market power in the Tampa Broadcast TV Spot Advertising, local TV news, broadcast labor, and

---

[216] *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d at 351.

[217] *Id.* at 350.

[218] Application at 30.

82

**App.487**

REDACTED – FOR PUBLIC INSPECTION

retransmission consent markets. Taking advantage of that increased market power is Applicants' driving financial motivation for the whole Transaction. They have failed to meet their burden to show that there would be <u>any</u> cognizable public interest benefits offsetting the public interest harms from the further concentration they propose. Applicants' claimed benefits are not merger-specific or verifiable, and the transaction is "presumptively unlawful" under existing DOJ guidelines.[219] Therefore the Commission should deny the transfer application for WTSP; or in the alternative, deny Applicants' waiver request in the Tampa DMA.

### 5. Phoenix (Prescott), AZ

The Phoenix (Prescott), AZ Designated Market Area is the 12th-largest U.S. TV market, with approximately 2.3 million TV households. Nexstar currently programs KAZT (CW) pursuant to a Local Marketing Agreement (LMA) that will become attributable if it acquires any other full-power TV license in the Phoenix DMA.[220] TEGNA owns KPNX (NBC) and KNAZ (NBC), a partial satellite repeater of KPNX.[221] KAZT is a VHF station (digital channel 7). Therefore, if the Commission properly recognized Nexstar's *de facto* control of KAZT's license, this DMA would currently contribute 1.8 percentage points towards Nexstar's National Cap limit of 39 percent. KPNX and KNAZ are both UHF stations (digital channels 18 and 22 respectively). Thus were Nexstar to divest KAZT, this market would contribute 0.9 percentage points towards Nexstar's national cap limit. However, if the post-merger entity were to continue operating KAZT under the existing attributable-LMA agreement, Phoenix would contribute the full 1.8 percentage points towards Nexstar's national reach.

---

[219] Horizontal Merger Guidelines at 6.

[220] Application at 39.

[221] *Id*. at 38–39 & n. 140.

83

**App.488**

**REDACTED – FOR PUBLIC INSPECTION**

Data from 2024 indicates that the Phoenix DMA is already highly concentrated, based on share of local TV revenues. The HHI for total market revenue during 2024 was ▨▨. Nexstar's acquisition of KPNX and KNAZ would, via its attributable interest in KAZT, increase the total market revenue HHI to ▨▨, and give Nexstar control of ▨ percent of the combined local TV spot ad and retransmission consent market revenues in the Phoenix DMA. Nexstar's share of the Phoenix market's retransmission consent revenues would be even greater, at ▨ percent.

Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the combination of the Nexstar-operated CW affiliate with TEGNA's NBC affiliates. They make the same unavailing claims about their need for the merger to "sustain" local journalism in the face of "technology and media companies . . . siphoning revenue away from local stations."[222] For the reasons explained in our opposition to the same claims made in the above DMAs, this vague claim is unsupported and uncognizable. TEGNA's NBC affiliate has a robust local news operation and appears to be highly viewed.[223] Local TV stations derive much of their financial success through their news operations, and therefore we fully expect that TEGNA would continue to produce local news for KPNX/KNAZ in the absence of this Transaction. If Nexstar were forced to terminate its Local Marketing Agreement with KAZT, there's no indication that the station would fail.

Applicants once again fail to describe the specific benefits that the public allegedly would reap from the combination of these stations, net of any public interest harms. They offer

---

[222] *Id.* at 40.

[223] *Id.* at 38. Applicants state that KPNX is the market's fifth-ranked station, and its satellite KNAZ is seventh-ranked. However they do not provide the more relevant metric, which is the combined pair's ratings. Nevertheless, TEGNA's NBC station pair in the Phoenix market appears to be in good operational and financial condition.

84

**App.489**

REDACTED – FOR PUBLIC INSPECTION

up the same litany of potential ATSC 3.0, distribution rights, and charitable benefits.[224] Yet again, Applicants fail to explain why or how these supposed potential public interest benefits are merger-specific or cognizable.

As we demonstrated regarding the above DMAs: whatever operational synergies and financial benefits Nexstar itself may obtain from further concentrating Phoenix's already highly concentrated local TV spot advertising and retransmission consent markets, those internal benefits would not result in any cognizable public interest benefits.  Applicants' rote "failing station" claims regarding divestiture of KNAZ[225] are no more convincing or well founded here than are the identical assertions made for the above DMAs. Applicants also fail to address the more obvious way to come into compliance: ending Nexstar's Local Marketing Agreement for KAZT.

Therefore, Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the Phoenix market. The Transaction would give Nexstar too much market power in the Phoenix Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets. Taking advantage of that increased market power is Applicants' driving financial motivation for this overall Transaction. They have failed to meet their burden to show that there would be any cognizable, merger-specific and verifiable public interest benefits offsetting the public interest harms from the further concentration of the Phoenix DMA they propose. Therefore the Commission should deny the transfer applications for KPNX and KNAZ; or in the alternative, deny Applicants' waiver request in the Phoenix DMA and dissolve the KAZT Local Marketing Agreement.

---

[224] *Id.* at 45.

[225] *Id.* at 41.

85

**App.490**

REDACTED – FOR PUBLIC INSPECTION

### 6. Denver, CO

The Denver, CO Designated Market Area is the 17th-largest U.S. TV market, with approximately 1.9 million TV households. Nexstar currently owns KDVR (FOX) and its satellite KFCT (FOX), as well as KWGN (CW). TEGNA owns KUSA (NBC) and KTVD (MyNetworkTV). Nexstar's stations are all UHF stations (digital channels 21, 34 and 36). Therefore this DMA currently contributes 0.7 percentage points towards Nexstar's National Cap limit of 39 percent. However, if Nexstar were to acquire KUSA, which broadcasts over VHF digital channel 9, the Denver market would then contribute 1.5 percentage points towards the merged company's national reach.

Data from 2024 indicates that the Denver DMA is already highly concentrated, based on control of total market local TV revenues. The HHI during 2024 was ▉▉ for revenues from the combined local TV gross advertising market plus retransmission consent market. Nexstar's acquisition of KUSA and KTVD would increase this total market revenue HHI to a whopping ▉▉, with Nexstar controlling nearly ▉ percent of these combined local TV revenues in the Denver DMA. Nexstar's control solely over the market's retransmission revenues would be even greater, with the HHI increasing from ▉▉ to ▉▉, and Nexstar's share of the Denver DMA retrans market increasing to nearly ▉ percent.

Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the combination of Nexstar's FOX and CW affiliates with TEGNA's NBC and MyNetworkTV affiliates. They recite the same unsuccessful claims we refute for the DMAs above, regarding trickle-down investment in local news in order to combat supposed competition from other tech and media companies—all made possible, in Applicants' telling, by the

86

**App.491**

**REDACTED – FOR PUBLIC INSPECTION**

<u>elimination</u> of actual in-market competition between local TV broadcast stations. As in all other cases, these supposed public interest benefits are unsupported and uncognizable.

TEGNA's NBC affiliate has a robust local news operation and appears to be highly viewed,[226] as is Nexstar's FOX station.[227] Local TV stations derive much of their financial success through their news operations, and we fully expect that TEGNA and Nexstar both would continue to produce local news in the absence of this Transaction. If post-merger Nexstar were allowed to form a full-power quadopoly, it would control Denver's first-, third-, fifth- and sixth-ranked stations. That would not increase the number of news-producing stations in the market, and would instead cost the DMA the loss of competing news-producing operations.

Applicants also fail to describe any <u>merger-specific</u> benefits that the public allegedly would reap from the combination of these stations, net of any public interest harms, offering the same litany of pro-consolidation arguments and unsupported claims about ATSC 3.0, distribution rights, and charitable efforts. They go on to make the same kind of preposterous waiver claims made in the above DMAs, asserting without sufficient evidence that if they were forced to divest KWGN and KTVD those stations would fail.[228]

Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the Denver market. The Transaction would give Nexstar too much market power in the Denver Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets. Taking advantage of that market power is Applicants' driving financial motivation for the entire Transaction. They have failed to meet their burden to show that there

---

[226] Applicants state that KUSA is the market's top-ranked station. *Id.* at 43.

[227] Applicants state that KDVR is the market's third-ranked station. *Id.*

[228] *Id.* at 46.

**App.492**

REDACTED – FOR PUBLIC INSPECTION

would be any cognizable, merger-specific and verifiable public interest benefits offsetting the public interest harms from the further concentration of the Denver DMA they propose, and the transaction is "presumptively unlawful" under existing DOJ guidelines.[229] Therefore the Commission should deny the transfer applications for KUSA and KTVD; or in the alternative, deny Applicants' waiver request in the Denver DMA.

### 7. Cleveland-Akron (Canton), OH

The Cleveland-Akron (Canton), OH Designated Market Area is the 19th-largest U.S. TV market, with approximately 1.6 million TV households. Nexstar currently owns WJW (FOX) and WBNX (CW), while TEGNA owns WKYC (NBC). WJW is a VHF station (digital channel 8). Therefore, this DMA already contributes 1.2 percentage points towards Nexstar's National Cap limit of 39 percent.

Data from 2024 indicates that the Cleveland DMA is already highly concentrated, with an HHI of ▨▨ in the "total local TV market revenues" product market we have defined to include local TV gross advertising revenues plus retransmission consent revenues. Nexstar's acquisition of WKYC would increase this total market revenue HHI figure to ▨▨, giving Nexstar control of more than ▨ percent of the combined local TV spot ad and retransmission market revenues in the Cleveland DMA. Nexstar's share of the market's retransmission consent revenues would be even greater, with the HHI going from ▨▨ to ▨▨, and Nexstar's share of the Cleveland retransmission consent market increasing to ▨ percent.

Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the combination of Nexstar's FOX and CW affiliates with TEGNA's NBC affiliate. They make the exact same kind of unsupported and uncognizable claims that we have

---

[229] Horizontal Merger Guidelines at 6.

**REDACTED – FOR PUBLIC INSPECTION**

outlined and refuted for the above DMAs, regarding trickle-down investments in journalism and supposed competition with media and tech companies outside of the relevant local broadcast TV product market. And their rote assertions about improved ATSC 3.0 rollout, programming distribution rights, and corporate charity are not merger-specific.

With respect to the specific stations implicated by the Transaction in the Cleveland DMA, TEGNA's NBC affiliate has a robust local news operation and appears to be highly viewed.[230] So does Nexstar's WJW, which is also highly viewed and appears to be in good operational and financial condition.[231] We fully expect that TEGNA would continue to produce local news for WKYC in the absence of this transaction, and Nexstar would continue to compete against TEGNA's news coverage with programming produced for its two FCC-licensed Cleveland DMA stations. If Nexstar were allowed to form a full-power triopoly, that would not result in an increase in the number of news-producing stations in the market, and would instead reduce the number of stations independently competing to produce local broadcast TV news.

Applicants state that if they were forced to divest WBNX, which Nexstar acquired only in 2025, the station would fail.[232] But they offer no concrete and verifiable evidence of why this station would qualify for a failing station waiver were it divested today. As we noted in the sections on other DMAs above, a claim of a low market share is not sufficient to support a failing station waiver.

Therefore, Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the Cleveland DMA. The Transaction would give Nexstar too much market

---

[230] Applicants state WKYC is the market's forth-ranked station. Application at 47.

[231] Applicants state WJW is the market's third-ranked station. *Id.*

[232] *Id.* at 50.

REDACTED – FOR PUBLIC INSPECTION

power in the Cleveland Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets. Taking advantage of that increased market power is Applicants' driving financial motivation for this overall Transaction. They have failed to meet their burden. They have not shown that there would be any cognizable, verifiable, and merger-specific public interest benefits offsetting the public interest harms from the further concentration proposed in the Cleveland DMA, and the transaction is "presumptively unlawful" under existing DOJ guidelines.[233] Therefore the Commission should deny the transfer application for WKYC; or in the alternative, deny Applicants' waiver request in the Cleveland DMA.

### 8. Charlotte, NC

The Charlotte, NC Designated Market Area is the 21st-largest U.S. TV market, with approximately 1.4 million TV households. Nexstar currently owns WJZY (FOX) and WMYT (CW), while TEGNA owns WCNC (NBC). All three stations broadcast via a UHF signal. Therefore, the Charlotte DMA currently contributes 0.6 percentage points towards Nexstar's National Cap limit of 39 percent, which would remain unchanged if the post-merger company were to acquire WCNC.

Data from 2024 indicates the Charlotte DMA is already highly concentrated, with an HHI of ▨ in the total local revenues TV market we have defined to include local TV gross advertising revenues plus retransmission consent revenues. Nexstar's acquisition of WCNC would increase this total market revenue HHI figure to ▨, giving Nexstar control of nearly ▨ percent of the combined local TV spot ad and retransmission market revenues in the Charlotte DMA. Nexstar's share of the Charlotte DMA's retransmission consent revenues would be even

---

[233] Horizontal Merger Guidelines at 6.

REDACTED – FOR PUBLIC INSPECTION

greater, with that HHI increasing from ▨▨ to ▨▨, and Nexstar's share of the local retransmission consent market increasing to more than ▨ percent.

Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the combination of Nexstar's FOX and CW affiliates with TEGNA's NBC affiliate. They make the exact same kind of unsupported and uncognizable claims that we have outlined and refuted for the above DMAs, regarding trickle-down investments in journalism and supposed competition with media and tech companies outside of the relevant local broadcast TV product market. And their rote assertions about improved ATSC 3.0 rollout, programming distribution rights, and corporate charity are not merger-specific.

With respect to the specific stations implicated by the Transaction in the Charlotte DMA, TEGNA's NBC affiliate has a robust local news operation and appears to be highly viewed.[234] So does Nexstar's FOX affiliate, which is also highly viewed and appears to be in good operational and financial condition.[235] We fully expect that TEGNA would continue to produce local news for WCNC in the absence of this Transaction, and that Nexstar would continue to compete against TEGNA's news coverage with programming produced for its two FCC-licensed stations in the Charlotte DMA. If Nexstar were allowed to form a full-power triopoly, that would not result in an increase in the number of news-producing stations in the market, and would instead reduce the number of stations independently competing to produce local broadcast TV news.

Applicants state that if they were forced to divest WMYT after the proposed merger, the station would fail.[236] But as we have explained in each case above with respect to this same

---

[234] Applicants state WCNC is the market's third-ranked station. *See* Application at 50.

[235] Applicants state WJZY is the market's forth-ranked station. *See id*.

[236] *Id.* at 54.

91

**App.496**

REDACTED – FOR PUBLIC INSPECTION

empty argument about stations in the larger DMAs, Applicants offer no concrete, sufficient evidence for this claim.

Applicants have once again not met the standard for a waiver of the Local Multiple Ownership rule, this time in the Charlotte DMA. The Transaction would give Nexstar too much market power in the Charlotte Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets. Taking advantage of that market power is the driving financial motivation for this Transaction. Applicants have failed to meet their burden to show that there would be any cognizable public interest benefits offsetting the public interest harms from such further concentration of the Charlotte DMA's local TV market. The few benefits they claim are not merger-specific or verifiable, and the transaction is "presumptively unlawful" under existing DOJ guidelines.[237] Therefore the Commission should deny the transfer applications for WCNC; or in the alternative, deny Applicants' waiver request in the Charlotte DMA.

### 9. Portland, OR

The Portland, OR Designated Market Area is the 23rd-largest U.S. TV market, with approximately 1.3 million TV households. Nexstar currently owns KOIN (CBS) and KRCW (CW), while TEGNA owns KGW (NBC). All three stations broadcast on UHF channels, so this DMA currently contributes 0.5 percentage points towards Nexstar's National Cap limit of 39 percent, and that would remain unchanged if the post-merger company were to acquire KGW.

Data from 2024 indicates that the Portland, OR DMA is already highly concentrated, with a total local TV market revenues-based HHI of ▨▨. Nexstar's acquisition of KGW would increase this total market revenue HHI figure to ▨▨, giving Nexstar control of ▨▨ of the

---

[237] Horizontal Merger Guidelines at 6.

92

**App.497**

**REDACTED – FOR PUBLIC INSPECTION**

combined local TV spot ad and retransmission market revenues in the Portland DMA. Nexstar's share of the DMA's retransmission consent revenues would be just as dominant, with the HHI going from ▉▉ up to ▉▉, and Nexstar's share of those retrans revenues increasing to nearly ▉ percent.

Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the combination of Nexstar's CBS and CW affiliates with TEGNA's NBC affiliate. They make the exact same kind of unsupported and uncognizable claims that we have outlined and refuted for the above DMAs, regarding trickle-down investments in journalism and supposed competition with media and tech companies outside of the relevant local broadcast TV product market. And their rote assertions about improved ATSC 3.0 rollout, programming distribution rights, and corporate charity are not merger-specific.

With respect to the specific stations implicated by the Transaction in the Portland DMA, TEGNA's NBC affiliate has a robust local news operation and appears to be highly viewed.[238] So does Nexstar's CBS affiliate, which is also highly viewed and appears to be in good operational and financial condition.[239] We fully expect that TEGNA would continue to produce local news for KGW in the absence of this Transaction, and that Nexstar would continue to compete against TEGNA's news coverage with programming produced for its two FCC-licensed stations in the Portland DMA. If Nexstar were allowed to form a full-power triopoly, that would not result in an increase in the number of news-producing stations in the market, and would instead reduce the number of stations independently competing to produce local broadcast TV news.

---

[238] Applicants state KWG is the market's forth-ranked station. *See* Application at 55.

[239] Applicants state that KOIN is the market's second-ranked station, and KRCW is ranked eighth. *Id.*

93

**App.498**

REDACTED – FOR PUBLIC INSPECTION

Applicants imply that if they were forced to divest KRCW after this merger, the station would fail.[240] But as we have explained in each case above with respect to this same empty argument about stations in the larger DMAs, Applicants offer no concrete, sufficient evidence for this claim.

Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the Portland, OR DMA. The Transaction would give Nexstar too much market power in the Portland Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets. Acting on that increased market power is Applicants' driving financial motivation. They have failed to meet their burden to show that there would be any cognizable public interest benefits offsetting the harms from the proposed reduction in the number of broadcast TV competitors and this further concentration of the relevant broadcast television product markets in the Portland DMA. Applicants' claimed benefits are not merger-specific or verifiable, and the transaction is "presumptively unlawful" under existing DOJ guidelines.[241] Therefore, the Commission should deny the transfer application for KGW; or in the alternative, deny Applicants' waiver request in the Portland DMA.

### 10. St. Louis, MO

The St. Louis, MO Designated Market Area is the 24th-largest U.S. TV market, with approximately 1.3 million TV households. Nexstar currently owns KTVI (FOX) and KPLR (CW), while TEGNA owns KSDK (NBC). All three stations broadcast via a UHF digital channel Therefore this DMA currently contributes 0.5 percentage points towards Nexstar's National Cap limit of 39 percent, a value that would not change if Nexstar were to acquire KSDK.

---

[240] *Id.* at 57.

[241] Horizontal Merger Guidelines at 6.

94

**App.499**

REDACTED – FOR PUBLIC INSPECTION

Data from 2024 indicates that the St. Louis DMA is already highly concentrated, with a total local TV market revenues-based HHI of ▓▓. Nexstar's acquisition of KSDK would massively increase this total market revenue HHI figure to ▓▓, and would give Nexstar control of nearly ▓ percent of the combined local TV spot ad and retransmission consent market revenues in the St. Louis DMA.

Applicants once more fail to provide concrete evidence of any cognizable public interest benefits that would arise from the combination of Nexstar's FOX and CW affiliates with TEGNA's NBC affiliate. They make the exact same kind of unsupported and uncognizable claims that we have outlined and refuted for the above DMAs, regarding trickle-down investments in journalism and supposed competition with media and tech companies outside of the relevant local broadcast TV product market. And their rote assertions about improved ATSC 3.0 rollout, programming distribution rights, and corporate charity are not merger-specific.

With respect to the specific stations implicated by the Transaction in the St. Louis DMA, TEGNA's NBC affiliate has a robust local news operation and appears to be highly viewed.[242] Nexstar's FOX and CW affiliates are also highly viewed and appear to be in good operational and financial condition.[243] We fully expect that TEGNA would continue to produce local news for KSDK in the absence of this Transaction, and that Nexstar would continue to compete against TEGNA's news coverage with programming produced for its two FCC-licensed stations in the St. Louis DMA. If Nexstar were allowed to form a full-power triopoly, that would not result in an increase in the number of news-producing stations in the market, and would instead reduce the number of stations independently competing to produce local broadcast TV news.

---

[242] Applicants state KSDK is the market's second-ranked station. *See* Application at 58.

[243] Applicants state KTVI is the market's third-ranked station, and KPLR is ranked sixth. *See id.*

95

**App.500**

REDACTED – FOR PUBLIC INSPECTION

Applicants state that if they were forced to divest KPLR after this merger, the station would fail.[244] But as we have explained in each case above with respect to this same empty argument about stations in the larger DMAs, Applicants offer no concrete, sufficient evidence for this claim.

Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the St. Louis DMA. The Transaction would give Nexstar too much market power in the St. Louis Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets. Taking advantage of that market power is the Applicants' driving financial motivation for this Transaction. They have failed to meet their burden to show that there would be <u>any</u> cognizable public interest benefits offsetting the public interest harms from the proposed reduction in the number of broadcast competitors and this further concentration of the St. Louis DMA. Applicants' claimed benefits are not merger-specific or verifiable, and the transaction is "presumptively unlawful" under existing DOJ guidelines.[245] Therefore, the Commission should deny application for KSDK; or in the alternative, deny Applicants' waiver request in the St. Louis DMA.

### 11. Indianapolis, IN

The Indianapolis, IN Designated Market Area is the 25th-largest U.S. TV market, with approximately 1.2 million TV households. Nexstar currently owns WXIN (FOX), plus WTTV (CBS) and its satellite WTTK (CBS). WXIN and WTTV/WTTK are the second- and third-highest ranked stations in the DMA. TEGNA owns WTHR (NBC), the market's top-rated

---

[244] *Id.* at 61.

[245] Horizontal Merger Guidelines at 6.

REDACTED – FOR PUBLIC INSPECTION

station, as well as Class-A station WALV-CD (MeTV).[246] Nexstar's WXIN, WTTV and WTTK are all UHF stations (digital channels 22, 27 and 15 respectively). Therefore, this DMA currently contributes 0.5 percentage points towards Nexstar's national cap limit of 39 percent. However, because TEGNA's WTHR broadcasts over VHF digital channel 13, this market's contribution to the post-merger entity's National Cap limit would be 1.0 percentage points.

Data from 2024 indicates that the Indianapolis DMA is already highly concentrated, which should come as no surprise given Nexstar's existing top four duopoly formed when WTTV/WTTK obtained the CBS affiliation in 2014.[247] The total local TV market revenue-based HHI during 2024 was ████. Nexstar's acquisition of WTHR and WALV-CD would increase this total market revenue HHI figure to ████, and give Nexstar control of nearly ██████ of the combined local TV spot ad and retransmission consent market revenues in the Indianapolis DMA. Nexstar's control over the market's retransmission consent revenues would be even greater, with that HHI rising from ████ to an eye-popping ████, and Nexstar's market share increasing to more than ██████ of the DMA's retrans revenue.

As in the earlier discussed DMAs, Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the combination of Nexstar's FOX and CBS affiliates with TEGNA's NBC and MeTV affiliates. They make the exact same kind of unsupported and uncognizable claims that we have outlined and refuted for the above DMAs, regarding trickle-down investments in journalism and supposed competition with media and tech companies outside of the relevant local broadcast TV product market. And their rote assertions

---

[246] Application at 62.

[247] "WTTV Move Shows CBS Testing The Market," *TV Newscheck* (Aug. 11, 2014).

97

**REDACTED – FOR PUBLIC INSPECTION**

about improved ATSC 3.0 rollout, programming distribution rights, and corporate charity are not merger-specific.

With respect to the specific stations implicated by the Transaction in the Indianapolis DMA, TEGNA's NBC affiliate has a robust local news operation and appears to be highly viewed.[248] So do Nexstar's FOX and CBS affiliates, which are also highly viewed and appear to be in good operational and financial condition.[249] We fully expect that TEGNA would continue to produce local news for WTHR in the absence of this Transaction, and that Nexstar would continue to compete against TEGNA's news coverage with programming produced for its three FCC-licensed stations in the Indianapolis DMA. If Nexstar were allowed to form a full-power triopoly (with a fourth full-power station operating as a satellite), and with WALV-CD a quadopoly, that would not result in an increase in the number of news-producing stations in the market, and would instead reduce the number of stations independently competing to produce local broadcast TV news.

Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the Indianapolis DMA. Allowing Nexstar to control the market's first, second and third highest-ranked news stations is plainly not in the public interest, as this would turn the Indianapolis local TV news market into a near-monopoly. The Transaction would give Nexstar too much market power in the Indianapolis Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets. Taking advantage of that massive market power is Applicants' driving financial motivation for the overall Transaction. They have failed to

---

[248] Applicants state WTHR is the market's top-ranked station. *See* Application at 62.

[249] Applicants state WXIN is the market's second-ranked station, and WTTV is ranked third. (Applicants do not specify the ranking of satellite WTTK, or whether the rating rank reported for WTTV includes WTKK). *See id*.

98

**REDACTED – FOR PUBLIC INSPECTION**

meet their burden to show that there would be any cognizable public interest benefits offsetting the harms from the proposed reduction in the number of broadcast competitors and this further concentration of the Indianapolis DMA. Applicants' claimed benefits are not merger-specific or verifiable, and the transaction is "presumptively unlawful" under existing DOJ guidelines.[250] Therefore, the Commission should deny the transfer applications for WTHR and WALV-CD; or in the alternative, deny Applicants' waiver request in the Indianapolis DMA.

### 12. San Diego, CA

The San Diego, CA Designated Market Area is the 30th-largest U.S. TV market, with approximately 1.1 million TV households. Nexstar currently owns KSWB (FOX and ION) and KUSI (Independent), while TEGNA owns KFMB (CBS and CW). KSWB and KUSI are UHF stations (digital channels 26 and 18 respectively). Therefore this DMA currently contributes 0.5 percentage points towards Nexstar's National Cap limit of 39 percent. However, because KFMB broadcasts over VHF digital channel 8, if Nexstar were to acquire that station's license, San Diego would contribute 0.9 percentage points towards the post-merger company's national reach.

Data from 2024 indicates that the San Diego DMA is already highly concentrated, with a total local TV market revenues-based HHI of ▨▨. Nexstar's acquisition of KFMB would increase this total market revenue HHI figure to ▨▨, and would give Nexstar control of nearly ▨ percent of the combined local TV spot ad and retransmission consent market revenues in the San Diego DMA. Nexstar's control over the market's retransmission consent revenues alone would be even greater, with the HHI increasing from ▨▨ to ▨▨, and Nexstar's share increasing to nearly ▨▨▨ of the retransmission consent revenue in the San Diego DMA.

---

[250] Horizontal Merger Guidelines at 6.

**REDACTED – FOR PUBLIC INSPECTION**

As in the earlier discussed DMAs, Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the combination of Nexstar's two stations with TEGNA's top-ranked CBS/CW affiliate. They make the exact same kind of unsupported and uncognizable claims that we have outlined and refuted for the above DMAs, regarding trickle-down investments in journalism and supposed competition with media and tech companies outside of the relevant local broadcast TV product market. And their rote assertions about improved ATSC 3.0 rollout, programming distribution rights, and corporate charity are not merger-specific.

With respect to the specific stations implicated by the Transaction in the San Diego DMA, TEGNA's CBS/CW affiliate has a robust local news operation and appears to be highly viewed, as it is the market's top-rated station.[251] Nexstar's two stations are also highly viewed and appear to be in good operational and financial condition.[252] We fully expect that TEGNA would continue to produce local news for KFMB in the absence of this Transaction, and that Nexstar would continue to compete against TEGNA's news coverage with programming produced for its two FCC-licensed stations in the San Diego DMA. If Nexstar were allowed to form a full-power triopoly, that would not result in an increase in the number of news-producing stations in the market, and would instead reduce the number of stations independently competing to produce local broadcast TV news.

Applicants imply that if they were forced to divest KUSI to gain approval for this merger, the station would fail.[253] But as we have explained in each case above with respect to this same

---

[251] *See* Application at 66.

[252] Applicants state that KSWB is the market's third-ranked station, and KUSI is ranked fifth. *See id*.

[253] *Id.* at 69–70.

REDACTED – FOR PUBLIC INSPECTION

argument about stations in the larger DMAs, Applicants offer no concrete, sufficient evidence for this claim. There is absolutely no reason to believe, if Nexstar were allowed to own only two of these three stations, that KUSI would become a failing or failed station.

Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the San Diego DMA. The Transaction would give Nexstar too much market power in the San Diego Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets. Taking advantage of that market power is Applicants' driving financial motivation for this overall Transaction. They have failed to meet their burden to show that there would be <u>any</u> cognizable public interest benefits offsetting the public interest harms from the proposed reduction in the number of broadcast competitors and this further concentration of the San Diego DMA. Applicants' claimed benefits are not merger-specific or verifiable, and the transaction is "presumptively unlawful" under existing DOJ guidelines.[254] Therefore, the Commission should deny the transfer application for KFMB; or in the alternative, deny Applicants' waiver request in the San Diego DMA.

### 13. Hartford-New Haven, CT

The Hartford-New Haven, CT Designated Market Area is the 33rd-largest U.S. TV market, with approximately 1.1 million TV households. Nexstar currently owns WTNH (ABC) and WCTV (MyNetworkTV), while TEGNA owns WTIC (FOX) and WCCT (CW). WTNH is a VHF station (digital channel 8). Therefore, this DMA currently contributes 0.9 percentage points towards Nexstar's National Cap limit of 39 percent. WCTV and TEGNA's two stations broadcast over UHF channels.

---

[254] Horizontal Merger Guidelines at 6.

101

**App.506**

**REDACTED – FOR PUBLIC INSPECTION**

Data from 2024 indicates that the Hartford DMA is already highly concentrated, with a total local TV market revenues-based HHI of ███. Nexstar's acquisition of WTIC and WCCT would increase this total market revenue HHI figure to ███, and give Nexstar control of well ███ of the combined local TV spot ad and retransmission consent market revenues in the Hartford-New Haven DMA. Nexstar's control over the DMA's retrans revenues alone would be even greater, with the HHI changing from ███ to ███, and Nexstar's share of that market increasing to nearly ███

As in the earlier discussed DMAs, Applicants yet again fail to provide concrete evidence of any cognizable public interest benefits that would arise from the combination of Nexstar's ABC and MyNetworkTV affiliates with TEGNA's FOX and CW affiliates. They make the exact same kind of unsupported and uncognizable claims that we have outlined and refuted for the above DMAs, regarding trickle-down investments in journalism and supposed competition with media and tech companies outside of the relevant local broadcast TV product market. And their rote assertions about improved ATSC 3.0 rollout, programming distribution rights, and corporate charity are not merger-specific.

With respect to the specific stations implicated by the Transaction in the Hartford DMA, TEGNA's FOX affiliate has a robust local news operation and appears to be highly viewed.[255] Nexstar's ABC affiliate is also highly viewed and appears to be in good operational and financial condition.[256] As we have explained, local TV stations derive much of their financial success through their news operations, and therefore we fully expect that TEGNA would continue to produce local news for its two Hartford DMA stations in the absence of this Transaction, while

---

[255] Applicants state WTIC is the market's fourth-ranked station. Application at 70.

[256] Applicants state WTNH is the market's second-ranked station. *Id.*

102

**App.507**

REDACTED – FOR PUBLIC INSPECTION

Nexstar would continue to compete against TEGNA's news coverage with programming produced for its two FCC-licensed stations in this DMA. If Nexstar were allowed to form a full-power quadopoly, that would not result in an increase in the number of news-producing stations in the market, and would instead reduce the number of stations independently competing to produce local broadcast TV news.

Applicants state that if they were forced to divest WCTX and WCCT to complete the merger, these stations would fail.[257] But as we have explained in each case above with respect to this same empty argument about stations in the larger DMAs, Applicants offer no concrete, sufficient evidence for this claim.

Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the Hartford DMA. The Transaction would give Nexstar too much market power in the Hartford Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets. Taking advantage of that market power is Applicants' driving financial motivation for this overall Transaction. They have failed to meet their burden to show that there would be any cognizable public interest benefits offsetting the public interest harms from the proposed reduction in the number of broadcast competitors and this further concentration of the Hartford DMA. Applicants' claimed benefits are not merger-specific or verifiable, and the transaction is "presumptively unlawful" under existing DOJ guidelines.[258] What's more, Nexstar's reacquisition of stations it previously divested to TEGNA to comply with its settlement in *U.S. v. Nexstar* is specifically prohibited under the terms of that 2020 DOJ

---

[257] *Id.* at 73.

[258] Horizontal Merger Guidelines at 6.

103

**App.508**

REDACTED – FOR PUBLIC INSPECTION

settlement.[259] Therefore, the Commission should deny the transfer applications for WTIC and WCCT; or in the alternative, deny Applicants' waiver request in the Hartford DMA.

### 14. Grand Rapids-Kalamazoo-Battle Creek, MI

The Grand Rapids-Kalamazoo-Battle Creek, MI Designated Market Area is the 43rd-largest U.S. TV market, with approximately 810,000 TV households. Nexstar currently owns WOOD (NBC) and WOTV (ABC), as well as WOGC-CD (a Class-A NBC satellite repeater) and Class-A stations WOHO-CD (MyNetworkTV) and WXSP-CD (MyNetworkTV). TEGNA owns WZZM (ABC).[260] WOOD is a VHF station (digital channel 7). Therefore, this DMA currently contributes 0.6 percentage points towards Nexstar's National Cap limit of 39 percent, which would remain unchanged if the post-merger entity were granted ownership of WZZM.

Data from 2024 indicates that the Grand Rapids DMA is already highly concentrated, with a total local TV market revenue-based HHI of ▨▨. Nexstar's acquisition of WZZM would increase that total market revenue HHI figure to ▨▨, and give Nexstar control of well ▨▨▨▨ of the combined local TV spot ad and retransmission consent market revenues in the Grand Rapids DMA. Nexstar's control over the DMA's retransmission revenues alone would be even greater, with the HHI changing from ▨▨ to ▨▨, and Nexstar's share of this market increasing to nearly ▨ percent.

As in the earlier discussed DMAs, Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the combination of Nexstar's NBC,

---

[259] *United States and Plaintiff States v. Nexstar Media Group, Inc. and Tribune Media Company*, Case 1:19-cv-02295, Final Judgment, at 17–18 (D.D.C. filed Feb. 10, 2020) ("*U.S. v. Nexstar* Final Judgment").

[260] Though they both carry ABC programming, WOTV and WZZM are not a satellite pair.

104

REDACTED – FOR PUBLIC INSPECTION

ABC, and MyNetworkTV affiliates with TEGNA's ABC affiliate. They make the exact same kind of unsupported and uncognizable claims that we have outlined and refuted for the above DMAs, regarding trickle-down investments in journalism and supposed competition with media and tech companies outside of the relevant local broadcast TV product market. And their rote assertions about improved ATSC 3.0 rollout, programming distribution rights, and corporate charity are not merger-specific.

With respect to the specific stations implicated by the Transaction in the Grand Rapids DMA, TEGNA's ABC affiliate has a robust local news operation and appears to be highly viewed.[261] Nexstar's NBC and ABC affiliates are also highly viewed and appear to be in good operational and financial condition.[262] We fully expect that TEGNA would continue to produce local news for WZZM in the absence of this Transaction, and Nexstar would continue to compete against TEGNA's news coverage with programming produced for its Grand Rapids DMA stations. If Nexstar were allowed to form a full-power triopoly (and control fully six stations in this hyphenate market when counting repeaters and Class-A facilities), that would not result in an increase in the number of news-producing stations in the market, and would instead reduce the number of stations independently competing to produce local broadcast TV news.

Applicants state that if they were forced to divest WOTV to gain approval for this merger, the station would fail.[263] But as we have explained in each case above with respect to this same empty argument about stations in the larger DMAs, Applicants offer no concrete, sufficient evidence for this claim.

---

[261] Applicants state WZZM is the market's fourth-ranked station. *See* Application at 74.

[262] Applicants state WOOD is the market's second-ranked station, while WOTV is ranked fifth. *See id.*

[263] *Id.* at 77.

105

**App.510**

**REDACTED – FOR PUBLIC INSPECTION**

Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the Grand Rapids-Kalamazoo-Battle Creek DMA. The Transaction would give Nexstar too much market power in this DMA's Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets. Taking advantage of that market power is Applicants' driving financial motivation for this overall Transaction. They have failed to meet their burden to show that there would be any cognizable public interest benefits offsetting the public interest harms that would result from the proposed reduction in the number of broadcast competitors and this further concentration of the DMA. Applicants' claimed benefits are not merger-specific or verifiable, and the transaction is "presumptively unlawful" under existing DOJ guidelines.[264] Therefore, the Commission should deny the transfer application for WZZM; or in the alternative, deny Applicants waiver request in the Grand Rapids DMA.

### 15. Norfolk-Portsmouth-Newport News, VA

The Norfolk-Portsmouth-Newport News, VA Designated Market Area is the 44th-largest U.S. TV market, with over 780,000 TV households. Nexstar currently owns WAVY (NBC) and WVBT (FOX and CW), as well as Class-A station WNLO-CD (CW). TEGNA owns WVEC (ABC). This Transaction would give Nexstar control over three of the market's top four-ranked stations.[265] All of Nexstar's and TEGNA's stations in the Norfolk DMA broadcast over UHF channels. Therefore, this DMA currently contributes 0.3 percentage points towards Nexstar's National Cap limit of 39 percent, which would not change if it acquired WVEC.

Data from 2024 indicates that the Norfolk DMA is already highly concentrated, with a total local TV market revenue-based HHI of ▨▨. Nexstar's acquisition of WVEC would

---

[264] Horizontal Merger Guidelines at 6.

[265] Application at 79.

106

**App.511**

REDACTED – FOR PUBLIC INSPECTION

increase that total market revenue HHI figure to a massive ☒☒, and let Nexstar control nearly ☒☒☒☒ of the combined local TV spot ad and retransmission consent market revenues in the Norfolk DMA. Nexstar's control over the market's retrans revenues alone would be even greater, with the HHI rising from ☒☒ to ☒☒, and Nexstar increasing its market share here to nearly ☒☒☒☒. This level of market control is outrageous, and even higher than Standard Oil's was when the government broke up its monopoly.[266]

As in the earlier discussed DMAs, Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the combination of Nexstar's NBC, FOX, and CW affiliates with TEGNA's ABC affiliate. They make the exact same kind of unsupported and uncognizable claims that we have outlined and refuted for the above DMAs, regarding trickle-down investments in journalism and supposed competition with media and tech companies outside of the relevant local broadcast TV product market. And their rote assertions about improved ATSC 3.0 rollout, programming distribution rights, and corporate charity are not merger-specific.

With respect to the specific stations implicated by the Transaction in the Norfolk DMA, TEGNA's ABC affiliate has a robust local news operation and appears to be highly viewed.[267] Nexstar's NBC and FOX affiliates are also highly viewed and appear to be in good operational and financial condition.[268] We fully expect that TEGNA would continue to produce local news for WVEC in the absence of this Transaction, and that Nexstar would continue to compete

---

[266] *See* Jeff Desjardins, "Chart: The Evolution of Standard Oil," *Visual Capitalist* (Nov. 24, 2017); *see also* Naomi R. Lamoreaux, "The Problem of Bigness: From Standard Oil to Google," 33 *Journal of Economic Perspectives* 94 (2019).

[267] Applicants state WVEC is the market's third-ranked station. *See* Application at 79.

[268] Applicants state WAVY is the market's top-ranked station, while WVBT is the market's fourth highest-ranked station. *See id.*

107

REDACTED – FOR PUBLIC INSPECTION

against TEGNA's news coverage with programming produced for its two FCC-licensed stations in this DMA. If Nexstar were allowed to form a full-power triopoly, that would not result in an increase in the number of news-producing stations in the market, and would instead reduce the number of stations independently competing to produce local broadcast TV news.

Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the Norfolk-Portsmouth-Newport News DMA. The Transaction would give Nexstar too much market power in this DMA's Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets. Taking advantage of that market power is Applicants' driving financial motivation for the entire Transaction. They have failed to meet their burden to show that there would be any cognizable public interest benefits offsetting the public interest harms from the proposed reduction in the number of broadcast competitors and this further concentration of the DMA. Applicants' claimed benefits are not merger-specific or verifiable, and the transaction is "presumptively unlawful" under existing DOJ guidelines.[269] Therefore the Commission should deny the transfer application for WVEC; or in the alternative, deny Applicants' waiver request in the Norfolk DMA.

### 16. New Orleans, LA

The New Orleans, LA Designated Market Area is the 50th-largest U.S. TV market, with nearly 700,000 TV households. Nexstar currently owns WGNO (ABC) and WNOL (CW), while TEGNA owns WWL (CBS) and WUPL (MyNetworkTV). All four of these stations transmit using UHF channels. Therefore, this DMA currently contributes 0.3 percentage points towards Nexstar's National Cap limit of 39 percent, which would not change if it were to acquire WWL and WUPL.

---

[269] Horizontal Merger Guidelines at 6.

108

REDACTED – FOR PUBLIC INSPECTION

Data from 2024 indicates that the New Orleans DMA is already highly concentrated, with a total local TV market revenue-based HHI of ☒. Nexstar's acquisition of WWL and WUPL would increase this total market revenue HHI figure to ☒, and give Nexstar control of nearly ☒ percent of the combined local TV spot ad and retransmission consent market revenues in the New Orleans DMA. Nexstar's control over the market's retrans revenues alone would be just as dominant, with the HHI increasing from ☒ to ☒, and Nexstar's share of this market increasing to nearly ☒ percent.

As in the earlier discussed DMAs, Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the combination of Nexstar's ABC and CW affiliates with TEGNA's CBS and MyNetworkTV affiliates. They make the exact same kind of unsupported and uncognizable claims that we have outlined and refuted for the above DMAs, regarding trickle-down investments in journalism and supposed competition with media and tech companies outside of the relevant local broadcast TV product market. And their rote assertions about improved ATSC 3.0 rollout, programming distribution rights, and corporate charity are not merger-specific.

With respect to the specific stations implicated by the Transaction in the New Orleans DMA, TEGNA's WWL has a robust local news operation and appears to be highly viewed,[270] as is Nexstar's WGNO.[271] We fully expect that TEGNA would continue to produce local news for its two New Orleans stations in the absence of this Transaction, and that Nexstar would continue to compete against TEGNA's news coverage with programming produced for its own two

---

[270] Applicants state that WWL is the market's second-ranked station, while WUPL is ranked seventh. *See* Application at 81.

[271] Applicants state that WGNO is the market's fourth-ranked station, while WNOL is ranked sixth. *See id.*

REDACTED – FOR PUBLIC INSPECTION

FCC-licensed stations in the New Orleans DMA. If Nexstar were allowed to form a full-power quadopoly, that would not result in an increase in the number of news-producing stations in the market, and would instead reduce the number of stations independently competing to produce local broadcast TV news.

Applicants state that if they were forced to divest WUPL and WNOL to gain approval for this merger, those stations would fail.[272] But as we have explained in each case above with respect to this same argument about stations in the larger DMAs, Applicants offer no concrete, sufficient evidence for this claim.

Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the New Orleans DMA. The Transaction would give Nexstar too much market power in the New Orleans Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets. Taking advantage of that market power is Applicants' driving financial motivation for this overall transaction. They have failed to meet their burden to show that there would be <u>any</u> cognizable public interest benefits offsetting the public interest harms from the proposed reduction in the number of broadcast competitors and this further concentration of the New Orleans DMA. Applicants' claimed benefits are not merger-specific or verifiable, and the transaction is "presumptively unlawful" under existing DOJ guidelines.[273] Therefore, the Commission should deny the transfer applications for WWL and WUPL; or in the alternative, deny Applicants' waiver request in the New Orleans DMA.

---

[272] *Id.* at 84–85.

[273] Horizontal Merger Guidelines at 6.

REDACTED – FOR PUBLIC INSPECTION

### 17. Memphis, TN

The Memphis, TN Designated Market Area is the 51st-largest U.S. TV market, with approximately 680,000 TV households. Nexstar currently owns the market's top-ranked station WREG (CBS), while TEGNA owns WATN (ABC) and WLMT (CW).[274] WREG broadcasts over UHF channel 28. Therefore, this DMA currently contributes 0.5 percentage points towards Nexstar's national cap limit of 39 percent. Because WATN and WLMT both transmit over UHF channels too, Nexstar's acquisition of either or both of these stations would not impact the merged entity's national reach, thanks to the Commission's anachronistic UHF discount.

Data from 2024 indicates that the Memphis DMA is already highly concentrated, with a total local TV market revenue-based HHI of ▉▉. Nexstar's acquisition of WATN and WLMT would increase that total market revenue HHI figure to ▉▉, with Nexstar controlling ▉ percent of the combined local TV spot ad and retransmission consent market revenues in the Memphis DMA. Nexstar's control over the market's retransmission consent revenues would be even greater, with the HHI going from ▉▉ to ▉▉, and Nexstar's share of the Memphis DMA's retransmission consent revenue increasing to just under ▉ percent.

As in the earlier discussed DMAs, Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the combination of Nexstar's CBS affiliate with TEGNA's ABC and CW affiliates. They make the exact same kind of unsupported and uncognizable claims that we have outlined and refuted for the above DMAs, regarding trickle-down investments in journalism and supposed competition with media and tech companies outside of the relevant local broadcast TV product market. And their rote assertions

---

[274] Application at 86.

111

**App.516**

REDACTED – FOR PUBLIC INSPECTION

about improved ATSC 3.0 rollout, programming distribution rights, and corporate charity are not merger-specific.

With respect to the specific stations implicated by the Transaction here, TEGNA has a robust local news operation in Memphis and its stations appear to be highly viewed.[275] Nexstar's WREG is also highly viewed and appears to be in good operational and financial condition.[276] We fully expect that TEGNA would continue to produce local news for its Memphis stations in the absence of this Transaction, and that Nexstar would continue to compete against TEGNA's news coverage with programming produced for WREG. If Nexstar were allowed to form a full-power triopoly, that would not result in an increase in the number of news-producing stations in the market, and would instead reduce the number of stations independently competing to produce local broadcast TV news.

Applicants state that if they were forced to divest WLMT, the station would fail.[277] But as we have explained in each case above with respect to this same empty argument about stations in the larger DMAs, Applicants offer no concrete, sufficient evidence for this claim.

Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the Memphis DMA. The Transaction would give Nexstar too much market power in the Memphis Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets. Taking advantage of that market power is Applicants' driving financial motivation for this overall Transaction. They have failed to meet their burden to show that there would be <u>any</u> cognizable public interest benefits offsetting the public interest harms from the

---

[275] Applicants state WATN is the market's fourth-ranked station and WLMT is ranked fifth. *See* Application at 86.

[276] Applicants state WREG is the market's top-ranked station. *See id*.

[277] *Id.* at 89.

112

**App.517**

**REDACTED – FOR PUBLIC INSPECTION**

proposed reduction in the number of broadcast competitors and this further concentration of the Memphis DMA. Applicants' claimed benefits are not merger-specific or verifiable, and the transaction is "presumptively unlawful" under existing DOJ guidelines,[278] while Nexstar's reacquisition of stations it previously divested to TEGNA is specifically prohibited by DOJ's 2020 settlement over Nexstar's purchase of Tribune.[279] Therefore, the Commission should deny the transfer applications for WATN and WLMT; or in the alternative, deny Applicants' waiver request in the Memphis DMA.

### 18. Buffalo, NY

The Buffalo, NY Designated Market Area is the 55th-largest U.S. TV market, with over 640,000 TV households. Nexstar currently owns the market's top-ranked station WIVB (CBS) as well as sixth-ranked WNLO (CW).[280] TEGNA owns WGRZ (NBC), the market's second-ranked station.[281] All three stations transmit over UHF channels. Therefore, the Buffalo DMA currently contributes 0.3 percentage points towards Nexstar's National Cap limit of 39 percent, a value that would not change if it were allowed to acquire WGRZ.

Data from 2024 indicates that the Buffalo DMA is already highly concentrated, with a total local TV market revenue-based HHI of ▨▨. Nexstar's acquisition of WGRZ would increase that total market revenue HHI figure to ▨▨, with Nexstar controlling ▨▨▨▨ of the combined local TV spot ad and retransmission consent market revenues in the Buffalo DMA. Nexstar's control over the DMA's retrans revenues would be even greater, with the HHI rising

---

[278] Horizontal Merger Guidelines at 6.

[279] *U.S. v. Nexstar* Final Judgment at 17–18.

[280] Application at 90.

[281] *Id.*

113

**App.518**

REDACTED – FOR PUBLIC INSPECTION

from ▨▨ to ▨▨, and Nexstar's share of Buffalo's retransmission consent market revenues increasing to nearly ▨ percent.

As in the earlier discussed DMAs, Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the combination of Nexstar's CBS and CW affiliates with TEGNA's NBC affiliate. They make the exact same kind of unsupported and uncognizable claims that we have outlined and refuted for the above DMAs, regarding trickle-down investments in journalism and supposed competition with media and tech companies outside of the relevant local broadcast TV product market. And their rote assertions about improved ATSC 3.0 rollout, programming distribution rights, and corporate charity are not merger-specific.

TEGNA's NBC affiliate has a robust local news operation and appears to be highly viewed,[282] as are Nexstar's CBS and CW affiliates.[283] Local TV stations derive much of their financial success through their news operations, and therefore we fully expect that TEGNA would continue to produce local news for WGRZ in the absence of this Transaction, while Nexstar would continue to compete against TEGNA's news coverage with programming produced for its own two FCC-licensed stations in the Buffalo DMA. If Nexstar were allowed to form a full-power triopoly, that would not result in an increase in the number of news-producing stations in the market, and would instead reduce the number of stations independently competing to produce local broadcast TV news.

---

[282] Applicants state that WGRZ is the market's second-ranked station. *See* Application at 90.

[283] Applicants state that WIVB is the market's top-ranked station, while WNLO is ranked sixth. *See id.*

114

**App.519**

REDACTED – FOR PUBLIC INSPECTION

Applicants state that if they were forced to divest WNLO, the station would fail.[284] But as we have explained in each case above with respect to this same argument about stations in the larger DMAs, Applicants offer no concrete, sufficient evidence for this claim.

Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the Buffalo DMA. The Transaction would give Nexstar too much market power in the Buffalo Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets. Taking advantage of that market power is Applicants' driving financial motivation for this overall Transaction. They have failed to meet their burden to show that there would be <u>any</u> cognizable public interest benefits offsetting the public interest harms from the proposed reduction in the number of broadcast competitors and this further concentration of the Buffalo DMA. Applicants' claimed benefits are not merger-specific or verifiable, and the transaction is "presumptively unlawful" under existing DOJ guidelines.[285] Therefore, the Commission should deny the transfer application for WGRZ; or in the alternative, deny Applicants waiver request in the Buffalo DMA.

### 19. Little Rock-Pine Bluff, AR

The Little Rock-Pine Bluff, AR Designated Market Area is the 59th-largest U.S. TV market, with nearly 600,000 TV households. Nexstar currently owns the second highest-ranked station in the market, KARK (NBC), as well as seventh-ranked KARZ (MyNetworkTV).[286] However, although it did not disclose this in the Application, Nexstar exerts meaningful control over two additional stations in Little Rock that are licensed to its "sidecar" company, Mission

---

[284] *Id.* at 93.

[285] Horizontal Merger Guidelines at 6.

[286] Application at 94.

115

REDACTED – FOR PUBLIC INSPECTION

Broadcasting. The Securities and Exchange Commission considers Mission Broadcasting to be a "Variable Interest Entity" of Nexstar's. This is because Nexstar is "deemed under U.S. GAAP to have controlling financial interest" in Mission.[287] Nexstar programs these stations and owns the non-license assets of Mission's KLRT (FOX), the market's fourth highest-ranked station, and KASN (CW) with a ranking not disclosed in the Application. In addition to these four stations, Nexstar seeks to acquire the TEGNA-owned KTHV (CBS), Little Rock's third highest-ranked station. KARK and KARZ transmit over UHF channels (digital channels 32 and 28 respectively). That means the Little Rock DMA currently contributes 0.2 percentage points towards Nexstar's National Cap limit of 39 percent. However, if Nexstar were to acquire KTHV, which broadcasts over VHF digital channel 12, Little Rock would contribute 0.5 percentage points towards Nexstar's national reach.

Data from 2024 indicates that the Little Rock DMA is already highly concentrated, and that's before even considering Nexstar's control over an unknown portion of Mission Broadcasting's Little Rock local TV spot advertising and retransmission consent revenues. The total local TV market revenue HHI during 2024 was ▨. Nexstar's acquisition of KTHV would increase that total market revenue HHI to ▨, resulting in Nexstar holding the licenses for stations responsible for just under ▨ of the combined local TV spot ad and retransmission consent market revenues in the Little Rock DMA. Nexstar's control over Little Rock's retransmission consent market revenues would be even greater, with the HHI changing from ▨ to ▨, and Nexstar's share from its licensed stations increasing to nearly ▨ percent.

Though the Commission still refuses to consider Variable Interest Entity sidecars as attributable for purposes of the local and national ownership rules, Nexstar's control over the

_____

[287] Nexstar 2024 Form 10-K, at 7.

116

**App.521**

REDACTED – FOR PUBLIC INSPECTION

programming and revenues of Mission's stations is absolutely germane to the Commission's public interest analysis. If we attributed 100 percent of the Mission stations' revenues to Nexstar, the total market revenue HHI would increase from ▨▨ to ▨▨, with Nexstar bringing in nearly ▨ percent of the Local Broadcast TV Spot Advertising and retransmission consent revenues in the Little Rock DMA. Under this attribution, Nexstar's control over the DMA's retransmission revenues would be even higher, with the HHI changing from ▨▨ to ▨▨, and Nexstar's share increasing to nearly ▨ percent. Nexstar's actual revenues from Mission remain unknown, but are likely significant. The Commission should demand this information from Applicants, and should also conduct a thorough investigation to determine if Nexstar has *de facto* control over Mission's FCC licenses.

As in the earlier discussed DMAs, Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the combination of the four Little Rock stations Nexstar operates with TEGNA's CBS affiliate. They make the exact same kind of unsupported and uncognizable claims that we have outlined and refuted for the above DMAs, regarding trickle-down investments in journalism and supposed competition with media and tech companies outside of the relevant local broadcast TV product market. And their rote assertions about improved ATSC 3.0 rollout, programming distribution rights, and corporate charity are not merger-specific.

TEGNA's CBS affiliate has a robust local news operation and appears to be highly viewed.[288] And Nexstar's two-licensed stations, along with the two stations it operates for Mission, are all also highly viewed and appear to be in good operational and financial

---

[288] Applicants state that KTHV is the market's third-ranked station. *See* Application at 94.

117

**App.522**

**REDACTED – FOR PUBLIC INSPECTION**

condition.[289] Local TV stations derive much of their financial success through their news operations, and therefore we fully expect that TEGNA would continue to produce local news for KTHV in the absence of this Transaction, while Nexstar would continue to compete against TEGNA's news coverage with programming produced for its two FCC-licensed stations in the Little Rock DMA, as well as programming it produces for the two Mission Broadcasting stations it operates. If Nexstar were allowed to form a full-power triopoly—and a *de facto* full-power quintopoly—that would not result in an increase in the number of news-producing stations in the market, and would instead reduce the number of stations independently competing to produce local broadcast TV news.

Applicants state that if they were forced to divest KARZ, the station would fail.[290] But as we have explained in each case above with respect to this same argument about stations in the larger DMAs, Applicants offer no concrete, sufficient evidence for this claim.

Therefore, Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the Little Rock DMA. The Transaction would give Nexstar too much market power in the Little Rock Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets. Taking advantage of that market power is Applicants' driving financial motivation for the whole Transaction. They have failed to meet their burden to show that there would be any cognizable public interest benefits offsetting the public interest harms from the proposed reduction in the number of broadcast competitors and this further concentration of relevant product markets in the Little Rock DMA. Applicants' claimed benefits

---

[289] Applicants state that the two Little Rock stations for which Nexstar holds the FCC licenses, KARK and KARZ, are second- and seventh-ranked respectively. KLRT, which Nexstar operates, is ranked fourth. *See id.*

[290] *Id.* at 96–97.

118

**App.523**

**REDACTED – FOR PUBLIC INSPECTION**

are not merger-specific or verifiable, and the transaction is "presumptively unlawful" under existing DOJ guidelines.[291] Therefore, the Commission should deny the transfer application for KTHV; or in the alternative, deny Applicants' waiver request in the Little Rock DMA.

### 20. Des Moines-Ames, IA

The Des Moines-Ames, IA Designated Market Area is the 67th-largest U.S. TV market, with nearly half a million TV households. Nexstar currently owns the market's number two-ranked station, WHO (NBC), while TEGNA owns WOI (ABC) and KCWI (CW), ranked number three and number seven respectively.[292] WHO transmits via VHF digital channel 12. Therefore, the Des Moines-Ames DMA currently contributes 0.4 percentage points towards Nexstar's National Cap limit of 39 percent. If for some reason Nexstar were to divest WHO but acquire WOI, this reach contribution would not change, as WOI transmits over VHF digital channel 5.

Data from 2024 indicates that the Des Moines-Ames DMA is already highly concentrated, with a total local TV market revenue-based HHI of ▨▨. Nexstar's acquisition of WOI and KCWI would increase that total market revenue HHI figure to ▨▨, giving Nexstar control of more than ▨ of the combined local TV spot ad and retransmission consent market revenues in the Des Moines-Ames DMA. Nexstar's control over the DMA's retransmission consent revenues would be even greater, with the HHI changing from ▨▨ to ▨▨, and Nexstar's share of the retransmission consent market revenue increasing to nearly ▨ percent.

As in the earlier discussed DMAs, Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the combination of Nexstar's NBC

---

[291] Horizontal Merger Guidelines at 6.

[292] Application at 97.

119

**App.524**

REDACTED – FOR PUBLIC INSPECTION

affiliate with TEGNA's ABC and CW affiliates. They yet again make the unsupported and uncognizable claims that we have outlined and refuted for the above DMAs, regarding trickle-down investments in journalism and supposed competition with media and tech companies outside of the relevant local broadcast TV product market. And their rote assertions about improved ATSC 3.0 rollout, programming distribution rights, and corporate charity are not merger-specific.

TEGNA's Des Moines stations have a robust local news operation and appear to be highly viewed.[293] Nexstar's WHO is also highly viewed and appears to be in good operational and financial condition.[294] We fully expect that TEGNA would continue to produce local news for WOI and KCWI in the absence of this Transaction, and that Nexstar would continue to compete against TEGNA's news coverage with programming produced for its NBC affiliate that is the second highest ranked station in the DMA. If Nexstar were allowed to form a full-power triopoly, that would not result in an increase in the number of news-producing stations in the market, and would instead reduce the number of stations independently competing to produce local broadcast TV news.

Applicants state that if they were forced to divest KCWI, the station would fail.[295] But as we have explained in each case above with respect to this same argument about stations in the larger DMAs, Applicants offer no concrete, sufficient evidence for this claim.

Therefore, Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the Des Moines DMA. The Transaction would give Nexstar too much market

---

[293] Applicants state WOI is the market's third-ranked station, while KCWI is ranked seventh. *See id.* at 98.

[294] Applicants state WHO is the market's second-ranked station. *See id*.

[295] *Id.* at 100–01.

120

REDACTED – FOR PUBLIC INSPECTION

power in the Des Moines Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets. Acting on that market power is Applicants' driving financial motivation for this entire Transaction. They have failed to meet their burden to show that there would be <u>any</u> cognizable public interest benefits offsetting the public interest harms from the proposed reduction in the number of broadcast competitors and this further concentration of the relevant product markets in the Des Moines DMA. Applicants' claimed benefits are not merger-specific or verifiable, and the transaction is "presumptively unlawful" under existing DOJ guidelines,[296] while Nexstar's reacquisition of stations it previously divested to TEGNA is specifically prohibited by DOJ's 2020 settlement over Nexstar's purchase of Tribune.[297] Therefore, the Commission should deny the transfer applications for WOI and KCWI; or in the alternative, deny Applicants' waiver request in the Des Moines DMA.

### 21. Huntsville-Decatur (Florence), AL

The Huntsville-Decatur (Florence), AL Designated Market Area is the 73rd-largest U.S. TV market, with approximately 460,000 TV households. Nexstar currently owns WHNT (CBS) and WHDF (CW), the market's top-ranked and fifth-ranked stations respectively.[298] TEGNA owns WZDX (FOX), the fourth highest-ranked station in Huntsville. WHNT transmits over VHF digital channel 2. Therefore, the Huntsville DMA already contributes 0.4 percentage points towards Nexstar's National Cap limit of 39 percent. However, in the event that Nexstar were to acquire WZDX while divesting WHNT, the Huntsville DMA would contribute just 0.2

---

[296] Horizontal Merger Guidelines at 6.

[297] *U.S. v. Nexstar* Final Judgment at 17–18.

[298] Application at 102.

121

**REDACTED – FOR PUBLIC INSPECTION**

percentage points towards Nexstar's national cap limit, as that station and WHDF both transmit over UHF channels (digital channels 18 and 19 respectively).

Data from 2024 indicates that the Huntsville DMA is already highly concentrated, with a total local TV market revenue-based HHI of ▨. Nexstar's acquisition of WZDX would increase this total market revenue HHI figure to ▨, with Nexstar controlling ▨ of the combined local TV spot ad and retransmission consent market revenues in the Huntsville DMA. Nexstar's control of the DMA's retransmission revenues would be even greater, with the HHI changing from ▨ to ▨, and Nexstar's share of this specific market increasing to well over ▨ percent.

As in the earlier discussed DMAs, Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the combination of Nexstar's CBS and CW affiliates with TEGNA's FOX affiliate. They make the exact same kind of unsupported and uncognizable claims that we have outlined and refuted for the above DMAs, regarding trickle-down investments in journalism and supposed competition with media and tech companies outside of the relevant local broadcast TV product market. And their rote assertions about improved ATSC 3.0 rollout, programming distribution rights, and corporate charity are not merger-specific.

TEGNA's FOX affiliate has a robust local news operation and appears to be highly viewed.[299] So are Nexstar's two Huntsville DMA stations [300] We fully expect that TEGNA would continue to produce local news for WZDX in the absence of this Transaction, and that Nexstar would continue to compete against TEGNA's news coverage with programming produced for its

---

[299] Applicants state that WZDX is the market's fourth-ranked station. *See id.* at 102.

[300] Applicants state that WHNT is the market's top-ranked station, while WHDF is ranked fifth. *See id.*

122

REDACTED – FOR PUBLIC INSPECTION

two FCC-licensed stations in the Huntsville DMA. If Nexstar were allowed to form a full-power triopoly, that would not result in an increase in the number of news-producing stations in the market, and would instead reduce the number of stations independently competing to produce local broadcast TV news.

Applicants state that if they were forced to divest WZDX, the station would fail.[301] But as we have explained in each case above with respect to this same argument about stations in the larger DMAs, Applicants offer no concrete, sufficient evidence for this claim.

In sum, Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the Huntsville DMA. The Transaction would give Nexstar too much market power in the Huntsville Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets. Taking advantage of that market power is Applicants' driving financial motivation for the whole Transaction. They have failed to meet their burden to show that there would be any cognizable public interest benefits offsetting the public interest harms from the proposed reduction in the number of broadcast competitors and this further concentration of the relevant product markets in the Huntsville DMA. Applicants' claimed benefits are not merger-specific or verifiable, and the Transaction is "presumptively unlawful" under existing DOJ guidelines,[302] while Nexstar's reacquisition of stations it previously divested to TEGNA is specifically prohibited by DOJ's 2020 settlement over Nexstar's purchase of Tribune.[303] Therefore, the Commission should deny the transfer application for WZDX; or in the alternative, deny Applicants' waiver request in the Huntsville-Decatur (Florence) DMA.

---

[301] *Id.* at 105.

[302] Horizontal Merger Guidelines at 6.

[303] *U.S. v. Nexstar* Final Judgment at 17–18.

123

**App.528**

REDACTED – FOR PUBLIC INSPECTION

### 22. Ft. Smith-Fayettville-Springdale-Rodgers, AR

The Ft. Smith-Fayettville-Springdale-Rodgers, AR Designated Market Area is the 95th-largest U.S. TV market, with approximately 363,000 TV households. Nexstar currently owns KFTA (FOX), KNWA (NBC), and KXNW (MyNetworkTV) while TEGNA owns KFSM (CBS). All three of Nexstar's stations in this DMA and TEGNA's KFSM broadcast over the UHF band.[304] Therefore this DMA currently contributes 0.3 percentage points towards Nexstar's National Cap limit of 39 percent, just as it would after the merger too.

Nexstar's current control of two top four-ranked Big 4 affiliates is an example of the Commission's failure to enforce the spirit of its multiple ownership rules. Nexstar acquired KFTA (then KFAA) and KNWA (then KPOM) in 2004.[305] At the time these two stations were satellites, both carrying NBC programming, with some differences in advertisements. In 2006, Nexstar turned KFAA into a Fox affiliate, taking the affiliation away from a Class-A station, whose contract allowed Fox to move to a full-power station if it gave 90 days notice. It rebranded the station as KFTA, while it maintained the NBC affiliation on KPOM, which was rebranded as KNWA.[306] Nexstar then arranged for its main sidecar company—Mission Broadcasting—to acquire KFTA's license.[307] However, Nexstar retained ownership over the

---

[304] Illustrating just how backwards the UHF discount is, as UHF's digital signal propagation characteristics are superior to VHF's, all of the commercial stations in the Ft. Smith DMA are UHF stations.

[305] Mary L. Crider, "NBC Affiliate Shifts Operations: Area Shows Canceled," *Times Record* (Feb. 24, 2004).

[306] Ben Bouldin, "Fox Switch Planned Monday: KPBI Changing to MyNetwork," *Times Record* (Aug. 26, 2006).

[307] Lance Turner, "Nexstar to Sell Fort Smith TV Station for $5.6 Million," *Arkansas Business* (Apr. 19, 2006).

124

**REDACTED – FOR PUBLIC INSPECTION**

non-license assets, the typical method Nexstar and other large broadcasting chains use to operate additional stations without running afoul of the Commission's multiple ownership rule.

While blessing this arrangement in early 2008, the Commission still sanctioned Nexstar for making false claims on its transfer application.[308] However, Nexstar and Mission never consummated the license transfer, and Nexstar simply operated the station pursuant to the prior satellite-pair duopoly waiver. This satellite waiver thus gave Nexstar the ability to acquire KXNW (MyNetworkTV) from Tribune in 2019, while spinning off KFSM (CBS) to TEGNA.[309]

Nexstar's operations in Ft. Smith provide a clear example of how it turns previously independent local newsrooms into top-down operations controlled by distant corporate managers. All three of Nexstar's stations in this market share a single website, as is the case in other markets where Nexstar operates two or more local news stations. Prior to Nexstar's 2019 acquisition of KXNW (MyNetworkTV), the station aired a newscast produced by the KFSM (CBS). That broadcast was replaced by a 7 p.m. newscast produced by Nexstar, following the close of the Tribune deal. Though that change did not represent a loss of a unique news-producing voice in the Ft. Smith DMA, it does serve to illustrate the inherent absurdity of the Commission allowing Nexstar to purchase one of its closest competitors in the Ft. Smith DMA and in other U.S. local TV news markets. These kinds of deals invariably lead to more news duplication, not more investment in original reporting and journalism.

---

[308] John Eggerton, "FCC Won't Deny Nexstar-Mission Fort Smith, Ark., Sale," *Broadcasting & Cable* (Mar. 3, 2008).

[309] Prior to acquiring the stations' licenses, Nexstar operated these stations under a Time Brokerage Agreement with then-owner Griffin Communications. One of Nexstar's first moves was to relocate the main facilities to Fayetteville from Ft. Smith, and cancel these stations' only two local public affairs shows. *See* Crider, *supra* note 305.

125

**REDACTED – FOR PUBLIC INSPECTION**

Applicants state that the Hearst-owned KHBS (ABC) is the top-rated station in the market (according to Nielsen data; Applicants do not specify the time period).[310] However, according to CommScore data Free Press obtained (via S&P Global), for the full year of 2024 KFSM (CBS, TEGNA) had the highest average rating, followed by KNWA (NBC, Nexstar), KHBS (ABC, Hearst), KFTA (FOX, Nexstar), and KXNW (MyNetworkTV, Nexstar).[311]

Regardless of the ratings and rankings, this market is already highly concentrated, with a total local TV market revenue HHI of ██. Nexstar's acquisition of KFSM would increase this to an extraordinary HHI of ██, giving Nexstar control of nearly █ percent of the local TV ad and retransmission consent revenue in the Ft. Smith DMA. Nexstar's control over the market's retransmission revenues would be far greater, with the HHI changing from ██ to ██, and Nexstar controlling nearly ██████████ of retransmission consent revenue in the Ft. Smith DMA; and that's before it exercises the newfound market power that the Transaction would bestow on the post-merger entity to extract even more from pay-TV subscribers.

When asking for a waiver of the Local Multiple Ownership rule in this DMA, Applicants trot out their core argument that this consolidation "will provide these stations with the scale needed in the Ft. Smith DMA to take on the technology and media companies that are siphoning revenue away from local stations."[312] The bottom line is that Nexstar is proposing to control three of the four local TV stations airing English-language news in the Ft. Smith DMA, and hopes to control three of the four "Big 4" network affiliates as well. From this remarkable starting point, Applicants bizarrely state that this deal yielding a nearly ██ point increase in

---

[310] Application at 106.

[311] Justin Nielson, "US TV station average household ratings continue descent in Q3 2025, *S&P Global Market Intelligence* (Nov. 07, 2025).

[312] Application at 107

126

**App.531**

REDACTED – FOR PUBLIC INSPECTION

HHI would " enhance competition in the Ft. Smith DMA."[313] Their rationale for how the post-merger Nexstar would "take on" these tech companies (which do <u>not</u> operate in the relevant local TV spot advertising product market) is unconvincing, and paints a picture not materially different from the *status quo*.[314] There's no mention of <u>lower</u> unit ad pricing from this supposed increase in competition, nor any economic data or analysis on how this station acquisition would impact other firms that sell digital advertising. There's no suggestion of how these purported competitors would respond to Nexstar's growth in Ft. Smith, nor how their customers would respond if at all. Claims that the Transaction would enable better competition with firms that do <u>not</u> operate in the Ft. Smith local TV spot advertising, local TV news, broadcast labor, and retransmission consent markets are non-cognizable. Efficiencies have to be related to the product market in which competition is being reduced; efficiencies that would impact competition with out-of-market firms, such as the "technology and media companies" Applicants cite, are not cognizable.[315]

Applicants imply that if they were forced to divest any of the smaller stations in this DMA to come into compliance with the Commission's rules, KFTA, KNWA, and/or KXNW would fail.[316] But as we have explained in each case above with respect to this same argument about stations in the larger DMAs, Applicants offer no concrete, sufficient evidence for this claim.

---

[313] *Id.* at 106.

[314] *See id.* at 108 ("[The] combined entity will be able to offer more attractive packages to advertisers that include additional broadcast inventory across a wider range of programs reaching different viewer demographics with targeted digital impressions on FAST/CTV channels and other digital platforms.").

[315] *See supra* note 137 (explaining that courts do not consider out-of-market efficiencies cognizable, requiring merger efficiencies from competition <u>in the relevant product market</u>).

[316] Application at 109–10.

127

REDACTED – FOR PUBLIC INSPECTION

Therefore, Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the Ft. Smith market. The Transaction would give Nexstar too much market power in the Ft. Smith Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets. Taking advantage of that market power is Applicants' driving financial motivation for this entire Transaction. They have failed to meet their burden to show that there would be <u>any</u> cognizable public interest benefits offsetting the public interest harms from the proposed reduction in the number of broadcast competitors and this further concentration of the relevant product markets in the Ft. Smith-Fayettville-Springdale-Rodgers DMA. Applicants' claimed benefits are not merger-specific or verifiable, and the Transaction is "presumptively unlawful" under existing DOJ guidelines,[317] while Nexstar's reacquisition of stations it previously divested to TEGNA is specifically prohibited by DOJ's 2020 settlement over Nexstar's purchase of Tribune.[318]

Therefore, the Commission should deny the transfer application for Ft. Smith; or in the alternative, deny Applicants' waiver request in the Ft. Smith DMA. What's more, the Commission should revisit its prior grandfathering of Nexstar's satellite station waiver in this market,[319] as Nexstar does not operate KNWA (NBC) and KFTA (FOX) stations as a satellite (*i.e.* repeating) station pair, but as two uniquely affiliated stations.

### 23. Davenport, IA-Rock Island-Moline, IL

The Davenport, IA-Rock Island-Moline, IL Designated Market Area is the 105th-largest U.S. TV market, with approximately 300,000 TV households. Nexstar currently owns the third

---

[317] Horizontal Merger Guidelines at 6.

[318] U.S. v. Nexstar Final Judgment at 17–18.

[319] *Nexstar-Tribune Order* ¶5 & n.20.

128

**REDACTED – FOR PUBLIC INSPECTION**

highest-ranked station in the market, WHBF (CBS); as well as KGCW (CW), the market's fifth-ranked station.[320] However, though it did not disclose this in the Application, Nexstar exerts meaningful control over an additional station in Davenport that is licensed to its sidecar company, Mission Broadcasting.[321] Nexstar programs Mission's KLJB (FOX), and owns the non-license assets of this fourth highest-ranked station in the DMA. The two Nexstar stations and Mission's station all share a single website, something unusual for stations owned by two supposedly competing news firms.[322]

In addition to these three stations that it operates in Davenport, Nexstar seeks to acquire the TEGNA-owned WQAD (ABC), Davenport's second highest-ranked station. WHBF transmits over VHF digital channel 4. Therefore, the Davenport DMA currently contributes 0.2 percentage points towards Nexstar's National Cap limit of 39 percent.

Data from 2024 indicates that the Davenport DMA is already highly concentrated, and that's before even considering Nexstar's control over an unknown portion of Mission Broadcasting's local TV spot advertising and retransmission consent revenues in Davenport. The total local TV market revenue-based HHI during 2024 was ███. Nexstar's acquisition of WQAD would increase that total market revenue HHI figure to ███, with Nexstar holding the licenses to the stations responsible for just under ███ of the combined local TV spot ad and retransmission revenue consent revenues in the Davenport DMA. Nexstar's control over the DMA's retransmission consent revenues would be even higher, with the HHI increasing from

---

[320] Application at 94.

[321] *See supra* note 287 and accompanying text for an explanation of why the SEC treats such stations as "Variable Interest Entities" under Nexstar's control.

[322] The single website for Nexstar's and Mission's Davenport stations is https://www.ourquadcities.com/.

129

**App.534**

REDACTED – FOR PUBLIC INSPECTION

███ to ███, and Nexstar's share from its FCC-licensed stations increasing to well above █ percent.

Though the Commission still refuses to consider Variable Interest Entity sidecars as attributable for purposes of the local and national ownership rules, Nexstar's control over the programming and revenues of Mission's station is absolutely germane to the Commission's public interest analysis here. If we attributed 100 percent of the Mission station's revenues to Nexstar, the total local TV market revenue-based HHI for Davenport would go from ███ to ███, with Nexstar bringing in over █ percent of the Local Broadcast TV Spot Advertising and retransmission consent revenues in the DMA. Under this attribution, Nexstar's control over the market's retrans revenues would be even greater, with the HHI changing from ███ to ███, and Nexstar's share increasing to ██████ of these revenues. Nexstar's actual revenues from Mission remain unknown, but are likely significant. The Commission should demand this information from Applicants, and should also conduct a thorough investigation to determine if Nexstar has *de facto* control over Mission's FCC license.

As in all of the earlier discussed DMAs, Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the combination of Nexstar's CBS and CW affiliates with TEGNA's ABC affiliate. They make the exact same kind of unsupported and uncognizable claims that we have outlined and refuted for the above DMAs, regarding trickle-down investments in journalism and supposed competition with media and tech companies outside of the relevant local broadcast TV product market. And their rote assertions about improved ATSC 3.0 rollout, programming distribution rights, and corporate charity are not merger-specific.

130

**App.535**

REDACTED – FOR PUBLIC INSPECTION

TEGNA's ABC affiliate has a robust local news operation and appears to be highly viewed.[323] And Nexstar's two licensed stations plus the Mission Broadcasting station that Nexstar operates are all also highly viewed and appear to be in good operational and financial condition.[324] We yet again fully expect that TEGNA would continue to produce local news for WQAD in the absence of this Transaction, and that Nexstar would continue to compete against TEGNA's news coverage with programming produced for the three Davenport DMA stations Nexstar operates. If Nexstar were allowed to form a full-power triopoly (and a *de facto* quadopoly due to KLJB), that would not result in an increase in the number of news-producing stations in the market, and would instead reduce the number of stations independently competing to produce local broadcast TV news.

Applicants imply that if they were forced to divest KGCW, the station would fail.[325] But as we have explained in each case above with respect to this same argument about stations in the larger DMAs, Applicants offer no concrete, sufficient evidence for this claim.

Therefore, Applicants have not met the standard for a waiver of the Local Multiple Ownership rule in the Davenport DMA. The Transaction would give Nexstar too much market power in the Davenport Broadcast TV Spot Advertising, local TV news, broadcast labor, and retransmission consent markets. Taking advantage of that market power is Applicants' driving financial motivation for the entire Transaction. They have failed to meet their burden to show that there would be <u>any</u> cognizable public interest benefits offsetting the public interest harms

---

[323] Applicants state that WQAD is the market's second-ranked station. *See* Application at 110.

[324] Applicants state that WHBF is the market's third-ranked station, while KGCW is ranked fifth. Mission's KLJB FOX affiliate is ranked fourth. *See id*.

[325] *Id.* at 113.

131

REDACTED – FOR PUBLIC INSPECTION

from the proposed reduction in the number of broadcast competitors and this further concentration of the relevant product markets in the Davenport, IA-Rock Island-Moline, IL DMA. Applicants' claimed benefits are not merger-specific or verifiable, and the transaction is "presumptively unlawful" under existing DOJ guidelines,[326] while Nexstar's reacquisition of stations it previously divested to TEGNA is specifically prohibited by DOJ's 2020 settlement over Nexstar's purchase of Tribune.[327] Therefore, the Commission should deny the transfer application for WQAD; or in the alternative, deny Applicants' waiver request in the Davenport, IA-Rock Island-Moline, IL DMA.

### 24. Austin, TX

The Austin, TX Designated Market Area is the 32nd-largest U.S. TV market, with over one million TV households. Nexstar currently owns Austin's top-ranked station, KXAN (NBC/ION), as well KNVO (Ind.). In addition, Nexstar operates KNVA (CW), a station licensed to a Nexstar sidecar company (Vaughn Media). All three stations broadcast from the same facilities. TEGNA currently owns KVUE (ABC), Austin's second highest-ranked station. Though Nexstar would control a full-power triopoly (and *de facto* full-power quadopoly) in the Austin DMA that is prohibited under the Commission's rules, Applicants did not request a waiver of this rule for the Austin market, presuming that a previous satellite station waiver would continue.[328] However, because Nexstar operates KXAN and KNVO as uniquely programmed stations, the previously granted satellite waiver should not carry over into this current Transaction.

---

[326] Horizontal Merger Guidelines at 6.

[327] *U.S. v. Nexstar* Final Judgment at 17–18.

[328] *See* Application, Attachment B, at 3–4.

132

**App.537**

REDACTED – FOR PUBLIC INSPECTION

The Application is therefore incomplete, and the Commission should require Nexstar to make a public interest showing as to why a waiver of the Local Multiple Ownership rule would be justified in the Austin DMA. In the alternative, the Commission could deny the transfer request for KVUE on the basis of this incomplete showing alone. In the end, the Commission should deny these transfer requests on the merits dictating denial for all of the aforementioned DMAs. This is because post-merger Nexstar would control more than ▓▓ of the Austin DMA's combined local broadcast TV gross advertising and retransmission revenues (see Figure 1 above). That level of control is unfathomable, and clearly worse for the public interest when compared to the *status quo* where Nexstar and TEGNA compete head-to-head in Austin.

### 25. Waco-Temple-Bryan, TX

The Waco-Temple-Bryan, TX Designated Market Area is the 83rd-largest U.S. TV market, with over 420,000 TV households. Nexstar currently owns KWKT (FOX) as well KYLE (MyNetworkTV). TEGNA currently owns KCEN (NBC) and its low-power satellite KAGS-LD (NBC). Though Nexstar would form a full-power triopoly in the Waco DMA that is prohibited under the Commission's rules, Applicants did not request a waiver of this rule for the Waco market, based on KYLE's satellite status. However, shortly after it acquired its stations, Nexstar converted KYLE into a full-time affiliate of MyNetworkTV in 2015.[329] Because KYLE no longer functions as a satellite, the previously granted waiver should not carry over into this current transaction.

The Application is therefore incomplete, and the Commission should require Nexstar to make a public interest showing as to why a waiver of the Local Multiple Ownership rule would be justified in the Waco DMA. In the alternative, the Commission could deny the transfer

---

[329] *See* "Nexstar Broadcasting's KYLE-TV to Launch as MyNetworkTV Affiliate," Nexstar Media Group (May 8, 2015).

133

**App.538**

REDACTED – FOR PUBLIC INSPECTION

requests for KCEN and KAGS-LD on the basis of this incomplete showing alone. In the end, the Commission should deny this transfer request on the merits dictating denial for all of the aforementioned DMAs. This is because post-merger Nexstar would control nearly ▉ percent of the Waco DMA's combined local broadcast TV gross advertising and retransmission revenues (see Figure 1 above). That level of control is unfathomable, and clearly worse for the public interest when compared to the *status quo* where Nexstar and TEGNA compete head-to-head in Waco.

### C. The Transaction Would Not Serve the Public Interest in Other Local Markets Where Nexstar Would Form New *De Jure* and *De Facto* Top Four-Ranked Duopolies and Triopolies.

We now turn to Applicants' license transfer requests in the remaining DMAs where they have not made requests for waivers of the National Multiple Ownership Rule or the Local Multiple Ownership Rule.

We begin by noting that Nexstar's use of so-called "sidecar" companies to avoid triggering the Commission's ownership rules means that it can assert that it need not seek waivers of the Local Multiple Ownership rule in six additional overlapping DMAs.[330] In four of these six overlapping markets, Nexstar operates, and also owns the non-license assets for,

---

[330] These six DMAs are: Austin, TX; Abilene-Sweetwater, TX; Odessa-Midland, TX; Tyler-Longview (Lufkin & Nacogdoches), TX; San Angelo, TX; and Wilkes Barre-Scranton-Hazleton, PA.

134

**App.539**

**REDACTED – FOR PUBLIC INSPECTION**

stations technically owned by Mission Broadcasting.[331] But the supposed independence of Mission from Nexstar is nothing more than a carefully constructed illusion. Indeed the Commission found just last year that Nexstar exercised *de facto* control over a Mission-licensed station (WPIX) without FCC consent.[332]

In Abilene, Nexstar currently owns and operates KTAB (CBS), the market's top-rated station.[333] Nexstar also operates Mission's KRBC (NBC), the market's third highest-ranked station. Nexstar proposes to acquire TEGNA's KXVA (FOX), the market's fourth highest-ranked station. That would leave only Sinclair's ABC affiliate (KTXS) to compete in the Abilene local TV news market and Big 4 affiliate retrans market against a Nexstar CBS-FOX-NBC triopoly. Post-merger Nexstar would control nearly ▨ of the market's combined local broadcast TV gross advertising and retransmission revenues (see Figure 1 above), and that's without considering the sidecar station revenues Nexstar earns. That level of control is unfathomable, and clearly worse for the public interest when compared to the *status quo* in Abilene, where Nexstar, Sinclair and TEGNA are nominal competitors. Therefore the Commission should deny the license transfer request for KXVA.

---

[331] These are KRBC (NBC) in Abilene-Sweetwater; KPEJ (FOX) in Odessa-Midland; KSAN (NBC) in San Angelo; and WYOU (CBS) in Wilkes Barre-Scranton-Hazleton, PA. There are five DMAs not involved in the Transaction where Nexstar operates three affiliates due to its use of Mission as a sidecar. These are Springfield, MO; Shreveport, LA; Amarillo, TX; Wichita Falls, TX & Lawton, OK; and Albuquerque-Santa Fe, NM. Nexstar also operates Big 4 affiliated duopolies in an additional 12 DMAs through its use of Mission as a side car. These are Providence, RI-New Bedford, MA; Albany-Schenectady-Troy, NY; Burlington, VT-Plattsburgh, NY; Grand Junction-Montrose, CO; Lansing, MI; Rockford, IL; Lubbock, TX; Monroe, LA-El Dorado, AR; Joplin, MO-Pittsburg, KS; Erie, PA; Terre Haute, IN; and Billings, MT.

[332] *In the Matter of Mission Broadcasting, Inc., Licensee of Station WPIX, New York, NY, Nexstar Media Group, Inc.*, Notice of Apparent Liability For Forfeiture, 39 FCC Rcd 3676 (2024).

[333] Application, Attachment B, at 27.

135

**App.540**

**REDACTED – FOR PUBLIC INSPECTION**

In Odessa-Midland, Nexstar currently owns and operates KMID (ABC), the market's fourth highest-rated station.[334] Nexstar also operates Mission's KPEJ (FOX). Nexstar proposes to acquire TEGNA's KWES (NBC), the market's third highest-ranked station. That would leave only Gray Media to compete in the Odessa-Midland English language local TV news market and Big 4 affiliate retrans market against a Nexstar ABC-FOX-NBC triopoly. Post-merger Nexstar would control nearly ▆▆ of the market's combined local broadcast TV gross advertising and retransmission revenues (see Figure 1 above), and that's without considering the sidecar station revenues Nexstar earns. That level of control is unfathomable, and clearly worse for the public interest when compared to the *status quo* in Odessa-Midland, where Gray, Nexstar and TEGNA are nominal competitors. Therefore the Commission should deny the license transfer request for KWES.

In San Angelo, Nexstar currently owns and operates KLST (CBS), and also operates KSAN, an NBC affiliate licensed to Mission Broadcasting. Nexstar proposes to acquire TEGNA's KIDY (FOX/MyNetworkTV). That would leave only Sinclair's low-power ABC affiliate, KTXE-LS, to compete in the San Angelo English language local TV news market and Big 4 affiliate retrans market against a Nexstar CBS-FOX-NBC triopoly. In fact, post-Transaction, Nexstar would operate all three of the full-power TV stations licensed to the San Angelo DMA. Post-merger Nexstar would control ▆▆▆▆ of the market's combined local broadcast TV gross advertising and retransmission revenues (see Figure 1 above), and that's without considering the sidecar station revenues Nexstar earns. That level of control is unfathomable, and clearly worse for the public interest when compared to the *status quo* in San

---

[334] *Id.*, Attachment B, at 24.

136

**App.541**

REDACTED – FOR PUBLIC INSPECTION

Angelo, where Nexstar, Sinclair and TEGNA are nominal competitors. Therefore the Commission should deny the license transfer request for KIDY.

In the Wilkes Barre DMA, Nexstar currently owns and operates WBRE (NBC), the market's second highest-rated station.[335] Nexstar also operates Mission's WYOU (CBS), the market's third highest-ranked station. Nexstar proposes to acquire TEGNA's WNEP (ABC), the market's top-ranked station. That would leave only the stations that Sinclair operates under service agreements (WOLF, ABC; WQMY, MyNetworkTV; and WSWB, CW) to compete in the Wilkes Barre local TV news market and Big 4 affiliate retrans market against a Nexstar ABC-CBS-NBC triopoly. Post-merger Nexstar would control ◼ percent of the market's combined local broadcast TV gross advertising and retransmission revenues (see Figure 1 above), and that's without considering the sidecar station revenues Nexstar earns. That level of control is unfathomable, and clearly worse for the public interest when compared to the *status quo* in Wilkes Barre, where Nexstar, Sinclair and TEGNA are nominal competitors. Therefore the Commission should deny the license transfer request for WNEP.

In addition to these four overlapping DMAs where Nexstar operates Mission Broadcasting affiliates, Nexstar also seeks to form a *de facto* CBS-FOX-NBC triopoly in the Tyler-Longview (Lufkin & Nacogdoches), TX DMA, where it operates the market's fourth highest-ranked station, KFXK (FOX), licensed to White Knight Broadcasting.[336] Though it did not disclose this in the Application, Nexstar exerts meaningful control over White Knight Broadcasting and KFXK. The Securities and Exchange Commission considers White Knight

---

[335] Application, Attachment B, at 15.

[336] Application, Attachment B, at 21. Nexstar also operates White Knight's other FCC-licensed station, WVLA (NBC) in the Baton Rouge, LA DMA. In that market Nexstar also owns the FOX affiliate (WGMB), and two Class-A stations (WBRL-CD, CW; KZUP-CD, Independent).

137

**App.542**

REDACTED – FOR PUBLIC INSPECTION

Broadcasting to be a "Variable Interest Entity" of Nexstar's. This is because Nexstar is "deemed under U.S. GAAP to have controlling financial interest" in White Knight Broadcasting.[337] In addition to this station, Nexstar also owns and operates KETK (NBC), the market's third highest-ranked station, and seeks to acquire TEGNA's KYTK (CBS/CW), the market's second-ranked station.[338] That would leave only Gray Media's ABC-affiliated satellite pair (KLTV/KTRE) to compete in the Tyler-Longview English language local TV news market and Big 4 affiliate retrans market against a Nexstar CBS-FOX-NBC triopoly. Post-merger Nexstar would control over ▨ of the market's combined local broadcast TV gross advertising and retransmission revenues (see Figure 1 above), and that's without considering the sidecar station revenues Nexstar earns. That level of control is unfathomable, and clearly worse for the public interest when compared to the *status quo* in Tyler, where Gray, Nexstar and TEGNA are nominal competitors. Therefore the Commission should deny the license transfer request for KYTK.

Nexstar also seeks to form a *de facto* quadpoly in the Austin, TX DMA, where it operates the market's CW affiliate, KNVA (CW), licensed to Vaughn Media.[339] In Part V.B above, we discussed Applicants' failure to seek a Local Multiple Ownership rule waiver in this DMA based on its earlier satellite station waiver. Here we note as well that Nexstar exerts meaningful control over Vaughn Media and KNVA, for the same reasons outlined above for the Mission and White Knight sidecar companies. In addition to this station, Nexstar also owns Austin's top-ranked

---

[337] Nexstar 2024 Form 10-K, at F-8–F-9.

[338] Application, Attachment B, at 20.

[339] Application, Attachment B, at 4, note 349. Nexstar also operates Vaughn Media's other FCC-licensed stations. In the Dayton, OH DMA Nexstar operates Vaughn's WBDT (CW) alongside its owned NBC affiliate (WDTN). In Youngstown, OH Nexstar operates Vaughn's ABC affiliate (WYTV) alongside Nexstar's WKBN (CBS) and WFYX-LD (FOX). In the Topeka, KS DMA Nexstar operates Vaughn's ABC affiliate (KTKA) alongside Nexstar's NBC and FOX affiliated stations (KSNT and KTMJ-CD).

138

**REDACTED – FOR PUBLIC INSPECTION**

station, KXAN (NBC/ION), as well KNVO (Ind.), and seeks to acquire TEGNA's KVUE (ABC), Austin's second highest-ranked station.[340] That would leave only Fox Corp.'s owned-and-operated affiliate and Sinclair's KEYE (CBS) to compete in the Austin, TX English language local TV news market and Big 4 affiliate retrans market against Nexstar's *de facto* quadopoly. Post-merger Nexstar would control ▮▮▮▮ of the market's combined local broadcast TV gross advertising and retransmission revenues (see Figure 1 above), and that's without considering the sidecar station revenues Nexstar earns. That level of control in a market with over one million TV households is unfathomable, and clearly worse for the public interest when compared to the *status quo* in Austin, where Fox, Nexstar, Sinclair and TEGNA are nominal competitors. Therefore the Commission should deny the license transfer request for KVUE.

We have now accounted for the proposed transfers in 30 of the 35 overlapping DMAs. In each of the five remaining overlapping DMAs, Nexstar seeks Commission approval to form new top four-ranked duopolies. Though the Commission's rules do not expressly prohibit these duopolies, Petitioners believe that these license transfers would not serve the public interest, as they would allow Nexstar to concentrate the local TV news, local TV spot advertising, local TV broadcast labor, and local retransmission consent markets to such a high level that it would undermine competition, localism, and diversity in these communities.

The Sacramento-Stockton-Modesto, Designated Market Area is the 20th-largest U.S. TV market, with over 1.5 million TV households. Nexstar currently owns the market's fourth highest-ranked station, KTXL (FOX).[341] TEGNA owns KXTV (ABC), the market's number

---

[340] *Id.*, Attachment B, at 20.

[341] *Id.*, Attachment B, at 1.

139

**App.544**

**REDACTED – FOR PUBLIC INSPECTION**

three-ranked station.[342] Data from 2024 indicates that the Sacramento DMA is already highly concentrated, with a total local TV market revenue-based HHI of ▨▨. Nexstar's acquisition of KXTV would increase this total market revenue HHI figure to ▨▨, with Nexstar controlling over ▨ percent of the combined local TV spot advertising and retransmission consent market revenues in the Sacramento DMA. Nexstar's control over the DMA's retransmission revenues alone would be even greater, with the HHI increasing from ▨▨ to ▨▨, with Nexstar's share of Sacramento's retransmission consent revenues increasing to well over ▨ percent. Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the formation of this duopoly. Therefore, the Commission should deny the transfer application for KXTV.

The Columbus, OH Designated Market Area is the 34th-largest U.S. TV market, with over 1 million TV households. Nexstar currently owns the market's third highest-ranked station, WCMH (NBC).[343] TEGNA owns WBNS (CBS), the market's number two-ranked station.[344] Data from 2024 indicates that the Columbus, OH DMA is already highly-concentrated, with a total local TV market revenue-based HHI of ▨▨. Nexstar's acquisition of WBNS would increase that total market revenue HHI to ▨▨, with Nexstar controlling nearly ▨ percent of the combined local TV spot ad market and retransmission consent market revenues in the Columbus, OH DMA. Nexstar's control over the DMA's retransmission revenues alone would be even greater, with this HHI changing from ▨▨ to ▨▨, and Nexstar's share of Columbus, Ohio's retransmission consent revenues increasing to nearly ▨ percent. Applicants fail to

---

[342] *Id.*

[343] *Id.*, Attachment B, at 7.

[344] *Id.*

140

**App.545**

**REDACTED – FOR PUBLIC INSPECTION**

provide concrete evidence of any cognizable public interest benefits that would arise from the formation of this duopoly. Therefore, the Commission should deny the transfer application for WBNS.

The Harrisburg-Lancaster-Lebanon-York, PA Designated Market Area is the 42nd-largest U.S. TV market, with over 800,000 TV households. Nexstar currently owns the market's third highest-ranked station, WHTM (ABC).[345] TEGNA owns WPMT (FOX), the market's number four-ranked station.[346] Data from 2024 indicates that the Harrisburg DMA is already highly concentrated, with a total local TV market revenue-based HHI of ▨▨. Nexstar's acquisition of WPMT would increase this total market revenue HHI figure to ▨▨, with Nexstar controlling nearly ▨ of the combined local TV spot advertising market and retransmission consent market revenues in the Harrisburg DMA. Nexstar's control of the market's retransmission revenues would be even greater, with the HHI changing from ▨▨ to ▨▨, and Nexstar's share of Harrisburg's retransmission consent revenues exceeding ▨ percent. Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the formation of this duopoly. Therefore, the Commission should deny the transfer application for WPMT.

The Greensboro-High Point-Winston Salem, NC Designated Market Area is the 47th-largest U.S. TV market, with nearly 800,000 TV households. Nexstar currently owns the market's third highest-ranked station, WGHP (ABC).[347] TEGNA owns WFMT (CBS), the market's number two-ranked station.[348] Data from 2024 indicates that the Greensboro DMA is already highly concentrated, with a total local TV market revenue-basedHHI of ▨▨. Nexstar's

---

[345] *Id.*, Attachment B, at 9.

[346] *Id.*

[347] *Id.*, Attachment B, at 12.

[348] *Id.*

REDACTED – FOR PUBLIC INSPECTION

acquisition of WFMT would increase that total market revenue HHI figure to ▨▨, with Nexstar controlling ▨▨▨▨▨ of the combined local TV spot advertising market and retransmission consent market revenues in the Greensboro DMA. Nexstar's control of the market's retransmission revenues would be just as high, with the HHI changing from ▨▨ to ▨▨, and Nexstar's share of Greensboro's retransmission consent revenues increasing to nearly ▨ percent. Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the formation of this duopoly. Therefore, the Commission should deny the transfer application for WFMT.

The Knoxville, TN Designated Market Area is the 61st-largest U.S. TV market, with nearly 600,000 TV households. Nexstar currently owns the market's third highest-ranked station, WATE (ABC).[349] TEGNA owns WBIR (NBC), the market's highest-ranked station.[350] Data from 2024 indicates that the Knoxville DMA is already highly concentrated, with a total local TV market revenue-based HHI of ▨▨. Nexstar's acquisition of WBIR would increase this total market revenue HHI figure to ▨▨, with Nexstar controlling nearly ▨▨ of the combined local TV spot advertising market and retransmission consent market revenues in the Knoxville DMA. Nexstar's control of the market's retransmission revenues would be just as high, with that HHI changing from ▨▨ to ▨▨, and Nexstar's share of Knoxville's retransmission consent revenues increasing to nearly ▨ percent. Applicants fail to provide concrete evidence of any cognizable public interest benefits that would arise from the formation of this duopoly. Therefore, the Commission should deny the transfer application for WBIR.

---

[349] Id., Attachment B, at 18.

[350] Id.

142

**App.547**

REDACTED – FOR PUBLIC INSPECTION

## VI.    CONCLUSION

For all of the foregoing reasons, the Commission should deny the Application in its entirety, and specifically deny the applications for consent to transfer licenses in violation of the National Multiple Ownership rule and the Local Ownership rule, including the waivers related thereto. Grant of the license transfers proposed in the Transaction decidedly could not and would not serve the public interest, convenience, and necessity.

Respectfully Submitted,

Cheryl Leanza
**United Church of Christ**
 **Media Justice Ministry**
100 Maryland Avenue, NE
Suite 330
Washington, DC 20002

S. Derek Turner, Senior Advisor
Matthew F. Wood, VP of Policy
**Free Press**
1025 Connecticut Avenue, NW
Suite 1110
Washington, DC 20036
202-265-1490

John Bergmayer
**Public Knowledge**
1818 N Street, NW
Suite 410
Washington, DC 20036

Nell Geiser
Ceilidh Gao
**Communications Workers of America**
501 Third Street, NW
Washington, DC 20001

December 31, 2025

143

**App.548**

**AFFIDAVIT**

This Petition to Deny by Free Press, the National Association of Broadcast Employees and Technicians - Communications Workers of America ("NABET-CWA"), The NewsGuild - Communications Workers of America ("TNG-CWA"), and the United Church of Christ Media Justice Ministry ("UCC Media Justice"), along with Public Knowledge, was prepared using facts of which I have personal knowledge or upon information provided to me.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge, and belief.

 Matthew F. Wood            

Vice President of Policy & General Counsel
Free Press
1025 Connecticut Avenue, NW
Suite 1110
Washington, DC 20036

202-265-1490

December 31, 2025

144

**CERTIFICATE OF SERVICE**

I, Matthew F. Wood, certify that on December 31, 2025, I caused a true and correct copy

of the foregoing Petition to Deny, in full and in redacted for public inspection form, to be served

via electronic mail on the following:

Jennifer A. Johnson
Jocelyn Jezierny
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
jjohnson@cov.com
JJezierny@cov.com
*Counsel for TEGNA Inc.*

Kathleen A. Kirby
Ari Meltzer
Wiley Rein LLP
2050 M Street, NW
Washington, DC 20036
KKirby@wiley.law
ameltzer@wiley.law
*Counsel for Nexstar Media Inc.*

Michael Beder, Esq.
Associate General Counsel
TEGNA Inc.
8350 Broad Street
Suite 2000
Tysons, VA 22102
mbeder@tegna.com

Rachel Morgan
EVP/General Counsel & Corp. Sec'y
Nexstar Media Group, Inc.
545 E. John Carpenter Freeway
Suite 700
Irving, TX 75062
rmorgan@nexstar.tv

David Brown
Chief, Video Division
Media Bureau
Federal Communications Commission
45 L Street, NE
Washington, DC 20554
David.Brown@fcc.gov

Chris Robbins
Deputy Chief, Video Division
Media Bureau
Federal Communications Commission
45 L Street, NE
Washington, DC 20554
Chris.Robbins@fcc.gov

145

**App.550**

Emily Harrison
Video Division
Media Bureau
Federal Communications Commission
45 L Street, NE
Washington, DC 20554
Emily.Harrison@fcc.gov

Jim Bird
Transaction Team
Office of General Counsel
Federal Communications Commission
45 L Street, NE
Washington, DC 20554
Jim.Bird@fcc.gov


  Matthew F. Wood              
Free Press


December 31, 2025

146

**App.551**

REDACTED – FOR PUBLIC INSPECTION

**APPENDIX A: Pre- and Post-Transaction DMAs and National Reach**

**Figure A1:**
**Nexstar Media Group: Pre-Merger Reach of U.S. TV Households (2025–2026)**

| | Nexstar's Pre-Transaction Reach (Licensed Stations) | | |
|---|---|---|---|
| DMA Rank | Designated Market Area | Actual Reach | Discounted Reach (if applicable) |
| 2 | Los Angeles, CA | 4.6% | 2.3% |
| 3 | Chicago, IL | 2.9% | 1.5% |
| 4 | Dallas-Ft. Worth, TX | 2.6% | 1.3% |
| 5 | Philadelphia, PA | 2.5% | 1.2% |
| 6 | Houston, TX | 2.3% | 1.1% |
| 8 | Washington, DC (Hagerstown, MD) | 2.1% | 1.1% |
| 9 | San Francisco-Oakland-San Jose, CA | 2.0% | 2.0% |
| 11 | Tampa-St.Petersburg (Sarasota), FL | 1.8% | 1.8% |
| 17 | Denver, CO | 1.4% | 0.7% |
| 19 | Cleveland-Akron (Canton), OH | 1.2% | 1.2% |
| 20 | Sacramento-Stockton-Modesto, CA | 1.2% | 0.6% |
| 21 | Charlotte, NC | 1.1% | 0.6% |
| 22 | Raleigh-Durham (Fayetteville), NC | 1.1% | 1.1% |
| 23 | Portland, OR | 1.0% | 0.5% |
| 24 | St. Louis, MO | 1.0% | 0.5% |
| 26 | Indianapolis, IN | 1.0% | 0.5% |
| 25 | Nashville, TN | 1.0% | 0.5% |
| 27 | Salt Lake City, UT | 0.9% | 0.5% |
| 30 | San Diego, CA | 0.9% | 0.4% |
| 33 | Hartford & New Haven, CT | 0.8% | 0.8% |
| 35 | Kansas City, MO-KS | 0.8% | 0.4% |
| 32 | Austin, TX | 0.8% | 0.4% |
| 34 | Columbus, OH | 0.8% | 0.4% |
| 36 | Greenville-Spartanburg-Asheville-Anderson, SC-NC | 0.8% | 0.8% |
| 40 | Las Vegas, NV | 0.7% | 0.7% |
| 42 | Harrisburg-Lancaster-Lebanon-York, PA | 0.6% | 0.6% |
| 43 | Grand Rapids-Kalamazoo-Battle Creek, MI | 0.6% | 0.6% |
| 44 | Norfolk-Portsmouth-Newport News, VA | 0.6% | 0.3% |
| 46 | Birmingham (Anniston and Tuscaloosa), AL | 0.6% | 0.3% |
| 47 | Greensboro-High Point-Winston Salem, NC | 0.6% | 0.3% |
| 45 | Oklahoma City, OK | 0.6% | 0.3% |
| 49 | Albuquerque-Santa Fe, NM | 0.6% | 0.6% |
| 50 | New Orleans, LA | 0.5% | 0.3% |

(continued on next page)

**App.552**

**REDACTED – FOR PUBLIC INSPECTION**

| | Nexstar's Pre-Transaction Reach (Licensed Stations) | | |
|---|---|---|---|
| DMA Rank | Designated Market Area | Actual Reach | Discounted Reach (if applicable) |
| | (continued from previous page) | | |
| 51 | Memphis, TN | 0.5% | 0.3% |
| 53 | Providence-New Bedford, RI-MA | 0.5% | 0.5% |
| 54 | Richmond-Petersburg, VA | 0.5% | 0.3% |
| 55 | Buffalo, NY | 0.5% | 0.3% |
| 56 | Fresno-Visalia, CA | 0.5% | 0.2% |
| 57 | Mobile-Pensacola (Ft. Walton Beach), AL-FL | 0.5% | 0.2% |
| 58 | Wilkes Barre-Scranton-Hazleton, PA | 0.5% | 0.5% |
| 59 | Little Rock-Pine Bluff, AR | 0.5% | 0.2% |
| 60 | Albany-Schenectady-Troy, NY | 0.5% | 0.2% |
| 61 | Knoxville, TN | 0.5% | 0.2% |
| 63 | Lexington, KY | 0.4% | 0.2% |
| 65 | Dayton, OH | 0.4% | 0.2% |
| 67 | Des Moines-Ames, IA | 0.4% | 0.4% |
| 68 | Green Bay-Appleton, WI | 0.4% | 0.2% |
| 69 | Honolulu, HI | 0.4% | 0.4% |
| 70 | Roanoke-Lynchburg, VA | 0.4% | 0.2% |
| 72 | Wichita-Hutchinson Plus, KS | 0.4% | 0.2% |
| 73 | Huntsville-Decatur (Florence), AL | 0.4% | 0.4% |
| 74 | Springfield, MO | 0.4% | 0.2% |
| 77 | Rochester, NY | 0.3% | 0.2% |
| 80 | Harlingen-Weslaco-Brownsville-McAllen, TX | 0.3% | 0.2% |
| 82 | Charleston-Huntington, WV | 0.3% | 0.3% |
| 83 | Waco-Temple-Bryan, TX | 0.3% | 0.2% |
| 84 | Savannah, GA | 0.3% | 0.2% |
| 85 | Charleston, SC | 0.3% | 0.2% |
| 87 | Syracuse, NY | 0.3% | 0.2% |
| 88 | El Paso (Las Cruces), TX-NM | 0.3% | 0.2% |
| 89 | Colorado Springs-Pueblo, CO | 0.3% | 0.2% |
| 90 | Champaign & Springfield-Decatur, IL | 0.3% | 0.3% |
| 91 | Shreveport, LA | 0.3% | 0.1% |
| 94 | Burlington-Plattsburgh, VT-NY | 0.3% | 0.1% |
| 95 | Ft. Smith-Fayettville-Springdale-Rodgers, AR | 0.3% | 0.1% |

(continued on next page)

App.553

**REDACTED – FOR PUBLIC INSPECTION**

| DMA Rank | Designated Market Area | Actual Reach | Discounted Reach (if applicable) |
|---|---|---|---|
| | **Nexstar's Pre-Transaction Reach (Licensed Stations)** | | |
| | *(continued from previous page)* | | |
| 96 | Baton Rouge, LA | 0.3% | 0.1% |
| 98 | Myrtle Beach-Florence, SC | 0.3% | 0.3% |
| 100 | Jackson, MS | 0.3% | 0.3% |
| 101 | Tri-Cities, TN-VA | 0.3% | 0.3% |
| 102 | Greenville-New Bern-Washington, NC | 0.3% | 0.3% |
| 105 | Davenport-Rock Island-Moline, IA-IL | 0.2% | 0.2% |
| 106 | Lincoln & Hastings-Kearny, NE | 0.2% | 0.2% |
| 107 | Tyler-Longview (Lufkin & Nacogdoches), TX | 0.2% | 0.1% |
| 108 | Ft. Wayne, IN | 0.2% | 0.1% |
| 109 | Evansville, IN | 0.2% | 0.2% |
| 110 | Augusta-Aiken, GA-SC | 0.2% | 0.1% |
| 111 | Johnstown-Altoona-State College, PA | 0.2% | 0.1% |
| 112 | Sioux Falls (Mitchell), SD | 0.2% | 0.2% |
| 113 | Lansing, MI | 0.2% | 0.1% |
| 115 | Springfield-Holyoke, MA | 0.2% | 0.2% |
| 117 | Youngstown, OH | 0.2% | 0.1% |
| 121 | Bakersfield, CA | 0.2% | 0.1% |
| 122 | Peoria-Bloomington, IL | 0.2% | 0.1% |
| 124 | Lafayette, LA | 0.2% | 0.2% |
| 126 | Columbus, GA (Opelika, AL) | 0.2% | 0.1% |
| 129 | La Crosse-Eau Claire, WI | 0.2% | 0.1% |
| 132 | Amarillo, TX | 0.2% | 0.1% |
| 137 | Rockford, IL | 0.1% | 0.1% |
| 140 | Lubbock, TX | 0.1% | 0.1% |
| 141 | Topeka, KS | 0.1% | 0.1% |
| 143 | Panama City, FL | 0.1% | 0.1% |
| 144 | Monroe-El Dorado, LA-AR | 0.1% | 0.1% |
| 146 | Odessa-Midland, TX | 0.1% | 0.1% |
| 148 | Minot-Bismarck-Dickinson (Williston), ND | 0.1% | 0.1% |
| 149 | Wichita Falls & Lawton, TX-OK | 0.1% | 0.1% |
| 150 | Sioux City, IA | 0.1% | 0.1% |
| 151 | Joplin-Pittsburg, MO-KS | 0.1% | 0.1% |

*(continued on next page)*

REDACTED – FOR PUBLIC INSPECTION

| | Nexstar's Pre-Transaction Reach (Licensed Stations) | | |
|---|---|---|---|
| DMA Rank | Designated Market Area | Actual Reach | Discounted Reach (if applicable) |
| | (continued from previous page) | | |
| 153 | Erie, PA | 0.1% | 0.1% |
| 160 | Terre Haute, IN | 0.1% | 0.1% |
| 162 | Binghamton, NY | 0.1% | 0.1% |
| 164 | Wheeling-Steubenville, WV-OH | 0.1% | 0.1% |
| 165 | Dothan, AL | 0.1% | 0.0% |
| 166 | Billings, MT | 0.1% | 0.0% |
| 167 | Abilene-Sweetwater, TX | 0.1% | 0.0% |
| 168 | Bluefield-Beckley-Oak Hill, WV | 0.1% | 0.1% |
| 169 | Hattiesburg-Laurel, MS | 0.1% | 0.0% |
| 170 | Rapid City, SD | 0.1% | 0.0% |
| 171 | Utica, NY | 0.1% | 0.0% |
| 173 | Clarksburg-Weston, WV | 0.1% | 0.1% |
| 175 | Jackson, TN | 0.1% | 0.0% |
| 179 | Elmira (Corning), NY | 0.1% | 0.0% |
| 180 | Watertown, NY | 0.1% | 0.0% |
| 183 | Alexandria, LA | 0.1% | 0.0% |
| 186 | Grand Junction-Montrose, CO | 0.1% | 0.1% |
| 197 | San Angelo, TX | 0.0% | 0.0% |
| **TOTAL PRE-MERGER REACH** | | **62.3%** | **39.2%** |

Source: Free Press Analysis of 2025–2026 Nielsen Media TV Households by DMA; S&P Global Market Intelligence

**REDACTED – FOR PUBLIC INSPECTION**

**Figure A2:**
**Nexstar Media Group: Post-Merger Reach of U.S. TV Households (2025–2026)**

### Nexstar's Post-Transaction Reach (Licensed Stations)

| DMA Rank | Designated Market Area | Actual Reach | Discounted Reach (if applicable) |
|---|---|---|---|
| 2 | Los Angeles, CA | 4.6% | 2.3% |
| 3 | Chicago, IL | 2.9% | 1.5% |
| 4 | Dallas-Ft. Worth, TX | 2.6% | 2.6% |
| 5 | Philadelphia, PA | 2.5% | 1.2% |
| 6 | Houston, TX | 2.3% | 2.3% |
| **7** | **Atlanta, GA** | **2.2%** | **2.2%** |
| 8 | Washington, DC (Hagerstown, MD) | 2.1% | 2.1% |
| 9 | San Francisco-Oakland-San Jose, CA | 2.0% | 2.0% |
| 11 | Tampa-St.Petersburg (Sarasota), FL | 1.8% | 1.8% |
| **12** | **Phoenix (Prescott), AZ** | **1.8%** | **0.9%** |
| **13** | **Seattle-Tacoma, WA** | **1.7%** | **0.8%** |
| **16** | **Minneapolis-St. Paul, MN** | **1.5%** | **0.8%** |
| 17 | Denver, CO | 1.4% | 1.4% |
| 19 | Cleveland-Akron (Canton), OH | 1.2% | 1.2% |
| 20 | Sacramento-Stockton-Modesto, CA | 1.2% | 1.2% |
| 21 | Charlotte, NC | 1.1% | 0.6% |
| 22 | Raleigh-Durham (Fayetteville), NC | 1.1% | 1.1% |
| 23 | Portland, OR | 1.0% | 0.5% |
| 24 | St. Louis, MO | 1.0% | 0.5% |
| 25 | Nashville, TN | 1.0% | 0.5% |
| 26 | Indianapolis, IN | 1.0% | 1.0% |
| 27 | Salt Lake City, UT | 0.9% | 0.5% |
| 30 | San Diego, CA | 0.9% | 0.9% |
| **31** | **San Antonio, TX** | **0.9%** | **0.4%** |
| 32 | Austin, TX | 0.8% | 0.4% |
| 33 | Hartford & New Haven, CT | 0.8% | 0.8% |
| 34 | Columbus, OH | 0.8% | 0.4% |
| 35 | Kansas City, MO-KS | 0.8% | 0.4% |
| 36 | Greenville-Spartanburg-Asheville-Anderson, SC-NC | 0.8% | 0.8% |
| 40 | Las Vegas, NV | 0.7% | 0.7% |
| **41** | **Jacksonville, FL** | **0.7%** | **0.7%** |
| 42 | Harrisburg-Lancaster-Lebanon-York, PA | 0.6% | 0.6% |
| 43 | Grand Rapids-Kalamazoo-Battle Creek, MI | 0.6% | 0.6% |

(continued on next page)

**App.556**

**REDACTED – FOR PUBLIC INSPECTION**

| DMA Rank | Designated Market Area | Actual Reach | Discounted Reach (if applicable) |
|---|---|---|---|
| | Nexstar's Post-Transaction Reach (Licensed Stations) | | |
| | (continued from previous page) | | |
| 44 | Norfolk-Portsmouth-Newport News, VA | 0.6% | 0.3% |
| 45 | Oklahoma City, OK | 0.6% | 0.3% |
| 46 | Birmingham (Anniston and Tuscaloosa), AL | 0.6% | 0.3% |
| 47 | Greensboro-High Point-Winston Salem, NC | 0.6% | 0.3% |
| **48** | **Louisville, KY** | **0.6%** | **0.6%** |
| 49 | Albuquerque-Santa Fe, NM | 0.6% | 0.6% |
| 50 | New Orleans, LA | 0.5% | 0.3% |
| 51 | Memphis, TN | 0.5% | 0.3% |
| 53 | Providence-New Bedford, RI-MA | 0.5% | 0.5% |
| 54 | Richmond-Petersburg, VA | 0.5% | 0.3% |
| 55 | Buffalo, NY | 0.5% | 0.3% |
| 56 | Fresno-Visalia, CA | 0.5% | 0.2% |
| 57 | Mobile-Pensacola (Ft. Walton Beach), AL-FL | 0.5% | 0.2% |
| 58 | Wilkes Barre-Scranton-Hazleton, PA | 0.5% | 0.5% |
| 59 | Little Rock-Pine Bluff, AR | 0.5% | 0.5% |
| 60 | Albany-Schenectady-Troy, NY | 0.5% | 0.2% |
| 61 | Knoxville, TN | 0.5% | 0.5% |
| 63 | Lexington, KY | 0.4% | 0.2% |
| **64** | **Tucson (Sierra Vista), AZ** | **0.4%** | **0.2%** |
| 65 | Dayton, OH | 0.4% | 0.2% |
| **66** | **Spokane, WA** | **0.4%** | **0.2%** |
| 67 | Des Moines-Ames, IA | 0.4% | 0.4% |
| 68 | Green Bay-Appleton, WI | 0.4% | 0.2% |
| 69 | Honolulu, HI | 0.4% | 0.4% |
| 70 | Roanoke-Lynchburg, VA | 0.4% | 0.2% |
| 72 | Wichita-Hutchinson Plus, KS | 0.4% | 0.2% |
| 73 | Huntsville-Decatur (Florence), AL | 0.4% | 0.4% |
| 74 | Springfield, MO | 0.4% | 0.2% |
| **76** | **Columbia, SC** | **0.4%** | **0.2%** |
| 77 | Rochester, NY | 0.3% | 0.2% |
| **79** | **Portland-Auburn, ME** | **0.3%** | **0.2%** |
| 80 | Harlingen-Weslaco-Brownsville-McAllen, TX | 0.3% | 0.2% |
| | (continued on next page) | | |

**App.557**

REDACTED – FOR PUBLIC INSPECTION

| | Nexstar's Post-Transaction Reach (Licensed Stations) | | |
|---|---|---|---|
| DMA Rank | Designated Market Area | Actual Reach | Discounted Reach (if applicable) |
| | (continued from previous page) | | |
| **81** | **Toledo, OH** | **0.3%** | **0.3%** |
| 82 | Charleston-Huntington, WV | 0.3% | 0.3% |
| 83 | Waco-Temple-Bryan, TX | 0.3% | 0.3% |
| 84 | Savannah, GA | 0.3% | 0.2% |
| 85 | Charleston, SC | 0.3% | 0.2% |
| 87 | Syracuse, NY | 0.3% | 0.2% |
| 88 | El Paso (Las Cruces), TX-NM | 0.3% | 0.2% |
| 89 | Colorado Springs-Pueblo, CO | 0.3% | 0.2% |
| 90 | Champaign & Springfield-Decatur, IL | 0.3% | 0.3% |
| 91 | Shreveport, LA | 0.3% | 0.1% |
| 94 | Burlington-Plattsburgh, VT-NY | 0.3% | 0.1% |
| 95 | Ft. Smith-Fayettville-Springdale-Rodgers, AR | 0.3% | 0.1% |
| 96 | Baton Rouge, LA | 0.3% | 0.1% |
| **97** | **Boise, ID** | **0.3%** | **0.3%** |
| 98 | Myrtle Beach-Florence, SC | 0.3% | 0.3% |
| 100 | Jackson, MS | 0.3% | 0.3% |
| 101 | Tri-Cities, TN-VA | 0.3% | 0.3% |
| 102 | Greenville-New Bern-Washington, NC | 0.3% | 0.3% |
| 105 | Davenport-Rock Island-Moline, IA-IL | 0.2% | 0.2% |
| 106 | Lincoln & Hastings-Kearny, NE | 0.2% | 0.2% |
| 107 | Tyler-Longview (Lufkin & Nacogdoches), TX | 0.2% | 0.1% |
| 108 | Ft. Wayne, IN | 0.2% | 0.1% |
| 109 | Evansville, IN | 0.2% | 0.2% |
| 110 | Augusta-Aiken, GA-SC | 0.2% | 0.1% |
| 111 | Johnstown-Altoona-State College, PA | 0.2% | 0.1% |
| 112 | Sioux Falls (Mitchell), SD | 0.2% | 0.2% |
| 113 | Lansing, MI | 0.2% | 0.1% |
| 115 | Springfield-Holyoke, MA | 0.2% | 0.2% |
| 117 | Youngstown, OH | 0.2% | 0.1% |
| **119** | **Macon, GA** | **0.2%** | **0.2%** |
| 121 | Bakersfield, CA | 0.2% | 0.1% |
| 122 | Peoria-Bloomington, IL | 0.2% | 0.1% |

(continued on next page)

REDACTED – FOR PUBLIC INSPECTION

## Nexstar's Post-Transaction Reach (Licensed Stations)

| DMA Rank | Designated Market Area | Actual Reach | Discounted Reach (if applicable) |
|---|---|---|---|
| 124 | Lafayette, LA | 0.2% | 0.2% |
| 126 | Columbus, GA (Opelika, AL) | 0.2% | 0.1% |
| 129 | La Crosse-Eau Claire, WI | 0.2% | 0.1% |
| **130** | **Corpus Christi, TX** | **0.2%** | **0.2%** |
| 132 | Amarillo, TX | 0.2% | 0.1% |
| 137 | Rockford, IL | 0.1% | 0.1% |
| 140 | Lubbock, TX | 0.1% | 0.1% |
| 141 | Topeka, KS | 0.1% | 0.1% |
| 143 | Panama City, FL | 0.1% | 0.1% |
| 144 | Monroe-El Dorado, LA-AR | 0.1% | 0.1% |
| **145** | **Beaumont-Port Arthur, TX** | **0.1%** | **0.1%** |
| 146 | Odessa-Midland, TX | 0.1% | 0.1% |
| 148 | Minot-Bismarck-Dickinson (Williston), ND | 0.1% | 0.1% |
| 149 | Wichita Falls & Lawton, TX-OK | 0.1% | 0.1% |
| 150 | Sioux City, IA | 0.1% | 0.1% |
| 151 | Joplin-Pittsburg, MO-KS | 0.1% | 0.1% |
| 153 | Erie, PA | 0.1% | 0.1% |
| **157** | **Bangor, ME** | **0.1%** | **0.1%** |
| 160 | Terre Haute, IN | 0.1% | 0.1% |
| 162 | Binghamton, NY | 0.1% | 0.1% |
| 164 | Wheeling-Steubenville, WV-OH | 0.1% | 0.1% |
| 165 | Dothan, AL | 0.1% | 0.0% |
| 166 | Billings, MT | 0.1% | 0.0% |
| 167 | Abilene-Sweetwater, TX | 0.1% | 0.0% |
| 168 | Bluefield-Beckley-Oak Hill, WV | 0.1% | 0.1% |
| 169 | Hattiesburg-Laurel, MS | 0.1% | 0.0% |
| 170 | Rapid City, SD | 0.1% | 0.0% |
| 171 | Utica, NY | 0.1% | 0.0% |
| 173 | Clarksburg-Weston, WV | 0.1% | 0.1% |
| 175 | Jackson, TN | 0.1% | 0.0% |
| 179 | Elmira (Corning), NY | 0.1% | 0.0% |
| 180 | Watertown, NY | 0.1% | 0.0% |
| 183 | Alexandria, LA | 0.1% | 0.0% |
| 186 | Grand Junction-Montrose, CO | 0.1% | 0.1% |
| 197 | San Angelo, TX | 0.0% | 0.0% |
| **TOTAL POST-MERGER REACH** | | **74.3%** | **54.5%** |

*Source: Free Press Analysis of 2025–2026 Nielsen Media TV Households by DMA; S&P Global Market Intelligence. Markets in **BOLD** represents new Nexstar DMAs*

App.559

**REDACTED – FOR PUBLIC INSPECTION**

**APPENDIX B: License Transfer Applications**

| Call Sign | Facility ID No. | Licensee | LMS File No. | Community of License |
|---|---|---|---|---|
| WUPL(TV) | 13938 | Belo TV, Inc. | 0000280940 | Slidell, LA |
| WBXN-CD | 70419 | Belo TV, Inc. | 0000280941 | New Orleans, LA |
| KFSM-TV | 66469 | Cape Publications, Inc. | 0000280719 | Fort Smith, AR |
| KTHV(TV) | 2787 | Cape Publications, Inc. | 0000280720 | Little Rock, AR |
| WZZM(TV) | 49713 | Combined Communications of Oklahoma, LLC | 0000280972 | Grand Rapids, MI |
| KENS(TV) | 26304 | KENS-TV, Inc. | 0000280703 | San Antonio, TX |
| KFMB-TV | 42122 | KFMB-TV, LLC | 0000280712 | San Diego, CA |
| KHOU(TV) | 34529 | KHOU-TV, Inc. | 0000280755 | Houston, TX |
| KTBU(TV) | 28324 | KHOU-TV, Inc. | 0000280756 | Conroe, TX |
| KING-TV | 34847 | KING Broadcasting Company | 0000280789 | Seattle, WA |
| KREM(TV) | 34868 | KING Broadcasting Company | 0000280799 | Spokane, WA |
| KTVB(TV) | 34858 | KING Broadcasting Company | 0000280798 | Boise, ID |
| K15IO-D | 34869 | KING Broadcasting Company | 0000280792 | McCall & New Meadows, ID |
| K16JE-D | 188132 | KING Broadcasting Company | 0000280790 | Glenns Ferry, ID |
| K17KF-D | 188131 | KING Broadcasting Company | 0000280797 | Cambridge, ID |
| K21CC-D | 50532 | KING Broadcasting Company | 0000280796 | Lewiston, ID |
| K23KY-D | 11446 | KING Broadcasting Company | 0000280791 | Council, ID |
| K29NB-D | 34884 | KING Broadcasting Company | 0000280793 | Cascade, ID |
| K30QA-D | 34861 | KING Broadcasting Company | 0000280794 | Coeur d'Alene, ID |
| KTFT-LD | 167056 | KING Broadcasting Company | 0000280795 | Twin Falls, ID |
| KONG(TV) | 35396 | KONG-TV, Inc. | 0000280832 | Everett, WA |
| KSKN(TV) | 35606 | KSKN Television, Inc. | 0000280842 | Spokane, WA |
| KTTU-TV | 11908 | KTTU-TV, Inc. | 0000280848 | Tucson, AZ |
| KVUE(TV) | 35867 | KVUE Television, Inc. | 0000280853 | Austin, TX |
| KWES-TV | 42007 | KWES Television, LLC | 0000280858 | Odessa, TX |
| KXTV(TV) | 25048 | KXTV, LLC | 0000280868 | Sacramento, CA |
| KBMT(TV) | 10150 | LSB Broadcasting, Inc. | 0000280646 | Beaumont, TX |
| KCEN-TV | 10245 | LSB Broadcasting, Inc. | 0000280649 | Temple, TX |
| KIDY(TV) | 58560 | LSB Broadcasting, Inc. | 0000280656 | San Angelo, TX |
| KIII(TV) | 10188 | LSB Broadcasting, Inc. | 0000280647 | Corpus Christi, TX |
| KXVA(TV) | 62293 | LSB Broadcasting, Inc. | 0000280652 | Abilene, TX |
| KYTX(TV) | 55644 | LSB Broadcasting, Inc. | 0000280651 | Nacogdoches, TX |
| KUIL-LD | 168234 | LSB Broadcasting, Inc. | 0000280655 | Beaumont, TX |
| KAGS-LD | 10246 | LSB Broadcasting, Inc. | 0000280648 | Bryan, TX |

**(continued on following page)**

**App.560**

**REDACTED – FOR PUBLIC INSPECTION**

**(continued from previous page)**

| Call Sign | Facility ID No. | Licensee | LMS File No. | Community of License |
|---|---|---|---|---|
| KIDU-LD | 58559 | LSB Broadcasting, Inc. | 0000280650 | Brownwood, TX |
| KIDV-LD | 58571 | LSB Broadcasting, Inc. | 0000280654 | Albany, TX |
| KVHP-LD | 168235 | LSB Broadcasting, Inc. | 0000280653 | Jasper, TX |
| WGRZ(TV) | 64547 | Multimedia Entertainment, LLC | 0000280922 | Buffalo, NY |
| KARE(TV) | 23079 | Multimedia Holdings Corporation | 0000280666 | Minneapolis, MN |
| KNAZ-TV | 24749 | Multimedia Holdings Corporation | 0000280670 | Flagstaff, AZ |
| KPNX(TV) | 35486 | Multimedia Holdings Corporation | 0000280667 | Mesa, AZ |
| K06AE-D | 35274 | Multimedia Holdings Corporation | 0000280668 | Prescott, AZ |
| K26OD-D | 35487 | Multimedia Holdings Corporation | 0000280669 | Globe, AZ |
| KPSN-LD | 63396 | Multimedia Holdings Corporation | 0000280672 | Payson, AZ |
| KTVD(TV) | 68581 | Multimedia Holdings Corporation | 0000280671 | Denver, CO |
| KUSA(TV) | 23074 | Multimedia Holdings Corporation | 0000280674 | Denver, CO |
| WJXX(TV) | 11893 | Multimedia Holdings Corporation | 0000280675 | Orange Park, FL |
| WTLV(TV) | 65046 | Multimedia Holdings Corporation | 0000280673 | Jacksonville, FL |
| KSDK(TV) | 46981 | Multimedia KSDK, LLC | 0000280839 | St. Louis, MO |
| WATL(TV) | 22819 | Pacific and Southern, LLC | 0000280898 | Atlanta, GA |
| WLTX(TV) | 37176 | Pacific and Southern, LLC | 0000280901 | Columbia, SC |
| WMAZ-TV | 46991 | Pacific and Southern, LLC | 0000280900 | Macon, GA |
| WXIA-TV | 51163 | Pacific and Southern, LLC | 0000280899 | Atlanta, GA |
| WBNS(AM) | 54901 | RadiOhio, Incorporated | 0000280910 | Columbus, OH |
| WBNS-FM | 54701 | RadiOhio, Incorporated | 0000280909 | Columbus, OH |
| WHAS-TV | 32327 | Sander Operating Co. I LLC D/B/A WHAS Television | 0000280924 | Louisville, KY |
| KGW(TV) | 34874 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280730 | Portland, OR |
| K16ML-D | 34851 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280736 | Corvallis, OR |
| K17HA-D | 130923 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280738 | Astoria, OR |
| K19LT-D | 34864 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280732 | Prineville, etc., OR |
| K25KS-D | 34844 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280735 | The Dalles, OR |
| K28MJ-D | 189303 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280737 | Tillamook, OR |
| K29AZ-D | 34865 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280734 | Newport, OR |
| K35HU-D | 34870 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280733 | Grays River, OR |
| KGWZ-LD | 30810 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280731 | Portland, OR |

**(continued on following page)**

**App.561**

REDACTED – FOR PUBLIC INSPECTION

**(continued from previous page)**

| Call Sign | Facility ID No. | Licensee | LMS File No. | Community of License |
|---|---|---|---|---|
| KMSB(TV) | 44052 | Sander Operating Co. V LLC D/B/A KMSB Television | 0000280816 | Tucson, AZ |
| KCWI-TV | 51502 | TEGNA Broadcast Holdings, LLC | 0000280681 | Ames, IA |
| WCCT-TV | 14050 | TEGNA Broadcast Holdings, LLC | 0000280688 | Waterbury, CT |
| WNEP-TV | 73318 | TEGNA Broadcast Holdings, LLC | 0000280689 | Scranton, PA |
| WOI-DT | 8661 | TEGNA Broadcast Holdings, LLC | 0000280692 | Ames, IA |
| WPMT | 10213 | TEGNA Broadcast Holdings, LLC | 0000280687 | York, PA |
| WQAD-TV | 73319 | TEGNA Broadcast Holdings, LLC | 0000280693 | Moline, IL |
| WTIC-TV | 147 | TEGNA Broadcast Holdings, LLC | 0000280683 | Hartford, CT |
| WZDX(TV) | 28119 | TEGNA Broadcast Holdings, LLC | 0000280684 | Huntsville, AL |
| W07DC-D | 73325 | TEGNA Broadcast Holdings, LLC | 0000280686 | Allentown/ Bethlehem, PA |
| W10CP-D | 73320 | TEGNA Broadcast Holdings, LLC | 0000280682 | Towanda, PA |
| W14CO-D | 73326 | TEGNA Broadcast Holdings, LLC | 0000280685 | Clarks Summit, etc., PA |
| W15CO-D | 73324 | TEGNA Broadcast Holdings, LLC | 0000280691 | Towanda, PA |
| W20AD-D | 73321 | TEGNA Broadcast Holdings, LLC | 0000280694 | Williamsport, PA |
| W26CV-D | 129499 | TEGNA Broadcast Holdings, LLC | 0000280695 | Mansfield, PA |
| W29FQ-D | 73327 | TEGNA Broadcast Holdings, LLC | 0000280690 | Pottsville, PA |
| WTSP(TV) | 11290 | Tegna East Coast Broadcasting, LLC | 0000280915 | St. Petersburg, FL |
| WLBZ(TV) | 39644 | Tegna East Coast Broadcasting, LLC | 0000280918 | Bangor, ME |
| WCSH(TV) | 39664 | Tegna East Coast Broadcasting, LLC | 0000280916 | Portland, ME |
| WGCI-LD | 39642 | Tegna East Coast Broadcasting, LLC | 0000280917 | Skowhegan, ME |
| WATN-TV | 11907 | TEGNA Memphis Broadcasting, Inc. | 0000280904 | Memphis, TN |
| WLMT(TV) | 68518 | TEGNA Memphis Broadcasting, Inc. | 0000280905 | Memphis, TN |
| WTHR(TV) | 70162 | VideoIndiana, Inc. | 0000280937 | Indianapolis, IN |
| WALV-CD | 70161 | VideOhio, Inc. | 0000280876 | Indianapolis, IN |
| WBIR-TV | 46984 | WBIR-TV, LLC | 0000280906 | Knoxville, TN |
| WBNS-TV | 71217 | WBNS-TV, Inc. | 0000280907 | Columbus, OH |
| WCNC-TV | 32326 | WCNC-TV, Inc. | 0000280911 | Charlotte, NC |
| W17EE-D | 32316 | WCNC-TV, Inc. | 0000280913 | Lilesville/ Wadesboro, NC |
| W36FB-D | 32317 | WCNC-TV, Inc. | 0000280912 | Briscoe, NC |
| KFAA-TV | 73701 | WFAA-TV, Inc. | 0000280990 | Decatur, TX |
| WFAA(TV) | 72054 | WFAA-TV, Inc. | 0000280989 | Dallas, TX |
| WFMY-TV | 72064 | WFMY Television, LLC | 0000280921 | Greensboro, NC |
| WKYC(TV) | 73195 | WKYC-TV, LLC | 0000280936 | Cleveland, OH |

**(continued on following page)**

App.562

REDACTED – FOR PUBLIC INSPECTION

**(continued from previous page)**

| Call Sign | Facility ID No. | Licensee | LMS File No. | Community of License |
|---|---|---|---|---|
| WTOL(TV) | 13992 | WTOL Television, LLC | 0000280938 | Toledo, OH |
| WUSA(TV) | 65593 | WUSA-TV, Inc. | 0000280943 | Washington, DC |
| WVEC(TV) | 74167 | WVEC Television, LLC | 0000280949 | Hampton, VA |
| WJHJ-LD | 35137 | WVEC Television, LLC | 0000280950 | Newport News, etc., VA |
| WWL-TV | 74192 | WWL-TV, Inc. | 0000280967 | New Orleans, LA |

**App.563**

**APPENDIX C: Declarations of Parties in Interest**

**App.564**

Declaration of Charlie Braico

1. I, Charlie Braico, am the President of the National Association of Broadcast Employees and Technicians - Communications Workers of America (NABET-CWA).

2. I live in the Washington, DC television market. I frequently watch news on over-the-air television, including WUSA-TV, currently licensed to TEGNA and WDCW and WDVM, currently licensed to Nexstar. I watch these stations using an antenna over-the-air, internet streaming, and cable services through Verizon FiOS.

3. I have been employed as a broadcast engineer/technician with ABC Television since 1980. I spent my career with ABC assigned to studio/field operations, working as a camera operator, audio engineer, and technical director on a wide variety of programs in the news, sports, and entertainment divisions of the company.

4. My work for NABET-CWA includes: 12 years as Vice President of Local 54041 (Chicago); five years as President of Local 54041; four years as NABET-CWA Sector Vice President; and, since June 2015, I have been and am currently the Sector President of NABET-CWA.

*NABET-CWA and Our Goals*

5. NABET-CWA represents more than 10,000 workers in broadcasting and related industries under approximately 100 different collective bargaining agreements nationwide.

6. As a sector of its parent union, CWA, NABET has the support of another 350,000 CWA members and more than 250,000 CWA retirees in telecommunications, media, tech and video games, public service, and other fields. NABET-CWA uses collective bargaining, contract enforcement, job training, political activity, and organizing to improve wages, working conditions, and job security.

7. NABET-CWA began in 1934 as the Association of Technical Employees (ATE) at NBC. In 1940, the organization transformed into an independent union: the National Association of Broadcast Engineers and Technicians (NABET), which continued to represent technical employees at NBC. Around the same time, the Federal Communications Commission ordered the network to divest some of its holdings and NBC divided into the Blue Network (NBC) and the Red Network (ABC). NABET continued to represent the technical employees who were transferred to ABC. The National Labor Relations Board certified NABET in 1944. NABET merged with CWA in 1993.

8. NABET-CWA's members have personal and professional interests in promoting and preserving a robust news and broadcasting industry. The stronger and more competitive

1

**App.565**

the news and broadcasting industry is, the more and better job opportunities NABET-CWA members will have, and the stronger our democracy will be. NABET-CWA advocates for these goals, and has participated in a number of FCC rulemaking and adjudicatory proceedings to promote localism in broadcasting and diversity of media ownership.

*Harm to NABET-CWA and Our Members - Labor Market*

9. During the history of NABET-CWA, in my experience, policy and legal decisions permitting additional consolidation in the broadcast industry lead consistently to industry actions maximizing common operation and ownership of broadcast stations as permitted by those decisions.

10. The proposed merger will harm the interests of NABET-CWA and our members in, among other things, organizing to improve wages, working conditions, and job security in the broadcast industry.

11. When there are fewer potential employers of NABET-CWA members, it harms individual workers and our union. The proposed merger will reduce the number of jobs for members of NABET-CWA, leading to reduced pay, reduced benefits and less market demand for NABET-CWA members.

12. The proposed merger would have an immediate and direct effect on labor markets in the Designated Market Areas (DMAs) where there is overlap between Nexstar and TEGNA. Among the DMAs where there is overlap between Nexstar and TEGNA, NABET-CWA represents Nexstar workers in Portland, OR; Denver, CO; Cleveland, OH; Buffalo, NY; and Hartford, CT, and TEGNA workers in Cleveland, OH and Hartford, CT.[1] NABET members in these locations will be directly harmed by the economic impacts of this merger in their workplaces and in the labor market at large.

13. NABET-CWA members in the DMA's where Nexstar and TEGNA overlap will be directly and immediately impacted by this transaction, as the merger will result in layoffs and the elimination of jobs. As described in the attached petition to deny, Nexstar has stated it plans to generate $300 million in synergies and operating expense reductions in the first year following the merger through consolidating production and operations, and specifically identifies "station-level" cost savings in "overlap markets" as an area that will create "a significant portion" of synergies.

14. In addition to affecting the local labor markets in the DMAs where Nexstar and TEGNA overlap, the proposed merger would also affect other local labor markets and the national labor market by reducing the total number of jobs in the country available for

---

[1] NABET-CWA also represents Nexstar workers in Evansville, IN/Henderson, KY and Rochester, NY.

2

NABET-CWA members. Many NABET-CWA members have relocated to different DMAs for work and many will in the future.

15. As described in the attached petition to deny, the proposed merger will substantially reduce competition in the market for broadcast technicians, eliminate substantial competition between firms, and expand Nexstar's monopsonic domination of the labor market. A post-merger Nexstar would employ 28.4% of all television broadcast workers in the country. The increased economic negotiating power of Nexstar would make it more difficult for NABET-CWA to negotiate increased pay and benefits for our members.

16. Furthermore, if this merger is approved and the rules regarding ownership limits are changed or waived, the past practice and forward-looking statements of employers in this industry regarding consolidation show that additional mergers would be extremely likely. This would cause further elimination of jobs, reductions in pay and compensation, and harm to the job market for broadcast workers, which would cause further harm to NABET-CWA members and NABET-CWA as an organization.

17. Preventing the merger would avoid these economic harms to NABET-CWA and its members.

*Harm to NABET-CWA as an Organization*

18. NABET-CWA, as an organization that represents its members via collective bargaining across the United States, will be harmed.

19. The proposed merger and further constricted market for NABET-CWA members would force NABET-CWA to spend more resources on representing our members at the bargaining table and reduce NABET-CWA's negotiating power. Consolidation in the broadcast industry increases the power of the industry vis-a-vis organized labor in the context of collective bargaining negotiations. Increased consolidation will make it more difficult for NABET-CWA to secure adequate salary and benefit packages for our members, which harms our members, reduces membership dues, and harms our negotiating power.  Moreover, Nexstar has repeatedly challenged the validity of Independent Agencies in the United States, including the National Labor Relations Board, in the United States Court of Appeals for the Second and Fifth Circuits.

20. Further, loss of jobs in the industry means that fewer workers are eligible to become members of NABET-CWA, which reduces our financial resources. Loss of union-represented jobs in the industry means that NABET-CWA would lose dues-paying members, also reducing our financial resources. This would cause NABET-CWA to face increased burdens in our efforts to organize new bargaining units.

3

**App.567**

21. We know from past experience that mergers result in lost jobs and a more challenging organizing and bargaining climate that requires more resources in order to further NABET-CWA's goals. In the last three decades, NABET-CWA has seen many mergers and thousands of lost jobs. As a result of past mergers and consolidations, NABET-CWA staff representatives supporting bargaining units have had to spend more time negotiating contracts and worsened negotiating conditions have forced NABET-CWA bargaining units to accept lower wage increases. The proposed merger would cause these same harms to NABET-CWA's organizational goals of collective bargaining, organizing, and contract administration.

*Harm to NABET-CWA and Our Members - Quality of Local News*

22. Our members not only make local news, they also care about local news and rely on local news as professionals who need to remain aware of local issues to perform their jobs in the news industry.

23. It is well-documented that consolidation leads to less local news coverage and decreased quality of local news due to layoffs and job eliminations, centralization of news creation, and news duplication across multiple markets. As described in the attached petition to deny, a recent study by academics at the University of Delaware found that of all the U.S. broadcasting companies, Nexstar airs the most duplicated news content of any broadcast owner.

24. A decrease in the quality and quantity of local news will harm NABET-CWA and its members.

*Harm to NABET-CWA and Our Members - Consumers of Pay TV*

25. Many NABET-CWA members subscribe to pay-TV services. For example, I pay for cable services through Verizon FiOS.

26. In addition to personal use, our members rely on pay TV services for access to local news and national news as professionals who need to remain aware of local and national issues to perform their jobs in the news industry.

27. The proposed merger would force pay-TV operators to pay larger fees to retransmit broadcast programming. The increased retransmission consent fees will be passed on to subscribers and will harm NABET-CWA and our members.

4

This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

Charlie Braico
President
NABET-CWA

Date: DECEMBER 22, 2025

5

**App.569**

Declaration of Jon Schleuss

1. My name is Jon Schleuss. I have been President of The NewsGuild - Communications Workers of America (TNG-CWA) and a Vice President of the Communications Workers of America since 2019.

2. I live in the Washington, DC television market. I frequently watch news on over the air television, including WUSA-TV, currently licensed to TEGNA, Inc. and WDCW and WDVM, currently licensed to Nexstar. I watch these stations using an antenna over the air and using internet streaming.

*TNG-CWA and Our Goals*

3. TNG-CWA is a sector of the Communications Workers of America and an affiliate with the AFL-CIO. It has 46 local unions in the United States and 17 local unions in Canada. TNG-CWA represents the interests of about 27,000 members and was founded in 1933.

4. TNG-CWA's constitution provides that: The purpose of the Guild shall be to advance the economic interests and to improve the working conditions of its members; to guarantee, as far as it is able, equal employment and advancement opportunity in the industry and constant honesty in news, editorials, advertising, and business practices; to raise the standards of journalism and ethics of the industry; to foster friendly cooperation with all other workers; and to promote industrial unionism in the jurisdiction of the Guild."

5. TNG-CWA's members are journalists and other communications professionals working at newspapers, online publications, magazines, news services and in broadcast in the U.S., Canada and Puerto Rico. Among other things, they hold positions as reporters, columnists, copy editors, photojournalists, videographers, podcast producers, directors, graphic designers and editorial cartoonists. Others are located in advertising, circulation, business offices and other departments essential to the operations of media enterprises. TNG-CWA also represents other employees – publishing house employees, spoken-language interpreters and translators, social justice workers and the staff of nonprofit organizations.

6. TNG-CWA represents workers at TEGNA-owned KSDK in St. Louis. Additionally, many of our members, for example, those working at online publications and news services, have previously worked in the broadcast industry and are likely to do so in the future. Today, a substantial portion of news services that formerly were solely print publications also produce video or audio content. For example, video content about news issues for websites and social media, and audio content for podcasts. Today, TNG-CWA members at these employers include videographers and podcast producers. There is substantial overlap in the broadcast journalism labor market, online publication labor

1

**App.570**

market, and news services labor market, and many TNG-CWA members have careers that involve broadcast and online publications or news services.

7. TNG-CWA has the history, mission, resources, experience and commitment to advance the fight for dignity and respect on the job along with job security, good pay and benefits. In addition, it promotes the welfare of its members by keeping abreast of industry trends – from the consolidation of ownership to emerging business models – and it advocates for journalists and high-quality journalism.

8. TNG-CWA's members have personal and professional interests in promoting and preserving a robust news industry. The stronger and more competitive the news industry is, the more and better job opportunities TNG-CWA members will have and the stronger our democracy will be. In pursuit of these goals, TNG-CWA has participated in a number of FCC rulemaking and adjudicatory proceedings to promote diversity of ownership. It has also made many presentations to the Department of Justice, the Federal Trade Commission and Congress to advocate for strong measures to promote ownership diversity in the communications industry.

9. As the largest union representing media workers in the U.S., TNG-CWA advocates for journalists' jobs and for the work they do, which is essential to a free and democratic society. To advance this longstanding commitment to build a sustainable future for the news industry, TNG-CWA has created a campaign called Save The News. Save The News presses for long-term solutions to the crisis facing the news industry by advocating for public policy that will: Break up corporate ownership of news organizations; Provide incentives for financial investors to sell news organizations to civic-minded, local investors; Provide grants, tax credits and new revenue for news organizations, and ensure that additional money is spent in newsrooms and not padding a corporate bottom line; Increase public access to government records; and Protect journalists and their sources from prosecution.

10. In the wake of the COVID-19 epidemic, TNG-CWA fought successfully in 2020 to expand eligibility for the Paycheck Protection Program to save thousands of journalism jobs. This addition to the pandemic relief bill helped news organizations, including television broadcasters, stay afloat and helped keep journalists on the job during the pandemic. In 2021, TNG-CWA advocated for the introduction and enactment of the Local Journalism Sustainability Act, which would have provided tax credits for news companies, including broadcasters, based on the number of journalists they employ as well as tax credits for the purchase of advertising on certain outlets, including many broadcasters. Linking the tax credits to jobs would have generated revenue for the news outlets, protected jobs and strengthened local journalism.

2

**App.571**

11. As a vice president of the Communications Workers of America, I also have a responsibility to represent the interests of all CWA members, including the CWA members employed at Nexstar and TEGNA who are represented by the National Association of Broadcast Employees and Technicians - Communications Workers of America (NABET-CWA).

*Harm to TNG-CWA and Our Members - Labor Market*

12. During the history of TNG-CWA, in my experience, policy and legal decisions permitting additional consolidation in the news industry lead consistently to industry actions maximizing common operation and ownership. Corporate consolidation has been devastating to the quality and quantity of local news and to jobs in journalism. Breaking up corporate ownership of news organizations and encouraging the ownership of news organizations by civic-minded, local investors are core goals of our Save The News campaign.

13. The proposed transaction will harm the interests of TNG-CWA and our members in, among other things, organizing to improve wages, working conditions, and job security in the news industry.

14. When there are fewer potential employers of TNG-CWA members, it harms individual workers and our union. The proposed merger will reduce the number of jobs for members of TNG-CWA, leading to reduced pay, reduced benefits, and less market demand for TNG-CWA members.

15. In the Designated Market Areas (DMAs) where Nexstar and TEGNA overlap, the merger will result in layoffs and the elimination of jobs. As described in the attached petition to deny, Nexstar has stated it plans to generate $300 million in synergies and operating expense reductions in the first year following the merger through consolidating production and operations, and specifically identifies "station-level" cost savings in "overlap markets" as an area that will create "a significant portion" of synergies.

16. The proposed merger would have an immediate and direct effect on the labor markets in the DMAs where there is overlap between Nexstar and TEGNA. Among the DMA's where there is overlap between Nexstar and TEGNA, TNG-CWA represents news industry workers in Dallas, Tampa, Denver, Akron, St. Louis, Indianapolis, Memphis, Phoenix, Wilkes-Barre, Buffalo, Hartford, Portland, and Sacramento. In St. Louis, TNG-CWA represents workers at TEGNA-owned KSDK. Additionally, of those markets where there is overlap between Nexstar and TEGNA, NABET-CWA represents Nexstar workers in Portland, Denver, Cleveland, Buffalo, and Hartford, and TEGNA workers in Cleveland and Hartford. TNG-CWA members at TEGNA-owned KSDK in St. Louis will be directly and immediately harmed by layoffs and consolidation. TNG-CWA members

3

**App.572**

in all these overlapping DMAs will be directly harmed by the economic impacts of this merger in their local labor markets.

17. In addition to affecting the local labor markets in the DMAs where Nexstar and TEGNA overlap, the proposed merger would also affect other local labor markets and the national labor market by reducing the total number of jobs in the country available for TNG-CWA members. Many TNG-CWA members have relocated to different DMAs for work and many will in the future.

18. Furthermore, if this merger is approved and the rules regarding ownership limits are changed or waived, the past practice and forward-looking statements of employers in this industry regarding consolidation show that additional mergers would be extremely likely. This would cause further elimination of jobs, reductions in pay and compensation, and harm the job market for broadcast workers, which would cause further harm to TNG-CWA members and TNG-CWA as an organization.

19. Preventing the merger would avoid these economic harms to TNG-CWA and its members.

*Harm to TNG-CWA as an Organization*

20. The proposed merger would harm TNG-CWA as an organization that represents its members via collective bargaining across the United States.

21. The proposed merger would reduce job opportunities for journalists throughout the country, not just in markets where Nexstar and TEGNA overlap. The loss of jobs and the lowered quantity and quality of local news would force TNG-CWA to divert personnel and financial resources to its campaigns to protect and promote local journalism. This in turn would interfere with TNG-CWA's organizing efforts and its ability to protect the welfare of its existing members.

22. The proposed merger would further constrict the market for TNG-CWA members, reduce TNG-CWA's bargaining power and force TNG-CWA to spend more resources on representing our members at the bargaining table. Consolidation in the broadcast industry increases the power of the industry vis-a-vis organized labor in the context of collective bargaining negotiations. Increased consolidation would make it more difficult for TNG-CWA to secure adequate salary and benefit packages for our members, which harms our members, reduces membership dues, and harms our negotiating power.

23. We know from experience that corporate consolidation and mergers result in lost jobs and a more challenging organizing and bargaining climate that requires more resources in order to further TNG-CWA's goals. As a result of past mergers and consolidation, TNG-CWA staff representatives supporting bargaining units have had to spend more time

4

**App.573**

negotiating contracts. Worsened negotiating conditions translate to worsened offers from employers and collective bargaining agreements that are not as strong for workers as they otherwise would be. The proposed merger would force TNG-CWA to spend more resources on bargaining and organizing, and would cause harm to the job market for news workers and to TNG-CWA's organizational goals of collective bargaining, organizing, and contract administration.

*Harm to TNG-CWA and Our Members - Quality of Local News*

24. Our members not only make local news, they also care about local news and rely on local news as professionals who need to remain aware of local issues to perform their jobs in the news industry.

25. It is well-documented that consolidation leads to less local news coverage and decreased quality of local news, due to layoffs and job elimination, centralization of news creation, and news duplication across multiple markets. As described in the attached petition to deny, a recent study of academics at the University of Delaware found that of all the U.S. broadcasting companies, Nexstar airs the most duplicated news content of any broadcast owner.

26. A decrease in the quality and quantity of local news will harm TNG-CWA and its members.

*Harm to TNG-CWA and Our Members - Consumers of Pay TV*

27. Many TNG-CWA members are subscribers to pay TV services.

28. In addition to personal use, our members rely on pay TV services for access to local news and national news as professionals who need to remain aware of local and national issues to perform their jobs in the news industry.

29. The proposed merger would force pay-TV operators to pay larger fees to retransmit broadcast programming. The increased retransmission consent fees will be passed on to subscribers, and will harm TNG-CWA and our members.

5

**App.574**

App.575

This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

_____

Jon Schleuss
President
TNG-CWA

Date: December 30, 2025

6

**DECLARATION OF CRAIG AARON**

1.  I, Craig Aaron, am President and co-CEO of Free Press, located at 1025 Connecticut Avenue NW, Suite 1110, Washington, DC 20036.

2.  I am over the age of 18 and am competent to make this declaration.

3.  Free Press is a nationwide, nonpartisan, nonprofit organization with members throughout the country.

4.  Free Press's mission is to change the media to transform democracy and to realize a just society. That is why the organization works against undue media concentration, historically and presently, in order to promote democratic outcomes, racial justice, and social justice initiatives only possible with an informed electorate and a public served by media responsive to communities' needs for local journalism and civic information.

5.  Free Press as an organization would be harmed by grant of the Application and the license transfers subject to this Petition to to Deny, because it would frustrate the organization's goals, hinder the programmatic outcomes we seek to achieve and cause us to expend additional financial resources.

6.  I understand that if these transfers were approved, the combined company's national reach over the public airwaves would grow to more than 80 percent of U.S. television households. That is more than twice as large as the 39 percent limit set by Congress, out of concern that such control would further erode localism in broadcasting. It is likely that more national content would be shown in local television markets, instead of local news content, with stories about local government and local issues not covered adequately.

7.  Likewise, the combined company would control half or more of the commercial broadcast television stations airing English-language local news in the markets detailed in the Petition to Deny, often in violation of the FCC's local-ownership rules designed to prevent such anti-competitive consolidation.

8.  Allowing one company to control this much scarce broadcast spectrum is dangerous to democracy. It would reduce competition that would otherwise incentivize these stations to better serve their local communities' information needs and cover a broader array of issues. It would thus significantly reduce the quality and amount of original local news, eliminate diverse viewpoints, and reduce Nexstar's incentive to invest in robust coverage of local political, social and cultural issues.

**App.576**

9. These concerns are particularized and specific to this proposed transaction, not general concerns about consolidation broadly. Nexstar is notorious for replacing acquired stations' original news broadcasts with the programming already aired on Nexstar's existing stations.

10. In fact, a recent study by academics at the University of Delaware found that of all the U.S. broadcasting chains, Nexstar airs the most duplicated news content.

11. This reduction in the quality of news and information available across the United States, and to people in the Designated Market Areas ("DMAs") impacted by the proposed Transaction, would frustrate Free Press goals, making it significantly more difficult and more costly for our organization to raise awareness about issues and move people to take action.

12. As a result, Free Press would be obligated to expend significantly more staff time and other budgetary resources on the programs that depend on this kind of civic information.

13. For example, Free Press works with community-based and other competitive journalism outlets to foster production of local news and information responsive to local communities' needs. In conjunction with the Media Power Collaborative project that Free Press coordinates, Free Press meets on a regular basis with other grasstops and grassroots organizations in states such as California, Maryland, Massachusetts, Pennsylvania, New Jersey, Oregon, and Washington, among others. We educate journalists and bring them together with their audiences to improve their knowledge about the public's concerns. In addition, we work with local leaders and news organizations to increase public access, support, and subsidies for the production of local news and information produced by commercial and noncommercial outlets. This work to improve and enhance local journalism amounts to approximately one third of our annual budget.

14. The local journalists and publications we work to educate and organize with and through our Media Power Collaborative project report that it is far more difficult for them to compete against broadcast conglomerates and other consolidated corporate media companies, frustrating our shared objectives and missions to serve local communities with local news and information. This requires Free Press to expend more staff time and resources overcoming the challenges posed by incumbent local TV broadcasters ever growing in size and dominating local media markets by controlling broadcast licenses beyond the number permitted by the FCC's rules, when those licenses could be put to better use in the hands of diverse community owners.

15. Similarly, Free Press organizes people at the national and local level to advocate for affordable broadband options; to protect journalists and other individuals exercising their First Amendment rights; and to halt the construction of data centers otherwise planned and built without sufficient public input on the impacts that these facilities have on the local ecosystem, electricity grid, and water supply.

**App.577**

16. Information about state policies that promote broadband access or address data centers are less likely to be covered by the media if there are fewer journalists and news outlets. Information about local efforts to place data centers or create affordable broadband networks is less likely to be available to the public and Free Press members when there are fewer journalists working locally. Less information in states and in local communities where these policies are adopted will also harm Free Press members nationwide because other communities will be less likely to learn about national trends, national corporate strategies or successful models that could be employed when they occur in other states or cities.

17. The resources Free Press expends on all of these programs are less effective when local journalists cannot successfully gain placement of locally responsive stories. In order to have the same impact, we will need to expend additional resources in markets where Nexstar and TEGNA combine and across the nation in other markets impacted by the overall reduction in civic information and educational news stories, including in states that are part of the DMAs in which these companies seek merger approvals such as California, Maryland, and Oregon.

18. Fewer people will know these policies are being made and how they will be impacted. This means that fewer people are likely to seek out Free Press resources on data centers, low-cost internet, or journalists that are targeted for their views. This means, in turn,  fewer people will join Free Press and make donations to Free Press, thus harming Free Press' financial success and as a community organizer.

19. None of these goals are achievable in the absence of accurate civic information and local journalism, free from undue interference by corporate or governmental interests. The merger proposed in this Transaction would reduce broadcast television newsrooms' responsiveness to these issues and their incentive to respond to local concerns.

20. This Declaration has been prepared in support of the foregoing Petition to Deny.

21. This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.


December 31, 2025


Craig Aaron
President and co-CEO
Free Press


**App.578**

**Declaration of Earl Williams, Jr.**

1. I, Earl Williams, Jr., reside at 19701 Fairmount Blvd, Shaker Heights, OH 44118. I am over the age of 18 and am competent to make this declaration.

2. I am a member of the United Church of Christ.  I am Vice Chair of the board of directors of the United Church of Christ Media Justice Ministry, Inc.  I am a member of Euclid Avenue Congregational Church UCC, Cleveland, Ohio.

3. I am a graduate of the Cleveland State University, Cleveland Marshall School of Law and Ohio University Scripps School of Communication. In my early career I had direct experience with communications policy, serving as a legal intern with Citizens Communication Center, Washington D.C. and as an undergraduate intern at WGN Radio Television, Chicago. Ill.  I am a member of the Ohio Bar and have served as an Assistant County Public Defender and Assistant County Prosecutor. I served as a city council member of the City of Shaker Heights for 20 years. I continue to serve on the Fair Housing Review Board for Shaker Heights and Board of Appeals for Shaker Heights.

4. I am a regular viewer of the television stations specifically WKYC and WJW serving the Cleveland-Akron, OH market, which is impacted by the proposed transaction.

5. The United Church of Christ's national vision is: United in Christ's love, a just world for all.  The UCC's mission is: United in Spirit and inspired by God's grace, we welcome all, love all, and seek justice for all.

6. The United Church of Christ describes its beliefs, in part, as follows: "We believe that each person is unique and valuable . . . . We believe that all of the baptized 'belong body and soul to our Lord and Savior Jesus Christ.' No matter who – no matter what – no matter where we are on life's journey – notwithstanding race, gender identity or expression, sexual orientation, class or creed – we all belong to God and to one worldwide community of faith . . . .  It is the will of God that every person belongs to a family of faith where they have a strong sense of being valued and loved . . . . UCC pastors and teachers are known for their commitment to excellence in theological preparation, interpretation of the scripture and justice advocacy. Even so, love and unity in the midst of our diversity are our greatest assets. We believe that God calls us to be servants in the service of others and to be good stewards of the earth's resources. 'To believe is to care; to care is to do.' We believe that the UCC is called to be a prophetic church. As in the tradition of the prophets and apostles, God calls the church to speak truth to power, liberate the oppressed, care for the poor and comfort the afflicted."

7. The United Church of Christ's vision of a just world for all has been articulated as "3 Great Loves:" Love of Neighbor, Love of Children, and Love of Creation.  These 3 Great Loves work together to address the inequities in our current world.

8. The mission of UCC Media Justice is: The United Church of Christ is a faith community rooted in justice that recognizes the unique power of the media to shape public understanding and thus society.  For this reason, UCC Media Justice works to create just and equitable media structures that give meaningful voice to diverse peoples, cultures and ideas.  Established in 1959, UCC Media Justice ultimately established the right of all citizens to participate at the Federal Communications Commission as part of its efforts to

1

**App.579**

ensure a television broadcaster in Jackson, MS served its African-American viewers during the civil rights movement.

9. In order to pursue a "just world for all" and to "seek justice for all," to pursue the UCC's Three Great Loves, and to implement UCC Media Justice's mission, I regularly rely on local broadcast television to monitor local news, information and events.

10. For example, many of my interests are in service of the UCC's social justice mission and its "Love of Neighbor" vision. I closely follow the state of Ohio's efforts to preempt charter cities' home rule rights particularly with respect to the regulation of assault weapons and other efforts to address and remedy those conditions affecting urban communities. I notice the impact of local media structures because I see that this issue requires additional media coverage because these legislative changes are added into must-pass budget legislation and escape notice by the general public. I similarly monitor efforts to undermine the right for labor to organize and efforts to adopt right-to-work laws.

11. I, and viewers like me, will be harmed by the combination between WKYC (Tegna), WJW and WBNX (Nexstar) because it will reduce the broadcaster's attention to the community's local needs. I will be harmed when fewer resources are devoted to local news as a result of the transaction. If this transaction is approved, it is likely that more national content will be shown in my local television market instead of local news content. As a local resident, I am harmed when stories covering local government are not covered adequately by the local media. Additionally, if there are layoffs, the station will lose valuable institutional memory and knowledge of local politics.

12. Research has consistently shown that media consolidation leads to less news coverage and coverage that is less responsive to community needs. Larger broadcast companies tend to replace locally-produced programming with nationally-produced programming to take advantage of supposed efficiencies. Journalists and other staff will be eliminated to reduce duplication. Nexstar has claimed it will realize $300 million in annual synergies from the merger. I reasonably believe the new ownership would make local news coverage less responsive to my community's needs, which will significantly reduce the quality and quantity of local news in my area.

13. I rely on local TV advertising to learn about political campaigns and local business offerings. I am concerned that fewer station owners in my local area will reduce competition, increase advertising prices and thus reduce my access to this information.

14. Harm to news coverage in other local communities harms me and harms the United Church of Christ and the UCC Media Justice Ministry. I monitor developments in other states in order to anticipate likely policy initiatives in my own state or in my own local area. I consult with my peers and colleagues around the country who also monitor local broadcast television in their own communities to identify issues of common concern. For example, I have monitored efforts to provide telecommunications and internet access to underserved communities around the country in other cities like Detroit. Many good and bad policy proposals begin in other states or cities, or, are part of an intentional nationwide strategy to alter local laws around the country. When news gathering is poor in those places, local people are less likely to adequately vet those policies and poor policies are more likely to be adopted. Moreover, I am less likely to know about those

**App.580**

policies and their impacts before they are adopted because there is less newsgathering locally in those communities.

15. The United Church of Christ has invested tremendous resources into improving racial, gender and LGBTQ diversity around the country, most recently through its Join the Movement campaign (www.jointhemovementucc.org) which encourages UCC members to become antiracists and to share stories about antiracism. These efforts are more difficult when UCC members cannot learn about racism, anti-racism or LGBTQ equality in their local communities and consolidated media makes it less likely that anti-racism or pro-LGBTQ messages will be carried in local news outlets. For example, in my home state of Ohio, media coverage of the Haitian community significantly impacted the work and efforts of UCC members to share a message of antiracism and welcoming of immigrant communities.

16. The failure of the media to cover important social justice issues, whether those are local impacts of national policies or local policies harms the denomination of the United Church of Christ and the UCC Media Justice Ministry organization because we have national ministries that work on issues that occur locally and nationally. For example, many UCC members are concerned about local data centers as they relate to environmental and AI policy and the UCC's national work is furthered when UCC members have access to information about local efforts and are more difficult if people do not know when they are occurring locally. The work of the denomination is made more difficult when it must first educate its members about issues and then members must investigate facts themselves rather than relying on the media to learn about new data centers and the impacts on their communities. Local data center policy is exactly the kind of story that will receive less news coverage when fewer resources are allocated to creating local news.

17. In the same manner, local education policy will receive less coverage if TV stations merge. The UCC has been extensively concerned with protecting children and others who are trans, non-binary or LGBTQ (see https://www.ucc.org/what-we-do/wider-church-ministries/gsjm/lgbtqia/trans/).  If the national denomination leadership cannot learn about local occurrences through local news stories and UCC members cannot learn about local events then the UCC's policy, lived out through the work of its national staff, will be more difficult and so will the local efforts of UCC members and churches.

18. Similarly, consolidation of media ownership, which is often accompanied by reductions in force, lessens employment opportunities for traditionally underrepresented groups, harming the UCC's and the UCC Media Justice Ministry's efforts to increase racial and gender equity and diversity in communications and other sectors.

19. If the transaction is approved, it will take more resources to live out God's call to fulfill the mission of the church, such as holding more webinars, writing more reports, doing more outreach workshops and the like.

20. I subscribe to pay TV services. I am also concerned that my subscription costs will increase if the combination of Nexstar and TEGNA can increase the cost for pay television operators to acquire their programming.

3

**App.581**

21. This Declaration has been prepared in support of the foregoing Petition to Deny or Dismiss.

22. This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

_J. Earl Williams, Jr._

December 30, 2025

4

**App.582**

**Declaration of Diane Miller**

I, Diane Miller, reside at 510 Indian Lane, Waxahachie, TX 75165. I am over the age of 18 and am competent to make this declaration.

1.  I am a member of the United Church of Christ. I am local member of Embrace UCC in Hurst, TX.

2.  I am a regular viewer of the stations serving the Dallas/Fort Worth market, and I regularly watch WFAA-TV, which is impacted by the proposed transaction.

3.  This Declaration has been prepared in support of the foregoing Petition to Deny the acquisition of TEGNA by Nexstar.

4.  The United Church of Christ's national purpose statement (from the Gospel of Matthew) is: To love God with all our heart, mind, soul, and strength and our neighbor as ourselves. Its vision statement is: United in Christ's love, a just world for all. And its mission statement is: United in Spirit and inspired by God's grace, we welcome all, love all, and seek justice for all. The United Church of Christ's vision of a just world for all has been articulated as "3 Great Loves:" Love of Neighbor, Love of Children, and Love of Creation. These 3 Great Loves work together to address the inequities in our current world.

5.  The mission of UCC Media Justice is The United Church of Christ is a faith community rooted in justice that recognizes the unique power of the media to shape public understanding and thus society. For this reason, UCC Media Justice works to create just and equitable media structures that give meaningful voice to diverse peoples, cultures, and ideas. Established in 1959, UCC Media Justice ultimately established the right of all citizens to participate at the Federal Communications Commission as part of its efforts to ensure a television broadcaster in Jackson, MS served its African-American viewers during the civil rights movement.

6.  In order to pursue a "just world for all" and to "seek justice for all," and to implement UCC Media Justice's mission, I regularly rely on local broadcast television to monitor local news, information, and events, and I rely in particular to WFAA-TV.

    For example, I use the news to know what is going on in North Texas, particularly news about what the Texas Legislature and state officials are proposing/passing. I also watch for information about professional sports teams in this area as they have a significant impact on the regional economy. I watch for information about local events, particularly on the *Good Morning, Texas* and the local segments dropped in to *Good Morning, America*. I rely on the transportation reports since there is always a route to be avoided, as is true with many big cities.

    I trust and rely on Pete Delkus, Jesse Hawila, Cassie Heiter, Tanya Eiserer, and Greg Fields for accurate weather reports, and I appreciate how this station stays on the air during a weather emergency—it even puts up its staff at the nearby hotel to make sure they are available to provide round-the-clock on-air coverage!

    WFAA-TV also does in-depth research to find answers beyond the immediate stories. It has won awards for the work it does, work that the average person (like me) cannot do because I don't have the resources to get the story behind the news.

**App.583**

WE HAVE NO LOCAL PRINTED NEWSPAPER! OUR LOCAL RADIO STATION DOES NOT CARRY LOCAL NEWS! WE RELY ON TV FOR IMPORTANT LOCAL

Even the *Dallas Morning News*, for 140 years locally owned, was sold to Hearst in September 2025. This will undoubtedly reduce the local news it carries, making local stations like WFAA-TV even more important to providing local stories for local residents.

7.  I, and viewers like me, will be harmed by the proposed transaction between Nexstar and TEGNA because it will reduce the broadcaster's attention to the community's local needs. I will be harmed when fewer resources are devoted to local news as a result of the transaction. If this transaction is approved, it is likely that more national content will be shown in my local television market instead of local news content. As a local resident, I am harmed when stories covering local government are not covered adequately by the local media. Additionally, if there are layoffs, the station will lose valuable institutional memory and knowledge of local politics.

    For example, WFAA recently added 30 additional minutes to its 6 p.m. newscast, replacing a syndicated entertainment program with more local news. This is a huge benefit for those of us interested in more than just 10 minutes of local news (followed by an important 10 minutes of local weather and 10 more minutes of local sports). Now we have the ability to hear 40 minutes of local news (less commercials, of course!), and I don't want to see this eliminated in the name of "corporate operating efficiencies."

8.  Research has consistently shown that media consolidation leads to less news coverage and coverage that is less responsive to community needs. Larger broadcast companies tend to replace locally produced programming with nationally produced programming to take advantage of supposed efficiencies. Journalists and other staff will be eliminated to reduce duplication. Nexstar has claimed it will realize $300 million in annual synergies from the merger. I reasonably believe the new ownership would make local news coverage less responsive to my community's needs, which will significantly reduce the quality and quantity of local news in my area.

9.  WFAA-TV has won local EMMYs for its coverage of North Texas (the expanded area beyond the Dallas/Fort Worth market) events. It was the focal point for a riot that occurred on May 30, 2020, nearby to its facility in downtown Dallas, and it saved the lives of people who were part of the legally approved protest about the treatment of George Floyd that was usurped by those who wanted to create a problem. It followed up with an extensively researched story about what happened as a result of the protest-turned-riot that day.

10. I rely on local TV advertising to learn about political campaigns and local business offerings. I am concerned that fewer station owners in my local area will reduce competition, increase advertising prices, and thus reduce my access to this information.

    Ads have been airing promoting various political candidates and causes since last summer, and the mid-term elections are over one (1) year away! I have opportunity, because of WFAA-TV, to learn the positions of various candidates so I can make an informed decision about for whom to vote.

    WFAA-TV was the ONLY station in Texas trusted to produce the coverage of the October 16, 2018, debate between U.S. Sen. Ted Cruz, R-Texas, and U.S. Rep. Beto O'Rourke. The debate was carried by other stations, including the ones that did not win the right to produce the debate coverage.

**App.584**

WFAA-TV produces *Inside Texas Politics,* a great place to learn about what is happening at the state level. WFAA's experienced reporters cover the wide range of Texas politics on both sides of the political divide, and the merger may cause the station to produce less of this resource valuable to those of us who are regular voters.

11. Increased broadcast ownership consolidation means that there are fewer independent local media voices offering differing viewpoints on political, social, and cultural issues. Consolidation of media ownership, which is often accompanied by reductions in force, lessens employment opportunities for traditionally underrepresented groups, harming my interests, as a member of the UCC, in racial and gender equity and diversity and in broadcast television stations that produces news, information and advertising that serves my community's and other communities' needs.

WFAA-TV has been owned by a variety of corporations over the years, but none of these ownership changes threatens the ability of WFAA to continue to provide excellent coverage of local events like this current merger threatens.

WFAA actively supports local charities through major campaigns like Santa's Helpers (collecting up to 50,000 holiday toys through local appearances by station personalities) and Duffels for Dignity (foster care bags). It partners with numerous non-profits like the Jewel Foundation, Empowering The Masses, St. Anthony Foundation, and When We Love, highlighting their needs and fundraising efforts for families in need across North Texas. It focuses on community impact through specific drives for kids, fostering self-sufficiency, and supporting various causes from housing to food insecurity.

WFAA's "Wednesday's Child" program has successfully helped many children in foster care find forever families. No other local station has a program like this, and it would be terrible if it were dropped in the name of "corporate operating efficiency."

12. Harm to news coverage in other local communities harms me. For example, many good and bad policy proposals begin in other states or cities or are part of an intentional nationwide strategy to alter local laws around the country. When news gathering is poor in those places, local people are less likely to adequately vet those policies and poor policies are more likely to be adopted. Moreover, I am less likely to know about those policies and their impacts before they are adopted because there is less newsgathering locally in those communities. I monitor developments in other states and communities in order to anticipate likely policy initiatives in my own state or in my own local area.

A recent example (December 12, 2025) is a story about the 2026 Arlington Pride event being suspended after the Arlington City Council voted on Tuesday not to reinstate local anti-discrimination protections for LGBTQ residents and others. WFAA was on this story minutes after it was announced by the sponsors of Arlington Pride events. This is an important story to me, and I know WFAA will keep reporting on this until it reaches its natural conclusion.

WFAA, through WFAA+, a free service, produces *Friday Night Football*, presenting coverage of 12 local/regional high school football teams each fall. The teams come from the entire viewing area, and it is a pleasure to be able to watch talented local athletes compete in their sport. This is one service that might be dropped in the merger, and it would be a great disappointment to those who cannot get to these games in person. (Football is a religion here in Texas; we worship it at all levels!)

13. I am also concerned that this transaction will result in a more concentrated media market where broadcasters will use their greater negotiating leverage that will risk access to broadcast content by pay TV subscribers, additional blackouts, increased consumer costs and loss of news and information.

    In North Texas, we already pay for the privilege of watching the Texas Rangers baseball team and the Dallas Stars hockey team games. This is above what is paid for access to local TV stations via Spectrum, for which we also pay a fee greater than $100 monthly.

14. This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.


/s/
Diane Miller, 12-12-25

Declaration of Clover Blake

1. I, Clover Blake, am over the age of 18 and am competent to make this declaration.

2. I am a member of the National Association of Broadcast Employees and Technicians - Communications Workers of America (NABET-CWA).

3. I reside at 5805 Green Tree Road, Bethesda MD, 20817.

*Economic Harms - Labor Market*

4. I worked as a News Photographer/Videographer for five years at the Nexstar station serving Evansville, Indiana/Henderson, Kentucky. My work involved going into the community to film video and sound, and cover breaking news including police activity, fires, and weather events. The role requires one to know how to operate a large news gathering camera, tripods, live feed equipment (for example, TVU or Dejero equipment), and microphone and audio equipment.

5. I was fired from my job at Nexstar in April 2025 in retaliation for my union activity. The union is actively fighting for my job back. There is an active case at the National Labor Relations Board regarding my termination. Under the National Labor Relations Act, a potential outcome of my case is backpay and reinstatement to my position at Nexstar. The union is seeking all potential remedies in my labor case.

6. I currently reside in the Washington, DC area and am looking for work in this job market.

7. I am submitting this declaration because I want to advocate with my colleagues and my union to protect our jobs and advocate for labor standards in the industry. The proposed merger would eliminate jobs, reduce pay and compensation, and negatively impact the local job market for news videographers. If stations in the Washington, DC area combine, I anticipate there will be layoffs and fewer jobs. When there are fewer job opportunities, salaries are often lower or increase less rapidly. When there are fewer jobs available, there are fewer opportunities for myself and other NABET-CWA members. These effects would cause economic harm to myself and other NABET-CWA members.

8. Furthermore, if this merger is approved and the rules regarding ownership limits are changed or waived, I believe that additional mergers would be extremely likely in my market and other markets. This would cause further elimination of jobs, reductions in pay and compensation, and harm to the local job market, which would cause further harm to myself and other NABET-CWA members. When there are fewer places where NABET members can work, it harms individual workers and our union.

9. If Nexstar becomes an even larger company nationally, it will negatively impact the ability of the union to bargain with Nexstar around their labor practices.

1

**App.587**

*Economic Harms - Union*

10. As a member of NABET-CWA, I benefit from the union's efforts to organize workers, bargain collective bargaining agreements, and preserve the quantity and quality of local news outlets.

11. When there are fewer eligible members in an industry, unions have to spend more staff time negotiating contracts and organizing workers, they see reduced dues income, and they face greater difficulty negotiating wage increases.

12. This proposed merger, and the mergers it will usher in, make it harder for NABET-CWA to advance the interests of my colleagues and myself and cause me harm.

*Harm to Quality of Local News*

13. I regularly watch news produced by local television stations through both over the air broadcast and streaming. I rely on the news to remain aware of local issues in my community and in order to perform work in the news industry, which requires me to be aware of local news issues and how they are covered.

14. Local news is important to me because it can be a life-saving resource. In my work as a News Photographer/Videographer, I covered issues including a house explosion in Evansville that shook the entire city and I've driven towards countless tornadoes. Covering issues like this on local news helps people in the community obtain resources and this information needs to stay accessible. I know that when companies conduct layoffs and cut corners, it affects how the news is made and local news will be less responsive. I worry that with layoffs and consolidation, local news in my area will suffer.

15. When there are fewer journalists, there is less coverage, which means we're less informed. A decrease in the quality and quantity of local news will harm me and my community.

16. Local news is made by workers. I don't want to see the industry suffer. If we have fewer journalists with less experience being paid less money to produce news, we receive lower quality journalism. As a local resident, I am harmed when stories covering local issues are not adequately covered by local media.

2

**App.588**

This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

_____

Clover Blake

Date: 12/26/25

3

**App.589**

**Declaration of Sara J. Fitzgerald**

1. I, Sara J. Fitzgerald, reside at 7929 Westpark Drive, Apartment 1714, Tysons, VA 22102. I am over the age of 18 and am competent to make this declaration.

2. I am a member of United Church of Christ. I am a member of Rock Spring Congregational Unitec Church of Christ in Arlington, VA. I am also a board member of the United Church of Christ Media Justice Ministry ("UCC Media Justice").]

3. I rely on stations serving the Washington, DC metro area market and I watch WUSA, WDVM and WDCW, which are impacted by the proposed transaction.

4. This Declaration has been prepared in support of the foregoing Petition to Deny the acquisition of TEGNA by Nexstar.

5. The United Church of Christ's national purpose statement (from the Gospel of Matthew) is: To love God with all our heart, mind, soul, and strength and our neighbor as ourselves. Its vision statement is: United in Christ's love, a just world for all. And its mission statement is: United in Spirit and inspired by God's grace, we welcome all, love all, and seek justice for all. The United Church of Christ's vision of a just world for all has been articulated as "3 Great Loves:" Love of Neighbor, Love of Children, and Love of Creation. These 3 Great Loves work together to address the inequities in our current world.

6. The mission of UCC Media Justice is: The United Church of Christ is a faith community rooted in justice that recognizes the unique power of the media to shape public understanding and thus society. For this reason, UCC Media Justice works to create just and equitable media structures that give meaningful voice to diverse peoples, cultures and ideas. Established in 1959, UCC Media Justice ultimately established the right of all citizens to participate at the Federal Communications Commission as part of its efforts to ensure a television broadcaster in Jackson, MS, served its African-American viewers during the civil rights movement.

7. In order to pursue a "just world for all" and to "seek justice for all," and to implement UCC Media Justice's mission, I regularly rely on local broadcast television to monitor local news, information and events.

8. For example I use the news to follow local political news, including the recent statewide and legislative elections in the Commonwealth of Virginia. I rely on local news to monitor potentially disruptive events in Washington, DC, including traffic closures related to special events, state visits, rallies and other large crowd gatherings. I also rely on local news to monitor weather reports during severe thunderstorms and snowstorms, to make plans for traveling and to help ensure my safety.

9. I, and viewers like me, will be harmed by the proposed transaction between Nexstar and TEGNA because it will reduce the broadcaster's attention to the community's local needs. I will be harmed when fewer resources are devoted to local news as a result of the

1

**App.590**

transaction. If this transaction is approved, it is likely that more national content will be shown in my local television market instead of local news content. As a local resident, I am harmed when stories covering local government, local storms and other disruptions are not covered adequately by the local media. Additionally, if there are layoffs, the station will lose valuable institutional memory and knowledge of local politics and our complex market, which covers two states and the District of Columbia.

10. Research has consistently shown that media consolidation leads to less news coverage and coverage that is less responsive to community needs. Larger broadcast companies tend to replace locally-produced programming with nationally-produced programming to take advantage of supposed efficiencies. Journalists and other staff will be eliminated to reduce duplication. Nexstar has claimed it will realize $300 million in annual synergies from the merger. I reasonably believe the new ownership would make local news coverage less responsive to my community's needs, which will significantly reduce the quality and quantity of local news in my area.

11. I rely on local TV advertising to learn about political campaigns and local business offerings. I am concerned that fewer station owners in my local area will reduce competition, increase advertising prices and thus reduce my access to this information.

12. Increased broadcast ownership consolidation means that there are fewer independent local media voices offering differing viewpoints on political, social and cultural issues. Consolidation of media ownership, which is often accompanied by reductions in force, lessens employment opportunities for traditionally underrepresented groups, harming the UCC's interest in racial and gender equity and diversity.

13. Harm to news coverage in other local communities harms me. For example, many good and bad policy proposals begin in other states or cities, or, are part of an intentional nationwide strategy to alter local laws around the country. When news gathering is poor in those places, local people are less likely to adequately vet those policies and poor policies are more likely to be adopted. Moreover, I am less likely to know about those policies and their impacts before they are adopted because there is less newsgathering locally in those communities. I monitor developments in other states in order to anticipate likely policy initiatives in my own state or in my own local area.

14. I am also concerned that this transaction will result in a more concentrated media market where broadcasters will use their greater negotiating leverage that will risk access to broadcast content to pay TV subscribers, additional blackouts, increased costs and loss of news and information.

15. This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

2

**App.591**

[Name]

DATE December 4, 2025

3

**App.592**

Declaration of Quientin McCarty

1.  I, Quientin McCarty, am over the age of 18 and am competent to make this declaration.

2.  I am a member of the National Association of Broadcast Employees and Technicians - Communications Workers of America (NABET-CWA).

3.  I reside at 3725 Milwaukee St., Denver, Colorado, 80205.

*Economic Harms - Labor Market*

4.  I worked as a Master Control Operator at Nexstar in Denver, Colorado for three years. As a Master Control Operator, my duties included managing the live television feed for multiple channels. The controls at my station would control what programming was live on a given channel, for example, upon observing a program cue I would press a button to trigger the correct commercial break. For days without "live" programming, the work would involve observing the programming list, making sure the timing for national commercials and local commercials was accurate, correcting any issues, loading shows onto the playlist, cutting shows, and rolling commercial breaks. For "live" programming days involving events like live sports broadcasts or awards shows, my work would also involve liaising with other teams and coordinating the live feed, for example, if a football game were running long, I would be in communication with the live news station about how much time the game was running over and whether they wanted to run the show late or shorten the program, in addition to coordinating commercial breaks and ensuring there was no empty airtime, for example, by running promotional material. At my workstation, I would manage nine to eleven stations at a time, in different time zones across the country.

5.  Prior to my role at Nexstar, I completed a one year certificate program at the Colorado Media School. Many of my colleagues at Nexstar had completed the same program. The program connected me with the job at Nexstar.

6.  I was fired from my job at Nexstar in February 2025 in retaliation for my union activity. The union is actively fighting for my job back. There is an active case at the National Labor Relations Board regarding my termination. Under the National Labor Relations Act, a potential outcome of my case is backpay and reinstatement to my position at Nexstar. The union is seeking all potential remedies in my labor case.

7.  I live in Denver, Colorado and am looking for work in the Denver job market.

8.  I am submitting this declaration because I want to advocate with my colleagues and my union to protect our jobs and advocate for labor standards in the industry. The proposed merger would eliminate jobs, reduce pay and compensation, and negatively impact the local job market for news videographers. If the stations in Denver combine, I anticipate

1

**App.593**

there will be layoffs and fewer jobs. When there are fewer job opportunities, salaries are often lower or increase less rapidly. When there are fewer jobs available, there are fewer opportunities for myself and other NABET-CWA members. These effects would cause economic harm to myself and other NABET-CWA members.

9. Furthermore, if this merger is approved and the rules regarding ownership limits are changed or waived, I believe that additional mergers would be extremely likely in my market and other markets. This would cause further elimination of jobs, reductions in pay and compensation, and harm to the local job market, which would cause further harm to myself and other NABET-CWA members. When there are fewer places where NABET members can work, it harms individual workers and our union.

10. If Nexstar becomes an even larger company nationally, it will negatively impact the ability of the union to bargain with Nexstar around their labor practices.

*Economic Harms - Union*

11. As a member of NABET-CWA, I benefit from the union's efforts to organize workers, bargain collective bargaining agreements, and preserve the quantity and quality of local news outlets.

12. When there are fewer eligible members in an industry, unions have to spend more staff time negotiating contracts and organizing workers, they see reduced dues income, and they face greater difficulty negotiating wage increases.

13. This proposed merger, and the mergers it would usher in, would make it harder for NABET-CWA to advance the interests of my colleagues and myself and would cause me harm.

*Harm to Quality of Local News*

14. I regularly watch news produced by local television stations, including Channel 7 in Denver which is owned by TEGNA. I watch local news through an antenna over the air and through social media. I rely on the news to remain aware of local issues in my community and in order to perform work in the news industry, which requires me to be aware of local news issues and how they are covered.

15. I care that there is authenticity in local reporting. For example, on issues of crime and safety in a community, political news, or wildfires in Colorado. It's important that local issues in Denver and Colorado get reported, and I know that already there are important stories that don't get reported on the news. National news services cover national stories, not local issues.

2

16. I have seen the effect of layoffs on news production. When workers are laid off, they take their expertise and not everyone knows how to do what the people who were laid off did. For example, I know of an occasion where programming from one channel was played on an entirely different channel due to a lack of proper staffing at that local broadcast channel. This is one example, but it shows that staffing is important and the effects of cutting corners.

17. When there are fewer journalists, there is less coverage, which means we're less informed. A decrease in the quality and quantity of local news will harm me and my community.

18. Local news is made by workers. If we have fewer journalists with less experience being paid less money to produce news, we receive lower quality journalism. As a local resident, I am harmed when stories covering local government are not adequately covered by local media.

This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

_____

Quientin McCarty

Date:  12/29/2025

3

**App.595**

**DECLARATION OF DENISE FAZIO**

1. I, Denise Fazio, am a member of Free Press, located at 1025 Connecticut Avenue NW, Suite 1110, Washington, DC 20036.

2. I am over the age of 18 and am competent to make this declaration.

3. I reside at 930 Button Rock Dr., Unit 83, Longmont, CO, in the Denver, CO Designated Market Area ("Denver DMA").

4. I rely on news produced, aired, or shared by local broadcast television stations serving the Denver DMA, including KUSA, KDVR/KFCT, KWGN-TV, KTVD, for awareness of relevant events and issues facing my community.

5. I would be harmed by the license transfer approvals in the Denver DMA sought in the application that is subject to this Petition to Deny.

6. I understand that if these transfers were approved, the combined company's national reach over the public airwaves would grow to more than 80 percent of U.S. television households. That is more than twice as large as the 39 percent limit set by Congress, out of concern that such control would further erode localism in broadcasting. It is likely that more national content would be shown in my local television market instead of local news content. As a local resident, I am harmed when stories about local government are not covered adequately.

7. Likewise, the combined company would control more than half of the commercial broadcast television stations airing English-language local news in the Denver market.

8. Allowing one company to control this much scarce broadcast spectrum is dangerous to democracy. It would reduce competition that would otherwise incentivize these stations to better serve their local communities' information needs and cover a broader array of issues. It would thus significantly reduce the quality and amount of original local news, eliminate diverse viewpoints, and reduce Nexstar's incentive to invest in robust coverage of local political, social and cultural issues.

9. These concerns are particularized and specific to this proposed transaction, not general concerns about consolidation broadly. Nexstar is notorious for replacing acquired stations' original news broadcasts with the programming already aired on Nexstar's existing stations.

10. In fact, a recent study by academics at the University of Delaware found that of all the U.S. broadcasting chains, Nexstar airs the most duplicated news content.

**App.596**

11. This Declaration has been prepared in support of the foregoing Petition to Deny.

12. This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

December 22, 2025

Denise Fazio

App.597

Docusign Envelope ID: 8220DA98-A085-4BC2-9690-9A6721794AAA

Declaration of Kenneth Koscick

1. I, Kenneth Koscick, am over the age of 18 and am competent to make this declaration.

2. I am a member of the National Association of Broadcast Employees and Technicians - Communications Workers of America (NABET-CWA) and I am the president of NABET-CWA Local 54042.

3. I reside at 8050 North Hills Drive, Broadview Heights, Ohio, 44147. I reside in the Cleveland television market.

*Economic Harms - Labor Market*

4. I worked in the broadcasting industry for 50 years and have been a NABET-CWA member since 1972. I worked as an Engineer Technician at WOIO/WUAB in Cleveland from 1975 to 2020. The work involved maintenance of a wide range of equipment required for broadcast, including transmitters, servers, switching equipment, cameras, and live shot equipment.

5. I have witnessed consolidation leading to layoffs and elimination of jobs in the broadcasting industry. The station I worked for changed hands multiple times during my career. The station was purchased by Gaylord Broadcasting, then Cannell Communications, then Malrite Broadcasting, and then Gray Media. These changes in ownership resulted in layoffs and buyouts, and cost-cutting that has affected the quality of local news.

6. I observe that the job market in this field is more challenging now for workers than it was before. There are fewer job postings than there used to be and there are only so many jobs available in this market. Outside of broadcast, there are some roles as camera operators in sports facilities or concerts, but it's often part-time or limited work without a regular salary. I know colleagues who have left the industry because of a lack of available positions within the industry, or who have relocated to other markets to pursue work.

7. I am submitting this declaration because I want to advocate with my colleagues and my union to protect our jobs and advocate for labor standards in the industry. I am worried about layoffs for my colleagues in Cleveland and overall in my industry. The proposed merger would eliminate jobs, reduce pay and compensation, and negatively impact the local job market for photographers/videographers and engineers, in addition to other positions, for example, producers, copywriters, editors, and shooters. NABET-CWA represents Nexstar and TEGNA workers in Cleveland. If stations in my market combine, those workers will be directly and immediately affected. There will be layoffs and fewer jobs, both in the market where I live and in other markets. When there are fewer jobs available, salaries are often lower or increase less rapidly and there are fewer

1

Docusign Envelope ID: 8220DA98-A085-4BC2-9690-9A6721794AAA

opportunities for myself and other NABET-CWA members. These effects would cause economic harm to myself and other NABET-CWA members.

8. Furthermore, if this merger is approved and the rules regarding ownership limits are changed or waived, I believe that additional mergers would be extremely likely in my market and other markets. This would cause further elimination of jobs, reductions in pay and compensation, and harm to the local job market, which would cause further harm to myself and other NABET-CWA members. When there are fewer potential employers of NABET members, it harms individual workers and our union.

9. I see that the proposed merger is putting a strain on our members in Cleveland, especially younger members with families. They are uncertain if their jobs will still exist after the merger. It is creating stress - and when a member has to go home and take care of their family, it creates even more anxious moments for them all.

*Economic Harms - Union*

10. As a member of NABET-CWA, I benefit from the union's efforts to organize workers, negotiate collective bargaining agreements, and preserve the quantity and quality of local news outlets. I pay dues that finance the union's work in these areas.

11. When there are fewer eligible members in an industry, unions have to spend more staff time negotiating contracts and organizing workers, they see reduced dues income, and they face greater difficulty negotiating wage increases. If Nexstar becomes an even larger company nationally, it will have greater negotiating power which will negatively impact the ability of the union to negotiate with Nexstar around its labor practices. This would negatively affect the labor conditions of NABET-CWA members.

12. This proposed merger, and the mergers it will usher in, would make it harder for NABET-CWA to advance the interests of my colleagues and myself and cause me harm.

*Harm to Quality of Local News*

13. Local news is important to me and I regularly watch news produced by local television stations over-the-air using an antenna and using cable. I rely on the news to remain aware of local issues in my community, from weather and what's happening in local politics, to sports and local events.

14. A decrease in the quality and quantity of local news will harm me and my community. Local news gives you the local information on what is happening politically. For example, what's happening in Broadview Heights or Akron or Cuyahoga Falls. You can't get that information on national news. It also gives you important local stories. For example, I worked on a story about a local man who abducted three young girls and held them hostage for over a decade until they were able to escape. National news came to

2

**App.599**

Docusign Envelope ID: 8220DA98-A085-4BC2-9690-9A6721794AAA

town briefly, but they moved on. If local news hadn't covered it as extensively as they did, the story would have gone unnoticed, and it was very important to the community. There are also fun examples, for example, when the Cavaliers won the NBA title in 2016. There was a big parade and local stations covered the celebration for days. A lot of people could not enjoy the celebration in person. My mother was still alive at the time and she couldn't go enjoy the parade, but she could watch the coverage on local news. She could get local news from the people she watches every day, who she trusts. You can't get that same local experience if it's a giant corporation.

15. Local news is made by workers. If we have fewer journalists with less experience being paid less money to produce news, we receive lower quality journalism. I have seen the quality of news deteriorate as companies get rid of experienced journalists and cut corners. For example, companies do not do the same preventative maintenance of equipment and preparation that was done in the past. The work then falls onto videographers, who are being spread thin because of layoffs and have more duties than before. They have to jump in the car to do a story in one city, then drive an hour and a half in bad weather to do another story. It's also dangerous for workers to be that short-staffed. For example, now there is often only one worker setting up the camera and recording, and we've had members get attacked. Workers have a hundred jobs to do at once and everyone is stressed out. Corporate leadership can't even make a decision as quickly when it's a giant corporation. Corporate bosses in Dallas or Atlanta have no idea what's happening in Cleveland. This inevitably affects the quality of the local news.

16. As a local resident, I am harmed when stories covering local government are not adequately covered by local media. I worry that important local stories, for example, covering local politics, are more likely to be overlooked because of future consolidation.

*Harm as Consumer of Pay TV*

17. I subscribe to pay TV services. I pay for cable television.

18. I understand that one of the objectives of the transaction is to force pay-TV operators to pay larger fees to retransmit broadcast programming. If retransmission consent fees are passed on to subscribers like me, I will incur higher costs for pay TV service.

3

Docusign Envelope ID: 8220DA98-A085-4BC2-9690-9A6721794AAA

This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

Kenneth Koscick

Date:

4

**App.601**

**Declaration of Charles Jefferson, Jr.**

1. I, Charles Jefferson, Jr., reside at 1034 W. 6th Street, Lorain, OH, 44052.  I am over the age of 18 and am competent to make this declaration.

2. I am a member of the United Church of Christ.  I am a board member of UCC Media Justice Ministries, and I'm a member of the Community Church of Chesterland, a UCC affiliated church, where I serve as a trustee, carrying out the business affairs of the congregation.

3. I am a regular viewer of the stations serving the Cleveland, OH market and I watch and have colleagues at both WKYC-TV and WJW-TV, which is impacted by the proposed transaction.

4. This Declaration has been prepared in support of the foregoing Petition to Deny the acquisition of TEGNA by Nexstar.

5. The United Church of Christ's national purpose statement (from the Gospel of Matthew) is: To love God with all our heart, mind, soul, and strength and our neighbor as ourselves. Its vision statement is: United in Christ's love, a just world for all. And its mission statement is: United in Spirit and inspired by God's grace, we welcome all, love all, and seek justice for all.  The United Church of Christ's vision of a just world for all has been articulated as "3 Great Loves:" Love of Neighbor, Love of Children, and Love of Creation.  These 3 Great Loves work together to address the inequities in our current world.

6. The mission of UCC Media Justice is: The United Church of Christ is a faith community rooted in justice that recognizes the unique power of the media to shape public understanding and thus society.  For this reason, UCC Media Justice works to create just and equitable media structures that give meaningful voice to diverse peoples, cultures and ideas.  Established in 1959, UCC Media Justice ultimately established the right of all citizens to participate at the Federal Communications Commission as part of its efforts to ensure a television broadcaster in Jackson, MS served its African-American viewers during the civil rights movement.

7. In order to pursue a "just world for all" and to "seek justice for all," and to implement UCC Media Justice's mission, I regularly rely on local broadcast television to monitor local news, information and events.

8. For example I use the news to engage in my local community, be abreast of local and regional economic and politics issues, and to stay informed of severe weather events to make informed decisions on my immediate safety.

9. I, and viewers like me, will be harmed by the proposed transaction between Nexstar and TEGNA because it will reduce the broadcaster's attention to the community's local

**App.602**

needs. I will be harmed when fewer resources are devoted to local news as a result of the transaction.  If this transaction is approved, it is likely that more national content will be shown in my local television market instead of local news content.  As a local resident, I am harmed when stories covering local government are not covered adequately by the local media.  Additionally, if there are layoffs, the station will lose valuable institutional memory and knowledge of local politics.

10. Research has consistently shown that media consolidation leads to less news coverage and coverage that is less responsive to community needs.  Larger broadcast companies tend to replace locally-produced programming with nationally-produced programming to take advantage of supposed efficiencies.  Journalists and other staff will be eliminated to reduce duplication. Nexstar has claimed it will realize $300 million in annual synergies from the merger.  I reasonably believe the new ownership would make local news coverage less responsive to my community's needs, which will significantly reduce the quality and quantity of local news in my area.

11. I rely on local TV advertising to learn about political campaigns and local business offerings. I am concerned that fewer station owners in my local area will reduce competition, increase advertising prices and thus reduce my access to this information.

12. Increased broadcast ownership consolidation means that there are fewer independent local media voices offering differing viewpoints on political, social and cultural issues. Consolidation of media ownership, which is often accompanied by reductions in force, lessens employment opportunities for traditionally underrepresented groups, harming my interests, as a member of the UCC, in racial and gender equity and diversity and in broadcast television stations that produces news, information and advertising that serves my community's and other communities' needs.

13. Harm to news coverage in other local communities harms me. For example, many good and bad policy proposals begin in other states or cities, or, are part of an intentional nationwide strategy to alter local laws around the country. When news gathering is poor in those places, local people are less likely to adequately vet those policies and poor policies are more likely to be adopted. Moreover, I am less likely to know about those policies and their impacts before they are adopted because there is less newsgathering locally in those communities. I monitor developments in other states and communities in order to anticipate likely policy initiatives in my own state or in my own local area.

14. I am also concerned that this transaction will result in a more concentrated media market where broadcasters will use their greater negotiating leverage that will risk access to broadcast content by pay TV subscribers, additional blackouts, increased consumer costs and loss of news and information.

15. I subscribe to pay TV services. I am also concerned that my subscription costs will increase if the combination of Nexstar and TEGNA can increase the cost for pay television operators to acquire their programming.

**App.603**

16. This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

Charles Jefferson, Jr.

_____

December 18, 2025

Declaration of David Biggs

1. I, David Biggs, am over the age of 18 and am competent to make this declaration.

2. I am a member of the National Association of Broadcast Employees and Technicians - Communications Workers of America (NABET-CWA).

3. I reside at 4334 SE 29th Ave., Portland Oregon, 97202.

*Economic Harms - Labor Market*

4. I have worked in the broadcast industry for over thirty years, including roles with creative services, commercial production, and news production. I am currently employed as a News Videographer at KOIN-Nexstar in Portland, Oregon and I have worked at KOIN-Nexstar since June 2024.

5. In my current role, I shoot and edit news stories, work with reporters, and work independently to film and report on breaking news of the day. My work requires technical knowledge of broadcast cameras, audio equipment, lighting equipment, grip gear, editing software (for example, Premiere Pro or Avid), and live feed equipment (for example, TVU or Dejero equipment). In addition, the ability to multi-task and perform work under significant time constraints, unfavorable weather conditions and other extraneous environmental factors, e.g., police/fire activity, protest violence and traffic is also common practice. The expertise needed for my job is specialized – not only technically, but also aesthetically, as the job also requires the artistic awareness that only comes with practice. In the industry, a commonly held view is that it takes three to five years of work experience in addition to schooling to gain the skills necessary to perform the job at the expected level.

6. I have witnessed consolidation leading to layoffs and the elimination of jobs in the broadcasting industry. I previously worked at a television station owned by the Meredith Corporation that acquired a smaller company in 2002. The merger resulted in the layoff of many employees. It combined job duties into one back-office staff and eliminated the duplication of department functions which put more responsibility on the remaining staff without an equivalent pay increase.

7. I am submitting this declaration because I want to advocate with my colleagues and my union to protect our jobs and advocate for labor standards in the industry. I am worried about layoffs for people at my workplace and in my industry. The proposed merger would eliminate jobs, reduce pay and compensation, and negatively impact the local job market for news videographers. Other positions would also be at risk including producers, copywriters, editors, technical directors, engineers, and assignment desk editors. If two stations in my market combine, there will be layoffs and fewer jobs, both in the market

1

**App.605**

where I live and in other places where I might relocate in the future. When there are fewer jobs available, salaries are often lower or increase less rapidly and there are fewer opportunities for me and other NABET-CWA members. These effects would cause economic harm to myself and other NABET-CWA members.

8. Furthermore, if this merger is approved and the rules regarding ownership limits are changed or waived, I believe that additional mergers would be extremely likely in my market and other markets. This would cause further elimination of jobs, reductions in pay and compensation, and harm to the local job market, which would cause further harm to myself and other NABET-CWA members. When there are fewer potential employers of NABET members, it harms individual workers and our union.

*Economic Harms - Union*

9. As a member of NABET-CWA, I benefit from the union's efforts to organize workers, negotiate collective bargaining agreements, and preserve the quantity and quality of local news outlets. I pay dues that finance the union's work in these areas.

10. When there are fewer eligible members in an industry, unions have to spend more staff time negotiating contracts and organizing workers. They see reduced dues income and face greater difficulty negotiating wage increases. If Nexstar becomes an even larger company nationally, it will have greater negotiating power which will negatively impact the ability of the union to bargain with Nexstar around its labor practices. This would adversely affect the labor conditions of myself and my colleagues.

11. This proposed merger, and the mergers it will usher in, would make it harder for NABET-CWA to advance the interests of my colleagues and myself and cause me harm.

*Harm to Quality of Local News*

12. Local news is important to me, and I regularly watch news produced by local television stations. I view local news to be important for critical coverage of issues. For example; elections for local city, county and state offices; coverage of ICE raids happening in our communities; policies and laws affecting change and other immediate threats to public safety regarding criminal activity or weather related hazards.

13. I rely on local news to be aware of issues in my community. In order to effectively perform my job in the news industry, I need to be aware of local news concerns and how they are covered by competing outlets.

14. A decrease in the quality and quantity of local news will harm me and my community. I know from my work that when we have more outlets reporting news, there is better verification of the facts, and the public obtains a better understanding of the issues. With

2

fewer news outlets, the quality of local news will decrease. The fewer approaches in news coverage will further weaken the variety of programming that's available to viewers.

15. Local news is made by workers. These workers, myself included, need to be justly compensated and be secure in our jobs for the level of expertise that's expected with such an important role in society. If we have fewer journalists with less experience being paid less money to produce news, we receive lower quality journalism. As a local resident, I am harmed when stories covering my community are not adequately covered by local media. National news outlets do not provide local news coverage. I worry that important local stories, for example, covering local politics, public safety and rival opinions are more likely to be overlooked because of future consolidation.

This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

_____

David Biggs

Date: 12/19/2025

3

**App.607**

Declaration of Jacob Jenkins

1. I, Jacob Jenkins, am over the age of 18 and am competent to make this declaration.

2. I am a member of the National Association of Broadcast Employees and Technicians - Communications Workers of America (NABET-CWA).

3. I reside at 1088 NE 7th Ave #517, Portland, Oregon, 97232.

*Economic Harms - Labor Market*

4. I have worked in the broadcast industry for over thirty years, including as a photographer at broadcast stations in Sacramento, Los Angeles, Fresno, and Portland. I worked for seventeen years at CBS in Los Angeles as a photographer. Throughout my career, I have worked in news production. I am currently employed as Chief Photographer at KOIN-Nexstar in Portland, Oregon and I have worked at KOIN-Nexstar for four years.

5. In my current role as Chief Photographer, I do the same work as staff photographers, in addition to coordinating administrative tasks like managing scheduling, equipment, and vehicles. I shoot news stories, work with reporters, and work independently to film and create news stories. My work requires knowledge of broadcast cameras, microphones and audio equipment, lighting equipment, grip gear, editing software (for example, Premiere Pro or Avid), and live feed equipment (for example, TVU or Dejero equipment), in addition to the ability to multi-task and perform work under significant time constraints. The expertise required for my job is specialized and in the industry, a commonly held view is that it takes five years of work experience in addition to schooling to gain the skills necessary to perform the job at the expected level.

6. I am submitting this declaration because I want to advocate with my colleagues and my union to protect our jobs and advocate for labor standards in the industry. I am worried about layoffs for people at my workplace and in my industry. The proposed merger would eliminate jobs, reduce pay and compensation, and negatively impact the local job market for news videographers, in addition to other positions, for example, producers, copywriters, editors, and shooters. If two stations in my market combine, there will be layoffs and fewer jobs, both in the market where I live and in other places where I might relocate in the future. When there are fewer jobs available, salaries are often lower or increase less rapidly and there are fewer opportunities for myself and other NABET-CWA members. These effects would cause economic harm to myself and other NABET-CWA members.

7. Furthermore, if this merger is approved and the rules regarding ownership limits are changed or waived, I believe that additional mergers would be extremely likely in my market and other markets. This would cause further elimination of jobs, reductions in pay

1

**App.608**

and compensation, and harm to the local job market, which would cause further harm to myself and other NABET-CWA members. When there are fewer potential employers of NABET members, it harms individual workers and our union.

8. I have witnessed layoffs and elimination of jobs in the broadcasting industry. I have been laid off from previous roles as a staff photographer. I have repeatedly relocated for work. When I worked in Fresno, Sacramento, Los Angeles, and my present job in Portland, I relocated to those markets in order to take on those jobs.

9. For comparable work in the broadcast, I notice there are not as many job opportunities as there used to be. There are more people looking for work than jobs available. I know people who have left the industry entirely because they cannot find comparable work.

*Economic Harms - Union*

10. As a member of NABET-CWA, I benefit from the union's efforts to organize workers, negotiate collective bargaining agreements, and preserve the quantity and quality of local news outlets. I pay dues that finance the union's work in these areas.

11. When there are fewer eligible members in an industry, unions have to spend more staff time negotiating contracts and organizing workers, they see reduced dues income, and they face greater difficulty negotiating wage increases. If Nexstar becomes an even larger company nationally, it will have greater negotiating power which will negatively impact the ability of the union to negotiate with Nexstar around its labor practices. This would negatively affect the labor conditions of myself and my colleagues.

12. This proposed merger, and the mergers it will usher in, would make it harder for NABET-CWA to advance the interests of my colleagues and myself and cause me harm.

*Harm to Quality of Local News*

13. Local news is important to me and I regularly watch news produced by local television stations. I view local news to be important for critical coverage of issues. For example, elections for local city, county and state offices, and other social issues.

14. I rely on the news to remain aware of local issues in my community and in order to perform my job in the news industry, which requires me to be aware of local news issues and how they are covered.

15. A decrease in the quality and quantity of local news will harm me and my community. I know from my work that when we have more outlets reporting news, there is better and less biased news. I care that the news is high quality, and not influencing viewers to a particular ideology. Journalistic ethics are important to me. I worry that if there are fewer and fewer companies making news, it will lead to more biased news.

2

**App.609**

16. Local news is made by workers. If we have fewer journalists with less experience being paid less money to produce news, we receive lower quality journalism. As a local resident, I am harmed when stories covering local government are not adequately covered by local media. National news outlets do not provide local news coverage. I worry that important local stories, for example, covering local politics, are more likely to be overlooked because of future consolidation.

This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

_Jacob Jenkins_

Date:    12/18/2025

3

**App.610**

**Declaration of Joyce Bathke**

1. I, Joyce Bathke, reside at 1576 Wilmer Road, Wentzville, MO 63385. I am over the age of 18 and am competent to make this declaration.

2. I am a member of the United Church of Christ.  I am a member of Faith United  Church of Christ in Wentzville.I am also a board member of the United Church of Christ.

3. I am a regular viewer of the stations serving the St. Louis market and I watch television in that market, including KSDK (NBC) as well as the CBS and PBS, which is impacted by the proposed transaction.

4. This Declaration has been prepared in support of the foregoing Petition to Deny the acquisition of TEGNA by Nexstar.

5. The United Church of Christ's national purpose statement (from the Gospel of Matthew) is: To love God with all our heart, mind, soul, and strength and our neighbor as ourselves. Its vision statement is: United in Christ's love, a just world for all. And its mission statement is: United in Spirit and inspired by God's grace, we welcome all, love all, and seek justice for all.  The United Church of Christ's vision of a just world for all has been articulated as "3 Great Loves:" Love of Neighbor, Love of Children, and Love of Creation.  These 3 Great Loves work together to address the inequities in our current world.

6. The mission of UCC Media Justice is: The United Church of Christ is a faith community rooted in justice that recognizes the unique power of the media to shape public understanding and thus society.  For this reason, UCC Media Justice works to create just and equitable media structures that give meaningful voice to diverse peoples, cultures and ideas.  Established in 1959, UCC Media Justice ultimately established the right of all citizens to participate at the Federal Communications Commission as part of its efforts to ensure a television broadcaster in Jackson, MS served its African-American viewers during the civil rights movement.

7. In order to pursue a "just world for all" and to "seek justice for all," and to implement UCC Media Justice's mission, I regularly rely on local broadcast television to monitor local news, information and events.

8. For example I use the news to help keep me up to date when making decsisions on services that impact me.

9. I, and viewers like me, will be harmed by the proposed transaction between Nexstar and TEGNA because it will reduce the broadcaster's attention to the community's local needs. I will be harmed when fewer resources are devoted to local news as a result of the transaction.  If this transaction is approved, it is likely that more national content will be shown in my local television market instead of local news content.  As a local resident, I am harmed when stories covering local government are not covered adequately by the

**App.611**

local media.  Additionally, if there are layoffs, the station will lose valuable institutional memory and knowledge of local politics.

10. Research has consistently shown that media consolidation leads to less news coverage and coverage that is less responsive to community needs.  Larger broadcast companies tend to replace locally-produced programming with nationally-produced programming to take advantage of supposed efficiencies.  Journalists and other staff will be eliminated to reduce duplication. Nexstar has claimed it will realize $300 million in annual synergies from the merger.  I reasonably believe the new ownership would make local news coverage less responsive to my community's needs, which will significantly reduce the quality and quantity of local news in my area.

11. I rely on local TV advertising to learn about political campaigns and local business offerings. I am concerned that fewer station owners in my local area will reduce competition, increase advertising prices and thus reduce my access to this information.

12. Increased broadcast ownership consolidation means that there are fewer independent local media voices offering differing viewpoints on political, social and cultural issues. Consolidation of media ownership, which is often accompanied by reductions in force, lessens employment opportunities for traditionally underrepresented groups, harming my interests, as a member of the UCC, in racial and gender equity and diversity and in broadcast television stations that produces news, information and advertising that serves my community's and other communities' needs.

13. Harm to news coverage in other local communities harms me. For example, many good and bad policy proposals begin in other states or cities, or, are part of an intentional nationwide strategy to alter local laws around the country. When news gathering is poor in those places, local people are less likely to adequately vet those policies and poor policies are more likely to be adopted. Moreover, I am less likely to know about those policies and their impacts before they are adopted because there is less newsgathering locally in those communities. I monitor developments in other states and communities in order to anticipate likely policy initiatives in my own state or in my own local area.

14. I am also concerned that this transaction will result in a more concentrated media market where broadcasters will use their greater negotiating leverage that will risk access to broadcast content by pay TV subscribers, additional blackouts, increased consumer costs and loss of news and information.

15. I subscribe to pay TV services. I am also concerned that my subscription costs will increase if the combination of Nexstar and TEGNA can increase the cost for pay television operators to acquire their programming.

16. This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

_/s/__Joyce Bathke_____

December 15, 2025

**App.612**

Declaration of David Carson

1. I, David Carson, am over the age of 18 and am competent to make this declaration.

2. I am a member of The NewsGuild - Communications Workers of America (TNG-CWA) and President of the United Media Guild, a local union within TNG-CWA.

3. I reside at 3127 Allen Avenue, St. Louis, MO, 63104.

*Economic Harms - Labor Market*

4. I am currently employed as a Photojournalist (Photographer/Videographer) at the St. Louis Post-Dispatch ("Post-Dispatch") and have worked there for 25 years. My work involves producing still photos, videos and contributing to newsgathering by conducting interviews and on-scene reporting for stories. I have won a Pulitzer Prize for my work at the Post-Dispatch. I am also currently a John S. Knight Journalism Fellow at Stanford University.

5. The Photographer/Videographer position involves gathering still photos,videos and reporting to accompany news stories. The position requires extensive knowledge of a wide range of still camera equipment, knowledge of video and sound equipment, computers and the ability to use software to edit photos (for example, using Photoshop or Photo Mechanic) and videos (for example, using Premiere Pro). As a photojournalist, I am also responsible for creating and posting online content to our website www.stltoday.com.

6. As the President of the United Media Guild, a local within TNG-CWA, I represent members at multiple employers, who hold roles as reporters, editors, designers, photographers, technical directors, and more. There is substantial overlap in the broadcast journalism labor market, online publication labor market, and news services labor market. The Post-Dispatch, and many news services that formerly were solely print publications, are now multimedia news organizations that produce video or audio content to augment written articles. For example, I have a former colleague who left a role as a reporter at the Post-Dispatch to work as a reporter at a local television station. Video that we have captured at the Post-Dispatch has aired on local and national news outlets. Additionally, all news organizations in the St. Louis market are competing with each other to build digital and online audiences by transitioning to digital-first platforms, prioritizing the rapid delivery of news to our community via social media, websites and apps.

7. During my time in the industry, I have seen consolidation result in layoffs. The Post-Dispatch was purchased by Lee Enterprises, which resulted in multiple rounds of layoffs. I see that the job market in the news industry is more challenging for workers than it was before. I know that when people in the industry are looking for work, they

1

**App.613**

often consider multiple markets because there are not as many jobs available as there used to be, particularly as companies merge and downsize.

8. I am submitting this declaration because I want to advocate with my colleagues and my union to protect our jobs and advocate for labor standards in the industry. The proposed merger would eliminate jobs, reduce pay and compensation, and negatively impact the local job market for jobs in the news industry. TNG-CWA represents members at KSDK in St. Louis, owned by TEGNA. If the stations in my market combine, there will be layoffs and fewer jobs. This impacts our members and the broader labor market. When there are fewer job opportunities, salaries are often lower or increase less rapidly and there are fewer opportunities for myself and other TNG-CWA members. These effects would cause economic harm to myself and other TNG-CWA members.

9. Furthermore, if this merger is approved and the rules regarding ownership limits are changed or waived, I believe that additional mergers would be extremely likely in my market and other markets. This would cause further elimination of jobs, reductions in pay and compensation, and harm to the local job market, which would cause further harm to myself and other TNG-CWA members. When there are fewer potential employers of TNG-CWA members, it harms individual workers and our union.

*Economic Harms - Union*

10. As a member of TNG-CWA, I benefit from the union's efforts to organize workers, negotiate collective bargaining agreements, and preserve the quantity and quality of local news outlets. I pay dues that finance the union's work in these areas.

11. When there are fewer eligible members in an industry, unions have to spend more staff time negotiating contracts and organizing workers, they see reduced dues income, and they face greater difficulty negotiating wage increases.

12. We know from experience that corporate consolidation and mergers result in lost jobs and a more challenging organizing and bargaining climate that requires more resources in order to further TNG-CWA's goals. As a result of past mergers and consolidation, TNG-CWA staff representatives supporting bargaining units have had to spend more time negotiating contracts, and the same result will occur here. The proposed merger would cause harm to the job market for news workers and to TNG-CWA's organizational goals of collective bargaining, organizing, and contract administration.

13. This proposed merger, and the mergers it will usher in, would make it harder for TNG-CWA to advance the interests of my colleagues and myself and cause me harm.

*Harm to Quality of Local News*

14. I watch news produced by multiple local television stations every day. I watch over the air using an antenna and through streaming on YouTube. I rely on the news to remain aware of local issues in my community and in order to perform my job in the news industry, which requires me to be aware of local news issues and how they are covered.

15. Local news is important to me because we need an informed community to make informed decisions at the ballot box. Local news builds the connections that neighbors have with one another, shares stories of people in the community, and increases your understanding of and empathy for who lives in your community. For many people, television broadcast news is their only exposure to news in a given day. It's critical that we maintain a diverse set of voices in the news environment in our communities.

16. I won the Pulitzer Prize for my work covering the Ferguson protests following Michael Brown's death. I often say that the reason our work was successful was that we knew the community. We knew the story better than the people who were just parachuting in from national news outlets. I tell people in the community, "I was here yesterday, I'm here, today, I'll be here tomorrow and the day after that. I'll be accountable to you. This is why you can trust me."

17. It's critical that a community has enough reporters. Consolidation of media companies doesn't benefit the community, it benefits corporations. Companies talk about economies of scale, but it doesn't play out that there are more reporters on the ground - they put one journalist out to do the same work for both stations. If the proposed merger goes through, the Nexstar station would control three local broadcasts in St. Louis. That's not good for the community, and not good for newsgathering - it's only good for the corporations who are going to cut corners in a short-sighted effort to save money at the expense of quality journalism. We've seen it happen in the newspaper industry, with round after round of consolidation and cuts that have damaged local news coverage and created news deserts across the country.

18. Local news is made by workers. I have seen downsizing during my time in the industry, including at my current workplace. If we have fewer news outlets and fewer journalists, we receive lower quality journalism. It's the job of journalists to hold public officials accountable, and uncover issues that otherwise might go unnoticed and keep the community informed about events both big and small. I worry that important local stories will be overlooked because of future consolidation. A decrease in the quality and quantity of local news will harm me and my community.

3

**App.615**

This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

David Carson

Date: 12/26/2025

4

**App.616**

## DECLARATION OF PAUL K. OGDEN

1. I, Paul K. Ogden, am a member of Free Press, located at 1025 Connecticut Avenue NW, Suite 1110, Washington, DC 20036.

2. I am over the age of 18 and am competent to make this declaration.

3. I reside at 3525 W. 55th St., Indianapolis, Indiana 46228. I am in the Indianapolis, IN Designated Market Area (the "Indianapolis DMA").

4. I am a regular viewer of the broadcast television stations serving the Indianapolis DMA, including WXIN, WTHR, WTTV/WTTK, and WALV-CD.

5. I rely on news produced by local broadcast television stations for awareness of relevant events and issues facing my community.

6. I would be harmed by the license transfer approvals in Indianapolis DMA sought in the application that is subject to this Petition to Deny.

7. I understand that if these transfers were approved, the combined company's national reach over the public airwaves would grow to more than 80 percent of U.S. television households. That is more than twice as large as the 39 percent limit set by Congress, out of concern that such control would further erode localism in broadcasting. It is likely that more national content would be shown in my local television market instead of local news content. As a local resident, I am harmed when stories about local government are not covered adequately.

8. Likewise, the combined company would control more than half of the commercial broadcast television stations airing English-language local news in the Indianapolis DMA.

9. Allowing one company to control this much scarce broadcast spectrum is dangerous to democracy. It would reduce competition that would otherwise incentivize these stations to better serve their local communities' information needs and cover a broader array of issues. It would thus significantly reduce the quality and amount of original local news, eliminate diverse viewpoints, and reduce Nexstar's incentive to invest in robust coverage of local political, social and cultural issues.

10. These concerns are particularized and specific to this proposed transaction, not general concerns about consolidation broadly. Nexstar is notorious for replacing acquired stations' original news broadcasts with the programming already aired on Nexstar's existing stations.

**App.617**

11. In fact, a recent study by academics at the University of Delaware found that of all the U.S. broadcasting chains, Nexstar airs the most duplicated news content.

12. This Declaration has been prepared in support of the foregoing Petition to Deny.

13. This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

December 19, 2025

Paul K. Ogden

**Declaration of DAVID BAHR**

1. I, David Bahr, reside at 4070 Jackdaw Street, San Diego, California, 92103. I am over the age of 18 and am competent to make this declaration.

2. I am a member of the United Church of Christ. I am a member Mission Hills United Church of Christ in San Diego.

3. I am a regular viewer of the stations serving the San Diego market and watch KFMB, KSWB, and KUSI which is impacted by the proposed transaction.

4. This Declaration has been prepared in support of the foregoing Petition to Deny the acquisition of TEGNA by Nexstar.

5. The United Church of Christ's national purpose statement (from the Gospel of Matthew) is: To love God with all our heart, mind, soul, and strength and our neighbor as ourselves. Its vision statement is: United in Christ's love, a just world for all. And its mission statement is: United in Spirit and inspired by God's grace, we welcome all, love all, and seek justice for all. The United Church of Christ's vision of a just world for all has been articulated as "3 Great Loves:" Love of Neighbor, Love of Children, and Love of Creation. These 3 Great Loves work together to address the inequities in our current world.

6. The mission of UCC Media Justice is: The United Church of Christ is a faith community rooted in justice that recognizes the unique power of the media to shape public understanding and thus society. For this reason, UCC Media Justice works to create just and equitable media structures that give meaningful voice to diverse peoples, cultures and ideas. Established in 1959, UCC Media Justice ultimately established the right of all citizens to participate at the Federal Communications Commission as part of its efforts to ensure a television broadcaster in Jackson, MS served its African-American viewers during the civil rights movement.

7. In order to pursue a "just world for all" and to "seek justice for all," and to implement UCC Media Justice's mission, I regularly rely on local broadcast television to monitor local news, information and events.

8. For example I use the news to stay informed about our city and world.

9. I, and viewers like me, will be harmed by the proposed transaction between Nexstar and TEGNA because it will reduce the broadcaster's attention to the community's local needs. I will be harmed when fewer resources are devoted to local news as a result of the transaction. If this transaction is approved, it is likely that more national content will be shown in my local television market instead of local news content. As a local resident, I am harmed when stories covering local government are not covered adequately by the local media. Additionally, if there are layoffs, the station will lose valuable institutional memory and knowledge of local politics.

**App.619**

10. Research has consistently shown that media consolidation leads to less news coverage and coverage that is less responsive to community needs. Larger broadcast companies tend to replace locally-produced programming with nationally-produced programming to take advantage of supposed efficiencies. Journalists and other staff will be eliminated to reduce duplication. Nexstar has claimed it will realize $300 million in annual synergies from the merger. I reasonably believe the new ownership would make local news coverage less responsive to my community's needs, which will significantly reduce the quality and quantity of local news in my area.

11. I rely on local TV advertising to learn about political campaigns and local business offerings. I am concerned that fewer station owners in my local area will reduce competition, increase advertising prices and thus reduce my access to this information.

12. Increased broadcast ownership consolidation means that there are fewer independent local media voices offering differing viewpoints on political, social and cultural issues. Consolidation of media ownership, which is often accompanied by reductions in force, lessens employment opportunities for traditionally underrepresented groups, harming my interests, as a member of the UCC, in racial and gender equity and diversity and in broadcast television stations that produces news, information and advertising that serves my community's and other communities' needs.

13. Harm to news coverage in other local communities harms me. For example, many good and bad policy proposals begin in other states or cities, or, are part of an intentional nationwide strategy to alter local laws around the country. When news gathering is poor in those places, local people are less likely to adequately vet those policies and poor policies are more likely to be adopted. Moreover, I am less likely to know about those policies and their impacts before they are adopted because there is less newsgathering locally in those communities. I monitor developments in other states and communities in order to anticipate likely policy initiatives in my own state or in my own local area.

14. I am also concerned that this transaction will result in a more concentrated media market where broadcasters will use their greater negotiating leverage that will risk access to broadcast content by pay TV subscribers, additional blackouts, increased consumer costs and loss of news and information.

15. This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

_____*David Bahr*_____
David Bahr

December 17, 2025

**App.620**

**DECLARATION OF INEZ GONZALEZ**

1. I, Inez Gonzalez, am a member of Free Press, located at 1025 Connecticut Avenue NW, Suite 1110, Washington, DC 20036.

2. I am over the age of 18 and am competent to make this declaration.

3. I reside at 4086 Georgia Street #8, San Diego in the San Diego, CA Designated Market Area ("San Diego DMA").

4. I rely on news produced, aired, or shared by local broadcast television stations serving the San Diego DMA, such as KFMB-TV, KSWB-TV, and KUSI-TV, for awareness of relevant events and issues facing my community.

5. I would be harmed by the license transfer approvals in the San Diego DMA sought in the application that is subject to this Petition to Deny.

6. I understand that if these transfers were approved, the combined company's national reach over the public airwaves would grow to more than 80 percent of U.S. television households. That is more than twice as large as the 39 percent limit set by Congress, out of concern that such control would further erode localism in broadcasting. It is likely that more national content would be shown in my local television market instead of local news content. As a local resident, I am harmed when stories about local government are not covered adequately.

7. Likewise, the combined company would control more than half of the commercial broadcast television stations airing English-language local news in the San Diego market.

8. Allowing one company to control this much scarce broadcast spectrum is dangerous to democracy. It would reduce competition that would otherwise incentivize these stations to better serve their local communities' information needs and cover a broader array of issues. It would thus significantly reduce the quality and amount of original local news, eliminate diverse viewpoints, and reduce Nexstar's incentive to invest in robust coverage of local political, social and cultural issues.

9. These concerns are particularized and specific to this proposed transaction, not general concerns about consolidation broadly. Nexstar is notorious for replacing acquired stations' original news broadcasts with the programming already aired on Nexstar's existing stations.

10. In fact, a recent study by academics at the University of Delaware found that of all the U.S. broadcasting chains, Nexstar airs the most duplicated news content.

**App.621**

11. This Declaration has been prepared in support of the foregoing Petition to Deny.

12. This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

December 22, 2025

_____Inez Gonzalez_____

Inez Gonzalez

**App.622**

**Declaration of the Rev. Jeff Lukens**

1. I, the Rev. Jeff Lukens, reside at 639 South Britain Rd, Southbury, CT.  I am over the age of 18 and am competent to make this declaration.

2. I am a member of the United Church of Christ.  I am the pastor of the South Britain Congregational Church, a member congregation of the United Church of Christ.

3. I am a regular viewer of the stations serving the Hartford/New Haven and New York Metro markets and I watch WTIC (Fox 61) and WTNH (Channel 8), which are impacted by the proposed transaction.

4. This Declaration has been prepared in support of the foregoing Petition to Deny the acquisition of TEGNA by Nexstar.

5. The United Church of Christ's national purpose statement (from the Gospel of Matthew) is: To love God with all our heart, mind, soul, and strength and our neighbor as ourselves. Its vision statement is: United in Christ's love, a just world for all. And its mission statement is: United in Spirit and inspired by God's grace, we welcome all, love all, and seek justice for all.  The United Church of Christ's vision of a just world for all has been articulated as "3 Great Loves:" Love of Neighbor, Love of Children, and Love of Creation.  These 3 Great Loves work together to address the inequities in our current world.

6. The mission of UCC Media Justice is: The United Church of Christ is a faith community rooted in justice that recognizes the unique power of the media to shape public understanding and thus society.  For this reason, UCC Media Justice works to create just and equitable media structures that give meaningful voice to diverse peoples, cultures and ideas.  Established in 1959, UCC Media Justice ultimately established the right of all citizens to participate at the Federal Communications Commission as part of its efforts to ensure a television broadcaster in Jackson, MS served its African-American viewers during the civil rights movement.

7. In order to pursue a "just world for all" and to "seek justice for all," and to implement UCC Media Justice's mission, I regularly rely on local broadcast television to monitor local news, information and events.

8. For example I use the news to connect current events with scripture as I prepare my sermons each week

9. I, and viewers like me, will be harmed by the proposed transaction between Nexstar and TEGNA because it will reduce the broadcaster's attention to the community's local needs. I will be harmed when fewer resources are devoted to local news as a result of the transaction.  If this transaction is approved, it is likely that more national content will be shown in my local television market instead of local news content.  As a local resident, I am harmed when stories covering local government are not covered adequately by the

**App.623**

local media.  Additionally, if there are layoffs, the station will lose valuable institutional memory and knowledge of local politics.

10. Research has consistently shown that media consolidation leads to less news coverage and coverage that is less responsive to community needs.  Larger broadcast companies tend to replace locally-produced programming with nationally-produced programming to take advantage of supposed efficiencies.  Journalists and other staff will be eliminated to reduce duplication. Nexstar has claimed it will realize $300 million in annual synergies from the merger.  I reasonably believe the new ownership would make local news coverage less responsive to my community's needs, which will significantly reduce the quality and quantity of local news in my area.

11. I rely on local TV advertising to learn about political campaigns and local business offerings. I am concerned that fewer station owners in my local area will reduce competition, increase advertising prices and thus reduce my access to this information.

12. Increased broadcast ownership consolidation means that there are fewer independent local media voices offering differing viewpoints on political, social and cultural issues. Consolidation of media ownership, which is often accompanied by reductions in force, lessens employment opportunities for traditionally underrepresented groups, harming my interests, as a member of the UCC, in racial and gender equity and diversity and in broadcast television stations that produces news, information and advertising that serves my community's and other communities' needs.

13. Harm to news coverage in other local communities harms me. For example, many good and bad policy proposals begin in other states or cities, or, are part of an intentional nationwide strategy to alter local laws around the country. When news gathering is poor in those places, local people are less likely to adequately vet those policies and poor policies are more likely to be adopted. Moreover, I am less likely to know about those policies and their impacts before they are adopted because there is less newsgathering locally in those communities. I monitor developments in other states and communities in order to anticipate likely policy initiatives in my own state or in my own local area.

14. I am also concerned that this transaction will result in a more concentrated media market where broadcasters will use their greater negotiating leverage that will risk access to broadcast content by pay TV subscribers, additional blackouts, increased consumer costs and loss of news and information.

15. I subscribe to pay TV services. I am also concerned that my subscription costs will increase if the combination of Nexstar and TEGNA can increase the cost for pay television operators to acquire their programming.

16. This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

_/s/ _Rev. Jeff Lukens_

December 5, 2025

**App.624**

**Declaration of John Madsen-Bibeau**

1. I, John Madsen-Bibeau, reside at 38 Brian Road, West Hartford, CT 06110. I am over the age of 18 and am competent to make this declaration.

2. I am an ordained minister in the United Church of Christ serving as Interim Pastor at Berlin Congregational Church in Berlin, CT, and a member of a yoked American Baptist-United Church of Christ congregation, South Church, New Britain, CT.

3. I am a regular viewer of the stations serving the Hartford market, and I watch WTIC and WTNH, which are impacted by the proposed transaction.

4. This Declaration has been prepared in support of the foregoing Petition to Deny the acquisition of TEGNA by Nexstar.

5. The United Church of Christ's national purpose statement (from the Gospel of Matthew) is: To love God with all our heart, mind, soul, and strength and our neighbor as ourselves. Its vision statement is: United in Christ's love, a just world for all. And its mission statement is: United in Spirit and inspired by God's grace, we welcome all, love all, and seek justice for all. The United Church of Christ's vision of a just world for all has been articulated as "3 Great Loves:" Love of Neighbor, Love of Children, and Love of Creation. These 3 Great Loves work together to address the inequities in our current world.

6. The mission of UCC Media Justice is: The United Church of Christ is a faith community rooted in justice that recognizes the unique power of the media to shape public understanding and thus society. For this reason, UCC Media Justice works to create just and equitable media structures that give meaningful voice to diverse peoples, cultures and ideas. Established in 1959, UCC Media Justice ultimately established the right of all citizens to participate at the Federal Communications Commission as part of its efforts to ensure a television broadcaster in Jackson, MS served its African-American viewers during the civil rights movement.

7. In order to pursue a "just world for all" and to "seek justice for all," and to implement UCC Media Justice's mission, I regularly rely on local broadcast television to monitor local news, information and events.

8. I use the news to inform all kinds of decisions about economics, race, politics, and Christ's place within them.

   I am a history buff and writer interested in African-American history, and I don't want African-American history to disappear from American history. WTNH's February 2025 extended story "Honoring Black History in Connecticut" is the type of local program that further media consolidation puts at risk.

9. I, and viewers like me, will be harmed by the proposed transaction between Nexstar and TEGNA because it will reduce the broadcaster's attention to the community's local needs. I will be harmed when fewer resources are devoted to local news as a result of the transaction. If this transaction is approved, it is likely that more national content will be

**App.625**

shown in my local television market instead of local news content. As a local resident, I am harmed when stories covering local government are not covered adequately by the local media. Additionally, if there are layoffs, the station will lose valuable institutional memory and knowledge of local politics.

10. Research has consistently shown that media consolidation leads to less news coverage and coverage that is less responsive to community needs. Larger broadcast companies tend to replace locally-produced programming with nationally-produced programming to take advantage of supposed efficiencies. Journalists and other staff will be eliminated to reduce duplication. Nexstar has claimed it will realize $300 million in annual synergies from the merger. I reasonably believe the new ownership would make local news coverage less responsive to my community's needs, which will significantly reduce the quality and quantity of local news in my area.

11. I rely on local TV advertising to learn about political campaigns and local business offerings. I am concerned that fewer station owners in my local area will reduce competition, increase advertising prices and thus reduce my access to this information.

12. Increased broadcast ownership consolidation means that there are fewer independent local media voices offering differing viewpoints on political, social and cultural issues. Consolidation of media ownership, which is often accompanied by reductions in force, lessens employment opportunities for traditionally underrepresented groups, harming my interests, as a member of the UCC, in racial and gender equity and diversity and in broadcast television stations that produces news, information and advertising that serves my community's and other communities' needs.

13. Harm to news coverage in other local communities harms me. For example, many good and bad policy proposals begin in other states or cities, or, are part of an intentional nationwide strategy to alter local laws around the country. When news gathering is poor in those places, local people are less likely to adequately vet those policies and poor policies are more likely to be adopted. Moreover, I am less likely to know about those policies and their impacts before they are adopted because there is less newsgathering locally in those communities. I monitor developments in other states and communities in order to anticipate likely policy initiatives in my own state or in my own local area.

14. I am also concerned that this transaction will result in a more concentrated media market where broadcasters will use their greater negotiating leverage that will risk access to broadcast content by pay TV subscribers, additional blackouts, increased consumer costs and loss of news and information.

15. This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.


*John Madsen-Bibeau*

_____

December 5, 2025

**App.626**

**DECLARATION OF SABRINA EDWARDS**

1.  I, Sabrina Edwards, am a member of Free Press, located at 1025 Connecticut Avenue NW, Suite 1110, Washington, DC 20036.

2.  I am over the age of 18 and am competent to make this declaration.

3.  I reside at 901 Wealthy St. SE, Grand Rapids, MI 49506 in the Grand Rapids-Kalamazoo-Battle Creek, MI Designated Market Area (the "Grand Rapids DMA").

4.  I am a regular viewer of the broadcast television stations serving the Grand Rapids DMA, including WOOD-TV, WZZM, WOTV, and WXSP-CD.

5.  I rely on news produced by local broadcast television stations for awareness of relevant events and issues facing my community.

6.  I would be harmed by the license transfer approvals in the Grand Rapids DMA sought in the application that is subject to this Petition to Deny.

7.  I understand that if these transfers were approved, the combined company's national reach over the public airwaves would grow to more than 80 percent of U.S. television households. That is more than twice as large as the 39 percent limit set by Congress, out of concern that such control would further erode localism in broadcasting. It is likely that more national content would be shown in my local television market instead of local news content. As a local resident, I am harmed when stories about local government are not covered adequately.

8.  Likewise, the combined company would control more than half of the commercial broadcast television stations airing English-language local news in Grand Rapids DMA.

9.  Allowing one company to control this much scarce broadcast spectrum is dangerous to democracy. It would reduce competition that would otherwise incentivize these stations to better serve their local communities' information needs and cover a broader array of issues. It would thus significantly reduce the quality and amount of original local news, eliminate diverse viewpoints, and reduce Nexstar's incentive to invest in robust coverage of local political, social and cultural issues.

10. These concerns are particularized and specific to this proposed transaction, not general concerns about consolidation broadly. Nexstar is notorious for replacing acquired stations' original news broadcasts with the programming already aired on Nexstar's existing stations.

**App.627**

11. In fact, a recent study by academics at the University of Delaware found that of all the U.S. broadcasting chains, Nexstar airs the most duplicated news content.

12. This Declaration has been prepared in support of the foregoing Petition to Deny.

13. This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

December 18, 2025

*Sabrina Edwards*

_____

Sabrina Edwards

**App.628**

Declaration of Andrew Halpin

1. I, Andrew Halpin, am over the age of 18 and am competent to make this declaration.

2. I am a member of the National Association of Broadcast Employees and Technicians - Communications Workers of America (NABET-CWA) and I am the president of NABET-CWA Local 51017.

3. I reside at 36 Theodore St., Newington, CT, 06111. I reside in the Hartford-New Haven-Waterbury television market.

*Economic Harms - Labor Market*

4. I have been a News Photographer at WFSB Channel 3 in Hartford, Connecticut for 44 years. The role involves news gathering, filming live shots, and putting stories together. It requires knowledge of technical equipment including cameras, editing equipment, and liveshot equipment. It also requires editorial judgment, as far as understanding what is news and how to tell stories, and aesthetic judgment, for example, framing a shot that will look good.

5. I have witnessed consolidation leading to layoffs and elimination of jobs in the broadcasting industry. The station I worked for changed hands multiple times during my career. The station was owned by Post Newsweek, then Meredith Broadcasting, then Gray Media. These changes in ownership resulted in layoffs and buyouts, and cost-cutting that has affected the quality of local news.

6. I observe that the job market in this field is more challenging now for workers than it was before. There are fewer jobs available than there were before and wages are lower than they were before. I know colleagues who have left the industry because of a lack of available positions within the industry. This used to be a job that could support a family, and it's not anymore.

7. I am submitting this declaration because I want to advocate with my colleagues and my union to protect our jobs and advocate for labor standards in the industry. I am worried about layoffs for my colleagues in Hartford and overall in my industry. The proposed merger would eliminate jobs, reduce pay and compensation, and negatively impact the local job market for photographers/videographers, in addition to other positions, for example, producers, copywriters, editors, and engineers. NABET-CWA represents TEGNA workers in Hartford. If stations in my market combine, those workers will be directly and immediately affected. There will be layoffs and fewer jobs, both in the market where I live and in other markets. When there are fewer jobs available, salaries are often lower or increase less rapidly and there are fewer opportunities for myself and

1

**App.629**

other NABET-CWA members. These effects would cause economic harm to myself and other NABET-CWA members.

8. Furthermore, if this merger is approved and the rules regarding ownership limits are changed or waived, I believe that additional mergers would be extremely likely in my market and other markets. This would cause further elimination of jobs, reductions in pay and compensation, and harm to the local job market, which would cause further harm to myself and other NABET-CWA members. When there are fewer potential employers of NABET members, it harms individual workers and our union.

*Economic Harms - Union*

9. As a member of NABET-CWA, I benefit from the union's efforts to organize workers, negotiate collective bargaining agreements, and preserve the quantity and quality of local news outlets. I pay dues that finance the union's work in these areas.

10. When there are fewer eligible members in an industry, unions have to spend more staff time negotiating contracts and organizing workers, they see reduced dues income, and they face greater difficulty negotiating wage increases. If Nexstar becomes an even larger company nationally, it will have greater negotiating power which will negatively impact the ability of the union to negotiate with Nexstar around its labor practices. This would negatively affect the labor conditions of NABET-CWA members.

11. This proposed merger, and the mergers it will usher in, would make it harder for NABET-CWA to advance the interests of my colleagues and myself and cause me harm.

*Harm to Quality of Local News*

12. Local news is important to me and I regularly watch news produced by local television stations over-the-air using an antenna. I rely on the news to remain aware of local issues in my community.

13. A decrease in the quality and quantity of local news will harm me and my community. All politics is local. We used to have more political reporters and beat reporters in Hartford and New Haven. When you have quality local news, reporters know other people, they aren't relying on just press releases and facebook. Reporters need to stay in a community in order to build those contacts. If you can't pay a good wage, reporters won't stay. The quality of local news is already much worse than it was before, and I worry that with increased consolidation it will get even worse.

14. If we go down to three stations in the Hartford-New Haven market, it will be tragic for local news. TEGNA already owns two of the stations and Nexstar owns two of the stations: together they'll have four of the stations in this market and will be broadcasting from four of the towers here. We are removing competition from the market, which is not

2

**App.630**

good for viewership. Competition is good for the industry. With multiple news stations, we appreciate each other, and challenge each other to create better news. With this merger, that will go away. There will be fewer people challenging each other to do better. It's not good for viewers, and worsens the quality of the local news. Broadcast companies have a license that is entrusted to them by the public. Their job is to bring information that the public wants. With consolidations and mergers, we are failing to do that and we are losing storytellers.

15. Local news is made by workers. If we have fewer journalists with less experience being paid less money to produce news, we receive lower quality journalism. I have seen the quality of news deteriorate as companies get rid of experienced journalists and cut corners.

16. As a local resident, I am harmed when stories covering local government are not adequately covered by local media. I worry that important local stories, for example, covering local politics, are more likely to be overlooked because of future consolidation.

This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

Andrew Halpin

Date: 12-22-25

3

**App.631**

**DECLARATION OF JESS PINKHAM**

1. I, Jess Pinkham, am a member of Free Press, located at 1025 Connecticut Avenue NW, Suite 1110, Washington, DC 20036.

2. I am over the age of 18 and am competent to make this declaration.

3. I reside at 1557 N. Rocheblave Street, New Orleans, LA 70119 in the New Orleans, LA Designated Market Area (the "New Orleans DMA").

4. I rely on news produced by local broadcast television stations serving the New Orleans DMA, including WWL-TV, WGNO, WNOL-TV, WUPL, for awareness of relevant events and issues facing my community.

5. I would be harmed by the license transfer approvals in the New Orleans DMA sought in the application that is subject to this Petition to Deny.

6. I understand that if these transfers were approved, the combined company's national reach over the public airwaves would grow to more than 80 percent of U.S. television households. That is more than twice as large as the 39 percent limit set by Congress, out of concern that such control would further erode localism in broadcasting. It is likely that more national content would be shown in my local television market instead of local news content. As a local resident, I am harmed when stories about local government are not covered adequately.

7. Likewise, the combined company would control more than half of the commercial broadcast television stations airing English-language local news in the New Orleans DMA.

8. Allowing one company to control this much scarce broadcast spectrum is dangerous to democracy. It would reduce competition that would otherwise incentivize these stations to better serve their local communities' information needs and cover a broader array of issues. It would thus significantly reduce the quality and amount of original local news, eliminate diverse viewpoints, and reduce Nexstar's incentive to invest in robust coverage of local political, social and cultural issues.

9. These concerns are particularized and specific to this proposed transaction, not general concerns about consolidation broadly. Nexstar is notorious for replacing acquired stations' original news broadcasts with the programming already aired on Nexstar's existing stations.

10. In fact, a recent study by academics at the University of Delaware found that of all the U.S. broadcasting chains, Nexstar airs the most duplicated news content.

**App.632**

11.  This Declaration has been prepared in support of the foregoing Petition to Deny.

12.  This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

December 18, 2025

*Jess Pinkham*

_____

Jess Pinkham

**App.633**

**Declaration of the Rev. Lindsey Braun**

1.  I, Lindsey Braun, reside at 1111 69th Street, Windsor Heights, IA, 50324. I am over the age of 18 and am competent to make this declaration.

2.  I am a member of the United Church of Christ.  I am a member and Senior Pastor of Urbandale United Church of Christ in Urbandale, IA.

3.  I am a regular viewer of the stations serving the Des Moines-Ames market and I watch WHO and WOI, which are impacted by the proposed transaction.

4.  This Declaration has been prepared in support of the foregoing Petition to Deny the acquisition of TEGNA by Nexstar.

5.  The United Church of Christ's national purpose statement (from the Gospel of Matthew) is: To love God with all our heart, mind, soul, and strength and our neighbor as ourselves. Its vision statement is: United in Christ's love, a just world for all. And its mission statement is: United in Spirit and inspired by God's grace, we welcome all, love all, and seek justice for all.  The United Church of Christ's vision of a just world for all has been articulated as "3 Great Loves:" Love of Neighbor, Love of Children, and Love of Creation.  These 3 Great Loves work together to address the inequities in our current world.

6.  The mission of UCC Media Justice is: The United Church of Christ is a faith community rooted in justice that recognizes the unique power of the media to shape public understanding and thus society.  For this reason, UCC Media Justice works to create just and equitable media structures that give meaningful voice to diverse peoples, cultures and ideas.  Established in 1959, UCC Media Justice ultimately established the right of all citizens to participate at the Federal Communications Commission as part of its efforts to ensure a television broadcaster in Jackson, MS served its African-American viewers during the civil rights movement.

7.  In order to pursue a "just world for all" and to "seek justice for all," and to implement UCC Media Justice's mission, I regularly rely on local broadcast television to monitor local news, information and events.

8.  For example I use the news to follow what's happening with our National Guard deployments, specifically the recent deaths of soldiers in Syria. I also use the news to follow and learn about developments with stories like the resignation of former DMPS Superintendent Ian Roberts and also community celebrations, events, and gatherings.

9.  I, and viewers like me, will be harmed by the proposed transaction between Nexstar and TEGNA because it will reduce the broadcaster's attention to the community's local needs. I will be harmed when fewer resources are devoted to local news as a result of the transaction.  If this transaction is approved, it is likely that more national content will be shown in my local television market instead of local news content.  As a local resident, I

**App.634**

am harmed when stories covering local government are not covered adequately by the local media. Additionally, if there are layoffs, the station will lose valuable institutional memory and knowledge of local politics.

10. Research has consistently shown that media consolidation leads to less news coverage and coverage that is less responsive to community needs. Larger broadcast companies tend to replace locally-produced programming with nationally-produced programming to take advantage of supposed efficiencies. Journalists and other staff will be eliminated to reduce duplication. Nexstar has claimed it will realize $300 million in annual synergies from the merger. I reasonably believe the new ownership would make local news coverage less responsive to my community's needs, which will significantly reduce the quality and quantity of local news in my area.

11. I rely on local TV advertising to learn about political campaigns and local business offerings. I am concerned that fewer station owners in my local area will reduce competition, increase advertising prices and thus reduce my access to this information.

12. Increased broadcast ownership consolidation means that there are fewer independent local media voices offering differing viewpoints on political, social and cultural issues. Consolidation of media ownership, which is often accompanied by reductions in force, lessens employment opportunities for traditionally underrepresented groups, harming my interests, as a member of the UCC, in racial and gender equity and diversity and in broadcast television stations that produces news, information and advertising that serves my community's and other communities' needs.

13. Harm to news coverage in other local communities harms me. For example, many good and bad policy proposals begin in other states or cities, or, are part of an intentional nationwide strategy to alter local laws around the country. When news gathering is poor in those places, local people are less likely to adequately vet those policies and poor policies are more likely to be adopted. Moreover, I am less likely to know about those policies and their impacts before they are adopted because there is less newsgathering locally in those communities. I monitor developments in other states and communities in order to anticipate likely policy initiatives in my own state or in my own local area.

14. I am also concerned that this transaction will result in a more concentrated media market where broadcasters will use their greater negotiating leverage that will risk access to broadcast content by pay TV subscribers, additional blackouts, increased consumer costs and loss of news and information.

15. This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

*Rev. Lindsey E. Braun*

12/16/2025

**App.635**

Declaration of Amanda Luberto

1. I, Amanda Luberto, am over the age of 18 and am competent to make this declaration.

2. I am a member of The NewsGuild - Communications Workers of America (TNG-CWA) and a Vice Chair of the Arizona Republic Guild.

3. I reside at 911 East Camelback Rd #2043, Phoenix, Arizona, 85014.

*Economic Harms - Labor Market*

4. I work as a Podcast Producer at the Arizona Republic. I run two weekly podcasts, one is a politics show and one goes more in depth on particular stories. My work requires knowledge of audio production, audio editing software (for example, Adobe Audition), and script writing. Prior to this role, I worked in radio broadcast as an Associate Producer at KJZZ, the local NPR station. I learned the skills required for my position on the job and through school. I have a Bachelors of Arts in Mass Communication and Journalism. In the Mass Communication and Journalism program, students could specialize in print or broadcast, and I studied broadcast. I also have videography skills which I have used in previous jobs.

5. There is substantial overlap in the broadcast journalism labor market, online publication labor market, and news services labor market. The Arizona Republic, and many news services that formerly were solely print publications, produce video or audio content in addition to written articles. For example, video content about news issues for websites and social media, and audio content for podcasts. The video team at the Arizona Republic creates various video news projects. They create both longer documentaries and short form video. For example, they created a longer investigative piece regarding violent assaults by a group of high school students which won local awards. They also record interviews with elected officials which would appear on the Arizona Republic website or social media.

6. I know colleagues at the Arizona Republic who have previously worked at broadcast television stations, and colleagues who have left the Arizona Republic to go work at broadcast television stations. The Arizona Republic was previously owned by TEGNA. It is now owned by Gannett.

7. The job market in the news industry is competitive and there are more individuals looking for jobs than there are job postings. When I was looking for work, I considered positions in multiple markets on the west coast because I knew how few jobs there were, particularly as companies merge and downsize. I know that many of my colleagues have a similar experience.

1

8. I am submitting this declaration because I want to advocate with my colleagues and my union to protect our jobs and advocate for labor standards in the industry. The proposed merger would eliminate jobs, reduce pay and compensation, and negatively impact the local job market for jobs in the news industry, including producers, photographers, videographers, copywriters, editors, and shooters. If two stations in my market combine, there will be layoffs and fewer jobs, both in the market where I live and in other places where I might relocate in the future. When there are fewer jobs available, salaries are often lower or increase less rapidly and there are fewer opportunities for myself and other TNG-CWA members. These effects would cause economic harm to myself and other TNG-CWA members.

9. Furthermore, if this merger is approved and the rules regarding ownership limits are changed or waived, I believe that additional mergers would be extremely likely in my market and other markets. This would cause further elimination of jobs, reductions in pay and compensation, and harm to the local job market, which would cause further harm to myself and other TNG-CWA members. When there are fewer potential employers of TNG-CWA members, it harms individual workers and our union.

*Economic Harms - Union*

10. As a member of TNG-CWA, I benefit from the union's efforts to organize workers, negotiate collective bargaining agreements, and preserve the quantity and quality of local news outlets. I pay dues that finance the union's work in these areas.

11. When there are fewer eligible members in an industry, unions have to spend more staff time negotiating contracts and organizing workers, they see reduced dues income, and they face greater difficulty negotiating wage increases.

12. We know from experience that corporate consolidation and mergers result in lost jobs and a more challenging organizing and bargaining climate that requires more resources in order to further TNG-CWA's goals. As a result of past mergers and consolidation, TNG-CWA staff representatives supporting bargaining units have had to spend more time negotiating contracts. The proposed merger would cause harm to the job market for news workers and to TNG-CWA's organizational goals of collective bargaining, organizing, and contract administration.

13. This proposed merger, and the mergers it will usher in, would make it harder for TNG-CWA to advance the interests of my colleagues and myself and cause me harm.

*Harm to Quality of Local News*

14. Local news is important to me and I regularly watch news produced by multiple local television stations, including Channel 12 News, Fox 10, NBC and CBS. I rely on the

2

**App.637**

news to remain aware of local issues in my community and in order to perform my job in the news industry, which requires me to be aware of local news issues and how they are covered.

15. I view local news to be one of the most important aspects of American society. It is crucial in this country. I've been able to go abroad and observe news being made in Europe. Their national news is more impactful because the countries are smaller. In a country as big as the United States, the only way to tell regional and impactful stories is through local news. National news is of course important. But as a news consumer and a news maker, I know that what people truly need to know every day will come in local news. For example, why is this road closed, why is my public school falling apart, why are my taxes changing. These issues will only be covered on local news.

16. The podcasts I produce at the Arizona Republic cover local issues and connect national issues to what is happening in Arizona. For example, what is happening at Scottsdale city council, why parking is hard to find in Phoenix, or interviews with a local civil rights leader. Local programming is necessary to make the connection between national news and local news. For example, nationally, the coverage might be about why Medicaid coverage is disappearing, but local coverage will connect it for residents to what is happening in Arizona.

17. A decrease in the quality and quantity of local news will harm me and my community. With fewer news outlets, the quality of local news will decrease. I worry about stories falling through the cracks. I know that understaffing leads news outlets to cover fewer stories. I worry that as companies merge and consolidate, and news coverage shrinks, that there will not be the reporting necessary to counter corruption. For example, I know that during the ballot recount of 2021, if there had not been consistent reporting and journalists acting as watchdogs, the ballot recount could have gone completely differently. Every day there were Arizona reporters asking why certain staff were on the floor of the recount and asking questions about what was happening. It had a direct impact on how the recount was conducted..

18. I know from my work that when we have more outlets reporting news, the quality of news is better. The existence of multiple local news stations and publications also encourages reporters to stay sharp and creative. For example, we will see another channel was able to get a story we were not aware of, and consider ways to improve our own coverage. If we all become one large conglomerate, it will discourage new ideas and make coverage worse.

19. I have seen downsizing during my time in the industry, including at my current workplace. Local news is made by workers. If we have fewer journalists with less experience being paid less money to produce news, we receive lower quality journalism.

3

**App.638**

As a local resident, I am harmed when stories covering local government are not adequately covered by local media. National news outlets do not provide local news coverage. I worry that important local stories will be overlooked because of future consolidation.

This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

Amanda Luberto

Amanda Luberto

Date:    12/19/2025

4

**App.639**

## DECLARATION OF SUE WILSON OF MEDIA ACTION CENTER

1. I, Sue Wilson of Media Action Center, am a member of Free Press, located at 1025 Connecticut Avenue NW, Suite 1110, Washington, DC 20036.

2. I am over the age of 18 and am competent to make this declaration.

3. I reside at 18125 Tyler Road Fiddletown CA  in the Sacramento DMA.

4. I am a regular viewer of the broadcast television stations serving the Sacramento DMA, including KTXL and KXTV.

5. I rely on news produced by local broadcast television stations for awareness of relevant events and issues facing my community.

6. I would be harmed by the license transfer approvals in the Sacramento DMA sought in the application that is subject to this Petition to Deny.

7. I understand that if these transfers were approved, the combined company's national reach over the public airwaves would grow to more than 80 percent of U.S. television households. That is more than twice as large as the 39 percent limit set by Congress, out of concern that such control would further erode localism in broadcasting. It is likely that more national content would be shown in my local television market instead of local news content. As a local resident, I am harmed when stories about local government are not covered adequately.

8. Likewise, the combined company would control half of the commercial broadcast television stations producing English-language local news in the Sacramento DMA.

9. Allowing one company to control this much scarce broadcast spectrum is dangerous to democracy. It would reduce competition that would otherwise incentivize these stations to better serve their local communities' information needs and cover a broader array of issues. It would thus significantly reduce the quality and amount of original local news, eliminate diverse viewpoints, and reduce Nexstar's incentive to invest in robust coverage of local political, social and cultural issues.

10. These concerns are particularized and specific to this proposed transaction, not general concerns about consolidation broadly. Nexstar is notorious for replacing acquired stations' original news broadcasts with the programming already aired on Nexstar's existing stations.

11. In fact, a recent study by academics at the University of Delaware found that of all the U.S. broadcasting chains, Nexstar airs the most duplicated news content.

**App.640**

12. What's more, giving this much control of local broadcast airwaves to a single entity will enhance Nexstar's ability to command monopoly-level retransmission payments from cable, satellite, and online TV distributors, which would harm me by increasing my monthly TV bill beyond what it would be but for this merger, and also would increase the chance of carriage blackouts.

13. This Declaration has been prepared in support of the foregoing Petition to Deny.

14. This statement is true to my personal knowledge and is made under penalty of perjury of the laws of the United States of America.

December 30, 2025

Sue Wilson

**App.641**

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Applications to Transfer Control of TEGNA | **)** | MB Docket No. 25-331 |
| Inc. to Nexstar Media Inc. | **)** | |
| | **)** | |
| | **)** | |
| | **)** | |

**PUBLIC INTEREST PETITIONERS' REPLY TO OPPOSITION**

Cheryl Leanza
**United Church of Christ**
 **Media Justice Ministry**
100 Maryland Avenue, NE
Suite 330
Washington, DC 20002

John Bergmayer
**Public Knowledge**
1818 N Street, NW
Suite 410
Washington, DC 20036

S. Derek Turner
Matthew F. Wood
**Free Press**
1025 Connecticut Avenue, NW
Suite 1110
Washington, DC 20036
202-265-1490

Nell Geiser
Ceilidh Gao
**Communications Workers of America**
501 Third Street, NW
Washington, DC 20001

January 27, 2026

**App.642**

**EXECUTIVE SUMMARY**

The Commission's role in reviewing broadcast media mergers is not a mere formality conducted alongside the Department of Justice. The FCC's public interest standard requires that the agency hold these broadcast companies seeking to acquire more of the scarce public airwaves to a very high standard, above and beyond mere antitrust, demonstrating that consolidation will bring unambiguous and clear civic benefits that more than fully offset the harms following the loss of a unique news voice. Nexstar and TEGNA have failed to meet this very high bar. They weave a tale of pending doom to local news production if the Commission does not take the extraordinary and unlawful step of attempting to waive the National Audience Reach Cap set by Congress to prevent mergers just like this one. Yet Applicants tell a completely different story to their investors, bragging about how insulated their businesses are from online competition.

Public Interest Petitioners exhaustively demonstrated the public interest harms that are certain to follow this merger. Contrary to Applicants' accusations, our evidence was not based on "speculation," but on rigorous analysis, academic studies, and real-world experiences observed by workers and the public following prior mergers. Petitioners also extensively documented why Applicants' claimed benefits are not actual benefits, not specific to this merger, and not cognizable. A more wealthy Nexstar is <u>not</u> a benefit that offsets the loss of TEGNA as a unique local news producer that competes directly against Nexstar in a local TV news market that desperately needs more unique voices.

Contrary to Applicants' assertions, the Public Interest Petitioners have standing to participate in this proceeding. It is not surprising that Nexstar would use every tool it can to pave the way for its local media monopolization, but the import of its arguments are dangerous to an agency that actually cares about the public interest.

The law is clear, the data is clear, and the likely harms of the Transaction are beyond dispute. The Commission must deny the Application in full.

2

**App.643**

**TABLE OF CONTENTS**

EXECUTIVE SUMMARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.  THE PUBLIC INTEREST PETITIONERS HAVE STANDING, DESPITE THE
OPPOSITION'S UNAVAILING CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.  The Public Interest Petitioners have representational standing. . . . . . . . . . . . . . . . . 6

        1.  CWA has representational standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        2.  Free Press and UCC Media Justice have representational standing . . . . . . . . . . . . . 8

    B.  The Public Interest Petitioners have organizational standing . . . . . . . . . . . . . . . . . . 10

        1.  CWA has organizational standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        2.  Free Press and UCC Media Justice have organizational standing. . . . . . . . . . . . . . 11

III.  THE COMMISSION CAN AND SHOULD CONSIDER LABOR MARKET
EFFECTS IN ITS APPLICATION OF THE PUBLIC INTEREST STANDARD. . . . . . . 13

IV.  APPLICANTS FAIL TO DEMONSTRATE THAT THE TRANSACTION
WOULD NOT HARM THE PUBLIC INTEREST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

V.  APPLICANTS FAIL TO DEMONSTRATE THAT THE TRANSACTION
WOULD RESULT IN MERGER-SPECIFIC, COGNIZABLE PUBLIC
INTEREST BENEFITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    A.  The Commission's Public Interest Review and Evaluation of Applicants' Local
Multiple Ownership Rule Waiver Requests Must Account for Nexstar's Actual
Control Over All Stations that it Operates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

3

**App.644**

## I.   INTRODUCTION

Public Interest Petitioners[1] hereby submit this Reply to the Consolidated Opposition to Petitions to Deny and Comments (the "Opposition") filed by TEGNA Inc. ("TEGNA") and Nexstar Media Inc. ("Nexstar") (together, "Applicants") in the above-captioned docket regarding the proposed transfer of TEGNA's licenses to Nexstar (the "Transaction").[2]

Our reply below briefly addresses three main topics: (1) Applicants' flawed arguments against Petitioners' standing and status as parties in interest under 47 U.S.C. § 309(d)(1) and 47 C.F.R. § 73.3584(a); (2) Applicants' attempt to discount the Commission's consideration of this merger's obvious detrimental impact on the companies' workers and on broadcast labor markets in general; and (3) Applicants' meritless opposition to Petitioners' explanation of the Transaction's obvious harms, along with Applicants' fruitless defense of the merger's often fanciful and always non-cognizable benefits.

---

[1] Petitioners are Free Press, the National Association of Broadcast Employees and Technicians - Communications Workers of America ("NABET-CWA"), The NewsGuild - Communications Workers of America ("TNG-CWA"), and the United Church of Christ Media Justice Ministry ("UCC Media Justice"), along with Public Knowledge. In their Opposition, Applicants' smirkingly refer to the Public Interest Petitioners as "Special Interest Groups," in search of a chuckle from fellow ideologues and a few culture war points. While the Commission obviously does not need to weigh such petty taunts in its deliberations on the public interest impacts of this Transaction, the general public can take note of just how Nexstar treats its own employees, as the company's high-paid lawyers dismiss not only non-profit advocacy organizations and religious institutions but even labor unions as "special interest" groups.

[2] On December 1, 2025, the Media Bureau released a Public Notice in this docket establishing the pleading cycle for petitions to deny the Transaction. *See Media Bureau Establishes Pleading Cycle for Applications to Transfer Control of TEGNA Inc. to Nexstar Media Inc. and Permit-But-Disclose* Ex Parte *Status for the Proceeding*, MB Docket No. 25-331, Public Notice, DA 25-1000 (rel. Dec. 1, 2025). That Public Notice set the date for replies as January 26, 2026. Due to the winter storm-related closure of federal offices in Washington, DC on that date, replies are instead due on "the next business day" following that "holiday" for "adverse weather." *See* 47 C.F.R. § 1.4(e)(1), (j). This Reply is timely filed on January 27, 2026, even as federal government offices remain closed due to the same adverse weather conditions.

**App.645**

## II.    THE PUBLIC INTEREST PETITIONERS HAVE STANDING, DESPITE THE OPPOSITION'S UNAVAILING CLAIMS.

The Applicants offer a confused hodgepodge of arguments opposing Petitioners' standing. They confuse what each Petitioner needs to show for each category of standing. To reiterate, the Article III test for standing requires: (1) injury-in-fact (2) fairly traceable to the challenged conduct (3) likely to be redressed by a favorable judicial decision.[3] Organizations can establish standing as representatives of their members or on their own behalf as organizations.[4]

As a preliminary matter it is important to note that in almost identical circumstances, both the Commission and the U.S. Court of Appeals for the Third Circuit recognized petitioners standing. That precedent is directly applicable here. In the Albritton/Sinclair transaction, Free Press submitted affidavits very similar to the ones presented in this docket.[5] The Commission recognized its standing.[6] The Third Circuit did likewise when petitioners challenged the Commission's Quadrennial Review decision to loosen media ownership rules because it would lead to consolidation and inflict harm.[7] The Third Circuit rejected the claim that anticipating

---

[3] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

[4] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023).

[5] Free Press and Put People First! PA, Petition to Deny Application for Consent to Assignment of Broadcast Station Licenses from Sinclair Television Group to Deerfield Media (Birmingham), Deerfield Media (Harrisburg) Licensee, LLC, and  HSH Charleston (WMMP) ) Licensee, LLC., MB Docket No. 13-203 (filed Sept. 13, 2013) (relying on declarations stating acquiring owner would combine operations and reduce the quality and amount of local news).

[6] *Applications for Consent to Transfer of Control from License Subsidiaries of Allbritton Communications Co. to Sinclair Television Group, Inc*., Memorandum Opinion and Order, 29 FCC Rcd 9156, ¶23 (MB 2014).

[7] *Prometheus Radio Project v. Fed. Commc'ns Comm'n*, 939 F.3d 567, 579–81 (3d Cir. 2019), *rev'd on other grounds*, 592 U.S. 414 (2021), *vacated*, 846 F. App'x 88 (3d Cir. 2021).

5

**App.646**

specific mergers was too speculative a harm even if the deals were not yet proposed because the point of media ownership rule relaxation was to permit consolidation.[8]

### A. The Public Interest Petitioners have representational standing.

Free Press, NABET-CWA, TNG-CWA, and UCC Media Justice all showed they meet the requirements of representational standing. As Applicants recognize, an organization seeking to establish standing on behalf of its members must show that at least one of its members satisfies each requirement.[9]

### 1. CWA has representational standing.

Applicants oddly claim that NABET-CWA and TNG-CWA  "have not identified a single member that is employed by Applicants in the vast majority of service areas implicated by the Transaction."[10] This claim is inapposite because NABET-CWA did demonstrate via affidavit that it represents workers in several markets where Nexstar and TEGNA control stations. For example, David Biggs and Jacob Jenkins work for KOIN-Nexstar in Portland, OR. NABET-CWA also submitted an affidavit showing it represents workers in other Nexstar/TEGNA markets such as Denver, CO; Cleveland, OH; Buffalo, NY; and Hartford, CT.[11] Similarly, TNG-CWA demonstrated via affidavit that it represents members in several markets where Nexstar and TEGNA control stations, including Dallas, TX; Tampa, FL; Denver, CO; Akron, OH; St. Louis, MO; Indianapolis, IN; Memphis, TN; Phoenix, AZ, Wilkes-Barre, PA; Buffalo, NY; Hartford, CT, Portland OR, and Sacramento, CA, and represents TEGNA workers

---

[8] *Id.*

[9] Opposition at 6 (emphasis added).

[10] Id. at 8–9.

[11] Petition to Deny of Public Interest Petitioners at 19 (citing Braico Declaration).

6

**App.647**

in St. Louis, MO.[12] And as Petitioners explained, "harm will occur to <u>all</u> NABET-CWA and TNG-CWA members nationwide, regardless of whether they work in a particular local market."[13] While CWA <u>did</u> provide affidavits where their members also watch television, such affidavits are not needed to establish harm to the union's members. Article III harm in this matter is not limited to harm caused to viewers in impacted markets. CWA demonstrated its members will be harmed in their <u>working</u> conditions and opportunities, not solely in their watching.

Further, Applicants perplexingly dispute CWA's standing because they claim "[h]arm to the labor market is a 'generalized grievance' that could be alleged by anyone seeking to protect labor interests."[14] The economic harms of a lost job, a lower salary, and or fewer benefits that would accrue to CWA's members, are quintessentially adequate to show concrete and particularized harm. Likely harm to workers as explained and sworn to by the impacted workers themselves is not a generalized grievance. Individual workers, who provided affidavits, will see a shrunken labor market, as well as reduced wages and benefits.[15] Petitioners pointed to statements by Nexstar demonstrating the likelihood of job cuts.[16] Beyond economic harm, CWA members articulated clear and specific negative consequences to them professionally if the quality of local newsgathering declines.[17] Courts have frequently granted unions standing on these grounds.[18]

---

[12] *Id.* at 20 (citing Schleuss Declaration).

[13] *Id.*

[14] Opposition at 9.

[15] Petition to Deny of Public Interest Petitioners at 19–20.

[16] Petition to Deny of Public Interest Petitioners at 56–57; *see infra* Part IV for a fuller discussion of Nexstar's promised "person by person" job cuts and synergies.

[17] Petition to Deny of Public Interest Petitioners at 21 & n.65.

[18] *E.g.*, *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996); *Int'l Bhd. of Elec. Workers, AFL-CIO Loc. 1245 v. Citizens Telecommunications Co. of California*, 549 F.3d 781, 788 (9th Cir. 2008).

**App.648**

Even more baffling, Applicants claim CWA's harms rely "on a highly attenuated chain of possibilities."[19] If the FCC approves this merger, the Applicants will merge. Nothing is more likely from FCC approval of the proposed transaction than the elimination of jobs and a loss of salaries and benefits by those workers. Further, Applicants argue that because they (incorrectly) allege that the Commission cannot consider harms to the labor market, CWA cannot have standing. They are wrong that the Commission cannot consider harms to labor.[20] But even if that were true, it would not prevent CWA from demonstrating standing, because as long as the FCC has the power to block the merger and its attendant harms, the harms that would be suffered by CWA are redressable.[21]

### 2. Free Press and UCC Media Justice have representational standing.

Applicants' arguments against Free Press's and UCC Media Justice's standing fare no better. Applicants claim that Petitioners "do not identify a single direct, non-speculative injury they would suffer" and "do not establish that they represent members who both live in the service area of and watch each of the stations."[22]

To the contrary, the declarants express very particularized concerns with the outcome of the Transaction, if consummated. And many of these are First Amendment harms, which are

---

[19] Opposition at 9.

[20] *See infra* Part III; *see also Application of Verizon Commc'ns Inc. & América Móvil, S.A.B. de C.V.*, 36 FCC Rcd 16994, ¶¶103–08 (2021) ("*América Móvil*") ; *In re Consent to Transfer Control of Certain Subsidiaries of TEGNA Inc. to SGCI Holdings III LLC*, 38 FCC Rcd 1282, ¶¶36–44 (MB 2023) ("*SGCI Order*") .

[21] The Commission cannot deny standing to a party adversely affected even if the harm alleged by the party was not a harm the Commission would necessarily take into account in considering the licensing decision. Petition to Deny of Public Interest Petitioners at 9 (citing *FCC v. Sanders Brothers Radio Station*, 309 U.S. 470, 476–77 (1940) and *Scripps-Howard Radio v. FCC*, 316 U.S. 4, 14 (1942)).

[22] Opposition at 9–10.

8

granted maximum "leniency" in a standing determination's injury-in-fact analysis.[23] As Petitioners noted, "Declarants fear less news coverage of local educational issues; LGBTQ stories and stories about anti-racism protests; or news from nearby suburbs, or on statewide elections, local elections, and politics and activity in their state capitals."[24] The declarations were focused on the loss of independent local newsrooms and institutional knowledge of long-time employees.[25] As Applicants recognize, Petitioners Free Press and UCC Media Justice filed "seven total declarations," and "nine total declarations," respectively, each one stating that the declarant watches television in a market where a station license will change hands.[26]

Finally, Petitioners showed that members would be harmed even if they do not live in a market where a license transfer would occur.[27]  For example, declarant Bathke states:

> Harm to news coverage in other local communities harms me. For example, many good and bad policy proposals begin in other states or cities, or, are part of an intentional nationwide strategy to alter local laws around the country. When news gathering is poor in those places, local people are less likely to adequately vet those policies and poor policies are more likely to be adopted. Moreover, I am less likely to know about those policies and their impacts before they are adopted because there is less newsgathering locally in those communities. I monitor developments in other states and communities in order to anticipate likely policy initiatives in my own state or in my own local area.[28]

---

[23] Petition to Deny of Public Interest Petitioners at 22 (citing *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013)).

[24] Petition to Deny of Public Interest Petitioners at 22 (citing Braun Declaration ¶8; Fitzgerald Declaration ¶¶8–9; Miller Declaration ¶¶8–9, 12; Koscick Declaration ¶¶14–15; Biggs Declaration ¶12).

[25] *E.g.*, Miller Declaration ¶¶7–10; Fitzgerald Declaration ¶¶ 8–10; Fazio Declaration ¶¶6–8; Ogden Declaration ¶¶6–11.

[26] Opposition at 11.

[27] *Contra* Opposition at 9–12.

[28] Bathke Declaration ¶13.

9

**App.650**

Declarants would be harmed by changes in markets outside of where they live. Petitioners' standing cannot be rejected for particular markets just because there are not declarations from those markets.

### B. The Public Interest Petitioners have organizational standing.

Organizational standing arises when an organization itself is harmed, not just via its members' individual harms.

#### 1. CWA has organizational standing.

Applicants do not challenge CWA's organizational standing, except to say (as refuted above, and also in more detail in Part III below) that CWA does not have standing because Applicants believe the Commission cannot consider labor harms as part of its public interest analysis. Regardless, CWA does not rely on a generic claim of "harm to the labor market"[29] in its claim of organizational standing. CWA would be harmed by this merger because further consolidation in the broadcast market would "force NABET-CWA to spend more resources on representing our members at the bargaining table and reduce NABET-CWA's negotiating power," and "make it more difficult for NABET-CWA to secure adequate salary and benefit packages for our members, which harms our members, reduces membership dues, and harms our negotiating power."[30] Nexstar is a particularly anti-union employer and its acquisition of more stations "will expand its anti-union tactics and strategies to more bargaining units and workplaces."[31]

---

[29] Opposition at 9.

[30] Petition to Deny of Public Interest Petitioners at 13.

[31] *Id.*

10

**App.651**

### 2.  Free Press and UCC Media Justice have organizational standing.

Applicants challenge Free Press's and UCC Media Justice's organizational standing, claiming these Petitioners only assert harm to "abstract social interests" which are "not the types of direct harms that are necessary to establish standing."[32] Neither organization relies on abstract social interests to demonstrate harm. For example, both Free Press and UCC Media Justice explain that they work with community members "to halt the construction of data centers otherwise planned and built without sufficient public input on the impacts that these facilities have on the local ecosystem, electricity grid, and water supply."[33] "Local data center policy is exactly the kind of story that will receive less news coverage when fewer resources are allocated to creating local news."[34] One-third of the Free Press budget is dedicated to its journalism and civic information programs, including its Media Power Collaborative project, which works with local communities in states such as California, Maryland, Massachusetts, Pennsylvania, New Jersey, Oregon, and Washington "to foster production of local news and information responsive to local communities' needs."[35] Those local journalists and publications dedicated to local news coverage report that in consolidated markets it is "far more difficult" to achieve "our shared objectives and missions to serve local communities with local news and information."[36] Consolidated markets are less hospitable to local news journalists and publications. Free Press's programmatic efforts and its Media Power Collaborative work will be harmed and require more resources to achieve its objective if the merger is consummated.

---

[32] Opposition at 7–8 (citing *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 384 (2024)).

[33] Aaron Declaration ¶15.

[34] Williams Declaration ¶16.

[35] Aaron Declaration ¶13.

[36] *Id.* ¶14.

11

**App.652**

Just as CWA did not necessarily need affidavits from viewers for harms not based on television viewership to establish standing, affidavits are not needed from Free Press and UCC Media Justice members who watch or live in particular markets to establish harm, particularly organizational harm. For this reason, Declarant Craig Aaron, whose declaration established Free Press's organizational standing, does not need to affirm that he watches television in his local market. Article III harm in this matter is not limited to harm caused to viewers in impacted markets. For example, given that Free Press expends considerable resources with partners and community members to increase the amount of local news coverage in markets around the country (including markets where the Transaction would transfer TEGNA licenses to Nexstar), and that its effort to increase local news coverage would require more resources if the merger were approved, it is of no consequence for that harm whether Declarant Craig Aaron watches television in the Washington, DC market. Also, as noted above, harm can occur to people who live outside of the directly impacted markets because policy in other markets impacts policies where they live.

Free Press's and UCC Media Justice's harms are not speculative for the same reason as CWA's are not. The harms would arise from the Transaction, and the Commission may approve or deny the transaction. Further, the harms need not be guaranteed to occur, as Applicants appear to claim.[37] They must be reasonably likely and redressable.[38] The harms that would occur as a result of this transaction are more than the required "identifiable trifle."[39]

---

[37] Opposition at 9.

[38] *Massachusetts v. EPA*, 549 U.S. 497 (2007) (finding that, although future effects of climate change mitigation measures were uncertain, plaintiffs had alleged a sufficient probability that relief would redress their injury to some extent).

[39] *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 689 n.14 (1973); *Drazen v. Pinto*, 74 F.4th 1336, 1345 (11th Cir. 2023) (receipt of an unwanted

12

Petitioners thus have standing and have demonstrated that they are parties in interest.

## III.    THE COMMISSION CAN AND SHOULD CONSIDER LABOR MARKET EFFECTS IN ITS APPLICATION OF THE PUBLIC INTEREST STANDARD.

The Commission has in prior proceedings considered employment effects, and how they impact localism in broadcast news. In considering the TEGNA/Standard General transaction, the Commission noted that "as a general matter, labor matters are handled and enforced by federal agencies other than the Commission," but emphasized that considering how newsroom and station staffing affect localism is entirely consistent with that principle:

> We do not depart from that precedent here. Rather, we recognize that local journalism is the heart of local news and community-responsive programming, and in that context we take seriously concerns that a diminution in the employment of local journalists and other local staff poses a threat to localism.[40]

More broadly, the impact of a merger on U.S. employment is part of the Commission's public interest analysis.[41] Indeed, the FCC has repeatedly confirmed that verifiable commitments

_____

text message causes a concrete injury).

[40] *SGCI Order*, ¶36; *see also id.* ¶¶36–44 (discussing decision to designate for hearing the question of whether the transaction would harm localism through the reduction of station-level staffing).

[41] *See, e.g., Applications of AT&T and Deutsche Telekom AG*, WT Docket No. 11-65, Order and Staff Analysis and Findings, ¶259 (2011) ("*AT&T/T-Mobile Staff Analysis and Findings*") ("As part of its public interest analysis, the Commission historically has considered employment-related issues such as job creation [and] commitments to honor union bargaining contracts. . ."); *Applications of Comcast Corporation, General Electric Company, and NBC Universal, Inc. for Consent to Assign Licenses and Transfer Control of Licenses*, Memorandum Opinion and Order, MB Docket No. 10-56, 26 FCC Rcd 4238, ¶224 (2011) ("We also note the Applicants' representations that additional investment and innovation that will result from the transaction will in turn promote job creation and preservation."); *Applications of Nextel Communications, Inc. and Sprint Corporation for Consent to Transfer Control of Licenses and Authorizations*, WT Docket No. 05-63, Memorandum Opinion and Order, 20 FCC Rcd 13967, ¶¶168–69 (2005) (considering job growth claims as part of FCC analysis); *Applications of Puerto Rico Telephone Authority and GTE Holdings (Puerto Rico) LLC for Consent to Transfer Control of Licenses and Authorization*, Memorandum Opinion and Order, 14 FCC Rcd 3122, ¶¶57–58 (1999) ("*Puerto Rico Telephone*") (finding that GTE's pledge not to make any involuntary terminations, except for cause, of PRTC workers employed as of a certain date would benefit the public interest); *Applications of Deutsche Telekom AG, T-Mobile USA, Inc.,*

13

**App.654**

to grow jobs in the U.S. represent a public interest benefit to be taken into account in the review of proposed mergers.[42] The FCC considers a merger's impact on service quality as part of its public interest analysis, and has determined that job cuts resulting in reductions in service quality are not in the public interest.[43] In previous merger reviews, Commissioners made clear that employment commitments are a merger-related benefit for the purposes of the public interest review.[44]

Furthermore, in situations where the Commission has declined to impose labor conditions, those decisions have turned on the specific record in each proceeding, and not on a categorical exclusion of labor issues from public interest review.[45] In arguing that labor matters

*and MetroPCS Communications, Inc.*, WT Docket No. 12-301, Memorandum Opinion and Order, 28 FCC Rcd 2322, ¶80 (2013) (considering T-Mobile's job claims as part of FCC analysis).

[42] *See, e.g.*, *AT&T and BellSouth Corporation Application for Transfer of Control*, Memorandum Opinion and Order, WC Docket No. 06-74, 22 FCC Rcd 5662, App. F (2007) (finding that a commitment to provide high quality employment opportunities in the U.S. by repatriating jobs previously outsourced outside the U.S. would serve the public interest); *see also AT&T/T-Mobile Staff Analysis and Findings*, ¶259 (stating that "the Applicants have the burden of proof regarding merger specificity, qualification, and verification" regarding claims of job creation).

[43] See *AT&T/T-Mobile Staff Analysis and Findings*, ¶231 (finding that outcomes such as lowering the number of representatives per customer and reducing the level of service that customers would experience "are, of course, not a public benefit . . ."); *Applications of Ameritech, Corp. Transferor, and SBC Communications, Transferee, for Consent to Transfer Control of Corporations Holding Commission Licenses and Lines Pursuant to Section 214 and 310(d) of the Communications Act*, CC Docket No. 98-141, Memorandum Opinion and Order, 14 FCC Rcd 14712, ¶567 (1999) ("*Ameritech/SBC Order*") ("Evidence in the record reveals that SBC has increased its commitments to improving service quality by hiring more employees.").

[44] *Application of WorldCom Inc. and MCI Communications Corporation for Transfer of Control of MCI Communications Corporation to WorldCom, Inc.*, CC Docket No. 97-211, Memorandum Opinion and Order, 13 FCC Rcd 18025, ¶213 (1998) (considering the impact of that merger on employment); *Ameritech/SBC Order*, ¶567 (citing SBC's commitment to "improving service quality by hiring more employees"); *Puerto Rico Telephone*, ¶57 (noting that employee commitments are a merger-related public interest benefit).

[45] *América Móvil*, ¶¶103–08 (finding that the transaction would have limited impact on telecommunications workers and declining to impose employment-related conditions); *In the*

14

are not "enforced" by the Commission, Applicants fundamentally misunderstand the agency's public interest authority. It is well established that the Commission has the authority to consider employment impacts in its transaction reviews. Given the substantial effects this Transaction would have on the labor market, the Commission should exercise that authority here.

## IV. APPLICANTS FAIL TO DEMONSTRATE THAT THE TRANSACTION WOULD NOT HARM THE PUBLIC INTEREST.

Applicants are simply wrong when they say Petitioners want the Commission to "assume the broadcast marketplace of 1950, or even 2021."[46] Petitioners want the Commission to look at the broadcast TV market as it stands right now: highly concentrated[47] and highly profitable[48] for the firms that have exclusive licenses to the public airwaves that insulate them from the kinds of competition they pretend to face. Petitioners want the Commission to look at the actual data that shows Nexstar and TEGNA are both highly profitable firms, and listen to the Applicants' own words spoken when they are in front of Wall Street investors describing their competitive "moat."[49]

---

*Matter of Applications of T-Mobile US, Inc., & Sprint Corp., for Consent to Transfer Control of Licenses & Authorizations, Applications of Am. H Block Wireless L.L.C., DBSD Corp., Gamma Acquisition L.L.C., & Manifest Wireless L.L.C. for Extension of Time*, WT Docket No. 18-197, 34 FCC Rcd 10578, ¶329 (2019) (While the Commission agreed with the CWA "that the transaction has the potential to lead to store closings, and thus could decrease retail employment to some extent," a majority of Commissioners felt that CWA did not "offer sufficient evidence to show that the four nationwide wireless service providers have oligopsony power, given the multiple retail job opportunities in urban areas.").

[46] Opposition at 17.

[47] Petition to Deny of Public Interest Petitioners at 36–39.

[48] *Id.* at 45.

[49] "Nexstar Media Group Reports Record Third Quarter Net Revenue of $1.27 Billion," Nexstar Media Group, Inc. Press Release (Nov. 8, 2022) ("Nexstar's results continue to benefit from our diverse, scaled, efficient and low leverage business model. Over 50% of revenue is contractual and from non-advertising sources and approximately 70% of our core advertising is from local advertisers which are historically more consistent in their spend throughout economic cycles. Nexstar has built an unparalleled local moat with more than 1,500 local sellers and

15

Applicants continually raise irrelevant strawmen arguments as they try to plead pending doom if they're not allowed to monopolize the local airwaves. Petitioners never stated any trends would "continue indefinitely," nor did we need to.[50] We simply made reasonable projections based on observable data and the Applicants' own words concerning the excellent financial health of their businesses.[51] Applicants seem to believe that the public interest is only served if they continue to earn supra-competitive profits that push their stock prices higher. But that is not the law, which requires more than Applicants simply showing that they believe they'll earn more money if allowed to further monopolize the public's property.

Applicants wildly claim that Petitioners' predictions that post-merger Nexstar would "cut news staff and consolidate news functions" are "speculative," and suggest that Petitioners are wrong when we note that this "will result in duplication of content across stations and harm to localism."[52] But it is the Applicants who speculate and craft fantastical scenarios of future doom if they don't get permission to monopolize local TV markets. Indeed, Applicants' stretch the bounds of credibility when they state that Petitioners' warnings of pending "job loss and a concomitant reduction of local content" are "merely speculation and unsupported by any evidence."[53] This is because the underlying financial motivation of the Transaction, and indeed

---

40,000 advertiser relationships in the 116 local markets we serve across America. In addition, we are extremely well positioned to continue to benefit from record levels of political advertising spending which is not dependent on the economy.") (emphasis added).

[50] Opposition at 18.

[51] *See* Comments of Free Press, *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 17-318, at 77–93 (filed Aug. 4, 2025) ("Free Press National Cap Comments").

[52] Opposition at 22.

[53] *Id.* at 27.

16

**App.657**

of any horizontal merger, is to reduce headcount and eliminate duplicated functions.[54] Here, as was the case following Nexstar's acquisition of Tribune stations, Nexstar will consolidate newsrooms and broadcast facilities, while eliminating a unique producer of local content.[55] The Commission doesn't have to take our word for it; it can simply review what Nexstar told its own investors, which is that it could "operate two stations off of one infrastructure" and that it is reviewing what costs to cut on a "person by person" basis.[56] Or the Commission need only look to Nexstar's headcount shortly following the closing of its acquisition of Tribune stations, compared to one year later: Just after closing the Tribune deal Nexstar reported 16,193 total employees, or 82 employees per station on average.[57] One year later Nexstar reported 12,412

---

[54] *See, e.g.*, G.J. Stigler, "A theory of oligopoly," 72 *Journal of Political Economy* 44 (1964); *see also* E. Devos *et. al.*, "How do mergers create value? A comparison of taxes, market power, and efficiency improvements as explanations for synergies," 22 *The Review of Financial Studies* 1179 (2009).

[55] *See, e.g.*, Matthew Keys, "After merging with Tribune, Nexstar issues Christmas pink slips," *The Desk* (Dec. 13, 2019); Dade Hayes and Ted Johnson, "Nexstar Laying Off 2% Of Workforce, Focusing Cuts On Local Stations," *Deadline* (Dec 11, 2024).

[56] *See* Comments of Lee Ann Gliha, VP and CFO, Nexstar Media Group Inc., 3Q 2025 Investor Call (Nov. 6, 2025) ("Gliha Nov. 6, 2025 comments") ("[T]here's about $300 million of synergies. It breaks out very similarly to how the synergies broke out on the Tribune deal, which was about 45 percent from net retrans and the remainder coming from operations. And then on the operations side of things, that's really a combination of things. It's looking at corporate overhead. You don't need duplicative corporate overhead. We have a number of hubs that we use that we can expand to help service the larger station footprint. And then it's looking kind of within the operations for efficiencies. We look at how we operate our stations versus how TEGNA operates theirs, and there are many areas where we do things a little bit differently that generates synergy. And then there's obviously the significant amount of 35 . . . markets that are the overlap markets that we can really operate two stations off of one infrastructure. And so that's an area where there's a significant portion of those synergies are coming out of that. As Perry said, this has been our initial analysis. We did a very deep analysis in terms of looking at line by line, person by person, what these costs could be. We're going to be in the market and doing a little bit more work and looking to see what else is there. I think as we also mentioned on a prior call, this really was reflective of the near-term synergies.").

[57] Nexstar 2019 10-K.

17

total employees, or 63 employees per station on average.[58] This is a nearly 25 percent decline in the number of employees and number of employees-per station in just a short period of time. Petitioners are not speculating about what is likely to follow this merger, we are simply paying attention to reality.

Applicants assert that Petitioners' concerns about the Transaction's impact on pay-TV consumers are "speculative" too, then smugly suggest that "no rule or regulation requires any MVPD to accept Nexstar's rates, let alone pass those rates along to its subscribers."[59] This is a deeply unserious posture that reflects Nexstar's hubris. It is not at all speculative for Petitioners to observe the history broadcasters extracting exponentially increasing retrans payments[60] from pay-TV customers who have no ability to avoid paying for this supposedly "free" programming even if they do not want to watch a single second of Nexstar's content. It is not speculative for Petitioners to note Nexstar's own statements reflecting how it will use "step up" clauses to capture the financial benefits of this deal, or how Nexstar predicts nearly half of the merger's synergies will come from extracting higher retrans payments.[61]

Given the eye-watering level of market concentration that this merger threatens, it is not surprising that Applicants suggest that the FCC's review standard is weaker than that required by the Clayton Act;[62] but this is plainly wrong. The public interest standard is a very high bar, one that absolutely cannot be cleared by transactions that are blatant violations of the Clayton Act.

---

[58] Nexstar 2020 10-K.

[59] Opposition at 38.

[60] Free Press National Cap Comments at 76.

[61] *See* Gliha Nov. 6, 2025 Comments, *supra* note 56. ("[T]here's about $300 million of synergies. It breaks out very similarly to how the synergies broke out on the Tribune deal, which was about 45 percent from net retrans and the remainder coming from operations.").

[62] Opposition at 40–41.

18

**App.659**

Addressing concerns about concentration in the marketplace of ideas and over the scarce public airwaves, and promoting the civic benefits of policies that "pursue values other than efficiency—including in particular diversity in programming"[63] are why the Commission's merger review and licensing duties are under its authority, and not solely the DOJ's or NTIA's.

For example, the Hart-Scott-Rodino pre-clearance process involves thresholds that would potentially allow the merger of a local market's top news-producing stations,[64] while the FCC's public interest standard, if properly enforced, would not permit the creation of a local TV news monopoly because that would not be a proper use of the public airwaves. Indeed, Applicants note the Commission's use of antitrust tools in spectrum management.[65] And in this Transaction we have the form of spectrum management that calls for the highest presumption against unfettered consolidation: the licensing of scarce public airwaves used for broadcasting local news and civic information.

## V.    APPLICANTS FAIL TO DEMONSTRATE THAT THE TRANSACTION WOULD RESULT IN MERGER-SPECIFIC, COGNIZABLE PUBLIC INTEREST BENEFITS.

Applicants' central justification for why they must be allowed to consummate a blatantly unlawful merger seems to boil down to their belief that since the internet enabled other firms to sell ads placed against content, broadcasters and the continued production of local TV broadcast

---

[63] *Fox Television Stations, Inc., v. FCC*, 280 F.3d 1027, 1047 (D.C. Cir. 2002) ("An industry with a larger number of owners may well be less efficient than a more concentrated industry. Both consumer satisfaction and potential operating cost savings may be sacrificed as a result of the Rule. But that is not to say the Rule is unreasonable because the Congress may, in the regulation of broadcasting, constitutionally pursue values other than efficiency—including in particular diversity in programming, for which diversity of ownership is perhaps an aspirational but surely not an irrational proxy.").

[64] 15 U.S.C. § 18a; 16 C.F.R. §§ 801–803; *see also* "New HSR thresholds and filing fees for 2026," Federal Trade Commission (Jan. 20, 2026).

[65] Opposition at n.146.

19

news face an existential crisis.[66] But Applicants' own words to Wall Street undermine this dire view.[67] And though Applicants say that Petitioners are wrong to suggest that allowing Nexstar to own three or more licenses in the overlapping DMAs would "harm local news,"[68] this harm is glaringly and necessarily obvious. The loss of a financially thriving independent local news producer is absolutely harmful to local news and local communities.

Applicants have failed to demonstrate that ATSC 3.0 deployment is a transaction-specific public interest benefit. Petitioners are correct to question the public interest benefits of the technology itself, and Applicants' recitation of the Commission's banal observation that this technology is "the future of broadcast television" does not change this.[69] The overwhelming majority of viewers of broadcast stations do not view them using antennas,[70] and those who do will have to purchase new equipment to do so, as they are promised dubious benefits like being subjected to the same types of privacy-violating ad targeting that is common with online media.[71]

Applicants also seem surprised that Petitioners would characterize duplicated, repackaged, and repeated content as a poor trade off for the loss of TEGNA's original news

---

[66] *Id.* at 2–3.

[67] *Supra* note 51.

[68] Opposition at 36.

[69] *Id.* at 25.

[70] *See, e.g.*, George Winslow, "Survey: Share of Homes With TV Antennas Falls to 19%," *TV Technology* (Apr. 10, 2025).

[71] Applicants, along with other major broadcasters, are currently pushing the Commission to force over-the-air viewers to purchase new equipment by sunsetting ATSC 1.0 in some markets as soon as 2028. Using the government to force this conversion, as opposed to letting market forces work, suggests that the consumer and public interest benefits of ATSC 3.0 remain uncertain at this time. *See* Monty Tayloe, "Broadcasters Push FCC on ATSC 3.0 Transition," *Communications Daily* (Jan. 23, 2026).

20

reporting.[72] And perhaps this should be expected from Nexstar, a firm that equates media monopolization with the public interest. However, for the purposes of the Commission's public interest standard, it absolutely is fair to characterize the addition of a few marginal minutes of repackaged reporting that previously aired on another station as a net harm to the public interest when the price paid for those additional minutes is the total loss of an independent news-producing voice.

### A. The Commission's Public Interest Review and Evaluation of Applicants' Local Multiple Ownership Rule Waiver Requests Must Account for Nexstar's Actual Control Over All Stations that it Operates.

Applicants continually suggest that past Commission decisions made under wildly different sets of facts should now act as barriers to the Commission's current public interest review. Yes, Petitioners understand that Nexstar took advantage of the Commission's satellite rules by taking stations that once were used as satellite repeaters and making them unique affiliates, and we understand that the Commission's practice is to allow prior waivers to stand until the license is transferred.[73] But the fact that Nexstar would retain its satellite station waivers for its existing portfolio while adding TEGNA stations in those same markets is a blatant exploitation of that precedent in order to steamroll the Commission's remaining local ownership limits. Petitioners are asking the Commission to view the current reality as germane to the public interest review, and to recognize that Nexstar's actual control over the majority of any DMA's network affiliates is central to that review.

And although Applicants very much want the Commission to ignore its Sidecar companies in its public interest review,[74] they and other broadcasters that use these dubious

---

[72] Opposition at 27.

[73] *Id.* at n.115.

[74] *Id.* at n.127.

21

**App.662**

rule-evading arrangements have repeatedly given the Commission reasons to take a very close look at how the use of shell companies undermines the public interest.[75]

## VI.    CONCLUSION

For the foregoing reasons and those enumerated in the Public Interest Petitioners' Petition to Deny, the Commission should deny the Application in its entirety, and specifically deny the applications for consent to transfer licenses in violation of the National Multiple Ownership rule and the Local Ownership rule, including the waivers related thereto.

Respectfully Submitted,

Cheryl Leanza
**United Church of Christ**
**Media Justice Ministry**
100 Maryland Avenue, NE
Suite 330
Washington, DC 20002

S. Derek Turner, Senior Advisor
Matthew F. Wood, VP of Policy
**Free Press**
1025 Connecticut Avenue, NW
Suite 1110
Washington, DC 20036
202-265-1490

John Bergmayer
**Public Knowledge**
1818 N Street, NW
Suite 410
Washington, DC 20036

Nell Geiser
Ceilidh Gao
**Communications Workers of America**
501 Third Street, NW
Washington, DC 20001

January 27, 2026

---

[75] *See, e.g.*, *Applications of Tribune Media Company and Sinclair Broadcast Group*, MB Docket 17-179, Hearing Designation Order, 33 FCC Rcd 6830 (2018); *see also In the Matter of DIRECTV, LLC; AT&T Services v. Deerfield et. al.*, MB Docket No. 19-168, Forfeiture Order, 36 FCC Rcd 12078 (2021); *In the Matter of Mission Broadcasting, Inc., Licensee of Station WPIX, New York, NY, Nexstar Media Group, Inc.*, Notice of Apparent Liability For Forfeiture, 39 FCC Rcd 3676 (2024); *Cincinnati Bell Extended Nexstar Media Inc. Dayton, OH Territories LLC dba altafiber v. Nexstar Media Inc.*, Complaint, File No. CSR-9023-C (2025).

22

**App.663**

**AFFIDAVIT**

This Reply to Opposition, submitted by Free Press, the National Association of Broadcast Employees and Technicians - Communications Workers of America ("NABET-CWA"), The NewsGuild - Communications Workers of America ("TNG-CWA"), and the United Church of Christ Media Justice Ministry ("UCC Media Justice"), along with Public Knowledge, was prepared using facts of which I have personal knowledge or upon information provided to me.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge, and belief.

 Matthew F. Wood            

Vice President of Policy & General Counsel
Free Press
1025 Connecticut Avenue, NW
Suite 1110
Washington, DC 20036

202-265-1490

January 27, 2026

23

**App.664**

**CERTIFICATE OF SERVICE**

I, Matthew F. Wood, certify that on January 27, 2026, I caused a true and correct copy of

the foregoing Reply to be served via electronic mail on the following:

Jennifer A. Johnson
Jocelyn Jezierny
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
jjohnson@cov.com
JJezierny@cov.com
*Counsel for TEGNA Inc.*

Kathleen A. Kirby
Ari Meltzer
Wiley Rein LLP
2050 M Street, NW
Washington, DC 20036
KKirby@wiley.law
ameltzer@wiley.law
*Counsel for Nexstar Media Inc.*

Michael Beder, Esq.
Associate General Counsel
TEGNA Inc.
8350 Broad Street
Suite 2000
Tysons, VA 22102
mbeder@tegna.com

Rachel Morgan
EVP/General Counsel & Corp. Sec'y
Nexstar Media Group, Inc.
545 E. John Carpenter Freeway
Suite 700
Irving, TX 75062
rmorgan@nexstar.tv

David Brown
Chief, Video Division
Media Bureau
Federal Communications Commission
45 L Street, NE
Washington, DC 20554
David.Brown@fcc.gov

Chris Robbins
Deputy Chief, Video Division
Media Bureau
Federal Communications Commission
45 L Street, NE
Washington, DC 20554
Chris.Robbins@fcc.gov

David Brown
Chief, Video Division
Media Bureau
Federal Communications Commission
45 L Street, NE
Washington, DC 20554
David.Brown@fcc.gov

Chris Robbins
Deputy Chief, Video Division
Media Bureau
Federal Communications Commission
45 L Street, NE
Washington, DC 20554
Chris.Robbins@fcc.gov

24

**App.665**

Daniel Kirkpatrick
BakerHostetler LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
dkirkpatrick@bakerlaw.com
*Counsel to CCB License, LLC*

Todd Eachus
Broadband Communications Association of Pennsylvania
127 State Street
Harrisburg, PA 17101
teachus@bcapa.com
*for Broadband Communications Association of Pennsylvania, Broadband Communications Association of Washington, Indiana Cable and Broadband Association, Mississippi Cable Telecommunications Association, Tennessee Cable & Broadband Association, and VCTA – Broadband Association of Virginia*

Pantelis Michaelopoulos
Steptoe & Johnson LLP
1330 Connecticut Ave., NW
Washington, DC 20036
pmichalopoulos@steptoe.com
*Counsel for Echostar Corp.*

Michael Nilsson
HWG LLP
1919 M Street, N.W. The Eighth Floor
Washington, DC 20036
MNilsson@hwglaw.com
*Counsel to DIRECTV*
*Counsel to the American Television Alliance and the National Content & Technology Cooperative*

Christopher Ruddy
Newsmax Media, Inc.
750 Park of Commerce Drive, Suite 100
Boca Raton, FL 33487
DanaK@newsmax.com
*for Newsmax Media, Inc.*

Daniel R. Suhr
Center for American Rights
1341 W. Fullerton Ave., Suite 170
Chicago, IL 60614
dsuhr@americanrights.org
*for Center for American Rights*


  Matthew F. Wood
Free Press

January 27, 2026

25

**App.666**

March 19, 2026

**<u>VIA ECFS</u>**

The Honorable Brendan Carr
Chairman
Federal Communications Commission
45 L Street, N.E.
Washington, DC 20554

> **Re:** ***Applications to Transfer Control of TEGNA Inc. to Nexstar Media Inc.***
> **MB Docket No. 25-331**

Dear Chairman Carr:

On behalf of Nexstar Media Group, Inc. and Nexstar Media Inc. (collectively, "Nexstar"), I take this opportunity to reaffirm Nexstar's longstanding commitment to operating our broadcast television stations in a manner that serves the public interest through locally focused programming responsive to the needs and interests of the communities we serve.

**Localism**

Service to local communities is at the core of Nexstar's values and serves as the North Star for our more than 5,000 journalists who live in those communities and are committed to delivering trusted, locally focused news that informs, educates, and empowers our viewers.

Our stations serve as a critical source of information that cannot be replicated by AI chatbots, social media algorithms, or national newsrooms, providing breaking news, public safety alerts, and emergency weather information. In recognition of exemplary local reporting and programming, during 2025, Nexstar journalists and technical staff earned 532 awards, including 1 duPont-Columbia award, 1 Walter Cronkite award, 57 national and regional Edward R. Murrow awards, 121 regional Emmy awards, 28 Associated Press awards and 324 state broadcasting association awards.

Our proposed acquisition of TEGNA ("TEGNA Acquisition"), once complete, will allow us to amplify our commitment to local journalism amidst unrelenting competition from the large technology and national media platforms that continue to transform the media landscape. The best way to compete with these mega-conglomerates is to emphasize what makes Nexstar unique: our connection to the local communities we serve and our investment in locally focused journalism.

Nexstar has a track record of not only maintaining but also expanding local news following its major acquisitions. In the five years following Nexstar's 2019 acquisition of Tribune, Nexstar's stations (including many of its newly acquired stations) increased local news

1

**App.667**

coverage by more than 28,000 hours per year (more than 12.5%) and garnered hundreds of awards annually recognizing their journalistic excellence. During the same period, local lifestyle programming on Nexstar's stations rose by more than 9,000 hours per year (more than 75%) and local political programming increased by almost 800 hours per year (more than 40%).

Nexstar will expand its investment in local news and programming after its acquisition of TEGNA is complete. Indeed, Nexstar commits to increasing the amount and availability of local programming in the aggregate in the acquisition markets, and to maintain that increase in local programming hours for a minimum of two years from the date the TEGNA Acquisition is consummated ("TEGNA Closing Date"). As previously noted, Nexstar plans to build upon the foundation already in place in 9 Designated Market Areas ("DMAs") to expand the local news it provides in those communities.[1] In addition, Nexstar has launched local station apps on a variety of platforms in 108 of its markets  and will continue launching apps until all markets have Nexstar stations available on this expanded local basis. These apps provide a wide array of truly local programming to serve viewers.

We also are dedicated to preserving the independence of our local newsrooms at a time when national media organizations increasingly dictate the news agenda. To that end, we have already ended our news cooperation relationship with one of the national broadcast networks, and we intend to allow our remaining agreements with the national broadcast networks to terminate as they expire.

**Local Ownership Waivers**

In its applications seeking FCC consent to the TEGNA Acquisition, Nexstar requested waivers of the Local Television Multiple Ownership Rule (the "Local TVO Rule") to permit Nexstar to own more than two full power television stations in 23 DMAs and provided fulsome support for why such waivers would serve the public interest in each of these communities. Nevertheless, Nexstar commits to divest KTVD, Denver, Colorado (MyNetwork), WTHR, Indianapolis, Indiana (NBC), WCTX, New Haven, Connecticut (MyNetwork), WAVY-TV, Portsmouth, Virginia (NBC), WUPL, Slidell, Louisiana (MyNetwork), and KNWA-TV, Rogers, Arkansas (NBC) no later than two years following the TEGNA Closing Date, provided that a waiver of the Local TVO Rule remains necessary under the Commission's rules at such time.

**Retransmission Consent**

Nexstar joins the Commission in its efforts to promote consumer affordability. It understands that the high cost of multichannel video programming distributors (MVPD) bills

---

[1] These include Dallas-Fort Worth, Houston, Washington-Hagerstown, Phoenix-Prescott, Grand Rapids-Kalamazoo-Battle Creek, Huntsville-Decatur-Florence, Waco-Temple-Bryan, Abilene-Sweetwater, and San Angelo.

2

is something the Commission cares about deeply. Unfortunately, those bills are wholly in the control of the MVPDs and include costs well beyond Nexstar's control, including for hundreds of other programming channels – particularly regional sports networks, equipment fees, DVR fees, regulatory fees, administrative fees, and HD fees, among the numerous charges before taxes. Although Nexstar's stations are always available free, over-the-air, to help consumers with MVPD affordability, Nexstar commits to offer those MVPDs with which Nexstar has an existing retransmission consent agreement ("RTCA") that expires after the TEGNA Closing Date and before November 30, 2026, an extension of such RTCA at the existing rates through November 30, 2026. This commitment is subject to acceptance by the MVPD that is party to the RTCA, and does not extend to any virtual MVPD, except those associated with DIRECTV.

**Pending License Renewal Applications**

Certain television broadcast stations ultimately owned by TEGNA and subject to the Transaction have license renewal applications that remain pending.

Consistent with the Commission's policy permitting consummation of a multi-station transfer of control or assignment overlapping with a renewal cycle,[2] Nexstar, as transferee, hereby agrees to succeed to the place of the current licensees for any pending renewal applications for those stations over which Nexstar will acquire control as a result of the Transaction.

* * *

Nexstar understands and embraces its responsibilities as a broadcast licensee. Our investment in local journalism and our commitment to serving viewers are grounded in long-standing principles and in full compliance with the Communications Act, the Commission's rules, and applicable federal law. We remain committed to operating both our existing stations and those we will acquire from TEGNA in a manner that serves the public interest and strengthens the local communities they serve.

We appreciate the Commission's consideration of these matters.

---

[2] *See Transfer of Control of Certain Subsidiaries of Univision Holdings, Inc. to Searchlight III UTD, L.P. et al.*, Memorandum Opinion and Order and Declaratory Ruling, 35 FCC Rcd. 14835, 14843-44 ¶ 25 (MB 2020) ("Commission policy permits the processing of multi-station, multi-market transfer of control applications that involve a subset of stations with pending renewal applications if: (1) there are no basic qualifications issues outstanding with respect to the transferor and transferee; and (2) the transferee explicitly agrees to stand in the shoes of the transferor in any renewal proceeding that is pending at the time of consummation of the transfer of control.") (citing *Shareholders of CBS Corporation*, Memorandum Opinion and Order, 16 FCC Rcd. 16072, 16072-3 ¶¶ 3-4 (2001)); *ION Media Networks Liquidating Trust (Transferors) and Media Holdco, LP (Transferee) For Transfer of Control of ION Media Networks, Inc., and Certain Subsidiaries, Licensees of Station WPXN-TV, New York, NY, et al.*, Memorandum Opinion and Order, 24 FCC Rcd. 14579, 14583 ¶ 14 (MB 2009).

3

**App.669**

Respectfully submitted,

/s/ Perry Sook

Perry Sook
Chairman and Chief Executive Officer
Nexstar Media Group, Inc.

4

**App.670**



## FCC Empowers Local Broadcast TV Stations

*Agency Approval of Nexstar - TEGNA TV Station Deal, with Conditions Committed to by Nexstar, Promotes FCC's Media Policy Goals of Localism, Diversity, and Competition*

WASHINGTON, March 19, 2026—Today, the FCC's Media Bureau approved the sale of certain local broadcast TV stations from TEGNA to Nexstar, with certain conditions Nexstar committed to in the record.  The Media Bureau found that approving this transaction, with those commitments, will empower these broadcasters to better serve their communities by investing in local news and reporting.  The transaction will also enable these broadcast TV stations to counter the growing power that national programmers have amassed in recent years.  In short, approving the deal—which will allow Nexstar to own less than 15% of television stations—will promote the FCC's longstanding media policy goals of competition, localism, and diversity.  This is especially so given the concrete commitments that Nexstar has made in the record on affordability, localism, and their commitment to divest a number of TV stations.

**Chairman Brendan Carr issued the following statement:**

"The FCC has been focused on empowering broadcast TV stations to serve their local communities, consistent with their public interest obligations.  Today's agency decision does exactly that as both the record and Nexstar's enforceable commitments demonstrate.  For too long, the FCC stood by while newspapers closed by the dozen in communities all across the country.  Those trusted sources of local news and information shuttered while the FCC dithered.  If you care about local news, you should care about the future of local broadcast TV stations.  Often, they are the ones in a market doing the gumshoe reporting that citizens value and need.  By approving this transaction, which allows Nexstar to own less than 15% of television stations, the FCC acts mindful of the media marketplace that exits today—not the one from decades past—and the agency ensures that these broadcasters have the resources to continue investing in their local news operations.

"The D.C. Circuit has already determined that the relevant media ownership regulation is an agency rule, not a firm statutory limit, and the full Commission has reached the same determination on multiple occasions.  Waiving that rule here is consistent with longstanding FCC authorities and doing so promotes the underlying purpose of the FCC's media regulations by promoting competition, localism, and diversity.  I want to thank the Media Bureau team for their great work on this matter."

**Additional Background Information:**

On December 1, 2025, the FCC accepted for filing applications seeking approval to transfer control of certain TV stations from TEGNA to Nexstar.  At the time, TEGNA operated 64 full power broadcast television stations, one AM radio station, and one FM radio station.  Nexstar operated 201 stations in 116 television markets.  According to the applicants' press release, the companies' footprints overlapped in 35 designated market areas (DMAs), and the combined company would operate 265 full-power television stations in 44 states and the District of Columbia and in 132 of the country's 210 television DMAs.  The applicants sought both a waiver of the FCC's National

App.672

Television Multiple Ownership rule and waivers of the Local Television Ownership rule in 23 DMAs to allow it to own more than two stations in the DMA; in addition, the consolidated company would own two stations in each of 17 DMAs.  Nexstar has committed to divesting 6 stations across 6 different DMAs as well as commitments that go to affordability and localism.

### 

**Media Contact: MediaRelations@fcc.gov / (202) 418-0500**
**@FCC / www.fcc.gov**



# Nexstar Media Group, Inc., Closes Acquisition of TEGNA Inc.

*March 19, 2026*

***Company Receives Approval of Transaction from Federal Communications Commission and U.S. Department of Justice***

 **IRVING, TX (Mar. 19, 2026)**—Nexstar Media Group, Inc. (Nasdaq: NXST), today announced that it has closed its acquisition of TEGNA Inc. following approval of the transaction from the Federal Communications Commission (FCC) and the United States Department of Justice (DOJ).

Nexstar's Founder, Chairman, and Chief Executive Officer, Perry Sook commented:

"This transaction is essential to sustaining strong local journalism in the communities we serve. By bringing these two outstanding companies together, Nexstar will be a stronger, more dynamic enterprise—better positioned to deliver exceptional journalism and local programming with enhanced assets, capabilities, and talent. We are grateful to President Trump, Chairman Carr, and the DOJ for recognizing the dynamic forces shaping the media landscape and enabling this transaction to move forward."

###

**About Nexstar Media Group:**
Nexstar Media Group, Inc. (NASDAQ: NXST), is a leading diversified media company that produces and distributes engaging local and national news, sports and entertainment content across its television and digital platforms.

**Investor Contacts:**
Lee Ann Gliha
Chief Financial Officer
Nexstar Media Group, Inc.
972/373-8800

**App.673**

Joseph Jaffoni or Jennifer Neuman

JCIR

212/835-8500 or nxst@jcir.com

**Media Contact:**

Gary Weitman

EVP/Chief Communications Officer

Nexstar Media Group, Inc.

972/373-8800 or gweitman@nexstar.tv

**← OLDER**

**NEWER →**

# Company

COMPANY HISTORY                                                    ›

COMPANY LEADERSHIP                                                 ›

# News

**Nexstar Media Group Announces Offering of $3,390 Million Senior Secured Notes Due 2033 and $1,725 Million Senior Notes Due 2034**

**Nexstar Media Group, Inc., Closes Acquisition of TEGNA Inc.**

**Nexstar's California Television Stations To Host Exclusive Live Debate Between Candidates for California Governor**

**(TUTV) TUTV student programming launches on PHL17+**

# More

CONTACT US                                                        ›

CAREERS                                                           ›

**App.674**

INVESTOR RELATIONS ⟩

NEXSTAR CC CERTIFICATION ⟩

CALM ACT CERTIFICATIONS ⟩

PRIVACY POLICY ⟩

✓✗ YOUR PRIVACY CHOICES ⟩

ADVERTISE WITH US ⟩

TERMS OF USE ⟩

AD TERMS AND CONDITIONS ⟩

© 1998-2026, Nexstar Media Group, Inc. | All rights reserved

App.675

**Before the**
**Federal Communications Commission**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| *Applications to Transfer Control of Tegna* | ) MB Docket No. 25-331 |
| *Inc. to Nexstar Media Inc.* | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**EMERGENCY APPLICATION FOR REVIEW OF**
**BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA;**
**BROADBAND COMMUNICATIONS ASSOCIATION OF WASHINGTON; INDIANA**
**CABLE AND BROADBAND ASSOCIATION; MISSISSIPPI INTERNET AND**
**TELEVISION; TENNESSEE CABLE & BROADBAND ASSOCIATION; VCTA –**
**BROADBAND ASSOCIATION OF VIRGINIA; DIRECTV, LLC; NEWSMAX MEDIA,**
**INC; PUBLIC KNOWLEDGE; COMMUNICATIONS WORKERS OF AMERICA;**
**UNITED CHURCH OF CHRIST MEDIA JUSTICE MINISTRY, INC.;**
**AND FREE PRESS**

Todd Eachus
President
BROADBAND COMMUNICATIONS
ASSOCIATION OF PENNSYLVANIA
127 State St.
Harrisburg, PA 17101

David Ducharme
Executive Director
BROADBAND COMMUNICATIONS
ASSOCIATION OF WASHINGTON
4217 Williams Ave. N.
Renton, WA 98056

Joseph Dant
Executive Director
INDIANA CABLE AND BROADBAND
ASSOCIATION
150 W. Market St., Ste. 412
Indianapolis, IN 46204

Lindsey Simmons
Interim Executive Director
MISSISSIPPI INTERNET AND TELEVISION
PO Box 55867
Jackson, MS 39296

Ann Marie Walp
President
TENNESSEE CABLE & BROADBAND
ASSOCIATION
414 Union St., Ste. 1900
Nashville, Tennessee 37219

Ray LaMura
President
VCTA – BROADBAND ASSOCIATION OF
VIRGINIA
1111 East Main St., Ste. 802
Richmond, VA 23219

**App.676**

Michael Nilsson
William M. Wilshire III
Timothy J. Simeone
HWG LLP
1919 M Street, N.W.
The Eighth Floor
Washington, D.C. 20036
(202) 730 1300

*Counsel to DIRECTV*

John Bergmayer
PUBLIC KNOWLEDGE
1818 N Street, NW
Suite 410
Washington, DC 20036

Nell Geiser
Ceilidh Gao
COMMUNICATIONS WORKERS OF
AMERICA
501 Third Street, NW
Washington, DC 20001

Michael Hartman
General Counsel
Chief External Affairs Officer and
Secretary
Stacy Fuller
Senior Vice President, External Affairs
DIRECTV, LLC
2260 E. Imperial Highway
El Segundo, CA 90245

Christopher Ruddy
Chief Executive Officer
Michael Martin
Director of Government Affairs
NEWSMAX MEDIA, INC.
750 Park of Commerce Drive, Suite 100
Boca Raton, FL 33487

Cheryl Leanza
UNITED CHURCH OF CHRIST MEDIA JUSTICE
MINISTRY, INC.
100 Maryland Avenue, NE
Suite 330
Washington, DC 20002

Matthew F. Wood
Vice President of Policy &
General Counsel
FREE PRESS
1025 Connecticut Avenue NW, Suite 1110
Washington, DC 20036

March 20, 2026

**App.677**

**TABLE OF CONTENTS**

SUMMARY ............................................................................................................... ii

I.    THE BUREAU'S WAIVER OF THE NATIONAL CAP VIOLATES THE
COMMUNICATIONS ACT, AS AMENDED BY THE 2004 CAA ........................................... 1

II.   THE BUREAU EXCEEDED ITS DELEGATED AUTHORITY BY ADDRESSING
NOVEL QUESTIONS OF LAW, POLICY, AND FACT ........................................... 6

    A.    The Order Unlawfully Concludes That the Commission Has the Authority to Waive the
National Cap ...................................................................................... 7

    B.    The Order Unlawfully Concludes That Waiver of the Cap, and Wholesale Waivers of
the Duopoly Rule, Would Be in the Public Interest................................................. 9

III.  THE BUREAU'S DISMISSAL OF RETRANSMISSION CONSENT-RELATED HARMS
IS ARBITRARY AND CAPRICIOUS AND INCONSISTENT WITH ESTABLISHED
PRECEDENT ............................................................................... 13

IV.   THE BUREAU ERRED IN FINDING THE PUBLIC INTEREST HARMS PRESENTED
IN THE RECORD ARE NOT ESTABLISHED ........................................... 15

    A.    The Record Leaves No Doubt That the Transaction Would Result in Supra-Competitive
Retransmission Consent Fees and Higher Consumer Prices ...................................... 16

    B.    The Bureau Also Errs in Failing to Acknowledge Nexstar's Track Record of
Consolidating Newsrooms and Cutting Jobs Following Consolidation ................................. 20

V.    THE COMMISSION MUST, AT MINIMUM, DESIGNATE THIS TRANSACTION FOR
HEARING................................................................................... 23

VI.   CONCLUSION ................................................................................... 24

CERTIFICATE OF SERVICE ...............................................................................

**Before the**
**Federal Communications Commission**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| *Applications to Transfer Control of Tegna* | )    MB Docket No. 25-331 |
| *Inc. to Nexstar Media Inc.* | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**EMERGENCY APPLICATION FOR REVIEW**

Pursuant to § 1.115 of the Federal Communications Commission's ("Commission") rules,[1] the Broadband Communications Association of Pennsylvania ("BCAP"); Broadband Communications Association of Washington ("BCAW"); Indiana Cable and Broadband Association ("ICBA"); Mississippi Internet and Television ("MIT") (formerly known as the Mississippi Cable Telecommunications Association); Tennessee Cable & Broadband Association ("TCBA"); VCTA – Broadband Association of Virginia ("VCTA"); DIRECTV, LLC ("DIRECTV"); Newsmax Media, Inc. ("Newsmax"); Public Knowledge; the Communications Workers of America ("CWA"); United Church of Christ Media Justice Ministry, Inc. ("UCC"); and Free Press (collectively, "Petitioners") hereby file this application for review and respectfully request that the Commission reverse the March 19, 2026 decision ("Order") of the Media Bureau ("Bureau") approving the transfer of control of the broadcast licenses of TEGNA Inc. ("TEGNA") to Nexstar Media Group, Inc. ("Nexstar") (collectively, the "Applicants") in the above-captioned proceeding ("Transaction").

---

[1] 47 C.F.R. § 1.115.

i

**App.679**

**SUMMARY**

The Transaction approved by the Media Bureau ushers in an unprecedented concentration of broadcast television market power. It would consolidate control of 265 full-power TV stations under one company (259 with illusory "divestitures" two years hence that may never materialize), reaching an astounding 80 percent of U.S. television households, and including three or more full-power stations in more than 20 markets. As a result, Nexstar would have vast power to raise carriage costs for pay TV distributors and their customers and threaten blackouts, across the country, of must-see programming like the NFL, college sports, and local news if their pricing demands are not met. The Applicants knew that the Transaction would violate both the National Television Ownership Rule's national audience reach limitation ("National Cap" or "Cap") and the Local Television Ownership Rule (or "Duopoly Rule"). Despite pending rulemakings considering whether the Commission may amend those rules on an industry-wide basis, the Applicants asked the Bureau to waive both rules for them. The Transaction would also result in a raft of other public interest harms, facilitating job cuts and increasing Nexstar's power in labor markets to the detriment of broadcast workers; reducing competition and raising prices in local television advertising; and cutting newsroom staff and original local reporting.

In response, Petitioners, along with numerous other stakeholders from across the political and ideological spectrum, opposed the Transaction.[2] The record made clear that the Transaction would violate the Communications Act and the Commission's rules, and cause immediate,

---

[2] *See, e.g.*, Petition to Deny of the Broadband Communications Association of Pennsylvania, Broadband Communications Association of Washington, Indiana Cable and Broadband Association, Mississippi Cable Telecommunications Association, Tennessee Cable & Broadband Association, and VCTA – Broadband Association of Virginia, MB Docket No. 25-331 (filed Dec. 31, 2025) ("Petition to Deny of State Cable Petitioners"); Petition to Deny of DIRECTV (filed Dec. 31, 2025); Petition to Deny of EchoStar, (filed Dec. 31, 2025); Petition to Deny of CCB License, LLC, (filed Dec. 31, 2025); Petition to Deny of Public Interest Petitioners, filed Dec. 31, 2025); Petition to Deny of Newsmax, (filed Dec. 31, 2025). Unless otherwise noted, all cited petitions to deny, comments, replies, reply comments, and *ex parte* letters are those filed in MB Docket No. 25-331.

irreparable, and sustained public interest harms.  Among other things, the Transaction would result in higher retransmission consent fees for multichannel video programming distributors ("MVPDs") and higher consumer prices, both immediately and in the longer term.  Contrary to this overwhelming record evidence and precedent, the Bureau adopted the Order, approving the Transaction and the Applicants' associated waiver requests.  As explained herein, the Commission should reverse the Bureau's Order because:

(1) the waiver of the National Cap violates Section 629 of the 2004 Consolidated Appropriations Act ("CAA") (47 C.F.R. §§ 1.115(b)(2)(i), (iii));

(2) the Bureau's waivers of the National Cap and the Duopoly Rule violate Commission rules prohibiting the Bureau from addressing "novel" questions of law, fact, and policy and matters that are not "minor," "routine" or "settled" under delegated authority (47 C.F.R. §§ 1.115(b)(2)(i), (ii));

(3) the Bureau's dismissal of retransmission consent-related harms contradicts Bureau and Commission precedent (47 C.F.R. § 1.115(b)(2)(i)); and

(4) the Bureau erred in approving the Transaction despite the concrete, Transaction-specific record evidence of harm warranting denial or designation for hearing consistent with past precedent (47 C.F.R. § 1.115(b)(2)(iv)).

The handful of station "divestitures" and other "affordability" commitments made by the Applicants are illusory and fail to remediate these legal errors and harms.

Petitioners respectfully request that the Commission reverse the Order and deny the Transaction, or, at minimum, designate the Transaction for an evidentiary hearing given the substantial questions of material fact in the record on consumer pricing impacts and other demonstrated harms, and insufficient evidence of asserted benefits.  Petitioners have simultaneously filed an emergency petition for stay of the Order pending a decision on this application for review, so as to preserve their right to effective review of this FCC action.[3]

---

[3] The Commission has granted stays in similar situations and should do so here.  *See*, *e.g.*, *Bloomberg L.P., Complainant v. Comcast Cable Communications, LLC, Defendant*, Memorandum Opinion and Order, 27 FCC Rcd. 9488 ¶ 11 (2012) (finding "that the novelty and importance of the issues presented warrant an administrative stay of certain aspects of the [order] to provide the Commission an opportunity to resolve the issues on review").

iii

**App.681**

### I. THE BUREAU'S WAIVER OF THE NATIONAL CAP VIOLATES THE COMMUNICATIONS ACT, AS AMENDED BY THE 2004 CAA

As explained by State Cable Petitioners, the Commission may not waive any rule "mandated by statute" unless the statute itself authorizes an exception, waiver, or similar relief.[4] The Bureau's Order fails to clear this threshold hurdle.  The Telecommunications Act of 1996 ("1996 Act"), as amended by the 2004 CAA, enshrined a "39 percent national audience reach limitation" into law in five different places:

- It directs the Commission to increase the national audience reach limitation for television stations to 39 percent;[5]

- It prescribes that "[a] person or entity that exceeds the 39 percent national audience reach limitation for television stations in paragraph (1)(B) through grant, transfer, or assignment of an additional license for a commercial television broadcast station shall have not more than 2 years after exceeding such limitation to come into compliance with such limitation";[6]

- It further prescribes that the divesture requirement above "shall not apply to persons or entities that exceed the 39 percent national audience reach limitation through population growth";[7]

- It makes clear that the Commission's forbearance authority in 47 U.S.C. § 160 "shall not apply to any person or entity that exceeds the 39 percent national audience reach limitation for television stations in paragraph (1)(B)";[8] and

- It excludes the "39 percent national audience reach limitation" from the quadrennial review of broadcast ownership rules.[9]

The Order concludes that the congressional mandate for the Commission to increase the Cap to 39 percent did not foreclose the possibility that the Commission could later amend or

---

[4] *See* Petition to Deny of State Cable Petitioners at 21 (citing *Nat'l Ass'n of Broads. v. FCC*, 569 F.3d 416, 426 (D.C. Cir. 2009)).

[5] Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, § 629(1), 118 Stat. 3, 99-100 ("2004 CAA"); Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(c)(1)(B), 110 Stat. 56, 111 ("1996 Act").

[6] 2004 CAA § 629(2); 1996 Act § 202(c)(3).

[7] 2004 CAA § 629(2); 1996 Act § 202(c)(3).

[8] 2004 CAA § 629(2); 1996 Act § 202(c)(4).

[9] 2004 CAA § 629(3); 1996 Act § 202(h).

1

**App.682**

waive the Cap.[10]  As explained by State Cable Petitioners, this reading is in conflict with the text of the Act:  "The *only* reason for Congress to say '39 percent,' *and to do so repeatedly*, was to 'enshrine' that limit into the statute."[11]  Moreover, the Applicants conceded that when Congress enshrines numerical limits in the Communications Act, it generally knows how to carve out exceptions.[12]  The lack of any such exception in connection with the National Cap weighs against the Order's conclusion.[13]  The Order's interpretation is also inconsistent with the structure of the 2004 CAA which, in addition to setting the Cap at 39 percent, removed the Cap from the Commission's quadrennial process.[14]  A reading of the CAA that allows the Commission to change the Cap outside of its periodic review of ownership rules "would render these congressional actions, which work together to bar changes to the cap, meaningless."[15]

Additionally, in interpreting the 2004 CAA, the Bureau ignored the significance of the divestiture provision in § 629(c)(3), accepting the Applicants' argument that "nothing in the divestiture provision" expressly "purports to revoke or limit the Commission's waiver authority."[16]  First, *Loper Bright* forecloses agency claims of agency authority based on congressional silence rather than express delegations of authority.[17]  Second, the best and only

---

[10] *Applications for Consent to the Transfer of Control of TEGNA Inc. to Nexstar Media Inc.*, Memorandum Opinion and Order, MB Docket No. 25-331, DA 26-267 ¶ 34 (MB Mar. 19, 2026) ("Order").

[11] *See* Reply of State Cable Petitioners at 10 (emphasis added).

[12] *See id.* at 10-11 (citing Consolidated Opposition to Petitions to Deny and Comments of TEGNA Inc. and Nexstar Media Inc., MB Docket 25-331, at 58-59 (filed Jan. 15, 2026) ("Opposition")).

[13] *See* Reply of State Cable Petitioners at 10-11 (citing *Collins v. Yellen*, 594 U.S. 220, 248 (2021)).

[14] *See* Reply of DIRECTV at 37.

[15] *Id.*; *see also* Reply Comments of NTCA – The Rural Broadband Association at 4-5 ("[T]he record here confirms that the statutory framework governing the national television ownership cap precludes such a waiver.").

[16] Opposition at 63; Order ¶ 36.

[17] *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 404 (2024).  This was the approach taken in the 2016 *UHF Discount Elimination Order*.  There, the Commission essentially argued that, while the 2004 CAA directed the Commission to adopt a 39 percent Cap, it did not otherwise bar the Commission from exercising its general rulemaking authority to adjust the Cap further.  *See generally Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Report and Order, 31 FCC Rcd. 10213 (2016) ("*UHF Discount*

2

**App.683**

reasonable interpretation of the two-year divestiture provision is that it is yet another signal of Congress's intent to remove the Cap from Commission discretion. Under the Bureau's interpretation, the day after enactment of the statute setting the Cap at 39 percent, the Commission could have immediately waived the Cap or initiated a rulemaking proceeding to raise the Cap to 100 percent, which would have been an absurd result and clearly contrary to the 2004 CAA.[18] There would be no need to prescribe a divestiture period at all—let alone one of such specific duration—if Congress intended the Commission to further adjust the National Cap up or down.[19] In fact, Congress established divestiture as the *exclusive* remedy for violations of the Cap occurring "through grant, transfer, or assignment of an additional license for a commercial broadcast station."[20] And in every case where a proposed license transfer would result in a violation of the Cap, the FCC has conditioned approval on mandatory divestitures to bring the new entity under the Cap, consistent with the requirements of the 2004 CAA.[21] The Order's unacknowledged change in position from prior orders is another reason for reversal.[22]

Nor is it possible to square the Order's interpretation with the fact that Congress made clear that divestiture would *not* be required if an entity exceeds the "39 percent" Cap "through

---

*Elimination Order*"). *Loper Bright* requires the Commission to defer to Congress, not the other way around. The Commission's attempt to sidestep those directives in the 2016 order cannot be relied upon by the Bureau.

[18] *See* Reply of State Cable Petitioners at 11; *see also* Comments of Free Press, *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 17-318, at 18-19 (filed Aug. 4, 2025).

[19] Reply of State Cable Petitioners at 11.

[20] 2004 CAA § 629(2).

[21] *See, e.g.*, *Applications for Consent to Transfer Control of License Subsidiaries of Media General, Inc., from Shareholders of Media General, Inc., to Nexstar Media Group, Inc.*, Memorandum Opinion and Order, 32 FCC Rcd. 183 ¶ 1 (MB 2017) ("*Nexstar/Media General Order*"); *Tribune Media Company and Nexstar Media Group, Inc., et al.*, Memorandum Opinion and Order, 34 FCC Rcd. 8436 ¶ 8 (2019) ("*Nexstar/Tribune Order*").

[22] *See Encino Motorcars v. Navarro*, 579 U.S. 211, 221-22 (2016) (finding that an unexplained inconsistency in agency policy is grounds to find agency action arbitrary and capricious). The "divestiture" commitments made by Applicants have no effect on their combined national reach, in violation of the Cap.

3

population growth"—and instead applied the Cap only to those entities that exceed it through acquisition.[23]  As State Cable Petitioners explained, "population growth" can only happen in the future, reinforcing the mandate that the "39 percent" Cap remain static.[24]

The Order also accepts the Applicants' argument that the 2004 CAA's exclusion of the Cap from the Commission's § 160 forbearance authority is insignificant based on § 160's applicability to telecommunications services and the difference between forbearance and waiver.[25]  This misreads Congressional intent:  Congress understood the Commission's forbearance authority to be the only mechanism built into the Communications Act by which the Commission could effectively waive application of a *statutory* requirement, and Congress made sure to expressly block that source of authority with respect to the Cap.[26]

The Order also fails to recognize the impact that insulating the National Cap from the Commission's Section 202(h) review process had on the Commission's authority over the Cap. Congress's decision to remove the periodic review process elevated the National Cap into a statutory rule.[27]  The Third Circuit confirmed this, finding that Congress had issued a "statutory

---

[23] 2004 CAA § 629(2); 1996 Act § 202(c)(3).

[24] *See* Petition to Deny of State Cable Petitioners at 15 (citing Letter from Brian Fitzpatrick, Vanderbilt Law School, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 2-3 (filed Nov. 3, 2025) ("[I]t is hard to see how the Commission could raise Congress's 39% cap without running afoul of Congress's 2004 provision requiring any entity to divest when they exceed 39%:  this provision clearly applies to *future growth*, not just to those entities that were too big on the date the 2004 amendments came into law.") (emphasis added)).

[25] Order ¶ 37.

[26] Reply of State Cable Petitioners at 13.

[27] *See* Reply of State Cable Petitioners at 13; Reply of EchoStar at 9-11; *see also* Kannon Shanmugam & William Marks, *The FCC Lacks Statutory Authority to Revise the Telecommunications Act's 39% National Ownership Cap for Television* 14-15 (2025), available at https://americantelevisionalliance.org/wp-content/uploads/2025/12/NationalOwnershipCapWhitePaper_12-15-25.pdf ("The 2004 amendments followed closely on the heels of the D.C. Circuit's decision in *Fox Television*.  Although the 2004 amendments retained the periodic-review provision for 'all of [the FCC's] ownership rules,' Congress expressly excluded the 39% cap from that requirement, thereby removing the FCC's authority to reevaluate the cap as it was required to do under the 1996 Act. . . .  [A] reviewing court would likely hold that Congress sought to exempt the revised 39% cap from agency alteration, both as a response to the D.C. Circuit's decision and to spare both the FCC and the market from the destabilizing force of continual litigation over the cap.").

4

directive" for the Commission to adopt "a precise 39% cap," without any express suggestion of discretion to change it.[28] Given Congress's action to change the status quo following the *Fox Television* decisions, the Order's conclusion that the National Cap remains subject to the Commission's general rulemaking authority fails.[29] Whatever authority Congress might have preserved for the Commission to revise the Cap in 1996, Congress plainly removed it in 2004.

Beyond the Order's inconsistency with the 1996 Act and 2004 CAA, the record makes clear that the Bureau's waiver of the Cap also runs contrary to the Major Questions Doctrine.[30] When an agency asserts a wide "breadth of . . . authority" with "economic and political significance," courts must "hesitate before concluding that Congress meant to confer such authority."[31] To overcome this presumption, a court must identify "clear congressional authorization" for the power the agency seeks to exercise, not a "merely plausible textual basis" for it.[32] Waiving the National Cap is an issue of economic and political significance, fundamentally altering the nationwide market for retransmission consent and the broadcast industry as a whole.[33] Furthermore, the Major Questions Doctrine prohibits the Commission from adopting "basic and fundamental changes in [a] scheme" designed by Congress.[34] That is precisely what the Order does.[35] For this reason, too, the Order must be reversed.[36]

---

[28] Reply of EchoStar at 10 (quoting *Prometheus Radio Project v. FCC*, 373 F.3d 372, 396 (3d Cir. 2004)).

[29] *See* Reply of State Cable Petitioners at 14.

[30] *See* Reply of EchoStar at 11; Reply Comments of NTCA – The Rural Broadband Association at 6-7.

[31] *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (internal quotations omitted).

[32] *Id.* at 723 (internal quotations omitted).

[33] *See, e.g.*, Reply of EchoStar at 11; Reply Comments of NTCA – The Rural Broadband Association at 6-7.

[34] Petition to Deny of Newsmax at 6 (quoting *Biden v. Nebraska*, 600 U.S. 477, 494 (2023)).

[35] *See id.* ("There could be no greater 'basic and fundamental change' in a limit established by Congress than permitting a company to exceed it.").

[36] 47 C.F.R. § 1.115(b)(2)(i).

**App.686**

## II.    THE BUREAU EXCEEDED ITS DELEGATED AUTHORITY BY ADDRESSING NOVEL QUESTIONS OF LAW, POLICY, AND FACT

Section 0.283 of the Commission's rules prohibits the Bureau from acting on matters "that present novel questions of law, fact or policy that cannot be resolved under existing precedents and guidelines."[37]  The Commission will find that there is a novel question when "[t]he legal and factual questions to be resolved . . . are [not] well-established"[38] and are not "routine [or] well-adjudicated,"[39] or where there is an "issue[ ] of first impression."[40]  Similarly, Section 0.5(c) of the Commission's rules limits the scope of delegated authority under the Communications Act to "matters which are *minor* or *routine* or *settled in nature.*"[41]  Whether the Commission, let alone the Bureau, may waive the 39 percent National Cap, or whether waiver would be in the public interest, are novel questions that cannot be resolved in the first instance by

---

[37] 47 C.F.R. § 0.283(c); *see also* 47 C.F.R. § 1.115(b)(2)(ii) (noting Bureau action warrants full Commission consideration where "[t]he action involves a question of law or policy which has not previously been resolved by the Commission"); *Delete, Delete, Delete*, Direct Final Rule, GN Docket No. 25-133, FCC 25-40, ¶ 10 & n.22 (2025) (noting "longstanding Commission rules" that "the Bureaus and Offices [do] not have delegated authority to act on any 'new or novel' issues").

[38] *Cf. Graphnet, Inc. Application for Supplemental Auth. to Provide Certain Digital Commc'ns Servs.*, Memorandum Opinion & Order, 84 F.C.C.2d 240 ¶ 5 (1981) (finding that "the certification of a new carrier or the expansion of authority for an existing carrier, as is the case here, normally does not involve novel questions of law and fact" because "[t]he legal and factual questions to be resolved in determining whether the public convenience and necessity require the additional service being offered by the carrier are well-established" and thus "[i]t cannot be said these considerations are novel in character").

[39] *Fones4all Corp. Petition for Expedited Forbearance*, Memorandum Opinion & Order, 21 FCC Rcd. 11125 ¶ 6 n.17 (2006) ("Extensions of time do not raise 'novel questions of fact, law or policy' as Fones4All asserts. Rather, the extension of time involves a routine and well-adjudicated procedural question[.]") (internal citations omitted).

[40] *Blanca Tel. Co. Seeking Relief from Demand for Repayment of a Universal Serv. Fund Debt*, Memorandum Opinion and Order and Order on Reconsideration, 32 FCC Rcd. 10594 ¶ 42 n.120 (2017); *see also Petition for Determination of Effective Competition in 32 Massachusetts Communities & Kauai, HI*, Memorandum Opinion & Order, 34 FCC Rcd. 10229 ¶ 4 (2019) (finding "novel" questions and addressing at the Commission level the question of whether the AT&T TV NOW streaming service met the effective competition test for cable rate regulation purposes).

[41] 47 C.F.R. § 0.5(c) (emphases added).

6

**App.687**

the Bureau.[42]  Likewise, it is not "minor," "routine," or "settled" for the Bureau to grant waivers of the Duopoly Rule on the scale contemplated in the Order.[43]  This constitutes clear legal error.

### A. The Order Unlawfully Concludes That the Commission Has the Authority to Waive the National Cap

The Bureau has virtually nothing to say on these threshold delegation issues.  Rather than explain why the waiver is "minor" or "routine" under its delegated authority, it cites, without elaboration, a third-party *ex parte* stating that "the Commission has taken the position in the past that it does have that authority"[44] and points elsewhere to the Commission's general rulemaking authority.[45]  According to the Bureau, such broad authority to change the Cap necessarily encompasses the authority to waive the Cap.[46]  This conclusion is erroneous for several reasons.

As a threshold matter, the relevant legal question in the 2016 order was whether the Commission had the authority to eliminate the UHF Discount under its general rulemaking authority, *not the Cap itself*.[47]  Thus, the cursory discussion relating to the Cap in that order is dicta.[48]  And there the Commission was focused exclusively on its authority to *tighten* the Cap,

---

[42] *See generally* Letter from Todd Eachus et al., President, Broadband Communications Association of Pennsylvania, to Marlene Dortch, Secretary, FCC (filed Feb. 10, 2026).

[43] *See* Petition to Deny of State Cable Petitioners at 24 ("[T]he Commission has never expressly held that the Cap may be waived, nor has it issued any guidance for the Bureau to follow in adjudicating waiver requests."); Reply of State Cable Petitioners at 15 ("[T]he question of whether the Commission, after Congress's legislative enactments in the CAA, still has authority to modify the National Cap is a novel legal question that the Commission has not addressed in the over two decades since the CAA was enacted."); Petition to Deny of DIRECTV at 61 ("[T]he question whether the Commission, after Congress's complex legislative enactments in the CAA, still has authority to modify the national cap is, to say the least, a novel legal question.").

[44] Order ¶ 43 & n.135.

[45] Order ¶ 32.

[46] Order ¶ 34.

[47] *See UHF Discount Elimination Order* ¶¶ 17-24 (framing the analysis under the heading "Authority to Modify the UHF Discount").

[48] For example, other than to quote the text of the statute itself in a footnote, nowhere does the *UHF Discount Elimination Order* mention, let alone analyze the 2004 CAA's "Divestiture" provision which twice expressly discusses the "39 percent national audience reach limitation."  *See generally UHF Discount Elimination Order*.

7

**App.688**

not to waive or otherwise relax the Cap. The Commission's decision to eliminate the UHF Discount had the effect of making the Cap *more restrictive*, and the Commission underscored that this action was fully consistent with what Congress enacted in the 2004 CAA. For example, as the Commission explained:

> [The forbearance provision in the 2004 CAA] is most reasonably interpreted as a congressional directive that the Commission *not decline to enforce against any person or entity the stricter national cap that Congress required the Commission to adopt*. After all, the statute was a response to the Commission's relaxation of the cap, and Congress directed the Commission to instead adopt a more stringent cap. *There is nothing in the CAA that suggests Congress intended to prevent the Commission from tightening the cap, repealing the UHF discount*, or otherwise changing its rules at a later date.[49]

In contrast, there is no basis under the *UHF Discount Elimination Order* to grant a wholesale waiver of the Cap as in the Order. To the extent the Commission (incorrectly) believed it had the authority to grant waivers of the Cap, the *UHF Discount Elimination Order* specified that such waivers would be limited to a small number of grandfathered stations that would otherwise fall out of compliance with the Cap, and made clear that any future transactions would be required to comply with it.[50] The Commission never granted any waivers pursuant to the order or designated the Bureau to adjudicate any such waiver requests. "An agency is bound by its own regulations," and because the Bureau lacked any precedent to guide its waiver grants in the Order, doing so was arbitrary and capricious.[51]

In any event, the Commission *reversed* the *UHF Discount Elimination Order* in a 2017 reconsideration order. There, the Commission not only vacated the *UHF Discount Elimination Order*, but also made clear its intention to open a future proceeding to consider Cap-related

---

[49] *Id.* ¶ 21 n.77 (emphases added).

[50] *See id.* ¶ 47 (requiring any grandfathered ownership combination subsequently assigned or transferred to comply with the Cap in effect at the time of the assignment or transfer).

[51] *Nat'l Environ. Dev. Ass'n v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014).

8

**App.689**

issues more holistically, which it promptly did later that same year.[52]  Importantly, the *2017 National Cap NPRM* sought comment *on the very legal questions that the Bureau purports to resolve in the Order challenged here*.  The NPRM acknowledged the "continued questions regarding the Commission's authority in this area" and sought comment on how to construe the Commission's authority in light of the changes made to the Cap in the 2004 CAA.[53]  If the Commission's authority to adjust the Cap were a "settled" question, there would have been no need to raise these issues in the NPRM, which remains pending to this day.[54]

In short, since the full Commission has not voted to increase or eliminate the National Cap pursuant to this pending NPRM, the Bureau is expressly precluded from addressing this novel legal issue under 47 C.F.R. § 0.283(c).  For this reason, the Order must be reversed.[55]

**B.  The Order Unlawfully Concludes That Waiver of the Cap, and Wholesale Waivers of the Duopoly Rule, Would Be in the Public Interest**

Even assuming *arguendo* that the Commission had previously and conclusively determined that it has the authority to adjust the Cap (which, as explained above, it has not), it has never decided whether actually doing so would be in the public interest.[56]  As noted, the

---

[52] *See Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Order on Reconsideration, 32 FCC Rcd. 3390 ¶ 17 (2017); *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Notice of Proposed Rulemaking, 32 FCC Rcd. 10785 (2017) ("*2017 National Cap NPRM*").

[53] *Id.* ¶¶ 7, 9.  For example, as explained at length in the record and in Section I, *supra*, Congress's removal of the Cap from the Commission's quadrennial review process was designed to withhold the Commission's authority to change the Cap as set by Congress.  *See, e.g.*, Petition to Deny of State Cable Petitioners at 12-14; Reply of State Cable Petitioners at 13-15; Petition to Deny of DIRECTV at 59; Reply of DIRECTV at 38-39; Reply of EchoStar at 9-11.

[54] *See Media Bureau Seeks to Refresh the Record in the National Television Multiple Ownership Rule Proceeding*, Public Notice, 40 FCC Rcd. 4159 (2025) ("*2025 National Cap Refresh Public Notice*").

[55] 47 C.F.R. § 1.115(b)(2)(i), (ii).  Additionally, the Order must be reversed based on its reliance on the *UHF Discount Elimination Order*, which was overturned.  *Id.* § 1.115(b)(2)(iii).

[56] *See* Petition to Deny of DIRECTV at 60-61 ("[A] transaction envisioning a merged entity that would 'serve 54.5% of the national audience' has never before been presented to the Commission. . . .  [T]here is [also] a difficult and novel policy question whether the kind of broadcasting giant that the proposed transaction would create should ever be allowed."); *see also* Petition to Deny of State Cable Petitioners at 24; Reply of State Cable Petitioners at 15.  In a recent interview, Chairman Carr said that while he believed the Commission has the authority to modify the Cap, he

Commission made clear its intention in the *UHF Discount Elimination Order* to launch an NPRM "to consider whether it is in the public interest to modify the national audience reach rule[.]"[57]  The subsequent NPRM teed up that very question.[58]  Rather than await the Commission's resolution of the issue, the Bureau purports to answer the question on its own.  In doing so, the Bureau considered the same public interest issues raised in the pending NPRM, such as whether increased consolidation causes public interest harms and whether those harms are outweighed by potential benefits to marketplace competition, and then finds in favor of the Applicants on all grounds.[59]  As explained in the record, such a usurpation of the Commission's role is plainly beyond the Bureau's delegated authority.[60]

The Bureau fails to grapple with the practical consequences of its decision in light of the scale of the instant Transaction.  Because the Cap applies on a nationwide basis, grant of the Applicants' request means that the Cap has been *eliminated* for a company that combines the first and fourth largest broadcast station owners in the country (first and third, if measured by national audience reach).[61]  Given the maximal scale of this Transaction, the waiver, if allowed

---

also believed that "there's a lot of interesting policy debates" around actually doing so.  *See* Christopher Cole, *12 Questions for FCC Chair Brendan Carr*, Law360 (Feb. 12, 2026).

[57] *See Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Order on Reconsideration, 32 FCC Rcd. 3390 ¶ 17 (2017).

[58] *See 2017 National Cap NPRM* ¶¶ 10-11.

[59] *See* Order ¶¶ 40-45, 51-54; *see also* Reply of State Cable Petitioners at 16, 18-19; *compare* 47 U.S.C. § 309(a) (requiring the Commission to consider "whether the public interest, convenience, and necessity will be served" by granting a broadcast license assignment application) *with 2017 National Cap NPRM* ¶¶ 13, 15-17 (seeking comment on whether the National Cap serves the public interest goals of localism, competition, and viewpoint diversity); *see also 2025 National Cap Refresh Public Notice* at 2 (seeking comment on how new analysis, evidence, or proposals about the National Cap "relate to the Commission's promotion of the public interest").

[60] *See* Petition to Deny of DIRECTV at 60-61; Petition to Deny of State Cable Petitioners at 24; Reply of State Cable Petitioners at 15; 47 C.F.R. § 0.5(c) (explaining that delegated authority is reserved for "matters which are *minor* or *routine* or *settled in nature.*") (emphases added).

[61] *See* Harry A. Jessell, *Nexstar Again Tops Station Groups as Consolidation Prospects Grow*, TVNewsCheck (Aug. 5, 2025), https://tvnewscheck.com/business/article/nexstar-again-tops-station-groups-as-consolidation-prospects-grow/.

10

to stand, would make the Bureau hard-pressed to deny similar relief to other station owners, effectively creating a new rule without Commission sanction. This approach conflicts with well-settled precedent that seeking a rule change is "inappropriate in the form of a waiver request."[62] The Bureau purports to moot the Commission-level *WPIX NAL*, which found that expansion of Nexstar's reach beyond the Cap was contrary to the public interest, but that is not something the Bureau is empowered to do, nor was the issue even addressed by the Applicants.[63]

The Bureau has similarly exceeded its authority in granting wholesale waivers of the Duopoly Rule to the Applicants. Unlike the statutory Cap, the Duopoly Rule may be waived under the Commission's general Section 1.3 waiver authority; however, the Commission and the Bureau have historically granted such waivers in discrete markets based on special circumstances.[64] The Order, in contrast, grants waivers in an unprecedented 21 markets covering tens of millions of U.S. viewers. It bears emphasis that the Applicants' "divestiture" commitments are illusory.[65] First, nothing prevents the combined company from exploiting the

---

[62] *Hull Broadcasting, Inc.*, Order, 19 FCC Rcd. 16710 ¶ 3 & n.7 (EB 2004) ("*Hull Broadcasting Order*") (citing *Applications of Empire State Broadcasting Corporation (WWKB) Buffalo, New York For Renewal of License Bursam Communications Corporation (WTHE) For Construction Permit*, Summary Decision of Administrative Law Judge Joseph Chachkin, 4 FCC Rcd. 7008 ¶ 63 (1989)) ("[R]esolution of this broad policy dispute properly belongs in a rule making proceeding, not a waiver request."); *see also Trib. Co. v. FCC*, 133 F.3d 61, 68 (D.C. Cir. 1998) ("[I]t is hornbook administrative law that an agency need not—indeed should not—entertain a challenge to a regulation, adopted pursuant to notice and comment, in an adjudication or licensing proceeding."); *cf.* Letter from David J. Brown, Chief, Video Division, Media Bureau, FCC to Sinclair, Inc., Cunningham Broadcasting Corporation and KMTR Television, LLC, and DIRECTV, LLC, LMS File Nos. 0000276551 & 0000276767 et al., at 9 & n.61 (Feb. 3, 2026) ("*2026 Sinclair Approval Order*") (citing *Community Television of S. Cal. v. Gottfried*, 459 U.S. 499, 511 (1983) ("[A] rulemaking is generally a better, fairer, and more effective method of implementing a new industry-wide policy than is the uneven application of conditions in isolated [adjudicatory] proceedings.").

[63] *See generally Mission Broadcasting, Inc., Licensee of Station WPIX, New York, NY*, Notice of Apparent Liability for Forfeiture, 39 FCC Rcd. 3676 (2024) ("*WPIX NAL*") (proposing "two divestiture options under which . . . Nexstar can remedy its noncompliance with the National Ownership Cap").

[64] *See, e.g.*, *Consent to Assign Certain Licenses from Imagicomm Eureka, LLC to Marquee Broadcasting West, Inc.*, Memorandum Opinion and Order, 40 FCC Rcd. 2491 ¶ 12 (MB 2025) (granting a waiver of the Local Television Ownership Rule based on the "unique characteristics of the Eureka DMA and the Stations at issue").

[65] *See* Order ¶ 55 ("Nexstar commits to divesting these stations 'no later than two years following the TEGNA Closing Date, provided that a waiver of the Local TVO Rule remains necessary under the Commission's rules at such time.'"). The Order's statement that "competition will not be *unduly* harmed during the period of common ownership" is cold comfort while consumers incur the costs of rising fees, increased blackouts, and job cuts. *Id.*

11

benefits of consolidation for the better part of the next two years and then divesting the stations

to its sidecars in a non-arms-length transaction.  Moreover, the Applicants only commit to

divesting these six stations if the Local Television Ownership Rule (now subject to a

Commission rulemaking) still requires the Applicants to obtain such a waiver at the end of two

years.  The Bureau's waiver grant under these circumstances merely sets the stage for granting

similar massive waivers in future transactions, and prejudges how the Commission will handle

the issue in the pending Quadrennial Review, well outside the Bureau's delegated authority.

Finally, the Bureau fails to demonstrate how waivers of this scale and scope are in any

way justified by "special circumstances," as required under the Commission's general waiver

standard.[66]  Rather, the Bureau merely echoes the Applicants' rote claims that waiver is

necessary to enable them to compete with Big Tech in the video marketplace and the wholly

implausible claims that the merger is necessary for the Applicants to "sustain operations."[67]

However the Applicants and other broadcasters have made exactly the same claims in support of

eliminating the Cap and the Duopoly Rule in the pending rulemakings.[68]  There is nothing

---

(emphasis added).  Moreover, unlike comparable transactions, the Order contains no clauses actually ordering these divestitures. *Cf.  Nexstar/Tribune Order* ¶ 71 & Appx. B; *Nexstar/Media General Order* ¶¶ 76-83.

[66] *NetworkIP, LLC v. FCC*, 548 F.3d 116, 127 (D.C. Cir. 2008); *see also Trib. Co.*, 133 F.3d at 69 (affirming denial of waiver of newspaper cross-ownership rule where "the evidence [the applicant] presents is not particular to the South Florida market" and "most, if not all, of the country's media markets have experienced similar growth"); *Hull Broadcasting Order* ¶ 3 (denying waiver of EAS rules where the requesting station made efficiency arguments that could be "invoked by many other stations that are co-located but not co-owned").

[67] Order ¶¶ 43, 44, 49.  These claims are directly contradicted, for example, by Nexstar CEO Perry Sook's statements to Wall Street *earlier this month* lauding TEGNA as a peer "best of breed" broadcast competitor with "the best balance sheet."  *See* Transcript of Nexstar CEO Perry Sook, Deutsche Bank 34th Annual Media, Internet & Telecom Conference (Mar. 9, 2026), https://seekingalpha.com/article/4880153-nexstar-media-group-inc-nxst-presents-at-deutsche-bank-34th-annual-media-internet-and-telecom; Letter from Brenda Victoria Castillo, President & CEO, National Hispanic Media Coalition, to Marlene H. Dortch, Secretary, FCC (filed Mar. 16, 2026); *see also* Petition to Deny of Public Interest Petitioners at 45 ("Nexstar and TEGNA separately are financially thriving and investing in their local news operations.") (emphasis in original).

[68] *See* Petition to Deny of EchoStar at 2; Reply of State Cable Petitioners at 18-19; Reply Comments of Altafiber at 3 ("[T]he issues [Nexstar] claims support Commission action outside of these rulemakings are not of the nature for which immediate action is necessary.  Nexstar's speculation of doom and gloom, assuming it would come to fruition, would be of equal concern to all broadcasters (and presumably would have a far greater negative impact on

12

"special" about these justifications; rather, they apply equally to the rest of the broadcast industry.  The Order must be reversed for this additional reason.[69]

### III.    THE BUREAU'S DISMISSAL OF RETRANSMISSION CONSENT-RELATED HARMS IS ARBITRARY AND CAPRICIOUS AND INCONSISTENT WITH ESTABLISHED PRECEDENT

The Order makes much of the *Nexstar/Tribune Order*'s finding that "an increase in retransmission consent rates, by itself, is [not] necessarily a public interest harm" to justify its dismissal of the Transaction-specific retransmission consent-related harms identified in the record.[70]  This mischaracterizes the *Nexstar/Tribune Order* and contradicts Commission and Bureau precedent.  The Bureau's deviation from this precedent requires reversal.[71]

Generally, the Commission's transaction review often "closely examines the effect of a proposed transaction on consumer prices."[72]  "[A]n overwhelming amount of evidence" has been submitted to the Commission over the years demonstrating that Big Four affiliate station duopolies, such as those proposed in the Transaction, drive up consumer prices as a result of increased retransmission consent fees and warrant consideration.[73]

While the *Nexstar/Tribune Order* found that increased fees, alone, do not constitute a transaction-specific public interest harm, the Commission found in the same order that public interest harms exist where an increase in retransmission consent rates is "not the product of

---

smaller broadcasters)."); *id.* at 2 ("In light of the pending rulemaking and given the magnitude of the transaction and scope of waivers required for the Commission to approve it, shouldn't Nexstar be obligated to go beyond simply making assertions that its ownership of the TEGNA stations would serve the public interest?").

[69] 47 C.F.R. § 1.115(b)(2)(i).

[70] *See Order* ¶ 78 (citing, e.g., *Nexstar/Tribune Order* ¶ 28).

[71] 47 CFR 1.115(b)(2)(i).

[72] Comments of American Television Alliance and National Content & Technology Cooperative ("ATVA & NCTC") at 3.

[73] *See, e.g.*, Petition to Deny of State Cable Petitioners at 45 (citing Petition to Deny of DIRECTV, Pleading No. 0000280877, LMS File No. 0000276662, at 13 (filed Nov. 18, 2025)).

13

**App.694**

'competitive marketplace conditions.'"[74]  It goes without saying that a merger of this scale that

would immediately increase prices above those already negotiated with TEGNA is anything *but*

an example of competitive marketplace conditions.  Moreover, as highlighted in the record, the

Bureau itself has confirmed in the *Standard General/TEGNA Hearing Designation Order* that

increases in retransmission consent rates can be public interest harms:

> The caselaw makes clear that increases in retransmission consent rates can
> constitute a public interest harm if such increases are not simply the product of a
> properly functioning competitive marketplace.  In particular, evidence that
> anticompetitive practices or other wrongdoing could distinguish what would
> perhaps constitute a market-driven rate increase from one that is anti-competitive,
> unwarranted, and harmful to consumers and the public interest.[75]

The record makes clear that the local consolidation produced by the Transaction is

anticompetitive, increasing the market power of the Applicants to extract supra-competitive rates

using a familiar playbook.[76]  The "massive" increases in retransmission consent fees are the

exact use of market power that the *Nexstar/Tribune Order* contemplated as a public interest

harm.[77]  Moreover, the Bureau designated the Standard General/TEGNA transaction for formal

hearing after finding substantial and material questions of fact exist as to whether transaction-

---

[74] *See Nexstar/Tribune Order* ¶ 29; *see also* Opposition at 40.

[75] *Applications of SGCI Holdings III LLC; TEGNA, Inc.; and CMG Media Corporation*, Hearing Designation Order, 38 FCC Rcd. 1282 ¶ 24 (MB 2023) ("*Standard General/TEGNA HDO*").  However, as DIRECTV explained, nothing in Section 325 limits the FCC's merger review and, in fact, Section 325 specifically directs the Commission to consider the impact of retransmission-consent issues on MVPD pricing.  *See* Reply of DIRECTV at 30.

[76] *See* Reply of State Cable Petitioners at 6, n.11; Petition to Deny of State Cable Petitioners at 45-46 (noting that the retransmission consent rates that would result from Nexstar's accumulation of multiple top-four stations would not be the product of a properly functioning or competitive marketplace); Petition to Deny of EchoStar at 21-23 ("By consolidating these duopolies, Nexstar would gain the power to threaten must-have programming on multiple fronts within the same community, forcing DISH to agree to supra-competitive rates."); Petition to Deny of Public Interest Petitioners at 42 ("More consolidation would also enhance Nexstar's market power they've already abused to extract excessive retransmission consent payments from pay-TV distributors and their weary customers."); Comments of ATVA & NCTC at 4 ("The Big Four duopolies and triopolies created and perpetuated by the proposed transaction would have anticompetitive effects.").

[77] *See* Reply of EchoStar at 6 ("[T]he massive fees broadcasters charge for retransmission are derived solely from their market power.  It is clear, then, that the further increase in retransmission fees that will result if this transaction is approved would harm the public interest.").

14

specific retransmission consent fee increases are not the product of a properly functioning competitive marketplace.[78]  The Bureau's dismissal of retransmission consent-related harms, and failure to investigate whether such harms are market-driven in this instance, is thus contrary to established precedent and arbitrary and capricious, and must be reversed.[79]

## IV.    THE BUREAU ERRED IN FINDING THE PUBLIC INTEREST HARMS PRESENTED IN THE RECORD ARE NOT ESTABLISHED

More than 45 individual organizations and companies came together in this proceeding to submit concrete harms that would directly flow from the Transaction, in the form of higher prices for consumers, MVPDs, and small businesses, as well as reductions in competition for labor, advertising, and newsgathering, localism, and diversity.  These claims were based specifically on the Applicants' past practices, Commission and Department of Justice ("DOJ") analyses and findings in past analogous transactions, and the Applicants' own statements to Wall Street regarding the Transaction.  As explained below, Applicants' commitments to reduce these

---

[78] *See Standard General/TEGNA HDO* ¶¶ 21-24.

[79] 47 CFR 1.115(b)(2)(i).  Relatedly, the Bureau erred in ignoring that Public Interest Petitioners have organizational standing.  The Supreme Court has recognized that organizations have standing themselves when harm "perceptibly impairs" core activities.  *See* Petition to Deny of Public Interest Petitioners at 10 (quoting *Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367, 395 (2024)).  Public Interest Petitioners demonstrated that they have such standing because the Transaction would harm unions' ability to represent, bargain, and organize its membership; make it "significantly more difficult and more costly for Free Press to raise awareness about issues and move people to take action"; and frustrate UCC's ability to further its denomination's goals.  *See id.* at 16-18 (internal quotations omitted).  Furthermore, Public Interest Petitioners demonstrated representational standing on behalf of their members through the harms the Transaction would cause its members, including economic injury and harms to First Amendment rights, and, further, through the harms to viewers in individual local markets.  *See id.* at 19-25.  Thus, the Bureau's conclusion with respect to Public Interest Petitioners must also be reversed, and is equally erroneous in restricting State Cable Petitioners' standing just to certain association members in certain markets; rather, standing should apply to all state association members for the foregoing reasons.

15

**App.696**

harms are illusory.  And, in any event, the Bureau's dismissal of these harms cannot be squared with the evidence available in the record, so it must be reversed.[80]

### A.  The Record Leaves No Doubt That the Transaction Would Result in Supra-Competitive Retransmission Consent Fees and Higher Consumer Prices

As noted above, the Bureau has recognized that retransmission rate increases that are "anti-competitive, unwarranted, and harmful to consumers" are public interest harms and has designated transactions for hearing on the basis of such harms presented in the record.[81] Similarly, as explained in the record, broadcast consolidation, including accumulation of multiple top-four stations in a single market, has been proven to lead directly to disproportionately higher retransmission consent costs as a result of increased negotiation leverage and threats of program blackouts.[82]  In these situations, the DOJ and Commission have relied on divestitures to ensure the public interest is served by broadcast transactions.[83]

Here, the Transaction results in Nexstar reaching 80 percent of U.S. Television households and owning Big Four station affiliate duopolies in 30 overlap markets (and a *triopoly* in one), giving them an increased ability to black out local stations across the country.  Three of the six required divestures are for MyNetworkTV affiliates; and all divested markets still have

---

[80] *See* 47 C.F.R. § 1.115(b)(2)(iv) (noting that Commission review is warranted where there was "an erroneous finding as to an important or material question of fact").  The assessment of public interest harms is all the more important where the Transaction violates both the National Cap and the Duopoly Rule.  *See 2026 Sinclair Approval Order* at 8-9 (Feb. 3, 2026) (noting that a discussion of public interest harms is required when an applicant is seeking a waiver or if a petitioner raises cognizable potential public interest harms).

[81] *See Standard General/TEGNA HDO* ¶ 24.

[82] *See* Petition to Deny of State Cable Petitioners at 38-41 (describing how DOJ and economic analysis have found that larger national scale leads to a heightened ability to threaten program blackouts and an ability to impose disproportionately higher costs on MVPDs, as demonstrated by the more than 1,000 percent increase in retransmission consent fees per subscriber from 2013-2023); Petition to Deny of DIRECTV at 22-25 (noting that the DOJ has recognized that Big Four duopolies increase retransmission fees in the context of the Nexstar-Media General, Gray-Raycom, Nexstar-Tribune, and Gray-Quincy mergers and required divestitures to reduce harms); Petition to Deny of EchoStar at 2-3 (noting a 7,230 percent rise in retransmission prices over the last 15 years and highlighting evidence that broadcast mergers lead to price increases).

[83] *See, e.g.*, Petition to Deny of DIRECTV at 22-25; Petition to Deny of State Cable Petitioners at 46-47.

16

Big Four duopolies.  Indeed, an economic analysis by Dr. Allan Shampine that DIRECTV submitted in the record "present[s] a case study of what happened to retransmission rates paid by DIRECTV after the Nexstar-Tribune merger," showing "a sharp increase in rates relative to trend and relative to other benchmarks for both the Tribune and Nexstar stations in the first post-merger negotiation (i.e., separate from the increase in Tribune rates immediately after the merger due to contractual adjustments)."[84]  Dr. Shampine's analysis provides concrete evidence that the retransmission consent-related harms have materialized in the past and will do so again here.

Furthermore, the risks of program blackouts are not theoretical:  the Applicants have had a long history of using blackouts as part of their playbook to extract higher retransmission consent fees.[85]  DIRECTV noted that 75 percent of Nexstar's contentious retransmission negotiations have resulted in program outages.  The Bureau dismisses these blackout concerns, claiming, among other things, that consumers' ability to access broadcast signals over-the-air will discipline the combined company from pursuing such tactics.[86]  This is absurd.  Does the Bureau really expect millions of consumers to figure out how to set up "rabbit ears"(assuming they even own them) to get those signals when Nexstar blacks out NFL games?  Furthermore, there is no evidence that consumer use of rabbit ears has ever disciplined Nexstar given its long track record of using blackouts as leverage in retransmission consent negotiations, and the fact its rates have risen by 2000% in the last 15 years.

The record leaves no doubt that the instant Transaction would introduce anticompetitive marketplace conditions that would result in steep hikes to retransmission consent fees and

---

[84] Reply of DIRECTV, Appendix C (Shampine Reply Decl.) ¶ 5.

[85] *See* Petition to Deny of State Cable Petitioners at 47-48 (outlining how Nexstar has blacked out local stations in over 290 cumulative markets in the last five years, more than any other broadcaster); Reply of EchoStar at 12 (noting that TEGNA has forced five major blackouts in recent years, one lasting four months).

[86] Order ¶ 72.

17

**App.698**

consumer prices.  For example, DIRECTV, ATVA, and the Public Interest Petitioners outlined detailed Herfindahl-Hirschman Index ("HHI") data showing that, in each of the affected DMAs, the market for retransmission consent for Big Four stations is highly concentrated and would become even more so if the Transaction is approved.[87]  As DIRECTV explained, claims of harm based on HHI data cannot be considered "speculative" when (1) HHI data "is the best tool to measure concentration and likely anticompetitive effects without access to Applicants' proprietary information,"[88] and (2) the Commission has routinely used HHI as "the most widely-accepted measure of concentration in competition analysis."[89]  The record also contains several declarations attesting that increased local and national scale of the Transaction leads directly to increased retransmission consent fees paid by MVPDs and prices paid by consumers.[90]

Moreover, the Bureau's conclusion that Petitioners have failed to make a "cognizable claim" of harms flatly ignores the fact that *Nexstar is touting the very same price hikes as a benefit of the Transaction*.  For example, Nexstar CFO Lee Ann Gliha told Wall Street that the Transaction will produce "about $300 million of synergies.  It breaks out very similarly to how

---

[87] *See* Petition to Deny of DIRECTV at 12-16; Comments of ATVA & NCTC at 7-8; Petition to Deny of Public Interest Petitioners at 39.

[88] Reply of DIRECTV at 14 (citing Elizabeth Xiao-Ru Wang, *Economic Tools for Evaluating Competitive Harm in Horizontal Mergers* (2013), https://media.crai.com/sites/default/files/publications/Economic-Tools for-Evaluating-Competitive-Harm-in-Horizontal-Mergers.pdf (describing Gross Upward Pricing Pressure Index)).

[89] *Id.* at 13 (quoting *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993 Ann. Rep. and Analysis of Competitive Mkt. Conditions with Respect to Mobile Wireless, Including Commercial Mobile Servs.*, Sixteenth Report, 28 FCC Rcd. 3700 ¶ 54 (2013)); *see also 2018 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Report and Order, 38 FCC Rcd. 12782 ¶ 84 (2023); *Applications of T-Mobile US, Inc., and Sprint Corp. for Consent to Transfer Control of Licenses and Authorizations*, Memorandum Opinion and Order, Declaratory Ruling, and Order of Proposed Modification, 34 FCC Rcd. 10578, 10616 ¶ 92 (2019).

[90] *See* Petition to Deny of State Cable Petitioners, Declaration of Joe Lorah, Declaration of Paul Beaudry, and Declaration of Jack Capparell; Petition to Deny of DIRECTV, App. D, Declaration of Rob Thun; Comments of American Television Alliance and National Content & Technology Cooperative, Declaration of Judith Meyka; Petition to Deny of Public Interest Petitioners at 23 (citing declarations of individual consumers).

18

**App.699**

the synergies broke out on the Tribune deal, which was about 45% from *net retrans*[.]"[91] Indeed, unlike applicants in past transactions, here, the Applicants offer no expert testimony and no evidence that the Transaction will not reduce competition and raise prices.[92]  Instead, Nexstar openly admits that "retrans synergies" are "number one" in its "playbook" and, in reference to the instant Transaction, that "the synergy playbook here is very similar to the playbook that you've seen us execute in the past."[93]  It is unsurprising, then, that the Applicants' commitment relating to retransmission consent rates is illusory.  The commitment only applies to MVPDs whose contracts come up for renewal before November 30, 2026; would apparently not prevent Nexstar from immediately raising rates for TEGNA stations to Nexstar's "existing" rates; and says nothing about Nexstar's ability to recoup any "lost" revenues by imposing massive rate hikes in advance of November 30 in the middle of the NFL season.

Nexstar has also made clear that the waivers granted by the Order pave the way for further "retrans synergies," with Gliha stating:

> [I]f [broadcast ownership rules] went away, I do think there's going to be significant opportunity for additional consolidation. . . . [I]n the past, we've been able to accomplish a lot of value . . . through application of our retransmission agreements[ ] onto the new assets.[94]

Sure enough, rather than referencing increases in programming value or any other market-driven factor that would justify increasing rates, Gliha touted to investors Nexstar's "ability to step up any targets['] retrans if it is lower to our level.  And that's a very nice synergy

---

[91] Nexstar Media Group, Inc., Q3 2025 Earnings Call Transcript (Nov. 6, 2025) (emphasis added); *see also* Petition to Deny of State Cable Petitioners at 42 n. 153.

[92] *See* Reply of DIRECTV at 4-5.

[93] *See* Nexstar June 2025 Investor Presentation at 22 ("The Nexstar Consolidation Playbook:  1. Retransmission Revenue Synergies:  Acquired stations move to Nexstar's retransmission consent agreements."); Transcript of Nexstar Media Group, Inc. M&A Call (Aug. 19, 2025).

[94] Transcript of Nexstar Media Group, Inc. Presentation at UBS Global Media & Communications Conference (Dec. 9, 2024); *see* Reply of State Cable Petitioners at 27-28.

19

**App.700**

to have.  It's easy to achieve."[95]  These statements flatly contradict the Bureau's conclusions, and thus this error must be reversed.[96]

### B.  The Bureau Also Errs in Failing to Acknowledge Nexstar's Track Record of Consolidating Newsrooms and Cutting Jobs Following Consolidation

Evidence submitted in the record outlines Nexstar's pattern of cutting jobs, consolidating newsroom operations, and running centralized content following consolidation.[97]  The Bureau's conclusion that labor related harms are more than offset by benefits to localism cannot possibly be correct when these harms are all too real for Nexstar and TEGNA workers, who actively fear more layoffs and fewer job opportunities, and who report part-time employees already being laid off in anticipation of the Transaction.[98]  Analysis submitted in the record confirms that such layoffs are a direct result of consolidation that enables content to be produced in a cheaper and more centralized fashion.[99]

This record evidence has direct bearing on Nexstar's ability to adhere to the Commission's public interest goals of promoting localism and viewpoint diversity.  What the

---

[95] Transcript of Nexstar Media Group, Inc. Presentation at 53rd Annual JPMorgan Global Technology, Media and Communications Conference (May 14, 2025); *see* Reply of State Cable Petitioners at 27.

[96] *See* 47 C.F.R. § 1.115(b)(2)(iv).  The Bureau bizarrely argues that these higher costs will not ultimately be borne by MVPD consumers.  Order ¶ 74.  The Commission has long recognized in its Cable Price Surveys and other reports and past regulations that retransmission consent costs are an "input" into MVPD pricing.  This is no different than how any video distributor helps defray programming-related costs.

[97] *See* Petition to Deny of State Cable Petitioners at 49-54; Petition to Deny of Public Interest Petitioners at 51-66 (outlining how Nexstar has significant power over its employees and how the proposed Nexstar/TEGNA Transaction will enable the combined company to cut jobs by eliminating an existing employer and consolidating news production functions and follow Nexstar's pattern of laying off workers following consolidation).

[98] *See* Petition to Deny of Public Interest Petitioners at 57-59.

[99] *See* Reply of State Cable Petitioners at 29 (citing Kressin Power*s, From Local Stations to Nationwide Conglomerates:  The High Cost of TV Mega-Mergers*, at i, 26-38 (Dec. 4, 2025), https://www.kressinpowers.com/post/why-consolidation-in-local-tv-is-bad-for-consumers-and-local-news-and-about-to-get-much-worse ("Beyond cost increases, increased consolidation is fueling a reduction in the quality and diversity of local television.  Recent decades have seen a series of local newsroom shutdowns, 'news duplication' across supposedly competing local stations, 'must run stories' mandated by corporate headquarters, a lack of diversity of viewpoints across the political spectrum, and a raft of local station layoffs.")).

20

Bureau wrongly credits as benefits of the merger are far more likely to result in tangible harms—evidence which the Order ignores.[100]   DIRECTV submitted detailed analysis showing that "in *every* market in which Applicants hold a duopoly today, they have consolidated news operations."[101]   This includes consolidation of news websites, news content, news leadership, and talent.[102]   Further, the Applicants emphasized the acquired stations' new access to Nexstar's D.C. Capital News Bureau, State Capital News Bureaus, and other remotely produced content.[103] Yet, as explained by Petitioners, these centralized reporting bureaus will *reduce* local news and replace it with national coverage reflective of the combined company's outsized national footprint and Nexstar's history as the country's leading "duplicator" of news content.[104] Nexstar's localism commitments promise only modest and time-limited increases in the "amount" and "availability" of "local" programming but notably omit any commitment not to duplicate such programming across stations.[105]

Contrary to the Bureau's conclusions, such harms cannot possibly be benefits to the public interest when the Transaction is designed "to reduce headcount and eliminate duplicated functions."[106]   Nexstar has openly admitted this to investors, stating:

> [T]here are many areas where we do things a little bit differently that generates synergy. . . . [T]here is obviously the . . . 35 of 51 markets that are the overlap

---

[100] Order ¶ 82.

[101] Reply of DIRECTV at 21-24, Apps. D-E; *see generally* Letter from Michael Nilsson, Counsel to DIRECTV, to Marlene H. Dortch, Secretary, FCC (Feb. 20, 2026) ("DIRECTV Letter") (compiling evidence that, in markets where broadcasters hold a duopoly, triopoly, or quadropoly today, they have consolidated news operations and offered the same local news on multiple stations).

[102] *See* Reply of DIRECTV at 21-24, Apps. D-E; *see also* DIRECTV Letter.

[103] *See* Petition to Deny of State Cable Petitioners at 52 (citing Applications of Nexstar Media Inc. and TEGNA Inc., FCC File Nos. 0000280646, et seq., Comprehensive Exhibit (filed Nov. 18, 2025) at 11-15).

[104] *See* Petition to Deny of State Cable Petitioners at 52-53 (citing Danilo Yanich & Benjamin E. Bagorri, *Reusing The News: Duplicating Local TV Content* (Aug. 2025), https://www.reusingthenews.org/ (finding that Nexstar controlled more station pairings nationwide that regularly duplicate content than any other group)).

[105] Order ¶ 82.

[106] Reply of Public Interest Petitioners at 16-17.

21

markets that we can really operate two stations off of one infrastructure. . . .  [T]hat is an area where there's a significant portion of those synergies coming out of that. . . .  We did a very deep analysis in terms of looking at line by line, person by person, what these costs could be.[107]

Accordingly, industry analysts and journalists across the country understand what the Bureau papers over:  that Nexstar's "path to 'synergies' runs through pink slips."[108]

In the *Standard General/TEGNA Hearing Designation Order*, the Bureau determined that substantial and material questions of fact existed about whether the "apparent intent to provide local news services remotely will promote or harm localism" and "[took] seriously concerns that a diminution in the employment of local journalists and other local staff poses a threat to localism."[109]  Nor did the Bureau address sufficiently the public interest harms to local advertising or news production.[110]  Nexstar will have power to increase prices in local broadcast TV spot advertising markets to the detriment of local businesses,[111] and also face reduced competition in news production to the detriment of local journalism.[112]  As State Cable Petitioners pointed out, "[t]his Transaction raises the same questions even more pointedly."[113]  The Bureau's failure to recognize these harms provides a further basis for reversing the Order.[114]

---

[107] Nexstar Media Group, Inc., Q3 2025 Earnings Call Transcript (Nov. 6, 2025); *see* Petition to Deny of State Cable Petitioners at 50-51.

[108] *See* Petition to Deny of State Cable Petitioners at 51 (collecting and citing numerous press reports).

[109] *Standard General/TEGNA HDO* ¶¶ 49, 36.

[110] Petition to Deny of Public Interest Petitioners at 7 (noting that, post-merger, Nexstar will "control half or more of the commercial stations airing English-language news").

[111] Petition to Deny of Public Interest Petitioners at 33-40 (noting that local businesses will face higher prices as the number of competitive spot-ad alternatives shrinks post-merger), 68-71.

[112] Petition to Deny of Public Interest Petitioners at 31-35, 43 (explaining that Nexstar will be able to increase the advertising time dedicated to commercials during news programming and reduce resources dedicated to journalism).

[113] Petition to Deny of State Cable Petitioners at 54.

[114] 47 C.F.R. § 1.115(b)(2)(iv).  The Bureau also ignored record evidence that the loss of TEGNA as a competitor in the spot advertising market will increase advertising prices.  *See, e.g.*, Petition to Deny of State Cable Petitioners at 55.

22

**App.703**

## V.    THE COMMISSION MUST, AT MINIMUM, DESIGNATE THIS TRANSACTION FOR HEARING

Congress requires the Commission to hold a hearing "[i]f a substantial and material question of fact is presented or if the Commission for any reason is unable to find that grant of the application would be consistent" with the public interest.[115]  In prior broadcast transactions, both the Commission and the Bureau have followed this Congressional mandate by designating applications for hearings where "'the totality of the evidence arouses a sufficient doubt' as to whether grant of the application would serve the public interest."[116]

Such doubts are present here.  As noted above, the Transaction raises, for the first time, a substantial and material question as to whether waiver of the Commission's broadcast ownership rules on the scale requested would serve the public interest.[117]  The record also presents the exact same questions of fact regarding retransmission consent rates and localism that the Bureau in the *Standard General/TEGNA Hearing Designation Order* found to justify a formal evidentiary hearing.[118]  Beyond these questions, the record presents several additional "substantial and material facts"  providing sufficient doubt that the Transaction serves the public interest and warranting the Commission's careful consideration and analysis.[119]

---

[115] 47 U.S.C. § 309(d)(2); *see also Astroline Comm'cns Co. v. FCC*, 857 F.2d 1556, 1561 (D.C. Cir. 1988) (noting that "in evaluating a request for an evidentiary hearing . . . the Commission must . . . assum[e] that" facts set forth in a petition to deny are true).

[116] *Standard General/TEGNA HDO* ¶¶ 15-16 (quoting *Serafyn v. FCC*. 149 F.3d 1213, 1216 (D.C. Cir. 1998)) (designating transaction for hearing where substantial questions of fact existed related to potential retransmission consent fee increases as a result of market power and the effects of the transaction on localism); *see also Applications of Tribune Media Company and Sinclair Broadcast Group*, Hearing Designation Order, 33 FCC Rcd. 6830 ¶ 17 (2018) ("*Sinclair/Tribune HDO*") (designating transaction for formal hearing where substantial and material questions of fact exist whether the applicant engaged in misrepresentation and/or lack of candor in its application, including with respect to its compliance with the broadcast ownership rules).

[117] *See* Section II.B., *supra*.

[118] *See* Sections III, IV, *supra*.

[119] *See, e.g.*, Petition to Deny of State Cable Petitioners at 5 ("Allowing any one entity to control dissemination of high-value news, sports, and emergency programming with this level of concentration at both the national and local levels would be . . . devastating for competition, localism, and viewpoint diversity."); *id.* at 32-33 (describing how Nexstar is seeking to require 11 TEGNA stations that the DOJ required Nexstar to divest, and prohibited from

23

Despite the submission of these substantial and material facts into the record, and the extensive evidence showing why this merger cannot reasonably be found to be in the public interest, the Bureau never even issued a request for additional information from the Applicants,[120] including for highly relevant economic studies they submitted to DOJ.[121]  Nor did it order a hearing as required by § 309(d)(2).  Notably, despite extensive record evidence—and the Applicants' own public statements to Wall Street Investors—on how the merger will increase consumers' monthly video bills, at a time when every policymaker's central concern is affordable pricing, the Bureau refused to follow the statute and order a hearing to probe further into that important issue.  Instead, it approved the merger after receiving its orders from the President.[122]  If the Commission does not deny the Transaction outright, it must designate the Transaction for hearing to resolve the substantial and material questions of fact presented.  Failure to do so for a Transaction of this size and scope is unprecedented and must be reversed.

## VI.    CONCLUSION

There are multiple grounds on which the Commission must reverse the Order.  The record in this proceeding makes clear that the Commission does not have the authority to modify or waive the National Cap and by doing so for the first time in this Transaction, the Bureau

---

reacquiring, in 2019); *id.* at 10, 33-34 (highlighting the Commission 2024 *WPIX NAL* where it found Nexstar in "willful" violation of the National Cap and noting that the Applicants failure to disclose the decision warrants a formal hearing consistent with the *Sinclair/Tribune HDO*) (citing *Mission Broadcasting, Inc., Licensee of Station WPIX, New York, NY*, Notice of Apparent Liability for Forfeiture, 39 FCC Rcd. 3676 ¶¶ 54, 85, 87 (2024); *Sinclair/Tribune HDO* ¶ 17).

[120] *See, e.g.*, *Sinclair/Tribune HDO* ¶ 6 ("On September 13, 2017, the Media Bureau issued a Request for Information (Information Request) to the Applicants. Sinclair responded to the Information Request on October 5, 2017. Thereafter, the Bureau announced an additional opportunity for comment on October 18, 2017.").

[121] *See* Letter from Michael Nilsson and William M. Wiltshire, Counsel to DIRECTV, to Marlene H. Dortch, Secretary, FCC (Mar. 6, 2026) (noting that Nexstar has not submitted studies to the FCC purporting to explain the "rationale that the definitions of markets and the definition of video certainly needs to evolve with the times").

[122] *See* Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 7, 2026, 10:25 AM), https://tinyurl.com/3cp7ufhj (urging the Commission, with reference to the Transaction to "GET THAT DEAL DONE!"); *see also* Brendan Carr (@BrendanCarrFCC), X (Feb. 7, 2026, 2:20 PM), https://tinyurl.com/yu4da25r (agreeing with President Trump and expressing his intent to "get it done.").

24

**App.705**

exceeded its delegated authority, contravened established Commission and Bureau precedent, and paved the way for irreparable public interest harms to MVPDs, businesses, workers, and consumers.  Likewise, by granting total waivers of the Duopoly Rule in 21 markets—effectively eliminating that rule's application to Nexstar, the largest broadcast station group owner in the country—the Bureau acted beyond its authority and committed legal error.  The Bureau also made erroneous findings of fact and ignored precedent when it credited the Applicants' asserted benefits while discounting the numerous, non-speculative harms identified in the record.  At a bare minimum, the Bureau should have recognized that there are numerous substantial and material issues of fact warranting further examination.  For all of these reasons, Petitioners respectfully request that the Commission reverse the Order and deny the Transaction or, in the alternative, designate the Transaction for a formal evidentiary hearing.

Respectfully submitted,

/s/ _____

| | |
|---|---|
| Todd Eachus<br>President<br>BROADBAND COMMUNICATIONS<br>ASSOCIATION OF PENNSYLVANIA<br>127 State St.<br>Harrisburg, PA 17101 | David Ducharme<br>Executive Director<br>BROADBAND COMMUNICATIONS<br>ASSOCIATION OF WASHINGTON<br>4217 Williams Ave. N.<br>Renton, WA 98056 |
| Joseph Dant<br>Executive Director<br>INDIANA CABLE AND BROADBAND<br>ASSOCIATION<br>150 W. Market St., Ste. 412<br>Indianapolis, IN 46204 | Lindsey Simmons<br>Interim Executive Director<br>MISSISSIPPI INTERNET AND TELEVISION<br>PO Box 55867<br>Jackson, MS 39296 |
| Ann Marie Walp<br>President<br>TENNESSEE CABLE & BROADBAND<br>ASSOCIATION | Ray LaMura<br>President<br>VCTA – BROADBAND ASSOCIATION OF<br>VIRGINIA |

25

**App.706**

414 Union St., Ste. 1900
Nashville, Tennessee 37219

Michael Nilsson
William M. Wilshire III
Timothy J. Simeone
HWG LLP
1919 M Street, N.W.
The Eighth Floor
Washington, D.C. 20036
(202) 730 1300

*Counsel to DIRECTV*

John Bergmayer
PUBLIC KNOWLEDGE
1818 N Street, NW
Suite 410
Washington, DC 20036

Nell Geiser
Ceilidh Gao
COMMUNICATIONS WORKERS OF
AMERICA
501 Third Street, NW
Washington, DC 20001

1111 East Main St., Ste. 802
Richmond, VA 23219

Michael Hartman
General Counsel
Chief External Affairs Officer and
Secretary
Stacy Fuller
Senior Vice President, External Affairs
DIRECTV, LLC
2260 E. Imperial Highway
El Segundo, CA 90245

Christopher Ruddy
Chief Executive Officer
Michael Martin
Director of Government Affairs
NEWSMAX MEDIA, INC.
750 Park of Commerce Drive, Suite 100
Boca Raton, FL 33487

Cheryl Leanza
UNITED CHURCH OF CHRIST MEDIA JUSTICE
MINISTRY, INC.
100 Maryland Avenue, NE
Suite 330
Washington, DC 20002

Matthew F. Wood
Vice President of Policy &
General Counsel
FREE PRESS
1025 Connecticut Avenue NW, Suite 1110
Washington, DC 20036

March 20, 2026

26

**App.707**

## CERTIFICATE OF SERVICE

I, Todd Eachus, certify that on this 20th day of March, I caused true and correct copies of the foregoing Reply to be served by electronic mail on the following:

Jennifer A. Johnson
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-5552
jjohnson@cov.com

*Counsel to TEGNA, Inc.*

Kathleen Kirby
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-3360
kkirby@wiley.law

*Counsel to Nexstar Media Inc.*

David Brown
Chief, Video Division
Media Bureau
Federal Communications Commission
45 L Street, NE
Washington, DC 20554
David.Brown@fcc.gov

Chris Robbins
Deputy Chief, Video Division
Media Bureau
Federal Communications Commission
45 L Street, NE
Washington, DC 20554
Chris.Robbins@fcc.gov

Emily Harrison
Video Division
Media Bureau
Federal Communications Commission
45 L Street, NE
Washington, DC 20554
Emily.Harrison@fcc.gov

Jim Bird
Transaction Team
Office of General Counsel
Federal Communications Commission
45 L Street, NE
Washington, DC 20554
Jim.Bird@fcc.gov

/s/ *Todd Eachus*
Todd Eachus

March 20, 2026

**App.708**

**Before the**
**Federal Communications Commission**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| *Applications to Transfer Control of Tegna* | ) MB Docket No. 25-331 |
| *Inc. to Nexstar Media Inc.* | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**EMERGENCY PETITION FOR STAY AND INJUNCTION PENDING APPEAL OF
BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA;
BROADBAND COMMUNICATIONS ASSOCIATION OF WASHINGTON; INDIANA
CABLE AND BROADBAND ASSOCIATION; MISSISSIPPI INTERNET AND
TELEVISION; TENNESSEE CABLE & BROADBAND ASSOCIATION; VCTA –
BROADBAND ASSOCIATION OF VIRGINIA; DIRECTV, LLC; NEWSMAX MEDIA
INC; PUBLIC KNOWLEDGE; COMMUNICATIONS WORKERS OF AMERICA;
UNITED CHURCH OF CHRIST MEDIA JUSTICE MINISTRY, INC.;
AND FREE PRESS**

Todd Eachus
President
BROADBAND COMMUNICATIONS
ASSOCIATION OF PENNSYLVANIA
127 State St.
Harrisburg, PA 17101

Joseph Dant
Executive Director
INDIANA CABLE AND BROADBAND
ASSOCIATION
150 W. Market St., Ste. 412
Indianapolis, IN 46204

Ann Marie Walp
President
TENNESSEE CABLE & BROADBAND
ASSOCIATION
414 Union St., Ste. 1900
Nashville, Tennessee 37219

David Ducharme
Executive Director
BROADBAND COMMUNICATIONS
ASSOCIATION OF WASHINGTON
4217 Williams Ave. N.
Renton, WA 98056

Lindsey Simmons
Interim Executive Director
MISSISSIPPI INTERNET AND TELEVISION
PO Box 55867
Jackson, MS 39296

Ray LaMura
President
VCTA – BROADBAND ASSOCIATION OF
VIRGINIA
1111 East Main St., Ste. 802
Richmond, VA 23219

**App.709**

Michael Nilsson
William M. Wilshire III
Timothy J. Simeone
HWG LLP
1919 M Street, N.W.
The Eighth Floor
Washington, D.C. 20036
(202) 730 1300

*Counsel to DIRECTV*

John Bergmayer
PUBLIC KNOWLEDGE
1818 N Street, NW
Suite 410
Washington, DC 20036


Nell Geiser
Ceilidh Gao
COMMUNICATIONS WORKERS OF
AMERICA
501 Third Street, NW
Washington, DC 20001

Michael Hartman
General Counsel
Chief External Affairs Officer and
Secretary
Stacy Fuller
Senior Vice President, External Affairs
DIRECTV, LLC
2260 E. Imperial Highway
El Segundo, CA 90245


Christopher Ruddy
Chief Executive Officer
Michael Martin
Director of Government Affairs
NEWSMAX MEDIA, INC.
750 Park of Commerce Drive, Suite 100
Boca Raton, FL 33487


Matthew F. Wood
Vice President of Policy &
General Counsel
FREE PRESS
1025 Connecticut Avenue NW, Suite 1110
Washington, DC 20036

Cheryl Leanza
UNITED CHURCH OF CHRIST MEDIA JUSTICE
MINISTRY, INC.
100 Maryland Avenue, NE
Suite 330
Washington, DC 20002

March 20, 2026

**App.710**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

BACKGROUND ........................................................................................................... 4

DISCUSSION .............................................................................................................. 8

   I.       PETITIONERS ARE LIKELY TO PREVAIL ON THE MERITS ............................ 8

      A.    Waiving the National Cap Violates the 2004 CAA and Commission Rules, and Is Arbitrary and Capricious ................................................................... 8

           1.    The Commission lacks authority to waive the National Cap.................................. 8

           2.    The Media Bureau lacks authority over novel questions of law and policy............ 10

      B.    Waiving the Duopoly Rule Exceeds the Bureau's Authority and Is Arbitrary and Capricious ........................................................................... 12

      C.    Granting the Applications Without Designating Them for a Hearing Violates Congressional Mandates and Is Arbitrary and Capricious ......................................... 13

   II.      THE REMAINING FACTORS DECISIVELY SUPPORT A STAY ....................... 15

CONCLUSION............................................................................................................. 19

CERTIFICATE OF SERVICE ..........................................................................................

**Before the**
**Federal Communications Commission**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| *Applications to Transfer Control of Tegna* | )    MB Docket No. 25-331 |
| *Inc. to Nexstar Media Inc.* | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**EMERGENCY PETITION FOR STAY AND INJUNCTION PENDING APPEAL OF BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA; BROADBAND COMMUNICATIONS ASSOCIATION OF WASHINGTON; INDIANA CABLE AND BROADBAND ASSOCIATION; MISSISSIPPI INTERNET AND TELEVISION; TENNESSEE CABLE & BROADBAND ASSOCIATION; VCTA – BROADBAND ASSOCIATION OF VIRGINIA; DIRECTV, LLC; NEWSMAX; PUBLIC KNOWLEDGE; COMMUNICATIONS WORKERS OF AMERICA; UNITED CHURCH OF CHRIST MEDIA JUSTICE MINISTRY, INC.; AND FREE PRESS**

**INTRODUCTION**

The Media Bureau's ("Bureau") approval order ("Order")[1] paves the way for Nexstar Media Group Inc. ("Nexstar") (the nation's largest television-station conglomerate) to acquire the broadcast licenses currently held by TEGNA Inc. ("TEGNA," with Nexstar, the "Applicants") (the third largest by national reach) as part of a $6.2 billion merger (the "Transaction"). New Nexstar will control 265 full-power stations (259 with illusory "divestitures" two years hence that may never materialize) spread over 132 media markets, reaching nearly every corner of the country and over 80 percent of U.S. households. To say that the merger will "adversely affect" Petitioners would be a massive understatement: Everyone (including the Applicants themselves) agrees that the new company will exert its newfound

---

[1] *Applications for Consent to the Transfer of Control of TEGNA Inc. to Nexstar Media Inc.*, Memorandum Opinion and Order, MB Docket No. 25-331, DA 26-267 (MB Mar. 19, 2026) ("Order").

leverage to demand ever-higher fees from multichannel video programming distributors ("MVPDs") wishing to carry Nexstar/TEGNA stations, which, in turn, will translate into higher prices for millions of MVPD subscribers. And the merger will further harm the public interest with imminent cuts to journalists and other workers employed by these stations across the country, and decreased competition and viewpoint diversity in news these stations produce. The Order took effect upon publication on March 19, 2026, and the merger closed immediately thereafter. Concurrently with this petition, Petitioners have also filed an emergency application for review of the Order.[2] Petitioners respectfully request that, pursuant to its authority under Section 10(d) of the Administrative Procedure Act, the Commission stay the effectiveness of the Bureau's Order pending Commission issuance of a ruling on this application for review and enjoin the Applicants from taking steps towards integration of the two companies.[3] **Petitioners further request that the Commission rule on this stay petition within twenty-four (24) hours—i.e., by 3:00 PM on March 21, 2026—to allow Petitioners time to seek a stay in the court of appeals, if necessary, in order to preserve their right to effective judicial review of this FCC action.**[4]

---

[2] Emergency Application for Review of the Broadband Communications Association of Pennsylvania, Broadband Communications Association of Washington, Indiana Cable and Broadband Association, Mississippi Internet and Television, Tennessee Cable & Broadband Association, and VCTA – Broadband Association of Virginia, DIRECTV, LLC; Newsmax Media Inc.; Public Knowledge; Communications Workers of America; United Church of Christ Media Justice Ministry, Inc.; and Free Press, MB Docket No. 25-331 (filed Mar. 20, 2026) ("Application for Review").

[3] *See* 5 U.S.C. § 705 ("When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review."); *Targeting and Eliminating Unlawful Text Messages; Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Advanced Methods to Target and Eliminate Unlawful Robocalls*, Order, 40 FCC Rcd. 1054 ¶ 1 (CGB 2025) (granting a petition for stay of the effective date of certain rules "find[ing] that justice requires postponement of the effective date pending judicial review of the adopted rule."). More generally, the Commission can issue an administrative stay on its own motion and has when warranted. *See, e.g., Bloomberg L.P., Complainant v. Comcast Cable Communications, LLC, Defendant*, Memorandum Opinion and Order, 27 FCC Rcd. 9488 ¶ 11 (2012) (finding "that the novelty and importance of the issues presented warrant an administrative stay of certain aspects of the *Neighborhood Order* to provide the Commission an opportunity to resolve the issues on review").

[4] Twenty-four hours is a reasonable period of time for Commission action and will ensure that Petitioners can pursue their statutory rights to effective judicial review of the Order. When, as here, an agency's "actions suggest the

2

**App.713**

Petitioners' challenges to the Order satisfy the Commission's criteria for a stay, which track the factors applied by federal courts.[5]  First and foremost, Petitioners' challenge is overwhelmingly likely to succeed on the merits.  For the reasons set forth in Petitioners' application for review, the Bureau's Order exceeds its delegated authority, violates Section 629 of the 2004 Consolidated Appropriations Act ("2004 CAA"), contradicts established precedent, and ignores substantial record evidence.

While this was all highlighted in the record, the Bureau still issued its Order without even designating the Transaction for a hearing, which is the absolute *least* it should have done given the multiple "substantial and material question[s]" about whether this merger serves "the public interest."[6]  Notably, even though the record—and the Applicants' own public statements to Wall Street investors—clearly show that consumers' monthly TV bills will increase substantially as a result of this merger, the Bureau determined that these affordability concerns were not important enough to probe more carefully in a fact-finding hearing.  Nor did it adequately address other substantial and material facts in the record, including the likelihood of harms to broadcast journalism and relevant workforces and the unlikelihood of the Applicants' claimed public interest benefits coming to fruition.

---

[agency] has made up its mind," the agency cannot "seek[] to avoid judicial review by holding out a vague prospect of reconsideration."  *Friedman v. FAA*, 841 F.3d 537, 543 (D.C. Cir. 2016).  When both President Trump and Chairman Carr, in reference to this Transaction, have specifically urged to "GET TH[E] DEAL DONE!", any attempt to "ignore[] the ticking clock" and keep Petitioners "in a holding pattern" can only be understood as "a constructive denial" of their application and stay petition.  *Id.* at 541-42; *see also* Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 7, 2026, 10:25 AM), https://tinyurl.com/3cp7ufhj; Brendan Carr (@BrendanCarrFCC), X (Feb. 7, 2026, 2:20 PM), https://tinyurl.com/yu4da25r.  The fact that Nexstar and TEGNA closed contemporaneous with the Bureau's Order makes it crystal clear that the parties and the Bureau were working hand-in-glove to try to insulate the Order from judicial review.

[5] *See, e.g.*, *Amendment of Parts 73 and 76 of the Commission's Rules Relating to Program Exclusivity in the Cable and Broadband Industries*, Order Denying Stay Request, 4 FCC Rcd. 6476 ¶ 6 (1989).

[6] 47 U.S.C. § 309(d)(2).

3

**App.714**

The remaining stay factors confirm the need for a stay.  Notwithstanding the legal infirmities of the Bureau's Order, Nexstar and TEGNA closed immediately upon its release.[7]  As the record makes clear, the Transaction will irreparably harm Petitioners and the public interest in the form of higher retransmission consent fees, higher consumer prices, subscriber losses for MVPDs, loss of jobs and negotiating power for broadcast workers and journalists, and the concentration of control over high-value news, sports, and emergency programming to 80 percent of American households in the hands of one company.  To protect the public interest, the Commission should grant a stay immediately and enjoin the Applicants from taking steps towards integration of the two companies.

## BACKGROUND

Procedurally, broadcast television licenses can only be transferred "upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby."[8]  If "the Commission for any reason is unable to make" that public-interest finding, or "[i]f a substantial and material question of fact is presented," "it shall formally designate the application for hearing."[9]  The Commission has in turn delegated its authority to "[p]rocess applications for . . . transfer" to the Media Bureau, subject to certain "reserv[ations],"[10]—among other things, the Commission reserved for itself the authority to decide "[m]atters that present novel questions of law, fact or policy that cannot be resolved under

---

[7] Press Release, Nexstar, Nexstar Media Group, Inc., Closes Acquisition of TEGNA Inc. (Mar. 19, 2026), https://www.nexstar.tv/ntam/.

[8] 47 U.S.C. § 310(d).

[9] *Id.* § 309(d)(2), (e).

[10] 47 C.F.R. § 0.61(a), (k).

4

**App.715**

existing precedents and guidelines."[11]  Thus, the Bureau cannot "decide issues of first impression."[12]

Substantively, in 1985, the Commission exercised its general rulemaking and licensing authority to set the National Television Ownership Rule's national audience reach limitation (the "National Cap" or "Cap") at 25 percent.  Afterwards, Congress in the Telecommunications Act of 1996 directed the Commission to increase the National Cap to 35 percent.[13]  In the years following the 1996 Act, Congress shared control with the Commission over the National Cap, directing the Commission to include the National Cap in its periodic review process.[14]  However, in the 2004 CAA, Congress set the National Cap to 39 percent and codified a slew of new provisions making express and repeated references to that "39 percent national audience reach limitation."[15]  Specifically, Congress:

(1) specified that "[a] person or entity that exceeds the 39 percent national audience reach limitation for television stations . . . through grant, transfer, or assignment of an additional license for a commercial television broadcast station" would have no more than two years to come into compliance;

(2) made clear that the Commission's forbearance authority "shall not apply to any person or entity that exceeds the 39 percent national audience reach limitation for television stations"; and

---

[11] *Id.* § 0.283(c).

[12] *Blanca Tel. Co. Seeking Relief from Demand for Repayment of a Universal Serv. Fund Debt*, Memorandum Opinion and Order and Order on Reconsideration, 32 FCC Rcd. 10594 ¶ 42 n.120 (2017) ("*Blanca Telephone Co. Order*").

[13] Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(c), 110 Stat. 56, 111 ("1996 Act").

[14] *See id.* § 202(g); *Fox Television Stations v. FCC*, 293 F.3d 537, 540 (D.C. Cir. 2002); S. Rep. No. 104-230 at 164 (1996) (underscoring the periodic-review process as the exclusive mechanism for revising ownership rules going forward).

[15] Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 ("2004 CAA").

5

**App.716**

(3) specified that the Commission's periodic review of ownership rules "does not apply to any rules relating to the 39 percent national audience reach limitation."[16] While the Commission asserted in its *UHF Elimination Order* that it retained "authority to modify the national audience reach cap"[17] that order was reversed on reconsideration, the question was reopened in late 2017, and the question remains open today in the Commission's pending rulemaking on this very question.[18]

The Commission also has authority to set restrictions "as public convenience, interest, or necessity requires" with respect to local broadcast ownership limits.[19] Pursuant to this authority, the Commission has promulgated the Local Television Ownership Rule (the "Duopoly Rule"), which "prohibits an entity from owning more than two full-power television stations in the same geographic market."[20] To receive a waiver of the rule, applicants must "plead with particularity" specific "facts,"[21] "demonstrat[ing] why its case is significantly different from the many other station combinations across the country that are similarly situated,"[22] and why "deviation better serves the public interest."[23] Moreover, "[s]ettled Commission precedent establishes that, in

---

[16] *Id.*

[17] *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Report and Order, 31 FCC Rcd. 10213 ¶ 21 (2016) ("*UHF Elimination Order*").

[18] *See Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Order on Reconsideration, 32 FCC Rcd. 3390 ¶ 17 (2017); *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Notice of Proposed Rulemaking, 32 FCC Rcd. 10785 (2017); *Media Bureau Seeks to Refresh the Record in the National Television Multiple Ownership Rule Proceeding*, Public Notice, 40 FCC Rcd. 4159 (2025).

[19] 47 U.S.C. §§ 154(i), 303(r).

[20] *Zimmer Radio of Mid-Missouri, Inc. v. FCC*, 145 F.4th 828, 841 (8th Cir. 2025).

[21] *Application of Maurice Rosenfield, Lois F. Rosenfield, Harold A. Weiss, Robert G. Weiss, and Devoe, Shadur, Plotkin, Krupp & Miller, A Copartnership, D.B.A. WAIT RADIO, Chicago, Ill.*, Memorandum Opinion and Order, 22 F.C.C.2d 934 ¶ 9 (1970).

[22] *Benedek License Corp.*, Letter, 13 FCC Rcd. 18913 (MMB 1998).

[23] *NetworkIP, LLC v. FCC*, 548 F.3d 116, 127 (D.C. Cir. 2008); *see also Hull Broad., Inc.*, Order, 19 FCC Rcd. 16710 ¶ 3 & n.7 (EB 2004) ("[R]esolution of this broad policy dispute properly belongs in a rule making proceeding, not a waiver request.").

6

considering a request to waive the duopoly rule, the agency's overriding goal is to determine whether a waiver is in the public interest, including whether it is consistent with the duopoly rule's goals of promoting economic competition and diversification of viewpoints."[24]  By contrast, the Commission has never waived the National Cap.  Rather, *in every prior case* where a proposed license transfer would result in a violation of the Cap, the FCC has conditioned approval on mandatory divestitures to bring the new entity under the Cap, consistent with the requirements of the 2004 CAA.[25]  The handful of divestitures that the Applicants have committed to make—all in markets where they would have triopolies or duopolies—do not affect the combined company's national reach in violation of the Cap.

In November 2025, Nexstar and TEGNA jointly filed an application with the FCC to transfer TEGNA's broadcast licenses to Nexstar.  The application acknowledged that the combined entity would run afoul of the FCC's broadcast ownership rules—in particular, the entity would reach roughly 80 percent of American households and own three or more full power stations in 23 media markets not subject to existing waivers—but argued that "[t]hose rules are in a state of flux and, to the extent not finally resolved during the pendency of the Applications, the applicants seek waiver of those rules that are pertinent."[26]  Petitioners, including MVPDs in markets where Nexstar and/or TEGNA currently operate separate stations as well as other communications companies, labor unions, and public interest organizations, filed petitions asking the Commission both to designate the Transaction for a hearing and to deny the

---

[24] *Busse Broad. Corp. v. FCC*, 87 F.3d 1456, 1464 (D.C. Cir. 1996) (collecting FCC precedent).

[25] *See, e.g.*, *Applications for Consent to Transfer Control of License Subsidiaries of Media General, Inc., from Shareholders of Media General, Inc., to Nexstar Media Group, Inc.*, Memorandum Opinion and Order, 32 FCC Rcd. 183 ¶ 1 (MB 2017); *Tribune Media Company (Transferor) and Nexstar Media Group, Inc. (Transferee), et al.*, Memorandum Opinion and Order, 34 FCC Rcd. 8436 ¶ 8 (2019).

[26] Applications of Nexstar Media Inc. and TEGNA Inc., FCC File Nos. 0000280646, et seq., Comprehensive Exhibit at 3 (filed Nov. 18, 2025).

7

**App.718**

applications.[27]  Nexstar and TEGNA filed a consolidated opposition on January 15, 2026.[28]

Petitioners replied on January 26, 2026.[29]  The Commission referred the Transaction to the

Bureau, which granted the transfer applications and denied Petitioners' petitions to deny in the

Order.  Petitioners now submit this emergency petition for stay along with an accompanying

emergency application of review of the Order.

## DISCUSSION

Under Commission precedent, petitioners must show that (1) they are likely to prevail on

the merits; (2) they will suffer irreparable harm if the stay is not granted; (3) other interested

parties will not be substantially harmed if the stay is granted; and (4) the public interest favors

granting a stay.[30]  Petitioners readily satisfy all four criteria.

### I.    PETITIONERS ARE LIKELY TO PREVAIL ON THE MERITS

#### A.    Waiving the National Cap Violates the 2004 CAA and Commission Rules, and Is Arbitrary and Capricious

##### 1.    The Commission lacks authority to waive the National Cap.

The Commission "has no authority to waive" requirements mandated by statute, unless

Congress expressly gives the Commission that authority.[31]  As the Petitioners emphasized in

---

[27] *See, e.g.*, Petition to Deny of the Broadband Communications Association of Pennsylvania, Broadband Communications Association of Washington, Indiana Cable and Broadband Association, Mississippi Cable Telecommunications Association, Tennessee Cable & Broadband Association, and VCTA – Broadband Association of Virginia, MB Docket No. 25-331 (filed Dec. 31, 2025) ("Petition to Deny of State Cable Petitioners").  Unless otherwise noted, all citations to petitions to deny, replies, comments, reply comments, or ex parte letters included herein are to those filed in response to the Transaction in MB Docket No. 25-331.

[28] Consolidated Opposition to Petitions to Deny and Comments of TEGNA Inc. and Nexstar Media Inc., MB Docket No. 25-331 (filed Jan. 15, 2026) ("Opposition").

[29] Reply of State Cable Petitioners.

[30] *Amendment of Parts 73 and 76 of the Commission's Rules Relating to Program Exclusivity in the Cable and Broadcast Industries*, Order Denying Stay Request, 4 FCC Rcd. 6476 ¶ 6 (1989) (citing *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 842, 843-44 (D.C. Cir. 1977)).

[31] *Johnston Broad. Co. v. FCC*, 175 F.2d 351, 354-55 (D.C. Cir. 1949); *accord Nat'l Ass'n of Broads. v. FCC*, 569 F.3d 416, 426 (D.C. Cir. 2009).

8

their petitions to deny, replies, and application for review, Congress established the National Cap at 39 percent in the 2004 CAA *in direct response to the FCC's attempt to aggressively raise the Cap to 45 percent*, and made repeated references to the 39 percent Cap in the statute.[32]  It is "hard to imagine a statutory term less ambiguous than . . . precise numerical thresholds."[33]  As Petitioners explain in their application for review, the CAA's removal of the Cap from the Commission's periodic review process and inclusion of a divestiture provision further signal Congress's intent to remove the Cap from Commission discretion.[34]  Likewise, Congress singled out the Commission's only mechanism for setting aside statutory requirements—the Commission's forbearance authority under 47 U.S.C. § 160—and made clear that it "shall not apply to any person or entity that exceeds the 39 percent national audience reach limitation."[35]  The Bureau's interpretation cannot withstand scrutiny when it "would render" Congress's rejection of the Commission's attempt to raise the Cap to 45 percent "a largely meaningless exercise."[36]

The statutory history of the 2004 CAA confirms the logic of this construction of the statute.  Congress's decision to remove the National Cap from the periodic review process was a direct response to the D.C. Circuit's 2002 *Fox Television* decisions, which concluded that the Commission retained authority to modify the Cap because the Cap remained within the ambit of the Commission's Section 202(h) review process.[37]  *The D.C. Circuit articulated that, to*

---

[32] *See* 2004 CAA § 629; *see also* Petition to Deny of State Cable Petitioners at 11; Reply of State Cable Petitioners at 9-10; Application for Review at 1-2.

[33] *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 326 (2014).

[34] Application for Review at 2-5.

[35] 2004 CAA § 629(2).

[36] *Rumsfeld v. Forum for Acad. and Inst. Rts.*, 547 U.S. 47, 57-58 (2006).

[37] *See Fox Television Stations v. FCC*, 280 F.3d 1027, 1043 (D.C. Cir. 2002); *opinion modified on reh'g* 293 F.3d 537 (D.C. Cir. 2002).

**App.720**

*reassert control over the Cap, Congress could take the Cap out of the Section 202(h) review process, which is exactly what it did in the 2004 CAA.*[38] "Congress is presumed to be aware of an administrative or judicial interpretation of a statute," and just as it presumably "adopt[s] that interpretation when it re-enacts a statute without change,"[39] it equally intends any "amendment to have real and substantial effect."[40]

Accordingly, until now, the Commission has never waived, nor sought to raise the National Cap in the aftermath of the 2004 CAA. Rather, when presented with proposed transactions that would exceed the Cap, it has *always* required divestitures. At the very least, the Commission would need to provide a very good explanation for "discover[ing]" "an unheralded power" to waive the Cap and allow Nexstar to reach (and control what gets reported to) 80 percent of American households.[41] As further discussed below, that is not something the Bureau is empowered to do on delegated authority, and even if it were, it has not come close to providing the requisite explanation for waiving the Cap. Its Order plainly violates the 2004 CAA, and is otherwise arbitrary and capricious.[42]

### 2. The Media Bureau lacks authority over novel questions of law and policy.

Even assuming *arguendo* that the full Commission might have authority to modify the National Cap, it is still improper for the Bureau to do so, because FCC regulations deny the Bureau authority over "novel questions of law, fact or policy that cannot be resolved under

---

[38] *Fox Television Stations*, 293 F.3d at 540 ("Had the Congress wished to insulate the [National Cap] from review under § 202(h), it need only have enshrined the 35% cap in the statute itself.").

[39] *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 194 (D.C. Cir. 1993).

[40] *Stone v. INS*, 514 U.S. 386, 397 (1995).

[41] *Util. Air Reg. Grp.*, 573 U.S. at 324; *see also Biden v. Nebraska*, 600 U.S. 477, 519 (2023) (Barrett, J., concurring) ("A longstanding 'want of assertion of power by those who presumably would be alert to exercise it' may provide some clue that the power was never conferred.").

[42] *See Encino Motorcars v. Navarro*, 579 U.S. 211, 221-22 (2016).

10

existing precedents and guidelines."[43]  Here, the Bureau purported to resolve two novel

questions with respect to the Cap:  (1) the question of whether the Commission has authority to

waive the National Cap; and (2) the question of when such a waiver would be in the public

interest.  As noted above, the Commission has launched a rulemaking to consider the specific

question of whether it has the authority to adjust the National Cap, and it has never waived the

Cap, let alone articulated a standard for doing so.[44]  If that does not constitute an "issue[ ] of first

impression," it is hard to imagine what would.[45]  Even assuming the Commission had previously

and conclusively determined that it has authority to waive or otherwise change the National Cap

(which, as explained above and in the accompanying application for review, it has not), it has

never actually decided whether doing so would be in the public interest.  The Bureau's Order

prejudges that public interest question in its waiver grant, far exceeding its delegated authority to

act on matters "which are minor or routine or settled in nature."[46] And the divestitures the

Applicants have committed to make are illusory, and, in any event, would do nothing to bring the

combined company under the Cap.

The Bureau's failure to "refer" the application "to the Commission en banc for

disposition" thus supplies an independent reason to set aside the Order.[47]  The unacknowledged

change in position from prior orders requiring divestiture supplies another reason.[48]  "An agency

---

[43] 47 C.F.R. § 0.283(c); *see also* 47 C.F.R. § 0.5(c) (limiting the scope of delegated authority under the Communications Act to "matters which are *minor* or *routine* or *settled in nature.*") (emphases added).

[44] *See supra* p. 6.

[45] *Blanca Telephone Co. Order* ¶ 42 n.120 (2017).

[46] 47 C.F.R. § 0.5(c).

[47] 47 C.F.R. § 0.283.

[48] *See Encino Motorcars*, 579 U.S. at 221-22.

11

**App.722**

is bound by its own regulations," and because the Bureau lacked any precedent to guide its grant of the requested waiver, purporting to do so was arbitrary and capricious.[49]

### B.    Waiving the Duopoly Rule Exceeds the Bureau's Authority and Is Arbitrary and Capricious

The Order is equally novel—and arbitrary and capricious—in granting a near-wholesale waiver of the Duopoly Rule in 21 markets across the country. In the past, the Commission has refused to waive its rules absent specific facts and special circumstances showing that "deviation better serves the public interest" in the particular markets at issue.[50]  Here, by contrast, Nexstar and TEGNA requested—and the Bureau granted—a wholesale waiver of the Duopoly Rule without any particularized consideration of the markets at issue or demonstration of special circumstances; instead, it simply deemed the rules at odds with the current media landscape.  These are the same rote arguments that the broadcast industry has made in the pending Quadrennial Review, and do not qualify as special circumstances warranting massive waivers.  The Bureau's grant of these unprecedented waivers thus not only exceeded the Bureau's delegated authority, but also violated "hornbook administrative law that an agency need not—indeed should not—entertain a challenge to a regulation, adopted pursuant to notice and comment, in an adjudication or licensing proceeding."[51]

While the Applicants committed to divest six stations, those commitments are illusory.  First, they can exploit the benefits of consolidation for those stations (in several cases triopolies)

---

[49] *Nat'l Environ. Dev. Ass'n v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014).

[50] *NetworkIP*, 548 F.3d at 127.

[51] *Trib. Co. v. FCC*, 133 F.3d 61, 69 (D.C. Cir. 1998).  *See also* Application for Review at 10-11; *accord* Letter from David J. Brown, Chief, Video Division, Media Bureau, FCC to Sinclair, Inc., Cunningham Broadcasting Corporation and KMTR Television, LLC, and DIRECTV, LLC, LMS File Nos. 0000276551 & 0000276767 et al., at 9 & n.61 (Feb. 3, 2026) (citing *Community Television of S. Cal. v. Gottfried*, 459 U.S. 499, 511 (1983) ("[A] rulemaking is generally a better, fairer, and more effective method of implementing a new industry-wide policy than is the uneven application of conditions in isolated [adjudicatory] proceedings.") (internal quotations omitted)).

12

**App.723**

for the better part of the next two years.[52]  Second, if they are ultimately required to divest them

at all (which the Order and Nexstar's commitment letter expressly leaves in doubt),[53] they can

simply divest the stations to sidecars, and as with WPIX, seek to reacquire them at some future

date.

Administrative law also directs that "an agency is under an obligation to follow,

distinguish, or overrule its own precedent."[54]  The Commission "may not act out of unbridled

discretion or whim in granting waivers any more than in any other aspect of its regulatory

function."[55]  "Sound administrative procedure contemplates" "limited waivers or exceptions

granted pursuant to an appropriate general standard"; indeed, that "is the very stuff of the rule of

law."[56]  Here, the Bureau did not mention (let alone distinguish or overrule) precedent requiring

it "to determine whether" waiving the Duopoly Rule "promot[es] economic competition and

diversification of viewpoints" in the specific market at issue.[57]  Unreasoned blanket waivers

bucking Commission precedent are the height of arbitrary and capricious decisionmaking.

### C.    Granting the Applications Without Designating Them for a Hearing Violates Congressional Mandates and Is Arbitrary and Capricious

Before granting an application to transfer licenses, Congress requires the Commission to

hold a hearing "[i]f a substantial and material question of fact is presented or if the Commission

for any reason is unable to find that grant of the application would be consistent" with the public

---

[52] The Order's statement that "competition will not be *unduly* harmed during the period of common ownership" is cold comfort while consumers incur the costs of rising fees, increased blackouts, and job cuts.  Order ¶ 55 (emphasis added).

[53] *Id.*

[54] *Steger v. Dep't of Def.*, 717 F.2d 1402, 1406 (1983).

[55] *WAIT Radio v. FCC*, 418 F.2d 1153, 1159 (D.C. Cir. 1969).

[56] *Id.*

[57] *Busse Broad. Corp.*, 87 F.3d at 1464.

13

interest.[58] Here, the Bureau ignored the "statutory mandate and the decisions of [the D.C. Circuit] establishing an analytic procedure for evaluating petitions for evidentiary hearings,"[59] as well as established Commission and Bureau precedent granting hearings in similar transactions.[60] This is both *ultra vires* and arbitrary and capricious.

As Petitioners outlined in the record, there are myriad reasons why transferring TEGNA's licenses to Nexstar would be *prima facie* inconsistent with the public interest, and also presented a number of "substantial and material facts" for the Commission's careful consideration and analysis. For example:

- Allowing any one entity to control dissemination of high-value news, sports, and emergency programming with this level of concentration at both the national and local levels would be devastating for competition, localism, and viewpoint diversity.[61]

- When Nexstar sought to acquire Tribune Media Company in 2019, the Department of Justice's Antitrust Division conditioned approval on Nexstar divesting particular stations, and further prohibited Nexstar from reacquiring those stations for 10 years. Nexstar subsequently sold 11 of those stations to TEGNA, and now seeks to reacquire them only six years later.[62]

- As recently as 2024, the Commission unanimously found that Nexstar's *de facto* control over a station it does not formally own put it in "willful" violation of the National Cap. The Commission did not contemplate waiving the Cap; it forced Nexstar to choose between renouncing control over the other stations or undertaking divestitures to "remedy its noncompliance with the National Ownership Cap."[63] The

---

[58] 47 U.S.C. § 309(d)(2); *see Astroline Comm'cns Co. v. FCC*, 857 F.2d 1556, 1561 (D.C. Cir. 1988) (noting that "in evaluating a request for an evidentiary hearing . . . the Commission must . . . assum[e] that" facts set forth in a petition to deny are true).

[59] *Astroline Comm'cns Co.*, 857 F.2d at 1573.

[60] *See, e.g.*, *Applications of Tribune Media Co. (Transferor) and Sinclair Broadcast Group, Inc. (Transferee) For Transfer of Control of Tribune Media Co. and Certain Subsidiaries, WDCW(TV), et al.*, Hearing Designation Order, 33 FCC Rcd. 6830 (2018) ("*Sinclair/Tribune HDO*"); *Applications of SGCI Holdings III LLC; TEGNA, Inc.; and CMG Media Corporation*, Hearing Designation Order, 38 FCC Rcd. 1282 (MB 2023).

[61] *See* Petition to Deny of State Cable Petitioners at 5.

[62] *See id.* at 32-33.

[63] *See id.* at 25 (citing *Mission Broadcasting, Inc., Licensee of Station WPIX, New York, NY*, Notice of Apparent Liability for Forfeiture, 39 FCC Rcd. 3676 ¶ 21 (2024)). The Applicants' failure to disclose the decision also

14

Bureau's Order not only amounts to a reversal of that 2024 position, but the Bureau also rejected Petitioners' request for a hearing "without elaboration."[64]

Despite the submission of these substantial and material facts into the record, and the extensive evidence showing why this merger cannot reasonably be found to be in the public interest, the Bureau never even issued a request for additional information from the Applicants (a fairly standard practice in large controversial mergers with substantial records).[65] Nor did it order a hearing as required by § 309(d)(2). Notably, despite extensive record evidence on how the merger will increase consumers' monthly video bills, at a time when every policymaker's central concern is affordable pricing, the Bureau refused to follow the statute and order a hearing to probe further into that important issue. Instead, it approved the merger after the FCC received orders from the President. As Petitioners argue in their application for review, the Commission must reverse the Order because it conflicts with established precedent holding that expanding Nexstar's national reach would be contrary to the public interest.

## II.  THE REMAINING FACTORS DECISIVELY SUPPORT A STAY

The remaining factors likewise support a stay. Petitioners will face serious and irreparable injury if the Order is not stayed; and the balance of harms and the public interest favors a stay, especially now that the Applicants have closed the merger. "[A]n irreversible" event "that frustrates later appellate review" "is a quintessential type of 'irreparable' injury."[66] Both the D.C. Circuit and the Supreme Court have recognized that

---

warranted a formal hearing consistent with the *Sinclair/Tribune HDO*. *See* Petition to Deny of State Cable Petitioners at 10, 33-34; *Sinclair/Tribune HDO* ¶ 17.

[64] *See Astroline Comm'cns Co.*, 857 F.2d at 1570.

[65] *See, e.g.*, *Sinclair/Tribune HDO* ¶ 5 ("On September 13, 2017, the Media Bureau issued a Request for Information (Information Request) to the Applicants. Sinclair responded to the Information Request on October 5, 2017. Thereafter, the Bureau announced an additional opportunity for comment on October 18, 2017.").

[66] *In re Al Baluchi*, 952 F.3d 363, 368 (D.C. Cir. 2020).

15

**App.726**

corporate mergers amply fit this standard.[67]  This is especially true here, where Congress gave Petitioners a "right to appeal" the Bureau's Order.[68]  This appeal would be frustrated if it does not happen before TEGNA "complete[ly] disappear[s]" into Nexstar, leaving courts with potentially no effective relief to grant.[69]

As the FCC record shows, Nexstar will shortly implement its "consolidation playbook" of increasing the retransmission consent rates of the acquired stations through "after-acquired station" clauses to Nexstar's industry-leading retransmission consent rates.  And the combined company would use its newfound increased leverage to drive prices even higher as contracts come up for renewal.[70]  It bears emphasis that the Applicants' commitment regarding retransmission consent pricing places no restriction on Nexstar's ability to immediately raise the current rates for TEGNA stations to the higher Nexstar rates, nor does it place any restrictions on raising rates further in subsequent renewals.[71]  These associated harms are indeed irreparable: Beyond the monetary costs to both MVPDs and consumers, a spike in fees harms MVPDs' goodwill with their customers, leading them to drop MVPD service and forcing smaller MVPDs

---

[67] *See, e.g.*, *FTC v. Dean Foods Co.*, 384 U.S. 597, 606 n.5 (1966) ("[W]here businesses have been merged or purchased and closed out it is commonly impossible to turn back the clock."); *Am Mail Line Ltd. v. FMC*, 503 F.2d 157, 170 (D.C. Cir. 1974) (recognizing "the problems inherent in unscrambling a merger once it has been consummated").

[68] 47 U.S.C. § 402(b).

[69] *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 336 n.13 (1963).

[70] *See* Petition to Deny of State Cable Petitioners at 4; *id.*, Declaration of Joe Lorah ¶ 7 ("Lorah Decl."), Declaration of Paul Beaudry ¶ 7 ("Beaudry Decl."), Declaration of Jack Capparell ¶ 7 ("Capparell Decl."); Petition to Deny of DIRECTV, App. D, Declaration of Rob Thun ¶ 13 ("Thun Decl.").  The Order capriciously rejects several proposed conditions that would have helped mitigate affordability concerns.  *See* Letter from Todd Eachus, President, Broadband Communications Association of Pennsylvania et al., to Marlene H. Dortch, Secretary, FCC (filed Mar. 9, 2026); Letter from Michael Nilsson, Counsel to DIRECTV, to Marlene H. Dortch, Secretary, FCC (filed Mar. 2, 2026); Letter from Cristina Chou, VP of Government Affairs, Optimum Communications, to Marlene H. Dortch, Secretary, FCC (filed Mar. 2, 2026); Letter from Eric E. Breisach, Counsel to Cincinnati Bell Extended Territories LLC dba altafiber and Hawaiian Telcom Services Company, Inc., to Marlene H. Dortch, Secretary, FCC (filed Feb. 20, 2026).

[71] Order ¶ 75.  Extending expiring agreements (at increased rates) to November 30, 2026 only increases the combined company's blackout leverage given that this date falls in the middle of the NFL season.

16

**App.727**

to exit the market entirely.[72]  Furthermore, should Petitioners refuse to accede to these extreme price increases, Nexstar would be able to simultaneously black out local stations, which would not only harm Petitioners' reputation with their customers, but also impact consumers' access to high-value news, sports, and emergency programming.[73]  These very dynamics are increasingly driving cable operators and other MVPDs to exit the video programming distribution market altogether; consummation of this Transaction will only accelerate this trend.[74]  In such circumstances, Petitioners have a commonsense need for a stay that preserves the status quo.

Workers at Nexstar and TEGNA would also face immediate harms if the Transaction is allowed to close.  Nexstar has concrete plans for personnel cuts through consolidation of operations within overlapping markets[75] and has publicly stated its intention to do so.[76]  Nexstar's localism commitments promise only modest and time-limited increases in total "local" programming *but notably omit any commitment not to duplicate such programming across stations*.[77]  The Transaction would also increase Nexstar's market power over broadcast workers

---

[72] *See* Petition to Deny of State Cable Petitioners at 4-5; *id.*, Lorah Decl. ¶ 13, Beaudry Decl. ¶ 13, Capparell Decl. ¶ 13.  Without a stay, petitioners will not be able to obtain meaningful review of the harms to workers, local news production, and local TV spot advertising caused by consummation of the Transaction.  *See* Petition to Deny of Public Interest Petitioners at 27-28, 41-47, 51-66, 68-143.

[73] *See* Petition to Deny of State Cable Petitioners at 4-5; *id.*, Lorah Decl. ¶ 10, Beaudry Decl. ¶ 1, Capparell Decl. ¶ 10; Petition to Deny of DIRECTV, App. D, Thun Decl. ¶ 11.

[74] *See* Petition to Deny of State Cable Petitioners at 4-5; *id.* Lorah Decl. ¶ 13; Beaudry Decl. ¶ 13; Capparell Decl. ¶ 13; *see also* Reply Comments of NTCA – The Rural Broadband Association at 3, 7.

[75] *See* Petition to Deny of Public Interest Petitioners at 55-59 ("One [union] member observed that part-time employees at their location already have been laid off, they presume in anticipation of this proposed Transaction.").  *See generally* Letter from Michael Nilsson and Annick M. Banoun, Counsel to DIRECTV, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 22-459 (Feb. 20, 2026) (compiling evidence that, in markets where broadcasters hold a duopoly, triopoly, or quadropoly today, they have consolidated news operations and offered the same local news on multiple stations).

[76] *See* Nexstar Media Group, Inc., Q3 2025 Earnings Call Transcript (Nov. 6, 2025) ("[T]here is obviously the . . . 35 of 51 markets that are the overlap markets that we can really operate two stations off of one infrastructure. . . . [T]hat is an area where there's a significant portion of those synergies coming out of that. . . .  We did a very deep analysis in terms of looking at line by line, person by person, what these costs could be."); Petition to Deny of State Cable Petitioners at 50-51.

[77] Order ¶ 82.

17

nationally and in multiple local markets, harming labor unions that represent workers in the industry and diminishing their bargaining power.[78]  A stay is all the more necessary when the Applicants already closed the transaction, despite the significant legal infirmities of the Bureau's Order.

The Applicants cannot plausibly claim such harms from a stay.  Their prompt closing upon the Bureau's approval of the Transaction was based purely on a desire to avoid judicial review, not on any contractual need to close immediately.  *In this regard, the Applicants' merger agreement contemplated closure by August 18, 2026 with a possible extension to November 18, 2026.*[79]  It also bears emphasis that the Order was issued in record time (a little over 100 days) for a transaction of this size and controversy compared to the time for FCC review of other similar transactions, which have consistently taken 200, 300, or even more days to complete.[80] And in a further departure from past practice, the Bureau made no requests for further information from the parties to investigate the factual basis for waivers or the harms pleaded on the record.  Applicants had no reasonable expectation to receive approval so quickly and thus would face no practical or contractual harm from a stay.

---

[78] *See* Petition to Deny of Public Interest Petitioners at 64-66, App. C, Declaration of Charlie Braico, Declaration of Jon Schleuss.

[79] Agreement and Plan of Merger, dated as of August 18, 2025, by and among Nexstar Media Group, Inc., Teton Merger Sub, Inc. and TEGNA Inc. § 8.1(b) (defining the "Outside Date" as "5:00 p.m. Eastern Time, on August 18, 2026").

[80] *See, e.g.*, Skydance Media and Paramount Global, MB Docket No. 24-275, https://www.fcc.gov/transaction/skydance-paramount (approved on Day 251); Nexstar and Tribune, MB Docket No. 19-30, https://www.fcc.gov/transaction/nexstar-tribune (approved on Day 210); Standard General and TEGNA, MB Docket 22-162 (designated for hearing on Day 309), https://www.fcc.gov/transaction/standard-general-tegna; Nexstar and Media General, MB Docket No.16-57, https://www.fcc.gov/transaction/nexstar-media-general (approved on Day 329).

**CONCLUSION**

For the foregoing reasons, Petitioners respectfully request that the Commission stay the effectiveness of the Order pending full Commission review of the emergency application for review and enjoin the Applicants from taking steps towards integration of the two companies. **If the Commission has not ruled on this stay petition within twenty-four (24) hours—i.e., by 3:00 PM on March 21, 2026—Petitioners will conclude that the agency has "denied the motion or failed to afford the relief requested."[81] and seek an emergency stay from the DC Circuit.**[82]

Respectfully submitted,

| | |
|---|---|
| Todd Eachus | David Ducharme |
| President | Executive Director |
| BROADBAND COMMUNICATIONS | BROADBAND COMMUNICATIONS |
| ASSOCIATION OF PENNSYLVANIA | ASSOCIATION OF WASHINGTON |
| 127 State St. | 4217 Williams Ave. N. |
| Harrisburg, PA 17101 | Renton, WA 98056 |
| | |
| Joseph Dant | Lindsey Simmons |
| Executive Director | Interim Executive Director |
| INDIANA CABLE AND BROADBAND | MISSISSIPPI INTERNET AND TELEVISION |
| ASSOCIATION | PO Box 55867 |
| 150 W. Market St., Ste. 412 | Jackson, MS 39296 |
| Indianapolis, IN 46204 | |
| | |
| Ann Marie Walp | Ray LaMura |
| President | President |
| TENNESSEE CABLE & BROADBAND | VCTA – BROADBAND ASSOCIATION OF |
| ASSOCIATION | VIRGINIA |
| 414 Union St., Ste. 1900 | 1111 East Main St., Ste. 802 |
| Nashville, Tennessee 37219 | Richmond, VA 23219 |

---

[81] Fed. R. App. P. 18(a).

[82] *Id.*

19

**App.730**

Michael Nilsson
William M. Wilshire III
Timothy J. Simeone
HWG LLP
1919 M Street, N.W.
The Eighth Floor
Washington, D.C. 20036
(202) 730 1300

*Counsel to DIRECTV*

John Bergmayer
PUBLIC KNOWLEDGE
1818 N Street, NW
Suite 410
Washington, DC 20036


Nell Geiser
Ceilidh Gao
COMMUNICATIONS WORKERS OF
AMERICA
501 Third Street, NW
Washington, DC 20001

Michael Hartman
General Counsel
Chief External Affairs Officer and
Secretary
Stacy Fuller
Senior Vice President, External Affairs
DIRECTV, LLC
2260 E. Imperial Highway
El Segundo, CA 90245


Christopher Ruddy
Chief Executive Officer
Michael Martin
Director of Government Affairs
NEWSMAX MEDIA, INC.
750 Park of Commerce Drive, Suite 100
Boca Raton, FL 33487

Matthew F. Wood
Vice President of Policy &
General Counsel
FREE PRESS
1025 Connecticut Avenue NW, Suite 1110
Washington, DC 20036

Cheryl Leanza
UNITED CHURCH OF CHRIST MEDIA JUSTICE
MINISTRY, INC.
100 Maryland Avenue, NE
Suite 330
Washington, DC 20002

March 20, 2026

20

**App.731**

## CERTIFICATE OF SERVICE

I, Todd Eachus, certify that on this 20th day of March, I caused true and correct copies of

the foregoing Reply to be served by electronic mail on the following:

Jennifer A. Johnson
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-5552
jjohnson@cov.com

*Counsel to TEGNA, Inc.*

Kathleen Kirby
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-3360
kkirby@wiley.law

*Counsel to Nexstar Media Inc.*

David Brown
Chief, Video Division
Media Bureau
Federal Communications Commission
45 L Street, NE
Washington, DC 20554
David.Brown@fcc.gov

Chris Robbins
Deputy Chief, Video Division
Media Bureau
Federal Communications Commission
45 L Street, NE
Washington, DC 20554
Chris.Robbins@fcc.gov

Emily Harrison
Video Division
Media Bureau
Federal Communications Commission
45 L Street, NE
Washington, DC 20554
Emily.Harrison@fcc.gov

Jim Bird
Transaction Team
Office of General Counsel
Federal Communications Commission
45 L Street, NE
Washington, DC 20554
Jim.Bird@fcc.gov

/s/ *Todd Eachus*
Todd Eachus

March 20, 2026

**App.732**

**No. 26-\_\_\_\_\_**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

FREE PRESS, NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES AND TECHNICIANS—COMMUNICATIONS WORKERS OF AMERICA, THE NEWSGUILD—COMMUNICATIONS WORKERS OF AMERICA, UNITED CHURCH OF CHRIST MEDIA JUSTICE MINISTRY, INC. AND PUBLIC KNOWLEDGE,

*Appellants/Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION,

*Appellee/Respondent*.

———————————

On Appeal from
an Order of the Federal Communications Commission,
MB Docket No. 25-331

———————————

## DECLARATION OF RONALD J. GABALSKI

———————————

I, Ronald J. Gabalski, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am the Chief of Staff and Assistant to the Sector President of the National Association of Broadcast Employees and Technicians - Communications Workers of America (NABET-CWA). I make this declaration based on facts of which I have personal knowledge or that have been provided to me by CWA staff.

2. I have been a staff member for NABET-CWA for over seven years. I have been Chief of Staff and Assistant to the Sector President since 2024. Prior to that I was a Staff Representative.

3. As Chief of Staff and Assistant to the Sector President, I oversee the contract bargaining work of our Staff Representatives and oversee bargaining at independent stations represented by NABET-CWA. I supervise our Staff Representatives and our Organizing Coordinator. Staff Representatives act as the lead spokesperson for the union in negotiating contracts at independent stations. Staff Representatives also do contract maintenance, contract enforcement, and grievance preparation work.

4. Before becoming a NABET-CWA staff member, I was a NABET-CWA member and worked as a News Photographer/Videographer for over twenty years at the CBS affiliate in Buffalo, New York.

### NABET-CWA Membership at Nexstar and TEGNA

5. Among the DMAs where there is overlap between Nexstar and TEGNA, NABET-CWA represents Nexstar workers in Portland, OR; Denver, CO; Buffalo, NY; Cleveland, OH; and Hartford-New Haven , CT, and TEGNA workers in Cleveland, OH and Hartford-New Haven, CT. NABET-CWA

also represents Nexstar workers in Evansville, IN/Henderson, KY; Syracuse, NY; Youngstown, OH; Erie, PA; Wheeling, WV; and Rochester, NY.

6.  As the legal collective bargaining representative of these workers, NABET-CWA has a legal obligation to bargain collectively with the employer regarding the terms and conditions of work for these workers and seek a collective bargaining agreement setting the terms and conditions of employment.

### Irreparable Harm to the Collective Bargaining Process

7.  NABET-CWA is actively in collective bargaining agreement negotiations with Nexstar regarding collective bargaining agreements for Nexstar workers in Denver, CO; Cleveland, OH; Erie, PA; and Buffalo, NY.

8.  In Buffalo, NY, we have bargaining session dates with Nexstar scheduled in April 2026.

9.  In Cleveland, OH, we had a bargaining session with Nexstar in February and are in the process of scheduling the next bargaining sessions with Nexstar.

10. In Erie, PA, we are in touch with Nexstar representatives about scheduling the next bargaining session dates. We do not currently have dates on the calendar due to the Nexstar attorney's medical leave schedule.

11. In Denver, CO, we have bargaining session dates scheduled in April 2026.

12. The collective bargaining agreements the union has with TEGNA in Hartford, CT and Cleveland, OH will expire in July 2026. We initiate bargaining 90 days prior to the expiration of the contract and seek to have a new collective bargaining agreement in place before the expiration date of the current contract. Accordingly, we plan to reach out to TEGNA regarding bargaining on the Hartford and Cleveland contracts in April 2026.

13. In these locations, NABET-CWA's bargaining power and its interests in the collective bargaining process will be substantially and irreparably harmed by the merger. As with any contract negotiation, in negotiations for a collective bargaining agreement that sets terms and conditions of employment, the employer and the union's relative bargaining power dictate the terms that the parties will reach.

14. As a result of the merger, Nexstar has indicated that it will consolidate production departments where it owns multiple stations. Consolidation will mean fewer employers, which will reduce employer competition for broadcast technician labor. In addition, a larger merged company with a larger share of the market has more negotiating power regarding terms and conditions of employment. And a larger merged company increases the

company's monopsonistic domination and wage-setting power over the labor market.

15. The elimination of an independent employer in the market also constricts the market for NABET-CWA members, reducing the number of competitive employers available to members. When workers have fewer options in employers, it increases the employer's bargaining power.

16. Furthermore, layoffs will diminish NABET-CWA's tools and power at the bargaining table. A union has more bargaining power when it represents more workers at a worksite.

17. The immediate layoffs and reduction in membership in the affected locations will diminish NABET-CWA's power at the bargaining table by diminishing the number of members it represents at the workplace and harming its ability to engage in concerted activities for the purpose of collective bargaining.

18. In Denver, Portland, Hartford-New Haven, Cleveland, and Buffalo, these effects will be most obvious and immediate. In each of these markets, the merger will immediately create an employer with much larger market share and reduce the number of broadcast employers in the local labor market. This will constrict the market for NABET-CWA members and increase the company's monopsonistic and wage-setting power in that local market. In

5

**App.737**

each of these markets, there will be layoffs and reductions in the number of jobs. These layoffs will diminish NABET-CWA's membership at the workplace and the union's ability to engage in concerted activities for the purpose of collective bargaining. These changes will immediately affect NABET-CWA's bargaining power.

19. Most of NABET-CWA's collective bargaining agreements are for a three year term. Occasionally we will have longer terms or shorter terms, however, three years is the most common term.

20. If the merger is allowed, Nexstar's strengthened bargaining position and our weakened position will make it impossible to obtain a collective bargaining agreement that we would have obtained absent the merger. A subsequent legal remedy will not be able to undo the harm of having executed a less favorable collective bargaining agreement. If there were to be a remedy years down the line, NABET-CWA will already be multiple years into a contract. At that point the union may not be able to undo or change the less favorable negotiated terms. What's more, each contract serves as the baseline for the next negotiation. So if the merger is allowed to proceed— even if it is eventually unwound—a less favorable collective bargaining agreement negotiated following a merger will have a cascading effect on

contracts for many cycles. This would set the union back for many years, not just one bargaining cycle.

21. The merger and the changed bargaining landscape it creates between the parties will also affect the timeline of contract bargaining and whether the parties are able to reach an agreement at all. Delays to the bargaining process or the inability to obtain a collective bargaining agreement would also cause irreparable harm to our membership and to the union. Workers and the union cannot subsequently be remedied for the time period in which they did not have collectively bargained terms. For example, an employer terminating a member during a time period in which there were no contract protections will result in irreparable harm to the worker and to the union. Furthermore, collective bargaining agreements are negotiated collectively, with the involvement of the entire union membership. As time passes, members may leave the bargaining unit or change jobs. Delays and the inability to reach a contract result in irreparable harm to the union's ability to bargain an agreement and a subsequent legal remedy will not be able to undo those harms.

22. As stated in our Petition to Deny, Nexstar exerts wage-setting power in multiple markets and this merger will also have a negative effect on the nationwide market for broadcast workers and accordingly, the union's

bargaining power at other employers and in other markets. Outside of the directly affected DMAs, Nexstar will also exert monopsony power over labor markets for broadcast workers in other localities and nationally. A subsequent legal remedy will not be able to undo the harm to the union's bargaining power and the harm to the collective bargaining process that occurred during this time in other localities and nationally.

23. We also made demands for collective bargaining for the Evansville, IN and Rochester, NY, Nexstar locations shortly after we were certified by the National Labor Relations Board as the legal collective bargaining representative following a union election. Nexstar has refused to recognize NABET-CWA as the collective bargaining representative and has refused to bargain with the union, in violation of the National Labor Relations Act. We have active unfair labor practice charges pending before the National Labor Relations Board and before the Second Circuit regarding these refusals to bargain. We anticipate that a stronger post-merger Nexstar is likely to continue these practices and expand them to their newly acquired worksites.

**Irreparable Harm of Layoffs of NABET-CWA Members**

24. As described in the Petition to Deny, NABET-CWA members in all the affected DMAs will be directly harmed by the economic impacts of this

8

**App.740**

merger in their workplaces and in the labor market at large. The merger will result in layoffs and the elimination of jobs.

25. We represent Nexstar workers in Portland, OR; Denver, CO; Buffalo, NY; Cleveland, OH; and Hartford, CT. We also represent TEGNA workers in Cleveland, OH and Hartford, CT.

26. The workers in these locations will immediately face layoffs in the workplace and the elimination of jobs. These layoffs will cause irreparable harm to our membership and to the bargaining process as the union's bargaining power is weakened when the number of members and therefore the union's ability to engage in collective action is reduced. Laid off workers need to provide for themselves and their families, and will not be able to wait for a legal process to be completed before they seek new employment. If we were to obtain a hypothetical legal remedy years in the future, workers will no longer be available for employment and the harm to the collective bargaining process and collective bargaining agreements will be irreversible.

Frewsburg, NY                                   *s/Ronald J. Gabalski*
March 22, 2026                                  Ronald J. Gabalski

**No. 26-\_\_\_\_\_**

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

FREE PRESS, NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES AND TECHNICIANS—COMMUNICATIONS WORKERS OF AMERICA, THE NEWSGUILD—COMMUNICATIONS WORKERS OF AMERICA, UNITED CHURCH OF CHRIST MEDIA JUSTICE MINISTRY, INC. AND PUBLIC KNOWLEDGE,

*Appellants/Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION,

*Appellee/Respondent*.

On Appeal from
an Order of the Federal Communications Commission,
MB Docket No. 25-331

## DECLARATION OF JOHN BERGMAYER

I, John Bergmayer, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am the Legal Director of Public Knowledge. In that capacity, I work on public-policy issues related to Public Knowledge's mission, including telecommunications, broadband, and media policy, I make this declaration based on facts of which I have personal knowledge or that have been provided to me by Public Knowledge staff, in connection with the Commission's review of the proposed merger between Nexstar Media Group, Inc. and TEGNA Inc.

1

**App.743**

2. This declaration addresses how Public Knowledge will be harmed by the FCC Media Bureau order approving the merger without protecting the public interest.

### Public Knowledge and Its Mission

3. Public Knowledge is a nonprofit public-interest organization headquartered in Washington, D.C. It advocates for policies that promote an open internet, access to affordable communications services, and a media environment that serves the public interest. Media consolidation and its effects on local journalism, consumer prices, and the diversity of viewpoints available to the public fall squarely within Public Knowledge's areas of work.

4. Public Knowledge communicates its positions to the public and to policymakers through multiple channels: its website, press releases, regulatory filings, social media, op-eds and articles, and appearances in media. Staff members regularly speak with journalists and appear as commentators and guests on television and radio programs, including local broadcast news programs, to explain telecommunications and media policy issues to general audiences.

### Harm from Reduced Access to Local Broadcast News Programs

5. Local broadcast television stations are an important venue for Public Knowledge staff to reach the general public. When telecom and media policy

2

**App.744**

issues arise (e.g. new broadband programs, FCC rulemakings, retransmission consent disputes, or the effects of media mergers) local TV stations often seek outside experts to explain the issues in accessible terms. Public Knowledge staff serve in exactly that capacity. These earned-media appearances let Public Knowledge communicate with viewers across multiple markets without cost.

6. The proposed transaction would combine Nexstar and TEGNA to create a broadcast group reaching approximately 80 percent of U.S. television households. It would produce new Big Four affiliate duopolies in 28 overlap markets and triopolies in three more. Fewer independently owned stations mean fewer producers of local news with independent editorial judgment. It also means fewer potential outlets that might invite Public Knowledge staff as guests, because consolidated ownership tends to centralize editorial decisions and booking practices. Where Nexstar and TEGNA previously made independent programming choices in their respective markets, a combined Nexstar-TEGNA would make those choices through a single management structure.

7. Public Knowledge's experience tracks what the record shows about consolidation generally: larger broadcast groups increasingly fill airtime with nationally produced content and reduce locally responsive programming. A station group focused on maximizing retransmission consent revenue and

3

**App.745**

achieving millions of dollars in claimed synergies has less incentive to invest in the kind of local journalism that produces original policy coverage and diversified guest lineups. As independent local news operations contract, Public Knowledge has fewer potential outlets for earned-media placements.

8. To reach the audiences those broadcast appearances would otherwise reach, Public Knowledge might have to purchase advertising time. Broadcast advertising is expensive. It is also a poor substitute for editorial coverage: a 30-second spot does not allow Public Knowledge to explain complex policy issues the way a guest appearance on a local news program does. The effective cost of communicating with those audiences thus rises if earned media opportunities shrink.

**Harm from Loss of Local News as an Informational Input**

9. Public Knowledge relies on local broadcast news not just as an outlet for its own communications, but as an informational input. Many of the policy issues Public Knowledge works on have significant local dimensions. Broadband deployment and adoption, for example, vary substantially by geography. Public Knowledge tracks local broadband developments in part by monitoring local news coverage. The same is true for media-ownership patterns, retransmission disputes, and digital-equity efforts.

4

**App.746**

10. When local broadcast news operations are reduced in staffing and scope, local policy developments receive less coverage. Public Knowledge then has less information available from which to assess where to direct its advocacy resources and which policy questions most urgently require attention.

11. Nexstar has a documented record of cutting local news staff and duplicating news content across markets following acquisitions. A recent academic study found that of all U.S. broadcasting companies, Nexstar airs the most duplicated news content of any broadcast owner. Duplicated national content does not substitute for original local reporting

**Harm from Higher Pay-TV Costs**

12. Several Public Knowledge staff members, including myself, subscribe to pay-TV services, including multichannel video programming distributors (MVPDs) and virtual MVPDs (vMVPDs). These services carry local broadcast stations whose retransmission consent fees are paid by the distributor and passed through to subscribers.

13. Access to video content through MVPD and vMVPD services is thus integral to how Public Knowledge staff do their jobs and how I personally stay informed.

14. The record in this proceeding contains substantial evidence that the proposed transaction would lead to immediate increases in retransmission consent fees.

5

**App.747**

App.748

Nexstar has stated publicly that it will apply its existing "after-acquired station" clauses to raise fees on the acquired TEGNA stations to Nexstar's current rates upon closing. Those higher fees will be passed through to MVPD and vMVPD subscribers. Public Knowledge staff who subscribe to those services will pay more for the broadcast content they need to do their work.

6

Washington, DC                                        *s/John Bergmayer*
March 22, 2026                                        John Bergmayer

7