**No. 26-1062**

IN THE U.S. COURT OF APPEALS FOR
THE DISTRICT OF COLUMBIA CIRCUIT

————

BROADBAND COMMUNICATIONS ASSOCIATION
OF PENNSYLVANIA, INC., et al.,

*PETITIONERS-APPELLANTS*,

*V.*

FEDERAL COMMUNICATIONS COMMISSION.

*RESPONDENT-APPELLEE.*

————

*Appeal from an order of the Federal Communications
Commission Media Bureau, MB Doc. No. 25-331*

————

**AMICUS BRIEF OF THE
CENTER FOR AMERICAN RIGHTS
IN SUPPORT OF THE FCC AND
IN OPPOSITION TO A STAY**

————

Daniel R. Suhr
Center for American Rights
1341 W. Fullerton Ave.,
Suite 170
Chicago, IL 60614
414.588.1658
dsuhr@americanrights.org

March 26, 2026

1

# DISCLOSURE STATEMENT

The Center for American Rights is a registered d/b/a of the National Center for Justice and Liberty Inc., which is an Illinois nonprofit corporation with no shareholders, owners, or parent company.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................... 3

INTEREST OF THE AMICUS ................................................................. 5

ARGUMENT ............................................................................................ 7

   1.   THE FCC HAS AUTHORITY OVER THE NATIONAL CAP. .......................... 8

   2.   THE MEDIA BUREAU COULD APPROPRIATELY ISSUE THIS ORDER BECAUSE IT DID NOT CONFRONT NOVEL QUESTIONS. ............................... 12

     *A. The Commission's authority over the national television ownership cap is not a novel legal question. ..................................... 13*

     *B. The standard to guide decision-making on waiver applications is not a novel policy question. ............................................................ 17*

   3.   THE RECORD SUPPORTS NEXSTAR'S POSITIVE APPROACH TO VIEWPOINT DIVERSITY........................................................................................ 19

CONCLUSION........................................................................................ 24

CERTIFICATES..................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Bruesewitz v. Wyeth LLC*, 562 U.S. 223 (2011) ..................................... 12

*Epic Sys. Corp. v. Lewis*, 584 U.S. 497 (2018) ........................................ 12

*Fox Television Stations, Inc. v. FCC*, 293 F.3d 537 (D.C. Cir. 2002) ....... 9

*Me. Cmty. Health Options v. United States*, 590 U.S. 296 (2020) .......... 13

*Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429 (1992) ..................... 12

*Rostker v. Goldberg*, 453 U.S. 57 (1981) ................................................ 12

*Tah v. Global Witness Publ., Inc.*, 991 F.3d 231 (D.C. Cir. 2021) .......... 22

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) ..................................... 12

*WAIT Radio v. FCC*, 418 F.2d 1153 (D.C. Cir. 1969) ............................ 19

## STATUTES

Consolidated Appropriations Act, Pub. L. No. 108-199, 118 Stat. 3 (2004) ...................................................................................... passim

Second Supplemental Appropriations Act, Pub. L. No. 98-396, § 304, 98 Stat. 1369 (1984) ................................................................................ 9

Telecommunications Act of 1996, Pub. LA. No. 104-104, 110 Stat. 56 (1996) ................................................................................................ 8, 9

## OTHER AUTHORITIES

*In re 2022 Quadrennial Regulatory Review*, 2025 FCC LEXIS 2352 (Sept. 30, 2025) ................................................................................. 20

*In re Amendment of Part 11 of the Commission's Rules Regarding the Emergency Alert Sys.*, 2026 FCC LEXIS 601 (PSHSB Mar 19, 2026) 18

*In re Amendment of Section 73.3555(e) of the Commission's Rules*, 28 FCC Rcd 14324 (2013) ................................................................. 14, 16

*In re Amendment of Section 73.3555(e) of the Commission's Rules*, 31 FCC Rcd 10213 (2016) ...................................................................... 15

*In re Amendment of Section 73.3555(e) of the Commission's Rules*, 32 FCC Rcd 10785 (2017).................................................................. 16

*In re Amendment of Section 73.3555(e) of the Commission's Rules*, 32 FCC Rcd 3390 (2017).................................................................... 16

*In re Application of WNAL-TV, Inc.*, 13 FCC Rcd 10070 (M.M.B. 1997) ............................................................................................................. 21

*In re Applications of Stockholders of CBS*, 11 FCC Rcd 3733 (1995) .... 19

*In re Consent to the Assignment of the License of WRTV(TV)*, 2026 FCC LEXIS 447 (MB Feb. 27, 2026) ........................................................... 20

*In re FCC Approves Skydance / Paramount (CBS) Transaction*, 40 FCC Rcd 5689 (2025) .................................................................................. 22

*In re MB Seeks to Refresh Rec. in Nat'l Cap Proc.*, 40 FCC Rcd 4159 (2025) ...................................................................................................... 17

*In re Midwest Communications*, 7 FCC Rcd 159 (1991)........................ 19

*In re Restoring Internet Freedom*, 33 FCC Rcd 311 (2018) .................... 22

*Petitions for Waiver of Various Sections of Part 69 of the Commission's Rules*, 1986 FCC LEXIS 3560 (April 28, 1986)................................... 19

Rep. Richard Hudson, Letter to Chairman Carr (March 28, 2025)....... 10

*RKO General Inc.* (*KRTH*), 4 FCC Rcd 4089 (1989) .............................. 19

Sen. Jerry Moran, Letter to Chairman Carr (May 6, 2025)................... 11

*Shareholders of Tribune Company*, 22 FCC Rcd 21266 (2007).............. 20

*State Broadband Associations*, FCC Submission ID: 123173493805 (Dec. 31, 2025) ..................................................................................... 11

*TVX Broadcast Group, Inc.*, 2 FCC Rcd 1534 (1987)............................. 19

## RULES

47 CFR § 73.3555(e) ........................................................................... 8

47 CFR 1.3 ......................................................................................... 18

## INTEREST OF THE AMICUS

The Center for American Rights is a non-profit, non-partisan, public-interest law firm headquartered in Chicago, Illinois. It frequently files on matters before the Federal Communications Commission.

The Center filed multiple times in this docket; several of its comments were cited in the Media Bureau's final order. *See, e.g.*, footnotes 22, 25, 34, 50, 52, 257. The Center has also filed multiple times on the national television ownership cap and local ownership caps, both of which raise related legal issues. *See* FCC Dockets MB 17-317 and 22-459. The Center's president has also written on the national television ownership cap. *See* Essay: *The Full Spectrum of FCC Rule-Making*, Law & Liberty (Dec. 11, 2025);[1] *Setting the Reagan Record Straight on Broadcasting*, National Pulse (Jan. 19, 2026).[2]

As advocates for a reinvigorated public interest doctrine, the Center is vigilant on behalf of viewers to protect core FCC policies like competition, localism, and viewpoint diversity.

---

[1] https://lawliberty.org/the-full-spectrum-of-fcc-rule-making/

[2] https://thenationalpulse.com/analysis-post/suhr-setting-the-reagan-record-straight-on-broadcasting/

Amicus certifies that no party or its counsel has authored the brief in whole or in part, no party or its counsel has funded the brief, and no other party or its counsel made a contribution intended to fund the brief.

Amicus secured consent to file from the FCC, DIRECTV, the State Broadband Associations, and the Public Interest Petitioners.

## ARGUMENT

In today's rapidly evolving media landscape, traditional broadcasters are handcuffed by decades-old regulatory limits that do not cover their competitors in cable, streaming, or digital video. Those competitors now come to this Court hoping to keep the shackles in place, demanding emergency action to maintain this un-free market in ways that benefit them. They hope this Court will agree that only Congress can act to lift the ownership limits, knowing that congressional dysfunction would likely lock their competition into a near-permanent structural disadvantage.

This Court should decline the invitation, especially at this stage. As explained in the briefs by the FCC and Nexstar, there is no emergency, no irreparable harm, and no reason to deviate from the Commission's standard appeals process.[3] Our goal as an amicus is to show that the petitioners are unlikely to succeed on the merits, and in particular to refute assertions made in opposing amicus briefs.

---

[3] Petitioners lean on the fact that Chairman Carr has publicly praised the Media Bureau order. They ignore that Commissioner Gomez has publicly criticized the order and Commissioner Trusty has been silent on it, so there is no reason to presume the outcome of any review at a Commission level.

The competitors' legal position is just as wrong-headed as their attitude toward opening up a free market for broadcasting. For a textualist, this case should be simple: Congress chose to act by directing the FCC to amend its rules, choosing a tool over which the FCC retained shared authority. Congress could have chosen to act through a statute, over which it has exclusive authority. It did not.

This Court should respect Congress's choice. Rather than accepting petitioners' invitation to cherry-pick its way through a jumble of legislative history and self-serving inferences, the Court should resolve the case on the text before it, end of story.

### 1. The FCC has authority over the national cap.

The national cap is not set in statute. It is set in a rule: 47 CFR § 73.3555(e). The Commission can modify that rule just like any other rule.

In the 1996 Telecommunications Act, Congress told the Commission to amend its rules to set the limit at 35 percent, and then to revisit that on a biennial basis (later changed to a quadrennial review). Thus, Congress knew that under the scheme it was creating, the Commission retained the power to modify the ownership rules—in fact, Congress was directing it to look at whether to do so on a regular basis. *Fox Television*

*Stations, Inc. v. FCC*, 293 F.3d 537, 540 (D.C. Cir. 2002) ("Had the Congress wished to insulate the NTSO Rule from review under § 202(h), it need only have enshrined the 35% cap in the statute itself.").

In the 2004 Consolidated Appropriations Act (CAA), Congress amended the 1996 Act to substitute 39 for 35, removed the national television limitation from the FCC's quadrennial review proceeding, and directed the Commission to add a divestiture provision. That's it. Congress did not "enshrine the [39]% cap in the statute itself," *contra* Broadband 7 & 17, but rather chose to again direct the Commission to amend its rules.[4]

So nothing in the text says, "This 39% limit is permanent." Instead, the petitioners divine from Congress's removal of the limit from quadrennial review that the cap is now frozen in place. Public Interest Petitioners 12. *See* CPAC 6-7, O'Rielly 10. This and other "surrounding context confirm[s] that Congress intended its decision to be final." DIRECTV 7. Amicus Commissioner O'Rielly similarly says the "text and structure" "indicate Congress's intent." O'Rielly 3.

---

[4] Which the Commission then did. *See* Broadband 18. That the Commission promptly complied with Congress's directive to amend its rule from 35 to 39 is hardly an acknowledgment that 39 percent is frozen permanently until further congressional action (*contra* O'Rielly 22). Indeed, the Commission has rejected that view many times, as explained below.

9

To reach this conclusion, Petitioners stitch together their inferences as to the purpose of the provisions in the 2004 CAA (Broadband 16, DIRECTV 8-9; Public Interest 12) and the recollections of a congressional staffer at the time (DIRECTV 7-8). Below, the Broadband Petitioners also relied on several statements in the congressional record, but they have dropped their appeal to legislative history in this Court.[5] *See Broadband Associations*, FCC Submission ID: 123173493805 (Dec. 31, 2025), at 15.

---

[5] DIRECTV says, "this idea that, *even on the very next day after Congress adopted the 39 percent cap*, the FCC could simply have changed it again to 100 percent makes nonsense of Congress's compromise and the carefully negotiated provisions effectuating it." DIRECTV 9.

Why? Congress can presume the Commission is a rational actor and would not change the congressionally directed cap without sufficient passage of time to justify it as a matter of policy (or politics). If the FCC acted too quickly and defied Congress's directive, Congress could always use other tools—oversight hearings, an actual statute, appropriations pressure—to bend the FCC to its will.

In this instance, the opposite occurred: Within the last year, the Commission received a letter urging it to provide regulatory relief from the existing ownership rule from 73 members of Congress, led by the chairman of the House subcommittee of jurisdiction. Rep. Richard Hudson, Letter to Chairman Carr (March 28, 2025). The chairman of the full House committee of jurisdiction also publicly expressed support for such relief at a hearing with the Commission. *Republicans push to raise broadcast cap*, Punchbowl News (Jan. 14, 2026) (reporting statement of Rep. Brett Guthrie). So did a group of 22 GOP U.S. Senators, many of whom sit on the Senate Commerce Committee. Sen. Jerry Moran, Letter to Chairman Carr (May 6, 2025).

Commissioner O'Rielly, however, incorporated these legislative history statements into his amicus brief. O'Rielly 10-11.

But that is not how courts interpret statutes. "We do not inquire what the legislature meant; we ask only what the statute means." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018). Here, the actual text of the 2004 CAA directs the Commission to amend its rules, which leaves the cap in a regulatory setting (the Commission's rules) over which the Commission has ongoing authority to make changes. This Court does not decide cases based on Congress's "intent," O'Rielly 3, 19, what Congress "intended," O'Rielly 12, 14, 16, what Congress "wanted," O'Rielly 14, 16, or whether Congress "understood" the cap to be permanent. O'Reilly 4, 10, 12. It only looks at the text Congress enacted as the sole "indicator" of "intent."

That is doubly so in light of background principles of law. The Supreme Court has said several times before "that appropriations legislation should not be considered as modifying substantive legislation." *Rostker v. Goldberg*, 453 U.S. 57, 74-75 (1981). *Accord Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 189-90 (1978); *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 441 (1992). Where appropriations language is relied on to imply repeal of an authority granted by substantive legislation, the Supreme

11

Court's "aversion" to such a reading "is especially strong." *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 315 (2020). That means this Court should read the CAA's impact narrowly rather than broadly—courts should not presume that Congress meant to amend the Communications Act of 1934 to remove Commission authority over its own rules when Congress had the opportunity to do so but chose not to, acting through rules-directing language in an appropriations bill instead.

Moreover, when Congress intends to continue a policy through appropriations bills, it can renew it each year through an "appropriations rider." The Hyde and Weldon Amendments, for instance, have been included in each HHS appropriations bill for decades. Here, Congress directed the FCC to act once to amend its rules; the FCC did so, and Congress let the matter drop. This Court should not turn a one-time decision into a perennial provision when Congress itself has not chosen to do so.

### 2. The Media Bureau could appropriately issue this order because it did not confront novel questions.

Petitioners correctly state that the Media Bureau lacks authority over novel questions. Broadband 19. *See* Public Interest 13-14, DIRECTV 12-13. However, "the legal question of whether the Commission can waive the 39% limit" is not a novel question under FCC precedent. *Id*. Nor is it

a novel question what standards and policies guide decisions on waivers, which bureaus issue all the time. *Id.*

### A. The Commission's authority over the national television ownership cap is not a novel legal question.

First, leading into its 2016 order on the ultra-high frequency (UHF) discount, the Commission issued a 2013 Notice of Proposed Rulemaking (NPRM) which "tentatively conclude[d] that the 2004 [CAA] does not preclude the Commission from revisiting the national television ownership rule ... in a proceeding separate from the quadrennial reviews of the broadcast ownership rules pursuant to Section 202(h) of the 1996 Act... [W]e believe the Commission retains the authority to modify [ ] the national audience reach restriction..., provided such action is undertaken in a rulemaking proceeding separate from the Commission's quadrennial review of the broadcast ownership rules pursuant to Section 202(h)." *In re Amendment of Section 73.3555(e) of the Commission's Rules*, 28 FCC Rcd 14324, 14329 (2013).

The Commission affirmed this position in the final 2016 UHF Order: "We conclude that the Commission has the authority to modify the national audience reach cap ... We find that no statute bars the Commission from revisiting the cap ... in a rulemaking proceeding so long as such a

13

review is conducted separately from a quadrennial review of the broadcast ownership rules pursuant to Section 202(h) of the 1996 Act. The CAA simply directed the Commission to revise its rules to reflect a 39 percent national audience reach cap and removed the requirement to review the national ownership cap from the Commission's quadrennial review requirement. It did not impose a statutory national audience reach cap or prohibit the Commission from evaluating the elements of this rule." *In re Amendment of Section 73.3555(e) of the Commission's Rules*, 31 FCC Rcd 10213, 10222-10223 (2016).[6]

The 2016 UHF Order was later vacated by the Commission, but as a matter of policy, not because of disagreement about the legal question. In the 2017 order granting reconsideration, the Commission affirmed its prior conclusion: "[T]he parties fail to support their assertion that the Commission lacks authority to modify the cap, ignoring the Commission's prior analysis and conclusion that it has such authority, which remains undisturbed." *In re Amendment of Section 73.3555(e) of the Commission's Rules*, 32 FCC Rcd 3390, 3398 n.60 (2017) (emphasis added).

---

[6] Indeed, it's worth noting that Commissioner O'Rielly authored the *dissenting* opinion that the cap was permanent. *See* O'Rielly 24.

In the 2017 NPRM on repealing the national ownership cap, the Commission did seek comment on the question of its legal authority, but the background section noted that both the Commission and the U.S. Court of Appeals for the D.C. Circuit had "interpreted the identical language in the 1996 Act as preserving the Commission's authority to modify the cap in the future." *In re Amendment of Section 73.3555(e) of the Commission's Rules*, 32 FCC Rcd 10785, 10789 (2017).

Moreover, Chairman Pai, who was responsible for the 2017 UHF reconsideration order and the 2017 NPRM, previously stated his view in a concurrence to the 2013 NPRM that "the 39 percent cap was neither a direct statutory limitation on the Commission's authority nor a revision of the Communications Act of 1934." 28 FCC Rcd at 14344 n.8 (Statement of Comm'r Pai). As such, he agreed with the NPRM's conclusion that "the Commission has the authority to 'modify both the national audience reach restriction . . .'" *Id*. at 14344.

Finally, the 2025 Media Bureau directive to refresh the record in the 2017 NPRM asked "whether there are any other legal or economic developments that the Commission should consider in the context of the na-

15

tional television audience cap. For example, how, if at all, have legal developments affected the Commission's past conclusions about its authority to implement changes to the national audience reach cap and the UHF discount?" *In re MB Seeks to Refresh Rec. in Nat'l Cap Proc.*, 40 FCC Rcd 4159, 4161 (2025). In other words, the Bureau's notice itself recognized the Commission's "past conclusions about its authority" and asks if there have been any developments since 2017 that would change those conclusions. Answer: there have not been.[7]

Thus, far from "effectively overrul[ing] Commission precedent without a full Commission vote," Broadband 18, the Bureau order acts in line with a number of Commission decisions consistently adopting the same view.[8]

---

[7] This is why the Broadband Petitioners' "final point" is not much of a point. The Commission has said multiple times that it has authority over the national cap, and its current comment period only asks if there have been any developments to change that position. Broadband 18-19.

[8] This is why, respectfully, Commissioner O'Rielly is incorrect to say "[t]he FCC has now reversed its yearslong position" on the cap's permanence. O'Rielly 3. The Commission has not seen the cap as permanent at least since the 2013 NPRM.

## B. The standard to guide decision-making on waiver applications is not a novel policy question.

The standards and policy considerations the Commission applies to waive a rule is not a novel question: "if special circumstances warrant a deviation from the general rule and such deviation will serve the public interest." *In re Amendment of Part 11 of the Commission's Rules Regarding the Emergency Alert Sys.*, 2026 FCC LEXIS 601, *3 (PSHSB Mar 19, 2026). That formulation comes from this Court's opinion in *WAIT Radio v. FCC*, 418 F.2d 1153, 1159 (D.C. Cir. 1969), and has been quoted in over 700 Commission and bureau-level decisions available on Lexis. For decades, the Commission has had clear benchmarks to guide its application of this test, also derived from *WAIT Radio*: "In deciding whether or not to grant specific waiver requests, we must 'take into account considerations of hardship, equity, or more effective implementation of overall policy' in our broader quest for regulation in the 'public interest.'" *Petitions for Waiver of Various Sections of Part 69 of the Commission's Rules*, 1986 FCC LEXIS 3560, *48 (April 28, 1986). Again, Lexis finds over 1300 cases quoting this core standard. The Media Bureau was not making policy in uncharted terrain—it was applying clear, long-standing Commission standards to this particular instance.

17

Moreover, the Commission *has* waived the national cap previously. *In re Applications of Stockholders of CBS*, 11 FCC Rcd 3733, 3775 (1995); *In re Midwest Communications*, 7 FCC Rcd 159, 160 (1991); *RKO General Inc.* (*KRTH*), 4 FCC Rcd 4089 (1989); *TVX Broadcast Group, Inc.*, 2 FCC Rcd 1534 (1987). Though these waivers were time-limited, they provide precedent to guide the policymaking decision on when waiver is appropriate (by looking at the normal public-interest considerations like competition and viewpoint diversity). The Bureau also had Commission decisions waiving the adjacent market-specific limits (the duopoly rule) available to guide its application of these standards. *See, e.g., In re Consent to the Assignment of the License of WRTV(TV)*, 2026 FCC LEXIS 447, \*6 (MB Feb. 27, 2026) (applying same standards to analyze petition for waiver of the duopoly rule).[9] These decisions demonstrate that the Media Bureau had sufficient precedent and policy to guide its application of these standards to this specific transaction.

---

[9] And, for that matter, the prior cross-ownership rule. *See, e.g., Shareholders of Tribune Company*, 22 FCC Rcd 21266, 21276 (2007).

### 3. The record supports Nexstar's positive approach to viewpoint diversity.

The Center for American Rights agrees on the importance of viewpoint diversity as a pillar of the public interest standard. *In re 2022 Quadrennial Regulatory Review*, 2025 FCC LEXIS 2352, \*22 (Sept. 30, 2025) (referencing "our core public interest goals of competition, localism, and viewpoint diversity"). *See* CPAC 13-14.

The Center believes that viewpoint diversity is not about how many companies own television stations, but how those companies *operate* their stations. Daniel Suhr, *It's How Owners Run Their Stations, Not How Many Owners, That Matters*, Broadband Media (Oct. 3, 2025).[10] When only four national television networks offer nightly news (ABC, NBC, CBS, and PBS), and all four are uniformly one-sided in their viewpoint, that is not viewpoint diversity. *See Tah v. Global Witness Publ., Inc.*, 991 F.3d 231, 254 (D.C. Cir. 2021) (Silberman, J., dissenting) ("Nearly all tel-

---

[10]    https://broadbandbreakfast.com/its-how-owners-run-their-stations-not-how-many-owners-that-matters/.

*See In re Application of WNAL-TV, Inc.*, 13 FCC Rcd 10070, 21618 (M.M.B. 1997) (approving license transfer where "Paxson's common control would occur at a level above the day-to-day management to ensure that each station maintains its editorial independence.").

evision—network and cable—is a Democratic Party trumpet."). Conversely, if one owner commits to hosting balanced programming that reflects multiple viewpoints, like PBS when both Bill Moyers and William F. Buckley hosted talk shows, then viewpoint diversity is realized.

As the Center introduced into the record below, Nexstar has an admirable record of running its properties in ways that protect viewpoint diversity. In its applications, Nexstar committed to "unbiased, fact-based reporting" on its stations—a value the Commission underscored recently. *See In re FCC Approves Skydance / Paramount (CBS) Transaction*, 40 FCC Rcd 5689, 5714 (2025). Nexstar contrasted the local news in which it invests with the content offered by social media sites, which (according to the applications) "do not employ journalists who cultivate sources and verify information" but instead have "varying degrees of reliability" reinforced by algorithms and content moderation polices "that result in echo chambers rather than the dissemination of fact-based news." *Accord In re Restoring Internet Freedom*, 33 FCC Rcd 311, 469 (2018) ("hosting services, social media platforms, edge providers, and other providers of virtual Internet infrastructure are more likely to block content on viewpoint

grounds."). In reality, that translates into Silicon Valley's selective censorship of conservatives. *Id.* at 469, n.983 (listing examples). As Nexstar said in its applications: "At a time when political bias is rampant and opinion too frequently masquerades as news, the need for the trustworthy news and information provided by the broadcast stations ... has never been greater."

Amen to that. In contrast to overtly partisan media, Nexstar's commitment to "unbiased, fact-based reporting" is a breath of fresh air.

Nexstar's commitment to unbiased, fact-based reporting is seen in its management of its NewsNation cable channel. Though cable channels do not have the same public-interest obligations as broadcasters, Nexstar has run NewsNation with a straight approach to news and balanced commentary.

Multiple times in the past several months, the Media Research Center has praised NewsNation for its programming. For instance, in October 2025 NewsNation hosted a town hall program in the same time slot as a CNN town hall. The CNN program featured Senator Bernie Sanders and Congresswoman Alexandria Ocasio-Cortez for "an extended infomercial

for socialism in America."[11] At that same time, NewsNation hosted "a robust debate with a parade of guests spanning both age and the political spectrum. Imagine that. A respectful but rigorous exchange of ideas featuring those left, right, and center about what ails the country and the need to both think critically and engage outside our partisan bubbles and media ecosystems. At its most fundamental core, that is what journalism should be."[12] The town hall featured multiple speakers, including conservatives like Rep. Jim Jordan, Border Czar Tom Homan, and HHS Secretary Robert F. Kennedy Jr., along with Democrats like Sen. John Fetterman and Rep. Ro Khanna, and independent former senator Joe Manchin. And the balanced, thoughtful, civil program drew "big ratings" from viewers.[13]

---

[11] Jorge Bonilla, *CNN's Shutdown 'Town Hall' Was Mostly an Infomercial for Socialism*, MRC (Oct. 16, 2025), https://newsbusters.org/blogs/nb/jorge-bonilla/2025/10/16/cnns-shutdown-town-hall-was-mostly-infomercial-socialism.

[12] Curtis Houck, *Balanced and Insightful: Wednesday's Real Town Hall Was on NewsNatio*n (Not CNN), MRC (Oct. 16, 2025), https://newsbusters.org/blogs/nb/curtis-houck/2025/10/16/balanced-and-insightful-wednesdays-real-town-hall-was-newsnation.

[13] Curtis Houck, *NewsNation Secures Big Ratings for Novel Concept: Civil Discourse at a Town Hall,* MRC (Nov. 4, 2025), https://newsbusters.org/blogs/nb/curtis-houck/2024/11/04/newsnation-secures-big-ratings-novel-concept-civil-discourse-town.

NewsNation features hosts from a variety of backgrounds and viewpoints, including both Fox News Channel alumnus Leland Vittert and CNN alumnus Chris Cuomo as hosts. The Center placed this information in the record for the Commission's consideration. *See* Media Bureau Order at n.34 (citing the Center's conclusion: "the applications evidence Nexstar's core commitment to the public interest in viewpoint diverse programming and unbiased, fact-based news.").

A variety of voices and down-the-middle news is the goal for local broadcasting: unbiased and fact-based. That's what Nexstar has delivered on NewsNation. It reflects the same ethos that pervades Nexstar's local newsrooms, and it previews what Nexstar promised to bring to managing additional local newsrooms. CPAC and Newsmax's concerns about Nexstar squelching viewpoint diversity, alternative conservative voices, is not borne out by the record—NewsNation in recent months hired as hosts Katie Pavlich and Batya Ungar-Sargon, which is not the action of a company looking to exclude conservative views.

23

## CONCLUSION

The Media Bureau's order should not be stayed. For the reasons laid out by the FCC and Nexstar, there is no justification to short-circuit full agency review of the bureau order. And as this brief explains, along with those briefs, the petitioners are unlikely to succeed on the merits.

Respectfully submitted,

/s/ Daniel R. Suhr
Daniel R. Suhr
Center for American Rights
1341 W. Fullerton Ave. Suite 170
Chicago, Illinois 60614
414.588.1658
dsuhr@americanrights.org

**CERTIFICATES**

This brief is 2,960 words from the Statement of Amicus' Interest through the conclusion, and is written in Century Schoolbook font, size 14. This brief is served on all petitioners via CM/ECF.[14]

/s/ Daniel R. Suhr

---

[14] Federal Rule of Appellate Procedure 25(a)(5) limits amicus briefs to half the length of a party's principal briefs "during a court's initial consideration of a case on the merits." No rule provides a word limit for amicus briefs on motions. Here, the amicus brief of CPAC is 2,790 words, and the amicus brief of Commissioner O'Rielly is 5,591 words, both of which also exceed half the limit on the motions (5200 words).