**[NOT SCHEDULED FOR ORAL ARGUMENT]**

**No. 26-1065; 26-1062**

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————————

FREE PRESS, NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES AND TECHNICIANS—COMMUNICATIONS WORKERS OF AMERICA, THE NEWSGUILD—COMMUNICATIONS WORKERS OF AMERICA, UNITED CHURCH OF CHRIST MEDIA JUSTICE MINISTRY, INC., AND PUBLIC KNOWLEDGE,

*Appellants-Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION,

*Appellee-Respondent*.

—————————————

On Appeal from
an Order of the Federal Communications Commission,
MB Docket No. 25-331

—————————————

## REPLY OF APPELLANTS-PETITIONERS FREE PRESS ET AL.
## IN SUPPORT OF EMERGENCY MOTION TO STAY

—————————————

Gigi B. Sohn
G Squared Strategies
3503 Alton Place, NW
Washington, DC 20008

Paul R.Q. Wolfson
Kali Schellenberg
Bradley Girard
Andrew Bookbinder
Robin F. Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

*Counsel for Appellants-Petitioners*

**TABLE OF CONTENTS**

GLOSSARY OF ABBREVIATIONS ................................................................ ii

INTRODUCTION ...........................................................................................1

ARGUMENT ..................................................................................................2

I.    The Court has jurisdiction to grant the relief requested. ...............................2

II.    The Public Interest Appellants are likely to succeed on the merits. ..............4

    A.    The Bureau did not have authority to decide this matter, especially without a hearing. ................................................4

    B.    The Bureau and the Commission lack authority to waive the National Cap. ...............................................................6

    C.    The Bureau's public interest analysis and waiver of the national and local ownership rules was arbitrary and capricious. .......................................................................7

III.    The remaining factors favor a stay. ................................................9

    A.    The Bureau's decision will irreparably harm Appellants. ...................9

        1.    The merger constitutes irreparable harm. .................................9

        2.    Public Interest Appellants' harm is both certain and great. ................................................................10

    B.    The balance of equities favors Appellants. ...................................11

CONCLUSION ..............................................................................................12

CERTIFICATE OF COMPLIANCE .....................................................................

CERTIFICATE OF SERVICE ..............................................................................

## GLOSSARY OF ABBREVIATIONS

Abbreviation | Definition
--- | ---
App. | Appendix
CAA | Consolidated Appropriations Act of 2004, Public Law No. 108-199
CWA | Communications Workers of America
FCC | Federal Communications Commission

**INTRODUCTION**

For the first time since Congress enacted a national-audience cap (National Cap) in 2004, the Commission waived it to permit the largest broadcast television merger in U.S. history. It did so while its authority to do so is the subject of ongoing rulemaking. And it attempted to shield that decision from judicial review by shunting it to a Bureau confined to routine matters and withholding Commission review while the merging parties hurtle toward integration. But the Bureau's order is patently a Commission decision. Agencies cannot immunize from judicial review major regulatory determinations by delegating them to inferior officers and dallying on review.

According to the Commission, Congress left it free to modify the National Cap as it sees fit. In fact, Congress enacted several provisions to take back the National Cap question for itself and remove it from the Commission's regulatory agenda. Congress's intent is clear:  The Commission has no authority to waive the National Cap.

Even setting that dispositive defect aside, the Order cannot stand. The Bureau overstepped its bounds by making other novel determinations, like radically expanding product market definitions, while also abdicating its fact-finding responsibility by uncritically accepting Nexstar's unsupported claims in disregard of

the record and without a hearing. The Bureau's order is profoundly flawed and should be stayed pending appeal.

## ARGUMENT

### I.    The Court has jurisdiction to grant the relief requested.

Congress gave this Court jurisdiction to review "decisions [or] orders of the Commission" on "an application for authority to transfer" broadcast licenses, and to grant temporary relief from such actions when "just and proper." 47 U.S.C. § 402(b)-(c). Such relief is justified, indeed imperative, here, where the Order has "the same force and effect" as a Commission decision, *see id.* § 155(c)(3), and Nexstar and TEGNA are combining operations in a manner that may be impossible to unwind.

Nexstar argues that the Order is not an "order[] of *the Commission*," Nexstar Opp'n 11, but it bears obvious indicia of the Commission's approval. The Commission instantly issued a press release commending it and characterizing it as an "agency decision." App.671; *see* NOA 6. Although Appellants immediately requested Commission review and an emergency stay, the Commission has failed to act. And tellingly, the Commission's Opposition gives no indication that it is reviewing the Order, much less with urgency.

Where, as here, the agency's "actions suggest" that it "has made up its mind," the agency cannot "avoid judicial review by holding out a vague prospect of reconsideration." *Friedman v. FAA*, 841 F.3d 537, 543 (D.C. Cir. 2016). This is

particularly so where "exigent circumstances render" an agency's "failure to act …

equivalent to a final denial" and threaten "irreparable injury," and "administrative

inaction has precisely the same impact on the rights of the parties as denial of relief."

*Envtl. Def. Fund, Inc. v. Hardin*, 428 F.2d 1093, 1098-99 (D.C. Cir. 1970).

Nexstar argues that this appeal is premature because the Commission has not

reviewed the Order. Nexstar Opp'n 12. But Appellants' emergency requests are

before the Commission, and the Commission's inaction confirms that it is happy to

allow the merger to proceed. Indeed, Nexstar emphasizes that the Order has the same

effect as a Commission decision, Nexstar Opp'n 11-12, and, relying on that fact,

Nexstar and TEGNA are combining operations. Yet, Nexstar and the Commission

also insist that Appellants, the public, and this Court stand by for a formal

Commission decision. This Court is not bound to such a wooden conception of

agency review.

In any event, this Court "has inherent power under the All Writs Act to stay

agency action ... to preserve its prospective jurisdiction." *In re NTE Conn., LLC*, 26

F.4th 980, 987 (D.C. Cir. 2022) (citation and quotations omitted) (staying agency

order, even though agency had not acted on application for rehearing); *see* FCC

Opp'n 2 n.1. Nexstar contends that "Appellants have not shown a clear and

indisputable right to immediate Commission action," and have "other adequate

means to attain relief," Nexstar Opp'n 13 (citations omitted). But "[w]hen an

3

agency's order is 'not yet final, [such that] no direct appeal from it yet [lies], and a stay pending appeal [is] not available to prevent irreparable injury,' the aggrieved party lacks an adequate statutory remedy," and the Court can grant emergency relief. *In re NTE Conn.*, 26 F.4th at 987.

Here, absent relief from this Court, Nexstar and TEGNA will continue to integrate, with irreparable harm to Appellants and the public. And under Nexstar's view, because the Commission has not acted on Appellants' application and motion, Appellants are "precluded from petitioning for direct judicial review of the [O]rder or a judicial stay pending such review." *Id.* This "satisfie[s] the preliminary condition distinctive to All Writs relief," *id.* (citation and quotations omitted), and Appellants additionally satisfy the requirements for a stay pending appeal.

## II.  The Public Interest Appellants are likely to succeed on the merits.

### A.    The Bureau did not have authority to decide this matter, especially without a hearing.

The Media Bureau's authority is limited to deciding "minor or routine or settled" matters. 47 C.F.R. § 0.5(c). Here, the Bureau approved the largest broadcast television merger in U.S. history, under a purported power the Commission has never before exercised, while radically altering the market previously considered relevant by the Commission.

The Commission maintains (Opp'n 10) that it previously concluded that it has the power to waive the National Cap, but since 2004, the Commission has never

done so, and it has an open rulemaking in which that authority is a central question. *See* 83 Fed. Reg. 3661, 3662 (2018). Further, in the past, the Commission has considered broadcast television to be a distinct product market, *2018 Quadrennial Review Order*, 38 FCC Rcd 12782, 12822-23 (2023), explicitly rejecting competition with streaming or online video advertising. How broadcasters *collectively* compete against streaming, social media, and "200 million active websites," App.13, and whether the existing regulatory regime should be revised wholesale to consider those product markets, are "novel questions of law, fact or policy" that the Bureau may not resolve. 47 C.F.R. § 0.283(c).

Compounding its errors, the Bureau acted without holding a hearing to resolve disputed issues of fact. The Commission argues (Opp'n 18-20) that the Bureau could do so because it decided as a policy matter that the transaction would benefit the public interest. But Congress's hearing requirement in 47 U.S.C. § 309(e) is not so easily evaded. Central to the Bureau's public-interest conclusion was its determination that the transaction would advance localism, based on Nexstar's assertions of prior investments in local programming and promises to do likewise in the future. *See* App.3, 33-34. But the Bureau reached that conclusion based *entirely* on a letter from Nexstar to the Commission Chair, App.667-70, that was filed on the docket *the day of its decision*, *id.* at 3 n.5, 33 n.253, and was not previously disclosed to the public under the Commission's "permit-but-disclose" rules for *ex parte*

5

communications, 47 C.F.R. § 1.1206; *see* App.4. The Bureau thus failed to engage in meaningful fact-finding (and so deserves no deference) and deprived objecting parties of the opportunity to contest Nexstar's claims. Contrary record evidence showed that consolidations—including those involving Nexstar—result in *less* local coverage, as locally originated news reporting is replaced by coverage repeated across stations and, inevitably, fewer broadcasting jobs. *See* App.446-48, 453, 456-71; *see also* 38 F.C.C. Rcd. 1282 (2023) (issues of labor harm sufficient for hearing). The Bureau's shortcuts cannot be papered over by characterizing them as "public interest" determinations owed deference, *contra* FCC Opp'n 20.

**B.    The Bureau and the Commission lack authority to waive the National Cap.**

Because the Bureau's authority is limited to "minor or routine or settled" matters, 47 C.F.R. § 0.5(c), it had no power to waive the National Cap. Nor does the Commission. The Commission's argument that it may waive the National Cap boils down to the argument that, despite all its actions, *see* Mot. 11-12, Congress did not *also* say, "The Commission may not alter this cap." But Congress need not incant "magic words" to make its intentions clear. *Kennedy v. Braidwood Mgmt., Inc.,* 606 U.S. 748, 780 (2025). Here, the statutory text shows that Congress permanently took the ability to modify the National Cap away from the Commission and off its regulatory agenda.

The Commission suggests that Congress would not have frozen the National Cap at 39 percent given the "dynamic nature of the broadcast market," Opp'n 12; *see* App.16-17. But Congress understood in 2004 that broadcasting was dynamic, and yet it was alarmed by the Commission's decision to raise the National Cap by ten percentage points. *See* Amicus Br. Michael O'Rielly at 8-11. Congress concluded that such a major decision, affecting a dramatic change in broadcasting, should be its to make.

### C. The Bureau's public interest analysis and waiver of the national and local ownership rules was arbitrary and capricious.

The Commission's defense of the Bureau's waiver determinations merely parrots the Bureau's analysis. But because the Bureau did not engage in meaningful fact-finding, and repeatedly ignored evidence that does not support its conclusion, *Genuine Parts Co. v. EPA*, 890 F.3d 304, 313 (D.C. Cir. 2018), did not consider important aspects of the problem, *Motor Vehicle Mfrs. Ass'n of the U. S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and provided insufficient reasoning in support of its conclusions, *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 603 (D.C. Cir. 2017), its determination is arbitrary and capricious.

1. The Bureau's public interest analysis rests on uncritical acceptance of Nexstar's assertions—made in a letter filed the day of the Bureau's decision—rather than reasoned evaluation of the entire record or the consolidation effects of this merger. In concluding that petitioners failed to show harm to local news markets, the

7

Bureau recited Nexstar's account of its increased local news coverage post-merger, App.29 ¶ 68, while ignoring contrary record evidence showing that Nexstar is notorious for airing duplicative content across stations. *See* App.452 n.140. The Bureau also concluded—without analysis—that Nexstar's time-limited commitments, App.32–33 ¶ 82, outweighed record evidence of structural harms to employment and local news functions that would persist well beyond two years. *See* App.446–47; App.456–71; App.376–81.

More fundamentally, the Bureau failed to meaningfully examine the effects of the unprecedented consolidation this merger would cause, despite record evidence that such consolidation predictably leads to centralized programming, job cuts, and increased retransmission rates. App.447–56. By relying on generalized conclusions instead of analyzing the merger's market-specific consolidation effects, the Bureau failed to consider an important aspect of the problem. *See State Farm*, 463 U.S. at 43; *AEP Tex. N. Co. v. STB*, 609 F.3d 432, 441 (D.C. Cir. 2010).

2. Even though viewpoint diversity is a central pillar of the public interest analysis, *see FCC v. Prometheus Radio Project,* 592 U.S. 414, 418 (2021), the Order discussed it in a single paragraph, App.32 ¶ 81, and the Commission's brief does not address it at all. Instead of analyzing it, the Bureau simply quoted a party *supporting* the merger to conclude the merger will not diminish viewpoint diversity. App.32 ¶ 81. That conclusion is at odds with the record, including evidence that Nexstar has

routinely closed newsrooms and cut journalists after its prior mergers, as it did after acquisitions of stations in Little Rock, Las Vegas, Denver and Des Moines. App.463-465. Reducing the number of competing voices and reporters is the opposite of promoting and sustaining viewpoint diversity. *See FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 797 (1978) (crediting determination that commonly owned entities are unlikely to promote viewpoint diversity).

## III. The remaining factors favor a stay.

### A.    The Bureau's decision will irreparably harm Appellants.

Rather than substantively address Public Interest Appellants' irreparable harm, the Commission and Nexstar merely stand on the Order, which in turn relies on Nexstar's self-serving letter as proof of the merger's public benefits. But the Bureau did not grapple with the evidence of harm that Public Interest Appellants raised, including the merger's impact on jobs, active and ongoing labor negotiations, pay-TV prices, and Nexstar's history of duplicate programming displacing local news—all of which may be irremediable, and judicial review rendered illusory, if integration is fully consummated.

### 1.    The merger constitutes irreparable harm.

The Commission and Nexstar argue that the merger is insufficiently "irreversible" to establish irreparable harm, suggesting that if this Court eventually reversed the Commission, the merger could then be unwound. FCC Opp'n 22; Nexstar Opp'n 6. That argument is divorced from reality. This Court and others have

9

noted the serious difficulties in unwinding corporate mergers once the "commingling of assets" begins. *FTC v. Exxon Corp.*, 636 F.2d 1336, 1342 (D.C. Cir. 1980); *see Consol. Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 261 (2d Cir.), *amended*, 890 F.2d 569 (2d Cir. 1989) ("[O]nce the tender offer has been consummated it becomes difficult, and sometimes virtually impossible, for a court to 'unscramble the eggs.'"); *FTC v. Penn State Hershey Med. Ctr.,* 838 F.3d 327, 352-53 (3d Cir. 2016) (preliminary injunction warranted because divestiture could not sufficiently "unscramble the egg"). Here, divestiture would involve separating the merger of two entities already at the 39% cap, dividing up a new massive conglomeration that will reach over 80% of all U.S. television households. Mot. 2-3. The unfounded speculation that divestitures could successfully be ordered in such circumstances— which further assumes without basis that someone would want to acquire the available assets—warrants no credit.

### 2. Public Interest Appellants' harm is both certain and great.

Many of CWA's labor agreements are currently in, or about to enter, collective bargaining, and the merger has already created less favorable negotiating conditions—harms compounded because contracts negotiated under such conditions set the baseline for future agreements. *See* App.735-36 ¶¶ 7-13; App.738-39 ¶ 20. Nexstar has further indicated it will consolidate production departments where it owns multiple stations, leading to layoffs that harm workers directly and weaken the

10

union's bargaining position. *See* App.736 ¶ 14; App.737 ¶ 17; App.740-41 ¶ 24. Additionally, the displacement of local news resulting from Nexstar's "synergies," *see* App.746 ¶ 7, and the increase in retransmission fee costs that will be passed along, harm the missions of the public interest nonprofits: driving up their costs, frustrating their work, reducing local election coverage heading into an election period, and cutting off vital avenues and platforms for the nonprofits to engage in advocacy. App.576 ¶ 5; App.584-585 ¶ 10; App.590 ¶¶8-9; App.602 ¶¶ 6-7; App.746-47 ¶¶ 9-10. The Bureau failed to engage in any fact-finding on these matters, instead relying on Nexstar's self-serving letter, which came in the day of the decision–showing that the Bureau did not dig into the underlying facts at all.

### B.    The balance of equities favors Appellants.

The Commission and Nexstar turn the equitable and the public interest factors upside down, arguing that this unprecedented approval process moving at breakneck pace cannot be delayed because to do so would "needlessly delay the realization of ... substantial public interest benefits," FCC Opp'n 24, and "pause 'Nexstar's commitments to increase the amount and availability of local programming," Nexstar Opp'n 23. But the Commission normally needs 180 days to decide applications for transfers and Nexstar and TEGNA's merger agreement accounted for a closure date as far out as November 2026. Given the momentous stakes at issue,

11

a temporary stay that would maintain the status quo is proper here. *See Prometheus Radio Project v. FCC,* 2003 WL 22052896, at *1 (3d Cir. Sept. 3, 2003).

## CONCLUSION

The Court should stay the Order pending disposition of this appeal.

Respectfully submitted,

| | |
|---|---|
| Gigi B. Sohn | s/ *Paul R.Q. Wolfson* |
| G Squared Strategies | Paul R.Q. Wolfson |
| 3503 Alton Place, NW | Kali Schellenberg |
| Washington, DC 20008 | Bradley Girard |
| | Andrew Bookbinder |
| | Robin F. Thurston |
| | Democracy Forward Foundation |
| | P.O. Box 34553 |
| | Washington, DC 20043 |
| | (202) 448-9090 |

*Counsel for Appellants-Petitioners*

March 27, 2026

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and D.C. Circuit Rule 32(e) because it contains 2,596 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(a)(1).

2. This brief complies with Federal Rule of Appellate Procedure 32(a)(5)'s typeface requirements and Federal Rule of Appellate Procedure 32(a)(6)'s typestyle requirements because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

March 27, 2026

s/ *Paul R.Q. Wolfson*
Paul R.Q. Wolfson

## CERTIFICATE OF SERVICE

I certify that, on March 27, 2026, I electronically filed this reply with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

s/ *Paul R.Q. Wolfson*

Paul R.Q. Wolfson